

**FILED**

**MAY 3 0 2019** *kb*

**THOMAS G. BRUTON**
**CLERK, U.S. DISTRICT COURT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No.   19 CR 322 |
| | ) | |
| v. | ) | Violations: Title 18, United States |
| | ) | Code, Sections 666(a)(1), 666(a)(2), |
| EDWARD M. BURKE, | ) | 1001(a)(2),   1951(a),   1952(a)(3), |
| PETER J. ANDREWS, and | ) | 1962(c) and 2 |
| CHARLES CUI | ) | |
| | ) | **SUPERSEDING INDICTMENT** |

**JUDGE DOW**
**MAGISTRATE JUDGE COLE**

## COUNT ONE

THE SPECIAL DECEMBER 2017 GRAND JURY charges:

1.     At times material to this superseding indictment:

### Relevant Entities and Individuals

a.     The City of Chicago was a unit of local government known as a municipal corporation, and a political subdivision of the State of Illinois.  The City of Chicago annually received in excess of $10,000 in federal benefits in the following calendar years: 2016, 2017, and 2018.

b.     The City of Chicago's legislative branch of government was the Chicago City Council (the "City Council"), which was comprised of fifty City Council members, each of whom represented one of Chicago's fifty wards, and who were also known as Aldermen.   The Aldermen were compensated and publicly elected.   It was one of the functions of Aldermen to provide or withhold their support for real estate development projects proposed for land in their respective wards, which support or non-support was instrumental in securing necessary governmental action or inaction relating

to the proposed projects, as well as the assistance or non-assistance of third parties concerning the projects.

        c.    The City Council maintained a Committee on Finance, which exercised legislative powers pertaining to the City of Chicago's finances. The Committee on Finance's powers included making recommendations to the full City Council on whether to approve tax increment financing ("TIF") and "Class L" designations. TIF was a special funding tool used by the City of Chicago to promote public and private investment across the City. A Class L designation was a special real estate tax assessment classification in Cook County that was designed to encourage the preservation and rehabilitation of landmark commercial, industrial not-for-profit, and multi-family residential buildings. If a property was designated as "Class L," owners could have their property tax assessment levels reduced for a period of years, provided they met certain investment and other requirements. Individuals or entities seeking to obtain TIF funds or Class L designation had to submit an application, which would be referred to the Committee on Finance for review. If approved by the Committee on Finance, the application would be submitted to the full City Council for a vote.

        d.    The City Council maintained a Committee on Zoning, Landmarks & Building Standards, which exercised legislative powers pertaining to land use in the City of Chicago, including the approval of zoning changes and other authorizations required for real estate development projects.

        e.    The City of Chicago Department of Buildings was an agency of the City of Chicago. The Department of Buildings issued building permits and sign permits

in the City of Chicago. Commissioner C was the Commissioner for the Department of Buildings.

      f.     The City of Chicago Department of Planning and Development was an agency of the City of Chicago. Among other things, the Department of Planning and Development ensured that building permits complied with the Chicago Zoning Ordinance. Administrator C was the Zoning Administrator for the Department of Planning and Development.

      g.     Defendant EDWARD M. BURKE was Alderman of the Fourteenth Ward in Chicago, a member of the City Council, and Chairman of the Committee on Finance. As Chairman of the Committee on Finance, BURKE had authority over which matters would be considered by that Committee. BURKE was an employee and agent of the City of Chicago, and was paid a salary by the City of Chicago. BURKE's Aldermanic office was located within City Hall, which was located at 121 North LaSalle Street, in Chicago.

      h.     BURKE was admitted to practice law in Illinois and was the proprietor of a private law firm, Klafter & Burke, which specialized in contesting tax assessments made on real property and seeking reductions in such tax assessments for the firm's clients.

      i.     Company A was a New York-based real estate company that, among other things, was involved in the renovation and redevelopment of the Old Chicago Post Office located in the vicinity of the Eisenhower Expressway and South Canal Street in Chicago, Illinois (the "Post Office project"). Individual A-1 was associated with

Company A and was involved in overseeing and managing the Post Office project. Individual A-2 was an employee of Company A. A limited liability company affiliated with Company A was the owner of the Post Office property.

      j.    Alderman A was Alderman of the Twenty-Fifth Ward in Chicago and Chairman of the Committee on Zoning, Landmarks & Building Standards. As Chairman of the Committee on Zoning, Landmarks & Building Standards, Alderman A had authority over which matters would be considered by that Committee. Alderman A was an employee and agent of the City of Chicago, and was paid a salary by the City of Chicago. Alderman A's Aldermanic office was located within City Hall. The Post Office project was located within Alderman A's ward. Unbeknownst to BURKE and others, Alderman A was cooperating with the Federal Bureau of Investigation, and acted at the direction of law enforcement in connection with BURKE's efforts to obtain business for his private law firm from Company A.

      k.    The National Railroad Passenger Corporation (commonly known as "Amtrak") was a corporation established by an Act of the United States Congress to provide passenger rail service to the public. Amtrak owned and operated Union Station, a railroad terminal station located in Chicago, Illinois, together with the railroad tracks and rights of way adjacent to Union Station. Some of Amtrak's property was near the Post Office property. Individual A-3 was an employee of Amtrak.

      l.    The City of Chicago Department of Water Management (the "Water Department") was an agency of the City of Chicago, headed by an individual known as

the Commissioner of the Water Department (the "Water Commissioner"). Individual A-4 was a former Water Commissioner.

        m.     Company B was an Illinois corporation with its principal office in Texas that operated fast food restaurants, including restaurants located in the Chicago metropolitan area, and was affiliated with a company that operated fast food restaurants throughout the country. Individual B-1 and Individual B-2 were executives of Company B.

        n.     PETER J. ANDREWS worked for BURKE in BURKE's Fourteenth Ward office.

        o.     Company C was a limited liability company which owned the property located at 4901 West Irving Park Road in Chicago, Illinois (the "4901 Property"), which was located in an area outside of BURKE's ward.

        p.     CHARLES CUI was the managing member of Company C, graduated from a law school located in Chicago, was admitted to practice law in Michigan, and operated his own law firm.

        q.     Individual C-1 was associated with a real estate consulting and project management firm in Chicago.

        r.     Individual C-2 was a real estate attorney located in Park Ridge, Illinois.

        s.     Company D was a retailer with multiple retail outlets in the Chicagoland area. Company D had contracted with Company C to operate a retail outlet at the 4901 Property.

.t.     Museum 1 was a charitable organization and educational institution that hosted exhibitions and other programs open to the public.   Museum 1 was located on property owned by the Chicago Park District, a unit of local government known as a municipal corporation.   The duties of the Chicago Park District and its Board of Commissioners (the "Park District Board") included approving any changes to the basic admission fees charged by Museum 1.   Individual E-1 was the child of a personal acquaintance of BURKE.   Individual E-2 was an employee at Museum 1, and Individual E-3 was an executive at Museum 1.

### Municipal Law: Ethics Ordinance

u.     There was in force and effect an ethics ordinance for the City of Chicago.   Among other things, Section 2-156-018 of the ethics ordinance required every city official to report, directly and without undue delay, to the City's Inspector General or Legislative Inspector General any and all information concerning conduct which was known, or should have been reasonably known, to involve corrupt or other unlawful activity.   Section 2-156-030 of the ethics ordinance provided in pertinent part as follows:

**2-156-030.   Improper influence**

(a)     No official or employee shall make, participate in making or in any way attempt to use his position to influence any city governmental decision or action in which he knows or has reason to know that he has any financial interest distinguishable from its effect on the public generally, or from which he has derived any income or compensation during the preceding twelve months or from which he reasonably expects to derive any income or compensation in the following twelve months.

(b)     No elected official, or any person acting at the direction of such official, shall contact either orally or in writing any other city official or employee with respect to any matter involving any person with whom the elected official has any business relationship that creates a financial interest on the part of the official, or the domestic partner or

6

spouse of the official, or from whom or which he has derived any income or compensation during the preceding twelve months or from whom or which he reasonably expects to derive any income or compensation in the following twelve months. In addition, no elected official may participate in any discussion in any city council committee hearing or in any city council meeting or vote on any matter involving the person with whom the elected official has any business relationship that creates a financial interest on the part of the official, or the domestic partner or spouse of the official, or from whom or which he has derived any income or compensation during the preceding twelve months or from whom or which he reasonably expects to derive any income or compensation in the following twelve months.

**State Law: Acts Involving Bribery**

v.      There was in force and effect felony criminal statutes of the State of Illinois which were punishable by imprisonment for more than one year, including the bribery statute, Chapter 720 Illinois Compiled Statutes, § 5/33-1(a), (d)-(e); the Illinois Official Misconduct statute, Chapter 720 Illinois Compiled Statutes, § 5/33-3(a)(4); and the Attempt statute, Chapter 720 Illinois Compiled Statutes, § 5/8-4, that prohibited an attempt to commit an offense, including bribery.

These statutes provided in pertinent part:

**Section 33-1.   Bribery**

A person commits bribery when:

(a)      With intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he or she promises or tenders to that person any property or personal advantage which he or she is not authorized by law to accept; or

(d)      He or she receives, retains or agrees to accept any property or personal advantage which he or she is not authorized by law to accept knowing that the property or personal advantage was promised or tendered with intent to cause him or her to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness; or

7

(e)    He or she solicits, receives, retains, or agrees to accept any property or personal advantage pursuant to an understanding that he or she shall improperly influence or attempt to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness.

### Section 33-3.    Official Misconduct

(a)    A public officer or employee or special government agent commits misconduct when, in his official capacity or capacity as a special government agent, he or she commits any of the following acts:

(4)    Solicits or knowingly accepts for the performance of any act a fee or reward which he knows is not authorized by law.

### Section 5/8-4.    Attempt

(a)    Elements of the offense.    A person commits the offense of attempt when, with intent to commit a specific offense, he or she does any act that constitutes a substantial step toward the commission of that offense.

## Federal Law:    Extortion and Use of
## Interstate Facility in Aid of Unlawful Activity

w.    There was in force and effect a federal statute, Title 18, United States Code, Section 1951, which prohibited extortion, attempted extortion, and conspiracy to commit extortion affecting commerce either through the wrongful use of actual and threatened fear of economic harm or under color of official right or both.

x.    There was in force and effect a federal statute, Title 18, United States Code, Section 1952, which prohibited the use of any facility in interstate commerce in aid of unlawful activity, including extortion and bribery in violation of the laws of the United States and the State of Illinois.

8

## I.   THE ENTERPRISE

2.     At times material to this indictment, the City of Chicago, including its agencies, offices, and legislative branch, was an "enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), which was engaged in, and the activities of which affected, interstate and foreign commerce.

## II.   THE RACKETEERING VIOLATION

3.     Beginning no later than in or around 2016, and continuing through in or around 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

EDWARD M. BURKE,

defendant herein, being a person employed by and associated with an enterprise, that is, the City of Chicago, which enterprise engaged in, and the activities of which affected interstate and foreign commerce, unlawfully and knowingly conducted and participated, directly and indirectly, in the conduct of the affairs of the City of Chicago through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and (5), through the commission of the racketeering acts set forth in paragraph 84 below.

## III.   MANNER AND MEANS OF THE RACKETEERING VIOLATION

4.     Defendant EDWARD M. BURKE used his positions as Alderman and Chairman of the Committee on Finance to solicit and receive from persons and parties having business with the City of Chicago, or otherwise subject to the authority and powers vested in BURKE and Alderman A as Aldermen, bribes and unlawful personal

9

financial advantage in the form of fees arising from the retention of his law firm, Klafter & Burke, as well as private benefits for BURKE's personal associates.

### Corrupt Solicitation of Company A
### in Connection with the Post Office project

5.      BURKE corruptly solicited legal business from Company A and Individual A-1 for BURKE's law firm, Klafter & Burke, in return for BURKE's official assistance concerning the redevelopment of, and financing concerning, the Post Office project, a development project located in Alderman A's ward.

6.      On or about August 26, 2016, BURKE asked Alderman A to recommend BURKE's law firm, Klafter & Burke, to Individual A-1 to do tax work for Company A. Alderman A agreed to do so, and BURKE suggested to Alderman A that he and Alderman A could then talk about a "marketing arrangement" from BURKE in return for securing Company A as a client for BURKE's firm.

7.      On or about September 26, 2016, while meeting with BURKE in BURKE's office at City Hall, BURKE asked Alderman A to set up a meeting with Individual A-1 so that BURKE could solicit business for his law firm, Klafter & Burke, from Individual A-1. Alderman A asked about the marketing arrangement BURKE had mentioned earlier, and BURKE advised that he was a "believer in sharing the wealth."

8.      On or about October 27, 2016, BURKE and Alderman A met with Individual A-1 and Individual A-2 in Alderman A's office at City Hall. During the meeting, BURKE solicited tax work for his firm, Klafter & Burke. In addition, Individual A-1 discussed various issues faced by the Post Office project, including

10

problems with Amtrak. BURKE assured Individual A-1 that there weren't "too many people around town that we don't know." After Individual A-1 departed the meeting, Alderman A asked BURKE about the marketing arrangement BURKE had mentioned earlier, and BURKE encouraged Alderman A to refer additional clients to BURKE's firm.

9.      On or about November 7, 2016, BURKE met with Alderman A in BURKE's City Hall office and discussed the possible retention of BURKE's firm, Klafter & Burke, by Company A. Alderman A advised BURKE that Alderman A intended to remind Individual A-1 that Individual A-1 needed "a lot of approvals" concerning the Post Office project, and that Alderman A believed that Alderman A could get Individual A-1 to hire BURKE's firm. BURKE responded, "Good." Alderman A asked how Alderman A would be paid by BURKE for bringing in clients to BURKE's law firm. BURKE advised Alderman A that if Alderman A received a percentage payment of BURKE's fee, the payment would have to be made indirectly to Alderman A through a lawyer or alternatively, Alderman A would be paid as a "marketing representative" on an hourly basis.

10.     On or about December 12, 2016, Alderman A told BURKE, as a ruse and at the direction of law enforcement, that Individual A-1 understood that, so long as BURKE and Alderman A helped Individual A-1 with necessary permits needed for the Post Office project, and BURKE assisted with issues concerning Amtrak, Individual A-1 would retain BURKE's law firm, Klafter & Burke. BURKE responded, "Okay, great."

11.    On or about December 22, 2016, BURKE met with Alderman A and reviewed information BURKE had obtained from Individual A-3, an Amtrak employee, concerning access to Amtrak property near the Post Office that was necessary for the completion of redevelopment work on the Post Office project.    BURKE advised Alderman A that Individual A-3 could be "worked with," but that up until that point in time, Individual A-3 had no reason to do any favors for the developer of the Post Office project.    BURKE noted BURKE had not been hired yet by Company A, and that Company A had additional properties in the Chicago area.    BURKE also communicated his belief that Individual A-1 and Company A would hire BURKE's private law firm, Klafter & Burke, to perform tax work only if there was something BURKE could do to assist Individual A-1 and Company A, by explaining that BURKE believed that they would otherwise only work with Jewish lawyers to the exclusion of everybody else.

12.    On or about January 25, 2017, BURKE advised Alderman A that BURKE would not take any action benefitting Individual A-1 and Company A in connection with the Post Office project unless Individual A-1 retained BURKE's firm, Klafter & Burke, and told Alderman A that "the cash register has not rung yet."

13.    On or about March 9, 2017, Alderman A advised BURKE that the developer of the Post Office project needed assistance with obtaining the "sign off" of the Water Commissioner on an issue concerning the Post Office project, and that if BURKE and Alderman A could assist with the Water Commissioner, "we should be able to get the tax work and maybe get my consulting from you."    BURKE said, "Good," and agreed to look into the matter.

12

14.     In or around March 2017, BURKE caused Individual A-4, a former Water Commissioner, to contact the Water Commissioner for the purpose of resolving the water service problem concerning the Post Office project.    Based on the information provided by Individual A-4, the Water Commissioner understood that there was pressure coming from City Hall to get water service established at the Post Office, and that BURKE was involved in the matter.    Thereafter, the Water Commissioner took steps to become personally involved to resolve the water service problem.

15.     On or about March 21, 2017, BURKE told Alderman A that Individual A-4 had talked to the Water Commissioner, and that while Company A could not get everything requested from the Water Department, Company A would be "comfortable" with the accommodations Company A would receive.

16.     On or about May 19, 2017, Alderman A advised BURKE that a representative of Company A's real estate management company still had a problem that needed to be resolved with the Water Department and with Amtrak concerning the Post Office project.    BURKE told Alderman A that BURKE had not heard about "getting hired to do the tax work," so BURKE was not "motivated" to provide any assistance concerning the Post Office project.

17.     On or about May 26, 2017, Alderman A told BURKE that Alderman A had spoken to Individual A-1.    BURKE asked Alderman A, "So, did we land the, uh, the tuna?"    Alderman A told BURKE that Alderman A had informed Individual A-1 that BURKE and Alderman A were not motivated to provide assistance to the Post Office project, and that Individual A-1 needed to "help Ed out."    At the direction of law

13

enforcement, Alderman A advised BURKE that Individual A-1 had agreed to provide tax work in the future to Klafter & Burke. BURKE informed Alderman A that he wanted to meet with Individual A-1, and promised Alderman A there would be a "day of accounting" for Alderman A if BURKE's firm was retained by Company A. BURKE also agreed to provide assistance to the Post Office project in that BURKE and Alderman A would follow up with the Water Department and BURKE confirmed that he would follow up with his contacts at Amtrak.

18. On or about June 19, 2017, at approximately 2:08 p.m. (Session #1368), BURKE used his cellular telephone, assigned telephone number (312) XXX-4006, to speak to Individual A-1 about the Post Office project. Individual A-1 asked for BURKE's assistance in resolving outstanding problems with Amtrak, and BURKE asked Individual A-1 to send BURKE an email of the outstanding issues, as well as the "names of the people that seem to be problems."

19. On or about June 20, 2017, Individual A-1 forwarded an email to BURKE's personal email account from Individual A-4 detailing the outstanding problems with Amtrak.

20. On or about June 22, 2017, BURKE spoke to Individual A-3 for the purpose of resolving Company A's outstanding problems with Amtrak.

21. On or about June 23, 2017, BURKE told Individual A-1 that BURKE had talked to an executive at Amtrak and that there had been a lot of progress with the issues identified by Individual A-1, and instructed Individual A-1 to let BURKE know how matters progressed.

22.     On or about August 2, 2017, Individual A-1 told BURKE and Alderman A that things were moving in the "right direction" with Amtrak.   Individual A-1 thanked BURKE for his assistance, and BURKE told Individual A-1 to keep BURKE informed of the progress with Amtrak.

23.     On or about August 25, 2017, BURKE told Alderman A that he had not heard from Company A, which BURKE expected would retain his law firm.   Alderman A told BURKE that things appeared to be going "really well" with the Post Office project, and BURKE replied, "[W]hen they get taken care of, you never hear from 'em. You only hear from 'em when it doesn't work out."

24.     On or about October 6, 2017, Alderman A advised BURKE that Company A was seeking the City of Chicago's support for TIF funds relating to the Post Office project.   As of that date, BURKE's law firm had still not been retained by Company A, and BURKE questioned why Alderman A would want to assist Individual A-1 with a request for TIF funds.

25.     On or about October 17, 2017, at Alderman A's request, Individual A-1 and others met with BURKE and Alderman A at Alderman A's office in City Hall to discuss the progress of the Post Office project.   As of that date, Company A still had not retained BURKE's law firm, Klafter & Burke.   One of the members of Individual A-1's group explained to BURKE why the Post Office project needed TIF funding.   After Individual A-1 and his group left the meeting, and BURKE and Alderman A were alone, BURKE expressed anger that his law firm had not been hired by Company A, by telling Alderman A that BURKE was not "fond of the way they've conducted themselves up

15

until this point, and as far as I'm concerned, they can go fuck themselves." Alderman A told BURKE that Alderman A had told Individual A-1 that Company A's request for TIF funding would go before BURKE's committee, the Committee on Finance, for approval. BURKE responded, "Well, good luck getting it on the agenda."

26. On or about January 18, 2018, Alderman A asked BURKE if BURKE would support Company A's request for a Class L designation, which BURKE stated had a value of approximately $100 million to Company A. BURKE confirmed that he decided what went on the agenda of the Committee on Finance, and once again complained that he had still not been hired by Individual A-1 to perform tax work, but noted being hired would "help." BURKE told Alderman A that he did not care about "these guys," and would do as Alderman A wished with respect to the financing for the Post Office project.

27. On or about February 26, 2018, the Committee on Finance passed the Class L incentive concerning the Post Office project.

28. On or about February 28, 2018, on BURKE's motion, the full City Council unanimously passed the Class L incentive concerning the Post Office project.

29. On or about August 7, 2018, at approximately 9:28 a.m. (Session #62645), BURKE used his cellular telephone, assigned telephone number (312) XXX-4006, to speak to Alderman A about the Post Office project. Alderman A advised BURKE that Alderman A had received BURKE's voicemail message, in which BURKE confirmed that a representative of Company A's real estate management company had contacted BURKE's firm to discuss hiring Klafter & Burke. Alderman A then asked BURKE if

16

he would support TIF funding for the Post Office project, and BURKE responded, "Absolutely."

30. On or about August 24, 2018, a representative of Company A's real estate management company was sent a contingent fee agreement that was signed by BURKE on behalf of Klafter & Burke. The agreement provided, among other things, that an affiliate of Company A would retain Klafter & Burke to perform real estate tax work with respect to a specific commercial property, and would pay Klafter & Burke a fee for its work, based in part on any tax reduction obtained. Klafter & Burke's fee was to be no less than $15,000 for 2018, $15,000 for 2019, and $15,000 for 2020.

31. On or about September 17, 2018, BURKE presided over a meeting of the Committee on Finance, called the Post Office TIF proposal, and asked Alderman A if Alderman A had a motion on the TIF proposal. Thereafter, the Committee on Finance voted to pass the proposal.

32. On or about September 20, 2018, the City Council met and voted to pass the Post Office TIF proposal. BURKE made the motion to pass the Post Office TIF proposal, and voted in favor of the proposal. BURKE did not publicly disclose his repeated efforts to obtain work for his private firm, Klafter & Burke, nor did BURKE disclose that his firm had entered into a contingent fee agreement with Company A's affiliate several weeks prior to this vote.

17

### Corrupt Solicitation and Attempted Extortion of Company B
### in Connection with Fast Food Restaurant

33. BURKE used his position as an Alderman to corruptly solicit and extort legal business from Company B for BURKE's law firm, Klafter & Burke, in return for BURKE's support for a building permit and a related driveway permit for a fast food restaurant operated by Company B in BURKE's ward.

34. On or about May 25, 2017, Individual B-1, an executive of Company B, contacted BURKE to obtain his official assistance as an Alderman with obtaining a building permit for a fast food restaurant located in BURKE's ward. BURKE proposed meeting with Individual B-2, who was also employed by Company B, to discuss this and another matter relating to the restaurant operated by Company B in BURKE's ward.

35. On or about June 8, 2017, BURKE directed a member of his Aldermanic staff to contact someone at his law firm, Klafter & Burke, and find out who had previously represented Company B with respect to prior tax assessment work concerning the fast food restaurant in BURKE's ward.

36. On or about June 11, 2017, BURKE spoke with a public official located outside the State of Illinois who was familiar with Individual B-1, and advised the public official that BURKE wanted to get legal business from Individual B-1. The public official promised to assist BURKE by making sure Individual B-1 was aware of how "important" BURKE was.

37. On or about June 14, 2017, BURKE, together with ANDREWS, met with Individual B-1 and Individual B-2 at the restaurant in BURKE's ward for which they had

18

sought a building permit. Immediately thereafter, BURKE took Individual B-1 and Individual B-2 to lunch at a local country club where BURKE was a member, for the purpose of soliciting tax work for his firm, Klafter & Burke, from Company B.

38. On or about June 27, 2017, at approximately 2:23 p.m. (Session #1779), BURKE used his cellular telephone, assigned telephone number (312) XXX-4006, to speak to Individual B-2. While speaking with Individual B-2, BURKE attempted to obtain legal business for his law firm, Klafter & Burke, by specifically tying BURKE's official assistance with permits to providing tax business for BURKE's law firm. Individual B-2 assured BURKE that Company B's architect would reach out to BURKE to discuss the permits and someone else would reach out to BURKE regarding the retention of BURKE's firm.

39. Company B received building permits for the restaurant from the City of Chicago in or around June 2017 and September 2017. However, Company B did not retain BURKE's law firm as BURKE had anticipated.

40. On or about October 24, 2017, at approximately 9:57 a.m. (Session #7441), BURKE used his cellular telephone, assigned telephone number (312) XXX-4006, to speak to ANDREWS about Company B. Because Company B failed to provide tax work to BURKE's law firm, BURKE and ANDREWS agreed that ANDREWS would take action to interfere with the operation of the restaurant based on the ground that the restaurant did not have a driveway permit.

19

41.    On or about October 24, 2017, ANDREWS contacted an employee of Company B, and asked Company B to shut down its remodeling work on the restaurant. As a result of this request, remodeling of the restaurant was halted.

42.    On or about October 25, 2017, at approximately 6:59 p.m. (Session #7537), BURKE used his cellular telephone, assigned telephone number (312) XXX-4006, to speak to ANDREWS about Company B.    Specifically, ANDREWS reported to BURKE that the construction work had been halted at the restaurant.    ANDREWS and BURKE agreed during this call that ANDREWS would now play "hard ball" with Company B.

43.    On or about October 26, 2017, ANDREWS met with representatives of Company B at BURKE's ward office.    During the meeting, ANDREWS was informed that Company B, led by Individual B-1, owned the restaurant.    Among other things, ANDREWS advised the group that BURKE's office had not signed off on the plans granting approval for the remodeling project, including a driveway permit.

44.    On or about November 14, 2017, Company B applied to the City of Chicago's Department of Transportation for a driveway permit for three pre-existing driveways adjacent to the restaurant.    Thereafter, BURKE caused members of his staff, including ANDREWS, to obstruct the approval of the application.

45.    On or about December 12, 2017, Individual B-1 and Individual B-2 met with BURKE for the purpose of getting BURKE to agree to the continuation of the remodeling project.    During the meeting, BURKE asked why he had not received tax business from Company B.    Individual B-1 informed BURKE that Individual B-1 had

20

talked to a representative of Company B and told that individual to get the process started to hire BURKE's firm. BURKE said he would try and get the remodeling project started again. During the same meeting, BURKE encouraged Individual B-1 and Individual B-2 to get involved with other politicians in Chicago, and BURKE asked Individual B-1 and Individual B-2 to attend a political fundraiser for another local politician that BURKE was hosting at his home.

46. On or about December 13, 2017, at approximately 10:03 a.m., at BURKE's direction, BURKE's assistant sent an email from BURKE's personal email account to a representative of Company B, for the purpose of arranging for tax work to be provided to BURKE's private law firm, Klafter & Burke.

47. On or about December 13, 2017, ANDREWS contacted an architect for Company B and advised that outstanding issues with the driveway permit had been cleared up.

48. On or about December 19, 2017, at approximately 1:17 p.m., at BURKE's direction, BURKE's assistant sent an email from BURKE's personal email account to a representative of Company B, stating that BURKE should obtain the tax work for all Illinois locations operated by Company B.

49. On or about December 19, 2017, Company B's application for a driveway permit was approved by the Department of Transportation, and was issued several weeks later.

### Bribery and Misconduct
### Involving Company C

50.     BURKE used his position as an Alderman to corruptly obtain legal business from CHARLES CUI for BURKE's law firm, Klafter & Burke, namely, tax work, in return for BURKE's official assistance with CHARLES CUI's efforts to obtain a permit for a pole sign located at the 4901 Property.

51.     On or about April 17, 2017, CUI caused to be submitted to the Department of Buildings an application for a permit for an existing pole sign located at the 4901 Property.   The application proposed that the sign would be used to advertise Company D's business at that location.

52.     On or about May 18, 2017, the application for the permit was denied by the Department of Planning and Development.

53.     On or about July 21, 2017, CUI, on behalf of Company C, entered into an agreement with Company D that provided that, if Company C was unable to obtain the necessary approvals to allow Company D to use the pole sign at the 4901 Property, then Company C would reduce Company D's rent for the 4901 Property according to an agreed-upon formula.   CUI estimated this rent reduction to have a total cost to Company C of $750,000.

54.     On or about August 23, 2017, at approximately 9:58 a.m., CUI sent an email to BURKE, asking for his assistance with respect to obtaining the permit, which stated, "Good Morning, Mr. Burke.   I had the chance to meet you with [Individual C-1] couple of months ago.   Hope you still remember me.   I have a legal matter that may need your

22

representation, if your schedule allows.    I own a property located at 4901 W. Irving Park Road, which used to be a Bank of America building.    My tenant [Company D] applied to reuse the existing pole sign in front of the building (see attached photo), but was denied by zoning, stating the pole sign was abandoned for several years, and now is illegal.    Can you look into the matter, and advise how to proceed?    [Company D] really needs it, otherwise they will either cancel the lease, or ask for significant rent reduction.    It is such a beautiful sign, it is becoming a landmark for the community and it costs lots of money to remove it."

55.    On or about August 24, 2017, at approximately 11:59 a.m., CUI forwarded to Individual C-1 the email he wrote to BURKE on or about August 23, 2017, and further wrote, "fyi.    I threw your name there.    Maybe he thinks there is conflict of interest, because of his position.    I'll ask him to represent me for property tax appeal, which will be a big bite, comparing with this."

56.    On or about August 24, 2017, at approximately 12:03 p.m., CUI sent an email to Individual C-2, who had represented CUI in property tax appeals for the 4901 Property.    In that email, CUI wrote, "Can I ask you for a favor?    Can I have Edward Burke handle 4901 W. Irving Park property tax appeal for me, at least for this year?    I have TIF deal going with the City, and he is the Chairman of Finance Committee.    He handled [sic] his tax appeal business card to me, and I need his favor for my tif money. In addition, I need his help for my zoning etc for my project.    He is a powerful broker in City Hall, and I need him now.    I'll transfer the case back to you after this year."

57. On or about August 24, 2017, at approximately 12:17 p.m., CUI sent an email to BURKE, that stated, "Dear Mr. Burke, I currently have this property 4901, 4925, 4939 W. Irving Park Road under redevelopment. I may need your representation for tax appeal. The property was totally vacant till July this year. . . . . Please let me know if you have time to handle this matter for me. Please let me know when we can schedule a brief phone call. Thank you!"

58. On or about August 24, 2017, at approximately 1:45 p.m., Individual C-1 called BURKE's office at City Hall and spoke with BURKE. During the call, Individual C-1 advised BURKE that CUI wished to hire BURKE to perform tax work, and noted "I guess he has some need for you now." BURKE said, "Well, I'll get together with him and see if we can do something to help him."

59. On or about August 25, 2017, at approximately 9:47 p.m., BURKE sent an email to CUI, that stated, "Charles, I instructed my team to reach out to you. If you do not hear from them by Tuesday, let me know personally! Thank you for expressing confidence in our firm, Ed."

60. On or about August 30, 2017, at approximately 10:42 a.m., an attorney associated with Klafter & Burke sent an email to CUI to initiate the process of representing CUI.

61. On or about August 30, 2017, at approximately 11:25 a.m., CUI responded to the email from the attorney associated with Klafter & Burke, and provided information related to the initiation of a tax appeal for several properties, including the 4901 Property.

24

62.     On or about August 30, 2017, at approximately 4:27 p.m. (Session #5043), BURKE had a telephone call with an assistant in his office at City Hall.     During the call, BURKE said, "Can you call [Commissioner C]?     Ask her to take a look at that situation where this . . . guy called about [Company D] on the pole that, ah . . . see if she'd, um, review it and see if there's any way that they can, ah, help us."

63.     On or about August 31, 2017, BURKE personally spoke with Commissioner C, and asked Commissioner C to figure out a way to try to help CUI get the permit he wanted for the 4901 Property.

64.     On or about September 5, 2017, CUI signed a contingent fee agreement with Klafter & Burke that provided, among other things, CUI would retain Klafter & Burke to perform real estate tax work and pay Klafter & Burke a fee for its work, based on a specified percentage of any tax reduction obtained for CUI.

65.     On or about September 14, 2017, at approximately 10:43 a.m., BURKE had a telephone call with an assistant in his office at City Hall.     During that call, the assistant advised BURKE that Commissioner C had not been able to figure out a way to issue the permit and had suggested contacting Administrator C.

66.     In or around September 2017, BURKE personally spoke with Administrator C, and asked Administrator C to review the denial of the permit for the 4901 Property.

67.     On or about November 6, 2017, the Department of Planning and Development issued a final denial of the permit.

68.     In or around 2018, Klafter & Burke performed real estate tax work for CUI.

25

## Attempted Extortion of Museum 1

69.     BURKE abused his position as an Alderman by threatening to take official action, in his capacity as Chairman of the Committee on Finance, to derail a proposed admission fee increase sought by Museum 1, due to the failure of Museum 1 to respond to his inquiry about an internship at Museum 1 for Individual E-1, who was the child of a personal acquaintance of BURKE.     After BURKE's threat, Individual E-1 was provided with the opportunity to apply for a full-time job at Museum 1, an offer which BURKE conveyed to Individual E-1's mother.

70.     In or around 2017, Museum 1 sought approval from the Chicago Park District to increase its basic admission fees.     The Park District Board scheduled a hearing on or about September 13, 2017, to consider Museum 1's request for an increase in its basic admission fees.

71.     On or about September 8, 2017, BURKE spoke with Individual E-2, a museum employee, who had called to speak with BURKE before the scheduled Park District Board meeting about the pending admission fee increase sought by Museum 1. During the call, BURKE threatened to contact the President of the Park District Board and object to Museum 1's requested admission fee increase because Museum 1 had failed to respond to BURKE's prior effort to obtain an internship for Individual E-1 at Museum 1.

72.     After BURKE's threat to oppose Museum 1's proposed admission fee increase, on or about September 11, 2017, BURKE received an e-mail from Individual E-

26

3, an executive at Museum 1, in which Museum 1 offered that Individual E-1 could apply for a full-time job at Museum 1.

73.     On or about September 12, 2017, at approximately 10:16 a.m. (Session #5594), BURKE used his cellular telephone, assigned telephone number (312) XXX-4006, to speak to Individual E-1's mother, and told her about the potential full-time job for Individual E-1 at Museum 1, and asked if Individual E-1 was interested in the new position.

74.     On or about September 12, 2017, at approximately 10:43 a.m., at BURKE's direction, his assistant sent an email to Individual E-3 and another employee of Museum 1, asking for additional details on how Individual E-1 could apply for the position and what the title of the position was.

75.     On or about September 12, 2017, at approximately 11:20 a.m., in response to the email from BURKE's assistant requesting details on how Individual E-1 could apply for the position, an employee of Museum 1 sent an email to Individual E-1, for the purpose of providing details concerning the job opportunity and for the purpose of setting up an informational interview later that week.

76.     On or about September 13, 2017, the Park District Board approved an increase in the basic admission fee for entrance to Museum 1.

77.     On or about September 19, 2017, Individual E-1 advised an employee of Museum 1 that she was declining consideration for the position.

## Concealment

78.     In order to conceal his corrupt activity, BURKE did not disclose his participation in corrupt activity as required under the City of Chicago's ethics ordinance.

79.     In order to further conceal his corrupt activity, BURKE concealed from other public officials and employees whom he sought to influence and persuade to take official action that he had a financial interest in matters BURKE raised with such officials and employees, and further concealed his violation of the City of Chicago's ethics ordinance prohibiting such conduct.

80.     In order to further conceal his corrupt activity, BURKE did not disclose he had a financial interest in matters that he considered and voted upon within the Committee on Finance and the City Council, and further concealed his violation of the City of Chicago's ethics ordinance prohibiting such conduct.

81.     In order to further conceal his corrupt activity, BURKE used his personal email account, instead of an email account operated by the City of Chicago, to facilitate, promote, and carry on his illegal activity.

82.     In order to further conceal his corrupt activity, BURKE planned to make payments to Alderman A through an intermediary in order to conceal BURKE's payments to Alderman A on account of legal work generated by Alderman A for BURKE's private law firm, Klafter & Burke.

83.     Defendant EDWARD M. BURKE, and others, misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the purposes of, and the acts done in furtherance of, the activity described above.

## IV.  THE PATTERN OF RACKETEERING ACTIVITY

84.     The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisted of the following acts:

### Racketeering Act 1
### (Post Office project)

Defendant EDWARD M. BURKE committed the following acts, any one of which alone constitutes the commission of Racketeering Act 1.

a.     Beginning in or around August 2016, and continuing to on or about January 18, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, committed an act involving bribery, that is, attempted to commit bribery, in that EDWARD M. BURKE attempted to solicit and agreed to accept property and personal advantage, namely, fees arising from the retention of his law firm, Klafter & Burke, pursuant to an understanding that EDWARD M. BURKE and Alderman A would improperly influence the performance of an act related to their employment and function as Aldermen and the employment and function of other employees of the City of Chicago, namely, acts taken by BURKE, Alderman A, and other employees of the City of Chicago concerning approvals from Amtrak, approvals from the City of Chicago Water Department, a Class L designation, and tax increment financing in connection with the Post Office project, in violation of 720 ILCS 5/33-1(e) and 720 ILCS 5/8-4.

b.     Beginning in or around August 2016, and continuing to on or about January 18, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and

elsewhere, EDWARD M. BURKE, defendant herein, committed an act involving bribery, that is, EDWARD M. BURKE solicited for the performance of an act, namely acts taken by BURKE concerning approvals from Amtrak, approvals from the City of Chicago Water Department, a Class L designation, and tax increment financing concerning the Post Office project, a fee and reward which he knew was not authorized by law, namely, fees arising from the retention of his law firm, Klafter & Burke, in violation of 720 ILCS 5/33-3(a)(4).

        c.     On or about June 19, 2017, at approximately 2:08 p.m. (Session #1368), at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, used a facility in interstate commerce, namely, a cellular telephone assigned telephone number (312) XXX-4006, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 720 ILCS 5/33-1(e) (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

        d.     On or about June 20, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, caused the use of a facility in interstate commerce, namely, an email account and associated communication network operated by the service provider AOL, with intent to promote, manage, establish, carry on, and facilitate the promotion, management,

establishment and carrying on of an unlawful activity, namely, a violation of 720 ILCS 5/33-1(e) (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

### Racketeering Act 2
### (Post Office project)

Defendant EDWARD M. BURKE committed the following acts, any one of which alone constitutes the commission of Racketeering Act 2.

a.    On or about August 7, 2018, at approximately 9:28 a.m. (Session #62645), at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, used a facility in interstate commerce, namely, a cellular telephone assigned telephone number (312) XXX-4006, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 720 ILCS 5/33-3(a)(4) (Official Misconduct), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity, in violation of Title 18, United States Code, Section 1952(a)(3).

b.    On or about August 24, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, committed an act involving bribery, that is, EDWARD M. BURKE solicited for the

31

performance of an act, namely acts taken by BURKE concerning tax increment financing for the Post Office project, a fee and reward which he knew was not authorized by law, namely, fees arising from the retention of his law firm, Klafter & Burke, in violation of 720 ILCS 5/33-3(a)(4).

### Racketeering Act 3
### (Restaurant Remodeling)

Defendant EDWARD M. BURKE committed the following acts, any one of which alone constitutes the commission of Racketeering Act 3.

a. Beginning no later than in or around 2017 and continuing through in or around 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, together with PETER J. ANDREWS, did knowingly attempt to commit extortion, which extortion would obstruct, delay and affect commerce, in that defendant attempted to obtain property, namely, fees arising from the retention of his law firm, Klafter & Burke, to be paid by Company B and its affiliate, with the consent of Company B and its affiliate, induced by the wrongful use of actual and threatened fear of economic harm, and under color of official right, in violation of Title 18, United States Code, Sections 1951(a) and 2.

b. Beginning no later than in or around 2017 and continuing through in or around 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, did conspire with PETER J. ANDREWS to obstruct, delay, and affect commerce by extortion, that is, the extortion of fees arising from the retention of his law firm, Klafter & Burke, to be paid by Company

B and its affiliate, with the consent of Company B and its affiliate, induced by the wrongful use of actual and threatened fear of economic harm, and under color of official right, in violation of Title 18, United States Code, Section 1951(a).

      c.     In or around June 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, committed an act involving bribery, that is, attempted to commit bribery, in that EDWARD M. BURKE attempted to solicit and agreed to accept property and personal advantage, namely, fees arising from the retention of his law firm, Klafter & Burke, pursuant to an understanding that EDWARD M. BURKE would improperly influence the performance of an act related to his employment and function as Alderman and the employment and function of other employees of the City of Chicago, namely, acts taken by BURKE and other employees of the City of Chicago concerning the approval and expediting of one or more building permits, in violation of 720 ILCS 5/33-1(e) and 720 ILCS 5/8-4.

      d.     In or around June 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, committed an act involving bribery, that is, EDWARD M. BURKE solicited for the performance of an act, namely the approval and expediting of one or more building permits, a fee and reward which he knew was not authorized by law, namely, fees arising from the retention of his law firm, Klafter & Burke, in violation of 720 ILCS 5/33-3(a)(4).

      e.     On or about October 24, 2017, at approximately 9:57 a.m. (Session #7441), at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

EDWARD M. BURKE, defendant herein, used a facility in interstate commerce, namely, a cellular telephone assigned telephone number (312) XXX-4006, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 18 U.S.C. § 1951(a) (Extortion), 720 ILCS 5/33-1(e) (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

        f.      On or about October 25, 2017, at approximately 6:59 p.m. (Session #7537), at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, used a facility in interstate commerce, namely, a cellular telephone assigned telephone number (312) XXX-4006, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 18 U.S.C. § 1951(a) (Extortion), 720 ILCS 5/33-1(e) (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

g. On or about December 13, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, caused the use of a facility in interstate commerce, namely, an email account and associated communication network operated by the service provider AOL, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 18 U.S.C. § 1951(a) (Extortion), 720 ILCS 5/33-1(e) (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

### Racketeering Act 4
### (Pole Sign Permit)

Defendant EDWARD M. BURKE committed the following acts, any one of which alone constitutes the commission of Racketeering Act 4.

a. On or about August 30, 2017, at approximately 11:25 a.m., at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, caused the use of a facility in interstate commerce, namely, an email account and associated communication network operated by service provider Yahoo!, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 720 ILCS 5/33-1 (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), 720 ILCS

35

5/29A-1 (Commercial Bribery), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

      b.    On or about August 30, 2017, at approximately 4:27 p.m. (Session #5043), at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, used a facility in interstate commerce, namely, a cellular telephone assigned telephone number (312) XXX-4006, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 720 ILCS 5/33-1 (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), 720 ILCS 5/29A-1 (Commercial Bribery), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

      c.    On or about September 5, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, committed an act involving bribery, that is EDWARD M. BURKE agreed to accept property, namely, fees arising from the retention of his law firm, Klafter & Burke, knowing that the property was promised and tendered with the intent to cause EDWARD M. BURKE to influence the performance of an act related to his employment and function as Alderman and the employment and function of other employees of the

36

City of Chicago, namely, acts taken by BURKE and other employees of the City of Chicago concerning the issuance of a permit for a pole sign, in violation of 720 ILCS 5/33-1(d).

### Racketeering Act 5
### (Museum 1 Job)

Defendant EDWARD M. BURKE committed the following acts, any one of which alone constitutes the commission of Racketeering Act 5.

a. In or around September 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, did attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that the defendant attempted to obtain property, namely, money and other compensation to be provided by Museum 1 to Individual E-1, with the consent of Museum 1, induced by the wrongful use of actual and threatened fear of economic harm, and under color of official right, in violation of Title 18, United States Code, Section 1951(a).

b. On or about September 12, 2017, at approximately 10:16 a.m. (Session #5594), at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, used a facility in interstate commerce, namely, a cellular telephone assigned telephone number (312) XXX-4006, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 18 U.S.C. § 1951(a) (Extortion), and thereafter, the defendant did perform and attempt to perform

an act to carry on and facilitate the promotion and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

All in violation of Title 18, United States Code, Section 1962(c).

## COUNT TWO

The SPECIAL DECEMBER 2017 GRAND JURY further charges:

1.      Paragraphs 1(a)-(l) of Count One of this superseding indictment are hereby realleged and incorporated here.

2.      Beginning in or around 2017, and continuing to on or about January 18, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### EDWARD M. BURKE,

defendant herein, as an agent of the City of Chicago, corruptly solicited and demanded things of value, namely, fees arising from the retention of his law firm, Klafter & Burke, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City of Chicago involving a thing of value of $5,000 or more, namely, approvals from the City of Chicago Water Department, a Class L designation, and tax increment financing in connection with the Post Office project;

In violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

39

## COUNT THREE

The SPECIAL DECEMBER 2017 GRAND JURY further charges:

On or about June 19, 2017, at approximately 2:08 p.m. (Session #1368), at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### EDWARD M. BURKE,

defendant herein, used a facility in interstate commerce, namely, a cellular telephone assigned telephone number (312) XXX-4006, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 720 ILCS 5/33-1(e) (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

## COUNT FOUR

The SPECIAL DECEMBER 2017 GRAND JURY further charges:

On or about June 20, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### EDWARD M. BURKE,

defendant herein, caused the use of a facility in interstate commerce, namely, an email account and associated communication network operated by the service provider AOL, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 720 ILCS 5/33-1(e) (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

41

## COUNT FIVE

The SPECIAL DECEMBER 2017 GRAND JURY further charges:

Beginning no later than in or around 2017 and continuing through in or around 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

EDWARD M. BURKE, and
PETER J. ANDREWS,

defendants herein, did knowingly attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that the defendants attempted to obtain property, namely, fees arising from the retention of BURKE's law firm, Klafter & Burke, to be paid by Company B and its affiliate, with the consent of Company B and its affiliate, induced by the wrongful use of actual and threatened fear of economic harm, and under color of official right;

In violation of Title 18, United States Code, Sections 1951(a) and 2.

## COUNT SIX

The SPECIAL DECEMBER 2017 GRAND JURY further charges:

Beginning no later than in or around 2017 and continuing through in or around 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

EDWARD M. BURKE, and
PETER J. ANDREWS,

defendants herein, did conspire to obstruct, delay, and affect commerce by extortion, that is, the extortion of fees arising from the retention of BURKE's law firm, Klafter & Burke, to be paid by Company B and its affiliate, with the consent of Company B and its affiliate, induced by the wrongful use of actual and threatened fear of economic harm, and under color of official right;

In violation of Title 18, United States Code, Section 1951(a).

## COUNT SEVEN

The SPECIAL DECEMBER 2017 GRAND JURY further charges:

On or about October 24, 2017, at approximately 9:57 a.m. (Session #7441), at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

EDWARD M. BURKE, and
PETER J. ANDREWS,

defendants herein, used a facility in interstate commerce, namely, a cellular telephone assigned telephone number (312) XXX-4006, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 18 U.S.C. § 1951(a) (Extortion), 720 ILCS 5/33-1(e) (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendants did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

44

## **COUNT EIGHT**

The SPECIAL DECEMBER 2017 GRAND JURY further charges:

On or about October 25, 2017, at approximately 6:59 p.m. (Session #7537), at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

EDWARD M. BURKE, and
PETER J. ANDREWS,

defendants herein, used a facility in interstate commerce, namely, a cellular telephone assigned telephone number (312) XXX-4006, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 18 U.S.C. § 1951(a) (Extortion), 720 ILCS 5/33-1(e) (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendants did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

## COUNT NINE

The SPECIAL DECEMBER 2017 GRAND JURY further charges:

On or about December 13, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### EDWARD M. BURKE,

defendant herein, caused the use of a facility in interstate commerce, namely, an email account and associated communication network operated by the service provider AOL, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 18 U.S.C. § 1951(a) (Extortion), 720 ILCS 5/33-1(e) (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

### COUNT TEN

The SPECIAL DECEMBER 2017 GRAND JURY further charges:

1.     Paragraphs 1(a), 1(b), 1(g), 1(h), 1(m), 1(n), and 34-49 of Count One of this superseding indictment are incorporated here.

2.     Prior to on or about November 29, 2018, the Federal Bureau of Investigation had initiated an investigation of BURKE and ANDREWS concerning potential violations of federal criminal law.

3.     The scope and nature of BURKE's and ANDREWS's interactions and contacts with Individual B-1 and Individual B-2 were material to the investigation.

4.     On or about November 29, 2018, at Chicago, in the Northern District of Illinois, Eastern Division,

### PETER J. ANDREWS,

defendant herein, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Federal Bureau of Investigation, an agency within the executive branch of the government of the United States, when he stated the following:

i.      ANDREWS denied ever hearing the name of Individual B-1;

ii.     ANDREWS denied ever hearing the name of Individual B-2;

iii.    When asked whether he thought BURKE had ever met Individual B-1 and Individual B-2, ANDREWS said, "I don't know.    I don't know."; and

iv.    When asked whether he remembered dealing with Individual B-1 and Individual B-2, ANDREWS replied, "They may have come in to our office or something. . . . .  Maybe, I don't know.    I don't recall."

In violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT ELEVEN

The SPECIAL DECEMBER 2017 GRAND JURY further charges:

1.     Paragraphs 1(a)-1(h), 1(o)-1(s), and 51-68 of Count One of this superseding indictment are hereby realleged and incorporated here.

2.     Between in or around August 2017, and continuing until in or around 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### EDWARD M. BURKE,

defendant herein, as an agent of the City of Chicago, corruptly accepted and agreed to accept things of value, namely, fees arising from the retention of his law firm, Klafter & Burke, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City of Chicago involving a thing of value of $5,000 or more, namely, a permit concerning the 4901 Property;

In violation of Title 18, United States Code, Section 666(a)(1)(B).

## COUNT TWELVE

The SPECIAL DECEMBER 2017 GRAND JURY further charges:

1. Paragraphs 1(a)-1(h), 1(o)-1(s), and 51-68 of Count One of this superseding indictment are hereby realleged and incorporated here.

2. At times material to Count Twelve of this superseding indictment:

### TIF Funding for the 4901 Property

a. On or about February 10, 2016, an ordinance was submitted to the City Council seeking approval of a redevelopment agreement between the City of Chicago and Company C that provided for $2,000,000 in TIF funding for the redevelopment of the 4901 Property (the "Ordinance"). The Ordinance was referred to the Committee on Finance.

b. On or about March 11, 2016, the Committee on Finance, with BURKE presiding, recommended that the Ordinance pass.

c. On or about March 16, 2016, on the motion of BURKE, the City Council passed the Ordinance. BURKE voted in favor of the Ordinance.

d. On or about June 28, 2016, the City of Chicago and Company C signed a redevelopment agreement for the 4901 Property, which gave Company C access to $2,000,000 in TIF funds for the redevelopment of the 4901 Property. These TIF funds were payable only after the conditions provided in the redevelopment agreement were met, and no TIF funds had been disbursed on or before September 5, 2017.

50

3.    Between in or around August 2017 and continuing until in or around 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

CHARLES CUI,

defendant herein, corruptly offered and agreed to give things of value, namely, fees arising from the retention of Klafter & Burke, intending to influence and reward BURKE, an agent of the City of Chicago, in connection with a business, transaction, and series of transactions of the City of Chicago involving a thing of value of $5,000 or more, namely, a permit and tax increment financing concerning the 4901 Property;

In violation of Title 18, United States Code, Section 666(a)(2).

51

## COUNT THIRTEEN

The SPECIAL DECEMBER 2017 GRAND JURY further charges:

On or about August 24, 2017, at approximately 12:03 p.m., at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### CHARLES CUI,

defendant herein, caused the use of a facility in interstate commerce, namely, an email account and associated communication network operated by the service provider Yahoo!, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 720 ILCS 5/33-1 (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), 720 ILCS 5/29A-1 (Commercial Bribery), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Section 1952(a)(3).

## COUNT FOURTEEN

The SPECIAL DECEMBER 2017 GRAND JURY further charges:

On or about August 24, 2017, at approximately 12:17 p.m., at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### CHARLES CUI,

defendant herein, caused the use of a facility in interstate commerce, namely, an email account and associated communication network operated by the service provider Yahoo!, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 720 ILCS 5/33-1 (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), 720 ILCS 5/29A-1 (Commercial Bribery), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Section 1952(a)(3).

53

## COUNT FIFTEEN

The SPECIAL DECEMBER 2017 GRAND JURY further charges:

On or about August 30, 2017, at approximately 11:25 a.m., at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

EDWARD M. BURKE, and
CHARLES CUI,

defendants herein, used and caused the use of a facility in interstate commerce, namely, an email account and associated communication network operated by service provider Yahoo!, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 720 ILCS 5/33-1 (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), 720 ILCS 5/29A-1 (Commercial Bribery), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendants did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

## COUNT SIXTEEN

The SPECIAL DECEMBER 2017 GRAND JURY further charges:

On or about August 30, 2017, at approximately 4:27 p.m. (Session #5043), at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### EDWARD M. BURKE,

defendant herein, used a facility in interstate commerce, namely, a cellular telephone assigned telephone number (312) XXX-4006, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 720 ILCS 5/33-1 (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

## COUNT SEVENTEEN

The SPECIAL DECEMBER 2017 GRAND JURY further charges:

1.      Paragraphs 1(a)-1(h), 1(o)-1(s), and 51-68 of Count One of this superseding indictment are incorporated here.

2.      Prior to on or about November 29, 2018, the Federal Bureau of Investigation had initiated an investigation of BURKE and CUI concerning potential violations of federal criminal law.

3.      One issue material to the investigation was the reason why CUI offered to hire BURKE as a tax appeal attorney in or around August 2017.

4.      On or about November 29, 2018, at Chicago, in the Northern District of Illinois, Eastern Division,

CHARLES CUI,

defendant herein, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Federal Bureau of Investigation, an agency within the executive branch of the government of the United States, when he stated the following:

     i.     CUI had made no business offers to BURKE during the pole signage matter;

     ii.     CUI offered business to BURKE "just because he is a good tax appeal lawyer"; and

     iii.     The information CUI provided to federal agents during his interview was accurate to the best of his knowledge.

In violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT EIGHTEEN

The SPECIAL DECEMBER 2017 GRAND JURY further charges:

In or around September 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### EDWARD M. BURKE,

defendant herein, did attempt to commit extortion, which extortion would obstruct, delay, and affect commerce, in that the defendant attempted to obtain property, namely, money and other employment compensation to be provided by Museum 1 to Individual E-1, with the consent of Museum 1, induced by the wrongful use of actual and threatened fear of economic harm, and under color of official right;

In violation of Title 18, United States Code, Section 1951(a).

## COUNT NINETEEN

The SPECIAL DECEMBER 2017 GRAND JURY further charges:

On or about September 12, 2017, at approximately 10:16 a.m. (Session #5594), at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### EDWARD M. BURKE,

defendant herein, used a facility in interstate commerce, namely, a cellular telephone assigned telephone number (312) XXX-4006, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 18 U.S.C. § 1951(a) (Extortion), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity;

In violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

A TRUE BILL:

_____

FOREPERSON

_____

UNITED STATES ATTORNEY