UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 19 CR 322 |
| | ) | Hon. Robert M. Dow, Jr. |
| EDWARD M. BURKE, | ) | |
| PETER J. ANDREWS, and | ) | |
| CHARLES CUI | ) | |

**GOVERNMENT'S CONSOLIDATED RESPONSE TO
DEFENDANTS' PRETRIAL MOTIONS**

JOHN R. LAUSCH, JR.
United States Attorney

AMARJEET S. BHACHU
DIANE MacARTHUR
SARAH E. STREICKER
MATTHEW L. KUTCHER
JULIA K. SCHWARTZ
Assistant United States Attorneys

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iv

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 2

ARGUMENT ..................................................................................................... 20

I.      Burke's Motion to Dismiss Counts 2 and 11 (R. 104 and 105) Should Be Denied. ............................................................................................... 20

     A.      Applicable Law .................................................................................. 20

     B.      The Indictment Properly Alleges Federal Funds Bribery In Violation of 18 U.S.C. § 666(a)(1)(B)........................................................ 21

     C.      The Indictment Is Not Defective for Failing to Allege a "*Quid Pro Quo*." ............................................................................................... 24

     D.      The Indictment Is Not Deficient Based on a Failure to Allege an "Official Act," Because *McDonnell*'s "Official Act" Standard Does Not Apply To § 666. ..................................................................... 34

     E.      Burke's Constitutional Arguments Are Without Merit. ....................... 36

II.      Burke's Motion to Dismiss and/or Strike "Amtrak/Post Office"-Based Counts and Racketeering Act (R. 108) Should Be Denied. ......................... 39

     A.      The Challenged Counts ....................................................................... 40

     B.      The Superseding Indictment Properly Alleges Violations of RICO and the Travel Act.......................................................................... 42

     C.      The Court Should Deny Burke's Motion to Strike Allegations from Count 1 .......................................................................................... 48

III.      Andrews' Motion to Dismiss Counts 7 and 8 Based on Inability to Establish Interstate Commerce (R. 98) Should Be Denied....................... 49

IV.      Andrews' Motion to Dismiss Counts 7 and 8 Based on Failure to Identify Subsequent Overt Acts (R. 99) Should Be Denied. ....................... 58

V.      Cui's Motion to Dismiss Counts 12, 13, 14, 15 (R. 88 and 89) Should Be Denied. ............................................................................................... 61

i

A.     Count 12 – 18 U.S.C. § 666(a)(2) .......................................................... 62

B.     Counts 13, 14 & 15 – 18 U.S.C. §§ 1952(a)(3) & 2 ................................. 72

VI.    Burke's Motion to Dismiss and Strike the State Bribery, Commercial Bribery and Official Misconduct Charges (R. 106, 107) Should Be Denied. ................................................................................................................ 88

A.     Applicable Law ...................................................................................... 88

B.     Analysis ................................................................................................. 89

VII.   Burke's First Motion to Suppress Title III Interceptions (R. 95, 97, 100) Should Be Denied. ............................................................................... 101

A.     There Was Probable Cause Supporting the Applications to Intercept Wire Communications........................................................... 102

B.     In the Alternative, The Government Relied in Good Faith on the Orders Authorizing Interception. ....................................................... 128

C.     There is No Basis to Suppress Subsequent Wiretap Calls. ................ 130

D.     Burke's Request for a *Franks* Hearing Should Be Denied. ................ 131

VIII.   Burke's Second Motion to Suppress Title III Interceptions (R. 102, 103) Should Be Denied. ............................................................................... 139

A.     The Government Properly Minimized Wire Communications as Required By the Authorizing Order and 18 U.S.C. § 2518................. 141

B.     There Was Probable Cause Supporting Continued Interception of Burke's Cellular Telephone.................................................................. 152

C.     The Government Demonstrated Necessity for Continued Interception over Burke's Cellular Telephone. ................................... 156

IX.    Burke's and Andrews' Motions for Bills of Particulars (R. 101, 109, 121) Should Be Denied. ............................................................................... 164

A.     Applicable Law .................................................................................... 165

B.     Burke's Motion For A Bill of Particulars Should Be Denied. ............. 166

C.     Andrews' Motion For A Bill of Particulars Should Be Denied. .......... 173

X.    Defendants' Motions for Severance (R. 86, 87, 96, 111, 112, 114, 121)
      Should Be Denied. ................................................................. 177

      A.    Defendants Were Properly Joined Under Rule 8(b). ......................... 177

      B.    Severance Is Not Warranted Under Rule 14. ................................. 183

      C.    Cui's and Andrews' November 29, 2018 Statements Do Not
            Implicate *Bruton*. ...................................................... 193

XI.   Burke's Motion to Strike Surplusage (R. 110) Should Be Denied. .......... 197

      A.    Applicable Law ............................................................. 197

      B.    Burke's Reference to "Jewish Lawyers" Is Relevant. ....................... 198

      C.    The Ethics Ordinance Is Relevant. ........................................ 199

XII.  Andrews' Motion for Disclosure of Evidence Related to Materiality
      (R. 117) Should Be Denied. ................................................... 202

      A.    Background ................................................................. 202

      B.    Analysis ................................................................... 204

CONCLUSION ......................................................................... 210

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Ali v. Federal Bureau of Prisons* 552 U.S. 214 (2008) ...........................................82

*Andrews* 749 F. Supp. 1517.............................................................................48

*Bastanipour* 697 F.2d 170 (7th Cir. 1982) ..........................................................204

*BedRoc Ltd., LLC v. United States* 541 U.S. 176 (2004).........................................25

*Bell v. Keating* 697 F.3d 445 (7th Cir. 2012).......................................................88

*Brady v. Maryland* 373 U.S. 83 (1963) .............................................................205

*Brinegar v. United States* 338 U.S. 160 (1949) ............................................112, 119

*Broadrick v. Oklahoma* 413 U.S. 601 (1973) ..................................................88, 96

*Bruton v. United States* 391 U.S. 123 (1968) ..............................................., 193

*Bynum v. United States* 423 U.S. 952 (1975)......................................................14

*Chaplinsky v. New Hampshire* 315 U.S. 568 (1942) ..............................................90

*Com. v. Benoit* 196 N.E.2d 228 (1964)..........................................................84, 85

*Commonwealth v. Bellis* 484 Pa. 486, 399 A.2d 397 (1979)............................passim

*Department of Housing and Urban Development v. Rucker* 535 U.S. 125 (2002)................82

*Department of Transportation v. Assoc. of American R.R.* 575 U.S. 43 (2015) ..............passim

*Evans v. United States* 504 U.S. 255 (1992) ..................................................... 169

*Expressions Hair Design v. Scheiderman* 137 S. Ct. 1144 (2017) ....................................89, 98

*First Nat. Bank of Boston v. Bellotti* 435 U.S. 765 (1978) .....................................90

*Franks v. Delaware* 438 U.S. 154 (1978).......................................................131, 144

*Giglio v. United States* 405 U.S. 150 (1972).........................................................205

*Hamling v. United States* 418 U.S. 87 (1974) .......................................................20

*Henrich v. Libertyville High Sch.* 712 N.E.2d 298 (Ill. 1998).................................85

iv

*Hobley v. Burge* 433 F.3d 946 (7th Cir. 2006) ..................................................................206

*Holder v. Humanitarian Law Project* 561 U.S. 1 (2010) ............................................. passim

*Hudson v. Michigan* 547 U.S. 586 (2006) .......................................................................130

*Illinois v. Gates* 462 U.S. 213 (1983) .....................................................................111, 144

*In re Grand Jury Witness* 288 F.3d 289 (7th Cir.2002) ....................................................206

*In re United States* 398 F.3d 615 (7th Cir. 2005) .....................................................136, 137

*Johnson v. United States* 576 U.S. 591 (2015) .................................................................36

*Jordan v. DeGeorge* 341 U.S. 223 (1951) .......................................................................88

*JSG Trading Corp. v. U.S. Dep't of Agric.* 176 F.3d 536 (D.C. Cir. 1999) ...........................86

*Kerner v. State Employees' Ret. Sys.* 72 Ill. 2d 507 (1978) ...............................................82

*Kolender v. Lawson* 461 U.S. 352 (1983) ...................................................................36, 88

*Kungys v. United States* 485 U.S. 759 (1988) ................................................................206

*Leopold v. United States Dep't of Just.*, 2020 WL 5253897 (D.D.C. Sep. 3, 2020) ..............205

*Maynard v. Cartwright* 486 U.S. 356 (1988) ....................................................................57

*McCormick v. United States* 500 U.S. 257 (1991) .............................................................95

*McDonnell v. United States*, -- U.S. --, 136 S. Ct. 2355 (2016) ..................................... passim

*New York v. Ferber* 458 U.S. 747 (1982) ........................................................................88

*Newland v. Budget Rent-A-Car Sys., Inc.* 744 N.E.2d 902 (Ill. App. Ct. 2001) .....................85

*People v. Brandstetter* 430 N.E.2d 731 (Ill. App. 1982) ...........................................92, 93, 94

*People v. Dougherty* 160 Ill. App. 3d 870 (1st Dist. 1987) ...............................47, 77, 78, 79

*People v. Freedman* 508 N.E.2d 326 (Ill. App. Ct. 1987) .............................................76, 199

*People v. Nankervis* 330 Mich. 17, 46 N.W.2d 592 (1951) .................................................83

*People v. Perry* 864 N.E.2d 196 (Ill. 2007) .....................................................................85

*People v. Seligman* 35 A.D.2d 591, (1970) .....................................................................85

*People v. Shoman* 2015 WL 1198100 (Ill. App. Ct. 2015) ..................................................47

*Perrin v. United States* 444 U.S. 37 (1979) ....................................................................94

*Richardson v. Marsh* 481 U.S. 200 (1987) ............................................................182, 192, 193

*Sabri v. United States* 541 U.S. 600 (2004)..............................................................................37

*Salinas v. United States* 522 U.S. 52 (1997) ...........................................................................56

*Scott v. United States* 436 U.S. 128 (1978) ......................................................................passim

*Skilling v. United States* 561 U.S. 358 (2010)....................................................................96, 97

*State v. Brewer* 258 N.C. 533, 129 S.E.2d 262 (1963) ............................................................83

*State v. Flansbaum-Talabisco* 121 So.3d 568 (Fl. App. Ct. 2013) .........................................77

*Swidler & Berlin v. United States* 524 U.S. 399 (1998).........................................................205

*United States. v. Irizarry* 341 F.3d 273 (3d Cir. 2003)..........................................................177

*United States v. Abdelhaq* 246 F.3d 990 (7th Cir. 2001) ..............................................180, 183

*United States v. Agostino* 132 F.3d 1183 (7th Cir. 1997)......................................26, 30, 31, 72

*United States v. Anderson* 280 F.3d 1121 (7th Cir. 2002) .......................................................20

*United States v. Armocida* 515 F.2d 29 (3d Cir. 1975) ...................................................140, 144

*United States v. Avenatti* 432 F. Supp. 3d 354 (S.D.N.Y. 2020) .............................24, 121, 134

*United States v. Baker* 82 F.3d 273 (8th Cir. 1996) .........................................................53, 54

*United States v. Baker* 227 F.3d 955 (7th Cir. 2000) ........................................................passim

*United States v. Barry* 888 F.2d 1092 (6th Cir. 1989) .............................................................53

*United States v. Bates* 96 F.3d 964 (7th Cir. 1996)..................................................................20

*United States v. Beavers* 2016 WL 6775966 (N.D. Ind. Nov. 16, 2016) ...............................175

*United States v. Bencivengo* 749 F.3d 205 (3d Cir. 2014) .....................................................171

*United States v. Blanchard* 542 F.3d 1133 (7th Cir. 2008) ...................................................165

*United States v. Boender* 649 F.3d 650 (7th Cir. 2011) .....................................................passim

*United States v. Boren* 278 F.3d 911 (9th Cir. 2002) ..............................................................43

*United States v. Boyland* 862 F.3d 279 (2d Cir. 2017).............................................................35

*United States v. Briscoe* 896 F.2d 1476 (7th Cir. 1990) .................................................176, 193

*United States v. Brissette* 919 F.3d 670 (1st Cir. 2019) ........................................................167

*United States v. Brown* 551 F.2d 639 (5th Cir. 1977) ........................................................195

*United States v. Bryant* 556 F.Supp.2d 378 (D.N.J. 2008) ................................................67, 76

*United States v. Bryant* 655 F.3d 232 (3d Cir. 2011) ...........................................................68

*United States v. Buljiubasic* 808 F.2d 1260 (7th Cir. 1987) ...............................................182

*United States v. Burke,* (N.D.Ill. 2019) ................................................................................140

*United States v. Calabrese,* 2008 WL 4274453 (N.D. Ill. Sept. 10, 2008).....................189, 190

*United States v. Campione* 942 F.2d 429 (7th Cir. 1991) ......................................................46

*United States v. Cardall* 885 F.2d 656 (10th Cir. 1989) ......................................................178

*United States v. Carson* 455 F.3d 336 (D.C. Cir. 2006) ......................................................177

*United States v. Carter* 530 F.3d 565 (7th Cir. 2008) ..................................................115, 171

*United States v. Cerone* 830 F.2d 938 (8th Cir. 1987)...........................................................59

*United States v. Charles* 213 F.3d 10 (1st Cir. 2000)....................................................151, 194

*United States v. Chaverra-Cardona* 667 F. Supp. 609 (N.D. Ill. 1987) ...............................197

*United States v. Childress* 58 F.3d 693 (D.C. Cir. 1995) ......................................................59

*United States v. Clayton* 108 F.3d 1114 (9th Cir. 1997) ........................................................50

*United States v. Climatemp, Inc.* 482 F. Supp. 376 (N.D. Ill. 1979)....................................196

*United States v. Collins* 272 F.3d 984 (7th Cir. 2001) ....................................................56, 57

*United States v. Cook* 970 F.3d 866 (7th Cir. 2020)..............................................................89

*United States v. Cornier-Ortiz* 361 F.3d 29 (1st Cir. 2004) ........................................62, 65, 69

*United States v. Costello* 610 F. Supp. 1450 (N.D. Ill. 1985) ...............................................140

*United States v. Cox* 462 F.2d 1293 (8th Cir. 1972)............................................................140

*United States v. Cox* 536 F.3d 723 (7th Cir. 2008)...................................................21, 42, 60

*United States v. Cox* 923 F.2d 519 (7th Cir. 1991)..............................................................185

*United States v. Crozier* 987 F.2d 893 (2d Cir. 1993) ...........................................................37

*United States v. Curescu* 674 F.3d 735 (7th Cir. 2012).........................................................181

*United States v. Daniels* 803 F.3d 335 (7th Cir. 2015) .........................................................180

*United States v. Davis* 890 F.2d 1373 (7th Cir. 1989) .........................................114, 115, 170

*United States v. Delatorre* 522 F. Supp. 2d 1034 (N.D. Ill. 2007).......................................186

*United States v. DeSapio* 229 F. Supp. 436, (S.D.N.Y. 1969) .................................................55

*United States v. Dorfman* 542 F. Supp. 345 (N.D. Ill. 1982) ..........................................passim

*United States v. Donagher*, 2021 WL 663181,  (N.D. Ill. Feb. 19, 2021)  ........................33, 37

*United States v. Doyle* 121 F.3d 1078 (7th Cir. 1997)..............................................................156

*United States v. Durham* 766 F.3d 672 (7th Cir. 2014) .....................................................162

*United States v. Dvorkin* 799 F.3d 867 (7th Cir. 2015).................................................52, 173

*United States v. Dwyer* 238 Fed. App'x 631 (1st Cir. 2007)..............................................63, 65

*United States v. Edwards* 303 F.3d 606 (5th Cir. 2002) ....................................................170

*United States v. Ervin* 540 F.3d 623 (7th Cir. 2008) .........................................................183

*United States v. Evans* 476 F.2d 1176 (11th Cir. 2007).........................................................50

*United States v. Farah* 475 Fed.Appx. 1 (4th Cir. 2007) ..............................................203, 208

*United States v. Fassnacht* 332 F.3d 440 (7th Cir. 2003) ...............................24, 164, 165, 173

*United States v. Ferriero* 866 F.3d 107 (3d Cir. 2017) ......................................................90, 99

*United States v. Firtash* 392 F. Supp. 3d 872 (N.D. Ill. 2019)..........................................21, 48

*United States v. Flaherty* 76 F.3d 967 (8th Cir. 1996) .........................................................194

*United States v. Garcia* 528 F.3d 481 (7th Cir. 2008)..........................................................127

*United States v. Gaudin* 515 U.S. 506 (1995) ....................................................................206

*United States v. Gee* 432 F.3d 713 (7th Cir. 2005)....................................................26, 27, 29

*United States v. Genova* 167 F. Supp. 2d 1021 (N.D. Ill. 2001).......................................47, 97

*United States v. George* 2015 WL 1523163 (D. Mass. Apr. 2, 2015).....................................65

*United States v. Giordano* 442 F.3d 30 (2d Cir. 2006).............................................................56

*United States v. Glecier* 923 F.2d 496 (7th Cir. 1991) .................................164, 165, 167, 168

*United States v. Gonzalez* 412 F.3d 1102 (9th Cir. 2005)..............................................162, 163

*United States v. Green* 350 U.S. 415 (1956) .......................................................................167

*United States v. Griffin* 827 F.2d 1108 (7th Cir. 1987)................................................112, 154

*United States v. Gulley* 992 F.2d 108 (7th Cir.1993) ...........................................................207

*United States v. Hackett* 638 F.2d 1179 (9th Cir. 1980) ......................................................194

*United States v. Hairston* 46 F.3d 361 (4th Cir. 1995) ........................................................170

*United States v. Halloran* 821 F.3d 321 (2d Cir. 2016) .........................................................53

*United States v. Hancock* 844 F.3d 702 (7th Cir. 2016)................................................132, 138

*United States v. Hardin* 874 F.3d 672 (10th Cir. 2017)....................................................37, 45

*United States v. Harris* 464 F.3d 733 (7th Cir. 2006) ..........................................................132

*United States v. Hawkins* 777 F.3d 880 (7th Cir. 2015) ...................................................25, 71

*United States v. Hemmingson* 157 F.3d 347 (5th Cir. 1998) .......................................194, 196

*United States v. Hernandez* 330 F.3d 964 (7th Cir. 2003) ...................................................165

*United States v. Hillie* 289 F. Supp. 3d 188 (D.D.C. 2018)...................................................44

*United States v. Hogan* 886 F.2d 1497 (7th Cir. 1989) ..........................................................97

*United States v. Hosseini* 679 F.3d 544 (7th Cir. 2012).......................................................179

*United States v. Hyde* 574 F.2d 856 (5th Cir. 1978) ............................................................156

*United States v. Infelise*, 1991 WL 255628, (N.D. Ill. Oct. 18, 1991) ...........................147, 148

*United States v. Isaacs* 493 F.2d 1124 (7th Cir. 1974)....................................................55, 116

*United States v. Javell* 695 F.3d 707 (7th Cir. 2012)...........................................................193

*United States v. Johnson* 874 F.3d 990 (7th Cir. 2017).............................................31, 32, 33

*United States v. Johnson*, 2011 WL 13365606 (N.D. Ill. Aug. 24, 2011).............................186

*United States v. Johnston* 814 F. App'x 142 (7th Cir. 2020)..................................................58

*United States v. Jones* 208 F. 3d 603 (7th Cir. 2000)..........................................................131

*United States v. Jones* 438 F.2d 461 (7th Cir. 1971)...........................................................185

*United States v. Joyner* 899 F.3d 1199 (11th Cir. 2018).....................................................193

*United States v. Jumah* 599 F.3d 799 (7th Cir. 2010).........................................................204

*United States v. Karigiannis* 430 F.2d 148 (7th Cir. 1970) ...........................................passim

ix

*United States v. Kelley* 864 F.2d 569 (7th Cir. 1989) .................................................................185

*United States v. Kendall* 665 F.2d 126 (7th Cir. 1981) ......................................................165

*United States v. Kirsch* 903 F.3d 213 (2d Cir. 2018) ........................................................167

*United States v. Koll* No. 09 CR 958-1, 2010 WL 996458 (N.D. Ill. Mar. 16, 2010) .............44

*United States v. Krout* 66 F.3d 1420 (5th Cir. 1995) ........................................................178

*United States v. Kubini* 304 F.R.D. 208 (W.D. Pa. 2015) ................................................205

*United States v. Lazo* 816 Fed. App'x 752 (4th Cir. 2020) .............................................53, 55

*United States v. LeFaivre* 507 F.2d 1288 (4th Cir. 1974) ..................................................55

*United States v. Leisure* 844 F.2d 1347 (8th Cir. 1988)............................. 112, 118, 120, 154

*United States* v. *Leon* 468 U.S. 897 (1984).................................................. 112, 127, 129, 154

*United States v. Lewis* 797 F.2d 358 (7th Cir. 1986) ........................................................167

*United States v. Loftus* 992 F.2d 793 (8th Cir. 1993) ........................................................172

*United States v. Lopez* 514 U.S. 549 (1995) ......................................................................52

*United States v. Lupton* 620 F.3d 790 (7th Cir. 2010) ..................................................passim

*United States v. Madison* 689 F.2d 1300 (7th Cir. 1982).................................................177

*United States v. Maggio* 862 F.3d 642 (8th Cir. 2017)......................................................35

*United States v. Malin* 908 F.2d 163 (7th Cir. 1990)...............................................111, 154

*United States v. Mancari* 663 F. Supp. 1343 (N.D. Ill. 1987) .....................................156, 157

*United States v. Mandel* 415 F. Supp. 997 (D. Md.) ......................................................201

*United States v. Mandel* 647 F.3d 710 (7th Cir. 2011) .............................................50, 51, 52

*United States v. Mandell* 833 F.3d 816 (7th Cir. 2016) ................................................155, 161

*United States v. Mann* 172 F.3d 50 (6th Cir. 1999) ..........................................................65

*United States v. Mansoori* 304 F.3d 635 (7th Cir. 2002) ................................................passim

*United States v. Manzella* 782 F.2d 533 (5th Cir. 1986).................................................178

*United States v. Marchetti* 466 F.2d 1309 (4th Cir. 1972) .................................................90

*United States v. Marcy* 777 F. Supp. 1400 (N.D. Ill. 1991)..................................141, 146, 147

*United States v. Marek* 238 F.3d 310 (5th Cir. 2001) ............................................... 52, 54, 55

*United States v. Maro* 272 F.3d 817 (7th Cir. 2001) .................................... 130, 131, 132, 138

*United States v. Marzano* 160 F.3d 399 (7th Cir. 1998) ..................................................... 177

*United States v. McAllister* 18 F.3d 1412 (7th Cir. 1994) .................................................. 131

*United States v. McLee* 436 F.3d 751 (7th Cir. 2006) ........................................................ 155

*United States v. McMurtrey* 704 F.3d 502 (7th Cir. 2013) ................................................. 131

*United States v. Medley* 913 F.2d 1248 (7th Cir. 1990) ....................................................... 30

*United States v. Mikhel* 889 F.3d 1003 (9th Cir. 2018) ...................................................... 193

*United States v. Moore* 563 F.3d 585 (7th Cir. 2009) ................................................... passim

*United States v. Morgan* 635 Fed. App'x. 423 (10th Cir. 2015) .................................. 121, 134

*United States v. Mullins* 800 F.3d 866 (7th Cir. 2015) ............................................ 26, 27, 28

*United States v. Murphy* 768 F.2d 1518 (7th Cir. 1985) .............................................. 97, 136

*United States v. Muskovsky* 863 F.2d 1319 (7th Cir. 1988) ................................................. 59

*United States v. Nader* 542 F.3d 713 (9th Cir. 2008) .......................................................... 53

*United States v. Nedza* 880 F.2d 896 (7th Cir. 1989) .................................................. 115, 171

*United States v. Nelson* 712 F.3d 498 (11th Cir. 2013) ........................................................ 37

*United States v. Ng Lap Seng* 934 F.3d 110 (2d Cir. 2019) ...................................... 35, 36, 99

*United States v. Nobles* 422 U.S. 225 (1975) ..................................................................... 205

*United States v. Norwood* 982 F.3d 1032 (7th Cir. 2020) .................................................. 198

*United States v. O'Brien* 994 F.Supp.2d 167 (D. Mass. 2014) ............................................. 65

*United States v. O'Malley* 796 F.2d 891 (7th Cir. 1986) ..................................................... 183

*United States v. Orzechowski* 547 F.2d 978 (7th Cir. 1976) .............................................. 203

*United States v. Ozar* 50 F.3d 1440 (8th Cir. 1995) ............................................. 146, 147, 151

*United States v. Palfrey* 499 F. Supp. 2d 34 (D.D.C. 2007) ................................................. 60

*United States v. Pappas* 592 F.3d 799 (7th Cir. 2010) ....................................................... 128

*United States v. Perez* 414 F.3d 302 (2d Cir. 2005) ............................................................ 50

*United States v. Peters* 435 F.3d 746 ...................................................................48

*United States v. Phillips* 239 F.3d 829 (7th Cir. 2001) .........................181, 183, 186

*United States v. Plescia* 48 F.3d 1452 (7th Cir. 1995) ........................................155

*United States v. Pless* 982 F.2d 1118 (7th Cir. 1992) ...................................112, 154

*United States v. Plummer* 581 F.3d 484 (7th Cir. 2009) .....................................89

*United States v. Pulido* 69 F.3d 192 (7th Cir. 1995) ..........................................198

*United States v. Quintana* 508 F.2d 867 (7th Cir. 1975) ...............................passim

*United States v. Raineri* 521 F. Supp 16 (W.D. Wis. 1980) ................................44

*United States v. Reed* 744 F.3d 519 (7th Cir. 2014) ...........................................127

*United States v. Richeson* 338 F.3d 653 (7th Cir. 2003) ......................50, 51, 52, 54

*United States v. Ring* 706 F.3d 460 (D.C. Cir. 2013) ...........................24, 121, 134

*United States v. Risk* 843 F.2d 1059 (7th Cir. 1988) .......................................61, 68

*United States v. Robinson* 663 F.3d 265 (7th Cir. 2011) .....................................63

*United States v. Ryans* 709 F. App'x 611 (11th Cir. 2017) ...................................37

*United States v. Schultz* 586 F.3d 526 (7th Cir. 2009) ......................................132

*United States v. Schweihs* 971 F.2d 1302 (7th Cir. 1992) ..................................182

*United States v. Searcy* 664 F.3d 1119 (7th Cir. 2001) ......................................111

*United States v. Shorter* 54 F.3d 1248 (7th Cir. 1995) .......................................183

*United States v. Shotts* 145 F.3d 1289 (11th Cir. 1998) ......................................91

*United States v. Silver* 948 F.3d 538 (2d Cir. 2020) ...........................................121

*United States v. Skelos* 707 Fed. App'x 733 (2d Cir. Sept. 26, 2017) .....................36

*United States v. Slizewski* 809 F.3d 382 (7th Cir. 2016) ....................................132

*United States v. Snyder* 428 F.2d 520 (9th Cir. 1970) .........................................44

*United States v. Sorich* 427 F. Supp. 2d 820 (N.D. Ill. 2006) ............................200

*United States v. Sorich* 523 F.3d 702 (7th Cir. 2008) ...................................57, 200

*United States v. Souffront* 338 F.3d 809 (7th Cir. 2003) .............................182, 187

*United States v. Spann* 409 F. Supp. 3d 619 (N.D. Ill. 2019) ...............................129

*United States v. Stanley* 765 F.2d 1224 (5th Cir. 1985) ......................................60

*United States v. Stillo* 57 F.3d 553 (7th Cir. 1995)....................................... passim

*United States v. Stoecker* 920 F. Supp. 876 (N.D. Ill. 1996) ...........................188, 189

*United States v. Stone*, 2013 WL 5934346 (E.D. Cal. Nov. 5, 2013)....................................205

*United States v. Sun-Diamond Growers of Cal.* 526 U.S. 398 (1999)........................26, 27, 29

*United States v. Suquet* 547 F. Supp. 1034 (C.D. Ill. 1982)..................................141, 145, 147

*United States v. Swanson* 210 F.3d 788 (7th Cir. 2000) ......................................131

*United States v. Tamras-Martin*, (N.D. Ill. Feb. 17, 2019) ....................................33

*United States v. Tarango* 396 F.3d 666 (5th Cir. 2005) .......................................191

*United States v. Tavelman* 650 F.2d 1133 (9th Cir. 1981) ....................................60

*United States v. Terry*, 2011 WL 2111127 (N.D. Ohio May 26, 2011)................................201

*United States v. Thomas* 150 F.3d 743 (7th Cir. 1998)..........................................21

*United States v. Thomas* 553 F. App'x 941 (11th Cir. 2014) ....................................50

*United States v. Thompson* 76 F.3d 442 (2d Cir. 1996) .........................................91

*United States v. Thompson* 286 F.3d 950 (7th Cir. 2002)....................................184, 186

*United States v. Thompson* 944 F.2d 1331 (7th Cir. 1991).................................130, 204

*United States v. Torres* 908 F.2d 1417 (9th Cir. 1990) ........................................140

*United States v. Troutman* 546 F. Supp. 2d 610 (N.D. Ill. 2008) .................................188, 189

*United States v. Turner* 93 F.3d 276 (7th Cir. 1996) ..........................................48

*United States v. United States Gypsum Co.* 438 U.S. 422 (1978)...................................91, 92

*United States v. Uribe* 890 F.2d 554 (1st Cir. 1989) ..........................................140

*United States v. Valentino* 436 F. App'x 700 (7th Cir. 2011)...................................177

*United States v. Vargas* 116 F.3d 195 (7th Cir. 1997) .........................................130

*United States v. Vaughn* 722 F.3d 918 (7th Cir. 2013)....................................... passim

*United States v. Vazquez-Botet* 532 F.3d 37 (1st Cir. 2008) ...................................170

*United States v. Velasquez* 772 F.2d 1348 (7th Cir. 1985)...................................................180

*United States v. Volpendesto* 746 F.3d 273 (7th Cir. 2014) .................................................193

*United States v. Vretta* 790 F.2d 651 (7th Cir. 1986)...........................................................198

*United States v. Walsh* 156 F. Supp.3d 374 (E.D.N.Y. 2016) ..................................................65

*United States v. Wantuch* 525 F.3d 505 (7th Cir. 2008) .......................................................198

*United States v. Warner* 498 F.3d 666 (7th Cir. 2007)..........................................181, 193, 196

*United States v. Warner*, 2004 WL 1794476 (N.D. Ill. Aug. 11, 2004) ........................195, 196

*United States v. Watts* 535 F.3d 650 (7th Cir. 2008) ...........................................................127

*United States v. Weathers* 169 F.3d 336 (6th Cir. 1999).........................................................54

*United States v. Welch* 327 F.3d 1081 (3d Cir. 2003)............................................................94

*United States v. Welch* 656 F.2d 1039 (5th Cir. 1981) ..................................................177, 178

*United States v. Westmoreland* 240 F.3d 618 (7th Cir. 2001)...................................................20

*United States v. White* 610 F.3d 956 (7th Cir. 2010) ..................................................20, 21, 42

*United States v. Williams* 507 F.3d 905 (5th Cir. 2007)...............................................63, 64, 65

*United States v. Williams* 553 U.S. 285 (2008) .....................................................................88

*United States v. Williams* 718 F.3d 644 (7th Cir. 2013) .......................................................130

*United States v. Wrobel* 841 F.3d 450 (7th Cir. 2016) .........................................................116

*United States v. Yannotti* 541 F.3d 112 (2d Cir. 2008) ..........................................................43

*United States v. Yashar* 166 F.3d 873 (7th Cir. 1999)............................................................20

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* 455 U.S. 489 (1982) ............36, 37

*Weatherford v. Bursey* 429 U.S. 545 (1977)......................................................................203

*Williams v. United States* 341 U.S. 97 (1951).......................................................................97

*Wisconsin Central Ltd. v. United States*, -- U.S. --, 138 S. Ct. 2067 (2018)............................25

*Wright v. City of Danville* 675 N.E.2d 110 (Ill. 1996) ...........................................................96

*Zafiro v. United States* 506 U.S. 534 (1993).................................................................182, 183

## Statutes

18 U.S.C § 2 ...................................................................................................18, 19

18 U.S.C. § 201(b) .............................................................................................26,29

18 U.S.C. § 666 ............................................................................................passim

18 U.S.C. § 1001 ...............................................................................18, 19, 201, 202

18 U.S.C. § 1343 .........................................................................................103, 111

18 U.S.C. § 1346 ......................................................................................34, 96, 97

18 U.S.C. § 1349 ...............................................................................................103

18 U.S.C. § 1512(b) .............................................................................................91

18 U.S.C. § 1951 ...........................................................................................passim

18 U.S.C. § 1952 ...........................................................................................passim

18 U.S.C. § 1958(a) .............................................................................................54

18 U.S.C. §§ 2510(11) .........................................................................................130

18 U.S.C. § 2518 .................................................................................136, 140, 155

18 U.S.C. § 3500 ...............................................................................................204

18 U.S.C. § 1962(c) ......................................................................................passim

31 U.S.C. § 5313 .................................................................................................68

49 U.S.C. § 24301 .............................................................................................122

49 U.S.C. § 24302 .............................................................................................122

720 ILCS 5/8-4 ...........................................................................................40, 198

720 ILCS 5/17-10.6(b)(2)......................................................................................84

720 ILCS 5/29A-1.......................................................................................passim

720 ILCS 5/29A-2.......................................................................................passim

720 ILCS 5/33-1 .........................................................................................passim

720 ILCS 5/33-3(a)(4) .................................................................................passim

720 ILCS 5/55-3(a)(4) ........................................................................................89

720 ILCS 33-1(a) ...................................................................................................73

La. Stat. Ann. § 14:73 ..........................................................................................84

Miss. Code § 97-9-10 ...........................................................................................84

P.L. 100–690, § 7053, 102 Stat. 4402 (1988) ....................................................53

## Rules

Fed. R. Crim. P. 7 ............................................................................19, 39 ,48, 163

Fed. R. Crim. P. 8(b) .........................................................................................176

Fed. R. of Crim. P. 12(b)(3)(B)(v) ......................................................................39

Fed. R. Crim. P. 14 ....................................................................................176, 182

Fed. R. Crim. P. 16 ...........................................................................203, 204, 206

Fed. R. Crim. P. 403 .........................................................................................198

Fed. R. Evid. 401 ..............................................................................................197

Fed. R. Evid. 403 ..............................................................................................198

## Other Authorities

1A Fed. Prac. & Proc. Crim. § 145 ....................................................................177

1984 U.S.C.C.A.N. 3182 .....................................................................................53

D. E. Ytreber, *American Law Reports* 1 A.L.R.3d 1350 ....................................82

## INTRODUCTION

Defendants Edward M. Burke, Peter J. Andrews, and Charles Cui filed seventeen pretrial motions through which they seek the dismissal of charges, striking of allegations, suppression of wire interceptions, severance from other defendants, bills of particulars, and disclosure of favorable evidence.

The criminal charges against defendants stem from Burke's corrupt efforts to use his position as a powerful alderman for his and his associates' personal benefit, and Andrews' and Cui's efforts to benefit from Burke's willingness to trade his power for private benefits. As properly alleged in the superseding indictment, Burke (a) corruptly sought to solicit Company A as a property tax client for his private law firm in return for taking action benefitting the Post Office project on a variety of matters, including approvals from Amtrak, the Chicago Water Department, a Class L designation, and tax increment financing; (b) corruptly sought to solicit Company B as a property tax client for his private law firm in return for approving and expediting their building permits; (c) received business for his private law firm from Charles Cui, knowing it was intended to influence him and others in connection with the issuance of a permit for a pole sign; and (d) attempted to extort a museum for a paid position for the child of a personal acquaintance.

Defendants argue that the Supreme Court's decision in *McDonnell v. United States*, -- U.S. --, 136 S. Ct. 2355 (2016), which involved a different statute, a different procedural posture, and different facts, nevertheless requires dismissal of nearly every count against them. Defendants' overly expansive reading of *McDonnell* finds

1

no support in the case law or in common sense. Burke's efforts to trade his official position for his own personal private gain, and Andrews' and Cui's participation in those efforts, were unlawful before and after *McDonnell*.

In addition to arguing that *McDonnell* fundamentally altered every federal and state statute that criminalizes public corruption, Burke also contends that every statute that could apply to his conduct is unconstitutional, including 18 U.S.C. § 666 and every Illinois bribery statute that is a predicate for his RICO and Travel Act violations. The Court should not adopt this radical position.

The superseding indictment asserts valid charges that follow well-established law. There is simply no basis to dismiss any of the charges or suppress any of the ample evidence of unlawful conduct derived from the wiretaps on Burke's phones. The Court should dismiss defendants' motions for the reasons set forth below.

## BACKGROUND

### *Factual Background*

Burke was Alderman of the 14th Ward in Chicago, a member of Chicago's City Council, and Chairman of the City of Chicago's Committee on Finance. R. 30 ¶ 1g. Burke was also a lawyer and proprietor of his own law firm, Klafter & Burke. *Id.* ¶ 1h. Klafter & Burke specialized in contesting tax assessments made on real property and seeking reductions in the tax assessments for the firm's clients. *Id.* Andrews worked for Burke in Burke's 14th Ward office. *Id.* ¶ 1n. Cui was a managing member of Company C, which owned real property in Chicago. *Id.* ¶¶ 1o, 1p. Cui was also a lawyer who operated his own law firm. *Id.* Cui retained Klafter & Burke to perform

2

tax work after a City of Chicago department denied a permit application for one of Company C's properties. *Id.* ¶¶ 51, 52, 57, 58, 64.

Between no later than 2016 and continuing through 2018, Burke used his positions as Alderman and Chairman of the Committee on Finance to solicit and receive bribes from persons and parties having business with the City of Chicago or subject to Burke's and Alderman A's authority as Aldermen. R. 30 ¶¶ 3, 4. Burke received and solicited these bribes in the form of fees arising from the retention of Klafter & Burke, as well as through private benefits for Burke's associates. *Id.* ¶ 4. The superseding indictment sets forth four incidents of corrupt activities. These incidents involve: (1) the redevelopment of the Old Post Office in Chicago; (2) the remodeling of a restaurant in Burke's ward that required City of Chicago-issued permits; (3) Cui's efforts to obtain a City of Chicago permit for a pole sign; and (4) Burke's threatened action against a museum for the museum's failure to respond to Burke's inquiry about hiring the child of one of Burke's personal acquaintances.

### *Post Office Project*

Burke corruptly solicited legal business for his law firm from the developers of the Old Chicago Post Office in Chicago in return for Burke's and Alderman A's official assistance with the redevelopment and financing of the Post Office project. R. 30 ¶¶ 4, 5, 84(a).

Company A, a New York-based real estate company, conducted extensive renovations on the Old Post Office, and Individual A-1 oversaw and managed the Post Office project on Company A's behalf. R. 30 ¶ 1i. During the ongoing project, the

developers needed various approvals and funding from the City of Chicago, including approval for water service from the Water Commissioner, as well as a favorable tax designation and funding in the form of Tax Increment Financing. The superseding indictment alleges that Burke corruptly solicited business for his private law firm intending to be influenced and rewarded in relation to these approvals and funding.

Specifically, in August 2016, Burke asked Alderman A to recommend Klafter & Burke to Individual A-1 to do tax work for Company A, and suggested to Alderman A that they could talk about a "marketing arrangement" in return for securing Company A as a client for Burke's firm. R. 30 ¶ 6. Alderman A was Alderman of the 25th Ward in Chicago and was Chairman of the City of Chicago Committee on Zoning, Landmarks & Building Standards. *Id.* ¶ 1j. The Post Office project was located in Alderman A's ward. Alderman A was cooperating with law enforcement in August 2016 and during the Post Office project events described in the superseding indictment. *Id.*

Later, on or about September 26, 2016, Burke met with Alderman A in Burke's City Hall office. During that meeting, Burke asked Alderman A to set up a meeting with Individual A-1 so Burke could solicit tax business for his firm. R. 30 ¶ 7. The first meeting between Burke and Individual A-1 took place on or about October 27, 2016 in Alderman A's office at City Hall. *Id.* ¶ 8. During the meeting, Burke solicited tax work from Individual A-1. *Id.* Individual A-1 discussed with Burke various aspects of the Post Office project, including difficulties Company A was having obtaining from Amtrak access to the track area below the building. *Id.* ¶¶ 8, 11. Burke

4

advised Individual A-1 that there weren't "too many people around town that we don't know." *Id.* ¶ 8.

On or about December 12, 2016, at the direction of law enforcement, Alderman A told Burke that, so long as Burke and Alderman A helped Individual A-1 with necessary permits for the Post Office project and Burke assisted with Company A's negotiations with Amtrak, Individual A-1 would retain Burke's law firm. R. 30 ¶ 10. Burke responded, "Okay, great." *Id.*

On or about December 22, 2016, Burke met with Alderman A to discuss information Burke had obtained from Individual A-3, an Amtrak employee, about access to Amtrak property near the Post Office needed by Company A to complete work on the Post Office project.[1] R. 30 ¶¶ 1k, 11. Burke told Alderman A that Individual A-3 could be "worked with," but that up to that time Individual A-3 had not had any reason to do any favors for the developer of the Post Office project. *Id.* ¶ 11. Burke noted that Company A had not yet hired his law firm, and expressed the belief that Individual A-1 and Company A would only hire his firm if there was something he could do to assist Individual A-1 and Company A. *Id.*

On or about January 25, 2017, Individual A-1 and Company A had still not retained Burke's law firm; Burke told Alderman A that he would not take any action

---

[1] The evidence at trial will show that, on or about December 16, 2016, Burke summoned Individual A-3 to his City Hall office for a meeting and that, during the meeting, Burke discussed the Post Office project. This fact is not alleged in the superseding indictment, which need not include all facts that will be presented at trial.

benefitting Individual A-1 and Company A unless Individual A-1 retained his law firm. R. 30 ¶ 12. Burke told Alderman A that "the cash register has not rung yet." *Id.*

On or about March 9, 2017, Alderman A told Burke that the developer of the Post Office project needed assistance with obtaining the Water Commissioner's "sign off" on an issue concerning the Post Office project. R. 30 ¶ 13. Alderman A told Burke that if they could assist in getting the Water Commissioner's sign off, then Burke should be able to get the tax work, and Alderman A should be able to get the consulting or marketing arrangement that Burke had suggested earlier. *Id.* Burke responded, "Good," and agreed to look into the matter. *Id.*

In or around March 2017, Burke caused Individual A-4, a former Water Commissioner, to contact the Water Commissioner about the water service problem with the Post Office project. R. 30 ¶ 14. The Water Commissioner understood from this contact that there was pressure coming from City Hall to get water service established at the Post Office and that Burke was involved in the matter. *Id.* On or about March 21, 2017, Burke told Alderman A that Individual A-4 had talked to the Water Commissioner and that Company A would receive accommodations with which the company would be "comfortable." *Id.* ¶ 15.

On or about May 19, 2017, Alderman A told Burke that a representative of Company A's real estate management company was continuing to have problems with Amtrak and the Water Department concerning the Post Office project. R. 30 ¶ 16. Neither Individual A-1 nor Company A had retained Burke's law firm as of that date. Burke told Alderman A that he had not heard about "getting hired to do the tax

6

work," and was not "motivated" to provide any assistance on the Post Office project. *Id.* One week later, on or about May 26, 2017, Alderman A told Burke that Alderman A had spoken with Individual A-1. *Id.* ¶ 17. Burke responded, "So, did we land the, uh, the tuna?" *Id.* At the direction of law enforcement, Alderman A told Burke that Individual A-1 had agreed to provide tax work to Burke's law firm in the future. *Id.* Burke told Alderman A that he wanted to meet with Individual A-1, and agreed to assist Company A by following up with the Water Department and his contacts at Amtrak. *Id.*

On or about June 19, 2017, at approximately 2:08 p.m., Burke called Individual A-1 on Burke's cell phone about the Post Office project.[2] R. 30 ¶ 18. During this call, Individual A-1 asked for Burke's assistance in resolving Amtrak problems. *Id.* Burke asked Individual A-1 to send him an email setting forth the outstanding issues and the "names of the people that seem to be problems." *Id.* On or about June 20, 2017, Individual A-1 forwarded an email to Burke's personal email account that outlined the outstanding Amtrak problems.[3] *Id.* ¶ 19. On or about June 22, 2017, Burke spoke to Individual A-3, an Amtrak employee, for the purpose of resolving Company A's outstanding Amtrak problems. *Id.* ¶¶ 1k, 20. The following day, on or about June 23, 2017, Burke told Individual A-1 that he had talked to an Amtrak executive and that

---

[2] This call is the basis of the Travel Act charge in Count 3.
[3] This email is the basis of the Travel Act charge in Count 4. The superseding indictment incorrectly states that the email was "from Individual A-4." R. 30 ¶ 19. The email was from an individual associated with the Old Post Office project and not Individual A-4.

there had been a lot of progress with the issues Individual A-1 had identified.[4] *Id.* ¶ 21. Burke instructed Individual A-1 to let him know how matters progressed. *Id.*

On or about August 2, 2017, Individual A-1 told Burke and Alderman A that things were moving in the "right direction" with Amtrak. R. 30 ¶ 22. Individual A-1 thanked Burke for his assistance. *Id.* Burke told Individual A-1 to keep him informed of the progress with Amtrak. *Id.* Three weeks later, on or about August 25, 2017, Burke told Alderman A he had not heard from Company A. *Id.* ¶ 23. Alderman A told Burke that things appeared to be going well with the Post Office project. *Id.* Burke replied, "[W]hen they get taken care of, you never hear from 'em. You only hear from 'em when it doesn't work out." *Id.*

On or about October 6, 2017, Alderman A told Burke that Company A was seeking TIF (Tax Increment Financing) funds for the Post Office Project.[5] R. 30 ¶ 24. Burke noted that Company A had not retained his law firm as of that date and Burke questioned why Alderman A would want to assist Individual A-1 with a TIF request.

---

[4] Burke assumes that the Amtrak "executive" referenced in the superseding indictment (R. 30, Count 1, ¶ 30) and Individual A-3 (*id.*, Count 1, ¶¶ 1k, 11, 20) are the same person. R. 108 at 4. The superseding indictment alleges that, on or about June 22, 2017, Burke spoke to Individual A-3, whom the indictment describes as an "employee of Amtrak," for the purpose of resolving Company A's outstanding problems with Amtrak. *Id.* ¶ 20. Individual A-3 is a known individual. The next paragraph of the indictment alleges that, on or about June 23, 2017, Burke told Individual A-1 that he had talked to an "executive" at Amtrak and that there had been a lot of progress with the issues identified by Individual A-1. *Id.* ¶ 21. The word "executive," as used in this paragraph of the indictment, is a descriptive word for what Burke said to Individual A-1. Burke told Individual A-1 that he "talked with the president of Amtrak yesterday and they seemed to believe that your folks are much more comfortable with the arrangement." Burke did not otherwise identify "the president" in the conversation. Individual A-3 was not a "president" of Amtrak.

[5] TIF is a special funding tool used by the City of Chicago to promote public and private investment across the City. R. 30 ¶ 1c.

*Id.* On or about October 17, 2017, at Alderman A's request, Individual A-1 and others met with Burke and Alderman A in Alderman A's office in City Hall to discuss the progress of the Post Office project. *Id.* ¶ 25. A member of Individual A-1's group explained to Burke why the Post Office project needed TIF funding. *Id.* After the meeting, when alone with Alderman A, Burke said he was not "fond of the way they've [those associated with the Post Office project] conducted themselves up until this point, and as far as I'm concerned, they can go fuck themselves." *Id.* Alderman A explained that he had told Individual A-1 that Company A's request for TIF funding would go before Burke's committee. *Id.* Burke responded, "Well, good luck getting it on the agenda." *Id.*

In January 2018, Alderman A told Burke that the Post Office project was also seeking Class L designation from the City of Chicago, which allows tax savings for landmark buildings.[6] R. 30 ¶¶ 1c, 26. Burke confirmed that he decided what went onto the Committee on Finance agenda and complained that Individual A-1 still had not hired him to do tax work. *Id.* Burke said being hired would "help." *Id.* Burke said he did not care about "these guys" and would do as Alderman A wished about the financing for the Post Office project. *Id.*

---

[6] Class L designation is a special real estate tax assessment classification in Cook County that is designed to encourage the preservation and rehabilitation of landmark buildings. R. 30 ¶ 1c. If a property is designated as "Class L," owners could have their property tax assessment levels reduced for a period of years, provided they met certain investment and other requirements. *Id.*

On or about February 26, 2018, the Committee on Finance passed the Class L designation for the Post Office project. R. 30 ¶ 27. On or about February 28, 2018, on Burke's motion, the full City Council unanimously passed the Class L designation. *Id.* ¶ 28.

In August 2018, Burke reported to Alderman A that a representative of Company A's property manager had contacted Burke's law firm about hiring the firm, and Burke confirmed he would "absolutely" support Company A's TIF funding proposal. R. 30 ¶ 29. A short time later, on or about August 24, 2018, a representative of Company A's property manager was sent a contingent fee agreement that was signed by Burke on behalf of Burke's law firm. *Id.* ¶ 30.

The following month, in September 2018, Burke's Committee on Finance and the City Council approved TIF funding for the Post Office project; Burke made the motion to pass the funding proposal and voted in favor of the proposal. R. 30 ¶¶ 31, 32.

### *Fast-food Restaurant Permit*

Burke used his position as Alderman to corruptly solicit and extort legal business from Company B in return for Burke's support for a building permit and related driveway permit for a fast-food restaurant located in Burke's ward. R. 30 ¶ 33. On May 25, 2017, Individual B-1, an executive of Company B, contacted Burke to seek Burke's official assistance as an Alderman with obtaining a building permit for the fast-food restaurant. *Id.* ¶ 34. Burke suggested meeting with Individual B-2, an employee of Company B, to discuss the permit and another restaurant-related

10

matter. *Id.* On June 8, 2017, Burke directed a member of his Aldermanic staff to contact his law firm, Klafter & Burke, to find out who had represented Company B on tax assessment work associated with Company B's fast-food restaurant in Burke's ward. *Id.* ¶ 35. Two days later, on June 11, 2017, Burke told a public official familiar with Individual B-1 that Burke wanted to get legal business from Individual B-1; the public official promised to impress upon Individual B-1 Burke's importance. *Id.* ¶ 36.

On June 14, 2017, Burke and Andrews met Individuals B-1 and B-2 at the fast-food restaurant. R. 30 ¶ 37. Burke then took Individuals B-1 and B-2 out to lunch for the purpose of soliciting tax work from them. *Id.* Two weeks later, on June 27, 2017, while on the telephone with Individual B-2, Burke attempted to obtain business for his law firm by tying his official assistance on the permits to providing his law firm with tax business. *Id.* ¶ 38. Individual B-2 told Burke that someone would reach out about the permits and someone else would reach out about the tax business. *Id.*

Company B received building permits in June 2017 and September 2017. R. 30 ¶ 39. But, by October 2017, Company B had not yet provided Klafter & Burke with any tax business. *Id.* ¶¶ 39, 40. On October 24, 2017, during a telephone conversation, Burke and Andrews agreed that Andrews would take action to interfere with the operations of the fast-food restaurant on the ground that the restaurant did not have a driveway permit, due to the failure of Company B to provide tax work to Burke's firm. *Id.* ¶ 40. The same day, Andrews told an employee of Company B to shut down the restaurant's remodeling work. *Id.* ¶ 41. The remodeling work came to a stop,

11

which Andrews reported to Burke on October 25, 2017. *Id.* ¶¶ 41-42. Burke and Andrews agreed that Andrews would play "hard ball" with Company B. *Id.*

On October 26, 2017, Andrews met with Company B representatives at Burke's ward office. R. 30 ¶ 43. Andrews was told during the meeting that Company B, led by Individual B-1, owned the fast-food restaurant. *Id.* Andrews told the representatives that Burke had not signed off on the plans granting approval for the remodeling project, which included a driveway permit. *Id.*

On November 14, 2017, Company B applied to the City of Chicago's Department of Transportation for a driveway permit for three pre-existing driveways adjacent to the fast-food restaurant. R. 30 ¶ 44. Burke caused members of his staff, including Andrews, to obstruct approval of the application. *Id.* On December 12, 2017, Individuals B-1 and B-2 met with Burke in an effort to get Burke to agree to the continuation of the remodeling project, and at that very same meeting, Burke asked why he had not received the tax business. *Id.* ¶ 45. Individual B-1 related that Individual B-1 had asked a representative of Company B to get the process started. *Id.* Burke said he would try to get the remodeling project restarted again. *Id.*

On December 13, 2017, at Burke's direction, Burke's assistant sent an email to a representative of Company B for the purpose of arranging tax work for Klafter & Burke. R. 30 ¶ 46. The same day, Andrews advised a Company B architect that the outstanding issues with the driveway permit had been cleared up. *Id.* ¶ 47. On December 19, 2017, at Burke's direction, Burke's assistant sent another email to a Company B representative stating that Burke should receive the tax business for all

12

of Company B's Illinois locations. *Id.* ¶ 48. The same day, the City of Chicago Department of Transportation approved Company B's application for a driveway permit. *Id.* ¶ 49. The permit was issued several weeks later. *Id.*

### False Statements by Andrews to FBI

On November 29, 2018, FBI agents spoke with Andrews about Individuals B-1 and B-2. R. 30, Count 10. During the conversation, Andrews falsely denied ever hearing the names of Individuals B-1 and B-2. *Id.* The agents asked Andrews whether he thought Burke had ever met Individuals B-1 and B-2. *Id.* Andrews responded that he did not know. *Id.* When the agents asked Andrews if he remembered dealing with Individuals B-1 and B-2, he falsely responded, "They may have come in to our office or something. . . . Maybe, I don't know. I don't recall." *Id.*

### Pole Sign Permit

Burke used his position as an Alderman to corruptly obtain from Cui tax business for Klafter & Burke in return for Burke's official assistance with Cui's efforts to obtain a permit for a pole sign at one of his properties. R. 30 ¶ 50. Further, Cui corruptly offered and agreed to give legal business to Burke's law firm with the intent to influence Burke in his official capacity in connection with the pole sign permit and TIF funds for Cui's property. *Id.*, Count 12. Cui was the managing member of Company C, which owned a property located at 4901 West Irving Park Road in Chicago (the "4901 Property"). *Id.* ¶¶ 1o, 1p. On April 17, 2017, Cui caused to be submitted an application for a permit to the City of Chicago Department of Buildings. *Id.* ¶ 51. The application requested that an existing pole sign at the 4901 Property be

used to advertise Company D's business at that location. *Id.* Company D was a retailer with multiple retail outlets in the Chicago area. *Id.* ¶ 1s. Company D had a contract with Company C to operate a retail outlet at the 4901 Property. *Id.* The following month, on May 18, 2017, the City of Chicago's Department of Planning and Development denied the application. *Id.* ¶ 52. In July 2017, Cui and Company C entered into an agreement with Company D that, in the event Company C could not obtain approval for Company D to use the pole sign, Company C would reduce Company D's rent at the 4901 Property. *Id.* ¶ 53.

On August 23, 2017, Cui sent an email to Burke requesting Burke's assistance with obtaining the pole sign permit. R. 30 ¶ 54. On August 24, 2017, Cui sent an email to Individual C-2, a real estate attorney, in which Cui asked Individual C-2 if Burke could handle the 4901 Property tax appeal "at least for a year." *Id.* ¶¶ 1r, 56. Cui explained that he needed Burke's help for "tif money" and for "zoning etc for my project." *Id.* ¶ 56. Cui added, "He [Burke] is a powerful broker in City Hall, and I need him now." *Id.* The same day, Cui sent Burke an email in which he told Burke he had a property at 4901, 4925, and 4939 West Irving Park Road under redevelopment. *Id.* ¶ 57. Cui told Burke he might need Burke's help for the tax appeal and asked Burke if he had the time to handle the matter. *Id.* The next day, August 25, 2017, Burke emailed Cui and told Cui that he had instructed a member of his team to reach out to Cui. *Id.* ¶ 58.

On August 30, 2017, an attorney with Klafter & Burke sent an email to Cui to initiate the process of representing Cui. R. 30 ¶ 60. Cui responded with information

for tax appeals on the 4901 Property and other properties. *Id.* ¶ 61. The same day, Burke asked an assistant in his City Hall office to call Commissioner C and to ask her to take a look at Company D and the pole sign situation. *Id.* ¶ 62. Burke asked his assistant to find out if there was any way Commissioner C "can, uh, help us." *Id.* Burke personally spoke with Commissioner C the next day. *Id.* ¶ 63.

On September 5, 2017, Cui signed a contingent fee agreement with Klafter & Burke. R. 30 ¶ 64. On September 14, 2017, Burke learned from his assistant that Commissioner C had not been able to figure out a way to issue the permit. *Id.* ¶ 65. Commissioner C suggested contacting Administrator C. *Id.* Burke then personally spoke with Administrator C and asked Administrator C to review the denial of the permit for the 4901 Property. *Id.* ¶ 66. On November 6, 2017, the Department of Planning and Development issued a final denial of the permit. *Id.* ¶ 67. Klafter & Burke performed tax work for Cui the following year. *Id.* ¶ 68.

### *False Statements by Cui to FBI*

On November 29, 2018, FBI agents spoke with Cui. R. 30, Count 17. During the interview, Cui falsely told the agents that he had made no offers to Burke during the pole signage matter. *Id.* Cui falsely stated that he offered business to Burke "just because he is a good tax appeal lawyer." *Id.* Cui also stated that the information he

15

had provided to the agents during the interview was accurate to the best of his knowledge. *Id.*

### *Museum 1 Admission Fee Increase*

Burke abused his position as Alderman by threatening to derail a proposed admission fee increase by Museum 1 due to Museum 1's failure to respond to Burke's inquiry about a paid internship position at Museum 1 for Individual E-1, the child of one Burke's personal acquaintances. R. 30 ¶¶ 1t, 69. In 2017, Museum 1 sought approval from the Chicago Park District for an increase in its admission fee. *Id.* ¶ 70. The Park District Board scheduled a hearing for September 13, 2017 to consider the requested increase. *Id.* On September 8, 2017, Burke spoke with Individual E-2, an employee of Museum 1, about the admission fee increase. *Id.* ¶ 71. Burke threatened to contact the President of the Park District Board and object to the admission fee increase because Museum 1 had failed to respond to his effort to obtain an internship position for Individual E-1. *Id.* ¶¶ 1t, 71.

On September 11, 2017, Burke received an email from Individual E-3, an executive at Museum 1, in which Museum 1 offered that Individual E-1 could apply for a full-time job at Museum 1. R. 30 ¶ 72. The next day, September 12, 2017, Burke telephoned Individual E-1's mother and told her about the potential full-time job. *Id.* ¶ 73. The same day, in response to an inquiry from Burke's assistant for more details about the position, an employee of Museum 1 sent Individual E-1 information about the position. *Id.* ¶¶ 74, 75. On September 13, 2017, the Park District Board approved an increase in Museum 1's admission fee. *Id.* ¶ 76. On September 19, 2017, Individual

E-1 told an employee of Museum 1 that she was declining consideration for the position. *Id.* ¶ 77.

### Consensually Recorded Conversations and Title III Interceptions

Between approximately August 2016 and May 2017, Alderman A consented to the recording of telephone and face-to-face conversations with Burke, including conversations about the Post Office project. The government also obtained court authorization to intercept calls on multiple telephones associated with Burke during the investigation. The interceptions on one of these telephones, Burke's cellular telephone, occurred between on or about May 12, 2017 and on or about February 11, 2018.

### The Superseding Indictment

On April 11, 2019, a grand jury returned a four-count indictment against Cui based on the pole sign incident and Cui's FBI interview. R. 1. On May 30, 2019, the grand jury returned a 19-count superseding indictment naming Burke, Andrews, and Cui as defendants.[7] R. 30. Defendants thereafter filed the now-pending pretrial motions.

The superseding indictment is premised on the above-described conduct. Burke is charged with racketeering, in violation of 18 U.S.C § 1962(c). The City of Chicago is the alleged enterprise, and the four incidents described above comprise the alleged racketeering acts. All three defendants are charged with using facilities in

---

[7] Burke had earlier been charged in a complaint with extortion in violation of 18 U.S.C. § 1951 based on the fast-food restaurant incident. *See* 19 CR 1 (N.D. Ill. Jan. 2, 2019).

interstate commerce, in violation of 18 U.S.C § 1952(a)(3) (the "Travel Act"). Burke and Andrews are charged with attempted extortion and extortion conspiracy, in violation of 18 U.S.C § 1951(a), based on the fast-food restaurant incident, and Burke is charged with attempted extortion based on the museum incident. Burke is charged with solicitation, in violation of 18 U.S.C § 666(a)(1)(B), based on the Post Office project and the pole sign incidents. Cui is charged with bribery, in violation of 18 U.S.C § 666(a)(2), based on the pole sign and TIF monies incidents. Andrews and Cui are both charged with making false statements to the FBI, in violation of 18 U.S.C § 1001(a)(2). The following chart summarizes the counts and charges in the superseding indictment.

| Count | Defendant(s) | Violation(s) | Description |
|-------|--------------|--------------|-------------|
| 1 | Burke | 18 USC § 1962(c) | Racketeering<br>Racketeering Act 1: Post Office<br>Racketeering Act 2: Post Office<br>Racketeering Act 3: Restaurant<br>Racketeering Act 4: Pole Sign<br>Racketeering Act 5: Museum |
| 2 | Burke | 18 USC § 666(a)(1)(B)<br>18 USC § 2 | Solicitation—Post Office Project |
| 3 | Burke | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—Post Office Project |
| 4 | Burke | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—Post Office Project |
| 5 | Burke<br>Andrews | 18 USC § 1951(a)<br>18 USC § 2 | Attempted Extortion—Restaurant |
| 6 | Burke<br>Andrews | 18 USC § 1951(a) | Extortion Conspiracy—Restaurant |
| 7 | Burke<br>Andrews | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—Restaurant |
| 8 | Burke<br>Andrews | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—Restaurant |
| 9 | Burke | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—Restaurant |
| 10 | Andrews | 18 USC § 1001(a)(2) | False Statement—Restaurant |

| 11 | Burke | 18 USC § 666(a)(1)(B) | Corrupt Acceptance—Pole Sign |
| 12 | Cui | 18 USC § 666(a)(2) | Corrupt Offer—Pole Sign and TIF monies |
| 13 | Cui | 18 USC § 1952(a)(3) | Travel Act—Pole Sign |
| 14 | Cui | 18 USC § 1952(a)(3) | Travel Act—Pole Sign |
| 15 | Burke Cui | 18 USC § 1952(a)(3) | Travel Act—Pole Sign |
| 16 | Burke | 18 USC § 1952(a)(3) | Travel Act—Pole Sign |
| 17 | Cui | 18 USC § 1001(a)(2) | False Statement—Pole Sign |
| 18 | Burke | 18 USC § 1951(a)(1) | Attempted Extortion—Museum |
| 19 | Burke | 18 USC § 1952(a)(3) 18 USC § 2 | Travel Act—Museum |

### *The Pretrial Motions*

Burke seeks through his pretrial motions to: (1) suppress the Title III interceptions (R. 95, 97, 100, 102, 103); (2) dismiss Counts 2 and 11 (R. 104, 105); (3) dismiss the predicate acts based on the state bribery, official misconduct, and commercial bribery statutes (R. 106, 107); (4) strike references to Amtrak in Count 1 and dismiss Counts 3 and 4 (R. 108); and (5) strike specified surplusage (R. 110). Burke requests a *Franks* hearing in connection with his motion to suppress. Andrews requests that this Court dismiss Counts 7 and 8 (R. 98, 99), and Cui requests that the Court dismiss Counts 12 through 15 (R. 88, 89). Burke and Andrews have requested bills of particulars. R. 101, 109. Andrews requests the production of favorable evidence related to his FBI interview. R. 117-119. All three defendants request severance. R. 86, 87, 96, 111-115.

# ARGUMENT

## I. Burke's Motion to Dismiss Counts 2 and 11 (R. 104 and 105) Should Be Denied.

### A. Applicable Law

An indictment must "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment complies with Rule 7 and the Constitution if it (1) states the elements of the crimes charged; (2) adequately informs a defendant of the nature of the charges brought against him; and (3) enables the defendant to assert the judgment as a bar to future prosecutions for the same offense. *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Vaughn*, 722 F.3d 918, 925 (7th Cir. 2013); *United States v. White*, 610 F.3d 956, 958-59 (7th Cir. 2010); *United States v. Anderson*, 280 F.3d 1121, 1124 (7th Cir. 2002). To successfully challenge the sufficiency of an indictment based on the failure to allege a required element, a defendant must establish both that an essential element was omitted and that he suffered prejudice as a result. *Vaughn*, 722 F.3d at 925.

"Facial sufficiency is not a high hurdle"; there is no need for an indictment to "exhaustively describe the facts surrounding a crime's commission." *United States v. Bates*, 96 F.3d 964, 970 (7th Cir. 1996), *aff'd*, 522 U.S. 23 (1997); *United States v. Westmoreland*, 240 F.3d 618, 633 (7th Cir. 2001) (an indictment need not spell out each element so long as each element is present in context). An indictment that tracks the words of a statute to state the elements of the crime generally is acceptable, so

long as the indictment states sufficient facts to place a defendant on notice of the specific conduct at issue. *Vaughn*, 722 F.3d at 925.

When considering a motion to dismiss under Rule 12(b), a court assumes all facts in the indictment to be true and "view[s] all facts in the light most favorable to the government." *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999); *see also United States v. Moore*, 563 F.3d 585, 586 (7th Cir. 2009). The court evaluates the allegations "on a practical basis and in their entirety, rather than in a hypertechnical manner." *United States v. Cox*, 536 F.3d 723, 726 (7th Cir. 2008) (quotation omitted). A motion to dismiss an indictment is not a summary-judgment motion and should not be used to "test[ ] the strength or weakness of the government's case, or the sufficiency of the government's evidence." *Moore*, 563 F.3d at 586 (citation omitted); *see also White*, 610 F.3d at 959 (courts "do not consider whether any of the [indictment's] charges have been established by evidence, or whether the Government can ultimately prove its case"); *United States v. Thomas*, 150 F.3d 743, 747 (7th Cir. 1998) (Easterbrook, J., concurring) ("Summary judgment does not exist in criminal cases." (citation omitted)); *United States v. Firtash*, 392 F. Supp. 3d 872, 885 (N.D. Ill. 2019) (Pallmeyer, J.) ("To the extent Defendants dispute the government's ability to prove their case, that is a matter for trial, not a basis for dismissal.").

## B. The Indictment Properly Alleges Federal Funds Bribery In Violation of 18 U.S.C. § 666(a)(1)(B).

Burke urges the Court to dismiss Count 2 and 11, which charge substantive § 666(a)(1)(B) offenses, on the grounds that these charges fail to allege (1) intent to

engage in a *quid pro quo*; and (2) Burke's corrupt intent in trading specific official acts, as defined by the Supreme Court in *McDonnell v. United States*, -- U.S. --, 136 S. Ct. 2355 (2016), for legal business for Burke's law firm. As pertinent here, § 666(a)(1)(B) of Title 18 makes it a crime for a public official to corruptly solicit or demand, for the benefit of any person, or to accept or agree to accept, anything of value, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of a government, organization, or agency that receives a threshold amount of federal funding involving anything of value of $5,000 or more. 18 U.S.C. § 666(a)(1)(B).

Based on this provision's plain language, the following elements must be proven to establish an offense under of § 666(a)(1)(B):

> (1) That the defendant was an agent of the City of Chicago;
>
> (2) That the defendant solicited, demanded, accepted, or agreed to accept something of value from another person;
>
> (3) That the defendant did so corruptly with the intent to be influenced or rewarded in connection with some business, transaction, or series of transactions of the City of Chicago, with corruptly defined as acting with the understanding that something of value is to be offered or given to reward or influence him in connection with his official duties;
>
> (3) That this business, transaction, or series of transactions involved a thing having a value of $5,000 or more; and
>
> (4) That the City of Chicago received benefits of more than $10,000 under a federal program during a one-year period.

Pattern Criminal Jury Instructions of the Seventh Circuit (2020 ed.) at 274 ("Pattern Instructions").

All of the above elements are properly alleged in Counts 2 and 11, both in language that tracks the wording of § 666(a)(1)(B), and in detailed factual allegations that describe the specific nature of the charges. Specifically, in Count 2, the superseding indictment alleges that Burke "corruptly solicited and demanded things of value, . . . intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City of Chicago involving a thing of value of $5,000 or more" in violation of § 666(a)(1)(B). R. 30, Count 2. The count puts Burke on fair notice of the conduct at issue, including by specifying the relevant dates (in or around 2017 and continuing to January 18, 2018), the place (Chicago), the "things of value" Burke sought ("fees arising from the retention of his law firm, Klafter & Burke"), and the business or transactions in connection with which Burke intended to be influenced and rewarded ("approvals from the City of Chicago Water Department, a Class L designation, and tax increment financing in connection with the Post Office project"). *Id*. Further, the "Post Office project" and the entities and individuals involved in that project are described in Paragraph 1(i) of Count 1, which is incorporated by reference in Count 2.[8]

Likewise, Count 11 alleges that Burke "corruptly accepted and agreed to accept things of value . . . intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City of Chicago involving a

---

[8] The allegations in Count 1 at Paragraphs 5 to 32, while not expressly incorporated in Count 2, also provide ample notice to Burke of the government's allegations regarding the Post Office project. *See Moore*, 563 F.3d at 585 (indictment should be reviewed on its face "as a whole" for purposes of a motion to dismiss).

thing of value of $5,000 or more" in violation of § 666(a)(1)(B). R. 30 at 49. The count puts Burke on fair notice of the conduct at issue, including by specifying the relevant dates (in or around August 2017, and continuing until in or around 2018), the place (Chicago), the things of value Burke accepted or agreed to accept ("fees arising from the retention of his law firm, Klafter & Burke"), and the City transactions in connection with which Burke intended to be influenced or rewarded ("a permit concerning the 4901 Property"). *Id*. Additional details about the Post Office project and the 4901 Property permit, as relevant here, were alleged in Count One. *Id*. at 10-17, 22-25.

In view of its detailed allegations, Counts 2 and 11 satisfy all legal and constitutional requirements. Both counts are more than sufficient to notify Burke of the charged offenses, protect him from double jeopardy, and enable him to prepare a defense; thus, they are facially valid. *See*, *e.g.*, *Vaughn*, 722 F.3d at 927 (indictment is adequate if it sets forth the elements of the offense, identifies the date and time of the alleged criminal conduct, and provides citations to applicable statutes (citing *United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003)).

## C. The Indictment Is Not Defective for Failing to Allege a "*Quid Pro Quo.*"

Burke contends that an indictment charging violations of § 666(a)(1)(B) must allege "intent to engage in a *quid pro quo*." R. 105 at 7-20. The plain text of § 666(a)(1)(B) reflects no such requirement, and the Seventh Circuit has repeatedly

held that there is no such requirement.[9]

A statute must be interpreted consistent with its plain meaning. *See*, *e.g.*, *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (noting that the "preeminent canon of statutory interpretation" is that Congress "says . . . what it means and means . . . what it says." (quotation marks omitted)); *Wisconsin Central Ltd. v. United States*, -- U.S. --, 138 S. Ct. 2067, 2070 (2018) (court is obliged to interpret "words consistent with their 'ordinary meaning at the time Congress enacted the statute'" (quotation marks omitted)). By its plain text, § 666(a)(1)(B) makes it a crime for a public official to demand, solicit, accept, or agree to accept a thing of value from another person, where the official acts "corruptly," "intending to be influenced or rewarded in connection with any business, transaction, or series of transactions" of the government agency by which he is employed. 18 U.S.C. § 666(a)(1)(B). Nothing in § 666(a)(1)(B) even remotely suggests that the guilt of a defendant who accepts a thing of value with the requisite scienter is contingent upon a *quid pro quo* bribery agreement or understanding with the payor. Indeed, the structure of § 666—which defines as separate crimes the offering and giving of a bribe or reward, *see* § 666(a)(2), and the solicitation and acceptance of a bribe or reward,

---

[9] Defendants use the phrase "*qui pro quo*" throughout their briefs, without clarity as to what they view that term to mean. With respect to § 666, it is clear that no *quid pro quo* in any form is required. Even in the context of honest services fraud, where a *quid pro quo* is required, no meeting of the minds between both parties or completed exchange is necessary; an intention by one party to engage in a *quid pro quo* suffices for that party to be held criminally responsible. *See, e.g., United States v. Ring*, 706 F.3d 460, 467-68 (D.C. Cir. 2013) (no completed corrupt exchange or agreement needed for honest services fraud; the statute punishes the scheme, not its success); *United States v. Avenatti*, 432 F. Supp. 3d 354, 365 (S.D.N.Y. 2020).

*see* § 666(a)(1)(B)—confirms that no *quid pro quo* agreement or understanding is required to establish a § 666(a)(2) offense. In other words, § 666(a)(1)(B) makes clear that the guilt of a public official who solicits a bribe or reward is not contingent on the solicitation target's payment or agreement to pay as requested.

Relying on the statute's plain language and structure, the Seventh Circuit repeatedly has held that no *quid pro quo* agreement or understanding is required to establish a violation of § 666. *See*, *e.g.*, *United States v. Hawkins*, 777 F.3d 880, 883-84 (7th Cir. 2015) (proof of a completed exchange is not required to establish a violation of § 666 (a)(1)(B)); *United States v. Mullins*, 800 F.3d 866, 871 (7th Cir. 2015) (holding that evidence of *quid pro quo* is not necessary to establish a violation of § 666(a)(1)(B)); *United States v. Boender*, 649 F.3d 650, 654 (7th Cir. 2011) (noting that "it is clear that our circuit, like most others, does not require a specific *quid pro quo*" in cases involving charged violations of § 666(a)(2)); *United States v. Gee*, 432 F.3d 713, 714 (7th Cir. 2005) (holding that a *quid pro quo* is sufficient but not necessary to violate § 666(a)(1)(B)); *United States v. Agostino*, 132 F.3d 1183, 1190-91 (7th Cir. 1997) (§ 666(a)(2), "by its statutory language, requires that the defendant act '*corruptly . . . with intent to influence or reward*,'" and on that basis "declin[ing] to import an additional, specific *quid pro quo* requirement into the elements of § 666(a)(2)").

Burke argues (R. 105 at 25-26) that the Supreme Court's statement in *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999), identifying a *quid pro quo* as an element of bribery under 18 U.S.C. § 201(b), indicates that § 666, which

also includes the phrase "intent to influence," must also include that element. *Sun-Diamond* in no way suggests that a bribery offense charged under § 201(b)—or a bribery offense under § 666—requires proof of a completed exchange or corrupt intent on the part of both parties. Instead, the Court distinguished between the scienter requirements of § 201(b) (bribery) and § 201(c) (illegal gratuities) to illustrate the distinct scienter requirement applicable to illegal gratuity offenses under § 201(c): proof of "a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." 526 U.S. at 404-06, 413.

In the years since *Sun-Diamond*, the Seventh Circuit repeatedly has reaffirmed its conclusion that a specific *quid pro quo* is not required to establish a violation of § 666. *See Gee*, 432 F.3d at 714; *Boender*, 649 F.3d at 654; *Mullins*, 800 F.3d at 871. More specifically, in *Gee*, the Seventh Circuit held that a "*quid pro quo* of money for a specific legislative act" was sufficient, but not necessary, to establish a violation of § 666(a)(1)(B). 432 F.3d at 714. At issue in *Gee* was a conspiracy to exchange payments to a Wisconsin senator to influence the awarding of contracts to Opportunities Industrialization Center of Greater Milwaukee. In addressing the defendant's challenge to the sufficiency of the evidence, the court rejected the argument that the charged conspiracy had not been proven because the evidence failed to establish any specific act taken by the senator in response to any specific payment, and held that "[a] *quid pro quo* of money for a specific legislative act is *sufficient* to violate the statute, but it is not *necessary*." *Id.* The court explained:

It is enough if someone "corruptly solicits or demands for the benefit of

27

> any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B).

432 F.3d at 714-15. The court held that a jury could reasonably conclude that the senator had the requisite corrupt intent, and therefore conspired to violate § 666. *Id.* Thus, the court made clear its rejection of the proposition that a *quid pro quo* is required to establish a bribery offense under § 666; the decision also indicates that an "exchange" of money for influence may be inferred from the acceptance of a bribe with corrupt intent.

In *Mullins*, the defendant was charged with violating § 666(a)(1)(B) based on his solicitation and acceptance of kickbacks from vendors whom he assisted in obtaining service contracts with Cook County. 800 F.3d at 867-68. The defendant challenged his conviction, arguing that the government had produced no evidence of a *quid pro quo. Id.* at 871. The court held that evidence of a *quid pro quo* was not required to establish a violation of § 666(a)(1)(B) but, even if it were, jurors could infer that the cash defendant received from the vendors "was a reward—a bribe—for buying his influence in obtaining their contracts" given that the vendors received contracts in return for their kickback payments. *Id.*

In *Boender*, the Seventh Circuit addressed whether a specific *quid pro quo* was required to establish a violation § 666(a)(2), in the context of a challenge to the instructions presented to the jury. 649 F.3d 650. Boender was convicted based on evidence showing that, intending to influence a Chicago alderman in connection with

the rezoning of certain industrial property, he paid $38,000 for repairs to the alderman's home and convinced business associates to contribute, at his expense, to the Congressional campaign of the alderman's aunt.

On direct review, Boender challenged the court's failure to instruct the jury that a specific *quid pro quo* was necessary to sustain a conviction, and the government's failure to prove such a *quid pro quo*. The Seventh Circuit held, consistent with its precedent, that proof of a *quid pro quo* was not necessary to establish a violation of § 666(a)(2) and, therefore, a jury instruction requiring one would have been incorrect as a matter of law. 649 F.3d at 654. In reaching this conclusion, the court specifically rejected Boender's argument (repeated by defendants here, R. 105 at 25-26) that, pursuant to *Sun-Diamond*, § 666 should be construed consistently with 18 U.S.C. § 201(b) (proscribing bribery of federal officials):

> Boender's premise is false: while parallel in some respects, the two statutes differ in the provisions central to Boender's argument. Whereas § 201(b) makes it a crime to "corruptly give[ ], offer [ ] or promise[ ] anything of value to any public official . . . with intent to influence any official act," § 666(a)(2) criminalizes corrupt giving "with intent to influence *or reward*" a state or local official. Further, § 201(b) is complemented by § 201(c), which trades a broader reach—criminalizing *any* gift given "for or because of any official act performed or to be performed," § 201(c)(1)(A)—for a less severe statutory maximum of two, rather than fifteen, years' imprisonment. Section 666(a)(2) has and needs no such parallel: by its plain text, it already covers both bribes and rewards.

> Moreover, Boender's parallel is undermined by *Sun–Diamond* itself. There, the Supreme Court distinguished between bribes, rewards, and other gratuities. The bribery provision, § 201(b), covers only bribery and requires a specific *quid pro quo*. Sun–Diamond, 526 U.S. at 404, 119 S.Ct. 1402. The "illegal gratuity" provision, § 201(c), on the other hand, requires only the identification of a specific official act "for or because of which" a gift was given. *Id*. at 406, 119

S.Ct. 1402. Tellingly, the example of an illegal gratuity that the Court cited was "a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *Id.* at 405, 119 S.Ct. 1402. Section § 666(a)(2), however, criminalizes both bribes and rewards in the same section. If the Supreme Court's construction of § 201 in *Sun–Diamond* tells us anything about § 666(a)(2), it is what we said in *Gee*: "A *quid pro quo* of money for a specific legislative act is sufficient to violate [§ 666], but it is not necessary."432 F.3d at 714.

Absent any reasons to reconsider our precedent—and indeed in light of the clear statutory text—we conclude that the government was not required to establish a specific *quid pro quo* of money in exchange for a legislative act.

649 F.3d at 655 (emphasis in original).

Burke's reliance on the Seventh Circuit's statement in *United States v. Medley*, 913 F.2d 1248 (7th Cir. 1990), that "[t]he essential element of a section 666 violation is '*quid pro quo*'; that is, whether the payment was accepted to influence and reward an official for an improper act" (R. 105 at 18; 913 F.2d at 1260), is misplaced. The court in *Medley* made that statement in the context of a challenge to the omission of an instruction defining the term "corruptly." The court held that, where a defendant is charged with accepting or agreeing to accept payment intending to be influenced or rewarded in the performance of his official duties, the term "corruptly" was "self-defining" and the failure to separately address it in the jury instructions was not plain error. 913 F.2d at 1261. Thus, the focus of the court's statement was the statute's requirement of corrupt intent, and it has no bearing on whether proof of a "*quid pro quo*" is required to establish a violation of § 666. *See id.* at 1260-61. Needless to say, the court did not remotely suggest that a *quid pro quo* must be specifically identified in the indictment.

The Seventh Circuit subsequently made that point crystal clear in *Agostino*. 132 F.3d at 1190 (stating that the question of "whether an indictment must contain specific allegations of a *quid pro quo* was not before the *Medley* court and it did not rule on this issue"). The *Agostino* court distinguished § 666(a)(2) from the provision at issue in *Medley* (§ 666(a)(1)(B)), and found that it was clear from the context of the statement that "the *Medley* court was not positing an additional element to the statutory definition of the crime, but instead was explaining the *sine qua non* of a violation of § 666," that is, the corrupt intent of the defendant in question. 132 F.3d at 1190. The court held, "[t]he elements of the offense remain those that are set forth in the statutory language." *Id*. After analyzing *Medley*, the *Agostino* court held that the indictment before it—which tracked the words of the statute—was not facially deficient for failing to include allegations of a specific *quid pro quo*. *Id.*

Indeed, *Agostino*'s discussion of the *Medley* court's analysis in the context of distinguishing § 666(a)(2) and § 666(a)(1)(B) made clear that guilt under § 666(a)(1)(B) depends on solely the corrupt intent of the public official, and guilt under § 666(a)(2) depends solely on the corrupt intent of the person who offers or pays the bribe or reward. Neither provision requires proof of a meeting of the minds or agreement between the two parties or a completed transaction.

Burke characterizes *United States v. Johnson*, 874 F.3d 990, 1002 (7th Cir. 2017), as having "signaled an even narrower read of § 666(a)(1)(B) as covering only *quid pro quo* bribery." R. 105 at 12. There is no merit to this claim. In *Johnson*, the defendant, after being convicted of a violation of § 666, challenged the instruction

31

that stated (as does the statute) that he could be found guilty if he "accepted anything of value from another person" and "acted corruptly with the intention to be influenced or rewarded in connection with some transaction or series of transactions," and, like the circuit's pattern instructions, further stated that a "person acts corruptly when that person acts with the understanding that something of value is to be offered or given to reward or influence him in connection with his official duties." *Id.* at 1001. The Seventh Circuit rejected the defendant's argument that the instructions impermissibly allowed him to be convicted of a gratuity. *Id.* at 1001-02.

The court started by reaffirming the circuit precedent that holds that § 666 criminalizes the receipt of both bribes *and* gratuities, meaning the instruction was not clearly erroneous. 874 F.3d at 1001. The court then held, in the alternative, that mere use of the word "reward" does not necessarily signal a gratuity instead of a bribe, and that the challenged instruction—despite the inclusion of the word "reward"—made the defendant's conviction contingent upon his acceptance of a bribe, because it told the jury that he needed to have corrupt intent at the time he "*accepted*" the bribe. *Id.* The court rejected the argument that the instruction "hypothetically" could be understood as permitting a conviction based on the defendant's acceptance of "gratuities," particularly since the evidence showed that the defendant received kickbacks (or bribes), rather than gratuities, in that the defendant intended to be paid for official acts before he received payment and before he took action. *Id.* at 1002. Thus, the *Johnson* court did not address whether a *quid pro quo* is a necessary element of proof under § 666 and did not need to do so, given that the case involved a

32

clear *quid pro quo*: the defendant's steering of government property in exchange for prearranged kickbacks. And, importantly, the court in *Johnson* held that the jury instructions—which did *not* contain a *quid pro quo* requirement but, rather, tracked the statutory language (as the indictment does in this case)—accurately stated the elements of bribery under § 666. 874 F.3d at 1001.[10]

Here, Burke is charged with accepting and agreeing to accept things of value (in Count 11), and with soliciting, demanding, and agreeing to accept things of value (in Count 2), with corrupt intent to be influenced or rewarded. Even were this Court to find that § 666 requires that the indictment allege an intended or consummated *quid pro quo* (which it does not), the indictment would still be more than sufficient. The indictment here, which tracks the language of § 666, includes ample factual

---

[10] Defendants also rely on District Judge Edmond Chang's memorandum opinion in *United States v. Tamras-Martin*, Case No. 18 CR 267-2 (N.D. Ill. Feb. 17, 2019). R. 105 at 28. In *Tamras-Martin*, the government pursued a bribery theory only, and Judge Chang instructed the jury that a *quid pro quo*—or an exchange of a thing of value for an official act—was required. In examining the Seventh Circuit's decisions in *Boender*, *Gee*, and *Mullins*, Judge Chang focused on the distinctions made in those cases between the way bribery and illegal gratuities are treated in the federal bribery statute (§ 201) and the federal program bribery statute (§ 666)—particularly, the fact that § 666, unlike § 201, addresses both bribery and illegal gratuities in the same statutory provision—and concluded that, where a "reward" or gratuity theory is not presented, the jury should be provided with instructions that mirror those applicable to § 201(b) bribery cases, which include a *quid pro quo* requirement.

The government respectfully disagrees with Judge Chang's analysis, which was rejected by Judge Lee in a recent decision. *See United States v. Donagher*, No. 19 CR 240, 2021 WL 663181, at *7 (N.D. Ill. Feb. 19, 2021) (Lee, J.) (indictment need not allege a quid pro quo where the government charges an intent to influence violation of § 666(a)(2)). The Seventh Circuit has, on numerous occasions, cited the textual differences between § 666 and § 201 in concluding that § 666 requires no proof of a *quid pro quo*. It reached that conclusion before *Sun-Diamond*, and it has reaffirmed the conclusion numerous times since *Sun-Diamond*. Had the court wanted to limit its holdings in the manner suggested by Judge Chang, it would have done so in plain terms. Moreover, Judge Chang's analysis is not applicable here. The indictment alleges that defendants acted with intent to both influence and reward.

allegations from which a *quid pro quo* may be inferred: Burke accepted Company C's legal business in exchange for his assistance with the pole sign permit, and solicited and demanded that Company A hire his firm in exchange for his assistance with the Post Officer Water Department approvals, TIF funding, and Class L designation.

### D. The Indictment Is Not Deficient Based on a Failure to Allege an "Official Act," Because *McDonnell*'s "Official Act" Standard Does Not Apply To § 666.

Relying on *McDonnell,* 136 S. Ct. 2355, Burke contends that the indictment should be dismissed because it fails to allege that the charged payments were made in exchange for an "official act," as that term is defined in *McDonnell*. R. 105 at 28-29. This argument lacks merit.

In *McDonnell*, the governor of Virginia and his wife were charged with honest services fraud, in violation of 18 U.S.C. § 1346, and Hobbs Act extortion, in violation of 18 U.S.C. § 1951, based on their acceptance of luxury goods, vacations, and personal loans from a Virginia businessman seeking to influence the funding decisions of state medical schools. 136 S. Ct. at 2362, 2364. McDonnell was convicted after trial, and his conviction was affirmed by the court of appeals. *Id*. at 2366-67. The Supreme Court reversed, holding that the jury instructions' definition of "official act," as pertinent to the charged statutes, was flawed. The Court held that the district court should have instructed the jury that (1) it must identify a "question, matter, cause, suit, proceeding or controversy involving the formal exercise of government power," *id*. at 2374; (2) the pertinent "'question, matter, cause, suit, proceeding or controversy' must be something specific and focused that is 'pending' or 'may by law be brought

before any public official,' such as the question whether to initiate the research studies," *id.*; and (3) "merely arranging a meeting or hosting an event to discuss a matter does not count as a decision or action on that matter." *Id.* at 2375.

Whereas *McDonnell* involved a prosecution for honest services fraud and extortion under color of official right, which both require proof that charged bribes were paid in exchange for an "official act" of the bribed official (for § 1346) or that the bribed official was acting under "color of official right" (for § 1951), § 666 does not use the term "official act" or "official right." Instead, § 666(a)(1)(B) proscribes things of value being corruptly solicited, demanded, or accepted by a public official "intending to be influenced or rewarded in connection with any business, transaction, or series of transactions" of the relevant governmental entity. Section 666 requires that the thing of value being solicited, demanded, or accepted be in connection with "any business [or] transaction" of the government entity, rather than an official act, and it does not include a list of concrete items, such as "cause, suit, proceeding or controversy," which the Supreme Court found implicitly limited the terms "question [or] matter." In other words, § 666 does not require that the defendant contemplate an exchange for a discrete official act, so long as he intended to be influenced in connection with governmental business more generally.

While the Seventh Circuit has not addressed the issue, every circuit court that has done so has declined to import *McDonnell*'s holding into prosecutions under § 666 for the above reasons. *See United States v. Ng Lap Seng*, 934 F.3d 110, 131-33 (2d Cir. 2019) (holding that § 666 is "more expansive" than § 201, so "the *McDonnell*

standard" does not apply); *United States v. Boyland*, 862 F.3d 279, 291 (2d Cir. 2017) (same); *United States v. Maggio*, 862 F.3d 642, 646 n.8 (8th Cir. 2017) ("*McDonnell* had nothing to do with § 666.").[11] Thus, *McDonnell* provides no basis for finding that the indictment in this case is deficient for failure to allege an "official act" to be performed by Burke.

### E.     Burke's Constitutional Arguments Are Without Merit.

No court has ever held that § 666—a lynchpin of federal law enforcement for upwards of 37 years—is unconstitutionally vague or overbroad, or otherwise constitutionally deficient, and this Court should decline defendants' invitation to be the first to do so.

The void-for-vagueness doctrine, derived from the Due Process Clause, see U.S. Const., amend. V, provides that a penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). A criminal statute violates the Fifth Amendment's guarantee of due process of law if it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595

---

[11] Burke cites *United States v. Skelos*, 707 Fed. App'x 733 (2d Cir. Sept. 26, 2017) (R. 105 at 39), without recognizing that the Second Circuit rejected the analysis in *Skelos* in *Ng Lap Seng*, 934 F.3d at 130, 133 n.25.

(2015). To be facially vague, a statute must be vague in all its applications. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982).

Section 666 is not vague. Intended to "protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery," *Sabri v. United States*, 541 U.S. 600, 606 (2004) (quotation marks and citation omitted), § 666 prohibits a public official's corrupt demand, solicitation, and acceptance with the intent to be influenced or rewarded "in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more." 18 U.S.C. § 666. As multiple courts have held, the language of this statute is adequate to alert a reasonable person of ordinary intelligence to the conduct it prohibits and presents no risk of arbitrary enforcement. *See United States v. Hardin*, 874 F.3d 672, 677 (10th Cir. 2017); *United States v. Nelson*, 712 F.3d 498, 510 (11th Cir. 2013); *United States v. Crozier*, 987 F.2d 893, 900 (2d Cir. 1993); *United States v. Ryans*, 709 F. App'x 611, 619 (11th Cir. 2017); *Donagher*, 2021 WL 663181, at *13 ("Every circuit court to have addressed this issue has held that § 666 is not void for vagueness.").

This is because, while the scope of § 666(a)(1)(B) is broad, its reach is limited in important respects. First, it applies only in the context of bribes and gratuities paid to agents of government agencies and organizations that receive more than $10,000 of federal funds in a one-year period. *See* 18 U.S.C. § 666(b). Second, it applies only to things of value provided to influence or reward such agents "in connection with business, transaction, or series of transactions" having a value of more than §5,000.

37

*See id.* § 666(a). Third, and most importantly, it applies only to defendants who act with corrupt intent. *Id.* This scienter requirement mitigates any possible ambiguity in the statute. *See Vill. of Hoffman Estates*, 455 U.S. at 499 (explaining that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed").

Burke has made no showing that, in the approximately 37 years § 666 has been on the books, the statute has been applied in manner that is arbitrary or discriminatory. Notably, no court has found § 666 to be overbroad, facially or as applied.

Relatedly, Burke argues that the Supreme Court's narrowed construction of the term "official act" in *McDonnell*, 136 S. Ct. 2355, was motivated by constitutional concerns that implicitly require all federal bribery statutes to contain an "official act" element; and that, absent such a requirement, the statute is unconstitutionally vague and overbroad and violates principles of federalism. R. 105 at 33-34, 37-38. As discussed above, *McDonnell* has no application to § 666, and it does not suggest a constitutional infirmity in that statute. The fact that § 666 does not use the term "official act" does not make the statute so vague as to make it incomprehensible to people of ordinary intelligence or create a risk of arbitrary enforcement.

Moreover, the conduct at issue in *McDonnell* is easily distinguished from the conduct of defendants in this case. In *McDonnell*, the alleged criminal conduct essentially consisted of facilitating meetings: McDonnell was alleged to have arranged meetings with government officials; hosted events designed to encourage

38

researchers to study a private company's product; contacted other government officials; allowed Williams to invite individuals to events at his mansion; and recommended to other government officials that they meet with the private company's executives. In other words, McDonnell was not alleged to have accepted bribes with corrupt intent to be influenced in connection with government business or transactions; all he did was facilitate meetings.

*McDonnell* dealt with a fundamentally different issue than what is at stake here. *McDonnell* was, quite simply, about what constitutes an official act in the context of honest services fraud; there was no question that the government had proven a *quid pro quo* exchange. The issue was whether the proved *quo*—the meetings arranged, events hosted, and contacts made—properly counted as "official act[s]" under § 201(a)(3). Here, there is no question that the "*quo*" constituted more than access or meetings: for example, Burke was involved in passing an ordinance providing TIF funding to Company A in connection with the Post Office project, among other governmental actions, held up a permit for a restaurant until he got legal work, and used his influence as an alderman to seek a City permit for Cui. This is precisely the type of corruption the federal bribery statutes are meant to criminalize.

## II. Burke's Motion to Dismiss and/or Strike "Amtrak/Post Office"-Based Counts and Racketeering Act (R. 108) Should Be Denied.

Burke moves to dismiss Counts 3 and 4 pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v) for failure to state an offense, and to strike allegations

related to Amtrak from Count 1, Racketeering Act 1, as surplusage pursuant to Federal Rule of Criminal Procedure 7(d). R. 108. Burke's claim is that the challenged allegations and counts are legally inadequate because they relate to events unconnected to his performance of any official act as Alderman or fail to identify any official acts that were or could be performed by him as Alderman with respect to Amtrak. Contrary to defendant's contention, the challenged allegations and counts relate directly to Burke's multi-pronged corrupt effort to obtain property from Individual A-1 (fees for legal work performed by his firm), intending to be influenced or rewarded in connection with official business related to the Post Office project. Burke's motion should be denied.

## A. The Challenged Counts

Count 1 charges Burke with participating in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Specifically, Racketeering Act 1 alleges that Burke committed multiple sub-predicate acts, including:

> (1) an act involving bribery, namely attempted bribery, in violation of 720 ILCS 5/33-1(e) (Bribery) and 720 ILCS 5/8-4 (Attempt), specifically, attempting during the period beginning in or around August 2016, and continuing to on or about January 18, 2018, to solicit and agree to accept property and personal advantage, namely, tax work for his law firm, Klafter & Burke, pursuant to an understanding that he and Alderman A would improperly influence the performance of an act related to their employment and function as Aldermen, and the employment and function of other employees of the City of Chicago, namely, acts taken by Burke and Alderman A, and other employees of the City of Chicago concerning approvals from Amtrak, approvals from the City of Chicago Water Department, a Class L designation, and tax increment financing in connection with the Post Office project;

(2)     an act involving bribery, namely bribery, in violation of 720 ILCS 5/33-3(a)(4), specifically, soliciting, during the period beginning in or around August 2016, and continuing to on or about January 18, 2018, a fee and reward which he knew was not authorized by law, namely, fees arising from the retention of his law firm, Klafter & Burke, for the performance of an act, namely, acts taken by Burke concerning approvals from Amtrak, approvals from the City of Chicago Water Department, a Class L designation, and tax increment financing concerning the Post Office project;

(3)     a violation of 18 U.S.C. §§ 1952(a)(3) and 2, specifically, in that on June 19, 2017, at approximately 2:08 p.m., Burke used a facility in interstate commerce, namely, a cellular telephone, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 720 ILCS 5/33-1(e) (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, performed and attempted to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity; and

(4) a violation of 18 U.S.C. §§ 1952(a)(3) and 2, specifically, in that on June 20, 2017, Burke used a facility in interstate commerce, namely, an email account and associated communication network, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 720 ILCS 5/33-1(e) (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, performed and attempted to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity.

Counts 3 and 4 charge violations of the Travel Act that substantially track subparagraphs (3) and (4) of Count 1, Racketeering Act 1.

With respect to Count 1, Racketeering Act 1, Burke makes clear that he challenges only the allegations related to his intercessions with Amtrak officials on behalf of Company A. *See* R. 108 at 2, n 1.

41

**B.    The Superseding Indictment Properly Alleges Violations of RICO and the Travel Act.**

**1.    Count 1, Racketeering Act 1**

Section 1962(c), the racketeering charge alleged in Count 1, provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). The essential elements of a § 1962(c) charge are: (1) the City of Chicago was an enterprise; (2) the defendant was associated with or employed by the enterprise; (3) the defendant knowingly conducted or participated in the conduct of the affairs of the City of Chicago through a pattern of racketeering activity; and (4) the activities of the City of Chicago affected interstate commerce. Pattern Instructions at 724. A "pattern" of racketeering activity requires that the defendant committed, or caused another person to commit, at least two racketeering acts and that those acts were in some way related to each other and that there was continuity between them. *Id.* at 726. Racketeering Act 1, one of the five alleged racketeering acts in Count 1, alleges the dates of the offenses, the participants, the locations, the citations to the underlying statutes allegedly violated, and the offense conduct in language which closely tracks the wording of the predicate statutes.

Count 1 properly alleges a § 1962(c) charge and satisfies Rule 7(c)(1)'s pleading requirements. *See White*, 610 F.3d at 958; *Vaughn*, 722 F.3d at 925 (a charge that tracks the language of the statute typically suffices if it contains enough facts to

provide the defendant with an understanding of the conduct at issue). The count states each element of the offense, identifies the enterprise (the City of Chicago), describes the manner and means of the alleged racketeering violation, and sets forth five alleged racketeering act that comprise a pattern of racketeering activity, with sufficient detail to put Burke on notice of the nature of the offense.

No greater detail is required from an indictment when alleging a RICO offense or the racketeering acts forming the basis of the charged offense. *See United States v. Yannotti,* 541 F.3d 112, 127 (2d Cir. 2008) (challenged racketeering act sufficient under Rule 7(c) because indictment made clear the nature of the criminal conduct, the time span, and the location where the conduct occurred). The count alleges specific facts that are more than sufficient to inform Burke of the nature of the charges to allow him to prepare a defense and to plead the judgment as a bar to any future prosecutions. Indeed, Burke does not even request dismissal of Count 1 or Racketeering Act 1, and instead seeks only the striking of specific allegations, relief that is not warranted here for reasons discussed below.

Burke's overarching claim—regarding this count and the others—is that he worked solely in a personal and non-governmental capacity in his dealings with respect to Amtrak, and therefore his intercessions with Amtrak on behalf of Company A as alleged in the indictment do not amount to a violation of Illinois law. Therefore, he claims, allegations concerning those dealings do not constitute racketeering acts for purposes of the RICO violation charged in Count 1, or predicates for the Travel

Act violations charged substantively in Counts 3 and 4. As an initial matter, Burke misconstrues the purpose of a motion to dismiss.

It is not the Court's role on a motion to dismiss to assess the potential success of the government's case at trial. *See United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002) (Rule 12(b)(3)(B)(v) motion to dismiss "cannot be used as a device for a summary trial of evidence"). The argument that Burke was acting in a personal, non-governmental capacity in his dealings with Amtrak on behalf of Company A, although wrong, is a factual one for the jury to assess. *See United States v. Koll*, No. 09 CR 958-1, 2010 WL 996458, at *2 (N.D. Ill. Mar. 16, 2010) (defendant could not challenge her status as an agent through a motion to dismiss an 18 U.S.C. § 666 charge because agency was a factual question that could not be resolved on a motion to dismiss); *see also United States v. Snyder,* 428 F.2d 520, 522 (9th Cir. 1970) ("A motion to dismiss is not the proper way to raise a defense."); *United States v. Raineri,* 521 F. Supp 16, 24 (W.D. Wis. 1980) (defendant's claim that his bar was not a business enterprise involved in prostitution and that his own involvement was sporadic were issues to be resolved by a jury and not through a motion to dismiss indictment).

At this stage, the Court's review is limited to determining whether the offenses charged, including the predicate acts for the RICO violation, are sufficiently pled and provide sufficient notice to Burke of the crimes committed. *See United States v. Hillie,* 289 F. Supp. 3d 188, 193 (D.D.C. 2018) (in ruling on a motion to dismiss, the court is "limited to reviewing the fact of the indictment and, more specifically, the language used to charge the crimes"). The challenged counts meet these requirements.

44

## 2. Counts 3 and 4

Counts 3 and 4 allege violations of Section 1952(a)(3) of the Travel Act. Section 1952(a)(3) provides:

> Whoever travels in interstate or foreign commerce or uses . . . any facility in interstate or foreign commerce, with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform . . . an act [to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity] [shall be imprisoned and fined in accordance with the law].

18 U.S.C. § 1952(a)(3). The essential elements of a Section 1952(a)(3) charge are: (1) the defendant used or caused to be used a facility in interstate or foreign commerce; (2) the defendant did so with the intent to promote, manage, establish, or carry on an unlawful activity or facilitate the promotion, management, establishment or carrying on of an unlawful activity; and (3) thereafter the defendant did or attempted to promote, manage, establish, or carry on an unlawful activity, or facilitate or attempt to facilitate the promotion, management, establishment, or carrying on of an unlawful activity. Pattern Instructions at 691. "Unlawful activity" for purposes of the Travel Act includes "bribery" and "extortion" in violation of the laws of the state in which the federal offense was committed. *Id.* at 694; *see also* 18 U.S.C. § 1952(b) ("'[U]nlawful activity' means . . . extortion, [and] bribery . . . in violation of the laws of the State in which committed or of the United States. . . .").

Counts 3 and 4, like Count 1, each state all the elements of the offense, tracking the statutory language of § 1952(a)(3). Specifically, both counts allege Burke's use of

a facility in interstate commerce, Burke's intent to promote, manage, establish, or carry on an unlawful activity or facilitate the promotion, management, establishment or carrying on of an unlawful activity, namely, three violations of state law concerning attempted bribery, official misconduct, and commercial bribe receiving, and that Burke performed or attempted to perform an act to carry on and facilitate the promotion and carrying on of the unlawful activity. The counts also inform Burke of the specific basis of the charge by specifically identifying a particular use of a facility in interstate commerce: (1) the June 19, 2017 telephone call described in Count 3; and (2) the June 20, 2017 email described in Count 4. Both counts allege specific facts that are more than sufficient to inform Burke of the nature of the charges to allow him to prepare a defense and to plead the judgment as a bar to any future prosecutions. Indeed, Burke does not contend that they provide insufficient notice of the nature of the charges. Instead, Burke contends that Counts 3 and 4 are legally insufficient because they fail to identify a specific official act that Burke performed or intended to perform in exchange for the legal fees to be paid by Individual A-1 or Company A. Once again, Burke is incorrect.

The Travel Act "refers to state law only to identify the defendant's unlawful activity"—the government need not *prove* the completion of the identified state crime. *United States v. Campione,* 942 F.2d 429, 434 (7th Cir. 1991); *see also United States v. Baker*, 227 F.3d 955, 961 (7th Cir. 2000) ("In short, since § 1952 does not incorporate state law as part of the federal offense, violation of the [Travel] Act does not require proof of a violation of state law." (citation omitted)); *United States v.*

*Karigiannis*, 430 F.2d 148, 150 (7th Cir. 1970) ("[P]roof that a state law had actually been violated was not a necessary element of the offense [§ 1952]."). As a result, it is sufficient that the indictment alleges that Burke used interstate facilities—a telephone and email—with the *intent* to promote, manage, establish, and carry on unlawful activity—bribery, official misconduct, and commercial bribery—even if he did not actually violate those state statutes. Thus, the motion to dismiss as to Counts 3 and 4 should be denied on this ground as well.

Moreover, Burke's arguments based on the elements of the predicate state offenses lack merit and provide no basis for dismissal. The indictment properly alleges the predicate state offenses—bribery, attempted bribery, official misconduct, and commercial bribery. Contrary to Burke's contention, the Supreme Court's "narrow[ ] defin[ition]" of "official action" in *McDonnell,* 136 S. Ct. 2355, has no application to state bribery statutes. *McDonnell* did not impose a one-size-fits-all definition of bribery for every state and federal statute that touches on public corruption, as discussed below. *Supra* at p. 34-36; *infra* at p. 95.[12]

Even if *McDonnell*'s definition of "official act" does apply to state bribery statutes (and it does not), the *McDonnell* Court acknowledged that the question of whether a public official's conduct constitutes an "official act" is the province of a

---

[12] In fact, the Illinois bribery statute, 720 ILCS 5/33-1, does not require proof of an official act. *See People v. Dougherty,* 513 N.E.2d 946, 949 (Ill. App. Ct. 1987) ("In order to commit the offense of bribery, the statute does not require that the act to be influenced ever be performed."); *United States v. Genova*, 167 F. Supp. 2d 1021, 1040-41 (N.D. Ill. 2001), *aff'd*, 333 F.3d 750 (7th Cir. 2003) (discussing Illinois law); *People v. Shoman*, 2015 IL App (1st) 133214-Us, at *4 (Ill. App. Ct. 2015).

properly instructed jury. *See McDonnell*, 136 S. Ct. at 2371, 2375 (remanding for a new trial). The time to resolve the application of the relevant law to the evidence presented at trial is at the jury instruction conference, not on a motion to dismiss. A motion to dismiss is not the proper vehicle to challenge the sufficiency of the government's evidence. *See, e.g., Firtash*, 392 F. Supp. 3d at 888.

In short, the superseding indictment properly alleges the racketeering and Travel Act offenses.

## C.    The Court Should Deny Burke's Motion to Strike Allegations from Count 1.

Burke moves to strike from the superseding indictment allegations in Count 1 concerning his intercessions with Amtrak officials on Company A's behalf. This request is governed by Federal Rule of Criminal Procedure 7(d), which serves as a "means of protecting the defendant against immaterial or irrelevant allegations in an indictment or information, which may, however, be prejudicial." Fed. R. Crim. P. 7(d), Advisory Committee Note. The Court may strike allegations from an indictment "only if the targeted allegations are clearly not relevant to the charge and are inflammatory and prejudicial." *United States v. Andrews*, 749 F. Supp. 1517, 1518-19 (N.D. Ill. 1990); *see also United States v. Peters*, 435 F.3d 746, 753 (7th Cir. 2006). This standard is an exacting one, which is only rarely met. *Andrews*, 749 F. Supp. 1517.

The allegations regarding Burke's intercessions with Amtrak officials on behalf of Company A are clearly relevant and material: Burke is alleged to have used his official position to solicit and obtain legal business for private gain. Moreover,

48

they are neither inflammatory nor prejudicial. Any possible risk of jury confusion or prejudice may be addressed at trial through jury instructions and, potentially, a special verdict form. *See*, *e.g.*, *United States v. Turner*, 93 F.3d 276, 284 (7th Cir. 1996) (limited jury instructions often are an adequate safeguard against the risk of prejudice (citation and quotation marks omitted)).

In sum, the challenged charges and allegations are legally sufficient and fully adequate to put Burke on notice of the nature of the charges against him. Therefore, Burke's motions to dismiss Counts 3 and 4, and strike as surplusage the Amtrak-related allegations from Count 1, Racketeering Act 1, should be denied.

## III. Andrews' Motion to Dismiss Counts 7 and 8 Based on Inability to Establish Interstate Commerce (R. 98) Should Be Denied.

Counts 7 and 8 charge Burke and Andrews with violations of the Travel Act, 18 U.S.C. § 1952, related to October 2017 calls described in Paragraphs 40 and 42 of the superseding indictment. Pertinent here, the Travel Act makes it a crime to "use[ ] . . . any facility in interstate or foreign commerce, with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity, and thereafter perform[ ] or attempt[ ] to perform" an "unlawful activity." 18 U.S.C. § 1952; *see also* Pattern Instructions at 691-92. Counts 7 and 8 properly allege that Burke and Andrews knowingly used a facility of interstate commerce—a cellular telephone—to promote, manage, and carry on the unlawful activities of extortion (18 U.S.C. § 1951) and bribery (720 ILCS 5/33-

1(e), 720 ILCS 5/33-3(a)(4), and 720 ILCS 5/29A-2).[13]

Andrews does not—and could not—contest that a cell phone is a facility of interstate commerce, in light of case law from both within and outside of this circuit. *See, e.g., United States v. Mandel,* 647 F.3d 710, 716 (7th Cir. 2011) (a cell phone is a facility of interstate commerce for purposes of § 1958, the murder-for-hire statute) (citing *United States v. Evans*, 476 F.2d 1176, 1180 (11th Cir. 2007) (telephones and cellular telephones are instrumentalities of interstate commerce)); *United States v. Clayton*, 108 F.3d 1114, 1117 (9th Cir. 1997) (cellular telephones are instrumentalities of interstate commerce); *United States v. Richeson*, 338 F.3d 653, 660 (7th Cir. 2003) (use of telephone lines constitutes use of facility in interstate commerce for purposes of § 1958(a), even when telephone calls themselves are intrastate); *see also United States v. Thomas*, 553 F. App'x 941, 946 (11th Cir. 2014) ("facilities of interstate commerce include cellular phones and automobiles."); *United States v. Perez*, 414 F.3d 302, 304 (2d Cir. 2005) (per curiam) (the national telephone network is a facility of interstate commerce); Pattern Instructions at 692, Committee Comment ("Facility is a broad term that can have many meanings. The most common 'facilities' are telephone systems, highways, banking systems, and the postal service." (citations omitted)).

Rather, Andrews submits that Counts 7 and 8 should be dismissed because Andrews and Burke were both located within Illinois during the October 24, 2017 and

---

[13] Burke moves to adopt Andrews' motion to dismiss. R. 121.

October 25, 2017 telephone calls and therefore those calls did not involve the interstate use of a telephone.[14] Under Andrews' interpretation, to be a "facility in interstate commerce," the use of the cell phone must be in interstate commerce. This argument rests on a misunderstanding of the statute and the case law.

Under the plain text of the Travel Act, a defendant must "use" a "facility in interstate commerce." A facility in interstate commerce is one that Congress is empowered under the Commerce Clause to regulate because it plays a critical role in, and facilitates, interstate commerce. *Mandel*, 647 F.3d at 722. Cars are one example; phones and email are others. *Id*. The Travel Act does not require that a facility in interstate commerce actually be used in interstate commerce, only that the facility in question be a facility of interstate commerce, which the telephone network undoubtedly is. Indeed, the plain language of § 1952 proscribes the *use* of a facility in interstate commerce, not the interstate use of a facility in interstate commerce. 18 U.S.C. § 1952(a) ("Whoever travels in interstate or foreign commerce *or uses the mail or any facility in interstate or foreign commerce* …." (emphasis added)).

For this and other reasons, the Seventh Circuit, like its sister circuits, has expressly rejected Andrews' argument that, not only must be the facility be interstate, but its use must also be interstate. Interpreting a closely-related statute, § 1958(a), the Seventh Circuit has twice held that a defendant's use of a facility of

---

[14] For purposes of this response brief, the government will assume that Andrews and Burke were both located in Illinois at the time of the telephone calls at issue (a fact that is not alleged in the superseding indictment).

interstate commerce—including a telephone—in a purely intrastate fashion is sufficient for federal jurisdiction. *See Richeson*, 338 F.3d at 660; *Mandel*, 647 F.3d at 716. Similar to § 1952, at the time of the *Richeson* decision, § 1958(a) prohibited using a "facility in interstate or foreign commerce" with the intent that a murder be committed in violation of federal or state law, in exchange for anything of pecuniary value. (The statute has since been amended to apply to a "facility of" interstate or foreign commerce.)

In *Richeson*, 338 F.3d at 660, the defendant (like Andrews) argued that intrastate telephone calls were not sufficient to satisfy the jurisdictional requirement of use of a facility in interstate commerce. Rejecting this argument, the Seventh Circuit held that "there is only one way to reach the plain language of the murder-for-hire statute, and that is to require that the facility, and not its use, be in interstate or foreign commerce." *Id.* at 660-61. The court explained that such an interpretation was consistent, not only with the plain language of the statute, but also with Supreme Court precedent holding that Congress through its commerce power "is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *Id.* at 660 (citing *United States v. Lopez*, 514 U.S. 549, 558 (1995)). For the same reasons, in *Mandel*, 647 F.3d at 721, the Seventh Circuit rejected defendant's argument that use of an automobile, also a facility in and of interstate commerce, needed to cross state lines to satisfy the statute. *Id.* ("[§ 1958(a)] . . . does not require

that a facility of interstate commerce actually be used in interstate commerce. This was a point that we settled in *Richeson*.").

The Seventh Circuit's reasoning in *Richeson* is directly applicable to § 1952. The Seventh Circuit has explained that "Section 1958 was modeled on, and intended to supplement, the Travel Act, 18 U.S.C. 1952(a)." *United States v. Dvorkin*, 799 F.3d 867, 876 n.18 (7th Cir. 2015) (citing *United States v. Marek*, 238 F.3d 310, 317 n.29 (5th Cir. 2001) (en banc) ("[I]t is appropriate to interpret § 1958 in light of § 1952 given that the two sections employ similar language, and that § 1958 was intended to supplement § 1952"); S.Rep. No. 98-225, at 306 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3485 (noting that § 1958 "follows the format" of the Travel Act).[15] Likewise, the Ninth Circuit in *United States v. Nader*, 542 F.3d 713, 717-20 (9th Cir. 2008), compared the language of § 1952 to § 1958 and relied on *Richeson* to hold that "intrastate" phone calls involve the use of a facility in interstate commerce, including because in the Travel Act's predicate "uses the mail or any facility in interstate or

---

[15] The fact that § 1958 was modeled on § 1952 is further reflected by the fact that, when it was first enacted, it was codified as § 1952A. *See* P.L. 100–690, § 7053, 102 Stat. 4402 (1988).

foreign commerce," the prepositional phrase "in interstate or foreign commerce" modifies the noun "facility," not the verb "uses."[16]

Focusing on the fact that the Travel Act prescribes the use of a facility "in," not "of," interstate commerce, Andrews attempts to create ambiguity in the case law where there is none. The distinction between "in" and "of" is not a material one, as the Seventh Circuit concluded in *Richeson*. In fact, as noted above, at the time of *Richeson*, § 1958 was identical to § 1952 in that it required use of a facility *in* interstate commerce. *Richeson*, 338 F.3d at 660. It was in that context that the court rejected the same argument Andrews makes here:

> The murder-for-hire statute requires the government to prove that the accused "use[d] or cause[d] another (including the intended victim) to use the mail or any facility in interstate or foreign commerce" with intent that a murder be committed. 18 U.S.C. § 1958(a). Richeson argues that because all of his phone calls were made intrastate, he cannot be found guilty of using a facility in interstate commerce under § 1958(a). In particular, though he concedes that the phone lines themselves are facilities "of" interstate commerce, Richeson insists that he did not use the phones "in" interstate commerce because he never placed a call across state lines. Richeson's construction would require us to read "in interstate or foreign commerce" as modifying "to use" rather than

---

[16] Other circuits have likewise concluded that the intrastate use of a facility of interstate commerce is sufficient under the Travel Act. *United States v. Halloran*, 821 F.3d 321, 342 (2d Cir. 2016) ("Purely intrastate use of an interstate facility is sufficient to violate the Travel Act." (citing *Nader*)); *United States v. Baker*, 82 F.3d 273, 275-76 (8th Cir. 1996) (intrastate withdrawal from interstate ATM network is sufficient under the Travel Act); *see also United States v. Lazo*, 816 Fed. App'x 752, 766, 767-68 (4th Cir. 2020) (affirming Travel Act convictions based on intrastate use of the telephone, which it found was based on the "vast weight" of out of circuit authority, including *Richeson*). Andrews relies on the Sixth Circuit's decision in *United States v. Barry*, 888 F.2d 1092 (6th Cir. 1989), in which the court, focusing on the "facility in interstate" commerce language of the Travel Act, held that intrastate use of the mail cannot satisfy the Travel Act. The reasoning of the court in *Barry*, however, was explicitly rejected by the Seventh Circuit in *Richeson*, as described above. Further, research does not reveal any Circuit Courts outside of the Sixth Circuit that have adopted or applied *Barry*'s reasoning.

"facility"; or, in other words, to require that both the facility and its use be in interstate commerce. We have not squarely faced this issue in prior cases, but our sister circuits have. The Fifth Circuit, sitting en banc, soundly rejected Richeson's suggested interpretation of § 1958's interstate commerce language in *United States v. Marek*, 238 F.3d 310 (5th Cir. 2001).[17] Richeson, however, urges us to find persuasive the Sixth Circuit's decision in *United States v. Weathers*, 169 F.3d 336 (6th Cir. 1999), where that court opined that the distinction between "in" interstate commerce and "of" interstate commerce is significant in the murder-for-hire statute.

We believe there is only one way to read the plain language of the murder-for-hire statute, and that is to require that the facility, and not its use, be in interstate or foreign commerce. We wholly agree with the Fifth Circuit that § 1958's construction, plain language, context in the realm of commerce clause jurisprudence, and legislative history all lead to the conclusion that "it is sufficient [under § 1958] that the defendant used an interstate commerce facility in an *intra* state fashion." *Marek*, 238 F.3d at 315.

*Id*.[18]

*United States v. Isaacs*, 493 F.2d 1124 (7th Cir. 1974), cited by Andrews, is not to the contrary. At issue in *Isaacs* was whether the facility of interstate commerce in that case (the travel of checks across state lines) was sufficiently tied to the alleged bribery scheme, and the court concluded it was not. Andrews cites to a portion of the

---

[17] In concluding that the defendant's intrastate use of a facility of interstate commerce (Western Unions) was sufficient under the murder for hire statute, the court in *Marek* examined the Travel Act, as well, adopting the reasoning of the Eighth Circuit in *Baker*, *supra*, which held that intrastate use of an ATM satisfied the Travel Act, and rejected the Sixth Circuit's reasoning in *Barry*. *Id*. at 319-20.

[18] Andrews also cites to *United States v. LeFaivre*, 507 F.2d 1288 (4th Cir. 1974), in support of his position that intrastate use of a facility of interstate commerce is not sufficient under the Travel Act. In 2020, however, the Fourth Circuit rejected the very language Andrews relies upon from *LeFaivre* and found it to be mere dicta. *Lazo*, 816 Fed. App'x at 766-68 (affirming Travel Act convictions based on intrastate use of the telephone, and noting that its holding was consistent with the "vast weight" of out of circuit authority, including *Richeson*, including cases addressing the "materially identical" language in § 1958).

opinion in which the Seventh Circuit stated, in dicta, that it disagreed with a Fourth Circuit opinion that "assume[d] that the use of a single check crossing state lines may trigger § 1952," including "because it suggests that the check need not actually travel interstate." *Id.* at 1149. The court cited to language from a 1969 Southern District of New York case that focused on the Travel Act's prohibition of the use of a facility "in" interstate commerce rather "of" interstate commerce as indicating that "some interstate travel is actually required." *Id.* at 1149 n.1 (*quoting United States v. DeSapio*, 229 F. Supp. 436, 448-49, (S.D.N.Y. 1969)). This reasoning was not central to the court's holding in *Isaacs* and, in any event, the "interstate travel" discussion in *Isaacs* is not obviously applicable outside of the travel prong of the Travel Act. The use of a cell phone, as the Seventh Circuit has held, is itself a facility in interstate commerce even absent a crossing of state lines.[19]

The rule of lenity does not apply. R. 98 at 7. As described above, the Travel Act unambiguously prohibits the use of a facility of interstate commerce—including telephones—regardless of whether that use is interstate in nature. Thus, the court should decline to apply the rule of lenity. *See, e.g., United States v. Giordano*, 442 F.3d 30, 39 (2d Cir. 2006) (rejecting defendant's claim that the murder-for-hire statute did not prohibit intrastate use of a telephone, holding that, "[b]ecause we find that the statute unambiguously reaches intrastate use of a telephone, we decline

---

[19] Recognizing this, the Seventh Circuit pattern instruction for "interstate commerce" as to §1952 provides, "[t]he term 'interstate commerce' means travel between one state and another state or use of an interstate facility, including the mail." Pattern Instructions at 693.

Giordano's invitation to apply the rules of lenity and constitutional avoidance to guide our interpretation" (*citing Salinas v. United States*, 522 U.S. 52, 66 (1997) ("The rule [of lenity] does not apply when a statute is unambiguous ….")).

Finally, Andrews argues that the Travel Act is void for vagueness to the extent it applies to the wholly intrastate use of a cellular phone. "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definitiveness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Collins*, 272 F.3d 984, 988 (7th Cir. 2001) (citations omitted). As is the case here, "[v]agueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis." *Id.* (*citing Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). As applied to this case, § 1952 is not unconstitutionally vague.

The text of § 1952 expressly prohibits the use of a facility of interstate commerce to promote unlawful activities, including bribery. "[S]everal cases on the books," including *Richeson*, placed Andrew and Burke on notice that a telephone is a facility of interstate commerce and its use to facilitate and promote bribery violates § 1952. *United States v. Sorich*, 523 F.3d 702, 711 (7th Cir. 2008) (rejecting vagueness challenge to § 1346 where "several cases on the books" provided "ample warning that they risked prosecution"). These cases are consistent with decades-old cases from courts across the country, which have held that a defendant need only use a facility of interstate commerce to violate the Travel Act, even if that use is purely intrastate.

The plain text of the statute also placed Andrews and Burke on notice that bribery is an unlawful activity, the facilitation of which is illegal under § 1952. *See* 18 U.S.C. § 1952(b) (defining "unlawful activity" to include "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States").

Andrews and Burke blatantly violated these provisions. In the telephone call underlying Count 7, Andrews and Burke agreed to take action against Company B's restaurant in retaliation for the fact that Company B had failed to provide tax work to Burke's law firm. As charged in Count 8, the next day, Andrews and Burke again used the phone to communicate about Andrews' progress in extorting Company B— specifically, Andrews reported to Burke that construction had been halted at the restaurant and Burke and Andrews agreed that Andrews would play "hard ball" with Company B. Andrews had fair notice that these activities were unlawful, and his motion to dismiss should be denied.

## IV.    Andrews' Motion to Dismiss Counts 7 and 8 Based on Failure to Identify Subsequent Overt Acts (R. 99) Should Be Denied.

As described above, 18 U.S.C. § 1952 provides that it is unlawful to: (a) use the mail or any facility in interstate or foreign commerce; (b) with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity; and (c) thereafter perform or attempt to perform the promotion, management, establishment carrying on or facilitating the promotion, management, establishment, or carrying on of any unlawful activity. Andrews moves to dismiss Counts 7 and 8 on the basis that they purportedly fail to

identify the acts that defendants performed after using a facility of interstate commerce to promote or facilitate the unlawful activities of extortion and bribery (the "subsequent acts").

As Andrews acknowledges, Counts 7 and 8 properly track the language of the statute, which typically makes dismissal an inappropriate remedy. *See, e.g., United States v. Johnston*, 814 F. App'x 142, 146 (7th Cir. 2020), *cert. denied,* 2021 WL 161152 (2021) ("[T]he indictment tracked the language of the statute and provided the date, time, and address of the incident. It therefore adequately put him on notice of the charged offense."). The counts allege that, at a specific date and time, Burke and Andrews engaged in a specific telephone call over Burke's cellular phone, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity—namely, extortion, bribery, official misconduct, and commercial bribe receiving—and that, "thereafter, the defendants did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity." R. 30, Counts 7 & 8.

Contrary to Andrews' claim, there is no requirement that a Travel Act charge specifically identify the "thereafter" (or subsequent) acts taken by the defendant. The Seventh Circuit has explained:

> The Defendants assert that their Travel Act indictments failed to specify what illegal acts they performed or facilitated following their use of interstate facilities. However, there is no requirement that the indictment specifically identify the "thereafter" acts. As the Eighth Circuit recently noted, "an indictment is sufficient if it sets forth the

59

> offense in the statutory language, provided that the statute sets out the necessary elements of the offense." *United States v. Cerone*, 830 F.2d 938, 951 (8th Cir. 1987), *cert denied* – U.S. –, 108 S.Ct. 1730, 100 L.E.2d 194 (1988). The indictments here did set forth the Travel Act offense in the statutory language. Thus, the failure to specify the "thereafter" acts was not error.

*United States v. Muskovsky*, 863 F.2d 1319, 1327 (7th Cir. 1988). *Muskovsky* remains good law and is binding on this Court. The court's reasoning in *Muskovsky* also is consistent with the position of other circuits to have addressed the issue.[20] *See United States v. Childress*, 58 F.3d 693, 720 (D.C. Cir. 1995) (affirming Travel Act convictions and stating that the third element of the offense was sufficiently alleged, albeit in conclusory language, where it tracked the language of the statute) (collecting cases, including *Muskovsky*); *United States v. Stanley*, 765 F.2d 1224, 1239-40 (5th Cir. 1985) ("Because the Travel Act fully and unambiguously sets out the essential elements of the offense, indictments drafted substantially in its language are sufficient."); *United States v. Tavelman*, 650 F.2d 1133, 1138 (9th Cir. 1981) (rejecting defendants' contention that the Travel Act charges were faulty because they failed to allege any specific subsequent acts); *see also United States v. Palfrey*, 499 F. Supp. 2d 34, 43 (D.D.C. 2007) (rejecting defendant's motion to dismiss Travel Act counts on the basis that they failed to specify the subsequent act).

Andrews claims that Counts 7 and 8 do not provide enough information regarding subsequent acts to allow him some means of "pinning down the specific

---

[20] Andrews fails to cite a single case supporting his argument that the indictment must go beyond the language of § 1952 and specify the subsequent act at issue, and research has revealed no such case.

conduct at issue," or "to determine with certainty" what subsequent act is charged in Counts 7 and 8. R. 99 at 5. The superseding indictment, however, includes a lengthy discussion of Andrews and Burke's conduct related to Company B in Paragraphs 33-49, including acts that took place after the October 24, 2017 and October 25, 2017 calls alleged in Counts 7 and 8, respectively. *See*, *e.g.*, R. 30, ¶ 43 ("On or about October 26, 2017, ANDREWS met with representatives of Company B and BURKE's ward office . . . . Among other things, ANDREWS advised the group that BURKE's office had not signed off on the plans granting approval for the remodeling project, including a driveway permit."). That these paragraphs are not incorporated into Counts 7 and 8 is not dispositive. *Cox*, 536 F.3d at 726 (indictments are to be reviewed "on a practical basis and in their entirety, rather than in a hypertechnical manner." (quotation omitted)).[21] Under these circumstances, Andrews cannot claim that he has been left to guess at the alleged unlawful conduct.

In summary, Counts 7 and 8 sufficiently allege each element of § 1952 and adequately inform Andrews of the charges.

## V. Cui's Motion to Dismiss Counts 12, 13, 14, 15 (R. 88 and 89) Should Be Denied.

Cui does not dispute that Counts 12 through 15 of the superseding indictment state the elements of the offense, inform him of the nature of the charges, and serve as a bar to double jeopardy, as required. Instead, he argues that the facts alleged do

---

[21] Furthermore, Andrews has received extensive discovery regarding this matter, including Title III materials, grand jury materials, and witness statements.

not constitute a violation of the statutes charged. R. 89 at 5 (*citing United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988)). For the reasons set forth below, Cui's motion should be denied.[22]

## A.    Count 12 – 18 U.S.C. § 666(a)(2)

### 1.    Count 12 States an Offense under § 666(a)(2), Notwithstanding § 666(c).

Count 12 alleges that, in violation of 18 U.S.C. § 666(a)(2), between in or about August 2017 and continuing until in or around 2018, Cui:

> corruptly offered and agreed to give things of value, namely, fees arising from the retention of Klafter & Burke, intending to influence and reward Burke, an agent of the City of Chicago, in connection with a business, transaction, and series of transactions of the City of Chicago involving a thing of value of $5,000 or more, namely, a permit and tax increment financing concerning the 4901 Property.

There is no dispute that this charge sufficiently alleges the elements of a § 666(a)(2) offense under Rule 12(b). Nevertheless, Cui maintains that the charge should be dismissed because it fails to allege that his retention of Klafter & Burke was outside of the ordinary course of business. Cui relies on 18 U.S.C. § 666(c), which provides in its entirety:

> This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

Subsection (c) was added in 1986 in order "to avoid [18 U.S.C. § 666's] possible application to acceptable business practices." *United States v. Cornier-Ortiz*, 361 F.3d

---

[22] Burke moves to adopt Cui's motion. R. 121.

29, 33-34 (1st Cir. 2004) (quoting H.R.Rep. No. 99–797, at 30 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6138, 6153).

Cui's motion to dismiss Count 12 on the basis of § 666(c) should be denied because whether a payment was made in the "usual course of business" is a question of fact for the jury. Even if it were a legal question appropriate for determination in a motion to dismiss (which it is not), the allegations in the superseding indictment— assumed to be true for present purposes—adequately establish that Cui's conduct was not an acceptable business practice exempted from the reach of § 666.

### a. Whether Cui's offer of payments to Burke was made "in the usual course of business" is a factual question for the jury.

The determination under § 666 of whether payments were made or offered in the usual course of business is a question of fact for the jury. *United States v. Lupton*, 620 F.3d 790, 802 (7th Cir. 2010) (citing *United States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007) ("Whether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide."); *see also United States v. Dwyer*, 238 Fed. App'x 631, 647 (1st Cir. 2007) ("Whether wages were bona fide is a question of fact for the jury."). Recognizing this, the Seventh Circuit pattern instruction for § 666(c) provides:

> Bona fide [salary, wages, fees, or other compensation paid; expenses paid or reimbursed], in the usual course of business, [does; do] not

qualify as a thing of value [solicited or demanded; given, offered, or agreed to be given] by the defendant.

Pattern Instructions at 282.[23]

In *Lupton*, for example, an agent of the State of Wisconsin was charged with soliciting a kickback in connection with his job of soliciting proposals from parties interested in purchasing property from the state. 620 F.3d at 794-95. In conversations with a real estate broker, Lupton sought a kickback of one-quarter of the fee that the broker would receive if the transaction went through. At a bench trial, Lupton argued that he had simply proposed a legitimate "commission split" with the broker, which was permitted under Wisconsin law, and that this permissible commission split was discussed only hypothetically. *Id.* at 802. Thus, Lupton argued, his discussions with the broker amounted to nothing more than a bona fide business transaction under § 666(c). In rejecting Lupton's argument and convicting him of the § 666 charge, the district court found that Lupton's "'unusual maneuvering' with [the broker] 'reveals that this was not to be a payment in the ordinary course of business.'" *Id.* at 820 (quoting *Lupton*, 2009 WL 679649, at *5). The Seventh Circuit agreed and made clear

---

[23] The Committee Comments to the pattern instruction state:

Section 666(c) exempts bona fide payments from the reach of the bribery provisions: "This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." 18 U.S.C. § 666(c). This exemption applies only to "the bribe itself," and does not apply to other elements of § 666, such as the element requiring that the business or transaction at issue have a value of at least $5,000. *United States v. Robinson*, 663 F.3d 265, 270 (7th Cir. 2011).

*Id.*

that the issue of whether a payment is in the ordinary course of business is an issue

of fact:

> The evidence was sufficient to support the factfinder's conclusion. *See United States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007) ("Whether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide.").

> Regardless of whether commission splitting is permissible under Wisconsin law, the record here is replete with evidence supporting the finding that this particular "split" was neither bona fide nor sought in the ordinary course of business.

*Id.* at 802.[24]

Likewise, the allegations against Cui, discussed in more detail below,

demonstrate that his hiring of Klafter & Burke was not bona fide or sought in the

ordinary course of business. Cui may argue to a jury that he offered and agreed to

---

[24] Like the Seventh Circuit, the First and Fifth Circuits have held that whether a payment was made in the usual course of business is a question of fact for the jury. *See United States v. Williams*, 507 F.3d 905, 909 (5th Cir.2007) ("Whether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide."); *United States v. Dwyer*, 238 Fed. App'x 631, 647 (1st Cir. 2007) (same). Research indicates that the only circuit court to have concluded that a defense predicated on § 666(c) can be a basis for dismissal of an indictment is the Sixth Circuit. *See United States v. Mann*, 172 F.3d 50 (6th Cir. 1999) (affirming district court's granting of a pre-trial motion to dismiss a theft of funds charge because the alleged conduct fell under the safe harbor provision of § 666(c)). In *United States v. O'Brien*, 994 F.Supp.2d 167 (D. Mass. 2014), cited by Cui (R. 89 at 8), the court stated, "Whether wages are *'bona fide'* and paid 'in the usual course of business' are questions of fact for the jury." *Id.* at 184 (emphasis in original) (citing *Dwyer,* 238 Fed.Appx. at 647–48 (1st Cir. 2007), and *Cornier–Ortiz,* 361 F.3d at 36)); *see also United States v. George*, 2015 WL 1523163, *5 (D. Mass. Apr. 2, 2015) (rejecting defendant's motion to dismiss § 666 charge based on § 666(c) because, "[w]hether wages [are] bona fide is a question of fact for the jury." (collecting cases); *United States v. Walsh*, 156 F. Supp.3d 374, 381 (E.D.N.Y. 2016) (noting the Second Circuit has yet to determine whether a § 666(c) defense could be decided on a pretrial motion, and stating that, because there were no factual disputes between the parties, the court "in an abundance of caution" would rule on the merits of defendant's motion to dismiss; ultimately, the court rejected defendant's motion because the indictment alleged that defendant obtained overtime payments under false pretenses).

give fees to Burke arising from the retention of Klafter & Burke in the usual course of business, but it is not a basis to dismiss the sufficiently pled offense in Count 12.

### b. Even if properly the subject of a motion to dismiss, Count 12 should not be dismissed because the alleged facts support a conviction under § 666.

Even assuming that Cui's argument under § 666(c) is properly considered in a motion to dismiss, Count 12 should not be dismissed. The superseding indictment's allegations are more than sufficient to prove that Cui's offer to hire Klafter & Burke was not made in the usual course of business.

The superseding indictment alleges—and the evidence cited in the superseding indictment, including emails, will prove—that Cui acted with corrupt intent in hiring Klafter & Burke to handle the property tax appeal for the 4901 Property. R. 30 ¶¶ 55-58. Although Cui hired Burke's firm to perform actual property tax work, his express purpose was to influence Burke in his official capacity, which made the arrangement unlawful. In other words, the retention of Klafter & Burke *was the bribe*.

Specifically, Cui offered to retain the firm precisely for the purpose of influencing and rewarding Burke in Burke's official capacity as an Alderman in connection with Cui's need for a sign permit and TIF monies for Cui's 4901 Property. Cui said as much in an email to his previous property tax attorney minutes before he reached out to Burke to hire his law firm:

> On or about August 24, 2017, at approximately 12:03 p.m., CUI sent an email to Individual C-2, who had represented CUI in property tax appeals for the 4901 Property. In that email, CUI wrote, "Can I ask you

> for a favor? Can I have Edward Burke handle 4901 W. Irving Park property tax appeal for me, at least for this year? I have TIF deal going with the City, and he is the Chairman of Finance Committee. He handled [sic] his tax appeal business card to me, and I need his favor for my tif money. In addition, I need his help for my zoning etc for my project. He is a powerful broker in City Hall, and I need him now. I'll transfer the case back to you after this year."

R. 30 ¶ 56. Minutes later, Cui followed through on his corrupt intentions by sending an email to Burke soliciting his representation on property tax matters:

> On or about August 24, 2017, at approximately 12:17 p.m., CUI sent an email to BURKE that stated, "Dear Mr. Burke, I currently have this property 4901, 4925, 4939 W. Irving Park Road under redevelopment. I may need your representation for tax appeal. The property was totally vacant till July this year. . . . . Please let me know if you have time to handle this matter for me. Please let me know when we can schedule a brief phone call. Thank you!"

*Id.* ¶ 57. Following this, on August 30, 2017, Cui took steps to retain Klafter & Burke to handle the property tax appeal for the 4901 Property. *Id.* ¶¶ 59-61. That very same day, Burke began to use his official position to attempt to help Cui secure a permit for the pole sign at the 4901 Property by contacting other City of Chicago officials who had authority over the permitting process. *Id.* ¶¶ 62-63.

Addressing similar facts, a federal court in New Jersey held that a salary paid under similar circumstances was a bribe. *United States v. Bryant*, 556 F.Supp.2d 378 (D.N.J. 2008). In *Bryant*, the dean of a school of medicine created a paid position for state legislator Wayne Bryant as a "program support coordinator." *Id.* at 385. The indictment alleged that the dean caused Bryant to receive a salary in that role in exchange for Bryant using his position as a state legislator to benefit the medical school. *Id.* at 385-86. The defendants moved to dismiss § 666 charges, relying on

§ 666(c). The court rejected this argument, holding that Bryant's "salary was not paid 'in the usual course of business' because it was allegedly the *quid* in a *quid pro quo* bribery arrangement." *Id.* at 428. The court explained that, even though it may have been paid for legitimate work, because the "salary itself constitutes the bribe . . . it was not 'bona fide' or paid 'in the regular course of business.'" *Id.* at 428-29 ("If a public official sells his office for wages, even if some legitimate work is performed in exchange for those wages, it is sufficiently clear that such wages are not "bona fide."). It concluded:

> [T]he reason why Bryant's . . . salary was not "bona fide" has nothing to do with the value of the legitimate work he did. Even if Bryant did provide value . . . in the form of legitimate work, his salary cannot be "bona fide" if it was part of a *quid pro quo* bribery deal.

*Id.*[25] Similar to the salary arrangement in *Bryant*, Cui's retention of Klafter & Burke was a critical part of the bribery scheme.

In seeking to have Count 12 dismissed despite acknowledging that it is sufficiently pled, Cui relies on *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988). *Risk* did not involve a bribery charge. Rather, the defendant was accused of failing to file Currency Transaction Reports under 31 U.S.C. §§ 5313 and 5322. *Id.* at 1060. In discovery, the government disclosed documents (which the government conceded were accurate) demonstrating that none of the relevant transactions totaled more than $10,000, a necessary factual predicate for the charges. *Id.* at 1060-61.

---

[25] Bryant's subsequent conviction for violating 18 U.S.C. § 666 and other statutes was affirmed on other grounds. *United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011).

Under these unique facts, the Seventh Circuit affirmed the district court's dismissal of the indictment because the undisputed evidence showed that none of the transactions at issue exceeded $10,000. *Id.* Critically, the court dismissed the indictment "not because the government could not prove its case, but because there was no case to prove." *Id.*

Nothing remotely similar occurred here. The superseding indictment alleges, and the evidence will prove, that Cui hired Burke's private law firm in order to influence and reward Burke in his capacity as an Alderman. Surely, Cui's scheme to bribe Burke through the retention of Burke's law firm in order to obtain a pole sign permit and TIF monies from the City of Chicago was not the sort of "acceptable business practice" that § 666(c) was intended to protect. *See Cornier–Ortiz*, 361 F.3d at 36 (rejecting a defense under § 666(c) and holding, "[a] scheme designed to evade conflict of interest rules is hardly legitimate or acceptable"); *Lupton*, 620 F.3d at 802 ("Regardless of whether commission splitting is permissible under Wisconsin law, the record here is replete with evidence supporting the finding that this particular 'split' was neither bona fide nor sought in the ordinary course of business.").

### 2. The timing of the TIF funding does not require dismissal of Count 12.

Cui argues that Count 12 should be dismissed to the extent that it relates to the City of Chicago's decision to award TIF money to the 4901 Property because the City of Chicago had already entered into agreement to provide TIF money to the property before any contact between Cui and Burke occurred. However, as alleged in the superseding indictment, the TIF money had not yet been disbursed as of the date Cui offered and agreed to hire Burke's law firm. In addition, Cui is charged with offering and agreeing to give Burke legal business intending not only to influence Burke, but also to "reward" Burke for Burke's support of the TIF ordinance.

Specifically, as set forth in Count 12, on February 10, 2016, an ordinance was submitted to the Chicago City Council seeking the approval of a redevelopment agreement ("RDA") between the City and Company C that provided for $2,000,000 in TIF funding for the redevelopment of the 4901 Property. R. 30, Count 12, ¶ 2(a). The ordinance was referred to the City Council's Committee on Finance, of which Alderman Burke was the Chairman. On or about March 11, 2016, the Committee on Finance recommended that the ordinance pass. *Id.* ¶ 2(b). Several days later, on Burke's motion, the City Council passed the ordinance with the TIF provision for the 4901 Property and Burke voted in favor of the ordinance. *Id.* ¶ 2(d). On or about June 28, 2016, the City and Company C signed a RDA for the 4901 Property, which gave Company C access to $2,000,000 in TIF monies for the redevelopment. *Id.* ¶ 2(d). Notably, as alleged in Count 12, "[t]hese TIF funds were payable only after the

70

conditions provided in the [RDA] were met, and no TIF funds had been disbursed on or before September 5, 2017," which was the date that Cui signed a contingent fee agreement with Klafter & Burke to provide real estate tax work for the 4901 Property. *Id.* ¶ 2(d); *see also id.*, Count 1, ¶ 64. Stated another way, at the time Cui retained Klafter & Burke, the TIF money for the 4901 Property had not been paid.

As previously described, in August 2017, Cui reached out to Burke seeking to hire his law firm to perform property tax work for the 4901 Property. At the same time, Cui emailed Individual C-2, who had previously represented Cui, to explain why he was transferring the property tax appeal business to Burke's law firm: "I have TIF deal going with the City, and he is the Chairman of Finance Committee. He handled [sic] his tax appeal business card to me, and I need his favor for my tif money. In addition, I need his help for my zoning etc for my project. He is a powerful broker in City Hall, and I need him now." R. 30 ¶ 56. Thus, in his own words, Cui was hiring Burke to perform legal work in order to influence and reward Burke (obtain Burke's "favor") in connection with Cui's "TIF deal" which was still "going with the City." Thus, this email demonstrates that the TIF matter was ongoing and Cui believed he still needed Burke's favor for the TIF money, which had not yet been disbursed.

Further, even if the TIF money had been disbursed, the superseding indictment sufficiently alleges that Cui's hiring of Klafter & Burke was a reward. *See, e.g.*, *Hawkins*, 777 F.3d at 881 (stating that the relevant portion of § 666 forbids gratuities as well as bribes, and holding that the jury could have convicted defendants based on a finding that defendants intended to be influenced in their official positions,

71

or if not influenced, then intended to be rewarded); *Agostino*, 132 F.3d at 1195 ("If the payer's intent is to influence or affect future actions, then the payment is a bribe. If, on the other hand, the payer intends the money as a reward for actions the payee has already taken, or is already committed to take, then the payment is a gratuity."). Indeed, the superseding indictment alleges that, prior to Cui's hiring of Klafter & Burke, Burke supported the TIF ordinance in the Committee on Finance and voted in favor of the TIF ordinance in the City Council. R. 30, Count 12, ¶¶2 (b)-(c).

At a future trial, Cui may argue to the jury that the government has failed to prove that his hiring of Burke's law firm was done to influence or reward Burke in connection with the TIF funds for the 4901 Property, for the reasons cited in Cui's motion. At this stage, however, the Court does not weigh the strength of the government's case and must view all facts alleged in the superseding indictment in the light most favorable to the government. Under this standard, the government has sufficiently alleged that Cui's offer and agreement to hire Burke's law firm was done with the intention to influence and reward Burke in connection with both the TIF funds and the sign permit concerning the 4901 Property.

### B.  Counts 13, 14 & 15 – 18 U.S.C. §§ 1952(a)(3) & 2

Counts 13 through 15 charge Cui with committing or aiding and abetting the commission of violations of 18 U.S.C. § 1952(a)(3)—namely, using a facility in interstate or foreign commerce to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of, of any unlawful activity, and thereafter performing or attempting to perform unlawful activity. The

72

"unlawful activity" alleged in the superseding indictment is the violation of the following four Illinois bribery statutes: 720 ILCS 5/33-1 (Bribery); 720 ILCS 5/33-3(a)(4) (Official Misconduct), 720 ILCS 5/29A-1 (Commercial Bribery); and 720 ILCS 5/29A-2 (Commercial Bribe Receiving).[26] Notably, and as discussed above, to convict Cui of violating § 1952 does not require proof that he violated these underlying state laws. *Baker*, 227 F.3d at 961; *Karigiannis*, 430 F.2d at 150. Contrary to Cui's argument, Counts 13 through 15 adequately state violations of § 1952, consistent with the governing case law on the Travel Act.

> **1.  The Superseding Indictment Sufficiently Alleges That Cui Used a Facility in Interstate Commerce to Promote and Carry On Activity that was Unlawful under the Illinois Bribery and Official Misconduct Statutes.**

The Illinois bribery statute, 720 ILCS 33-1(a) and (d), provides in relevant part:

A person commits bribery when:

> (a) With intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he or she promises or tenders to that person any property or personal advantage which he or she is not authorized by law to accept; or

> ***

> (d) He or she receives, retains or agrees to accept any property or personal advantage which he or she is not authorized by law to accept knowing that the property or personal advantage was

---

[26] The specific uses of a facility of interstate commerce at issue in Counts 13 through 15 are, respectively, Cui's August 24, 2017 email to Individual C-2 in which he tells his prior tax appeal counsel that he will be giving Burke the tax appeal business for the 4901 Property because "I need his favor for my tif money" and "I need his help for my zoning etc for my project" (R. 30 ¶ 56); Cui's August 24, 2017 email to Burke asking that he represent the 4901 Property for the tax appeal (*id.* ¶ 57); and Cui's August 30, 2017 email to an attorney associated with Klafter & Burke necessary for the initiation of the tax appeal (*id.* ¶ 61).

> promised or tendered with intent to cause him or her to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness.

As to subsection (a) of this statute, the bribery offense that is the "predicate" for the Travel Act violations in Counts 13 through 15 requires that: (1) Burke was a public officer; (2) Cui promised or tendered to Burke property or a personal advantage; and (3) Cui did so with the intent to influence the performance of any act related to Burke's employment or function as a public officer. *See* Illinois Pattern Criminal Jury Instructions § 21.11-21.12 (approved 2018), available at https://courts.illinois.gov/CircuitCourt/CriminalJuryInstructions/Criminal_Jury_Instructions.pdf ("Illinois Pattern Instructions"). The allegations in the superseding indictment, if proven, demonstrate that Cui promoted and facilitated this unlawful conduct. Burke was a public officer; Cui promised Burke legal fees arising from Klafter & Burke's representation of Cui's property in a property tax appeal; and Cui did so, as plainly stated in his August 24, 2017 email (R. 30 ¶ 56), in return for securing Burke's assistance with obtaining the permit he needed for the 4901 Property.

With regard to subsection (d), the elements of the offense are that: (1) Burke received, retained or agreed to accept any property or a personal advantage from another; and (2) Burke knew that the property or personal advantage was tendered or promised with intent to cause the defendant to influence the performance of any act related to the employment or function of a public officer or public employee. *See* Illinois Pattern Instructions, *supra*, § 21.11-21.12C. The superseding indictment alleges, and the evidence will prove, that Cui facilitated and promoted this unlawful

conduct, as well. Cui's objective was to give Burke legal fees, and Burke knew that he was getting business from Cui so that Burke would influence the performance of any act related to the employment of a public employee—here, Burke's actions and those of other public employees who would decide whether to issue a permit to Cui for the pole sign.

As alleged in the superseding indictment, Cui also aided and abetted Burke in violating the Illinois official misconduct statute, 720 ILCS 5/33-3(a)(4), which provides that "[a] public officer or employee . . . commits misconduct when, in his official capacity . . . he . . . solicits or knowingly accepts for the performance of any act a fee or reward which he knows is not authorized by law." The elements of this offense are that: (1) that Burke was a public officer; and (2) in his official capacity, Burke solicited or knowingly accepted for the performance of any act, a fee or reward which he knew was not authorized by law. Illinois Pattern Instructions, *supra*, § 21.15. Burke was a public officer; and Cui intended for Burke to accept a fee he was not authorized by law to accept, namely a bribe, in return for having Burke influence the decision to award a permit to Cui.

Cui argues that Burke was authorized by law to receive legal fees and therefore Cui did not promise or tender anything to Burke that he was not authorized by law to accept. But, per Illinois law, Burke was not authorized by law to receive legal fees that were intended to influence Burke in his official capacity, and Cui was not authorized to promise or tender those fees with intent to influence Burke. Nor was

Burke authorized under law to take action on a matter in which he had a financial interest distinguishable from the general public. R. ¶ 1(u).

The Illinois pattern instructions specify that the question of whether a payment is "authorized by law" is in most cases a legal one to be determined by the court, not the jury. *See* Illinois Pattern Instructions, *supra*, § 21.11, Committee Note. Illinois law, in turn, is well-established that a public official is not "authorized by law" to accept legal fees intended as a bribe. In *People v. Freedman*, 508 N.E.2d 326, 328 (Ill. App. Ct. 1987), the defendants were attorneys charged with soliciting money from their clients, with the understanding that the defendants would tender the money to a judge to influence the judge's rulings. The defendants contended that the payments they received from their clients were authorized by law, because, as attorneys, they were allowed to accept or solicit money from a client. *Id.* at 329. The Appellate Court disagreed: "Bribery of a judge is a criminal offense. No one, particularly a lawyer, who is an officer of the court, is or can be, authorized to accept or solicit money to bribe a judge." By the same token, a lawyer cannot accept a legal fee in order to ensure that the lawyer himself takes corrupt action.

Stated another way, bribe money is not "authorized by law" simply because it is paid in the form of legal fees. *See also Bryant*, 556 F. Supp. 2d at 412 (where the New Jersey state bribery statute, similar to the Illinois bribery statute, prohibited a public official from accepting a benefit that was "not authorized by law," rejecting defendants' motion to dismiss and holding that, "[d]efendants are not being prosecuted because Bryant's work was deficient qualitatively or quantitatively, but

76

because, regardless of what legitimate work he may have done, Bryant allegedly accepted his SOM salary in exchange for taking official action. The New Jersey Bribery Act clearly applies to this conduct."); *see also State v. Flansbaum-Talabisco*, 121 So.3d 568 (Fl. App. Ct. 2013) (where defendant, a local mayor, received financial assistance from a developer for her election campaign in exchange for supporting the developer's project, rejecting defendant's argument that campaign contributions are "authorized by law" and therefore could not form the basis for a state bribery charge; holding that such an interpretation of the state bribery statute would lead to absurd results); *People v. Dougherty*, 513 N.E.2d 946, 949 (Ill. App. Ct. 1987) (rejecting defendant's claim that transfer of money between two private parties could not be bribery and stating, "the receipt of money by [an intermediary] private citizen for the purpose of paying off a public employee constitutes bribery").

While it is unnecessary to do so here, and as Cui acknowledges (R. 89 at 14), Illinois courts at times look to government ethics provisions to determine whether the receipt of money was authorized by law. Here, Illinois ethics provisions further demonstrate that Cui's and Burke's actions were unlawful. Contrary to Cui's argument (R. 88 at 15), the City of Chicago Governmental Ethics Ordinance (Chapter 2-156 of the City of Chicago's Municipal Code) in effect during the relevant 2017 time period did, in fact, prohibit Burke from using his official position to assist Cui, with whom he had a financial relationship through Klafter & Burke. As stated in the superseding indictment (R. 30, Count 1, ¶1(u)), the Ethics Ordinance prohibited any city official or employee from participating in or making or in any way attempting to

77

"use his position to influence any city governmental decision or action which he knows or has reason to know that he has any financial interest distinguishable from its effect on the public generally, or from which he has derived any income or compensation during the preceding twelve months or from which he reasonably expects to derive any income or compensation in the following twelve months." § 2-156-030(a).[27] Similarly, the Ethics Ordinance prohibited any official or person acting at the direction of such official from contacting any other city official or employee "with respect to any matter involving any person with whom the elected official has any business relationship that creates a financial interest on the part of the official . . . or from whom or which he has derived any income or compensation during the preceding twelve months or from whom or which he reasonably expects to derive any income or compensation in the following twelve months." § 2-156-030(b) (R. 30 ¶1(u)). The same provision prohibited elected officials from participating in any discussion in any city council committee hearing or meeting or to vote on any matter "involving the person with whom the elected official has any business relationship that creates a financial interest on the part of the elected official . . ." *Id.*

The conduct prohibited in these ordinances is exactly the conduct that Cui sought from Burke in exchange for Cui hiring Klafter & Burke. Cui wanted Burke to

---

[27] The superseding indictment cites the version of the Ethics Ordinance that was in effect at the time of the charged conduct. Section 2-156-030 was amended effective May 29, 2019. *See* Chicago Ethics Ord. § 2-156-030(b), *available at* https://www.chicago.gov/content/dam/city/depts/ethics/general/Ordinances/GEO-2019-color%20through%20June%202020.pdf. Those amendments do not impact this case.

use his official position with the City of Chicago to influence a city governmental decision or action—namely, the awarding of a pole sign permit for the 4901 Property. In fact, Cui sent an email to Burke on August 23, 2017, asking for his help in obtaining a pole sign permit for the 4901 Property ("Can you look into the matter, and advise how to proceed?"). R. 30 ¶ 54. On the very next day, Cui sent emails to C-1 and C-2 (*id.*, ¶¶ 55-56) stating that he would hire Burke's law firm for the property tax appeal work in order to gain Burke's favor on the sign permit and TIF funding matters. Minutes later, Cui sent an email to Burke seeking to hire his private law firm for the tax appeal. *Id.* ¶ 57. Burke then initiated the process of Cui retaining Klafter & Burke to perform the property tax appeal work. *Id.* ¶¶ 59-61. At the very same time, Burke began reaching out to other public officials to lobby for pole sign permit Cui wanted for the 4901 Property, as described in detail in paragraphs 62 through 66 of the superseding indictment. Burke talked to the Commissioner of the City of Chicago Department of Buildings ("Commissioner C") to ask Commissioner C to figure out a way to help Cui obtain the sign permit, and when those efforts were unsuccessful, Burke asked the Zoning Administrator for the Chicago Department of Planning and Development ("Administrator C") to review the sign permit's denial. *Id.* The Ethics Ordinance plainly prohibited Burke from contacting these city officials in order to influence a governmental decision as to Cui's sign permit because Burke had a business relationship with Cui that created a financial interest for Burke.

Cui's argument that the Ethics Ordinance permitted Burke to accept compensation for services "wholly unrelated" to his official duties to the City of

Chicago is a non-sequitur. *See* Chicago Governmental Ethics Ordinance, § 2-156-142. Burke was permitted under the Ethics Ordinance to receive compensation for his work as an attorney, so long as it was wholly unrelated to his official duties; but, here, the compensation that Cui offered to Burke through his law firm and that Burke accepted was not unrelated to his official duties. It was directly related to Burke using his office to assist Cui. Nothing in the Ethics Ordinance permitted Burke to receive, or Cui to offer, compensation for legal services for the purpose of influencing Burke as an Alderman. As alleged in the superseding indictment, and as demonstrated by the cited emails, Cui admitted that he was hiring Burke as an attorney in order to cause Burke to take action favorable toward Cui in regards to the sign permit he sought for the 4901 Property, including contacting other public officials to cause them to issue the permit.

> **2.  The Superseding Indictment Sufficiently Alleges That Cui Used a Facility in Interstate Commerce to Promote and Carry On Activity that Was Unlawful under the Illinois Commercial Bribery Statutes.**

Counts 13 through 15 allege that, in addition to bribery, Cui used a facility of interstate commerce to promote the unlawful activities of commercial bribery, in violation of 720 ILCS 5/29A-1, and commercial bribe receiving, in violation of 720 ILCS 5/29A-2. Cui argues that these counts fail to allege conduct constituting an offense because these statutes purportedly do not apply to the bribery of public officials and because the City of Chicago, through the Chicago Governmental Ethics

80

Ordinance discussed above, consented to Burke's receipt of compensation for outside employment at Klafter & Burke. As set forth below, both arguments lack merit.

### a. The commercial bribery statutes apply to public officials.

720 ILCS 5/29A-1 provides that "[a] person commits commercial bribery when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs." The elements of this offense are that Cui: (1) conferred, offered or agreed to confer a benefit upon Burke, who was an employee, agent or fiduciary of the City of Chicago, which was an employer or principal; (2) did so without the consent of the employer or principal; and (3) did so with the intent to influence the employee's, agent's or fiduciary's conduct in relation to his employer's or principal's affairs. Illinois Pattern Instructions, *supra*, § 21.08.

720 ILCS 5/29A-2 provides that "[a]n employee, agent or fiduciary commits commercial bribe receiving when, without consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs." The elements of this offense require that Burke: (1) was an employee, agent or fiduciary of the City of Chicago, his employer or principal; (2) solicited, accepted or agreed to accept a benefit from another person; (3) did so upon an understanding or agreement that such benefit would influence his

conduct in relation to his employer's or principal's affairs; and (4) did so without the consent of his employer or principal. Illinois Pattern Instructions, *supra*, § 21.10.

Cui argues that these statutes are intended to apply to bribery of private persons, not public officials. R. 89 at 18-19.[28] The plain text of 720 ILCS 5/29A-1 and A-2 does not support this argument. By its plain text, the statute applies to "*any* employee" who receives a benefit from a third party in order to influence his conduct in relation to his employer's affairs. "Any" is a broad term, connoting "all." *E.g.*, *Department of Housing and Urban Development v. Rucker*, 535 U.S. 125, 131 (2002); *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 219-20 (2008); *see also Kerner v. State Employees' Ret. Sys.*, 72 Ill. 2d 507, 512 (1978). The statute does not distinguish between public and private employees, and it certainly does not exclude public employees.

Cui's reading would oddly exclude public officials who are employees of a municipality from the reach of the statute—without any statutory language to support such a narrowing construction—that is generally applicable to all other employees. This would be inconsistent with the statutory language, and also inconsistent with the application of other states' commercial bribery statutes, with similar language, to government employees. *See* D. E. Ytreber, *American Law*

---

[28] Cui states that research failed to uncover any case in which these statutes were applied to bribery of a public official. R. 89 at 18. The government's research has revealed the same; it found no reported decisions addressing whether a public official can be prosecuted for violating the Illinois commercial bribery statute. That is not particularly surprising, as 720 ILCS 5/29A-1 has been cited in only 24 published decisions, and 720 ILCS 5/29A-2 has been cited in only 3 such decisions.

*Reports*, 1 A.L.R.3d 1350 (originally published in 1965 and last updated in 2015) ("Although the [commercial bribery] statutes are usually applied to the bribing of private employees, government employees and officials have been successfully prosecuted under the commercial bribery statutes when their acts were such as to come within the scope of the statute.").

For example, the Pennsylvania Supreme Court addressed an argument similar to Cui's in *Commonwealth v. Bellis*, 484 Pa. 486, 492, 399 A.2d 397, 400 (1979). There, a city councilman took money and stock in exchange for favoring a corporation in its dealings with the city and was convicted of violating Pennsylvania's commercial bribery statute. Like Cui, the councilman argued that the commercial bribery statute did not apply to a public official, because the Pennsylvania legislature had enacted a separate statute penalizing bribery of public officials. The Pennsylvania Supreme Court rejected the councilman's argument, holding:

> There is no indication in either Sections 4667 [the commercial bribery statute] or 4303 [the governmental bribery statute] that the legislature intended that Section 4303, a statute which is only applicable to a limited form of governmental bribery, be the sole governmental bribery statute: the existence of Section 4303 did not foreclose the application of Section 4667 to governmental bribery.

*Id.*; *See also, e.g., People v. Nankervis*, 330 Mich. 17, 23, 46 N.W.2d 592, 595 (1951) (rejecting argument that Michigan's commercial bribery statute "applies only to employees of private employers"); *State v. Brewer*, 258 N.C. 533, 554, 129 S.E.2d 262, 277 (1963) (affirming convictions under North Carolina commercial bribery statute,

including conviction of state highway commission engineer who accepted things of value in exchange for official action in highway sign procurement).

As in *Bellis*, the fact that the Illinois legislature enacted a criminal statute specific to bribing public officials does not bar the prosecution of a public official under the broadly worded commercial bribery statute. The statutes are not redundant: Unlike Illinois bribery, which is a felony regardless of the amount of the bribe, commercial bribery in Illinois is a misdemeanor in any case where the benefit conferred is less than $500,000, punishable only as a fine. And, as discussed above, 720 ILCS 5/29A-1 and 720 ILCS 5/29A-2 do not distinguish between public and private employees. If Illinois legislators had intended to limit the commercial bribery statutes to private employees, it would have included limiting language,[29] as it did in other commercial bribery statutes applicable only to certain types of employees. *E.g.,* 720 ILCS 5/17-10.6(b)(2) (criminalizing commercial bribery by "[a]n employee, agent, or fiduciary *of a financial institution*" (emphasis added)).

The cases Cui cites are distinguishable. R. 89 at 20. *Com. v. Benoit*, 196 N.E.2d 228, 230 (1964), addressed public official defendants' arguments that they were entitled to immunity under Massachusetts' commercial bribery statute as witnesses who had testified before the Massachusetts Crime Commission. The Supreme Judicial Court of Massachusetts held that a governmental bribery statute, rather

---

[29] Other state legislatures have specified, in the statutory text, that their commercial bribery statutes apply only to "private" actors. *See, e.g.,* La. Stat. Ann. § 14:73; Miss. Code § 97-9-10; Vt. Stat. Ann. tit. 13, § 1108.

than the commercial bribery statute, applied and that the defendants were therefore not entitled to immunity. *Id.* And *People v. Seligman*, 35 A.D.2d 591, 593, (1970), *aff'd as modified*, 270 N.E.2d 721 (1971), addressed a former New York statute that "relate[d] only to 'commercial fraud' committed by employees of a Private business."

Cui cites two canons of statutory interpretation, neither of which apply. He argues that a specific statute controls over a more general one, and that ambiguous statutes should be interpreted in favor of lenity. But a court may only resort to these canons of construction if a statute is ambiguous or conflicts with another statute. *See People v. Perry*, 864 N.E.2d 196, 209 (Ill. 2007) ("[A] court will not engage in statutory construction if the statutory language is unambiguous."); *Newland v. Budget Rent-A-Car Sys., Inc.*, 744 N.E.2d 902, 906 (Ill. App. Ct. 2001) ("Defendants correctly note that specific statutory provisions usually prevail over general provisions. However, courts only resort to this device when the two provisions *conflict.*" (citations omitted)). Where the statute's plain language is clear—as it is here—the court may not resort to other aids of construction. *See, e.g., Henrich v. Libertyville High Sch.*, 712 N.E.2d 298, 304 (Ill. 1998), *as modified on denial of reh'g* (June 1, 1999) (declining to apply the specific-governs-the-general canon, because "we can ascertain the legislative intent from the plain language of section 3–108(a) and can give it effect without resorting to other aids for construction"). Here, the commercial bribery statute's plain language permits a prosecution for bribery of a public official.

### b. The City of Chicago did not consent to Burke's acceptance of a bribe in the form of legal fees from Cui.

Cui argues that Counts 13 through 15 fail to allege facts constituting a violation of the commercial bribery statutes because the City of Chicago, Burke's employer and principal, purposely consented to Burke receiving compensation for private employment. This is factually and legally inaccurate. While it allowed Burke to practice law unrelated to his official responsibilities as an Alderman, the City of Chicago absolutely did not consent to Burke accepting a bribe from Cui in the form of legal fees for Burke's private law firm.

This is confirmed by the case law governing consent for commercial bribery purposes. Commercial bribery requires a lack of consent from the employer. There can be no consent from the employer, however, if the employer is not fully informed by the employee, including the fact and purpose of payments received. *See JSG Trading Corp. v. U.S. Dep't of Agric.*, 176 F.3d 536, 542-43 (D.C. Cir. 1999) (noting that commercial bribery statutes, including in Illinois, typically require a finding of secrecy); Louis Altman & Malla Pollack, 3 *Callmann on Unfair Comp., Tr. & Mono.* § 12:1 (4th Ed.) ("Commercial bribery may be defined as the offer of consideration to another's employee or agent in the expectation that the offeree will, without *fully* informing his principal, be sufficiently influenced by the offer to favor the offeror." (emphasis added)). This is consistent with the law of agency, which permits an agent to breach his duty of loyalty to the principal, but *only* if "the agent (i) acts in good faith, (ii) discloses all material facts that the agent knows, has reason to know, or

should know would reasonably affect the principal's judgment unless the principal has manifested that such facts are already known by the principal or that the principal does not wish to know them, and (iii) otherwise deals fairly with the principal; and (b) the principal's consent concerns either a specific act or transaction, or acts or transactions of a specified type that could reasonably be expected to occur in the ordinary course of the agency relationship." Restatement (Third) Of Agency § 8.06 (2006); *accord* Restatement (Second) of Agency § 390 (1958).

Here, as alleged in the superseding indictment, none of those requirements are met. Neither Cui nor Burke disclosed that Cui hired Burke's law firm in order to get a financial benefit in his dealings with the City. Thus, the lack-of-consent element should be easily satisfied. *Cf. Bellis*, 484 Pa. at 492-93 (rejecting defendant's argument that he did not commit commercial bribery because his representation of private parties before city departments did not interfere with his official duties as a city councilman, because defendant breached his duty of undivided loyalty to the city in soliciting and receiving money from third parties in return for acting on their behalf in city affairs). In fact, the City of Chicago has affirmatively demonstrated that it would not consent to Burke's receipt of payment under these circumstances because the ethical rules governing the conduct of City employees preclude Burke from taking action on matters involving a person with whom Burke had a financial interest distinguishable from the general public.

87

## VI. Burke's Motion to Dismiss and Strike the State Bribery, Commercial Bribery and Official Misconduct Charges (R. 106, 107) Should Be Denied.

In addition to arguing that § 666 is constitutionally infirm, Burke also argues that *every single* state bribery statute, which form the predicate RICO acts and the "unlawful activity" promoted for purposes of the Travel Act charges, is unconstitutional as well.  In other words, Burke takes the radical position that there is not a single bribery statute, federal or state, that passes constitutional muster.[30] As discussed below, the argument is obviously wrong.

### A. Applicable Law

Where First Amendment rights are potentially implicated (as Burke alleges), a defendant may make a facial challenge to a statute but must prove that the statute "substantially" criminalizes or suppresses protected speech in comparison to its plainly legitimate sweep. *Bell v. Keating*, 697 F.3d 445, 452-53 (7th Cir. 2012) (quoting *New York v. Ferber*, 458 U.S. 747, 769 (1982) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)); *United States v. Williams*, 553 U.S. 285, 292-93 (2008)). In its analysis, the Court should take into account whether the scope of the statute has been limited by case law.  *Id.* at 456.

Outside of the First Amendment context, void-for-vagueness challenges are governed by the due process clause in the Fifth Amendment, which requires that a penal statute define a criminal defense so that ordinary people can understand what

---

[30] Andrews moves to adopt this motion. R. 122.

conduct is prohibited, and in a manner that does not encourage arbitrary enforcement. *Kolender*, 461 U.S. at 357. This does not require perfect clarity and precise guidance but does require a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. *Jordan v. DeGeorge*, 341 U.S. 223, 231 (1951) (citations omitted). While Burke's First Amendment challenge is properly viewed as a facial challenge to the statute, his more general due process challenge should be analyzed as an as-applied challenge. *United States v. Plummer*, 581 F.3d 484, 488 (7th Cir. 2009); *see also United States v. Cook*, 970 F.3d 866, 876 (7th Cir. 2020). In other words, while a statute may not be clear in every application, so long as the statutory terms are clear in their application to the party before the court, a "vagueness challenge must fail." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 21-23 (2010) (rejecting vagueness challenge because although "material-support statute potentially implicates speech, the statutory terms are not vague as applied to plaintiffs" (citations omitted)). *Accord Expressions Hair Design v. Scheiderman*, 137 S. Ct. 1144, 1151 (2017).

**B.    Analysis**

### 1.    Burke's First Amendment Challenge to the State Statutes Is Without Merit.

None of the state law bribery predicates—720 ILCS 5/33-1(e), 720 ILCS 5/29A-2, and 720 ILCS 5/55-3(a)(4)—are constitutionally overbroad under the First

Amendment.[31] Each one of these state statutes legitimately criminalizes bribery. Preventing corruption and preserving citizens' confidence in government are "interests of the highest importance," *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 788-89 (1978) (citations omitted), and measures calculated to prevent bribery plainly accomplish this goal. Here, each of the statutes is designed to target corruption by criminalizing efforts to provide things of value as a means of obtaining improper and unlawful influence over individuals in positions of trust.

None of the challenged statutes has the effect of substantially criminalizing protected speech, such as legitimate campaign contributions. Acts of bribery—like other crimes that might be accomplished through speech—are not protected speech. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) ("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."); *United States v. Ferriero*, 866 F.3d 107, 125 (3d Cir. 2017) (state bribery statute that punishes corrupt agreements does not criminalize legitimate First Amendment activity); *United States v. Marchetti*, 466 F.2d 1309, 1314 (4th Cir. 1972) ("Threats and bribes are not protected simply because they are written and spoken; extortion is a crime although it is verbal.").

By their plain text, the statutes in question clearly distinguish between criminal conduct (which is not protected speech) and permissible conduct (which can

---

[31] There are references to other provisions in the superseding indictment, which are not discussed herein owing to the focus of the instant motion on the provisions identified here.

include protected speech). For example, § 33-1(e) requires that the property or personal advantage provided be given to "improperly influence" the performance of a public officer. Use of the term "improperly" to describe the nature of the influence is synonymous with wrongful influence,[32] requiring that an intention of wrongdoing accompany the tender of property and providing fair notice. *See United States v. United States Gypsum Co.,* 438 U.S. 422, 445 (1978) (to meet the statute's *mens rea* requirement, a defendant must consciously behave in a way the law prohibits, "and such conduct is a fitting object of criminal punishment").

Addressing analogous federal statutes, courts have held that this type of scienter requirement protects a statute against impermissible infringement of protected speech. For example, in *United States v. Thompson*, 76 F.3d 442 (2d Cir. 1996), the Second Circuit considered whether an obstruction of justice statute that punished "corruptly persuad[ing] another person . . . with intent to influence . . . the testimony of any person in an official proceeding," 18 U.S.C. § 1512(b), was overbroad. Concluding the statute was not overbroad, the Second Circuit explained that the use of the term "corruptly" as a scienter requirement (which it interpreted to mean "motivated by an improper purpose") meant that the statute was "clearly limited to

---

[32] In fact, the legislative history reflects that the initial draft of the statute included the words "unlawfully influence," and the language was changed to "improperly influence," on the understanding that there was no substantive change intended. *See* Ill. Senate, 84th General Assembly, June 27, 1985 Tr., available at https://www.ilga.gov/senate/transcripts/strans84/ST062785.pdf at 43 ("The House Committee on Judiciary felt the necessity to change our language and to insert the words 'improperly influence' for the words 'unlawfully influence.' I don't think it's any substantive change. To me it appears as though it's a technical change.").

. . . constitutionally unprotected and purportedly illicit activity." 76 F.3d at 452. Likewise, in *United States v. Shotts*, 145 F.3d 1289, 1301 (11th Cir. 1998), the Eleventh Circuit held that, "[b]y prohibiting only that persuasion which has an improper purpose," § 1512(b) "does not impermissibly limit protected speech." The same "corruptly" requirement is found in 18 U.S.C. § 666, which, as discussed above, functions to distinguish between bribes and protected speech.

Burke claims that the state bribery statute is overbroad because it may criminalize innocent conduct, such as campaign contributions, or a token lunch provided in connection with a speech. R. 107 at 13-15. This argument fails to account for the scienter requirement, which requires an effort to "improperly influence" the act of a public official and therefore removes from threat of prosecution such things as campaign contributions and token lunches. *United States Gypsum Co.,* 438 U.S. at 445. In addition, the Illinois state courts have made clear that legitimate campaign contributions (which are protected speech, if authorized by law) are not within the ambit of the state bribery statute. *See People v. Brandstetter*, 430 N.E.2d 731, 736 (Ill. App. 1982) (rejecting claim that section (a) of same statute was overbroad in part on ground that "it is also clear that other public officials are 'authorized by law' to receive campaign contributions from those who might seek to influence the candidate's performance as long as no promise for or performance of a specific official act is given in exchange").

The scope of both the commercial bribe receiving statute and the official misconduct statute is similarly limited. The commercial bribe receiving statute only

covers those benefits received without the consent of the principal or employee. This standard is given meaning by other laws and rules governing the conduct of City employees; for example, ethical rules govern the conduct of City officials and employees, including by prohibiting an elected official from making contact with any other city official or employee on a matter involving a person with whom the elected official reasonably expects to derive income or compensation from in the following twelve months. By the same token, the official misconduct statute only prohibits soliciting a fee or reward that is "not authorized by law," 720 ILCS 5/33-3(a)(4), a limitation that plainly excludes legitimate campaign contributions. *Brandstetter*, 430 N.E.2d at 736.

Burke suggests there is some novelty in applying the commercial bribery statute in this context, because the statute requires a defendant to receive a benefit "without consent of his employer or principal." According to Burke, it is unclear to him that, as a public official, he is an agent or employee of the City of Chicago or what it means to act with consent. R. 107 at 25-26. Burke's status and obligations are factual matters for the government to establish at trial, not the grist of a motion to dismiss. At trial, the government will establish that Burke is employed by the City of Chicago, and that he acted as an agent of the City, and took steps in violation of his employer's rules governing his conduct.

Burke argues that the Illinois commercial bribery statute is overbroad because it encompasses not only bribery by public officials, but also the breach of duty by individuals who work in the private sector. R. 107 at 21-23. But any potential

overbreadth as applied to private actors does not implicate First Amendment rights. Indeed, much of Burke's argument about the application of the commercial bribery statute has nothing to do with the First Amendment; instead it concerns a general dissatisfaction with the government's use of the commercial bribery statute as a predicate for a violation of § 1952 (alongside several other felony predicates). While Burke suggests that the charging of this misdemeanor offense as a § 1952 predicate was a "clever sleight of hand" (R. 107 at 21), it is well-settled that this type of charge was appropriate (as discussed above in response to Cui's motion to dismiss), *Perrin v. United States*, 444 U.S. 37, 41-49 (1979),[33] and that a misdemeanor offense under state law is a suitable § 1952 predicate, *Karigiannis*, 430 F.2d at 150.[34]

Burke's overbreadth challenge to the official misconduct statute is also meritless. He argues that Illinois courts have broadly construed the phrase "official capacity" and that the requirement that a public official solicit a payment "not authorized by law" in his official capacity is not sufficient to cabin the statute because it enables the government to argue that a campaign contribution was not authorized by law when it served as a bribe. R. 107 at 36. This is a stretch. As noted earlier, the Illinois courts have held that legitimate campaign contributions are outside the scope

---

[33] Indeed, *Perrin* details at length Congress's intention that the bribery predicate be given broad application to capture many different forms of corruption. 444 U.S. at 45-50 ("[T]he statute reflects a clear and deliberate intent on the part of Congress to alter the federal-state balance in order to reinforce state law enforcement.").

[34] The cases Burke cites in support of his own motion establish this point. *E.g., United States v. Welch*, 327 F.3d 1081, 1092 (3d Cir. 2003) (accomplishment of state offense is not prerequisite to § 1952 prosecution).

of the statute, whereas campaign contributions exchanged for specific official acts are within the statute's scope. *Brandstetter*, 430 N.E.2d at 736. This interpretation of state law is in accord with the interpretation of analogous federal statutes. *McCormick v. United States*, 500 U.S. 257, 271-72 (1991) (specific exchange of campaign contribution for official action is criminal). There is no overbreadth problem here: campaign contributions that serve as a bribe are not protected speech.

Despite all this, Burke maintains that the Illinois state statutes referenced above are all constitutionally infirm. As he sees it, the Supreme Court's decision in *McDonnell* effected a seismic change in the law that has rendered every single state bribery statute unconstitutional. However, as is the case with a number of his other motions, it is plain that Burke has exaggerated the significance of *McDonnell*. To begin with, he *does not identify a single case*, state or federal, where a state bribery statute has been found unconstitutional based on *McDonnell*—on either First Amendment or vagueness grounds—in the nearly five years since the decision's issuance.

In addition, as noted earlier, *McDonnell* was confined to deciding what constituted an "official act" for purposes of the honest services fraud statute. It did not purport to call into question wide swaths of state law and, in fact, specifically declined to revisit its holding in *Skilling* upholding the statute against a vagueness challenge. *McDonnell*, 136 S. Ct. at 2375. Read against this background, Burke's arguments about the ground-shaking changes wrought by *McDonnell* fall apart.

### 2. The State Statutes Are Not Unconstitutionally Vague, Facially or As Applied to Burke.

The state statutes also are not unconstitutionally vague in violation of the due process clause. Each of the state statutes plainly defines the criminalized conduct, as discussed above, and therefore on their face and as applied to Burke, provided fair notice.

In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court addressed whether the honest services fraud statute, 18 U.S.C. § 1346, was unconstitutionally vague, and held that it was not, including because it was "plain as a pikestaff" that the provision, at its core, prohibited bribery and kickbacks. *Id.* at 412. The Supreme Court emphasized that, even if the outermost boundaries of a statute are imprecise, it will survive scrutiny if a defendant's conduct falls squarely within the "hard core" of the statute. *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 608 (1973)); *see also McDonnell*, 136 S. Ct. at 2375 (citing *Skilling*, 561 U.S. at 403 (seeking "to construe, not condemn, Congress' enactments")).

Consistent with the Supreme Court's interpretation of § 1346 in *Skilling*, the Illinois bribery statutes provided fair notice to Burke of the conduct prohibited. As in *Skilling*, at their core, the pertinent state statutes target the crime of bribery and, much like § 666, which has withstood repeated vagueness challenges, they speak in terms of an improper or unlawful effort to influence the actions of a public official by means of the solicitation or offer of property, benefit, fee or reward. *See, e.g, Wright v. City of Danville*, 675 N.E.2d 110, 118 (Ill. 1996) ("the essence of a violation of the

[official misconduct] statute 'is that a public official has attempted to personally enrich himself or another by an act exceeding his 'lawful authority' as a public servant" (citation omitted)). Because it is "plain as a pikestaff" that illegal bribery is the central focus of these statutes, there is no question that Burke was on fair notice of what they proscribed. *Skilling*, 561 U.S. at 412 (quoting *Williams v. United States*, 341 U.S. 97, 101 (1951)).

Nor do the statutes pose a risk of arbitrary enforcement. Opinions of state and federal courts define with specificity the conduct prohibited by the state statutes. *See, e.g., United States v. Hogan*, 886 F.2d 1497, 1502-04 (7th Cir. 1989) (construing Illinois bribery statute); *United States v. Genova*, 167 F. Supp. 2d 1021, 1039-40 (N.D. Ill. 2001) (discussing scope of official misconduct statute). Moreover, the Illinois bribery statute was first enacted in 1961, and the amendment to section (e) became effective in 1985. In the intervening 36 years, there has been no indication that the statute has been arbitrarily enforced. The same holds true of the commercial bribery and official misconduct statutes.

Burke complains at length that the government did not charge him with honest services fraud, in violation of 18 U.S.C. § 1346. As he sees it, this was a decision made to skirt the Supreme Court's decision in *McDonnell*. The government routinely has brought RICO cases based on the violation of state bribery statutes when appropriate under the particular facts of a case. *See, e.g., United States v. Murphy*, 768 F.2d 1518, 1531 (7th Cir. 1985) (discussing indictment from Operation Greylord that contained RICO charge alleging defendant committed 13 identified violations of Illinois bribery

statute); *Genova*, 167 F.Supp.2d at 1041-42 (discussing RICO charge based in part on violation of Illinois state bribery law). Moreover, as the Court is aware, the racketeering charge in this case includes allegations of extortion as well as bribery. It would not have been possible to bring a single charge encapsulating the full breadth of Burke's criminal conduct under the honest services fraud statute.

Finally, an examination of the state statutes as applied to Burke makes clear he has no legitimate vagueness claim. *Humanitarian Law Project*, 561 U.S. at 21-23; *Scheiderman*, 137 S. Ct. at 1151. Here, Burke (a) sought to solicit Company A as a tax client in return for taking action benefitting the Post Office project on a variety of matters, including approvals from Amtrak, the Chicago Water Department, a Class L designation, and tax increment financing; (b) sought to solicit Company B as a tax client in return for approving and expediting their permits; and (c) received business for his law firm from Charles Cui, knowing it was intended to influence him and others in connection with the issuance of a permit for a pole sign. Whatever the outer contours of the Illinois bribery statutes may be, it is plain that Burke's efforts to solicit, obtain, and receive private benefits in exchange for his action on these matters as alleged in the superseding indictment constituted bribery.

Burke's remaining vagueness arguments as to each statute are unconvincing. He argues that the state bribery statute is vague because it encompasses the receipt of both property and "personal advantage" and does not use the exact same definition for "official acts" as provided by the Supreme Court in *McDonnell*, instead referencing "any act related to the employment or function of any public officer." R. 107 at 18. He

98

also makes the immodest suggestion that a limiting construction should be applied to the state bribery statutes so that they reach the exact same conduct the Supreme Court identified in *McDonnell*. *Id*. at 38-39. A statute is not vague merely because it is not delimited along the exact same lines as another.[35]

Consistent with principles of federalism (a key factor motivating the Supreme Court's decision in *McDonnell*), the State of Illinois has the "prerogative to regulate the permissible scope of interactions between state officials and their constituents," *McDonnell*, 136 S. Ct. at 2373, and can determine the scope of its own laws. It need not track *identically* the language later used by the Supreme Court. Here, in fact, the Illinois state bribery statute is *narrower* than the honest services fraud statute considered in *McDonnell*, including because it requires a defendant to seek to improperly influence a public official, a phrase synonymous with corrupt or unlawful influence. *Ferriero*, 866 F.3d at 125 (state bribery statute that punishes corrupt agreements is not unconstitutionally vague). No further limitations are necessary to resolve Burke's overbreadth and vagueness claims.[36]

---

[35] Unsurprisingly, other courts have refused to apply *McDonnell* to invalidate other bribery statutes. *United States v. Ferriero*, 866 F.3d 107, 127-28 (3d Cir. 2017) (declining to extend *McDonnell* to state bribery statute); *Ng Lap Seng*, 934 F.3d at 134 (where text of some other bribery statute differs meaningfully from by § 201, "*McDonnell*'s 'official act' standard does not pertain").

[36] Of course, this Court will provide the jury with appropriate legal instructions that will guide its consideration, and ensure that the jury makes the appropriate findings of fact in light of the scope of the state bribery statutes as interpreted by the state and federal courts. The jury instructions are not ripe for decision; even if they were, defendant's suggestion that there is a *McDonnell* one-size-fits-all meaning of every bribery statute in the country is obviously wrong, for the reasons already discussed.

Burke's vagueness arguments fare no better with respect to the commercial bribery statute. He makes no attempt to explain how the commercial bribery statute does not reach the precise conduct charged in the superseding indictment. While Burke raises the specter of the statute being applied to public officials engaging in the "most prosaic interactions" (R. 107 at 28), the superseding indictment charges him with trying to exchange his support on various matters that came before him and Alderman A in their capacity as Aldermen (such as the support of legislation and required permits) in return for the payment of legal fees to his private law firm.

Burke also argues that because the commercial bribery statute reaches defendant's conduct as it relates to the affairs of his employer, it is vague. However, as noted earlier, the statute requires a defendant to take action concerning the affairs of his employer (1) without the consent of his employer and (2) in return for a personal benefit. These limiting features of the statute make it clear that if a defendant takes action on matters in his capacity as an Alderman in return for benefits he is forbidden to receive, it will give rise to liability. Read as a whole in this manner, the statute gives fair notice of what conduct is prohibited. Indeed, many of the cases cited by Burke *rejected* claims that commercial bribery statutes are unconstitutionally vague. R. 107 at 30-31.[37]

---

[37] Burke suggests that, since public officials are not routinely charged under commercial bribery statutes, the statute is vague. R. 107 at 29-30. As Burke concedes, and as discussed above, there are multiple decisions (some decades old) finding it appropriate to charge a public official under commercial bribery statutes. *Cf. Bellis*, 399 A.2d 397.

Burke does not develop any vagueness argument with respect to the official misconduct statute (thereby waiving the claim). R. 107 at 38. He simply contends the statute criminalizes nearly any act by a public official, *id.*, which is simply incorrect; as noted above, the statute specifically criminalizes the solicitation of a fee or reward that the official is not authorized by law to receive.

## VII.   Burke's First Motion to Suppress Title III Interceptions (R. 95, 97, 100) Should Be Denied.

During the course of the investigation, the government obtained authorization to intercept wire communications involving Burke, primarily over his cellular telephone. The interceptions are powerful evidence of Burke's involvement in unlawful activity that involved his efforts to use his and Alderman ███ position as public officials for his own private gain, as set forth in the superseding indictment.[38] In an effort to keep this evidence from the jury, Burke has filed a motion seeking to suppress the interceptions. For the reasons that follow, the motion should be denied.

---

[38] Alderman ███ is referred to as "Alderman A" in the Superseding Indictment.

A.     **There Was Probable Cause Supporting the Applications to Intercept Wire Communications.**

1.     **Background**

*Authorization for Interceptions*

On May 1, 2017, Chief Judge Ruben Castillo authorized the interception of wire communications over six telephones located within Burke's Aldermanic office at City Hall (the "office telephones"). After the government began intercepting calls over the office telephones, the government advised the Chief Judge in a special report that it was experiencing technical difficulties in conducting interceptions: Pen register information for the Target Phones reflected that there were numerous calls being made to and from the Target Phones that were not being intercepted. Special Report dated May 4, 2017. The government filed an amended application and affidavit on May 5, 2017, seeking to conduct interceptions over extension lines associated with the office telephones to ensure it could effectively intercept calls. R. 100-B.[39]

On May 12, 2017, the government sought to conduct interceptions over Burke's cellular telephone (identified as "Target Phone 9" in the government's filings), and explained that intercepting Burke's cellular telephone was necessary because ███

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[39] Burke filed the amended affidavit under seal as Exhibit B to his motion to suppress. The amended affidavit is cited as "R. 100-B."

102



; *see also id.* ¶

[40] Chief Judge Castillo authorized the interception of wire communications over Burke's cellular telephone, and

The initial affidavit submitted in support of interceptions over the office telephones and the affidavit submitted in support of interceptions over Burke's cellular telephone were substantially the same, and, unless specifically noted, is collectively referred to herein as the affidavit. The subject offenses identified in the affidavit were wire fraud, in violation of 18 U.S.C. § 1343, attempted wire fraud, in violation of 18 U.S.C. § 1349, attempted extortion, in violation of 18 U.S.C. § 1951,

---

[40]

and use of interstate facilities to promote and carry on unlawful activity, in violation of 18 U.S.C. § 1952. R. 100-C ¶ 2.[41]

### *Affidavit's Summary of Recorded Conversations with Alderman* ████

The affidavit set forth the government's showing of probable cause that Burke was committing these offenses and that evidence concerning the commission of these offenses would be obtained through interceptions over the target phones. ████,

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████. The affiant explained that, owing to his position as Chairman of the Zoning Committee, ████ was able to support or block zoning requests and other approvals developers required to develop property located within Chicago. *Id.* ¶ 20.

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

During ████ cooperation, a developer, ████████ (referred to as Individual A-1 in the Superseding Indictment), was undertaking a $500 million renovation and redevelopment of the Old Chicago Post Office (the "Post Office

---

[41] ████████████████████████████████████████████ references herein generally are to the affidavit submitted with respect to that telephone, which has been filed by Burke under seal as Exhibit C to his motion to suppress, and is cited as "R. 100-C."

project"). Owing to the size and scope of this project, the affiant explained that it would likely require additional approvals from the City and assistance from City officials as the project progressed. R. 100-C ¶ 25-26.

In addition to being an Alderman, Burke operated his own law firm, Klafter & Burke, which specialized in contesting tax assessments made on real property. R. 100-C ¶ 24. In recorded conversations, Burke asked ▅▅ to help him obtain business for his law firm from developers, including from ▅▅▅ The affiant explained that Burke initially contacted ▅▅▅ asking ▅▅ to help a company, ▅▅▅ ▅▅▅ obtain business in connection with the Post Office project. *Id.* ¶ 28. After ▅▅ told Burke that he would be willing to get ▅▅▅ an interview with the general contractor on the Post Office project, noting that ▅▅▅ and his son "understood that it's important that they look at a process that's acceptable to me to recommend to his contractors," Burke immediately suggested that ▅▅ recommend ▅▅▅ hire Burke's own law firm and suggested paying ▅▅ a fee for securing ▅▅▅ as a client for the firm. *Id.* ¶ 29. The affiant explained that the Post Office project was located in ▅▅▅ ward; that Burke, as a seasoned Alderman, was aware that Aldermen exert substantial influence over any development project located in their wards; and that it was reasonable to believe that Burke was aware that ▅▅▅ would have difficulty rejecting a request from ▅▅ to steer work to Burke, because ▅▅▅ would need to maintain ▅▅▅ support for the project and might need his assistance in the future. *Id.* ¶ 29 n.5. After this meeting, Burke called an individual from ▅▅▅ and told him/her to call ▅▅ about getting work on the Post Office

105

project; Burke told this individual that ██████ was a "main player in this whole, ah process." *Id.* ¶ 31.

At the FBI's direction, ██████ arranged a meeting between Burke and ██████ so that Burke could make a "pitch" for legal work for his firm. R. 100-C ¶ 32-33. This pitch was held on City property—inside ██████ Aldermanic office—in clear prohibition of City rules barring individuals from conducting private commercial business at City Hall. *Id.* ¶ 34. During this meeting, Burke freely mixed his pitch for tax work with a discussion of the official assistance needed by ██████ including by assuring ██████ that he could be helpful in resolving the development's ongoing problems with respect to Amtrak, owing to Burke's connections with Amtrak officials, including a Presidentially-appointed Amtrak board member. *Id.* ¶ 35. ██████ told Burke that he would reach out to him if needed, and Burke advised him that "Chicago's a very small town" and that "between ██████ ██████ and I, there aren't too many people around town that we don't know." *Id.* After the meeting, ██████ told Burke that ██████ needed Amtrak to be more cooperative, and that Amtrak wanted to charge ██████ $5,000 "every time they go down," a reference to the fee Amtrak charged for access to the space under the Post Office. *Id.* ¶¶ 36-42. Burke urged ██████ to recruit other developers as clients for Burke's law firm, in return for a portion of

the legal fees generated from the work, which the affiant explained was unlawful under the rules of ethics governing attorneys.[42] *Id.* ¶ 36 & n.12, 37.

Conversations recorded by ██ as summarized by the affiant, also revealed that Burke was willing to take official action in an aldermanic capacity in order to ensure his private law firm got tax work, and that he also agreed that ██ would use his official position as an Alderman to secure business for Burke's law firm. For example, on November 7, 2016, ██ told Burke that ██ believed he could get ██ to hire Burke's law firm by reminding ██ that ██ needed ██ help with getting additional approvals for the Post Office project: "I'm gonna remind him ██ again, 'cause he needs a lot of help, a lot of approvals, that I think carefully I can get him to go with you." R. 100-C ¶ 38. In response to this plainly extortionate plan to secure business for Burke's law firm (and an illegal fee to ██ Burke simply said, "Good." *Id.* Burke then suggested ways to conceal any payment to ██ by routing it through another lawyer and added that he was a believer in "making money" and sharing the wealth. *Id.*

As another example, on December 12, 2016, ██ told Burke that it appeared that ██ was going to use another law firm but that ██ was still experiencing problems with Amtrak and would "need permits and stuff . . . ." R. 100-C ¶ 42. ██

---

[42] While Burke is correct that it is not a federal crime to violate the rules of ethical conduct governing attorneys (R. 100 at 44-45), this arrangement demonstrates Burke's consciousness of guilt. Not only was Burke willing to enter into an unlawful payment arrangement with ██ that entailed a kickback, he also offered to conceal the payments by using a third party. *See* R. 100-C ¶ 38.

told Burke that it would "make the deal for him" (meaning, result in tax work) if Burke intervened with Amtrak on ████ behalf, which Burke agreed to do. *Id.* ████ reiterated later that day that ████ "seems to understand it and as long as we help him, and, with the necessary permits, which I think I'll follow up [o]n, and then if you can follow up with the Amtrak, then I think he understands he'll use your firm." *Id.* Burke—after once again having been informed that there would be an illegal trade of assistance with City permits and with Amtrak in return for the award of legal work to Burke's firm—said, "Okay, great." *Id.* Thereafter, Burke proposed that he negotiate directly with "the Amtrak bureaucrats" to resolve ████ problems. *Id.* ¶ 44.

Several days later, Burke advised ████ that he had met with an individual that ████████████, ████ had gathered more information about the Post Office project's problems with Amtrak, which included gaining access to Amtrak space underneath the Post Office to perform construction work; and believed ████ could be "worked with." R. 100-C ¶ 46. Burke explained that he would be able to extract concessions from Amtrak but had not been hired by ████ so his role was limited to getting background information on the problem. *Id.* Making his intentions clear, Burke explained, "[W]ell, you know as well as I do, Jews are Jews and they'll deal with Jews to the exclusion of everybody else unless . . . unless there's a reason for them to use a Christian." The affiant interpreted this distasteful comment to mean that Burke believed he would only be hired to perform

108

tax work by ▮▮▮ if he was able to take favorable action for ▮▮▮ in his capacity as an Alderman. *Id.*

Several weeks later, after ▮▮▮ asked if Burke was going to have a discussion with ▮▮▮ or ▮▮▮ (an Amtrak Board member) on the Amtrak matter, Burke told ▮▮▮ he would not assist ▮▮▮ with Amtrak unless he received tax work from ▮▮▮ "[I]f we're not signed up, I'm not gonna do any lifting for this guy." R. 100-C ¶ 48. ▮▮▮ told Burke later in the conversation that ▮▮▮ company had a "lot of other stuff they're gonna need in the future, I don't think that the historical landmark issue has been resolved yet either," to which Burke responded, "the cash register has not rung yet"—again tying assistance on City business to private gain. *Id.*

The affiant provided yet another example of Burke's willingness to trade official action for tax work. In March 2017, ▮▮▮ told Burke that ▮▮▮ needed water access for the Post Office project, which would require the approval of the City's water commissioner, ▮▮▮ R. 100-C ¶ 53. ▮▮▮ told Burke that "if we can take care of the water commissioner, we should be able to get the tax work and maybe get my consulting from you." *Id.* Again, when confronted with a specific exchange of official action—namely, getting the water commissioner to grant an accommodation to the Post Office project, in return for a private benefit—Burke said, "Good. Let me take a look at it." *Id.*[43] Burke instructed ▮▮▮ to send him information concerning the

---

[43] ▮▮▮ reiterated in a subsequent conversation that Burke and he would "seal the deal," meaning receive tax business from ▮▮▮ if they could resolve the water access issue in ▮▮▮ favor. *Id.* ¶ 55. Burke responded, "Alright. We're on it." *Id.*

water problems to his private email account, instead of his City email account. *Id.* ███ was subsequently advised by ███ that ███ (the former water commissioner, whom Burke had previously suggested enlisting due to his expertise) and Burke wanted to meet with ███ to discuss the aforementioned water issue. *Id.* ¶¶ 55, 57. This planned meeting was abandoned after the *Chicago Tribune* ran a story, dated March 21, 2017, that reported possible ethical violations in connection with the Post Office project and efforts made to help the project "getting access to Amtrak-controlled space beneath the building and lower fees from the rail agency." *Id.* ¶ 59. Burke explained that he and ███ should not meet with ███ because Burke was "nervous" about the water commissioner and referenced the *Chicago Tribune* article, which the affiant explained to mean that Burke was afraid that ███ could not be trusted to be discrete about Burke's planned intervention on behalf of ███ *Id.* Nonetheless, ███ was able to confirm with ███ that Burke, through ███ had asked ███ what he could do to resolve the Post Office's water problems. *Id.* ¶ 61.

The affidavit explained that Burke had used his cellular telephone (and office telephones) in connection with the offenses under investigation; for example, Burke had many of the recorded conversations with ███ on his cellular telephone, and phone records reflected the Burke had been in recent contact with individuals associated with the Post Office project's water problems, including ███ who had been directed by Burke to act as his intermediary to help solve the problems facing the Post Office project. R. 100-C ¶ 67. The affiant also explained that the FBI planned

110

to instruct ▮▮▮▮ to have additional conversations with Burke about ▮▮▮▮ issues, including one in which ▮▮▮▮ would ask Burke to follow up with ▮▮▮▮ about those issues. *Id.* ¶ 68. Moreover, the affiant explained that, in light of the *Chicago Tribune* exposé, Burke was conscious that his activities were unlawful and that he would seek to exert his influence indirectly, including over the telephone. *Id.*

In light of the recorded conversations with ▮▮▮▮ and the other evidence summarized above, the affiant pointed to no less than 23 separate grounds to support the conclusion that there was probable cause to believe Burke (1) had participated in the attempted extortion of ▮▮▮▮ in violation of 18 U.S.C. § 1951, in that Burke had sought to obtain ▮▮▮▮ business through "Alderman ▮▮▮▮ knowing that Alderman ▮▮▮▮ is a 'main player' with respect to the Post Office project and any future City approvals needed for the Post Office project," which Burke knew were "tied to the award of business to [Burke's] firm;" (2) had participated in a scheme to defraud the citizens of Chicago of their right to his and ▮▮▮▮ honest services and attempted to do so, in violation of 18 U.S.C. §§ 1343, 1346 & 1349, in that Burke had planned to take action in his capacity as a public official and believed that ▮▮▮▮ would take action in his capacity as a public official, to benefit the Post Office project for the specific purpose of ensuring that his private law firm received business; and (3) had used a facility of interstate commerce to promote and facilitate unlawful activity, in violation of 18 U.S.C. § 1952, in that Burke used his private email account to facilitate efforts to obtain accommodations from the water commissioner, with the understanding that he would receive business for his law firm in return. R. 100-C ¶ 65.

111

### 2.    Applicable Law

The Fourth Amendment provides that a warrant, including for electronic surveillance, shall issue upon a showing of probable cause—that is, "sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Searcy*, 664 F.3d 1119, 1122 (7th Cir. 2001) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Probable cause involves a common-sense view of the everyday realities of life, *Brinegar v. United States,* 338 U.S. 160, 175 (1949), and requires only a "fair probability" that evidence of a crime will be found in a particular place. *Gates*, 462 U.S. at 238-39. Even if there is a possibly innocent explanation for the conduct under investigation, as long as there is a reasonable probability that there is criminal activity afoot, the probable-cause standard is met. *See, e.g., United States v. Malin*, 908 F.2d 163, 166 (7th Cir. 1990) (citations omitted).

The conclusion of the judge issuing the search warrant is entitled to "great deference." *United States* v. *Leon*, 468 U.S. 897, 914 (1984). Courts do not "undertake a piecemeal dismemberment of the various paragraphs of the affidavit without attention to its force as a whole," *United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir. 1988), and in reviewing the issuing court's decision, even doubtful cases should be resolved in favor of upholding the warrant. *United States v. Pless*, 982 F.2d 1118, 1124 (7th Cir. 1992); *United States v. Griffin*, 827 F.2d 1108, 1111 (7th Cir. 1987).

### 3.    The Affidavit Clearly Established Probable Cause.

The government clearly established probable cause to conduct wire interceptions. In the recordings made by Alderman ███ summarized in the affidavit

submitted in support of the authority to intercept Burke's communications, Burke engaged in attempted extortion, honest services fraud, and promoted bribery.

Specifically, when he asked ████ to solicit legal business for his firm from ████ Burke was fully aware that Alderman ████ had powerful influence over the Post Office project by virtue of its location in ████ ward and ████ role as Chairman of the Zoning Committee. Indeed, ████ specifically told Burke that ████ understood it was important to follow a process acceptable to ████ in connection with the project, and Burke specifically urged ████ to bring this pressure to bear on ████ Then, during a pitch for ████ legal business at Alderman ████ office at City Hall—using the trappings of Alderman ████ office as a means to extract business—Burke led ████ to believe that he could use his own influence as a public official and cause a Presidentially-appointed member of Amtrak's board to resolve ████ outstanding problems with the Post Office project.

During the same timeframe, ████ repeatedly told Burke that ████ planned to solicit work for Burke's law firm from ████ by emphasizing what Burke and ████ could do for ████ in an official capacity; in response, Burke approved the tactic and offered a portion of the legal fees to ████ For example, on November 7, 2016, Burke answered "Good," when told by ████ that ████ planned to remind ████ that he needed "a lot of [City] approvals" for the Post Office project. R. 100-C ¶ 38. Burke similarly thought it was "great" on December 12, 2016, when ████ told him that ████ understood that "as long as we help him, and with the necessary permits . . . and then if you can follow up with Amtrak, then I think he understands he'll use your

113

firm." *Id.* ¶ 43. Burke offered to "negotiate" directly with Amtrak officials to resolve ████ problems and contacted ████ whom Burke said ██████████ ██████████, to gather information—but declined to do any substantive work to assist ████ until his firm was retained to do tax work. *Id.* ¶¶ 44-46. When ████ later explained that ████ would hire Burke's firm if he and Burke could resolve the developer's problems with the City's water department, Burke unhesitatingly said, "Good. Let me take a look at it," and made plans to meet with the water commissioner on ████ behalf—all with a view towards privately benefitting himself and his law firm. *Id.* ¶ 53.

It was on the basis of all of these facts that Chief Judge Castillo properly concluded there was probable cause that Burke was committing the subject offenses and that interceptions over Burke's office telephones and cellular telephone would provide the government with additional evidence of wrongdoing.[44]

### 4. Burke's Arguments to the Contrary Are Without Merit.

Relying on *McDonnell*, 136 S. Ct. 2355, and its discussion of what constitutes an "official act" for purposes of honest services fraud prosecutions, Burke argues that Chief Judge Castillo wrongly decided there was a "fair probability" that he intended

---

[44] As it turned out, the government did uncover considerable evidence of Burke's corrupt activities through interceptions over his cellular telephone, as described in detail in the superseding indictment, including Burke's repeated efforts to corruptly exchange official action for business from ████ For example, in an intercepted call on June 19, 2017, ████████████████████████████████████████████████

or planned to take official action in exchange for legal work for his firm. R. 100 at 29-46. This argument is without merit.

### a. There Was Probable Cause For Subject Offenses Other Than Honest Services Fraud.

As a threshold matter, there were numerous subject offenses, other than honest services fraud, that did not require the government to prove that Burke intended or planned to take official action. For example, attempted extortion, in violation of 18 U.S.C. § 1951, includes extortion accomplished through the wrongful use of actual and threatened fear of economic harm. *See United States v. Davis*, 890 F.2d 1373, 1378 (7th Cir. 1989). The evidence set forth in the affidavit established probable cause to believe Burke committed this offense: In recorded conversations, Burke tried to get ▮▮▮ to steer business to him, knowing ▮▮▮▮ was dependent on ▮▮▮ official support for the project; assented to ▮▮▮ telling ▮▮▮ that ▮▮▮▮ needed to give tax work to Burke in order to get the necessary approvals, permits, and assistance with the Post Office project; and proposed rewarding ▮▮▮ for threatening the economic viability of the project to ensure ▮▮▮▮ gave him business. These facts created a fair probability that Burke engaged in attempted extortion by

wrongful using the fear of economic harm, which does not require the government to prove he engaged in an official act.[45]

The evidence summarized in the affidavit also established probable cause to believe that Burke engaged in attempted extortion under color of official right, which also did not require Burke to take official action. *See, e.g., United States v. Carter*, 530 F.3d 565, 574 (7th Cir. 2008) ("[T]he Hobbs Act's application is not dependent upon the success of the public official in carrying out his promised acts."); *United States v. Nedza*, 880 F.2d 896, 902 (7th Cir. 1989) (stating that "*de jure* ability to perform the promised acts is not required"). As the affiant explained, the evidence demonstrated that Burke was using ███████ with ██████ acting in an official capacity— to generate business for his law firm. In other words, Burke agreed to leverage ██████ official powers in return for splitting legal fees with ██████ which Burke fails to address. And because the subject offense described in the affidavit was an attempt crime, factual impossibility is not a defense, so it did not matter whether or not ██████ was in a position to take official action or intended to do so, so long as Burke acted with the intent to extort ██████ under this premise. *See United States v. Wrobel*,

---

[45] Burke does not address extortion through the wrongful use of fear of economic harm because, he says, the affidavit is devoid of evidence of the wrongful use of fear. R. 100 at 21 n. 14. Burke overlooks the fact that "fear" includes fear of economic harm. The evidence summarized in the affidavit establishes probable cause under both theories of extortion in violation of § 1951: under color of official right *and* by attempting to obtain property using a threat of official position or authority to cause economic harm. *See, e.g., Davis*, 890 F.2d at 1378 ("[T]he two forms of extortion proscribed by § 1951 are equally applicable to the conduct of public officials who take unlawful advantages of 'opportunities' relating to their public office.").

116

841 F.3d 450, 456 (7th Cir. 2016) (collecting cases establishing that factual impossibility is not a defense to an attempt crime).

Likewise, the evidence established Burke's use of a facility of interstate commerce to promote and facilitate unlawful activity, that is, Illinois bribery, commercial bribery, and misconduct, in violation of 18 U.S.C. § 1952. This offense, too, did not require Burke's official action, as discussed above. The Illinois bribery statute, 720 ILCS 5/33-1(d), punishes the receipt of property where the recipient knows that the property was "tendered or promised with intent to cause the individual to influence the performance of any act related to the employment or function of a public officer." It does not require that the public officer intend or agree to take official action; it merely requires the recipient to be aware of the purpose with which property is tendered. *United States v. Isaacs*, 493 F.2d 1124, 1145 (7th Cir. 1974). Likewise, Illinois commercial bribery does not require any "official action" by a public official as an element of the offense. Moreover, § 1952 does not require the government to prove the violation of state law—only that an interstate facility was used to *promote* this unlawful activity. *Baker*, 227 F.3d at 961; *Karigiannis*, 430 F.2d at 150. Since there was probable cause for these offenses, the Chief Judge properly

117

granted the government's application to conduct wire interceptions. The inquiry can end there.

### b. There Was Probable Cause to Support Honest Services Fraud As A Subject Offense.

The affidavit also established probable cause to conclude that Burke engaged in honest services fraud. First, the affiant explained that Burke "participated in a scheme to defraud the citizens of Chicago of their right to his *and* ███ *honest services*," and attempted to do so, because not only did Burke plan to take action in his capacity as a public official, but he believed "███ [would] take action in his capacity as a public official[ ] to benefit the Post Office project for the specific purpose of ensuring that his private law firm receives business." R. 100-C ¶ 65. In other words, whether Burke engaged in or intended to engage in official action is not dispositive; Burke believed that ███ would be acting in an official capacity.

Second, Burke is simply incorrect that the affidavit did not establish a fair probability that he personally intended or planned to take official action (as defined in *McDonnell*) in exchange for work being awarded to his firm. The affidavit describes in detail how Burke expressly linked his official assistance on issues related to the Post Office project to private gain in the form of ███ hiring Burke's law firm. Burke's anticipated official actions included assistance with city permits, getting the water commissioner to grant an accommodation for the Post Office project, and resolving problems with Amtrak representatives. And the bribe Burke intended to

receive for his performance of official acts was the legal fees ██████ company would pay to Burke's law firm.

### c. The Affidavit Must Be Interpreted as a Whole, And In Any Event Burke's Individualized Challenges Are Meritless.

Burke spends 17 pages seeking to cast each and every aspect of his conduct in an innocent light. This approach is flatly inconsistent with how courts are to make assessments of probable cause; as noted earlier, judges must take a commonsense view of the evidence presented, looking at it as a whole, rather than dismembering it paragraph by paragraph. *See Brinegar,* 338 U.S. at 175; *Leisure*, 844 F.2d at 1354. Even with a possibly innocent explanation, evidence that establishes a reasonable probability that there is criminal activity afoot satisfies the probable cause standard. *See Malin*, 908 F.2d at166. Here, the Chief Judge had ample reason to conclude that there was a fair probability that Burke's conduct was criminally motivated. Taking the information in the affidavit together as a whole, there clearly is probable cause that Burke intended to engage in honest services fraud, among other crimes.

Even if the Court were to consider Burke's individual challenges, they are without merit. For example, Burke attempts to recast his meeting with ██████ as an innocent effort to gain ██████ business, and his mention of his association with ██████ an Amtrak board member, as nothing more than an offer of a simple introduction to a personal friend. R. 100 at 31-34. This censored summary of the affidavit overlooks important facts. The meeting with ██████ did not take place in a void; it took place after Burke—who knew of the power Aldermen have over projects

in their wards and knew that ▆▆ was a "main player" who ▆▆ would need to rely upon for future official action in connection with the Post Office project—asked ▆▆ to steer legal business to his firm and offered ▆▆ a cut of the legal fees from ▆▆ The pitch for business took place in ▆▆ office in City Hall—an official setting. During the meeting, Burke expressed his willingness to contact ▆▆ to help resolve problems ▆▆ was experiencing with Amtrak, but after the meeting refused to talk to ▆▆ because he had not yet received any tax work from ▆▆ These facts all pointed to Burke's willingness to abuse ▆▆ power and his own as a public official in order to obtain a private benefit for himself.[46]

Contrary to Burke's characterization of ▆▆ problems with Amtrak as not sufficiently concrete to be a matter upon which Burke (or any other official) could take action (R. 100 at 31-32), ▆▆ specifically told Burke that Amtrak was trying to charge ▆▆ $5,000 "every time they go down [to access Amtrak's property under the Post Office]," and Burke reiterated he had a relationship with a member of Amtrak board. R. 100-C ¶ 36. Later, ▆▆ again explained to Burke that ▆▆ was really concerned "about that Amtrak matter because it's costing him $5,000 every

---

[46] Burke's subsequent conduct confirmed the affiant's interpretation of Burke's statements. As noted in the superseding indictment, after this meeting, Burke had numerous conversations in which he indicated that he would be prepared to take official action in return for tax business from ▆▆ R. 30 at 13 (Burke noting he was not motivated to provide assistance to Post Office project because he had not heard about "getting hired to do the tax work"); *id.* at 15-16 (Burke suggesting in response to ▆▆ request for TIF financing support that ▆▆ and his associates could "go fuck themselves" since Burke's law firm had not yet been hired); *id.* at 16-17 (▆▆ telling Burke he had confirmed the retention of Burke's law firm, and Burke indicating he "absolutely" would support ▆▆ request for TIF financing).

120

time he tries to use it," and explained to Burke that, if they helped  obtain the "necessary permits" and Burke helped resolve the matter with Amtrak, "he understands he'll use your firm." *Id.* ¶ 43. Burke responded "Okay, great," and then discussed negotiating with the Amtrak bureaucrats directly. *Id.* This clearly demonstrates Burke's willingness to take official action, including action relating to the approval of permits, on a specific matter or controversy in return for obtaining business for his firm.

Burke argues that, because ▮▮▮ did not commit to hiring Burke during the initial pitch meeting, the government failed to demonstrate that there was an agreement between Burke and ▮▮▮ to exchange official action for private benefits. This argument fails. First, as a factual matter, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ ▮ ▮ ▮▮▮ ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮. Second, it is irrelevant whether ▮▮▮ hired or intended to hire Burke. Impossibility is not a defense to an attempt charge, and Burke's expressed willingness to pursue an illegal exchange, even if not accepted by ▮▮▮ is a crime. Contrary to Burke's characterization, *McDonnell* requires neither a meeting of the

minds between Burke and ██████ nor an agreed-upon exchange.[47] *See United States v. Silver,* 948 F.3d 538, 547-52 (2d Cir. 2020), *cert. denied,* 141 S. Ct. 656 (2021) (neither extortion under color of official right nor honest services fraud require a meeting of the minds agreement between the public official and a bribe payor); *United States v. Morgan*, 635 Fed. App'x. 423, 428-32 (10th Cir. 2015) (bribery does not require corrupt intent of both parties; the focus in a prosecution of a bribe recipient is on "whether he had the intent to receive the retainer fees . . . in exchange for his legislative influence"); *United States v. Ring*, 706 F.3d 460, 467-68 (D.C. Cir. 2013) (no completed corrupt exchange or agreement is necessary for honest services fraud; the statute punishes the scheme, not its success); *United States v. Avenatti*, 432 F.Supp.3d 354, 365 (S.D.N.Y. 2020) (honest services fraud effected by bribery does not require a third party to agree to a corrupt exchange and their state of mind is "legally irrelevant"; "In short, the focus of bribery-based honest services fraud is the defendant's state of mind and his understanding that there is a *quid pro quo* exchange—no actual agreement with the counterparty, implicit or explicit, is required." (citations omitted)).

---

[47] A hypothetical example demonstrates why this is the case. Suppose a police officer planned to extract bribes from speeding motorists in return for not writing the motorists speeding tickets, but a motorist refuses to pay the requested bribe. Even though there was no "meeting of the minds," the officer is nonetheless guilty. The motorist does not have to agree to the corrupt exchange for the government to prove the officer schemed to pursue a corrupt exchange. The same holds true in this case. Burke's intent to engage in a corrupt exchange was well-established by the evidence in the affidavit, summarized above.

Burke also argues that, since he did not have any oversight authority over Amtrak or ██████ he was not in a position to take official action within the meaning of *McDonnell*. *McDonnell* itself recognizes that the official-act requirement is satisfied if a public official uses "his official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." 136 S. Ct. at 2372. Here, Burke suggested his willingness to resolve ██████ problems with Amtrak by contacting ██████ a Presidentially-appointed public official—as a means of causing Amtrak to change its official position on issues related to the Post Office project.[48]

In similar piecemeal fashion, Burke attempts to portray his interactions with ██████ as innocent, including because he purportedly was merely attempting to get "background" on the problems ██████ (a potential client) had with Amtrak from a "friend." R. 100 at 35. The characterization of Burke's motives as purely altruistic is

---

[48] Pursuant to 49 U.S.C. § 24302, the board of Amtrak (formally known as the National Railroad Passenger Corporation) is composed of the Secretary of Transportation, the President of Amtrak, who serves as a non-voting member of the board, and "8 individuals appointed by the President of the United States, by and with the advice and consent of the Senate . . ." with requisite qualifications in transportation and like industries. The affiant noted that the board members appointed by the President take the oath to support the Constitution, receive a formal commission from the President, and that ██████ ██████ R. 100-C ¶ 35 n.10. Although Congress has sought to classify Amtrak itself as a non-governmental entity, see 49 U.S.C. § 24301, the Supreme Court has repeatedly rejected that classification, and has held that because the political branches exercise substantial control over Amtrak, including through the appointment of its board members by the President, it is a governmental entity for constitutional purposes. *See Department of Transportation v. Assoc. of American R.R.*, 575 U.S. 43, 51-55 (2015).

belied by what came before this meeting, including ███ comments to Burke that he would get tax business for his law firm *if* they first resolved the Amtrak matter. The Amtrak matter was not within the scope of Burke's anticipated legal work for ███ which instead, per Burke's own pitch to ███ would be real estate tax work. R. 100-C ¶ 48-49 (███ "But you said, you would still prefer the tax work, right?" Burke: "Somebody's got to do it. I thought that's what our conversation was.").[49]

Nor was Burke's conduct with respect to the Post Office project's water access problems innocent. R. 100 at 38-43. Viewed in its totality, the evidence summarized in the affidavit established that Burke intended to do far more than simply try to direct the matter to someone with technical expertise. ███ specifically *told* Burke that he (███ would remind ███ that he needed help with project approvals and

---

[49] The affidavit disclosed that ███ mentioned Burke potentially performing lobbying work for ███ in connection with Amtrak, which Burke said he could do. *Id.* ¶ 49. That fact did not undermine probable cause. Indeed, within short order, ███ confirmed to Burke that the business ███ was willing to provide was tax business. *Id.* ¶ 50.

Burke also unsuccessfully attempts to ascribe an innocent explanation to his criminal conduct involving ███ R. 100 at 37. While Burke's conduct with respect to ███ is not necessary to establish probable cause, it is yet another example of Burke's willingness to trade official action for private gain. As described in the affidavit, when Burke and ███ toured Union Station with ███ in February 2017, ███ discussed plans to redevelop Union Station that would require City approval. R. 100-C ¶ 50. After the tour, ███ suggested to Burke, "do you think we can suggest to ███ ███ that we'll get him what he needs on the [Union Station redevelopment] project if he gets us what we need in regards to ███ *Id.* ¶ 51. Far from rejecting this proposal, Burke noted that he had a call into ███ and asked for a "list of things that they [███ think right now they could benefit from[.]" *Id.* ███ reiterated that if they could get ███ what he needed and "we can help each other," they would "lock in the tax work." *Id.* Again, Burke did not question this corrupt arrangement, and instead said, "Good. Well just get me a list of the things that they need from ███ and I'll talk to him." *Id.*

"permits" as a means of securing tax work for Burke's firm—in other words, a *quid pro quo* of legal business for official acts. R. 100-C ¶¶ 38, 42. ▮ also told Burke, "if we can take care of the water commissioner"—contemplating official action, which Burke planned to pursue until the *Chicago Tribune* article was published—they "should be able to get the tax work." *Id.* ¶¶ 53, 59-61. Indeed, if, as Burke suggests, he was merely trying to be a helpful official serving the citizenry of Chicago, he would have had no reason to become "nervous" about his efforts to assist the Post Office project after the *Tribune* article was published. *Id.* ¶ 60.

### d. There Was Probable Cause that the Target Phones Were Being Used in Furtherance of the Subject Offenses.

Finally, Burke makes a series of undeveloped arguments that the affidavit did not set forth probable cause to demonstrate that the office telephones were being used to commit the subject offenses. This is incorrect.

As an initial matter, the affiant explained that each of the six telephones in Burke's office could be used to answer incoming calls to Burke's office, regardless of which of the phone numbers was dialed, as confirmed by a representative from AT&T.[50] R-100-B ¶¶ 14, 20. And many of the office telephones were listed in City Hall directories as being associated with Burke's office. *Id.* ¶ 20. ▮ placed recorded calls

---

[50] For this reason, Burke's argument regarding the absence of "substantive" calls over two of the office telephones (R. 100 at 48) is without merit. Because they were part of the same block of telephones and were effectively interchangeable with telephones that had been used to make and receive calls in furtherance of the subject offenses, there was reasonable cause to believe all six lines would be used in furtherance of the subject offenses.

to four of the six telephones that concerned efforts to obtain tax work from ███ and others during the course of his cooperation, and certain of those calls concerned discussion of actions that ███ and Burke would need to take to aid the Post Office project to ensure Burke received tax work. *Id.* ¶¶ 14, 20. Some of the telephones also were used to communicate with the former water commissioner, ███ who was contacted by Burke to assist with resolving the Post Office's water access. *Id.* ¶¶ 56, 58, 67-69. Toll records also established that there were *hundreds* of telephone calls between Burke's cellular telephone and the office telephones, indicating that the office telephones were utilized frequently by Burke to communicate. *Id.* ¶¶ 67-70.

Chief Judge's Castillo properly found, based on these facts, that there was a fair probability that the office telephones would be used by Burke and his staff members to discuss the subject offenses. It was apparent that Burke had access to multiple telephone lines within his City Hall office, any one of which could be used to field or place a call by Burke. Most of the office telephones had, in fact, been used by Burke to discuss or further the subject offenses. Under these facts, authorizing the interception over the office telephones was well supported, and Burke is incorrect that there was a lack of evidence that he used the office telephones.

Burke complains that a number of his calls with ███ were short. R. 100 at 46. While short, the calls were nonetheless pertinent and furthered the criminal activity under investigation. For example, in a call that lasted less than two minutes, ███ conveyed to Burke (who was using one of the office telephone lines) that ███ would hire Burke's law firm if he received the necessary permits and assistance with

126

Amtrak. R. 100-B ¶ 43. In another call that lasted barely four minutes, Burke (who was again using an office telephone) told ███ that he wanted to "negotiate" with the Amtrak bureaucrats directly. *Id.* ¶ 44. Other office telephone calls, though short, were placed for the purposes of coordinating meetings and future action concerning the Post Office project. *E.g.*, *id.* ¶ 45.

Burke also appears to suggest that calls to named interceptees could have been innocuous. R. 100 at 47. Again, the Chief Judge was not required to assume or credit an innocent explanation for phone contacts with interceptees. Indeed, there was ample evidence for the Chief Judge to conclude otherwise. For example, with respect to calls between Burke and ███ the affiant explained that, on March 9, 2017, Burke suggested involving ███ as a prelude to Burke and ███ meeting with the current water commissioner, ███ regarding the Post Office project; toll records reflected that, the very next day, three calls were placed from two of Burke's office telephones to ███ consistent with Burke's later report to ███ and with ███ reports to law enforcement. R. 100-B ¶¶ 55-57; *see also id.* ¶ 67 n.31 (summarizing Burke's statement to ███ on March 29, 2017, that Burke had talked to ███ about meeting with ███ Similarly, the day after Burke spoke to ███ about the need for Burke to "negotiate" with ███ directly concerning ███ problems with Amtrak, a call was placed from one of Burke's office telephones to ███ number. *Id.* ¶ 44 & n.18. Within days, Burke provided ███ with detailed information he received from ███ about the dispute between the Post Office project and Amtrak. *Id.* ¶ 46.

**B. In the Alternative, The Government Relied in Good Faith on the Orders Authorizing Interception.**

Even if the affidavit were somehow lacking, the agents who intercepted the wire communications after judicial approval acted in good faith reliance on the Chief Judge's determination that probable cause existed.

It is well settled that suppression of evidence obtained pursuant to a warrant later declared invalid is inappropriate if the law enforcement officers relied in good faith on the issuing judge's finding of probable cause. *United States v. Watts*, 535 F.3d 650, 656-57 (7th Cir. 2008) (citing *Leon*, 468 U.S. at 920). An officer's decision to obtain a warrant is *prima facie* evidence that he was acting in good faith. *Leon*, 468 U.S. at 921 n. 21; *United States v. Reed*, 744 F.3d 519, 522 (7th Cir. 2014). A defendant may rebut this evidence by demonstrating that the issuing judge failed to perform his neutral and detached function and served as a rubber stamp; that the officer was dishonest or reckless in preparing the affidavit; or that the affidavit was so lacking in probable cause that no officer could have reasonably relied on it. *United States v. Garcia*, 528 F.3d 481, 487 (7th Cir. 2008).

Even if this Court identifies a fatal flaw in the wiretap affidavit, the good-faith exception applies here. Burke does not assert that the Chief Judge failed to perform his neutral and detached function, and, as discussed below, he has not shown that the affiant was dishonest or reckless in preparing the affidavit. Further, he has not shown that the affidavit was so lacking in probable cause that a reasonable agent could not have relied on it, for all of the reasons identified above.

128

That the affiant obtained approval from a prosecutor further bolsters that he was acting in objective good faith. *See United States v. Pappas*, 592 F.3d 799, 802 (7th Cir. 2010) ("Consulting with the prosecutor prior to applying for [a] search warrant provides additional evidence of [that officer's] objective good faith." (quotation marks and citations omitted)). As *Leon* permits, the agent placed "objectively reasonable reliance" on the Chief Judge's determination that probable cause existed for the wire interceptions; the Court should conclude that evidence suppression is not the appropriate remedy for any flaw in the affidavit.

Burke argues that *Leon*'s good-faith exception does not apply to warrants obtained pursuant to Title III because the statute contains its own suppression remedy. R. 100 at 61-62. While the Seventh Circuit has not considered the matter, other persuasive authority supports the application of the good-faith exception to Title III. The history of Title III supports this interpretation; Title III's suppression provision was modeled on the Supreme Court's exclusionary rule in the Fourth Amendment context and was intended to incorporate subsequent Supreme Court precedent:

> The exclusionary rule was first created by the Supreme Court and then adopted by Congress. The Senate report cited a number of Supreme Court cases defining the contours of the exclusionary rule to the date of enactment. In this context, the words "existing" and "present" [in the Senate Report on the wiretap statute] do not imply that Congress rejected any future developments in the Supreme Court's application of the exclusionary rule. Rather, those words, along with the breadth of cases cited, indicate that Congress was adopting the *entirety* of the exclusionary rule as applied by the Supreme Court. Without express rejection of future developments, this Court does not see a reason to understand that to be Congress's intent. Indeed, it would be

unreasonable for Congress to adopt a judicial doctrine but reject any further developments of that doctrine, leaving Title III with a judicially undeveloped exclusionary rule.

*United States v. Spann*, 409 F. Supp. 3d 619, 625 (N.D. Ill. 2019) (Durkin, J.). This analysis is supported by the House Report that accompanied the initial draft of the Electronic Communications Privacy Act of 1986, which amended a portion of the wiretap statute and specified that: "In the event that there is a violation of law of a constitutional magnitude the court involved in a subsequent criminal trial will apply the existing constitutional law with respect to the exclusionary rule." H.R. No. 99-647 at 48 (1986) (citing *Leon*, 468 U.S. 897, among other cases).

Moreover, limitations on the exclusionary rule were suggested by cases that predated the enactment of the wiretap statute, and therefore, it is unlikely Congress intended to exclude good-faith jurisprudence from the Title III suppression provision. *Spann,* 409 F. Supp.3d at 625-26. Indeed, as the Supreme Court explained in *Hudson v. Michigan*, 547 U.S. 586, 591-95 (2006), "[s]uppression of evidence . . . has always been our last resort, not our first impulse," and the rule has never been applied where its deterrent benefit was outweighed by substantial social costs. There is no deterrent benefit here, where the Chief Judge found, based on a 101-page affidavit containing numerous undercover recordings of Burke himself, that there was probable cause that Burke had committed the subject offenses.

## C. There is No Basis to Suppress Subsequent Wiretap Calls.

Burke argues that, if the Court suppresses the initial wiretaps, it must also suppress calls intercepted pursuant to the government's applications to extend

130

monitoring over Burke's cellular telephone. Because there was no error infecting the initial applications to intercept communications on the City Hall telephone lines and on Burke's cellular telephone, there is no basis to suppress the later calls.

Moreover, to the extent Andrews seeks to join this motion (R. 122), Andrews was not a party against whom the interception was directed at the outset of the wiretaps, so he does not have standing. *See* 18 U.S.C. §§ 2510(11), 2518(10)(a). He may join the motion only to the extent that he was a party to a telephone call intercepted during the initial round of interceptions over Burke's office telephones and Burke's cellular telephones. *See United States v. Vargas*, 116 F.3d 195, 196-97 (7th Cir. 1997) (citing *United States v. Thompson*, 944 F.2d 1331, 1339 (7th Cir. 1991)). He identifies no such calls that were material to the government's subsequent renewal application for continued interceptions over Burke's cellular telephone.

## D.    Burke's Request for a *Franks* Hearing Should Be Denied.

### 1.    Applicable Law

A defendant is entitled to a *Franks* hearing only if he can make a "substantial preliminary showing" that (1) the warrant affidavit contained materially inaccurate information, (2) the authorities knew of or recklessly disregarded relevant inaccuracies in the affidavit, and (3) the purported inaccuracies were necessary to the finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *United States v. Williams*, 718 F.3d 644, 649 (7th Cir. 2013); *United States v. Maro*, 272 F.3d 817, 821 (7th Cir. 2001). All three requirements must be met; in addition, defendant

131

must provide sworn statements of witnesses attesting to the claims of falsity. *United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013).

"'*Franks* makes it clear that affidavits supporting a search warrant are presumed valid, and that the 'substantial preliminary showing' that must be made to entitle the defendant to an evidentiary hearing must focus on the state of mind of the warrant affiant'—that is, the law enforcement officer who sought the search warrant." *United States v. Owens*, No. 16-CR-38-JPS, 2016 WL 7079609, at *5 (E.D. Wis. Dec. 5, 2016) (quoting *United States v. Jones*, 208 F. 3d 603, 607 (7th Cir. 2000)). Allegations of negligence, or the identification of mere factual errors, do not entitle a defendant to a *Franks* hearing. *McMurtrey*, 704 F.3d at 509. A defendant's conclusory allegations of deliberate or recklessly false factual representations likewise are inadequate. *Id.*; *see also United States v. McAllister,* 18 F.3d 1412, 1416 (7th Cir. 1994) (defendant's "attack must be more than conclusory and must be supported by more than a mere desire to cross-examine" the affiant). Rather, "[t]he defendant must offer evidence showing either that the warrant affiant lied or that the warrant affiant recklessly disregarded the truth because he 'in fact entertained serious doubts as to the truth of his allegations' or had 'obvious reasons to doubt the veracity of the allegations.'" *United States v. Jones*, 208 F.3d 603, 607 (7th Cir. 2000) (citations omitted). This is a difficult burden to meet. *See United States v. Swanson*, 210 F.3d 788, 789-90 (7th Cir. 2000). In fact, as noted by the Seventh Circuit, a showing of "egregious errors" is necessary for a *Franks* hearing. *Maro*, 272 F.3d at 822.

132

The alleged errors must also be material—that is, the allegedly false statements in the challenged affidavit must have been "necessary to find probable cause." *United States v. Schultz*, 586 F.3d 526, 531 (7th Cir. 2009). If probable cause existed irrespective of the affiant's alleged errors, a hearing is unnecessary and the motion should be denied. *See United States v. Harris*, 464 F.3d 733, 738 (7th Cir. 2006). In other words, a defendant must make a substantial preliminary showing that, absent the misrepresentations, a judge would not have found probable cause. *United States v. Hancock*, 844 F.3d 702, 708 (7th Cir. 2016).

Because the requirements for a *Franks* hearing "are hard to prove," and there is a presumption in favor of the warrant's validity that requires more than self-interested inferences and conclusory statements, "*Franks* hearings are rarely held." *Maro*, 272 F.3d at 821 (internal marks omitted); *see also United States v. Slizewski*, 809 F.3d 382, 384 (7th Cir. 2016) ("Because these elements are hard to prove, *Franks* hearings are rarely required.").

### 2. The Affidavit Did Not Contain Material Misrepresentations or Omissions Relating to the Determination of Probable Cause.

#### a. Purported Material Misrepresentation Concerning ▮▮▮▮▮▮

The affidavit did not contain any material misrepresentations, and no *Franks* hearing is required.

Burke claims that the affidavit falsely did not inform the Chief Judge that ▮▮▮▮▮ conversations with Burke, including about securing ▮▮▮▮▮ legal business, were at the behest of the FBI. This is patently false. The government's affidavit

133

informed the Chief Judge that Alderman ▮▮▮ had been the subject of an ongoing investigation (R. 100-C ¶ 10)—a fact that the Chief Judge knew not only from this wiretap applications, but also because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮ ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮ ▮▮.

The affiant explained that, ▮▮▮▮▮▮▮▮▮▮, ▮▮▮ "made multiple consensual recordings of conversations with Alderman BURKE *at the direction of the FBI*." *Id.* ¶ 13 (emphasis added).

Burke argues that the affidavit was nonetheless materially misleading because the Chief Judge may have somehow thought that ▮▮▮ was truly interested in providing legal business to Burke's firm, and entering into a corrupt exchange of legal work for official action based on what ▮▮▮ told Burke, and that this affected the probable cause analysis. This argument is a makeweight. It was apparent to a reasonable person reading the affidavit that ▮▮▮ was cooperating with the government, was acting at the direction of the FBI, was hiding his cooperation from Burke, and in his undercover capacity was pretending to have an interest in and ability to generating clients for Burke's law firm in order to develop evidence concerning the subject offenses.[51] ▮▮▮▮ ▮▮▮ ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



The offense of attempted extortion—using Alderman ▮ position as a "main player" with respect to the Post Office project to extract business—did not require ▮ ( ▮ only required a showing that Burke was attempting to extort ▮ which he was. Similarly, the subject offenses of wire fraud and attempted wire fraud did not require the participation of both the individual seeking a bribe as well as the intended bribe-payor. *Morgan*, 635 Fed. App'x at 428-32 (bribery does not require both parties to bribe having corrupt intent; the focus in prosecution of bribe recipient is on "whether he had the intent to receive the retainer fees . . . in exchange for his legislative influence"); *Ring*, 706 F.3d at 467-68 (no completed corrupt exchange or agreement is necessary in honest services fraud prosecutions; the statute punishes the scheme, not its success); *Avenatti*, 432 F.Supp.3d at 365 (honest services fraud effected by bribery does not require a third party to agree to a corrupt exchange and their state of mind is "legally irrelevant") (citations omitted).

To put it another way, the evidence summarized in the affidavit showed that Burke was attempting to solicit a bribe in return for taking official action, and was

willing to split fees with ███ who indicated that his approvals on the Post Office project had been tied to Burke receiving legal work. This established a wire fraud and attempted extortion offense ████ ████ ████ ████ ████ ████.

Finally, as discussed earlier, § 1952 requires the use of a facility of interstate commerce to promote bribery; it does not require proof of a completed bribery offense. *Baker*, 227 F.3d at 961. Even if the government were required to prove the underlying elements of state-law bribery, 720 ILCS 5/33-1(d) does not require a meeting of the minds; it only requires the receipt of property knowing that it was tendered with intent to influence an official act. Burke responds that 720 ILCS 5/33-1(e)—a state law neither referenced in the affidavit nor otherwise relied upon by the government— requires a mutual understanding concerning the nature of the bribe. R. 100 at 58. This argument clearly demonstrates that Burke is grasping at straws: He accuses the government of deceiving the Chief Judge because it did not discuss a statute that was not even listed as a predicate offense in the wiretap affidavit. His casual accusations of misconduct should be rejected.

### b. Purported "Targeting" of Burke

Burke argues that the government misled the Chief Judge by not explaining that it was "deliberate[ly] targeting" him for investigation and that it had "sheer animus" towards him. R. 100 at 53-55. This narrative is contradicted by the facts contained in the affidavit. Burke is the one who approached ███ and, upon hearing that ███ would be able to pressure ████ to hire vendors, specifically requested

136

that ▌ solicit ▌ legal business on behalf of Burke's firm and offered him a cut of the fees he received. R. 100-C ¶¶ 13, 28-29. Burke is the one who, of his own accord, suggested a corrupt course of dealing with ▌. Again and again, Burke shamelessly tied official action to his law firm's receipt of business. The government acted more than reasonably in investigating Burke's conduct, an inquiry that, as set forth in the superseding indictment, revealed Burke to be thoroughly corrupt and worthy of prosecution. *See United States v. Murphy*, 768 F.2d 1518, 1529 (7th Cir. 1985) (holding covert investigation of public official was appropriate; "[t]he Government offered ▌ opportunities to sell the powers of his office and disgrace himself. He accepted with alacrity.").

In any event, Burke cites no authority for the proposition—and there is none— that the government must explain in a Title III affidavit why it is worthwhile to investigate a particular public official. That requirement does not appear in the wiretap statute; what is required by the text of the statute is a statement of facts sufficient to justify the issuance of an order and a finding of probable cause that a crime has been committed. 18 U.S.C. § 2518. Nothing more is necessary or appropriate. *See In re United States*, 398 F.3d 615, 618 (7th Cir. 2005).



### 3. Burke Has Not Made a Substantial Preliminary Showing That the Affiant Made Intentional or Reckless Misrepresentations.

Even if there were falsities in the affidavit (and there are not), Burke has not

made the substantial preliminary showing that he must that the affiant deliberately

---

52 ███████████████████████████████████████████████████████████
████████████████████████████████████████████████████

Burke also suggests that the fact that ███ had not engaged in criminal activity with him in the past would have been dispositive for purposes of undermining probable cause. *Id.* at 53-54. It clearly was not; by the time the affidavit was submitted to the Chief Judge, Burke had repeatedly agreed to commit criminal acts with ███ on tape. This was on top of Burke's criminal conduct caught on tape by another cooperator concerning a separate offense.

lied or had a reckless disregard for the truth, or that the false or omitted information was material. *Hancock*, 844 F.3d at 708; *Maro*, 272 F.3d at 821.

The fact that ▮▮▮ was cooperating with the government and deceiving Burke in the process was evident from the affidavit; even if it wasn't, the fact that ▮▮▮ had not agreed to give business to Burke was not material to the decision about whether Burke himself had the requisite criminal intent, as discussed earlier. Finally, the affidavit correctly laid out the events that caused the government to pursue recordings against Burke, and none of the purportedly missing information would have affected the probable cause analysis.

In short, there were no errors in the affidavit, let alone material and intentionally-made ones, that would justify an evidentiary hearing.

## VIII. Burke's Second Motion to Suppress Title III Interceptions (R. 102, 103) Should Be Denied.

During the course of initial interceptions over the office telephones and Burke's cellular telephone, law enforcement discovered that Burke had been approached by the operators of a local ▮▮▮▮▮ restaurant, ▮▮▮▮ and ▮▮▮▮▮▮ who needed him to take action on a permit under review in his office so they could remodel the restaurant. As with the Post Office project, Burke sensed an opportunity to exploit his ability to grant or withhold official action, and set upon trying to extract legal business for his private law firm from the ▮▮▮▮.

The government intercepted calls proving Burke's criminal intent during both the initial 30-day period of interceptions and in the following months. For example,

in a June 27, 2017 call between Burke and one of the ████████ Burke specifically tied the restaurant's receipt of permit approvals to the award of tax work to his firm: "Good. And um, we were going to talk about the real estate tax representation and you were going to have somebody get in touch with me so we can expedite your permits." *See United States v. Burke*, No. 19 CR 1 (N.D.Ill. 2019) [ECF#1 ¶ 25] (criminal complaint). When Burke did not receive tax work for his law firm as he expected, he conspired with co-defendant Andrews to play "hard ball" with the ████████ *Id.* ¶¶ 31-37. At Burke's direction, Andrews caused remodeling work to come to a halt and obstructed the ████████ efforts to obtain a driveway permit from the City. *Id.* ¶¶ 35-58.

Subsequent interviews with the ████████ confirmed that Burke was soliciting legal business in exchange for Burke's help with permits for the restaurant. *Id.* ¶ 22. Indeed, after the ████████ agreed to give Burke legal work, their permits were approved. *Id.* ¶¶ 59-73.

Burke seeks to suppress these highly incriminating interceptions. First, he argues that the government failed to properly minimize interceptions relating to this extortionate conduct during the initial interception period over the office telephones and his cellular telephone. Second, he argues that the affidavit submitted in support of an additional 30-day period of interceptions over the cellular telephone did not establish probable cause. Third, he argues that same affidavit did not demonstrate necessity for the wire interceptions relating to the extortion of the ████████ As discussed below, all of these arguments are meritless.

140

### A. The Government Properly Minimized Wire Communications as Required By the Authorizing Order and 18 U.S.C. § 2518.

#### 1. The Government Has Established its *Prima Facie* Case of Reasonable Conduct.

Title 18 U.S.C. § 2518(5) requires that wiretaps "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." Section 2518, however, "does not forbid the interception of all non-relevant conversations." *Scott v. United States*, 436 U.S. 128, 139-40 (1978); *see United States v. Torres*, 908 F.2d 1417, 1423 (9th Cir. 1990); *United States v. Armocida*, 515 F.2d 29, 42 (3d Cir. 1975); *United States v. Costello*, 610 F. Supp. 1450, 1477 (N.D. Ill. 1985) ("The interception of some innocent, non-pertinent conversations is 'inevitable.'").

The reasonableness of the agents' minimization is to be examined objectively in the context of information then known to the monitoring agent. *Scott*, 436 U.S. at 137. The review of minimization efforts is not to be used to second-guess, with hindsight, the failure to minimize particular calls. *United States v. Mansoori*, 304 F.3d 635, 647 (7th Cir. 2002); *United States v. Quintana*, 508 F.2d 867, 874 (7th Cir. 1975) (quoting *United States v. Cox*, 462 F.2d 1293, 1301 (8th Cir. 1972)). This is so because the courts recognize that the interception of innocent conversations will necessarily follow from the interception of pertinent ones. "The government is held to a standard of honest effort; perfection is usually not attainable, and is certainly not legally required." *United States v. Uribe*, 890 F.2d 554, 557 (1st Cir. 1989). The cases are thus uniform in taking *Scott* at its word: The government's obligation is to reduce

141

*to the extent possible* interception of non-pertinent conversations. As a result, calls less than three minutes in duration will generally not be subject to minimization. *Mansoori*, 304 F.3d at 648 (citing *Bynum v. United States*, 423 U.S. 952, 954 (1975) (Brennan, J., dissenting from denial of *certiorari*)).

In considering the government's good faith efforts at minimization, the Court must focus on the conduct of the agents monitoring the interceptions: The Court must assess "the facts and circumstances of each case" to determine the objective reasonableness of the agents' conduct in protecting the privacy rights of the speakers. *Scott*, 436 U.S. at 140; *Mansoori*, 304 F.3d at 647. Factors to be considered in determining whether the government has established a *prima facie* case of reasonable conduct in minimizing the non-pertinent interceptions include:

> the kind and scope of criminal enterprise that the government was investigating, the thoroughness of the government's efforts to ensure that nonpertinent calls will be minimized, the extent to which the government could have foreseen that certain types of conversations would be innocuous and thus subject to minimization, use of code, and the extent to which the authorizing judge oversaw the interception efforts.

*Mansoori*, 304 F.3d at 647 (citing *Quintana*, 508 F.2d at 874-75). Once the government has set forth its *prima facie* case, the burden of persuasion shifts to the defendants. *See Quintana*, 508 F.2d at 875 (defendant bears burden of proposing alternative procedures that "would have better minimized interception of noncriminal conversation while still permitting the government to achieve its legitimate objectives")*; United States v. Suquet*, 547 F. Supp. 1034, 1042 n.19 (C.D. Ill. 1982); *United States v. Marcy*, 777 F. Supp. 1400, 1405 n.3 (N.D. Ill. 1991).

142

Here, an analysis of the *Mansoori* factors shows that the government minimized interceptions in an objectively reasonable fashion. First, with respect to the criminal activity under investigation, monitors were investigating the corrupt activities of a public official. As a public official, Burke was capable of directing and acting through others, including his staff, as well as third parties to carry out the subject offenses. In order to fully understand the manner in which Burke committed the subject offenses, it was necessary to monitor his calls with subordinates, as well as outside parties who may have been called upon to assist Burke. The identities of those Burke may have employed to carry out the subject offenses was unknown. In addition, because he had many different responsibilities as a public official, it was entirely possible that conversations with subordinates and third parties would shift to various different topics during the course of one telephone call. *Mansoori*, 304 F.3d at 645-46 ("A conversation may be short and to the point or long and meandering; and a conversation may begin on a non-pertinent topic but switch to a pertinent subject in short order."). Moreover, because the calls often originated by a third party calling a member of Burke's staff, there was the additional possibility of delay before Burke joined the call to begin discussing the subject offenses. *See* Government Exhibit A (Minimization Instructions dated May 1, 2017) at 6 n.1 ("As reflected in the Affidavit, based on the fact that BURKE has members of his staff answer calls intended for him, there may be some delay before you are able to determine whether BURKE is an intended participant in the conversation or will join the conversation.").

Under these circumstances, monitors were entitled to latitude in making a determination of whether a call was pertinent or not.

Second, the government made good faith and thorough efforts to minimize non-pertinent interceptions. A minimization conference was held before interceptions began over the office telephones and the cellular telephone. During this conference, an Assistant U.S. Attorney reviewed with monitoring agents the principles that would guide their efforts to minimize wire communications. Guidance also was provided to the agents in writing, in the form of Minimization Instructions. *See* Government Exhibit A and Government Exhibit B (Minimization Instructions dated May 12, 2017).[53] These instructions emphasized that monitors could not simply listen to calls in their entirety, and instead, had to make a prompt determination of whether the call was criminal in nature within the first few minutes of listening to the call, and then terminate monitoring if the call was non-criminal. *See id.* at 6-8 (instructing agents to intercept "usually not in excess of two minutes, to determine whether the conversation concerns criminal activities" and to discontinue listening if they "determine during the initial few minutes that a conversation . . . is not criminal conversation"). These are precisely the sort of minimization instructions the Seventh Circuit has found permissible. *Mansoori,* 304 F.3d at 646-47 (describing minimization instructions that permitted listening for usually two minutes to assess pertinence and spot-checking to determine whether the call had turned to criminal matters).

---

[53] Copies of the minimization instructions that include signatures of the monitoring agents are available upon request.

Calls intercepted during this time frame reflect the monitors' good-faith efforts to follow minimization directives. Numerous calls were minimized (and even subject to automatic minimization in some cases) once it was determined that the call concerned a non-pertinent subject or was with an individual who had a personal or private relationship with Burke.[54]

Moreover, during the course of interceptions, the government submitted periodic 10-day progress reports to the supervising judge. The submission of periodic reports to the supervising judge is a "circumstance that suggests [the government]



conducted the surveillance in good faith." *Mansoori*, 304 F.3d at 648 (citing *Quintana*, 508 F.2d at 875).[55]

Third, courts consider minimization efforts in light of what the investigators could have reasonably anticipated about the content of conversations as the investigation developed. In particular, courts consider factors such as: (1) the phase of the investigation in which communications are being intercepted; (2) the government's awareness (or lack thereof) of the identities of the offenders and their confederates; (3) the extent and scope of the subject criminal activities; and (4) the experience of the monitoring agents and their familiarity with the investigation. *See Scott*, 436 U.S. at 139-42; *Quintana*, 508 F.2d at 874-75; *Suquet*, 547 F. Supp. at 1037; *United States v. Dorfman*, 542 F. Supp. 345, 390-92 (N.D. Ill. 1982) (citing cases). Awareness of such facts permits the government to "tailor its minimization efforts" to avoid interception of calls presumed to be non-pertinent. *Quintana*, 508 F.2d at 874.

Here, the government's efforts at minimization were objectively reasonable given what the agents could have reasonably been expected to know about the nature of intercepted conversations. In the initial 30 days of interceptions over the office telephones and the cellular telephone, agents were becoming familiar for the first

---

[55] Indeed, as discussed earlier, the government also submitted special reports to the Chief Judge, identifying technical problems with interceptions, and also advised the Chief Judge when it appeared that a potentially privileged call had been intercepted, and identified what steps were being taken to ensure that further such privileged calls were not monitored. *See* R. 103, Under Seal Exhibit C at 45 n.18 (referencing Special Report dated June 2, 2017).

time with a wide number of individuals who interacted with Burke, and it was unclear who of these individuals Burke might enlist to carry out the subject offenses. *See Quintana*, 508 F.2d at 874; *Scott*, 436 U.S. at 141 ("During the early stages of surveillance the agents may be forced to intercept all calls to establish categories of non-pertinent calls which will not be intercepted thereafter."). Moreover, as noted earlier, a call with any given individual could easily begin with a non-criminal topic and then shift unpredictably towards criminal activity, or Burke could join the line after an initial discussion between a staff member and a third party. *Cf. United States v. Infelise*, No. 90 CR 87, 1991 WL 255628, at *13 (N.D. Ill. Oct. 18, 1991) (where tapped phone line was used for legitimate and illegitimate business, government was unable to determine what group of calls would be innocent before or even during interception period).

Fourth, judicial oversight over the conduct of the interceptions supports the reasonableness of the government's minimization efforts. *See United States v. Ozar*, 50 F.3d 1440, 1443 (8th Cir. 1995) (discussing weekly status reports); *United States v. Marco*, 777 F. Supp. 1400, 1405 (N.D. Ill. 1991) (discussing 10-day reports). Chief Judge Castillo required the government to submit 10-day reports during the interception period, which included information about the number of interceptions, pertinent interceptions, privileged interceptions (if any), and excerpts of various pertinent interceptions. The progress reports thus provided the authorizing judge with complete, accurate and contemporaneously recorded information tracking the volume of interceptions, the number of pertinent interceptions, and the agents'

147

ongoing compliance with the court's minimization directives. *See Ozar*, 50 F.3d at 1447; *Marcy*, 777 F. Supp. at 1404-05; *Dorfman*, 542 F. Supp. at 391-92.

The government supplemented the status reports with line sheets of pertinent interceptions, which reflected the nature of the interceptions and their duration, thereby providing a means to scrutinize the progress of the operation if the court found it necessary to do so. *See Marco*, 777 F. Supp. at 1405; *Infelise*, 1991 WL 255628 at *13. The authorizing judge's substantial oversight of the clandestine interceptions, and the government's continued willingness to provide the judge with information to assess its minimization efforts, supports that the government was making a good faith attempt at minimization. *Quintana*, 508 F.2d at 875; *Infelise*, 1991 WL 255628, at *13-14; *Marcy*, 777 F. Supp. at 1405.

### 2.     Burke Has Not Met His Burden of Proof.

As the government has established its *prima facie* case, Burke bears the ultimate burden of persuasion as to whether any portion of the intercepted conversations should be suppressed for failure to minimize. *Suquet*, 547 F.Supp. at 1042 n.19; *Marcy*, 777 F.Supp. at 1405 n.3. He does not come close to meeting that burden.

In support of his motion, Burke cites several conversations intercepted during the first 30 days of interceptions over the office telephones and (primarily) over Burke's cellular telephone. As the Seventh Circuit has cautioned, "[i]t is all well and good to say, after the fact, that certain conversations were irrelevant and [monitoring] should have been terminated. However, the monitoring agents are not gifted with

prescience and cannot be expected to know in advance which direction the conversation will take." *Quintana*, 508 F.2d at 874.

This admonition applies with particular force to the conversations that Burke has identified. For example, he cites a May 9, 2017 call (Target Phone 11, Session #246)—which was the fourth day of interceptions after the government submitted an amended application for authorization to tap the office telephones. ███ ████████ ███████████████████████████████████████████████ ████████████████. At this early stage, monitors were still attempting to become familiar with Burke's use of the office telephones and identify potential participants in the subject offenses. Indeed, Burke fails to mention that the identified call was, in fact, minimized after approximately one and a half minutes. *Id*. When agents performed a spot check, a conversation about the ██████ project already was ongoing. *Id*. Discussion about the ██████ lasted roughly 35 seconds, before a different matter was discussed. *Id*.

Burke's argument that agents improperly minimized this conversation is frivolous. Agents have a reasonable period of time within which to make a determination concerning the pertinence of a conversation, which can run up to two to three minutes, and may spot-check thereafter; if an intercepted call is short, then agents monitoring the wiretap need not minimize the call, because the ability to "make quick assessments of the pertinence of a conversation [is] difficult." *Mansoori*, 304 F.3d at 645-48. Agents kept well within these bounds, as well as the minimization instructions they were provided. *See* Government Exhibit A at 7-8 (instructing agents

to discontinue listening if they "determine during the initial few minutes that a conversation . . . is not criminal conversation," and permitting spot-checking to determine if conversation had turned to criminal matters thereafter).

The same analysis holds true for the remaining calls Burke identifies. *See* R. 103 ¶¶ 9-13. The May 23, 2017 call (Session #309) was a voicemail left for Burke by ███████████ the content of which lasted approximately 27 seconds. R. 103 ¶ 9. Burke's argument that agents were required to minimize this call, despite its short length, demonstrates how unreasonable his position is. The remaining calls he identifies all terminated within a similarly short period of time. For example, Session #414 from May 25, 2017, lasted no more than approximately two minutes before being minimized. Session #640 from June 1, 2017, an incoming call from ███████████ lasted approximately 37 seconds before being minimized. Session #938 from June 8, 2017, was a call between Burke and his assistant, in which the topic of conversation shifted, meriting extended interception; the content relating to the ███████ lasted less than two minutes before being minimized. Session #1030 from June 11, 2017, lasted approximately one minute 20 seconds. ████████████████████████ ██████████████████████████████████████████ ██████████████████████████

The minimization of each of these calls was well within the permissible time allowed for monitors to make a determination concerning the pertinence of the call. Monitors plainly made good-faith efforts to minimize conversations—and in the

initial round of interceptions, this included calls relating to the ████████ consistent with the instructions they had received.

While the calls were all of limited duration, the call on June 8, 2017 signaled that Burke's extortionate activity extended beyond the Post Office project. By June 8, 2017, Burke had received multiple requests from the ████████ for his assistance with a permit (that is, assistance in Burke's official capacity). Burke in response asked to meet with the ████████ "key person" in Chicago, ostensibly for the purpose of resolving their permit issue. Burke's motive for this meeting was revealed on June 8, 2017: Burke instructed a member of his staff at City Hall to find out (by contacting his law firm) who handled the ████████ tax work. The timing of this inquiry clearly suggested that, as with the Post Office project, Burke was prepared to leverage his ability to take official action in an effort to obtain tax work for his law firm  and, including because it took place contemporaneously with Burke's efforts to extort the developer of the Post Office project for legal work, justified the continued monitoring of calls relating to the ████████ the official action they were seeking from Burke, and his efforts to obtain tax work from them.

In the subsequent call on June 11, 2017 (Session#1030), Burke told a public official in Texas, ████████ that he wanted law business from ████████ ████ agreed to "work him ████████," and Burke replied, "Good." This call reflected an attempt by Burke to leverage the influence of another public official for the purpose of obtaining legal work for his law firm and, coupled with other facts known to law enforcement, provided a clear predicate for law enforcement to believe that

151

Burke intended to extort the ██████ Accordingly, it was clearly appropriate to intercept this call in its entirety.

In short, Burke has failed to demonstrate improper minimization. Even if the Court were to find that the government failed in any particular instance to minimize a call correctly (and it should not), the Court should suppress only those interceptions it finds were improperly minimized. *See United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000); *Mansoori*, 304 F.3d at 647; *Ozar*, 50 F.3d at 1448; *Dorfman*, 542 F. Supp. at 394-95. It is only in the "particularly horrendous" case that total, rather than partial, suppression would be warranted, and Burke does not come close to making such a showing, much less demonstrating that any call relating to the ██████ was improperly intercepted. *Id.*

## B. There Was Probable Cause Supporting Continued Interception of Burke's Cellular Telephone.

The foregoing discussion makes clear that there was also probable cause to intercept conversations concerning Burke's efforts to obtain legal work from the ██████

At the time the government submitted its application to conduct interceptions over Burke's cellular telephone for an additional 30 days, law enforcement had recorded Burke on multiple occasions expressing his willingness to trade official action on his and ██████ part in order to secure work for his law firm from ██████ These recordings were summarized in the affidavit submitted in support of the continued interception, as they were in the original affidavit. The affidavit for

continued interception also summarized calls from the first 30 days of interceptions over the office telephones and Burke's cellular telephone, which clearly established the illegal nature of Burke's conduct.

Notably, as summarized in the affidavit in support of continued interceptions, Burke was told by ████ that ████ still had a problem with the City's Water Department and also was "having a hard time getting the permits to dig the hole under the post office." R. 103-C ¶ 21.[56] Burke responded he was not "motivated" to help solve these problems because "I've never heard anything from these people about getting hired to do the tax work . . ." *Id.* In other words, Burke made explicit the affiant's earlier-stated belief: that Burke was seeking to condition official action on his receipt of a private benefit.

According to the affidavit, after this call, ████ informed ████ of his conversation with Burke, including Burke's comment that he was not motivated to help ████ because he had not received legal work. R. 103-C ¶ 23. ████ responded that he had hired another law firm to assist on the Post Office project but would be "happy to try to get [Burke] other business." *Id.* When ████ relayed this information to Burke, Burke expressed interest in meeting ████ for a cup of coffee and stated that if they were able to "land the tuna" there would be a "day of accounting"— meaning ████ would receive a cut of any legal fees paid by ████ *Id.* ¶ 24. Burke

---

[56] Burke has filed a copy of the affidavit submitted in support of continued interceptions over his cellular telephone as Exhibit C to his motion. It is cited as "R. 103-C ¶ __."

then agreed that he and ███ would follow up with the Water Department and Burke's contacts at Amtrak. *Id.*

In addition, the affiant summarized intercepted calls from the initial 30-day period concerning the ███ and their restaurant. Specifically, the affiant explained that ███ had contacted Burke on multiple occasions, asking for his assistance with a remodeling application that was "stuck in your office or something," and that Burke had asked to meet with ███ "key person" in Chicago about a problem with trucks parking in the restaurant's parking lot. R. 103-C ¶¶ 27-28; *see id.* ¶ 27 n.12 (Andrews confirming in another intercepted call that Burke would not sign off on the remodeling request until he met with the ███ Shortly thereafter, Burke made the above-discussed inquiry about who did tax work for the ███ restaurant, in advance of his planned meeting with the ███ *Id.* ¶ 30. In a subsequent call with a public official from Texas, Burke confirmed that he would "like to get some of [the ███ law business." *Id.* ¶ 31.

Burke's claim that there was no basis to believe that he planned to tie his official assistance to the ███ to a request for legal work (R. 103 ¶ 18), ignores all of this evidence. The communications summarized in the affidavit established that, at the same time the ███ asked Burke to facilitate permits for the remodeling of their restaurant, Burke planned to ask the ███ for a private benefit—work for his law firm. This conduct occurred at the very same time that Burke was trying to condition official action related to the Post Office project on the receipt of legal work from ███ Under these circumstances, the affiant's belief that

154

Burke intended to extort the ███████ was a reasonable one—and it was borne out by subsequent events, as explained above. In short, the Chief Judge reasonably concluded that there was probable cause to continue interceptions, reading the affidavit and considering its force as a whole. *See Leisure*, 844 F.2d at 1354; *Pless*, 982 F.2d 1118 at 1124; *Griffin*, 827 F.2d at 1111.

Even if, as Burke suggests, there was a possibly innocent explanation for his conduct as it concerned the ███████ despite the fact that Burke was in the midst of a parallel and very similar shake-down involving ███████ this does not defeat probable cause. So as long as there was a reasonable probability of criminal activity, which there was here, probable cause was present. *Malin*, 908 F.2d 163 at 166.

In any event, the Chief Judge's finding of probable cause to continue interceptions over Burke's cellular telephone was not predicated solely on Burke's extortionate activity concerning the ███████ it also encompassed Burke's continuing extortionate and corrupt conduct with respect to the Post Office project, which itself was sufficient to justify continued interceptions. *See* R. 103-C ¶ 32 (discussing why additional interceptions concerning Post Office project were likely to occur, including fact that ███████ indicated his intention to contact Burke about sending business to his law firm). Accordingly, the Chief Judge's decision to allow interceptions to continue was not erroneous, and the reliance of agents in good faith on the Chief Judge's approval was appropriate. *Leon*, 468 U.S. at 914.

Insofar as Burke argues that the government had to prove that he and the ███████ agreed upon a *quid pro quo* exchange (R. 103 ¶¶ 17, 19), he is wrong for

155

the same reasons discussed earlier. Neither attempted extortion nor attempted wire fraud, two of the subject offenses, required such an agreement; a meeting of the minds also was unnecessary to prove honest services fraud. *See supra* at pp. 120-21.[57]

### C.     The Government Demonstrated Necessity for Continued Interception over Burke's Cellular Telephone.

Under the "necessity" requirement, a wiretap application must include a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(1)(c), and the authorizing judge must conclude that this requirement has been met. *Id.* § 2518(3)(c). Despite its name, the necessity requirement was not intended to ensure that wiretaps are used only as a last resort in an investigation, but rather that they are not to be routinely employed as the "first step" in a criminal investigation.'" *United States v. McLee*, 436 F.3d 751, 762-63 (7th Cir. 2006).

The government's burden of establishing compliance with the necessity requirement is "not great," and whether it has been met is considered in a practical and common-sense fashion. *United States v. Plescia*, 48 F.3d 1452, 1463 (7th Cir. 1995). The need to obtain evidence sufficient to prove a defendant's guilt of an offense beyond a reasonable doubt will support a finding of necessity. *United States v.*

---

[57] As noted earlier, the violation of § 1952 also did not require the government to show the completion of the underlying unlawful activity. Burke continues to attempt to avoid addressing this predicate offense by maintaining it was unclear what that underlying unlawful activity was (R. 103 ¶ 16), but as noted earlier, the underlying state-law predicate was laid out in detail in three prior initial affidavits, which were incorporated by reference. *See* R. 103-C ¶ 13 n.3.

*Mandell*, 833 F.3d 816, 822-23 (7th Cir. 2016). Indeed, a court's finding that normal investigation procedures were unlikely to be successful will be upheld so long as there is a "factual predicate" to support this finding in the affidavit. *United States v. Doyle*, 121 F.3d 1078, 1093 (7th Cir. 1997). After-the-fact suggestions from defense counsel as to how an investigation might have been handled are entitled to little weight in an analysis of whether the necessity requirement was satisfied. *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978); *United States v. Mancari*, 663 F. Supp. 1343, 1350 (N.D. Ill. 1987).

Here, the affidavit submitted in support of continued interceptions over Burke's cellular telephone provided a comprehensive explanation of the need for continued interceptions and contained the necessary factual predicate to support the Chief Judge's necessity finding. The affiant detailed the traditional investigatory methods that had been used, explained why other traditional methods would be futile, and explained that a wiretap was necessary in part to gather evidence concerning Burke's intent to commit the subject offenses. R. 103-C ¶¶ 34-64. The affiant explained that physical surveillance would not suffice because, among other things, the conduct under investigation would not be evident from surveillance alone and the illegal activity would often be encapsulated in conversations outside the view or earshot of surveillance agents, such as Burke's private calls with ███ about the Post Office project. *Id.* ¶ 37. The affiant also noted that conducting physical surveillance of Burke at his office at City Hall would not be possible. *Id.* ¶ 39.

157

The affiant considered and rejected the utility of pen register and telephone analyses to gather the necessary evidence against Burke, because this technique would not reveal the parties to particular calls, nor would it reflect the substance of the conversations. R. 103-C ¶ 40. As such, the affiant concluded that pen register records and toll analysis would not be sufficient to establish proof of the subject offenses. *Id.* The affiant also noted that pen register and toll records were particularly unhelpful in this case because Burke often received calls on his cellular telephone from his City Hall office, therefore rendering pen register information unhelpful, because it did not reveal the identity of the caller. *Id.* ¶ 41.

The affiant considered whether undercover agents could be utilized to further the investigation and concluded they could not. R. 103-C ¶¶ 42-45. The affiant explained there was no plausible way to introduce an undercover agent who could play a role with respect to the Post Office project. *Id.* ¶¶ 42-43. Considering whether law enforcement could introduce an undercover agent who would pose as a real estate developer, the affiant concluded that it would be very difficult to develop a satisfactory "cover story." *Id.* ¶ 43. ███████████████████

███████████████████████████████████████████

██████████████████████████ ██████ ███████████████

█████████████████████████████████████ ███████████

███████████████████████████████████████████

████████████████████████ █ ███████████████████████

███████████████████████████████████████████

158



The affiant discussed whether cooperating sources and witnesses could be used to gather necessary evidence. R. 103-C ¶¶ 46-52. ███████████████████████ ████

███████████████████████████████████████████████

███████████████████████████████████████████████

The affiant explained that, based on his experience in public corruption cases, public officials may attempt to claim they never intended to take official action in return for any benefits conferred on them. The affiant further explained that Burke's contact with third parties, such as ████ and ████ concerning the Post Office project, would help rebut this type of defense, and that ████ would not be able to develop this type of information. *Id.* ¶¶ 47-49. The affiant also noted that Burke appeared to be obtaining information concerning the Post Office project from third parties, and that interceptions with these parties would demonstrate both his interest in taking official action and efforts to conceal his personal interest in obtaining tax work. *Id.* ¶ 50.

███████████████████████████████████████████

███████ ████████ ██ ██

The affiant considered and ruled out the use of search warrants and consent searches. R. 103-C ¶¶ 53-57. The affiant considered obtaining a search warrant for Burke's email account, since it had been used to obtain an email relating to the Post Office project, but concluded that such a search was likely to only confirm what was already known to investigators. *Id.* ¶ 54. The affiant indicated that a video recording of Burke had shown him referring to notes relating to the Post Office project, but that given the caution Burke had displayed, it was unlikely Burke had retained any written notes that were particularly incriminating on their face. *Id.* ¶ 55. Moreover, the affiant explained that a search would thwart the ongoing undercover investigation and cause the discontinuation of activities relating to the subject offenses by alerting Burke and the possible other subjects of the government's investigation. *Id.* ¶¶ 55-56.

The affiant discussed whether grand jury subpoenas could be effectively used and concluded they could not, because Burke would likely be uncooperative, and serving others would likely alert Burke to the existence of the investigation, thereby causing him to alter his activities or otherwise compromise the investigation and potentially alerting him to the scope and nature of the investigation. R. 103-C ¶ 58. In similar fashion, the affiant considered witness interviews, but concluded they would not be successful for a variety of reasons, including that contacting direct participants knowledgeable about the conduct under investigation would risk

alerting them to the existence of the investigation and that they would likely decline to talk to agents. *Id.* ¶ 59. The affiant informed the Chief Judge that Burke had previously submitted to interviews with the FBI, but explained that requesting another interview at this juncture was too risky because of the ongoing nature of the investigation and the risk Burke could thwart the ongoing investigation by altering his conduct. *Id.* ¶ 60.

The affiant explored whether trash pulls would be helpful, and concluded they would not, since the subjects under investigation were not expected to have discarded any evidence of evidentiary value in their trash. *Id.* ¶ 61. The affiant also explained that it would be particularly difficult to identify what trash within City Hall belonged to Burke. *Id.* ¶ 62.

Finally, the affiant explained that wire interceptions would be particularly helpful because corrupt public officials often used telephones to further their illicit activity, and that these communications were very useful for purposes of demonstrating knowledge of the illegal conduct, and to obtain timely information about planned meetings. R. 103-C ¶ 63. The affiant concluded by noting that difficulties in conducting interceptions over the office telephones had hampered the collection of evidence. *Id.* ¶ 64.

Based on the detailed discussion by the affiant of traditional investigative techniques and their limitations in developing the necessary evidence to prove Burke's guilt beyond a reasonable doubt, Chief Judge Castillo correctly found the government had demonstrated necessity. Not only did the affiant provide a detailed

discussion of the various investigative techniques, he also discussed their particular application to Burke and explained their limitations in connection with the shakedown of the Post Office project and the ███████ In addition, the affiant explained that wire interceptions would be particularly useful in proving Burke's intent and in defeating any intent-based defense Burke might raise. *See, e.g., Mandell*, 833 F.3d at 823 ("Especially considering the increased burden of proof at trial, it is clear the district judge did not abuse her discretion in finding the necessity requirement met.").

Burke argues that the government did not demonstrate that it was necessary to intercept conversations relating to his efforts to extort the ███████ noting that, while investigators spent a considerable amount of time using consensual recordings to develop information relating to the Post Office project, the government sought to intercept conversations relating to the extortion of the ███████ in a matter of days. R. 103 at 10-12. But the government's necessity showing does not require it to demonstrate that wiretaps are being utilized as a last resort; the requirement simply discourage the routine use of wiretaps as a first step. Here, the wiretap *was* necessary. Unlike with the Post Office project—an instance where Burke had approached ███████████ and initiated criminal conversation—the government did not have an undercover agent or cooperator capable of developing similar evidence relating to the ███████ which eliminated consensual recordings as an option. Indeed, the only reason the government was aware of the planned extortion of the ███████ was through the wiretap itself. Furthermore, the affiant

162

explained that interceptions would help prove beyond a reasonable doubt that Burke had the requisite criminal intent with respect to the  and, as it turns out, the interceptions proved critical in doing exactly that.



Finally, although Burke seeks to bifurcate the government's necessity discussion between the Post Office project and the ███████ extortion, the points made in the affidavit concerning the limitations of traditional investigative techniques applied with equal force to both episodes, and the affiant provided specific reference to the ███████ extortion in explaining why this was the case.

Burke relies on a Ninth Circuit decision to challenge the government's showing of necessity. *United States v. Gonzalez*, 412 F.3d 1102 (9th Cir. 2005). To begin, the Seventh Circuit has specifically rejected the Ninth Circuit's necessity analysis. *See United States v. Durham*, 766 F.3d 672, 681 (7th Cir. 2014). In any event, the decision in *Gonzalez* was highly fact-bound, and the facts of *Gonzalez* are not remotely similar

to the facts of this case. In *Gonzalez*, after an extensive undercover investigation of alien smuggling, the government obtained authority to wiretap two Arizona bus stations. 412 F.3d at 1106-07. After the government began these interceptions, it made a separate application to wiretap a totally different facility—an office in Los Angeles, again for proof of alien smuggling. *Id.* at 1107-08. As to this separate office in Los Angeles, the Ninth Circuit concluded that there was no independent effort to verify that a wiretap was necessary, including because extended surveillance was not properly considered or undertaken, and the affidavit was unclear whether any effort had been made to introduce a source within that specific office. *Id.* at 1113-14.

Alien smuggling investigations are fundamentally different from public corruption investigations, including with respect to the likely success of physical surveillance as an investigative technique. Moreover, in Burke's case, the government was not pursuing a separate wiretap of a separate office thousands of miles away; it was seeking to continue monitoring the same cellular telephone used by the same person. The government did not "transfer" or "bootstrap" its showing of necessity from the earlier affidavit, as Burke alleges. Many of the limitations discussed in the earlier application and affidavit simply applied with equal force to the later discussion of necessity.

## IX.  Burke's and Andrews' Motions for Bills of Particulars (R. 101, 109, 121) Should Be Denied.

Among the boilerplate motions filed by the defendants are their motions for a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f). Andrews asks

that the bill of particulars identify the "thing of value" in Counts 7 and 8. R. 101. Burke adopts Andrews' motion. R. 121. In his motion, Burke asks that a bill of particulars identify the "property" and "official act" for the attempted extortion alleged in Counts 1 (Racketeering Act 5), 18, and 19 ("the Museum Counts"). R. 109.

The government has exceeded its obligations to apprise defendants about the nature of the charges against them, both in the superseding indictment and in discovery. Given the detailed allegations of the superseding indictment and the voluminous discovery that has been produced, a bill of particulars is not warranted. At 59 pages long, the superseding indictment states the elements of each crime, apprises defendants of the nature of the charges so that they may prepare a defense, and allows defendants to plead the judgment as a bar to future prosecution. *See Moore*, 563 F.3d at 585. Additionally, discovery produced to the defendants includes hundreds of reports of interview, grand jury transcripts, Title III recordings, and more. Along with those materials, the government has provided comprehensive indices so that materials may be more easily located. As described in greater detail below, the superseding indictment and discovery provide a roadmap of the government's evidence and identifies every person who could be called as a potential witness at trial (including defense witnesses).

## A.    Applicable Law

A "defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved." *Fassnacht*, 332 F.3d at 446 (quotations and citation omitted); *see also United States v. Glecier*, 923 F.2d 496, 502

(7th Cir. 1991) (citing *United States v. Kendall*, 665 F.2d 126, 134 (7th Cir. 1981)) (a defendant's "constitutional rights under the fifth and sixth amendments require that he be informed of the nature of the offense charged to allow him to prepare a defense and to protect his double jeopardy rights; they do not require the government to reveal the details of how it plans to prove its case"). A motion for a bill of particulars should be denied when the indictment "includes each of the elements of the offense charged, the time and place of the accused's conduct which constituted a violation, and a citation to the statute or statutes violated." *Fassnacht*, 332 F.3d at 446.

Where the indictment, combined with the discovery, adequately informs the defendants of the charges against them, no bill of particulars is warranted. *See, e.g.*, *Vaughn*, 722 F.3d at 927; *United States v. Blanchard*, 542 F.3d 1133, 1140-41 (7th Cir. 2008) (affirming denial of motion for bill of particulars where the defendant "was the beneficiary of extensive pretrial discovery"); *United States v. Hernandez*, 330 F.3d 964, 975 (7th Cir. 2003). The "choice to grant or deny" a bill of particulars "is committed to the discretion of the trial court, and a decision denying a bill of particulars" is reviewable only for an abuse of discretion. *Fassnacht*, 332 F.3d at 446 (citing *Kendall*, 665 F.2d at 134).

**B.  Burke's Motion For A Bill of Particulars Should Be Denied.**

With respect to the Museum Counts, the superseding indictment tracks the language of 18 U.S.C. §§ 1951 and 1952 and fairly informs Burke of the attempted extortion and Travel Act charges against him. *See Glecier*, 923 F.2d at 500 (affirming denial of bill of particulars in an Operation Greylord RICO case, because indictment

specified "the time period during which the alleged conspiracy operated, the locations and courts, the principal actors, and, with some detail, the specific types of predicate crimes to be committed and the modus operandi of the conspiracy").

### 1. The Superseding Indictment Identifies the Property Burke Sought to Extort.

The superseding indictment clearly identifies the "property" Burke attempted to extort from Museum 1: wages and employment compensation for Individual E-1, the daughter of Burke's personal acquaintance. R. 30, Count 1 (Racketeering Act 5), Count 18, Count 19.

Specifically, the superseding indictment alleges that, on September 8, 2017, a museum employee (Individual E-2) called Burke to discuss the pending admission fee increase that was scheduled to be considered by the Chicago Park District Board on September 13, 2017. R. 30 ¶¶ 71, 76. During that call, Burke "threatened to contact the President of the Park District Board and object to Museum 1's requested admission fee increase because Museum 1 had failed to respond to BURKE's prior effort to obtain an internship for Individual E-1 at Museum 1." *Id.* ¶ 71. Three days after Burke's threat, and just two days before the Park District was scheduled to vote on the fee increase, a museum executive "offered that Individual E-1 could apply for a full-time job at Museum 1." *Id.* ¶ 72. Burke then called Individual E-1's mother "and told her about the potential full-time job for Individual E-1 at Museum 1." *Id.* ¶ 73. Burke also directed his assistant to send an email to a museum employee "asking for additional details on how Individual E-1 could apply for the position and what the

title of the position was." *Id.* ¶ 74. Museum employees also sent job application information to Individual E-1. *Id.* ¶ 75.

Tracking the language of 18 U.S.C. §§ 1951(a) and 1952(a)(3), the superseding indictment makes crystal clear what Burke attempted to extort: "money and other employment compensation to be provided by Museum 1 to Individual E-1." R. 30, Count 18 & 19, *see also* Count 1, ¶84, Racketeering Act 5(a).[58] The income that Individual E-1 would have earned as a result of the full-time job undoubtedly constitutes "property" under the Hobbs Act. The Hobbs Act does not require that the extortionist receive a benefit. *See* 18 U.S.C. § 1951; *United States v. Green*, 350 U.S. 415, 418, 420 (1956); *United States v. Lewis*, 797 F.2d 358, 364 (7th Cir. 1986). And wages, like cash, satisfy the common-law definition of "property" incorporated by Congress in the Hobbs Act. *See, e.g., United States v. Brissette*, 919 F.3d 670, 682-86 (1st Cir. 2019) (forced payment of wages to a third-party can satisfy the Hobbs Act's "obtaining of property" element); *United States v. Kirsch*, 903 F.3d 213, 227 (2d Cir. 2018) ("Wages and benefits are 'capable of passing from one person to another,'—in this case, from the employer to the employee—and are therefore 'transferable.'" (citation omitted)). In short, the indictment's identification of the property Burke attempted to extort as "money and other employment compensation" to Individual E-

---

[58] Contrary to Burke's claim that the relevant time period is unclear (R. 109 at 9-10), the superseding indictment alleges the attempted extortion occurred in September 2017. *See* R. 30 ¶ 72 ("After BURKE's threat to oppose Museum 1's proposed admission fee increase, on or about September 11, 2017"); *id.* ¶ 84, Racketeering Act 5(a) ("In or around September 2017. . ."); *id.*, Count 18 ("In or around September 2017 . . .").

1 provides sufficient factual detail for Burke to determine the conduct on which the government intends to rely; Burke is entitled to nothing more. See *Glecier*, 923 F.2d at 501 (bill of particulars may not be used to obtain evidentiary details about the government's case).

Furthermore, "a bill of particulars is unnecessary if the information the defendant seeks is readily available through alternate means such as discovery." *Vaughn*, 722 F.3d at 927. The discovery, particularly recorded phone calls and the interviews and grand jury testimony of Museum 1's CEO, Individual E-1, and Burke's assistant, read in conjunction with the indictment, provides a roadmap of the government's evidence.

Not only does the discovery alert Burke to the nature of the charges against him, the discovery belies Burke's claim that he "never demanded a job for Ind. E-1" and that "the Museum, on its own initiative" offered Individual E-1 a job. R. 109 at 2, 8.[59] In his September 8, 2017 recorded phone call to a Museum 1 employee, Burke's threat was not subtle: "I'm sure I know what you want to do, because if the Chairman of the Committee on Finance calls the President of the Park Board, your proposal is going to go nowhere." TP 9, Session 5515. Burke further threatened, "[T]his was a very sensitive matter a number of years ago," referring to his prior objection to another museum's fee increase. *Id.*

---

[59] Even if Burke did not demand a job for Individual E-1, an express demand or inducement is not an element of Hobbs Act extortion under color of official right. *See Evans v. United States*, 504 U.S. 255, 258-59 (1992) (affirmative act of inducement by a public official, such as a demand, is not an element of Hobbs Act extortion under of color of official right).

Less than ten minutes after that call, Museum 1's CEO called Burke. Burke said he was embarrassed that he had not heard back about the internship for Individual E-1. Although Burke said that he had hired Individual E-1 (TP 9, Session 5516), Burke nevertheless continued to pressure Museum 1 employees, as the evidence at trial will show: On September 11, 2017, he directed his assistant to follow up about how Individual E-1 could apply for a job. The next morning, a Museum 1 employee sent Burke an email about the full-time job opportunity Individual E-1 could apply for. That same day, Burke called Individual E-1's mother about the job opportunity, and said: "So anyway, he's now telling me there's a position there, ummm, coordinator or something or other . . . Full time." TP 9, Session 5594. Although Individual E-1's mother stated that her daughter was happy working for Burke, she stated that she would think about it and get back to Burke's assistant. *Id.*

Burke's efforts to obtain a paid position for Individual E-1 at the museum did not end there. Approximately 30 minutes after his call with Individual E-1's mother, Burke's assistant sent an email to a Museum 1 employee that stated: "The Alderman was inquiring how [Individual E-1] can apply and what the position is titled exactly to make sure she applies for the correct position." Soon after that, at approximately 11:14 a.m., an employee in Museum 1's public relations department sent Burke's assistant an email attaching the description of "a Public Relations Coordinator position," and stating that she would reach out to Individual E-1 "directly to share the position description and discuss setting up an interview." Individual E-1 was also emailed about the job opportunity, which she ultimately declined.

170

### 2. The Superseding Indictment Identifies the Official Action Burke Threatened.

With respect to Burke's argument that the superseding indictment does not identify the official action Burke threatened under color of official right (R. 109 at 10-11),[60] the superseding indictment makes clear that Burke threatened to object to Museum 1's admission fee increase, and that this threat remained very much alive as Burke took steps to determine whether Individual E-1 would entertain a full-time position with the museum.

The superseding indictment properly alleges that "[Burke] abused his position as an Alderman by threatening to take official action, in his capacity as Chairman of the Committee on Finance, to derail a proposed admission fee increase sought by Museum 1, due to the failure of Museum 1 to respond to his inquiry about an internship at Museum 1 for Individual E-1." R. 30 ¶ 69.

The discovery provides additional detail regarding Burke's threats to derail Museum 1's admission fee increase in September 2017. In addition to the evidence discussed above, Burke expressly linked Individual E-1's job opportunity to the fee increase during his call with Individual E-1's mother. He told her that Museum 1's

---

[60] The superseding indictment alleges two theories of attempted extortion regarding Museum 1: under color of official right and by wrongful fear of economic harm. R. 30, Count 18. The government is not required to prove an "official act" for a Hobbs Act claim for extortion under fear of economic harm. *See* 18 U.S.C. § 1951(a); 18 U.S.C. § 1952(a)(3). A public official violates the Hobbs Act when he attempts to obtain property by threatening to use his official position or authority to cause economic harm to the victim to obtain property. *See, e.g., United States v. Davis*, 890 F.2d 1373, 1378 (7th Cir. 1989); *United States v. Vazquez-Botet*, 532 F.3d 37, 60-61 (1st Cir. 2008); *United States v. Edwards*, 303 F.3d 606, 635-637 (5th Cir. 2002); *United States v. Hairston*, 46 F.3d 361, 367 (4th Cir. 1995).

"staff screwed up, and now they're calling me asking me to help 'em on another matter and I read 'em the riot act because of the way they treated [Individual E-1's], uh, application. So anyway he's now telling me there's a position there." TP 9, Session 5594.

Burke acknowledges that exerting pressure on another official can constitute an official act under *McDonnell* but contends that he could not have attempted to extort Museum 1 because he was not a member of the Park District Board. R. 109 at 10-11. Burke's position is inconsistent with Supreme Court and Seventh Circuit case law. Burke's threat to call the President of the Park District Board is exactly the type of conduct the Supreme Court described as unlawful in *McDonnell. See McDonnell*, 136 S. Ct. at 2371 (a public official's "attempt[s] to pressure or advise another official on a pending matter" is illegal "if the official agreed to exert that pressure or give that advice in exchange for a thing of value").

Furthermore, it is well settled that an official can be guilty of attempted extortion under color of official right even if he does not have the power to take official action, if the victim could reasonably believe that the official had such power. *See, e.g., Carter*, 530 F.3d at 574, *supra*; *Nedza*, 880 F.2d at 902, *supra*; *United States v. Bencivengo*, 749 F.3d 205, 212-13 (3d Cir. 2014) ("[W]here a public official has, and agrees to wield, influence over a governmental decision in exchange for financial gain, or where the official's position could permit such influence, and the victim of an extortion scheme reasonably *believes* that the public official wields such influence, that is sufficient to sustain a conviction under the Hobbs Act, regardless of whether

172

the official holds any *de jure* or *de facto* power over the decision."); *United States v. Loftus*, 992 F.2d 793, 796 (8th Cir. 1993).

The evidence at trial (consistent with discovery) will show that Museum 1 employees knew that Burke was a powerful Alderman, and that he had objected to a fee increase at another Chicago museum. In fact, Individual E-2 called Burke seeking his support for the admission fee increase, precisely because she believed that Burke could make things difficult for the museum.[61] And Individual E-2 understood Burke's statement to Individual E-2—that "if the Chairman of the Committee on Finance calls the President of the Park Board, your proposal is going to go nowhere"—to be a threat to derail the admission fee increase. Museum 1 quickly followed up regarding a job for Individual E-1 to ameliorate any negative effect Burke might have on the museum.

### C. Andrews' Motion For A Bill of Particulars Should Be Denied.

Andrews' motion for a bill of particulars should also be denied (R. 101), as the superseding indictment need not identify the property or benefit Andrews and Burke attempted to receive in order to state a valid offense under 18 U.S.C. § 1952(a)(3). A Travel Act offense, as charged in Counts 7 and 8, requires that Andrews: (1) traveled in, or used a facility of, interstate or foreign commerce (2) with the intent to commit a specified unlawful act and (3) thereafter performed or attempted to perform that act. *Dvorkin*, 799 F.3d at 876. The unlawful activity alleged in Counts 7 and 8 include

---

[61] The employee's statements refute Burke's claim that the September 8, 2017 phone call was merely a "courtesy notice of the Museum's request of an admission fee increase." R. 109 at 3.

Hobbs Act extortion, bribery in violation of Illinois law, and official misconduct in violation of Illinois law.

Andrews' motion incorrectly assumes that the government is required to prove a "thing of value" to sustain a Travel Act conviction. R. 101 at 2. It is not. As discussed above, § 1952 does not require the government to prove that Andrews committed the "predicate" unlawful act—here, extortion, bribery, and official misconduct. *See Baker*, 227 F.3d at 961; *Karigiannis*, 430 F.2d at 150. Accordingly, the government need not prove—and the indictment need not allege—that Andrews sought or exchanged a "thing of value" in violation of state or federal law.

Even if the government were required to allege and prove a "thing of value" for a Travel Act count (and it is not), the superseding indictment clearly informs Andrews and Burke of the property they attempted to unlawfully obtain. Viewed in its entirety, *see Fassnacht*, 332 F.3d at 445, the superseding indictment makes clear that the "thing of value" sought by Andrews, and the basis of the unlawful act in Count 7 and 8, is fees arising from the retention of Burke's law firm, Klafter & Burke.

Count 1 describes the property Burke and Andrews attempted to unlawfully obtain, "namely fees arising from the retention of his law firm, Klafter & Burke, to be paid by Company B and its affiliate." R. 30 ¶ 84, Racketeering Act 3. The superseding indictment specifically describes the October 24, 2017 phone call between Burke and Andrews that forms the basis of Count 7:

> . . . Because Company B failed to provide tax work to BURKE's law firm, BURKE and ANDREWS agreed that ANDREWS would take action to

interfere with the operation of the restaurant based on the ground that the restaurant did not have a driveway permit.

R. 30 ¶ 40.

The superseding indictment also quotes the phone call between Burke and Andrews the next day, which forms the basis of Count 8:

> On or about October 25, 2017, at approximately 6:59 p.m. (Session #7537), BURKE used his cellular telephone, assigned telephone number (312) XXX-4006, to speak to ANDREWS about Company B. Specifically, ANDREWS reported to BURKE that the construction work had been halted at the restaurant. ANDREWS and BURKE agreed during this call that ANDREWS would now play "hard ball" with Company B.

R. 30 ¶ 42. The superseding indictment then details how Andrews played "hard ball": by advising Company B's representatives that Burke's office had not approved the plans for the remodeling project, including a driveway permit, and later obstructing approval of the permit application. *Id.* ¶¶ 43-44. Once Andrews believed that Company B planned to hire Burke's firm and that fees would be forthcoming, however, he "contacted an architect for Company B and advised that outstanding issues with the driveway permit had been cleared up." *Id.* ¶ 47. This leaves little room for ambiguity that the "thing of value" sought by Andrews was fees arising from the retention of Burke's law firm.[62]

Andrews argues that "a large amount of discovery can in some circumstances create the need for a bill of particulars." R. 101 at 6. This is inconsistent with Seventh

---

[62] These same phone calls have been produced in discovery. In addition to discussing holding up the driveway permits for Company B's construction, Burke and Andrews discussed on the phone calls produced to the defense their prior meetings with Company B's owners, at which Burke corruptly solicited legal business for his firm, and the fact that Company B had not hired Burke. *E.g.,* TP 9, Sessions 7441, 7537.

Circuit precedent holding that "a bill of particulars is unnecessary if the information the defendant seeks is readily available through alternate means such as discovery." *Vaughn*, 722 F.3d at 927. Here, the government has provided voluminous discovery, but has also included detailed indices with each production to aid in the defendants' review of documents. Moreover, the charged telephone calls are identified in the superseding indictment, and are even referred to by date, time, and session number, making them readily accessible to Andrews. R. 30 ¶¶ 40, 42; *Id.*, Counts 7 & 8.

This case is therefore unlike *United States v. Beavers*, No. 16-CR-00068, 2016 WL 6775966 (N.D. Ind. Nov. 16, 2016), where the district court granted a bill of particulars because the indictment did not specify the "time, place, manner, or substance of the Defendant's threat or false statement," and the discovery contained multiple potential false statements. *Id.* at *2-3. Unlike in *Beavers,* the superseding indictment identifies the time, place, and substance of the communication for each Travel Act count. A bill of particulars is not warranted, and Andrews' motion should be denied. R. 101.

In light of the detailed superseding indictment and voluminous discovery, there is no basis for defendants' assertion that they do not have sufficient information about the government's evidence to prepare for trial. This Court should deny Burke's and Andrews' requests for bills of particulars.

## X. Defendants' Motions for Severance (R. 86, 87, 96, 111, 112, 114, 121) Should Be Denied.

Defendants each request a separate trial. Andrews and Cui have argued that joinder of all defendants is improper under Federal Rule of Criminal Procedure 8(b), and in the alternative that severance is required under Federal Rule of Criminal Procedure 14. R. 86, 87, 96. Burke moves to adopt both motions. R. 121. Burke has filed a motion to sever from Cui, based primarily on Rule 14. R. 111. Burke has also filed motions to sever from Cui and Andrews on *Bruton* grounds. R. 112, 114.

The motions for severance should be denied. *United States v. Stillo*, 57 F.3d 553 (7th Cir. 1995), and related cases require denial of defendants' motions claiming improper joinder. Additionally, defendants have not met the heavy burden of showing that any potential prejudice resulting from a joint trial outweighs the interests of judicial economy and fairness. Finally, Burke is not entitled to severance under *Bruton v. United States*, 391 U.S. 123, 126 (1968), because Andrews' and Cui's statements to the FBI were not confessions that implicate Burke.

### A. Defendants Were Properly Joined Under Rule 8(b).

#### 1. Applicable Law

Liberal joinder of defendants is permitted to promote judicial efficiency. *Stillo*, 57 F.3d at 556. Rule 8(b) affords the government wide latitude in joining defendants and offenses, provided that, as here, the government can establish that defendants participated in the same illegal act or transaction, or in the same series of illegal acts or transactions, constituting the offense or offenses. *See generally United States v.*

177

*Briscoe*, 896 F.2d 1476, 1515 (7th Cir. 1990); *United States v. Marzano*, 160 F.3d 399, 401 (7th Cir. 1998). The Seventh Circuit has stated that "[a] typical relationship justifying joinder is the defendants' mutual reliance on a common third party to link their individual, yet similar, schemes." *United States v. Valentino*, 436 F. App'x 700, 706 (7th Cir. 2011). Moreover, "[i]f the indictment invites joint proof . . . *prima facie* joinder is shown." *United States v. Madison*, 689 F.2d 1300, 1305 (7th Cir. 1982) (marks and citations omitted).

Where an indictment charges a RICO violation, the requirements of Rule 8(b) are satisfied by establishing the existence of an enterprise and that each defendant participated in a predicate act of racketeering. *See Stillo*, 57 F.3d at 557. The RICO enterprise supplies the nexus to tie the various defendants and predicate offenses together. *See also, e.g., United States v. Welch*, 656 F.2d 1039, 1051 (5th Cir. 1981) ("When otherwise separate offenses are charged as predicate acts of a substantive RICO count, they may be related to each other in such a way as to satisfy Rule 8(b).").[63] Significantly, "offenses committed as part of the pattern of racketeering activity are properly joined even if the defendant objecting is not named in the RICO

---

[63] Other appellate courts to address this issue have reached the same conclusion. *See* Wright & Miller, 1A Fed. Prac. & Proc. Crim. § 145 (5th ed.); *United States. v. Irizarry*, 341 F.3d 273, 290 (3d Cir. 2003) (holding that Rule 8(b) "permits the joinder of RICO and non-RICO counts in one indictment where the offenses charged in the non-RICO counts are also charged as racketeering predicates in the RICO counts" (quotation marks and citation omitted)); *United States v. Carson*, 455 F.3d 336, 373 (D.C. Cir. 2006) (indictment alleging that all counts were overt acts in furtherance of the narcotics conspiracy and predicate acts in furtherance of the RICO conspiracy satisfied Rule 8(b)); *United States v. Moran*, No. 11-CR-6083CJS, 2013 WL 6408124, at *3 (W.D.N.Y. Nov. 26, 2013), *report and recommendation adopted*, No. 11-CR-6083, 2015 WL 641825 (W.D.N.Y. Feb. 13, 2015) (collecting decisions).

count." *United States v. Krout*, 66 F.3d 1420, 1429 (5th Cir. 1995); *see also United States v. Manzella*, 782 F.2d 533, 540 (5th Cir. 1986) ("That Jimenez was not indicted on the RICO counts does not militate against the joinder's propriety under Rule 8(b)."); *United States v. Cardall*, 885 F.2d 656, 668 (10th Cir. 1989) ("the indictment clearly alleged an ongoing series of *interconnected* illegal transactions amounting to the operation of a criminal enterprise," even though "some defendants were not involved in each aspect of the overall enterprise").

### 2. Analysis

Count 1 alleges that Burke conducted the affairs of an enterprise affecting interstate commerce through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). The defendants are properly joined under Rule 8(b), because each defendant is charged with conduct that is also alleged as a racketeering predicate. *See Welch*, 656 F.2d at 1052.

The Seventh Circuit's decision in *United States v. Stillo*, 57 F.3d 553 (7th Cir. 1995), requires denial of defendants' improper joinder motions. *Stillo* involved a two-count indictment against two defendants: (1) a state judge charged with conducting and participating in an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c); and (2) the judge's nephew, charged (along with the uncle) with conspiracy to commit extortion, in violation of 18 U.S.C. § 1951. *Id.* at 556. The conspiracy between the judge and his nephew related to a bribe alleged as one of the RICO predicates, but the nephew played no role in the other RICO predicates. *Id.* The Seventh Circuit held that the counts were properly joined because

179

the bribery scheme charged in the extortion count was also a predicate act of racketeering. *Id.* at 557. Even though the nephew was not involved in the other predicate acts, the judges' other bribes were part of the same "series of acts or transactions" as the bribe involving his nephew. *Id.*

This case is closely analogous to *Stillo*. Like Judge Stillo, Burke is the only defendant charge with violating 18 U.S.C. § 1962(c). Like Judge Stillo's nephew, Andrews and Cui are charged with separate crimes that are also charged as predicate racketeering acts. Even though Andrews and Cui did not participate in every predicate act, their schemes were part of the same series of acts or transactions as those alleged in Count 1.

While conceding that *Stillo* and other decisions hold that "alleged participation in racketeering activity permits joinder with a racketeering count, even where the defendant contesting joinder is not charged with racketeering," Andrews attempts to distinguish and limit the case's applicability here.[64] R. 96 at 10-13 & n.5. *Stillo* is wholly consistent with circuit precedent, including in requiring a common plan or scheme and finding that requirement met by the overlap in evidence required to prove the RICO charges and the underlying predicate offenses, and remains binding authority in this circuit. *See United States v. Hosseini*, 679 F.3d 544, 552 (7th Cir. 2012) (citing *Stillo*, 57 F.3d at 556-57). Contrary to Andrews' argument, the holding in *Stillo* was not limited to "straightforward" two-defendant cases or cases in which

---

[64] Cui does not address this authority.

the conduct underlying the non-RICO count was necessary to avoid a statute of limitations issue. The decision in *Stillo* was motivated by a concern that severance would have required two trials with the same proof, including because a statute of limitations issue made the nephew's bribery scheme a critical element of the government's case. *Id.* While there is no similar limitations issue here, the concern for judicial efficiency applies equally. The government should not be required to call the same witnesses in two separate trials, when the defendants are properly joined.[65]

The cases defendants rely on do not involve RICO claims and are therefore distinguishable. *United States v. Daniels*, 803 F.3d 335 (7th Cir. 2015), involved charges against three defendants for multiple armed bank robberies and related gun offenses. Because the indictment in *Daniels* did not allege a conspiracy or a common plan or scheme that connected the bank robberies, joinder was not appropriate. *Id.* at 340. *United States v. Velasquez*, 772 F.2d 1348 (7th Cir. 1985), involved charges against five defendants for cocaine trafficking and charges against one of the five defendants for an unrelated heroin distribution scheme. In that case, joinder was improper because the indictment did not tie the heroin charges to the cocaine charges against the other defendants. *Id.* at 1353. Here, by contrast, the charges are connected by a common link: all defendants are charged with conduct that is also charged as a racketeering predicate.

---

[65] In an effort to distinguish *Stillo*, Andrews claims "the Restaurant Remodeling allegations are not essential to the racketeering charge in Count One." R. 96 at 12. Yet it is the government—not Andrews—that determines the crimes it prosecutes and the evidence it presents at trial. *Cf. United States v. Abdelhaq*, 246 F.3d 990, 992 (7th Cir. 2001).

Contrary to Cui's suggestion, the counts that do not double as predicate acts are also properly joined. Specifically, Counts 12, 13, 14 and 17 relate to Cui's efforts to hire Burke's law firm in order to influence Burke to obtain a permit for a pole sign and influence and reward Burke in connection with TIF funding for the 4901 Property, and Counts 10 and 17 relate to Andrews' and Cui's false statements to the FBI to cover up their involvement. The conduct alleged in these counts involve the same participants and subject matters as the RICO predicates alleged in Count 1. They all involve Burke using his position as a powerful alderman for his and his associates' personal benefit, and defendants' efforts to benefit from Burke's willingness to trade his power for private benefits and to cover up their unlawful conduct, including by making false statements to the FBI. *United States v. Warner*, 498 F.3d 666, 699 (7th Cir. 2007) (noting that "a conspiracy and its cover-up are parts of a common plan" (quotation marks and citation omitted)). Indeed, many of the same facts will be necessary to prove these claims and the RICO predicates. *See, e.g., United States v. Curescu*, 674 F.3d 735, 742 (7th Cir. 2012) (joinder proper where one defendant "was at the heart of both [conspiracies charged in the indictment], for both were conspiracies to obtain unlawful benefits for his building"); *United States v. Phillips*, 239 F.3d 829, 838 (7th Cir. 2001) (joinder proper even though appellant was the only defendant not charged with committing a violent crime in aid of racketeering, because "there is a presumption that participants in a conspiracy or other criminal schemes should be tried together"). Joinder is therefore proper.

**B.      Severance Is Not Warranted Under Rule 14.**

**1.      Applicable Law**

When defendants have been properly joined under Rule 8(b), a district court should grant a Rule 14 severance motion only if defendant is able to demonstrate that there is a serious risk that a joint trial would compromise a specific trial right or would prevent the jury from making a reliable judgment concerning guilt or innocence. *See Zafiro v. United States*, 506 U.S. 534, 539 (1993). "There is a preference in the federal system for joint trials of defendants who are indicted together. Joint trials 'play a vital role in the criminal justice system.' They promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Id.* at 537 (quoting *Richardson v. Marsh*, 481 U.S. 200, 209-10 (1987) (citations omitted)); *see also United States v. Souffront*, 338 F.3d 809, 828 (7th Cir. 2003) ("There is a particularly strong preference for a single trial with codefendants who have been jointly indicted." (citations omitted)); *United States v. Buljiubasic*, 808 F.2d 1260, 1263 (7th Cir. 1987) (describing "strong interest in joint trials" for judicial economy and because "[a] joint trial gives the jury the best perspective on all the evidence and therefore increases the likelihood of a correct outcome" (citations omitted)). A motion for severance is therefore committed to the sound discretion of the trial court, and the court should "give deference to the strong public interest in having jointly indicted defendants tried together . . . ." *United States v. Schweihs*, 971 F.2d 1302, 1321 (7th Cir. 1992).

183

Particularly where a RICO charge links the defendants' criminal conduct, judicial economy favors a joint trial. "Under RICO, it is irrelevant that each defendant participated in the enterprise's affairs through different and unrelated crimes. Although the defendants used different means, they were alleged to have participated in the same offense: furtherance of the enterprise." *United States v. O'Malley*, 796 F.2d 891, 895 (7th Cir. 1986) (internal quotations and citations omitted). It also is irrelevant whether a particular defendant was charged with RICO offenses or instead charged with non-racketeering offenses; the operative inquiry is whether each defendant's criminal activities furthered the criminal enterprise. *See Phillips*, 239 F.3d at 838-39 (defendant charged with drug and weapon possession offenses was not entitled to severance of his trial from three co-defendants who faced additional charges under RICO alleging crimes of violence in aid of racketeering; all four defendants were involved in enterprise which dealt in illegal drugs, and jury instructions emphasized separate consideration of each defendant); *see also Stillo*, 57 F.3d at 557.

A defendant is not entitled to severance "merely because [he] may have a better chance of acquittal in [a] separate trial[ ]." *Zafiro*, 506 U.S. at 540. Thus, the oft-cited "evidentiary spillover" theory as a basis for requiring severance has been almost universally rejected in this Circuit. *See United States v. Ervin*, 540 F.3d 623, 630 (7th Cir. 2008) (alleged prejudicial spillover effect did not warrant separating drug-conspiracy and homicide counts for trial); *Abdelhaq*, 246 F.3d at 992 ("[A]s a basis for requiring severance, 'evidentiary spillover' has been rejected."); *United States v.*

*Shorter*, 54 F.3d 1248, 1259 (7th Cir. 1995) ("Such 'spillover' claims alone do not warrant severance."). Instead, courts have consistently ruled that a limiting instruction will typically suffice to cure any risk of potential "spillover" prejudice. *See, e.g., United States v. Thompson*, 286 F.3d 950, 968 (7th Cir. 2002) (discussing presumption that jury can capably sort through evidence and follow court's limiting instructions to consider each defendant separately); *Stillo*, 57 F.3d at 557.

### 2. Analysis

Defendants have not demonstrated that the potential for prejudice resulting from a joint trial outweighs the interests of judicial economy and fairness.

### a. Burke's Rule 14 Arguments

Burke's motion seeking severance from Cui can be dispatched with quickly. Evidence proving the extortion of Company B and the pole sign allegations against Burke will overlap almost entirely with the evidence proving Andrews' and Cui's guilt. This is because the charges against Burke stem from his corrupt use of his position as an Alderman to obtain legal business from Cui and from Company B, aided by Andrews.

For example, with respect to the counts concerning Company B, the jury will hear testimony that Burke and Andrews met with Company B representatives in June 2017 to tour the restaurant site. After that meeting, Burke took Company B representatives to lunch and pitched his law firm. In phone calls intercepted in October 2017, Burke and Andrews discussed interfering with the operation of Company B's restaurant by causing construction work to be halted, after Company B

185

had not hired Burke's law firm. Andrews then took action to stall the restaurant remodeling project. Once Andrews learned that Company B planned to hire Burke's firm, however, he told an architect for Company B that outstanding permitting issues had been resolved.

As to Cui, evidence at trial will show that Cui emailed Burke on August 23, 2017, stating that he had a legal matter for Burke's law firm and asking for assistance in obtaining a permit for the pole sign that had been denied. The next day Cui emailed his real estate lawyer (Individual C-2) asking if Burke could handle his property tax appeal for a year, because "I need his favor for my tif money" and "I need his help for my zoning etc for my project." That same day, Cui emailed Burke about the representation. Burke responded the following day that his team would reach out to Cui. Cui engaged Burke's firm, and Burke made multiple phone calls to city officials inquiring about the pole sign permit for Cui. In short, judicial economy strongly favors a joint trial of the claims against Burke and the other defendants.

Burke argues that certain of Cui's statements are inadmissible against him and that their admission will compromise his trial rights. R. 111 at 7. Contrary to Burke's contention, Cui's emails to Individual C-1 and C-2 about the pole sign and TIF issues will be admissible against Burke through multiple exceptions to the hearsay rule. For example, they are joint venturers' statements admissible under Federal Rule of Evidence 801(d)(2)(E). *See United States v. Cox*, 923 F.2d 519, 526 (7th Cir. 1991); *United States v. Kelley*, 864 F.2d 569, 573 (7th Cir. 1989); *United States v. Jones*, 438 F.2d 461, 466 (7th Cir. 1971). Even if the emails were somehow

186

inadmissible against Burke, however, the potential prejudice could be cured by use of an appropriate limiting instruction. *See Thompson*, 286 F.3d at 968; *Phillips*, 239 F.3d at 839.

Burke also argues that his rights under the Confrontation Clause would be threatened by a joint trial. As detailed below in response to Burke's *Bruton* motion, Cui did not admit wrongdoing to the FBI and therefore his statements may be admitted at a joint trial without implicating the Confrontation Clause.

The decisions on which Burke relies differ from this case. In *United States v. Johnson*, No. 09 CR 0332-9, 2011 WL 13365606 (N.D. Ill. Aug. 24, 2011), the indictment charged a violent narcotics conspiracy, including under RICO. The district court severed the charges against one defendant, who was a narcotics customer charged in only 2 out of 13 counts in the indictment, because neither the RICO count nor the predicate racketeering acts involved him and because he was not an alleged member of the racketeering conspiracy. *Id.* at *3-4. In *Delatorre*, the district court separated the trials of 14 members of the Insane Deuce National Street Gang into a trial of the leaders and a trial of the more minor participants. The court denied individual defendants' motions to sever under Rule 14, but nevertheless ordered two trials, after considering the potential prejudice "to the jury system and the jurors themselves," the potential for delay, and the potential prejudice that could result from a four- to five-month "mega-trial." *United States v. Delatorre*, 522 F. Supp. 2d 1034, 1049-55 (N.D. Ill. 2007), *aff'd sub nom. United States v. Benabe*, 436 F. App'x 639 (7th Cir. 2011).

187

The facts of *Johnson* and *Delatorre* are not even remotely similar to the facts of this case. Here, each defendant has been charged with conduct that is also charged as a RICO predicate. Each played a significant part in the charged enterprise, even though not charged with racketeering offenses themselves, as is clear from the face of the superseding indictment. As set forth in Count 1, Andrews worked with Burke to shut down Company B's restaurant remodeling efforts, in an attempt to corruptly solicit and extort the company's business for Burke's law firm. Cui, for his part, hired Burke's law firm with the expectation that Burke would in return help him secure a pole sign permit that had a $750,000 value to Cui's business.

And the Court is not confronted with a complex 14-defendant mega-trial that may last four to five months. The government anticipates that the government's case-in-chief for all three defendants will last a matter of weeks, not months. A joint trial will be manageable without any risk of undue prejudice to the defendants.

### b. Andrews' Rule 14 Arguments

Andrews also is not entitled to severance. He is named in five counts (namely the counts relating to Company B), which relate to a charged predicate for the RICO conspiracy, meaning that separate trials would require duplicate evidence and testimony. In an effort to overcome the "strong preference" for joint trials, *Souffront*, 338 F.3d at 828, Andrews claims that he should be tried separately because 14 counts of the superseding indictment, and all racketeering acts other than those related to Company B, do not relate to him. R. 96 at 18. Juries are routinely asked to decide the guilt of defendants who are named in a small number of counts. This is a common

188

facet of federal criminal trial practice and does not merit the extraordinary step Andrews demands. The jury will be instructed to consider separately the counts that relate to Andrews from those that do not. Jurors will readily be able to grasp the difference between crimes that do not concern Andrews, and acts that do concern him.

Andrews claims that Alderman A's testimony will prejudice him because it will "demonstrate the corruption of wide-ranging aspects of City government – virtually all of which have nothing to do with Mr. Andrews." R. 96 at 19. The Seventh Circuit rejected a similar prejudicial spillover argument in *Stillo,* summarized above. There, the court concluded that "it was easy for the jury to compartmentalize the evidence involving Joseph Stillo and that transaction from Judge Stillo's earlier bribe taking," particularly given the district judge's "frequent, clear, and explicit instructions to this effect." *Stillo*, 57 F.3d at 557. As in *Stillo,* any potential prejudice will be remedied by an instruction that the jury may not consider Alderman A's testimony against Andrews.

Andrews points to two district court cases in support of his motion for severance: *United States v. Troutman*, 546 F. Supp. 2d 610 (N.D. Ill. 2008), and *United States v. Stoecker*, 920 F. Supp. 876 (N.D. Ill. 1996). Neither case is on point. In *Troutman*, defendant Gilbert was charged with one count of extortion, but was not charged in the overarching scheme to defraud that made up Count 1 of the indictment or any other count in a 15-count indictment. The district court relied heavily on the fact that there was a "gross disparity" in the evidence between Gilbert and the other defendants, the fact that Gilbert had engaged in only "one illegal act," and the concern

189

that a joint trial might implicate Gilbert's confrontation rights under *Bruton*. *Id*. at 617. By contrast, in this case, Andrews is charged with five separate counts related to his illegal participation in Burke's criminal enterprise. Although his conduct is but one example of Burke's wide-ranging criminal conduct, Andrews' role in the extortion of Company B was an important part of the pattern of racketeering charged in Count 1. Moreover, Andrews has not raised any potential *Bruton* issues that would make a joint trial prejudicial.

*Stoecker* involved a 98-page, 58-count indictment that charged a complex bank fraud scheme against the shareholders and officers of a company who had participated in a scheme to defraud some 25 financial institutions after borrowing $400 million. *Stoecker*, 920 F. Supp. at 879-80. In addition to the shareholder and officer defendants, an accountant was charged in 3 counts of the indictment. The court ruled that the accountant was entitled to severance so that he could obtain exculpatory testimony from a co-defendant. *Id*. at 886. The court also found that there would be a disparity in evidence against the accountant and his co-defendants, and that much of the evidence would not be admissible in a trial against the accountant alone. *Id*. at 887. There is nothing remotely similar here. Unlike the accountant, Andrews was a critical player in Burke's racketeering scheme. And he identifies no exculpatory testimony from a co-defendant he seeks to introduce.

A district court case that more closely resembles these facts, and gives appropriate credit to the faculties and common sense of this district's jury pool, is Judge Zagel's opinion in *United States v. Calabrese*, No. 02 CR 1050-10, 2008 WL

190

4274453, at *4-5 (N.D. Ill. Sept. 10, 2008), *aff'd sub nom. United States v. Schiro*, 679 F.3d 521 (7th Cir. 2012). In that case, multiple defendants who participated in the Chicago Outfit's illegal video gambling business sought severance on the ground that they were not charged in the Count One racketeering conspiracy, which charged other defendants with more than a dozen Outfit murders, in addition to illegal gambling. Judge Zagel rejected requests for severance, and in denying a new trial motion ruled that any potential prejudice was cured by jury instructions directing the jury to give defendants separate consideration. *Id.*; *see also Calabrese*, No. 02 CR 1050, slip op. at 1-3, 24-25 (N.D. Ill. May 11, 2007) (Dkt. #512).

### c.  Cui's Rule 14 Arguments

Like Andrews, Cui characterizes himself as a "'bit player,' whose charges constitute only a tiny piece of the superseding indictment's otherwise sweeping allegations of widespread public corruption." R. 87 at 12. Cui's severance motion should be denied. Like Andrews, although he did not play as all-encompassing a role as Burke, Cui's criminal conduct involving Company C is intertwined with Burke's, such that the balance of equities favors a joint trial.

In response to Cui's argument that much of the evidence at trial will be irrelevant to him, a properly instructed jury will be able to separate the counts that relate to Cui from those that do not. Even if separate trials will decrease the time and money defendants must spend preparing for and attending a joint trial, as Cui contends, any such savings will be vastly outweighed by the additional time the Court would spend presiding over separate trials with overlapping issues and the parties

191

(collectively) would spend trying those cases. Even more importantly, Cui is unfairly asking that witnesses related to the Company C allegations be required to testify not once but twice concerning the same events. Separate trials would impose a substantial burden on these witnesses, the government, and the Court.

Cui cites *United States v. Tarango*, 396 F.3d 666 (5th Cir. 2005), in which the Fifth Circuit held that a district court did not abuse its discretion in granting defendant's motion for a new trial after a guilty verdict in a healthcare fraud trial against a doctor and his office manager (the appellant). The doctor was tried in absentia after he became a fugitive. The government called five witnesses who testified directly as to the office manager's complicity, compared to 50 witnesses who testified as to the fugitive doctor's role. *Id.* at 670. The Fifth Circuit's "principal concern" was the prejudice that resulted from the office manager being tried next to an "empty chair," as well as from the volume of evidence heard by the jury that was inadmissible against the officer manager (but admissible against the doctor). *Id.* at 674. Recognizing that a "disparity of evidence in a trial involving multiple defendants does not in and of itself constitute prejudice," the court nevertheless affirmed in light of the "scant testimony" that the office manager did anything improper. *Id.* at 674-75. In this case, there should be no empty chair, there is substantial evidence of Cui's improper conduct, and Cui's statements will be largely admissible against both Cui and Burke.

In short, if separate trials were ordered, the efficiencies to this Court and the prosecution of a joint trial would be lost, and the government would be required to

192

present evidence concerning Burke's criminal enterprise at separate trials. Defendants cannot meet the high burden for seeking severance under Rule 14.

### C. Cui's and Andrews' November 29, 2018 Statements Do Not Implicate *Bruton.*

Burke is not entitled to severance under *Bruton v. United States*, 391 U.S. 123, 126 (1968), because Andrews' and Cui's statements to the FBI were not confessions that implicate Burke. To the contrary, Andrews and Cui *denied* wrongdoing. Under these circumstances, Burke's *Bruton* motions should be denied. R. 112, R. 114.[66]

### 1. Applicable Law

In *Bruton*, 391 U.S. 123, the Supreme Court held that a defendant's Sixth Amendment right to confront witnesses against him is violated when the confession of a non-testifying co-defendant, which expressly implicates the defendant as a participant in the crime, is admitted in the joint trial of the two defendants. This holds true even if the jury is instructed to consider the confession only against the defendant who made the statement. *See id.* at 135-37.

Under *Bruton* and its progeny, however, a co-defendant's statement only violates another defendant's right to confrontation if the confession is "powerfully incriminating" or "incriminating on its face" against that defendant. *Bruton*, 391 U.S. at 135; *Richardson v. Marsh*, 481 U.S. 200, 208-09 (1987) (*Bruton* only applies to "facially incriminating confessions," not to "confession incriminating by connection.");

---

[66] If the Court concludes that Andrews' and Cui's November 2018 statements implicate *Bruton,* the government requests an opportunity to submit supplemental briefing on the merits of the *Bruton* claim and ways to reduce prejudice short of severance.

*id.* at 208-09 (recognizing the "vital role" joint trials play in the criminal justice system and declining to adopt "an expansive *Bruton* rule"). Where a co-defendant's statement is not incriminating, by contrast, a *Bruton* challenge fails. *See United States v. Warner*, 498 F.3d 666, 701 (7th Cir. 2007) (no *Bruton* violation where co-defendant's statements were not inculpatory); *United States v. Volpendesto*, 746 F.3d 273, 291 (7th Cir. 2014) (no *Bruton* violation where statement was not powerfully incriminating to either defendant); *United States v. Javell*, 695 F.3d 707, 712 (7th Cir. 2012) (no *Bruton* violation where "nothing in the government's *Bruton* statement was facially incriminating, nor did any part of the statement even reference [defendant] indirectly"); *United States v. Briscoe*, 896 F.2d 1476, 1503 (7th Cir. 1990) (no *Bruton* violation where co-defendant's statement did not "directly implicate" defendant).

"A statement is not facially incriminating merely because it identifies a defendant; the statement must also have a sufficiently devastating or powerful inculpatory impact to be incriminatory on its face." *United States v. Mikhel*, 889 F.3d 1003, 1044 (9th Cir. 2018), *cert. denied*, 140 S. Ct. 157 (2019) (quotations and citations omitted); *see also United States v. Joyner*, 899 F.3d 1199, 1207 (11th Cir. 2018) (co-defendant statement that mentioned another defendant not inculpatory and therefore did not implicate *Bruton*).

### 2.    Analysis

Cui's and Andrews' statements to FBI agents on November 29, 2018, do not implicate Burke. They were false exculpatory statements in which Cui and Andrews

194

denied wrongdoing. Their admission at a joint trial would therefore not present any *Bruton* issue.

Although Cui admitted to offering business to Burke's law firm while he was trying to resolve the pole sign issue (R. 113 at 10), he expressly denied that there was any connection between this issue and his decision to hire Burke's law firm. Instead, Cui claimed he hired Burke because he was a good lawyer. *Id.* at 11, 14, 15, 17. These statements form the basis of the false statements count against Cui (Count 17), as Cui's own emails directly linked the pole sign issue to the tax appeal work he offered to Burke's firm.

Andrews, for his part, denied remembering almost anything about the restaurant remodeling issues. Andrews denied knowing Individual B-1 and Individual B-2, denied having heard their names, and stated he did not know whether Burke met with them. R. 115 at 1-3. These statements form the basis of the false statement count against Andrews (Count 10), as the evidence at trial will show Andrews knew who Individual B-1 and B-2 were and had even met them.

Because Andrews and Cui's false exculpatory statements do not facially implicate Burke in criminal activity, they raise no concerns under *Bruton. See, e.g., United States v. Hemmingson*, 157 F.3d 347, 357 (5th Cir. 1998) (co-defendant's false statements to law enforcement did not implicate *Bruton* because they did not inculpate the defendant); *United States v. Flaherty*, 76 F.3d 967, 972 (8th Cir. 1996) (no *Bruton* violation, where co-defendant's false statements to an ATF agent were "evasive, false, and threatening, but not incriminating"); *United States v. Hackett*,

638 F.2d 1179, 1187 (9th Cir. 1980) (co-defendant's false exculpatory statements about his relationship with defendant did not implicate *Bruton*); *United States v. Brown*, 551 F.2d 639, 647 (5th Cir. 1977), *on reh'g*, 569 F.2d 236 (5th Cir. 1978) (no *Bruton* violation where co-defendants' statements "were by no means equivalent to confessions" but were "exculpatory, although apparently false at least in part," even if the statements "perhaps indicative of consciousness of guilt on the part of" the defendants who made them).

Burke's *Bruton* challenge is similar to the claim raised by Lawrence Warner during his joint trial with co-defendant and former Illinois Governor George Ryan on charges arising from their improper direction of state leases and contracts to Warner-controlled entities while Ryan was the Illinois Secretary of State. Warner sought severance on the ground that Ryan's statements to law enforcement inculpated him. Like Cui's statements that he had hired Burke's law firms but only because Burke was a good lawyer (R. 113 at 14-17), Ryan made admissions about appointing Warner but denied a financial reason for the appointment. Specifically, Ryan told FBI agents "that he appointed Warner to the McPier board on a resigning board member's recommendation; that he never discussed the Joliet lease or SOS Office leases with Warner and had no personal knowledge that Warner profited from the Joliet lease; that he had no idea of the source of Warner's information concerning those leases; and that he had no personal financial relationship with Warner." *United States v. Warner*, No. 02 CR 506, 2004 WL 1794476, at *24 (N.D. Ill. Aug. 11, 2004). The district court concluded that "nothing about any of these statements suggests

improper conduct on Warner's part," and therefore no *Bruton* concerns required severance. *Id.* The Seventh Circuit affirmed, finding "no *Bruton* issue, because the statements admitted at trial were not inculpatory and did not amount to a confession from Ryan." *Warner*, 498 F.3d at 701 (also noting that the district court excluded all references to Warner "except those with innocuous or uncontested references").

Nonetheless, out of an abundance of caution, the government will request an instruction at trial that the jury should only consider Andrews' and Cui's November 2018 statements as to the person who made the statements. *Cf. Hemmingson*, 157 F.3d 347, 357 (5th Cir. 1998) (district court "probably should have issued a limiting instruction" as to the co-defendant's false statements, even though the statements did not implicate defendant).

## XI.   Burke's Motion to Strike Surplusage (R. 110) Should Be Denied.

Burke seeks to strike as surplusage the reference to "Jewish lawyers" in Paragraph 11 in Count 1, and references to Chicago's ethics ordinance in Paragraphs 1 and 78-80. R. 110 at 2-4. Andrews moves to adopt Burke's motion to strike references to the ethics ordinance. R. 122. The motion should be denied.

### A.   Applicable Law

On the motion of a defendant, it is within a court's discretion to strike immaterial or irrelevant allegations as surplusage. *United States v. Climatemp, Inc.*, 482 F. Supp. 376, 391 (N.D. Ill. 1979), *aff'd sub nom.*, *United States v. Reliable Sheet Metal Works, Inc.*, 705 F.2d 461 (7th Cir.), *cert. denied*, 462 U.S. 1134 (1983). Such motions should be granted, however, "only if the targeted allegations are clearly not

197

relevant to the charge and are inflammatory and prejudicial"—a "rather exacting" standard that applies "only rarely." *United States v. Chaverra-Cardona*, 667 F. Supp. 609, 611 (N.D. Ill. 1987).

### B. Burke's Reference to "Jewish Lawyers" Is Relevant.

The superseding indictment's reference to "Jewish lawyers" is plainly relevant when considered in the context of the government's allegation that Burke corruptly solicited legal business from Company A for Burke's law firm in return for Burke's official assistance on the Post Office project. R. 30 ¶ 11. In a recorded call summarized in the superseding indictment, Burke stated that Company A would only hire his law firm if there was something Burke could do for Company A, because otherwise Company A would hire Jewish lawyers. The government anticipates that Alderman A will testify that he understood Burke to mean that Individual A-1 (who is Jewish) would only hire Burke (who is a Christian) and his law firm if Burke would use his official position as Alderman to benefit Individual A-1; otherwise, Burke believed that Individual A-1 would hire a Jewish tax attorney.

In other words, Burke's reference to Jewish lawyers is directly relevant to his intent to take official action in exchange for Company A hiring his law firm. *See* Fed. R. Evid. 401 (defining relevant evidence as anything having "any tendency to make a fact more or less probable than it would be without the evidence," if "the fact is of consequence in determining the action"). Burke's comment shows that he was soliciting legal fees, pursuant to an understanding that he would improperly influence or attempt to influence the performance of official act or function. *See* R. 30

¶ 11 & ¶ 84, Racketeering Act 1(a). In doing so, he attempted to commit bribery in violation of Illinois law. 720 ILCS 5/33-1(e); 720 ILCS 5/8-4.

Contrary to Burke's contention, the probative value of Burke's limited reference to the religion of the referenced lawyers is not substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Crim. P. 403. Rule 403 is not meant to sanitize a defendant's criminal conduct or exclude relevant evidence whose absence will create "a chronological and conceptual void," leaving the jury to speculate. *See United States v. Pulido*, 69 F.3d 192, 202 (7th Cir. 1995) (affirming admission of triple murder in drug conspiracy prosecution); *see also United States v. Vretta*, 790 F.2d 651, 656 (7th Cir. 1986). Rather, evidence should be excluded as unfairly prejudicial under Rule 403 only if it has a tendency to blind the jury and encourage a verdict "on a purely emotional basis," rather than on the evidence presented. Fed. R. Evid. 403 (advisory committee's note); *United States v. Wantuch*, 525 F.3d 505, 518 (7th Cir. 2008). Here, a limited reference to the lawyers' religion is not so inflammatory as to be unfairly prejudicial, particularly in light of the fact that the statement is highly probative as to Burke's intent—it clearly demonstrates his understanding that he would get legal business in return for taking official action. *See United States v. Norwood*, 982 F.3d 1032, 1052-53 (7th Cir. 2020).

### C. The Ethics Ordinance Is Relevant.

Burke also claims that references to the Chicago Governmental Ethics Ordinance in Count 1 of the superseding indictment are irrelevant and likely to confuse the jury. R. 110 at 3.

199

The provisions of the City of Chicago ethics ordinance cited in Paragraphs 1(u) and 78 to 80 of the superseding indictment are relevant to the allegation that Burke violated the Illinois bribery and official misconduct statutes, which are alleged as state-law RICO predicates. Those statutes require a showing that Burke was not authorized by law to solicit work for his law firm in return for performing acts as an Alderman. Specifically, the Illinois official misconduct statute bars a public officer from soliciting or knowingly accepting "for the performance of any act a fee or reward *which he knows is not authorized by law*." 720 ILCS 5/33-3(a)(4) (emphasis added). The Illinois bribery statute bars receiving, retaining, or agreeing to accept property or personal advantage that an individual "is not *authorized by law* to accept knowing that the property or personal advantage was promised or tendered with intent to cause him or her to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness." 720 ILCS 5/33-1(d) (emphasis added); *see also Freedman*, 508 N.E.2d at 328, *supra*.

The Chicago Governmental Ethics Ordinance supplied one source of legal authority that barred Burke from accepting legal fees in exchange for taking action as an Alderman. As discussed above, the Ethics Ordinance prohibited any city official from using or attempting to "use his position to influence any city governmental decision or action which he knows or has reason to know that he has any financial interest distinguishable from its effect on the public generally, or from which he has derived any income or compensation during the preceding twelve months or from which he reasonably expects to derive any income or compensation in the following

twelve months." R. 30 ¶ 1(u) (citing § 2-156-030(a)). Similarly, the Ethics Ordinance prohibited any official or person acting at his direction from contacting any other city official or employee regarding "any matter involving any person with whom the elected official has any business relationship that creates a financial interest on the part of the official . . . or from whom or which he has derived any income or compensation during the preceding twelve months or from whom or which he reasonably expects to derive any income or compensation in the following twelve months." R. 30 ¶ 1(u) (citing § 2-156-030(b)). Additionally, Section 2-156-018 requires city officials to report to the City's Inspector General information involving corrupt or unlawful activity. Count 1, ¶ 1(u) (citing § 2-156-018).

Here, the Chicago Governmental Ethics Ordinance is plainly relevant, because it governed Burke's duties as a city official, and demonstrates that his conduct was not authorized by law and was done without the consent of the City. *Cf. United States v. Sorich*, 427 F. Supp. 2d 820, 834 (N.D. Ill. 2006), *aff'd*, 523 F.3d 702 (7th Cir. 2008) (approving reference to Chicago Governmental Ethics Ordinance as one source of defendant's fiduciary duties in honest services fraud indictment). This fact

201

distinguishes this case from the cases cited by Burke. R. 110 at 3-4.[67] Accordingly, the superseding indictment properly references the sources of Burke's legal obligations, including the Chicago Governmental Ethics Ordinance.

## XII. Andrews' Motion for Disclosure of Evidence Related to Materiality (R. 117) Should Be Denied.

### A. Background

On November 29, 2018, after a multi-year investigation, the FBI approached Andrews to conduct an interview regarding evidence of corruption involving Burke. During the interview, FBI agents asked Andrews a series of questions, including about Andrews' involvement in a scheme to extort Company B. Andrews provided false responses to the agents' questions and was subsequently charged with making false statements, in violation of 18 U.S.C. § 1001. Andrews was also charged with one count of extortion, in violation of 18 U.S.C. § 1951(a) (Count 5), one count of conspiracy to commit extortion, in violation of 18 U.S.C. § 1951(a) (Count 6), and two

---

[67] In *Terry*, the district court concluded that references to the judicial code promulgated by the Ohio Supreme Court should be stricken from an indictment alleging a state judge committed honest services fraud, because "the code is not legislative, and, therefore, does not have the force of law" and "[b]ecause state law supplies the necessary legal duty, the government need not resort to the judicial code to support its prosecution." *United States v. Terry*, No. 1:10CR390, 2011 WL 2111127, at *8 (N.D. Ohio May 26, 2011), *aff'd* 707 F.3d 607 (6th Cir. 2013). In *Mandel*, the court struck references to the state Code of Ethics in mail fraud counts, because "whether or not the act which violated the Code is fraudulent depends on whether it was done with intent to defraud, and the only relevance of the Code is to the issue of intent," and "it is possible that the evidence at trial would fail to demonstrate the relevancy of the Code on this issue." *United States v. Mandel*, 415 F. Supp. 997, 1009 (D. Md.), *supplemented*, 415 F. Supp. 1025 (D. Md. 1976). Neither decision is applicable here; in this case, the Ethics Code helps to define the phrase, "authorized by law" in the Illinois bribery and official misconduct statutes.

counts of using an interstate wire to carry on an unlawful activity, in violation of 18 U.S.C. § 1952(a)(3) (Counts 7 and 8), all related to the extortion of Company B.

In his motion, Andrews seeks an order compelling production of "agents' communications with each other and with prosecutors where the motivation for or tactics to be used in the interview of Mr. Andrews may have been discussed." R. 117 ¶ 20. Specifically, Andrews seeks to compel the government to "search for and disclose" all "documents including internal communications between agents, between agents and supervisors or analysts, between agents and prosecutors, prosecutors and supervisors, and any other government officials related to" the following ten topics: "(1) the decision to interview [Andrews]; (2) the purpose of the interview; (3) information hoped to be gained by the interview; (4) the decision to record the interview; (5) the type of questions to be asked; (6) the manner of questioning; (7) the state of the government's investigation at the time of the interview; (8) the decision regarding which photographs to display to [Andrews]; (9) whether the agents intended to be truthful or deceptive in their statements to [Andrews]; and (10) whether the interview was intended and designed to produce information or whether it was intended and designed in the hopes of producing a statement usable in an 18 U.S.C. § 1001 prosecution." R. 117, Exhibit A.

Andrews asserts, based on discovery the government has made to Andrews, that the FBI's interview of Andrews' was "not designed to obtain evidence that would be material to the government's investigation but rather was a means of obtaining a statement from Andrews that the government could charge under § 1001." R. 117

¶ 14. Specifically, Andrews believes that the FBI's questioning of Andrews about the identity of his victims and whether he or Burke had ever met with the victims had "no utility to the government's investigation" and had "no apparent investigatory benefit." *Id*. ¶¶ 14-15. Andrews further suggests that the FBI's decision to record its interview with Andrews is indicative that the FBI was "fishing" for Andrews to make a false statement. *Id*. ¶¶ 16, 20. In furtherance of an anticipated argument that his false statements were not material, Andrews seeks discovery regarding the FBI's and prosecutors' motives in interviewing him.

## B.    Analysis

While district courts have broad discretion to manage discovery in criminal cases, *Weatherford v. Bursey,* 429 U.S. 545, 559 (1977); *States v. Bastanipour,* 697 F.2d 170, 175 (7th Cir. 1982), there are narrow grounds upon which a criminal defendant may demand discovery from the government. Rule 16(a) of the Federal Rules of Criminal Procedure requires the government to produce upon request documents and data "material to preparing the defense," Fed. R. Crim. P. 16(a)(1)(E)(I), subject to applicable privileges. Documents are material if they would enable the defendant to "substantially alter the quantum of proof in his favor," *United States v. Orzechowski*, 547 F.2d 978, 984 (7th Cir. 1976), not simply because they bear an "abstract logical relationship" to the issues in the case," *United States v. Farah*, 475 Fed.Appx. 1, 6 (4th Cir. 2007) (distinguishing "materiality" standard governing discovery in criminal cases from the lesser "relevance" standard in civil cases).

204

The government also has discovery obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), the Jencks Act and 18 U.S.C. § 3500, with which the government intends to fully comply. Relevant here, the government's *Brady* obligations, largely co-extensive with its Rule 16 obligations, are limited to documents and information that are material; *Brady* "does not grant criminal defendants unfettered access to government files" just because the defense believes they may contain helpful materials. *United States v. Jumah*, 599 F.3d 799, 809 (7th Cir. 2010). A defendant bears the burden to "make at least a *prima facie* showing that the requested items are material to his defense." *United States v. Thompson*, 944 F.2d 1331, 1342 (7th Cir. 1991).

The Court should reject Andrews' demand for internal communications between and among government personnel regarding his interview. First, internal communications between and among prosecutors and agents regarding their investigatory work plan, including the reasons for and topics to be discussed during the Andrews interview, are explicitly *excluded* from the government's production obligations under Fed. R. Crim. P. 16(a)(2). Federal Rule of Criminal Procedure 16(a)(2) "does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Fed. R. Crim. P. 16(a)(2); *United States v. Hansen*, No. 4:18-CR-00346-DCN, 2019 WL 4397335, at *6 (D. Idaho Sept. 13, 2019).

This is because the government's internal work product, including discussions between prosecutors and investigating agents, is protected from disclosure by the work product privilege so long as the materials do not contain exculpatory information not otherwise available to the defense. *Hobley v. Burge,* 433 F.3d 946, 949–50 (7th Cir. 2006). The Supreme Court articulated the rationale of the work-product protection in *United States v. Nobles*, 422 U.S. 225, 238-39 (1975):

> At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

*See also Leopold v. United States Dep't of Just.*, No. CV 19-1278 (RBW), 2020 WL 5253897, at *5 (D.D.C. Sep. 3, 2020) (extending the doctrine to protect material prepared by agents, as well as government attorneys); *United States v. Kubini*, 304 F.R.D. 208, 220–21 (W.D. Pa. 2015) (internal emails are "other internal documents" and therefore "constitute internal government work product which is exempted from criminal discovery under Rule 16(a)(2)"); *United States v. Stone*, No. CR12-0072-JCC, 2013 WL 5934346, at *3 (E.D. Cal. Nov. 5, 2013) ("Defendant is requesting documents that clearly fall under Rule 16(a)(2): substantive communications by the prosecutors about the case to other law enforcement agents."). Communications between prosecutors and agents, which are not exculpatory and subject to *Brady*, are also typically protected by the attorney-client privilege. *See, e.g.*, *Swidler & Berlin v.*

206

*United States,* 524 U.S. 399 (1998); *In re Grand Jury Witness,* 288 F.3d 289 (7th Cir.2002) (when legal advice is given to or for the benefit of a governmental body, it . . . enjoys the benefit of this privilege).

Here, Andrew seeks internal documents created by prosecutors or agents, and communications between or among prosecutors or agents, that contain mental impressions, reflect personal beliefs as to investigative tactics, and further reflect deliberative discussions that are protected by the above privileges.[68] And the contents of the documents are not exculpatory: The government has carefully reviewed all potentially responsive materials and found that none are even arguably exculpatory.

Second, even if not protected by the applicable privileges, the internal communications sought by Andrews are not material to his defense, as required by Fed. R. Crim. P. 16(a)(1)(E)(I). Andrews claims that the internal communications would reflect that his false statements were not material, as required by § 1001. In the Seventh Circuit, for a statement to be materially false, it "must have 'a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *United States v. Gaudin,* 515 U.S. 506, 509 (1995) (quoting *Kungys v. United States,* 485 U.S. 759, 770 (1988)). The Seventh Circuit does not, by contrast, require that the statement "*actually* influence

---

[68] Should the Court deem it necessary to review the documents the government has gathered as potentially responsive to Andrews' requests, including to determine whether they constitute *Brady* material, the government will submit them *ex parte* and *in camera* for the Court's review. The government requests that the Court conduct an *in camera* review to determine if those communications are in fact *Brady* before requiring production by the government.

the agency to which it was directed, or even that the agency rely on the statement in any way." *Lupton,* 620 F.3d at 806.

Andrews' false statements during his interview—for example, that he did not know the victims of the extortion—were material to the FBI's investigation because they were capable of affecting the FBI's investigation into Andrews and Burke's extortion scheme. Per well-established law, the statements need not have actually influenced the FBI, or any prosecutorial decisions. For that reason, it does not matter that the FBI knew the truth and therefore were not deceived by Andrews' statements, so long as the statements were *capable* of influencing an ongoing investigation into Andrews' conduct—which they were. *United States v. Gulley,* 992 F.2d 108, 112–13 (7th Cir.1993) ("materiality requires only a potentiality of influencing the decisionmaker; it does not require actual reliance").

Presumably because Andrews understands the privileges applicable to prosecutor and agent communications and the narrow definition of materiality applicable to § 1001 charges, he argues for an expansion of *Brady,* relying solely on the fact that the government disclosed internal FBI documents in *United States v. Michael T. Flynn*, Crim No. 17-232 (D.D.C.). That decision—in a case involving a different defendant in a different district—has little bearing on Andrews' motion.

In that case, the *sole* charge against Flynn was the false statement charge, and only after the prosecutors in that case conducted a "considered review of all of the facts and circumstances . . . including . . . information appended to the defendant's supplemental pleadings" did the government conclude that the FBI's interview of

Flynn had no "legitimate investigative basis," and therefore Flynn's false statements were not "material." *United States v. Flynn*, Crim No. 17-232, Dkt. #198 at 1-2 (D.D.C.) (R. 117, Exhibit B). Specifically, prior to approaching Flynn, the FBI had "found no basis to 'predicate further investigative efforts' into whether Mr. Flynn was being directed or controlled by a foreign power," which was the subject of its investigation. *Id.* at 13. The government also represented that the subject of the interview—communications between Flynn and the Russian ambassador— "implicated no crime." *Id.* at 15.

The events in *Flynn* are not at all similar to the facts of this case. Here, prior to the FBI's interview of Andrews, significant evidence—including intercepted communications, surveillance, and documentary evidence—reflected that Andrews and Burke had engaged in extortion of Company B. The investigation of Andrews was open and ongoing when the FBI approached Andrews (indeed, he was listed as a Violator, in other words, an individual involved in the subject offense, in the government's earlier wiretap applications), and a truthful interview of Andrews would have likely led to further evidence regarding the extortion, including Andrews' and Burke's motive and intent when carrying out the extortion, and acts of concealment.

When it approached Andrews, the FBI was actively investigating Andrews' extortionate conduct. It was not "fishing for falsehoods merely to manufacture jurisdiction over any statement" by Andrews. R. 117 at 3. Indeed, the government

had sufficient evidence to bring charges against Andrews without his false statements—and it in fact brought such charges in this case.

Accordingly, the *Flynn* case does not change the government's discovery obligations; the government will continue to abide by the requirements of *Brady* to produce exculpatory information, including exculpatory information regarding materiality as defined in the Seventh Circuit. Andrews' Motion to Compel should therefore be denied.

## CONCLUSION

For foregoing reasons, the government respectfully requests that the Court deny defendants' pretrial motions.

Respectfully submitted.

JOHN R. LAUSCH, JR.
United States Attorney

/s/ *Amarjeet Bhachu*
AMARJEET S. BHACHU
DIANE MacARTHUR
SARAH E. STREICKER
MATTHEW L. KUTCHER
JULIA K. SCHWARTZ
Assistant United States Attorneys
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 353-5300

210