**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cr-322 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| ALDERMAN EDWARD M. BURKE, | ) | |
| PETER J. ANDREWS, and CHARLES | ) | |
| CUI, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In 2019, a grand jury indicted Defendant Alderman Edward M. Burke on federal racketeering and bribery charges. The crux of the sprawling superseding indictment [30 (redacted), 31 (sealed)] is that Ald. Burke pressured real estate developers to hire his private law firm, Klafter & Burke, in exchange for Ald. Burke's assistance in securing official favors, including lucrative tax breaks and permits from the City of Chicago. In nineteen counts, the grand jury charges Ald. Burke with violations of federal laws prohibiting racketeering, federal program bribery, extortion, and the use of interstate facilities in furtherance of violating those and other laws. The indictment also names two co-Defendants, a staffer of Ald. Burke's named Peter J. Andrews, and a businessman named Charles Cui, both of whom were allegedly embroiled in Ald. Burke's deals.

All three co-Defendants filed hundreds of pages of pre-trial motions now before this Court [86, 88, 95, 96, 98, 99, 101, 103, 104, 106, 108, 109, 110, 111, 112, 114, 117, 121, 122]. Together these motions would have this Court dismiss almost every charge of the indictment against all Defendants. Most notable among those many motions, Ald. Burke and Andrews seek to suppress voluminous evidence gathered from a multi-month wiretap of Ald. Burke's phone. In Ald. Burke's

view, the Government's wiretap application not only lacked probable cause under the principles of *McDonnell v. United States*, 579 U.S. 550 (2016), but also effectively pulled a fast one on the Chief Judge of the Northern District of Illinois about the circumstances allegedly justifying the Government's surveillance.

The Court denies these motions in full. Among other reasons described in further detail below, in the Court's view, these motions largely go to the strength of the evidence, not the sufficiency of the indictment and wiretap application. It is a fact-finder's role to assess whether the Government has proven the allegations beyond a reasonable doubt at trial, not this Court's at the pleadings stage. The Court also concludes that Ald. Burke and his co-Defendants attempt to extend the logic of *McDonnell* on the federal and Illinois anti-public corruption scheme beyond the outer reaches of that important decision.

Accordingly, for the reasons stated below, the Court denies all of Defendants' pretrial motions [86, 88, 95, 96, 98, 99, 101, 103, 104, 106, 108, 109, 110, 111, 112, 114, 117], with the limited exception that the Court has granted Defendant Ald. Burke's and Andrews's respective motions to adopt [121, 122] for purposes of this opinion. The motions to sever are denied without prejudice, as the parties and the Court may reassess whether all three Defendants should be tried together at each later stage of the case.

I.      **Background**

        A.      **Factual Background**

The Government has filed a nineteen-count indictment against Alderman Edward Burke, the Alderman of the Fourteenth Ward in Chicago and former Chairman of the City of Chicago's Committee on Finance. [30 (Indictment) at Count 1, ¶ 1g]. Ald. Burke is the longest-serving member of Chicago's City Council with tenure dating back to 1969. He owned a private law firm

2

named Klafter & Burke at all relevant times.  [*Id.* at ¶ 1h].  Klafter & Burke represented clients contesting and seeking reductions in the tax assessments made on their real property.  [*Id.*]

The superseding indictment ("Indictment") [30] alleges that Ald. Burke exploited the power he amassed as Alderman and Chairman of the Committee on Finance to solicit and receive bribes from real estate developers within his sphere of influence between at least 2016 through 2018.  Specifically, the Indictment alleges that during those years, Ald. Burke sought fees from the retention of Klafter & Burke from several people and companies doing business before the City of Chicago or subject to his and a fellow Alderman's authority.  [30 (Indictment) at Count 1, ¶ 4].

The Indictment highlights four episodes in which Ald. Burke allegedly solicited fees in exchange for his official acts: (1) the redevelopment of the Old Post Office in Chicago (referred to as the "Post Office Project"), (2) the remodeling of a fast-food restaurant in Ald. Burke's ward (the "Fast-Food Restaurant Remodeling"), (3) Cui's application for a pole-sign permit (the "Pole-Sign Permit"), and (4) a position at a museum located in Chicago ("Museum 1 Admission Fee Increase").  The Court will elaborate on these episodes and the specifics of the nineteen charges against Ald. Burke and his co-Defendants, Peter J. Andrews and Charles Cui, later in this opinion. For now, the Court will describe the events of 2016 through 2018 in relatively broad brushstrokes. The account that follows is not a finding of facts.  Fact-finding is a job exclusively for a jury—or for this Court if the parties so choose—at a later stage of this case.  Instead, the following account draws on the allegations of the Indictment to contextualize the motions up for resolution in today's opinion.

As noted above, the Indictment [30] alleges that Ald. Burke exploited his position to solicit and receive bribes.  Three of the four episodes involve Ald. Burke's alleged attempt to solicit fees

for his law firm, Klafter & Burke, by leveraging his official authority and that of fellow Alderman Daniel Solis. During the period relevant here, Ald. Solis represented the Twenty-Fifth Ward in Chicago and served as Chairman of the City of Chicago Committee on Zoning, Landmarks & Building Standards. [30 (Indictment) at Count 1, ¶ 1j]. Unbeknownst to Ald. Burke, however, Ald. Solis was cooperating with law enforcement. [*Id.*]

### 1. Old Post Office Project

The first episode of the Indictment concerns Ald. Burke's and Ald. Solis's involvement with the Old Post Office, which was located in Ald. Solis's ward. [30 (Indictment) at Count 1, ¶¶ 5–32, ¶ 84(a) (RICO Act 1)]. A New York-based real estate company referred to in the Indictment as Company A undertook a renovation and redevelopment of the building. [*Id.* at ¶¶ 1i, 5].

Ald. Burke and Ald. Solis expected the massive redevelopment to present a window of opportunity. The Indictment alleges that Ald. Burke solicited Individual A-1, who was associated with Company A and oversaw and managed the Post Office project on Company A's behalf, as a prospective client for Klafter & Burke and further alleges that Ald. Burke agreed to accept property in exchange for Ald. Burke and Ald. Solis's official assistance with redeveloping and financing the renovation and redevelopment. [30 (Indictment) at Count 1, ¶¶ 5, 84(a)]. As Ald. Solis observed, Company A and its associates would require certain approvals and funding for the project. [*Id.* at ¶ 9].

The attempts to solicit the Old Post Office developers as clients of Ald. Burke's law firm stretch back at least to 2016. In August 2016, while discussing the redevelopment with Ald. Solis, Ald. Burke asked Ald. Solis to recommend Klafter & Burke to Individual A-1 for Company A's tax work. [30 (Indictment) at Count 1, ¶ 6]. He further suggested compensating Ald. Solis for his

assistance through a "marketing arrangement." [*Id.*] In September 2016, Ald. Burke asked Ald. Solis to arrange a meeting between Individual A-1 and Ald. Burke to solicit tax business for Klafter & Burke. [*Id.* at ¶ 7]. The first meeting between Individual A-1 and Ald. Burke took place in Ald. Solis's City Hall office in October 2016 together with an employee of Company A, referred to here as Individual A-2. [*Id.* at ¶¶ 1i, 8]. During the meeting, Ald. Burke solicited tax work for his law firm. [*Id*.] Individual A-1 relayed obstacles facing the redevelopment project, which (as Ald. Burke's subsequent discussions with an Amtrak employee revealed) included accessing certain property owned by Amtrak below the Old Post Office building. [*Id.* at ¶¶ 8, 11]. Ald. Burke advised Individual A-1 that there were not "too many people around town that we don't know." [*Id.* at ¶ 8]. Then, in December 2016 and at law enforcement's direction, Ald. Solis told Ald. Burke that if he and Ald. Solis assisted Company A's negotiations with Amtrak and helped with other permits, Individual A-1 would retain Ald. Burke's law firm. [*Id.* at ¶ 10]. Ald. Burke responded, "Okay great." [*Id.*]

During the ensuing two years, a series of meetings and conversations revealed the ways in which the two aldermen could assist Company A and Individual A-1 and the aldermen's attempts to retain Company A and its associates for Klafter & Burke. As the Court will describe in detail below, that assistance included access to Amtrak property, approval from the Water Commissioner for a water line, and favorable tax designation (Class L designation) and funding (TIF financing).

Regarding Amtrak, to complete redevelopment work on the Old Post Office project, the redevelopers needed access to Amtrak property located near the Post Office. [30 (Indictment) at Count 1, ¶¶ 1k, 11]. Between December 2016 and June 2017, Ald. Burke took steps to address the Old Post Office's issues with Amtrak but repeated his reluctance to assist the redevelopers until he was hired by Company A. For example, after speaking to an Amtrak employee named

Individual A-3, Ald. Burke advised Ald. Solis that Individual A-3 could be "worked with," but to date Individual A-3 had no reason to do any favors for the Old Post Office developer. [*Id.* at ¶¶ 1k, 11]. Ald. Burke further noted that he had not yet been hired by Company A and that Company A had additional properties in Chicago. [*Id.*] On another occasion, on January 25, 2017, Ald. Burke informed Ald. Solis that he would not take any action benefitting Individual A-1 and Company A unless Individual A-1 retained his law firm. [*Id.* at ¶ 12]. According to Ald. Burke, "the cash register has not rung yet." [*Id.*] As yet another example, on or about May 19, 2017, Ald. Solis advised Ald. Burke that a representative of Company A's real estate management company still had a problem that needed to be resolved with the Water Department (more on that, below) and with Amtrak concerning the Post Office project. [*Id.* at ¶ 16]. Ald. Burke informed Ald. Solis that he had not heard about "getting hired to do the tax work," so Ald. Burke was not "motivated" to provide any assistance concerning the Post Office project. [*Id.*]

Ultimately, and at law enforcement's direction, in May 2017 Ald. Solis informed Ald. Burke that Individual A-1 had agreed to provide tax work in the future to Klafter & Burke. [30 (Indictment) at Count 1, ¶ 17]. Ald. Burke responded that he wanted to meet with Individual A-1 and promised Ald. Solis "a day of accounting" if Ald. Burke's firm was retained by Company A. [*Id.*] Ald. Burke also "agreed to provide assistance to the Post Office project," including that he and Ald. Solis would follow up with the Water Department and that Ald. Burke would follow up with Amtrak contacts. [*Id.*] In June 2017, Ald. Burke discussed the Amtrak issues directly with

Individual A-1. [*Id.* at ¶ 18].[1] Days later, Ald. Burke spoke to Individual A-3, an Amtrak employee, for the purpose of resolving Company A's outstanding Amtrak problems. [30 at ¶ 20].[2]

Rewinding the chronology by a few months, other opportunities to assist the Old Post Office redevelopment surfaced in early 2017, including the Old Post Office's issues with the Water Department. On March 9, 2017, Ald. Solis advised Ald. Burke that the Old Post Office needed the Water Commissioner's "sign off" on an issue concerning the project and that if Ald. Solis and Ald. Burke could assist with the Water Commissioner, they "should be able to get the tax work and maybe get my [Ald. Solis's] consulting work from you [Ald. Burke]." [30 at Count 1, ¶ 13]. Ald. Burke responded "Good," agreeing to look into the issue. [*Id.*] Then, around that same month, Ald. Burke caused a former Water Commissioner named Individual A-4 to contact the current Water Commissioner regarding the Old Post Office's water access issue. [*Id.* at ¶ 14]. "Based on the information provided by Individual A-4, the Water Commissioner understood that there was pressure coming from City Hall to get water service established at the Post Office, and that [Ald. Burke] was involved in the matter." [*Id.*] The Water Commissioner "took steps to

---

[1] On June 19, 2017, Ald. Burke called Individual A-1 about the Post Office project. [30 (Indictment) at Count 1, ¶ 18]. During this call, Individual A-1 requested assistance with the Amtrak problems. [*Id.*] Ald. Burke instructed Individual A-1 to send an email outlining the outstanding issues and "names of the people that seem to be problems." [*Id.*] Individual A-1 forwarded an email to Ald. Burke's personal email account that outlined the outstanding Amtrak problems on June 20, 2017. [*Id.* at ¶ 19].

[2] In a follow-up the next day, June 22, 2017, Ald. Burke updated Individual A-1 that he had talked to an Amtrak executive and that there had been a lot of progress with the issues Individual A-1 had identified. [30 (Indictment) at Count 1, ¶ 21]. Burke instructed Individual A-1 to let him know how matters progressed. [*Id.*]

On August 2, 2017, Individual A-1 told Ald. Burke and Ald. Solis that things were moving in the "right direction" with Amtrak. [30 (Indictment) at Count 1, ¶ 22]. Individual A-1 thanked Ald. Burke for his assistance. [*Id.*] Ald. Burke told Individual A-1 to keep him informed of the progress with Amtrak. [*Id.*] When Ald. Burke updated Ald. Solis on August 25, 2017, that he had not heard from Company A, Ald. Solis observed that things appeared to be going well with the Old Post Office. [*Id.* at ¶ 23]. Burke responded, "[W]hen they get taken care of, you never hear from 'em. You only hear from 'em when it doesn't work out." [*Id.*]

7

become personally involved to resolve the water service problem." [*Id.*] And on March 21, 2017, Ald. Burke informed Ald. Solis that Individual A-4 spoke with the Water Commissioner and that Company A "could not get everything requested from the Water Department," but Company A "would be 'comfortable' with the accommodations Company A would receive." [*Id.* at ¶ 15].

Several months later, yet another opportunity for Ald. Burke and Ald. Solis to assist the Old Post Office redevelopment arose. The Old Post Office sought Tax Increment Financing (TIF) and Tax L designation status. On or about October 6, 2017, Ald. Solis told Ald. Burke that Company A was seeking TIF funds for the Old Post Office project. [30 (Indictment) at Count 1, ¶ 24]. Company A had not retained Ald. Burke's law firm as of that date, and Ald. Burke questioned why Ald. Solis would want to assist Individual A-1 with a TIF request. [*Id.*] That same month, on October 17, 2017, at Ald. Solis's request, Individual A-1 and others met with Ald. Burke and Ald. Solis in Ald. Solis's City Hall office to discuss the progress of the Old Post Office project. [*Id.* at ¶ 25]. A member of Individual A-1's group explained to Ald. Burke why the Old Post Office project needed TIF funding. [*Id.*] Alone with Ald. Solis following the meeting, Ald. Burke (whose authority as Chairman of the Committee on Finance included which matters would be considered by that Committee, [*id.* at ¶ 1g]), said he was not "fond of the way they've [those associated with the Post Office project] conducted themselves up until this point, and as far as [he's] concerned, they can go fuck themselves." [*Id*. at ¶ 25]. Ald. Solis relayed that he had told Individual A-1 that Company A's request for TIF funding would go before Ald. Burke's committee. [*Id.*] Ald. Burke responded, "[w]ell, good luck getting it on the agenda." [*Id.*]

Then, in January 2018, Ald. Solis asked Ald. Burke if he would support the Old Post Office project's request for "Class L designation," a real estate tax classification that permits tax breaks for landmark buildings, which Ald. Burke estimated was worth about $100 million to Company

8

A.  [30 (Indictment) at Count 1, ¶¶ 1c, 26].  Ald. Burke observed that he decided what went onto the Committee on Finance agenda and complained that Individual A-1 still had not hired him to do tax work.  [*Id*. at ¶ 26].  Ald. Burke said being hired would "help."  [*Id*. at ¶ 26].  Ald. Burke also remarked that he did not care about "these guys" and would do as Ald. Solis wished about the financing for the Old Post Office project.  [*Id*.]  On or about February 26, 2018, the Committee on Finance passed the Class L designation for the Old Post Office project.  [*Id*. at ¶ 27].  On or about February 28, 2018, on Ald. Burke's motion, the full City Council unanimously passed the Class L designation.  [*Id*. at ¶ 28].

In August 2018, Ald. Solis confirmed to Ald. Burke that he had received Ald. Burke's report that a representative of Company A's real estate manager had contacted Klafter & Burke about hiring the firm, and Ald. Burke confirmed he would "absolutely" support Company A's TIF funding proposal.  [30 (Indictment) at Count 1, ¶ 29].  A short time later, on or about August 24, 2018, a representative of Company A's real estate manager was sent a contingent fee agreement that was signed by Ald. Burke on behalf of Klafter & Burke.  [*Id*. at ¶ 30].  The following month, in September 2018, Ald. Burke's Committee on Finance and the City Council approved TIF funding for the Post Office project.  [*Id*. at ¶¶ 31–32].  Ald. Burke made the motion to pass the funding proposal before the City Council and voted in favor.  [*Id*.]

## 2.  **Fast-Food Restaurant Remodeling**

The Indictment further states that Ald. Burke's attempts to solicit Klafter & Burke clients in exchange for his official assistance extended to other real estate developers during that period as well.  Between May and December 2017, Ald. Burke allegedly used his position as Alderman to corruptly solicit and extort legal work from Company B in return for Ald. Burke's support for

a building permit and related driveway permit for a fast-food restaurant operated by Company B that was located in Ald. Burke's ward. [30 (Indictment) at Count 1, ¶¶ 1m, 33].

Specifically, on May 25, 2017, Individual B-1, an executive of Company B, contacted Ald. Burke to seek Ald. Burke's official assistance as an Alderman with obtaining a building permit for the fast-food restaurant. [30 (Indictment) at Count 1, ¶ 34]. Ald. Burke suggested meeting with another executive of Company B named Individual B-2 to discuss the permit and another restaurant-related matter. [*Id.*] On June 8, 2017, Ald. Burke directed a member of his Aldermanic staff to contact his law firm, Klafter & Burke, to find out who had represented Company B on tax assessment work associated with Company B's fast-food restaurant in Ald. Burke's ward. [*Id.* at ¶ 35]. Several days later, Ald. Burke told a public official familiar with Individual B-1 that he wanted to get legal business from Individual B-1, and the public official promised to impress upon Individual B-1 Ald. Burke's importance. [*Id.* at ¶ 36].

The meeting between Ald. Burke and Individuals B-1 and B-2 took place on June 14, 2017, at the fast-food restaurant. [30 (Indictment) at Count 1, ¶ 37]. Ald. Burke and an employee of his Fourteenth-Ward Office, co-Defendant Peter Andrews, met Individuals B-1 and B-2 and then took them out to lunch for the purpose of soliciting tax work from them. [*Id.* at ¶¶ 1n, 37]. On the telephone with Individual B-2 two weeks later, Ald. Burke attempted to obtain business for his law firm by tying his official assistance on the permits to providing his law firm with tax business. [*Id.* at ¶ 38]. Individual B-2 told Ald. Burke that someone would reach out about the permits and someone else would reach out about the tax business. [*Id.*] Company B did receive the building permits in or around June 2017 and September 2017; however, Company B did not retain Ald. Burke's law firm. [*Id.* at ¶ 39].

10

According to the Indictment, Company B's reluctance to hire Klafter & Burke mobilized Ald. Burke into action. In October 2017, Ald. Burke spoke to Andrews about Company B, and "[b]ecause Company B failed to provide tax work to [Ald. Burke's] law firm," the two agreed that Andrews would interfere with the operation of the restaurant based on the ground that the restaurant did not have a driveway permit. [30 (Indictment) at Count 1, ¶ 40]. Andrews contacted an employee of Company B and asked Company B to shut down its remodeling work on the restaurant. [*Id.* at ¶ 41]. During a phone call the following day, Andrews and Ald. Burke agreed "that [Andrews] would now play 'hard ball' with Company B." [*Id.* at ¶ 42]. On October 26, 2017, Andrews met with representatives of Company B at Ald. Burke's ward office, advising them that Burke's "office had not signed off on the plans granting approval for the remodeling project, including a driveway permit." [*Id.* at ¶ 43]. Company B applied for a driveway permit, but "Burke caused members of his staff, including [Andrews], to obstruct the approval of the application." [*Id.* at ¶ 42].

The Indictment further alleges that Individuals B-1 and B-2 soon changed their tune, after which Ald. Burke took his foot off the brake. Specifically, Ald. Burke met with Individuals B-1 and B-2 personally in December 2017 regarding resumption of the remodeling project. [30 (Indictment) at Count 1, ¶ 45]. During the December meeting, Ald. Burke asked why his firm had not received tax business from Company B. [*Id.*] Individual B-1 informed Ald. Burke that he had talked to a representative of Company B and instructed him to "get the process started to hire" Ald. Burke's firm. [*Id.*] Ald. Burke "said he would try and get the remodeling project started." [*Id.* at ¶ 46]. He also encouraged Individuals B-1 and B-2 "to get involved with other politicians in Chicago" and "to attend a political fundraiser for another local politician" being hosted at Ald. Burke's home. The next day, at his direction, Ald. Burke's assistant emailed a representative of

Company B to arrange tax work provided by Klafter & Burke, and Andrews informed the architect for Company B that the driveway permit issue had been "cleared up." [*Id.* at ¶¶ 47–48]. The application for the permit was approved on December 19, 2017. [*Id.* at ¶ 49].

### 3.  Pole-Sign Permit

According to the Indictment, that same period featured yet another deal between Ald. Burke and other real estate developers, including Charles Cui, the managing member of Company C, which owned real property in Chicago. [30 (Indictment) at Count 1, ¶¶ 1o–p]. Ald. Burke "used his position as an Alderman to corruptly obtain legal business from [Cui] for Burke's law firm, Klafter & Burke, namely, tax work, in return for [Ald. Burke's] official assistance with [Cui's] efforts to obtain a permit for a pole sign." [*Id.* at ¶ 50]. Specifically, in April 2017, Cui caused an application to be submitted to the Department of Buildings concerning a pole sign located at a property owned by Company C at 4901 West Irving Park Road in Chicago, Illinois (the "4901 Property"). [*Id.* at ¶ 1o, 51]. That application proposed to convert the pole sign to advertise Company D's business. [*Id.* at ¶ 51]. After the Department of Planning and Development denied that application, Cui struck a deal with Company D that would reduce Company D's rent (to the tune of $750,000) if Company C was unable to secure approvals concerning the pole sign. [*Id.* at ¶ 53].

The indictment alleges that Cui then sought Ald. Burke's assistance to obtain the permit in August 2017. [30 (Indictment) at Count 1, ¶ 54]. Cui emailed Ald. Burke about the sign, describing the permit denial and asking Ald. Burke to "look into the matter, and advise how to proceed." [*Id.*] The following day, he sent an email to the person who had represented him in property tax appeals for the 4901 Property, Individual C-2, requesting a favor. [*Id.* at ¶ 56]. Cui asked, "[c]an I have Edward Burke handle 4901 W. Irving Park property tax appeal for me, at least

for this year? I have TIF deal going with the City, and he is the Chairman of Finance Committee. He handled [*sic*] his tax appeal business card to me, and I need his favor for my tif money" as well as "for my zoning etc[.] for my project. He is a powerful broker in City Hall, and I need him now. I'll transfer the case back to you after this year." [*Id*. at ¶ 56].[3]

In the days following, Cui and his associates discussed with Ald. Burke the possibility of hiring Klafter & Burke. Cui emailed Ald. Burke advising that he "may need your [Ald. Burke's] representation for tax appeal," [30 (Indictment) at Count 1, ¶ 57]. Later that day, a colleague of Cui's named Individual C-1 spoke with Ald. Burke over the phone and advised him that Cui "wished to hire [Ald. Burke] to perform tax work," noting "I guess he has some need for you now," [*id.* at ¶¶ 1q, 58]. On August 30, 2017, an associate at Klafter & Burke and Cui emailed about initiating the firm's representation of a tax appeal for several properties. [*Id.* at ¶¶ 60–61].

That same day, Ald. Burke took steps on the permit, instructing his staff at City Hall to ask an official named Commissioner C "to take a look at that situation where this * * * guy called about [Company D] on the pole that ah * * * see if she'd, um, review it and see if there's any way that they can, ah, help us." [30 (Indictment) at Count 1, ¶ 62]. The day following, he spoke directly to Commissioner C, "ask[ing] Commissioner C to figure out a way to try to help [Cui] get the permit he wanted for the 4901 Property." [*Id.* at ¶ 63]. Cui subsequently signed a contingency fee arrangement with Klafter & Burke, and Ald. Burke followed up with another city official, Administrator C, about reviewing the permit denial. [*Id.* at ¶¶ 64–66]. The permit was ultimately denied in November 2017, but Klafter & Burke did perform real estate tax work for Cui. [*Id.* at ¶¶ 67–68].

---

[3] That same day, Cui also forwarded the email he had sent to Ald. Burke to a colleague named Individual C-1, indicating "I'll ask him to represent me for property tax appeal, which will be a big bite, comparing with this." [30 (Indictment) at Count 1, ¶ 55].

### 4.     Museum 1 Admission Fee Increase

Finally, veering in a slightly different direction, the Indictment also alleges that Ald. Burke threatened executives at a museum based in Chicago when they snubbed his inquiry seeking a job for the child of a personal acquaintance.  [30 (Indictment) at Count 1, ¶¶ 69–77].

According to the Indictment, Ald. Burke sought an internship for a family acquaintance, but when that did not pan out, he threatened to obstruct Museum 1's efforts to increase its fees. Specifically, around 2017, Museum 1[4] sought approval from the Chicago Park District to increase its basic admission fees.  [30 (Indictment) at Count 1, ¶ 70].  On September 8, 2017, several days prior to a Park District Board hearing scheduled on the fee increase matter, [*id.*], Ald. Burke spoke with a museum employee named Individual E-2, who had called to discuss the pending admission fee increase.  [*Id.* at ¶ 71].  The Indictment alleges that Ald. Burke "threatened to contact the President of the Park District Board and object to Museum 1's requested admission fee increase because Museum 1 had failed to respond to [his] prior effort to obtain an internship for Individual E-1 at Museum 1."  [*Id.*]

Several days later, an executive at the Museum named Individual E-3 contacted Ald. Burke to offer an opportunity for Individual E-1 to apply for a full-time job at Museum 1.  [30 (Indictment) at Count 1, ¶ 72].  Ald. Burke followed up, directing his staff to connect with Individual E-3 and another employee for more details about the position and how to apply.  [*Id.* at ¶ 74].  A Museum employee responded with details about the opportunity and to set up an informational interview the next day.  [*Id.* at ¶ 75].  Although on September 13, 2017, the Park District approved an increase to the admission fee, [*id.* at ¶ 76], Individual E-1 later advised an employee of the Museum that she was declining consideration for the position, [*id.* at ¶ 77].

---

[4] The identities of these individuals and entities are not included in the record.

### B. Procedural Posture

The events described above gave way to a criminal investigation and, ultimately, federal charges against three of the players, Ald. Edward M. Burke, Peter J. Andrews, and Charles Cui.

#### 1. Government Recordings and Wiretaps

With Ald. Solis's consent, the United States Government recorded conversations between Ald. Solis and Ald. Burke between August 2016 and May 2017. Around May 2017, the Government went straight to the source, applying for and receiving authorization to intercept Ald. Burke's own telephones. The Court will elaborate on the Government's application and authorization to perform the wiretap in detail later in this opinion, see Part VII below. For now, note that the Government applied to intercept Ald. Burke's telephone calls in May 2017, and Chief Judge Castillo initially authorized the Government's request on May 1, 2017. Pursuant to that authorization and subsequent renewals, the Government intercepted Ald. Burke's cellular telephone from approximately May 12, 2017, until February 11, 2018.

#### 2. Indictment

On April 11, 2019, a grand jury returned a four-count indictment against Charles Cui. Then, on May 30, 2019, the grand jury returned a superseding indictment ("Indictment") naming Ald. Burke, Andrews, and Cui as co-defendants. [30]. The Indictment charges Ald. Burke with racketeering, see 18 U.S.C. § 1962(c) (Count One), defining the alleged enterprise as the City of Chicago, and outlining the four incidents described above—the Post Office Project, Fast-Food Restaurant Remodeling, Pole-Sign Permit, and Museum 1 Admission Fee Increase—as the underlying racketeering acts.

The Indictment charges nineteen counts in total. In addition to the RICO count against Ald. Burke, all three Defendants are charged with using facilities in interstate commerce, in

violation of 18 U.S.C § 1952(a)(3) (the "Travel Act"). Both Ald. Burke and Andrews are charged with attempted extortion and extortion conspiracy, in violation of 18 U.S.C § 1951(a), based on the Fast-Food Restaurant Remodeling incident, and Ald. Burke is charged with attempted extortion based on the Museum 1 Admission Fee Increase incident. Ald. Burke is further charged with solicitation, in violation of 18 U.S.C § 666(a)(1)(B), based on the Post Office Project episode and the Pole-Sign Permit incident. Cui is charged with bribery, in violation of 18 U.S.C § 666(a)(2), based on the Pole-Sign Permit (and TIF funding) incident. Finally, Andrews and Cui are both charged with making false statements to the FBI, in violation of 18 U.S.C § 1001(a)(2).

Given the lengthy list of charges and permutations of statutes, incidents, and defendants, the Court borrows the Government's summary table of charges.

| Count | Defendant(s) | Violation(s) | Description |
|---|---|---|---|
| 1 | Burke | 18 USC § 1962(c) | Racketeering<br>Racketeering Act 1: Post Office<br>Racketeering Act 2: Post Office<br>Racketeering Act 3: Restaurant<br>Racketeering Act 4: Pole Sign<br>Racketeering Act 5: Museum |
| 2 | Burke | 18 USC § 666(a)(1)(B)<br>18 USC § 2 | Solicitation—Post Office Project |
| 3 | Burke | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—Post Office Project |
| 4 | Burke | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—Post Office Project |
| 5 | Burke<br>Andrews | 18 USC § 1951(a)<br>18 USC § 2 | Attempted Extortion—Restaurant |
| 6 | Burke<br>Andrews | 18 USC § 1951(a) | Extortion Conspiracy—Restaurant |
| 7 | Burke<br>Andrews | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—Restaurant |
| 8 | Burke<br>Andrews | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—Restaurant |
| 9 | Burke | 18 USC § 1952(a)(3)<br>18 USC § 2 | Travel Act—Restaurant |
| 10 | Andrews | 18 USC § 1001(a)(2) | False Statement—Restaurant |
| 11 | Burke | 18 USC § 666(a)(1)(B) | Corrupt Acceptance—Pole Sign |

| 12 | Cui | 18 USC § 666(a)(2) | Corrupt Offer—Pole Sign and TIF monies |
| 13 | Cui | 18 USC § 1952(a)(3) | Travel Act—Pole Sign |
| 14 | Cui | 18 USC § 1952(a)(3) | Travel Act—Pole Sign |
| 15 | Burke Cui | 18 USC § 1952(a)(3) | Travel Act—Pole Sign |
| 16 | Burke | 18 USC § 1952(a)(3) | Travel Act—Pole Sign |
| 17 | Cui | 18 USC § 1001(a)(2) | False Statement—Pole Sign |
| 18 | Burke | 18 USC § 1951(a)(1) | Attempted Extortion—Museum |
| 19 | Burke | 18 USC § 1952(a)(3) 18 USC § 2 | Travel Act—Museum |

[139 (Gov't Br.) at 36–37].

### 3.    Pre-Trial Motions

That brings the Court to the heart of this opinion. Ald. Burke, Andrews, and Cui have filed a litany of pre-trial motions. Ald. Burke first challenges the interceptions of his phone(s). He has moved [95, 97 (redacted), 100 (sealed)] to suppress evidence from the May 2017 wiretaps forward as the improper fruits and derivatives of the electronic surveillance conducted pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and seeks a *Franks* hearing in connection with the motion. And, in the event that the Court denies his first motion, Ald. Burke moves to suppress [102 (redacted), 103 (sealed)] evidence from the June 2017 wiretaps forward as the improper fruits and derivatives of the electronic surveillance, also conducted pursuant to Title III.

Second, Ald. Burke moves to dismiss Counts Two and Eleven [104, 105], challenging the legal sufficiency of the Indictment and the constitutionality of 18 U.S.C. § 666(a)(1)(B). Third, Ald. Burke seeks [106, 107] dismissal of the Illinois state-law predicates that underpin the RICO and Travel Act charges, challenging their constitutionality under the First Amendment's Free Speech and the Fifth Amendment's Due Process clauses, respectively, on their face and in certain instances as applied to Ald. Burke. Ald. Burke's fourth request is to strike references to Amtrak

17

in Count One and dismiss Counts Three and Four [108], and his fifth [110] asks to strike as surplusage certain references in the Indictment. Andrews moves to adopt certain of these motions. [122].

Shifting to Ald. Burke's co-Defendants, Andrews requests that this Court dismiss Counts Seven and Eight [98, 99]. Both Andrews and Ald. Burke have requested bills of particulars [101, 109]. Andrews also seeks the production of favorable evidence related to his FBI interview [117]. Cui moves to dismiss Counts Twelve through Fifteen of the Indictment [88, 89]. Finally, all three Defendants request severance. See [86, 87, 96, 111, 112, 114, 115].

The Government opposes Defendants' motions in full [139 (sealed), 140 (redacted)].

## ANALYSIS

The pretrial motions referenced above are now before this Court. Considering the length and volume of motions, the Court will largely follow the course charted by the Government in its consolidated response [139]. In the omnibus opinion that follows, the Court will first address (in Part II below) Ald. Burke's motion to dismiss Counts Two and Eleven [104, 105]; then (Part III) Ald. Burke's motion to dismiss and/or strike the Amtrak-Based Counts (Counts One, Three, and Four) [108]; (Part IV) Andrews's motion to dismiss Counts Seven and Eight based on an inability to establish interstate commerce [98] and failure to identify a subsequent overt act [99]; (Part V) Cui's motion to dismiss Counts Twelve, Thirteen, Fourteen, and Fifteen [88, 89]; (Part VI) Ald. Burke's motion to dismiss and strike the state bribery charges [106, 107]; (Part VII) Ald. Burke's motion to suppress the Title III intercepts and request for a *Franks* hearing [95, 97, 100, 102, 103]; and (Part VIII) Ald. Burke's and Andrews's motions for bills of particulars [101, 109]. Finally, the Court will then turn (Part IX) to all Defendants' motions for severance [86, 87, 96, 111, 112,

114]; (Part X) Ald. Burke's motion to strike surplusage [110]; and (Part XI) Andrews's motion for disclosure of evidence [117].

However, as a preliminary matter, the Court notes that Ald. Burke's motions draw extensively on the United States Supreme Court's decision in *McDonnell v. United States*, 579 U.S. 550 (2016). Thus, it is helpful to summarize that case before diving into the specifics of Ald. Burke's and his co-Defendants' motions. In *McDonnell*, the former governor of Virginia was indicted for honest services fraud and Hobbs Act extortion based on allegations that he and his wife had accepted $175,000 in loans, gifts, and other benefits from a Virginia businessman. *Id.* at 555. The businessman hoped that Virginia's public universities would perform research studies on a nutritional supplement his company had developed, as those studies were a key step to securing FDA approval. *Id.* The businessman wanted Governor McDonnell's assistance to obtain those studies, which he provided by (among other things) arranging meetings and hosting events between the businessman and other officials. *Id.* at 556–61.

During trial, the court defined the Hobbs Act and honest services charges by reference to a third federal law, the federal bribery statute, 18 U.S.C. § 201. *McDonnell*, 579 U.S. at 562–63. Section 201 prohibits, in relevant part, "a public official" from "directly or indirectly, corruptly" demanding, seeking, receiving, accepting, or agreeing "to receive or accept anything of value" in return for being "influenced in the performance of any official act." 18 U.S.C. § 201(b)(2). The upshot was that "the Government was required to show that Governor McDonnell committed (or agreed to commit) an 'official act' in exchange for the loans and gifts." *Id.* at 550. The court instructed the jury that "to convict Governor McDonnell it must find that he agreed 'to accept a thing of value in exchange for official action.'" *Id.* at 564. The court further instructed that "'official act' encompasses 'acts that a public official customarily performs,' including acts 'in

furtherance of longer-term goals' or 'in a series of steps to exercise influence or achieve an end.'" *Id.* However, the court declined Governor McDonnell's request to instruct the jury that an "'official act' must intend to or 'in fact influence a specific official decision the government actually makes—such as awarding a contract, hiring a government employee, issuing a license, passing a law, or implementing a regulation.'" *Id.* at 565.

Following his conviction for honest services fraud and Hobbs Act extortion, Governor McDonnell sought to vacate the criminal judgment against him, arguing that the definition of "official act" in the jury instructions was erroneous. *McDonnell*, 579 U.S. at 565. At issue was the proper definition of "official act," and "whether arranging a meeting, contacting another official, or hosting an event—without more—can be a 'question, matter, cause, suit, proceeding or controversy,' and if not, whether it can be a decision or action on a 'question, matter, cause, suit, proceeding or controversy.'" *Id.*

In a unanimous decision, the Supreme Court "adopt[ed] a more bounded interpretation of "official act," agreeing with the former governor that simply "[s]etting up a meeting, hosting an event, or calling an official (or agreeing to do so) merely to talk about a research study or to gather additional information * * * does not qualify as a decision or action on the pending question whether to initiate the study." *McDonnell*, 579 U.S. at 573. According to the Court, the government's expansive definition did not comport with the plain language of the statute. In support of its ruling, the Court explained that to treat setting up a meeting, calling another public official, or hosting an event, standing alone, as an official act ran the risk of chilling government officials from workaday interactions with their constituents, as "[o]fficials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse." *Id.* at 575.

Furthermore, the definition did not give officials specific enough guidance such that "ordinary people can understand what conduct is prohibited," or "in a manner that does not encourage arbitrary and discriminatory enforcement." *Id.* at 576. That said, the Court specifically rejected the former governor's invitation to strike down the honest services statute and Hobbs Act as unconstitutionally overbroad and vague. *Id.* at 580.

In sum, the Court defined the term "official act" as follows:

> an "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official. Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of "official act."

*McDonnell*, 579 U.S. at 574.

Ultimately, the Court did vacate the former governor's convictions. Because "the jury was not correctly instructed on the meaning of 'official act,'" there was a risk that the jury "may have convicted Governor McDonnell for conduct that is not unlawful." *McDonnell*, 579 U.S. at 579. The Court raised three specific concerns.

> The problem with the District Court's instructions is that they provided no assurance that the jury reached its verdict after finding those questions or matters. The testimony at trial described how Governor McDonnell set up meetings, contacted other officials, and hosted events. It is possible the jury thought that a typical meeting, call, or event was itself a "question, matter, cause, suit, proceeding or controversy." If so, the jury could have convicted Governor McDonnell without finding that he committed or agreed to commit an "official act," as properly defined. To prevent this problem, the District Court should have instructed the jury that it must identify a "question, matter, cause, suit, proceeding or controversy" involving the formal exercise of governmental power.

Second, the instructions did not inform the jury that the "question, matter, cause, suit, proceeding or controversy" must be more specific and focused than a broad policy objective. The Government told the jury in its closing argument that "[w]hatever it was" Governor McDonnell had done, "it's all official action." App. to Pet. for Cert. 263a–264a. Based on that remark, and the repeated references to "Bob's for Jobs" at trial, the jury could have thought that the relevant "question, matter, cause, suit, proceeding or controversy" was something as nebulous as "Virginia business and economic development," as the District Court itself concluded. Supp. App. 87–88 ("The alleged official actions in this case were within the range of actions on questions, matters, or causes pending before McDonnell as Governor as multiple witnesses testified that Virginia business and economic development was a top priority in McDonnell's administration"). To avoid that misconception, the District Court should have instructed the jury that the pertinent "question, matter, cause, suit, proceeding or controversy" must be something specific and focused that is "pending" or "may by law be brought before any public official," such as the question whether to initiate the research studies.

Third, the District Court did not instruct the jury that to convict Governor McDonnell, it had to find that he made a decision or took an action—or agreed to do so—on the identified "question, matter, cause, suit, proceeding or controversy," as we have construed that requirement. At trial, several of Governor McDonnell's subordinates testified that he asked them to attend a meeting, not that he expected them to do anything other than that. See, *e.g.*, App. 3075, 3739–3740, 4220. If that testimony reflects what Governor McDonnell agreed to do at the time he accepted the loans and gifts from Williams, then he did not agree to make a decision or take an action on any of the three questions or matters described by the Fourth Circuit.

The jury may have disbelieved that testimony or found other evidence that Governor McDonnell agreed to exert pressure on those officials to initiate the research studies or add Anatabloc to the state health plan, but it is also possible that the jury convicted Governor McDonnell without finding that he agreed to make a decision or take an action on a properly defined "question, matter, cause, suit, proceeding or controversy." To forestall that possibility, the District Court should have instructed the jury that merely arranging a meeting or hosting an event to discuss a matter does not count as a decision or action on that matter.

*Id.* at 578–79.

In sum, although the Court agreed with the Fourth Circuit that there was some evidence from which a jury *could* have found that the former governor committed an official act, the government also presented evidence that fell well outside the scope of prohibited conduct as newly circumscribed by the Supreme Court. Without proper instructions, the trial court created a risk that Governor McDonnell was convicted for conduct that did not qualify as an official act.

*McDonnell* thus provides critical guidance for—among other things—assessing probable cause and shaping proper jury instructions.

With these important principles in mind, the Court thus turns to the substance of Defendants' motions.

## II.     Motion to Dismiss Counts Two and Eleven [104, 105]

To begin, Ald. Burke asks the Court to dismiss Counts Two and Eleven of the Superseding Indictment ("Indictment") [104, 105].

### A.     Factual and Procedural Background

Counts Two and Eleven of the Indictment [30] charge Ald. Burke with solicitation, in violation of the federal program bribery statute, 18 U.S.C. § 666(a)(1)(B).  Count Two alleges that from 2017 through January 2018, Ald. Burke corruptly solicited and demanded things of value— namely, fees arising from the retention of Klafter & Burke—intending to be influenced and rewarded in connection with a business involving a thing of value of $5,000 or more, namely, approvals from the City of Chicago Water Department, a Class L designation, and tax increment financing in connection with the Post Office project.  [30 (Indictment) at Count 2, ¶ 2].  Count Two also incorporates by reference Paragraphs 1(a)-(l) of Count One.  [*Id.* at ¶ 1].

In a similar vein, Count Eleven alleges that from August 2017 continuing until in or around 2018, Ald. Burke corruptly accepted and agreed to accept fees arising from the retention of his law firm, intending to be influenced and rewarded in connection with a business of the City of Chicago involving $5,000 or more—this time, a permit concerning the 4901 Property.  [30 (Indictment) at Count 11, ¶ 2].  Count Eleven similarly incorporates allegations from Count One, Paragraphs 1(a)- 1(h), 1(o)-1(s) and 51-68, which describes, among other things, the main players involved in the Pole-Sign Permit incident.

As noted, Ald. Burke seeks dismissal of both charges. In his brief, he questions the legal sufficiency of Counts Two and Eleven and the constitutionality of the federal program bribery statute, 18 U.S.C. § 666(a)(1)(B). See [105 (Ald. Edward M. Burke's Memo. of Law in Support of His Mot. to Dismiss Counts Two & Eleven of the Superseding Indictment ("Burke MTD Counts 2 & 11 Br."))].

### B.    Legal Standard

Ald. Burke seeks relief under Federal Rule of Criminal Procedure 12(b)(3)(B)(v). Rule 12(b)(3)(B)(v) authorizes a defendant to challenge the sufficiency of an indictment for "failure to state an offense." This rule recognizes a defendant's right not to be "held to answer for a capital, or otherwise infamous crime, unless on a[n] [] indictment of a Grand Jury," U.S. CONST. amend. V, and "to be informed of the nature and cause of the accusation." U.S. CONST. amend. VI.

Federal Rule of Criminal Procedure 7(c)(1) provides that an "indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." The Seventh Circuit has "held that an indictment is legally sufficient if (1) it states all the elements of the crime charged, (2) adequately informs the defendant of the nature of the charges against him, and (3) allows the defendant to assert the judgment as a bar to future prosecutions of the same offense." *United States v. Vaughn*, 722 F.3d 918, 925 (7th Cir. 2013) (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974)). "To successfully challenge the sufficiency of an indictment, a defendant must demonstrate that the indictment did not satisfy one or more of the required elements and that he suffered prejudice from the alleged deficiency." *Id.*

To assess whether an indictment is sufficient, a court asks, "whether [the indictment] conforms to minimal constitutional standards." *Vaughn*, 722 F.3d at 925 (quoting *United States v. Hausmann*, 345 F.3d 952, 955 (7th Cir. 2003)). "[A]n indictment 'that "tracks" the words of a

statute to state the elements of the crime is generally acceptable, and while there must be enough factual particulars so the defendant is aware of the specific conduct at issue, the presence or absence of any particular fact is not dispositive.'" *Id.* (quoting *United States v. White*, 610 F.3d 956, 959 (7th Cir. 2010)); *United States v. Bates*, 96 F.3d 964, 970 (7th Cir. 1996), *aff'd*, 522 U.S. 23 (1997) (similar). "The indictment must be 'read to include facts which are necessarily implied.'" *United States v. Palumbo Bros.*, 145 F.3d 850, 860 (7th Cir. 1998) (quoting *United States v. Blinder*, 10 F.3d 1468, 1471 (9th Cir. 1993)). "In determining whether an essential element of the crime has been omitted from the indictment, courts will not insist that any particular word or phrase be used." *United States v. Smith*, 223 F.3d 554, 572 (7th Cir. 2000) (quoting *United States v. Garcia-Geronimo*, 663 F.2d 738, 742 (7th Cir. 1981)). Rather, "each element must be present in context." *Id.* at 571.

In analyzing a motion to dismiss, the Court does not review the contents in a "hypertechnical manner" but rather "on a practical basis and in their entirety." *United States v. Cox*, 536 F.3d 723, 726 (7th Cir. 2000) (quoting *United States v. Harvey*, 484 F.3d 453, 456 (7th Cir. 2007)). The allegations in an indictment must be taken as true and viewed in the light most favorable to the Government. *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999). Critically, a motion to dismiss an indictment is not a summary judgment motion and should not be used to "test[ ] the strength or weakness of the government's case, or the sufficiency of the government's evidence." *United States v. Moore*, 563 F.3d 585, 586 (7th Cir. 2009) (citation omitted).

### C.    Analysis

In his memorandum of law [105], Ald. Burke identifies two, independent reasons to dismiss Counts Two and Eleven of the Indictment. Neither is persuasive. To begin, both counts

include all the essential elements of an 18 U.S.C. § 666(a)(1)(B) violation. In addition, § 666, both

on its face and as applied to Counts Two and Eleven, does not deprive Ald. Burke of due process

under the Fifth Amendment.

### 1. Sufficiency of the Indictment

Ald. Burke first attacks Counts Two and Eleven of the Indictment as violating his Fifth

Amendment right to indictment by grand jury and Sixth Amendment right to be informed of the

nature of the criminal accusation. Both counts allege violations of 18 U.S.C. §666(a)(1)(B), the

federal program bribery statute.[5] Under § 666(a)(1)(B), whoever "corruptly solicits or demands

for the benefit of any person, or accepts or agrees to accept, anything of value from a person,

intending to be influenced or rewarded" in connection with the business of an entity "involving

anything of value of $5,000 or more" is liable. Ald. Burke claims that neither Count Two nor

Eleven of the Indictment alleges an intent to enter a *quid pro quo*, which he views as an essential

element of 18 U.S.C. § 666(a)(1)(B). The Government disagrees, directing us to an unbroken

string of Seventh Circuit cases holding that a *quid pro quo* is not an essential element of 18 U.S.C.

§ 666. See [139 (Gov't's Consolidated Resp. to Defs.' Pretrial Mots. ("Gov't Br.") at 37].

---

[5] According to the Seventh Circuit's pattern jury instructions, the following elements must be proven to establish an offense under 18 U.S.C. § 666(a)(1)(B):

(1) That the defendant was an agent of the City of Chicago;
(2) That the defendant solicited, demanded, accepted, or agreed to accept something of value from another person;
(3) That the defendant did so corruptly with the intent to be influenced or rewarded in connection with some business, transaction, or series of transactions of the City of Chicago, with corruptly defined as acting with the understanding that something of value is to be offered or given to reward or influence him in connection with his official duties;
(4) That this business, transaction, or series of transactions involved a thing having a value of $5,000 or more; and
(5) That the City of Chicago received benefits of more than $10,000 under a federal program during a one-year period.

See 7th Cir. Crim. Pattern Jury Instr. at 724 (2020 ed.).

Ald. Burke has an uphill battle here to persuade this Court that dismissal of the counts is proper. Ald. Burke would first have to convince this Court that a *quid pro quo* is an essential element of a § 666 violation, and second that neither Counts Two nor Eleven allege a *quid pro quo*. Both arguments fall well short of the mark. With respect to the former, decades of Seventh Circuit jurisprudence hold that § 666 does not require a *quid pro quo*. As for the latter, even if the Seventh Circuit revisited its standard, both counts do allege a *quid pro quo*.

The Seventh Circuit has held repeatedly that a *quid pro quo* agreement is not an essential element of a § 666 violation. In *United States v. Agostino*, 132 F.3d 1183 (7th Cir. 1997), the court of appeals announced that "[s]ection 666(a)(2), by its statutory language, requires that the defendant act '*corruptly * * * with intent to influence or reward*.' This intent, and not any specific *quid pro quo* is what must be alleged in the indictment." *Id.* at 1190 (footnote omitted). The court of appeals has come to the same conclusion at every opportunity since, observing for example in *United States v. Gee*, 432 F.3d 713 (7th Cir. 2005), that,

> [a] *quid pro quo* of money for a specific legislative act is *sufficient* to violate the statute, but it is not *necessary*. It is enough if someone "corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more."

*Id.* at 714–15 (quoting 18 U.S.C. § 666(a)(1)(B)). This Court faced the same issue in *United States v. Boender*, 719 F. Supp. 2d 951 (N.D. Ill. 2010). There, the real estate developer who was convicted of bribery and the Chicago Alderman, Ald. Isaac Carothers, insisted that § 666 required a *quid pro quo*. *Id.* at 961. Relying on circuit precedent, this Court rejected the argument. See *id.* The Seventh Circuit affirmed. See 649 F.3d 650, 655 (7th Cir. 2011) ("[W]e conclude that the government was not required to establish a specific *quid pro quo* of money in exchange for a legislative act"). Later decisions have hewed to the same line. See *United States v. Hawkins*,

27

777 F.3d 880, 881 (7th Cir. 2015) ("This part of § 666 forbids taking gratuities as well as taking bribes"); *United States v. Mullins*, 800 F.3d 866, 871 (7th Cir. 2015) ("In any case, evidence of quid pro quo is not necessary to establish a violation of § 666(a)(1)(B)"); *United States v. Johnson* (*Johnson II*), 874 F.3d 990, 1001–02 (7th Cir. 2017) ("This court has ruled that the word 'reward' in § 666 criminalizes the receipt of bribes *and* gratuities").

In sum, as in *Boender*, "[t]he biggest obstacle to [Ald. Burke's] argument is that [the Seventh Circuit] long ago held that a specific *quid pro quo* is not an element of § 666(a)(2)" nor "§ 666(a)(1)(B), the parallel provision criminalizing the solicitation and acceptance of bribes and rewards. From these cases, it is clear that our circuit, like most others, does not require a specific *quid pro quo* and that * * * such a requirement would be incorrect as a matter of law." 649 F.3d at 654 (citations omitted) (first citing *Agostino*, 132 F.3d at 1190, and then citing *Gee*, 432 F.3d at 714).

In his effort to convince the Court that a *quid pro quo* is an essential element of a § 666 violation, Ald. Burke attempts to limit the scope of the decisions cited above. According to Ald. Burke, those decisions apply only to § 666's "intent to reward" prong, *i.e.*, *gratuities*, but not to its "intent to influence" prong, *i.e.*, *bribes*. See [105 (Burke MTD Counts 2 & 11 Br.) at 17–24]. To put it differently, he insists that the Seventh Circuit has not foreclosed the possibility that a § 666 *bribe* requires a *quid pro quo* as an essential element.[6]

---

[6] The First Circuit offers a helpful overview of the distinction between intent to influence and intent to reward prongs:

> The distinguishing feature of each crime is its intent element. Bribery requires intent "to influence" an official act or "to be influenced" in an official act, while illegal gratuity requires only that the gratuity be given or accepted "for or because of" an official act. In other words, for bribery there must be *a quid pro quo*—a specific intent to give or receive something of value in exchange for an official act. An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), *or for a past act that he has already taken*.

Ald. Burke's attempt to limit the reach of the Seventh Circuit cases enumerated above is unavailing because the appellate court has never qualified its holding that a *quid pro quo* is not an essential element of a § 666 violation. To the contrary, the Seventh Circuit has held, repeatedly, that § 666 covers two types of conduct: (1) bribes, otherwise known as an "intent to influence," and (2) gratuities, otherwise known as an "intent to reward." The appellate court did not circumscribe any of its decisions in the manner suggested by Ald. Burke.

Most recently, Judge Lee considered and rejected the argument that the Seventh Circuit's cases only apply to the gratuities prong of § 666. For a bribe that does not involve a campaign contribution (which raises unique concerns), Judge Lee rejected the argument that a *quid pro quo* is an essential element of a § 666 bribery conviction. Addressing *Agostino* and its progeny, Judge Lee explained that the Seventh Circuit "neither drew nor suggested a distinction between the intent-to-influence and intent-to-reward prongs. In fact, to the extent the court emphasized either prong, it was the intent-to-influence one." See *United States v. Donagher*, 520 F. Supp. 3d 1034, 1046–47 (N.D. Ill. 2021). Like Judge Lee, this Court "is constrained to read the appellate court's controlling cases to hold that neither the intent-to-influence nor the intent-to-reward prong of § 666 requires a *quid pro quo* in the non-campaign-contribution context." See *id.* at 1049.

Ald. Burke's reading of the Seventh Circuit case law does not survive close scrutiny. [105 (Burke MTD Counts 2 & 11 Br.) at 17–24]. For example, *Medley* does not undermine the Court's position because the issue of whether a *quid pro quo* is an essential element was neither addressed nor reached by the Seventh Circuit in that case. See *United States v. Medley*, 913 F.2d 1248, 1252–56 (7th Cir. 1990). Granted, the court of appeals stated that "[t]he essential element of a section

---

*United States v. Fernandez*, 722 F.3d 1, 19 (1st Cir. 2013), *aff'd sub nom. Bravo-Fernandez v. United States*, 137 S. Ct. 352 (2016). The Eighth Circuit similarly has noted, "[t]he core difference between a bribe and a gratuity is not the time the illegal payment is made, but the *quid pro quo*, or the agreement to exchange [a thing of value] for official action." *United States v. Griffin*, 154 F.3d 762, 764 (8th Cir. 1998).

666 violation is a 'quid pro quo'; that is, whether the payment was accepted to influence and reward an official for an improper act." *Id.* at 1260. But the court was explaining the "*sine qua non*" of a § 666 violation, not importing an essential element. In fact, *Agostino*, on which Ald. Burke also relies, rejected the very argument Ald. Burke makes here.[7] While Ald. Burke sees ambiguity in the statute, the interpretation of the statute (including the import of the legislative history and the circuit split[8]) has been resolved in this circuit for decades, and whether to revisit that interpretation to omit gratuities is a matter for the Seventh Circuit and the Supreme Court of the United States in our hierarchical system.

But even if the Seventh Circuit were to revisit its approach, a change in the law likely would not help Ald. Burke in this case for two additional reasons. First, the Government could proceed under the intent to reward theory, which even Ald. Burke concedes does *not* require a *quid pro quo* under the law of this circuit. Instead, the intent-to-reward prong requires the Government to "prove a link between a thing of value conferred upon a public official and a specific 'official

---

[7] See *Agostino*, 132 F.3d at 1190 ("The question of whether an indictment must contain specific allegations of a *quid pro quo* was not before the *Medley* court and it did not rule on this issue. * * * * It is clear from the context that the *Medley* court was not positing an additional element to the statutory definition of the crime, but instead was explaining the *sine qua non* of a violation of § 666. The elements of the offense remain those that are set forth in the statutory language").

[8] See, *e.g.*, *Fernandez*, 722 F.3d at 26 ("We therefore hold that gratuities are not criminalized under § 666"). But see *Hawkins*, 777 F.3d at 881 ("Defendants have not asked us to overrule *Anderson* and *Agostino* in favor of the position taken in *Fernandez*"). The circuits are far from unanimous. See *Bravo-Fernandez*, 137 S. Ct. at 361 n.4 (noting the First Circuit is in the minority of a circuit split); *United States v. Abbey*, 560 F.3d 513, 520 (6th Cir. 2009) ("By its terms, the statute does not require the government to prove that [the defendant] contemplated a specific act when he received the bribe; the text says nothing of a *quid pro quo* requirement to sustain a conviction, express or otherwise"); *United States v. McNair*, 605 F.3d 1152, 1188 (11th Cir. 2010) ("[W]e now expressly hold there is no requirement in § 666(a)(1)(B) or (a)(2) that the government allege or prove an intent that a specific payment was solicited, received, or given in exchange for a specific official act, termed a *quid pro quo*"). Compare *United States v. Zimmerman*, 509 F.3d 920, 927 (8th Cir. 2007) ("Section 666(a)(1)(B) prohibits both the acceptance of bribes and the acceptance of gratuities intended to be a bonus for taking official action. * * * *. The government therefore was not required to prove any quid pro quo"), with *United States v. Suhl*, 885 F.3d 1106 n.5 (8th Cir. 2018) (assuming without deciding that § 666 requires *a quid pro quo* exchange).

act' for or because of which it was given." See *United States v. Sun-Diamond Growers of Ca.*, 526 U.S. 398, 414 (1999).

Second, even assuming the Seventh Circuit were willing to revisit § 666 in light of the gratuities-bribery distinction, Counts Two and Eleven each likely include "ample allegations from which a *quid pro quo* may be inferred." [139 (Gov't Br.) at 45]. Ald. Burke specifically argues that Count Two "allege[s] no particular facts as to Ald. Burke's mindset, much less facts suggesting that Ald. Burke had the requisite intent to engage in a *quid pro quo*" and was "bereft of any allegations showing how or from whom Ald. Burke solicited or demanded law firm business." [105 (Burke MTD Counts 2 & 11 Br.) at 30, 33]. The Court disagrees. Count Two specifies Ald. Burke's intent: "corruptly solicited and demanded things of value, namely, fees arising from the retention of his law firm, Klafter & Burke, intending to be influenced and rewarded." [30 (Indictment) at Count 2, ¶ 2]. "The test for validity is not whether the indictment could have been framed in a more satisfactory manner," see *Vaughn*, 722 F.3d at 925, and the Government need not reveal any further detail at this juncture because "[t]he defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved." See *Agostino*, 132 F.3d at 1191. That proposition is particularly true when it comes to information about how the Government will prove the defendant's intent, for that "information * * * is peculiarly within the defendant's own knowledge." See *Id.* (in upholding conviction, the court rejected the defendant's argument that the indictment did not include specific facts about the government's theory of intent).

Count Two also puts Ald. Burke on notice of the *quid*, the players, and the *quo.* As for the *quid*, Count Two specifies that Ald. Burke sought legal fees that would flow from retaining clients for Klafter & Burke. See [30 (Indictment) at Count 2, ¶ 2]. As for the players, the relevant

individuals are identified, if not their precise roles. Count Two incorporates by reference allegations referring to Company A, a New-York based real estate company involved in renovation and redevelopment of the Old Chicago Post Office, Individual A-1, who was associated with Company A and oversaw the Post Office property, and Individual A-2, an employee of Company A. [30 at Count 2, ¶ 1; at Count 1, ¶ 1(i)]. That leaves the *quo*, *i.e.*, the business or transactions with which Burke intended to be influenced or rewarded, including "approvals from the City of Chicago Water Department," "a Class L designation," and "tax increment financing in connection with the Post Office project," [*id.* at Count 2, ¶ 1].[9]

Finally, the allegations in Count One necessarily imply the exchange because there are allegations that Ald. Burke made his official acts contingent on receiving Company A's and Individual A-1's tax work. Specifically, the Indictment alleges that Ald. Burke "advised Alderman [Solis] that [Ald. Burke] would not take any action benefitting Individual A-1 and Company A in connection with the Post Office project unless Individual A-1 retained [Ald. Burke's] firm, Klafter & Burke, and told Alderman [Solis] that 'the cash register has not rung yet.'" [30 (Indictment) at

---

[9] The relevant transactions, identified by incorporation, describe the mechanics of TIF financing and the Class L designation, as well as the role of the Committee on Finance (which Ald. Burke chaired) in recommending whether to approve Class L status and tax increment financing, see [30 (Indictment) at Count 1, ¶¶ 1(c), (g)].

Specifically, the Committee on Finance's responsibilities include making recommendations to the full City Council on certain real estate and property matters, such as whether to approve tax increment financing ("TIF") and "Class L" designations. [30 (Indictment) at Count 1, ¶ 1(c)]. Individuals or entities seeking to obtain TIF funds or Class L designation had to submit an application, which would be referred to the Committee on Finance for review. [*Id.*] As Chairman, Ald. Burke had "authority over which matters would be considered by that Committee." [*Id.* at ¶ 1(g)]. And, if approved by the Committee on Finance, the application would be submitted to the full City Council for a vote." [*Id.* at ¶ 1(c)]. Significant financial benefit can flow to an owner whose property is approved for either TIF funding or Class L designation. For example, the owners of a property designated Class L could have their property tax assessment levels reduced for a period of years. [*Id.* at ¶ 1(c)].

Those paragraphs also describe the main players with respect to the Water Department. [30 (Indictment) at Count 1, ¶ 1l].

¶ 12]. According to the Indictment, that sentiment played out in practice: when informed by Ald. Solis that Company A still had issues to be resolved with the Water Department and Amtrak, Ald. Burke stated he "had not heard about 'getting hired to do the tax work,' so [he] was not 'motivated' to provide any assistance concerning the Post Office project." [*Id.* at ¶ 16]. Ald. Solis communicated a similar message to Company A and Individual A-1, relaying to Ald. Burke that he had advised Individual A-1 that "[Ald. Burke] and Alderman [Solis] were not motivated to provide assistance to the Post Office Project, and that Individual A-1 needed to 'help Ed out.'" [*Id.* at ¶ 17]. Then, when Individual A-1 supposedly agreed to his side of the bargain, the Indictment further alleges that Ald. Burke assented to execute the *quo*. Namely, when Ald. Solis advised Ald. Burke that "Individual A-1 had agreed to provide tax work in the future to Klafter & Burke," Ald. Burke "agreed to provide assistance to the Post Office project" in the form of "follow[ing] up with the Water Department" and "follow[ing] up with his contacts at Amtrak," and did then speak to an Amtrak employee about the outstanding problems. [*Id.* at ¶ 20].

A similar pattern played out with the TIF funding: by the time Company A informed Ald. Burke that it had applied for TIF funding, Company A still had not retained Klafter & Burke. [30 (Indictment) at ¶ 25]. Ald. Burke told Ald. Solis privately that he "was not 'fond of the way they've conducted themselves up until this point, and as far as [he is] concerned, they can go fuck themselves.'" [*Id.*] Ald. Burke further remarked, "good luck getting it on the agenda" of the Committee on Finance. [*Id.*] Then, months later, when Ald. Burke received word that Company A's real estate management company did indeed want to discuss hiring Klafter & Burke, Ald. Burke responded that he would "[a]bsolutely" support TIF funding, called Ald. Solis to move for the TIF proposal before the Committee on Finance, and voted in favor of the TIF funding. [*Id.* at ¶¶ 29–32].

In sum, the allegations that Ald. Burke withheld assistance from Company A on Water Department, Amtrak, and TIF matters until he received word that the cash register had "rung," read as a whole, necessarily imply a *quid pro quo*. Ald. Burke could not have made his assistance on each matter contingent on Company A/Individual A-1 hiring Klafter & Burke without necessarily intending to enter an exchange. Compare *United States v. Barrios-Ramos*, 732 Fed. App'x 457, 459 (7th Cir. 2018) (indictment necessarily implied defendant acted knowingly because one cannot "conspire" without intending to do so); *Smith*, 223 F.3d at 572 (in upholding indictment on plain error review, the court reasoned that the allegations that defendant induced minor to violate law necessarily implied requisite intent); *United States v. Dixon*, 596 F.2d 178, 180–81 (7th Cir. 1979) (despite omission of the scienter, "it would be unlikely that a person would unknowingly carry a weapon around a penal institution, and thus the acts charged implicitly included" the essential element). Although the Indictment did not reference the detailed allegations of each episode with the same specificity as Count One, that oversight does not doom Count Two. To dismiss on such a technicality would run afoul of the Seventh Circuit's directive to avoid reading an indictment in such a "hypertechnical manner." See *Cox*, 536 F.3d at 726; *Bates*, 96 F.3d at 970 ("Indictments need not exhaustively describe the facts surrounding a crime's commission nor provide lengthy explanations of the elements of the offense").[10]

---

[10] As the Government points out, see [139 (Gov't Br.) at 42 n.9], it is unclear how Ald. Burke defines a *quid pro quo*. It is therefore unclear what he thinks the Indictment should have, but did not, include that would have satisfied any such *quid pro quo* requirement. A few examples of his shifting between definitions:

- "the Government was required to allege the essential *quid pro quo* element of § 666(a)(1)(B): that Ald. Burke solicited or demanded law firm fees intending for those things of value to be in exchange for his performance of an official act," [105 (Burke MTD Counts 2 & 11 Br.) at 30];

- "By and of itself, Count Two is bereft of any allegations showing how or from whom Ald. Burke solicited or demanded law firm business, and also fails to allege

Ald. Burke's arguments with respect to Count Eleven fail for a similar reason. Ald. Burke contends that the Government failed to "allege[] that Ald. Burke intended to carry out the *quo* of a *quid pro quo*" and omitted "particular facts as to Ald. Burke's mental state in accepting Mr. Cui's business." [105 (Burke MTD Counts 2 & 11 Br.) at 34]. In his reply brief, Ald. Burke argues that "the Bribery Counts should be dismissed for failing to allege that Ald. Burke * * * accepted business (Count Eleven- Mr. Cui) in exchange for performing official acts." [159 (Ald. Edward

---

any facts suggesting that Ald. Burke had the requisite 'corrupt intent' to engage in a *quid pro quo*," [*id.* at 33];

- "Count Two fails to allege that Ald. Burke engaged in a *quid pro quo*, and indeed alleges no specific facts that illuminate the nature of Ald. Burke's purportedly corrupt conduct" [159 (Burke MTD Counts 2 & 11 Reply Br.) at 9];

- "In sum, the Seventh Circuit in *Johnson* appears to have interpreted § 666's intent to be rewarded or influenced provision as requiring the Government to prove that the defendant 'accepted bribes,' or payments in exchange for official acts" [*id.* at 13];

- "the Bribery Counts should be dismissed for failing to allege that Ald. Burke solicited or demanded business (Count Two-Post Office) or accepted business (Count Eleven—Mr. Cui) in exchange for performing official acts" [*id.* at 16].

At the hearing on these motions, the Court invited Defendants to specify what, if anything, was missing from the Indictment. [179 (Order) at ¶ 2]. Defendants did not identify any specific missing allegations. [182 (Feb. 22 Hr'g Tr.) at 19:9–23:15] (discussing this Court's questions with respect to the sufficiency of the indictment).

To be clear, the Court appreciates Defendants raising the *quid pro quo* issue at this time. As the discussion above demonstrates, since its last pronouncement in 2017—which post-dates *McDonnell*—the Seventh Circuit has not strayed from its holding that a *quid pro quo* is not an essential element under 18 U.S.C. § 666. Since that time, Judge Lee and Judge Chang have looked carefully at the issue. As noted above, in *Donagher*, Judge Lee considered whether a *quid pro quo* is required in the context of a challenge to the sufficiency of the indictment and declined to dismiss the charges on that ground. See 520 F. Supp. 3d at 1047–49. Judge Chang considered the issue at a later stage of the case while fashioning jury instructions and instructed the jury that a *quid pro quo* was required. *United States v. Tamras-Martin*, Case No. 18-cr-0267, dkt. 63 (N.D. Ill. 2018) (relying on the reasoning of *Boender* to "adopt[] a quid pro quo requirement * * * for § 666(a)(2)").

Given that this case is only at the indictment stage, the Court does not see any reason to depart from Judge Lee's approach. However, as counsel recognized at a hearing on this motion, even if the *quid pro quo* issue is premature, both at this stage of the case and under current circuit law, it is helpful to have the matter percolating. Any party may raise this issue at later stages of the case, including on jury instructions. If the Supreme Court or Seventh Circuit changes the law in the way Defendants predict, then the Court obviously must follow suit.

M. Burke's Reply in Support of His Motion to Dismiss Counts Two & Eleven of the Superseding Indictment ("Burke MTD Counts 2 & 11 Reply Br.") at 16].

Again, the Court disagrees. Count Eleven specifies Ald. Burke's intent with the requisite level of specificity: "Defendant * * * corruptly accepted and agreed to accept things of value, namely, fees * * * intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City of Chicago," and it identifies the City transactions in connection with which he intended to be influenced or rewarded, namely, "a permit concerning the 4901 Property." [30 (Indictment) at Count 11, ¶ 2]. See *Agostino*, 132 F.3d at 1190. It also refers in detail to the *quid*, *i.e.*, the things of value Burke accepted or agreed to accept, "[f]ees arising from the retention of his law firm, Klafter & Burke," and specifies the person from whom he solicited those fees. See [30 at Count 2, ¶ 1; Count 1, ¶¶ 1(o)-(r)] (incorporated by reference, listing Company C as the owner of the 4901 Property, Cui as managing member of Company C, and Individuals C-1 and Individual C-2). Ald. Burke allegedly was asked about the permit and "handled [sic] his tax appeal business card" to Cui, [*id.* at C¶ 56], and, after Cui signaled he would in fact switch from his tax attorney to Klafter & Burke, Ald. Burke called two other City officials about the permit. [*Id.* at Count 2; Count 1, ¶ 58–66]. Like the Old Post Office allegations, the exchange was necessarily implied, thereby completing the *quo* aspect of the deal. See *Barrios-Ramos*, 732 Fed. App'x at 459.

Ald. Burke's counterarguments that the Government needed to include more detail underscores the prematurity of this argument. He discusses the pattern jury instructions and cases challenging jury instructions and the sufficiency of the evidence. [105 (Burke MTD Counts 2 & 11 Br.) at 34–35]. He remarks, for example, that "[t]he fundamental deficiency in Count Eleven is manifest if one substitutes the words 'grand jury' for 'jury' and 'indictment' for 'instructions'

in the Second Circuit's [*United States v. Ford*, 435 F.3d 204, 213 (2d Cir. 2006),] opinion." [105 at 36]. While something "more" to show his corrupt intent might be necessary to uphold a conviction, the threshold for the indictment is much lower.[11] See *Moore*, 563 F.3d at 586 (an indictment should not be used to "test[ ] the strength or weakness of the government's case, or the sufficiency of the government's evidence"). The Court cannot simply "substitute" the term "instructions" for "indictment", as Ald. Burke suggests, because this is the "indictment" stage of the case, and that fact defines the Government's burden at this point in the case.

Ald. Burke's argument that the Indictment did not allege an intent to trade "official act[s]" also misses the mark. [105 (Burke MTD Counts 2 & 11 Br.) at 37]. The Government argues that § 666 does not require the exchange be for a discrete, official act. Ald. Burke disagrees. Courts of appeals that have reached the issue have not imported the standard Ald. Burke recommends. Compare *United States v. Suhl*, 885 F.3d 1106, 1112 (8th Cir. 2018) (assuming without deciding that *McDonnell*'s definition applies to federal-funds bribery), with *Ng Lap Seng*, 934 F.3d at 131–33 ("[W]e conclude that the *McDonnell* 'official act' standard, derived from the quo component of bribery as defined by § 201(a)(3), does not necessarily delimit the quo components of other bribery statutes, such as § 666 or the FCPA"); *United States v. Maggio*, 862 F.3d 642, 646 n.8 (8th Cir. 2017). But resolution of this issue can be saved for another day because here the Indictment alleges that Ald. Burke took an official act for which he intended to be influenced: by asking

---

[11] Even then, cases cited by Defendant suggest that the allegations of the Indictment could conceivably meet that higher threshold. See, *e.g.*, *United States v. Suhl*, 885 F.3d 1106 n.5 (8th Cir. 2018) ("[W]e find the federal-funds instructions did include the element by defining "corruptly"' as acting 'with the intent that something of value be given or offered to influence an agent of the state in connection with the agent's official duties." See *United States v. Jennings*, 160 F.3d 1006, 1019 (4th Cir. 1998) (explaining that "a court need not resort to Latin to make this point. It simply may explain that the defendant must have intended for the official to engage in some specific act (or omission) or course of action (or inaction) in return for the charged payment.").

Commissioner C to try to help with approval of Cui's application for a pole sign for the 4901 Property.[12] This is a clear act within *McDonnell*'s guidance.

### 2. Constitutionality of § 666

Ald. Burke also claims that the underlying federal program bribery statute, 18 U.S.C. § 666, is unconstitutionally vague on its face and as applied to both Counts Two and Eleven. Under the void-for-vagueness doctrine, a penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1993). A criminal statute violates the Fifth Amendment's guarantee of due process of law if it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States* (*Johnson I*), 576 U.S. 591, 595 (2015).

The Seventh Circuit has not had occasion to address the constitutionality of 18 U.S.C. § 666. However, this Court agrees with the chorus of circuits, which have held that § 666 is not unconstitutionally vague. See *United States v. Ng Lap Seng*, 934 F.3d 110, 135 (2d Cir. 2019) ("The language of these statutes is adequate to alert a reasonable person to the illegality of [the defendant's] conduct here and to avoid arbitrary enforcement of these laws against him"); *United States v. Hardin*, 874 F.3d 672, 677 (10th Cir. 2017) (rejecting as-applied challenge); *United States v. Nelson*, 712 F.3d 498, 510 (11th Cir. 2013) (same); *United States v. Crozier*, 987 F.2d 893, 900 (2d Cir. 1993) (rejecting facial and as-applied challenge to statute). See *Donagher*, 520 F. Supp.

---

[12] See [30 at Count 1, ¶¶ 62–63] (alleging that Ald. Burke asked his assistant to "call [Commissioner C]? Ask her to take a look at that situation where this * * * guy called about [Company D] on the pole that, ah * * * see if she'd, um, review it and see if there's any way that they can, ah, help us," and that Ald. Burke "personally spoke with Commissioner C, and asked Commissioner C to figure out a way to try to help [Cui] get the permit he wanted for the 4901 Property" (alterations in original)); [30 at Count 11, ¶ 1] (incorporating Paragraphs 51–68 by reference).

3d at 1053 ("Every circuit court to have addressed this issue has held that § 666 is not void for vagueness").

Section 666 gives fair notice to a reasonable person of the conduct that it prohibits. First and foremost, it applies only to defendants who act with corrupt intent. See *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982) ("[A] scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed"). As the Government points out, the statute includes other limiting principles as well. It applies only to government agencies that have received more than $10,000 of federal funds in a one-year period and only to things of value provided to influence agents in connection with a thing of value more than $5,000.

Those guideposts alleviate the vagueness concerns raised by the Supreme Court in *McDonnell v. United States*, 579 U.S. 550 (2016). *McDonnell* concerned 18 U.S.C. § 201 and did not hold that § 666 was constitutionally infirm. Instead, the *McDonnell* Court rejected the government's expansive definition of an official act under § 201 because under that definition— which encompassed everything from meetings to phone calls—"nearly anything a public official does * * * counts as a *quo*" and thus jeopardized due process. 579 U.S. at 574–75. Unlike in *McDonnell*, the language of § 666 is also limited to "business" and "transactions" involving $5,000 or more in value. See *Donagher*, 520 F. Supp. 3d at 1054 (citing 18 U.S.C. § 666). And, as applied, the Counts are readily distinguishable from the conduct in *McDonnell*. Count Two addresses passing an ordinance for TIF funding, Class L designation, and upending a water permit policy, and Count Eleven concerns approving a pole permit at a discrete location. In contrast to *McDonnell*, allegations of such specific, pending matters do not threaten to make "nearly anything

39

a public official does—from arranging a meeting to inviting a guest to an event—count[] as a *quo*." See *McDonnell*, 579 U.S. at 575.

Having found that Counts Two and Eleven neither omit an essential element nor run afoul of the Fifth Amendment, the Court denies Ald. Burke's motion to dismiss [104, 105].

### III.    Motion to Strike Surplusage and Dismiss Amtrak/Post-Office Based Counts [108]

Ald. Burke next challenges the Superseding Indictment's ("Indictment") [30] inclusion of allegations that he intervened in the Old Post Office's negotiations with Amtrak. Ald. Burke asks the Court [108] to dismiss Counts Three and Four and to strike part of Count One of the Indictment as surplusage.

#### A.    Factual and Procedural Background

Recall that one episode at the heart of the Indictment is the allegation that Ald. Burke sought to exchange his assistance with the redevelopment and financing of the Old Post Office site for legal fees for his private law firm, Klafter & Burke. One dimension of the charges points to Ald. Burke's actions in facilitating the project's access to land owned by Amtrak near the Old Post Office. [30 (Indictment) at ¶¶ 1(k), 8–11, 16–22]. Count One charges Ald. Burke with participating in a pattern of racketeering activity in violation of the federal prohibition on Racketeer Influenced and Corrupt Organizations (RICO), 18 U.S.C. § 1962(c). The RICO charge alleges a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1) and § 1961(5), comprising five underlying Racketeering Acts. "Racketeering Act 1," in turn, offers four alternatives, "any one of which alone," the Indictment alleges, "constitutes the commission" of Act 1:

> a.    Beginning in or around August 2016, and continuing to on or about January 18, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, committed an act involving bribery, that is, attempted to commit bribery, in that EDWARD M. BURKE

attempted to solicit and agreed to accept property and personal advantage, namely, fees arising from the retention of his law firm, Klafter & Burke, pursuant to an understanding that EDWARD M. BURKE and Alderman [Solis] would improperly influence the performance of an act related to their employment and function as Aldermen and the employment and function of other employees of the City of Chicago, namely, acts taken by BURKE, Alderman [Solis], and other employees of the City of Chicago concerning approvals from Amtrak, approvals from the City of Chicago Water Department, a Class L designation, and tax increment financing in connection with the Post Office project, in violation of 720 ILCS 5/33-1(e) and 720 ILCS 5/8-4.

b.      Beginning in or around August 2016, and continuing to on or about January 18, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, committed an act involving bribery, that is, EDWARD M. BURKE solicited for the performance of an act, namely acts taken by BURKE concerning approvals from Amtrak, approvals from the City of Chicago Water Department, a Class L designation, and tax increment financing concerning the Post Office project, a fee and reward which he knew was not authorized by law, namely, fees arising from the retention of his law firm, Klafter & Burke, in violation of 720 ILCS 5/33-3(a)(4).

c.      On or about June 19, 2017, at approximately 2:08 p.m. (Session #1368), at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, used a facility in interstate commerce, namely, a cellular telephone assigned telephone number (312) XXX-4006, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 720 ILCS 5/33-1(e)(Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

d.      On or about June 20, 2017; at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, EDWARD M. BURKE, defendant herein, caused the use of a facility in interstate commerce, namely, an email account and associated communication network operated by the service provider AOL, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 720 ILCS 5/33-1(e) (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, the defendant did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity, in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

[30 at Count 1, ¶ 84].  Counts Three and Four, which allege Ald. Burke violated the Travel Act, 18 U.S.C. § 1952(a)(3), are nearly identical to sub-predicate acts of Racketeering Act 1, subsections (c) and (d), respectively.  [*Id.* at 40 (Counts 3); 41 (Count 4)].

### B.    Legal Standard

In the instant motion [108], Ald. Burke seeks to strike the references to the Amtrak episode in Count One as surplusage under Federal Rule of Criminal Procedure 7(d).  He also moves to dismiss Counts Three and Four for failure to state an offense pursuant to Rule 12(b)(3)(B)(v).

For the sake of brevity, the Court refers to the legal standard for Federal Rule of Criminal Procedure 12 discussed above, see Part II.B above, but adds two points salient to the instant motion.  First, to withstand a motion to dismiss, "an indictment must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating."  *United States v. Gimbel*, 830 F.2d 621, 624 (7th Cir. 1987).  Second, with respect to the motion to strike, Federal Rule of Criminal Procedure 7(d) does permit a court to "strike surplusage from the indictment."  However, "[s]urplusage should not be stricken unless 'it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial.'"  *United States v. Peters*, 435 F.3d 746, 753 (7th Cir. 2006) (quoting *United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir. 1998)).  This standard is "rather exacting."  *United States v. Groos*, 616 F. Supp. 2d 777, 789 (N.D. Ill. 2008) (quoting *United States v. Chaverra–Cardona*, 667 F. Supp. 609, 611 (N.D. Ill. 1987)).

### C.    Analysis

With respect to all three counts, Ald. Burke's chief complaint is that the allegations concerning his interactions with Amtrak are legally inadequate under state law.[13]  [108 (Ald.

---

[13] He specifically requests that "with respect to Racketeering Act 1 in Count One, the lack of any predicate state offense based on the Amtrak/Post Office allegations requires that those allegations be stricken as

Edward M. Burke's Mot. to Dismiss and/or Strike 'Amtrak/Post Office'-Based Counts & Racketeering Act ("Burke Amtrak Br.")) at 5]. However, Ald. Burke takes issue with these allegations only to the extent that they refer to the Amtrak matter, as his motion indicates that the other alleged assistance he gave "to the Post Office owners charged in the Superseding Indictment—the City Tax Increment Financing ("TIF") Funds, Class L tax status, a City Water Department approval—are not at issue in this motion." [*Id.* at 2 n.1]. The Government asks this Court to deny the motion because the concerns it raises are for the jury to assess, not this Court. [139 (Gov't Br.) at 56, 61].

The Court agrees with the Government that Ald. Burke's arguments are premature and thus denies [108] the motion as to all three counts.

### 1. Motion to Partially Strike Count One

Regarding Count One, the essential elements of an 18 U.S.C. § 1962(c) charge are (1) an enterprise existed, (2) the defendant was associated with or employed by the enterprise, (3) the defendant knowingly conducted or participated in the conduct of the affairs of the enterprise through a pattern of racketeering activity; and (4) the activities of the enterprise affected interstate commerce. See 7th Cir. Crim. Pattern Jury Instrs. at 724 (2020 ed.). Count One satisfies Rule 7(c)(1)'s pleading requirements. Count One states each element of the offense, identifies the enterprise, describes the manner and means of the alleged racketeering violation, and sets forth five alleged racketeering acts that comprise a pattern of racketeering activity, with sufficient detail to put Burke on notice. See, *e.g.*, *United States v. Vaughn*, 722 F.3d 918, 925–26 (7th Cir. 2013)

---

surplusage. *Id.* at pp. 30–31. In particular, subparagraphs (c) and (d) of paragraph 84 should be stricken in their entirety, and the references to Amtrak should be stricken from subparagraphs (a) and (b) of paragraph 84. *Id.* at p. 29–31. Additionally, all other references to Amtrak in Count One should be stricken. See generally *id.* at ¶ 1(k), ¶8–30." [108 (Burke Amtrak Br.) at 10].

("[A]n indictment "that 'tracks' the words of a statute to state the elements of the crime is generally acceptable"). See also *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (challenged racketeering act sufficient).

Ald. Burke's arguments for striking portions of the Indictment are that his "alleged conduct regarding Amtrak did not amount to or involve any official action, an essential element of both the state bribery and official misconduct statutes," nor did he enter an agreement that entail his duties as an "employee or fiduciary" of the City of Chicago to constitute commercial bribery. See [108 (Burke Amtrak Br.) at 5]. In other words, he asserts that the allegations about Amtrak do not link up to his performance of any official act and fail to identify official acts that were or could be performed by him, so the challenged allegations and counts do not amount to a violation of state law.[14]

The Court disagrees with Ald. Burke's view that the allegations about Amtrak do not state an offense because the question—whether Ald. Burke intended to attempt or take an official act— is not properly resolved on a motion to dismiss. To be sure, Ald. Burke characterizes the dispute as a legal question, *i.e.*, a failure to amount to a state offense under the Illinois state bribery law, 720 ILCS 5/33-1(e), and Illinois's official misconduct statute, 720 ILCS 5/33-3(a)(4) (Official Misconduct). He insists that he did not oversee Amtrak, do anything related to Amtrak, hold authority over Amtrak, and instead used his personal "contacts" with "an Amtrak executive" to get the job done. [108 (Burke Amtrak Br.) at 6–7]. Ald. Burke's argument that the Amtrak allegations

---

[14] Also pertinent here, the Amtrak allegations are only *one* of several actions that Ald. Burke allegedly took on the Old Post Office developer's behalf (*e.g.*, Class L designation, Water Department approvals), that constitute the basis of the state law violations. See [30 (Indictment) at Count 1, ¶¶ 84(a)–(b)]. So, as Ald. Burke concedes, even if this Court were incorrect that portions of sub-predicate acts (a) and (b), as well as all of sub-predicate acts (c) and (d) should be stricken, much of sub-predicate acts (a) and (b) would remain intact. To put it plainly, the Government would still have three independent avenues to prove Racketeering Act 1.

do not state an offense under the commercial bribe receiving statute, 720 ILCS 5/29A-2, similarly claims that the Amtrak episode does not relate to the affairs of his employer.

These arguments all turn on a factual dispute—whether the steps Ald. Burke took constitute official acts or personal ones. To answer that question, a jury would need to evaluate factual disputes, which might include what steps Ald. Burke took with respect to Amtrak, Ald. Burke's duties and official capacities, and if the legal fees were received or solicited "pursuant to an understanding that he shall improperly influence/attempt to influence the performance of any act related to the employment or function of a public officer." See Ill. Pattern Jury Instr. – Crim. §§ 21.11–12 (Illinois state bribery); 21.15–.16 (Illinois official misconduct) (2019 ed.) The Seventh Circuit has repeatedly explained that a motion to dismiss an indictment (or in this case to strike surplusage) is not a summary-judgment motion and should not be used to "test[ ] the strength or weakness of the government's case." See, *e.g.*, *United States v. Moore*, 563 F.3d 585, 586 (7th Cir. 2009) (citation omitted); *United States v. Firtash*, 392 F. Supp. 3d 872, 884–85 (N.D. Ill. 2019) (rejecting defendants' effort to dismiss RICO provision for lack of sufficient facts "to establish the necessary connection to United States commerce [because it] misstates the standard to which indictments are held upon a motion to dismiss"); *United States v. Koll*, 2010 WL 996458, at * 2 (N.D. Ill. Mar. 16, 2020) (concluding that the jury, not the judge on a motion to dismiss, is the appropriate vehicle to evaluate whether defendant was an agent in connection with 18 U.S.C. § 666 charge).[15]

---

[15] Even if the Indictment were subject to a more searching inquiry, Defendant has not convinced the Court that the Government will be unable to prove at trial that Ald. Burke's conduct amounted to official acts for 720 ILCS 5/33-1(e) and 720 ILCS 5/33-3(a)(4) and were related to his employment for the commercial bribery law, see 720 ILCS 5/29A-2. Elsewhere in Count One of the Indictment, the grand jury charged that Ald. Burke discussed the Amtrak issues with the Old Post Officer owners. During that conversation, Ald. Burke leaned on his position as a power broker in official affairs. Namely, he "assured Individual A-1 that there weren't 'too many people around town that we don't know'" and later informed Ald. Solis that given

45

Among other cases raised in Ald. Burke's reply, *United States v. Freedman*, 562 F. Supp. 1378 (N.D. Ill. 1983), and *United States v. Manzo*, 714 F. Supp. 2d 486 (D.N.J. 2010), *aff'd*, 636 F.3d 56 (3d Cir. 2011), are readily distinguishable. Both cases addressed whether a private citizen could perform an act "under color of official right" within the meaning of the Hobbs Act and entertained the question of whether the defendant must "be in some position [of] authority, at the time that payment was accepted." *Manzo*, 714 F. Supp. 2d at 491. In both cases, the district courts determined that, as the *Manzo* court put it, "the threshold question of who is enough like a public official to be within the scope of the 'under the color of official right' theory is not appropriately left to the jury." See *id.* at 496 (private citizen running, but not yet elected, for office); *Freedman*, 562 F. Supp. at 1384–88 (private lawyers). The courts could not discern that the statute applied where "the public official element is missing." See *Manzo*, 714 F. Supp. 2d at 500.

Here, by contrast, Ald. Burke indisputably is a public official. Unlike the private citizens in the cases cited above, his conduct *could* amount to an abuse under color of official right. "[P]rivate persons, as a general rule, do not visibly wield the same power as public officials." *United States v. McClain*, 934 F.2d 822, 830 (7th Cir. 1991) (describing split among district courts

---

his history with one of the Amtrak executives, the executive "could be worked with." See [30 (Indictment) at Count 1, ¶¶ 8, 11].

What is more, transcripts generated during the Government's wiretap of Ald. Burke's telephone (and addressed in a separate part of this opinion) include Ald. Burke's discussion about ways to pressure Amtrak through official channels. Ald. Burke specifically told the Old Post Officer owners that he believed he could influence the Amtrak executive because he had helped make the executive's relative a judge. See [100-3 (Sealed May Cell Phone Title III Application) at 43, ¶ 35] ("As far as Amtrak in [*sic*] concerned, put it in the back of your mind * * * * But, ah, we made [a board member's] daughter a judge here, in Cook County"). In another instance, he discussed with Ald. Solis the possibility of brokering the deal between Amtrak and the Old Post Office by offering Amtrak his assistance obtaining city permits for Union Station. [*Id.* at 62, ¶ 51] (Ald. Solis suggested "do you think we can suggest to Ray that we'll get him what he needs on the project if he gets us what we need in regards to Skydell, to which Ald. Burke responded "Ah, in fact I've got a call into him right now"). Any of these actions could conceivably implicate official acts. By giving these examples and others, the Court is not intending to determine whether the Government ultimately proves the underlying state law counts for the RICO racketeering activity, but rather to demonstrate why dismissing the allegations at this stage in the case would be premature.

whether Hobbs Act extortion under color of official right applies to private citizens). In fact, *Freedman* confirms that what a public official does with his power is the proper province of a jury:

> Hobbs Act "official right" extortion prosecution, it is enough to show a victim reasonably believes the defendant *himself* has the actual or residual or anticipated official power to deliver on his promises.
>
> Hence in the cases where public official defendants promised favors beyond their official powers, the courts focused on defendants' holding of offices that lent credence to their claimed ability. After all, that would indeed show not "official right" itself, but "color" of the defendants' own "official right."

562 F. Supp. at 1.

### 2.    Motion to Dismiss Counts Three and Four

Ald. Burke's challenge to Counts Three and Four are denied for that same reason. Both counts charge a violation of the Travel Act, 18 U.S.C. § 1952(a)(3), the elements of which are that (1) the defendant used or caused to be used a facility in interstate or foreign commerce; (2) the defendant did so with the intent to promote, manage, establish, or carry on an unlawful activity or facilitate the promotion, management, establishment, or carrying on of an unlawful activity; and (3) thereafter the defendant did or attempted to promote, manage, establish, or carry on an unlawful activity, or facilitate or attempt to facilitate the promotion, management, establishment, or carry on an unlawful activity. 7th Cir. Crim. Pattern Instrs. 691 (2020 ed.).

Counts Three and Four state all the elements of the offense, tracking the statutory language of § 1952(a)(3). The counts also inform Ald. Burke of the specific bases of each charge by identifying a particular use of a facility in interstate commerce: (1) the June 19, 2017 telephone call described in Count Three, and (2) the June 20, 2017 email described in Count Four.

Ald. Burke's reprisal of the argument that the Amtrak allegations involve only personal conduct disconnected from his employment as a Chicago Alderman "fail[] to allege that Ald. Burke 'formed a specific intent' to facilitate a violation of state law" is no more effective here.

[161 (Ald. Edward M. Burke's Reply in Support of His Mot. to Dismiss and/or Strike 'Amtrak/Post Office'-Based Counts & Racketeering Act) at 3]. As explained above, Ald. Burke's argument that his involvement with Amtrak omits an essential element (intent to perform an official act) is futile. In addition, because the Travel Act "refers to state law only to identify the defendant's unlawful activity," the Government need not prove the completion of the identified state crime. See, *e.g.*, *United States v. Campione*, 942 F.2d 429, 434 (7th Cir. 1991). The request to dismiss Counts Three and Four thus is denied.

## IV.     Motions to Dismiss Counts Seven and Eight [98, 99]

Next up are Defendant Peter Andrews's motions to dismiss [98, 99] Counts Seven and Eight of the Superseding Indictment ("Indictment"). Counts Seven and Eight charge Andrews and Ald. Burke with using a "facility in interstate commerce, namely, a cellular telephone * * * with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity," in violation of the Travel Act, 18 U.S.C. § 1952(a)(3) and (2). [30 (Indictment") at Count 7, 8].

Andrews seeks dismissal under Federal Rule of Criminal Procedure 12(b)(3)(B) in two motions, each of which advances an independent and alternative reason for dismissal of the charges. First, Andrews moves [98] to dismiss both charges on the basis that they fail to state an offense. According to Andrews, his calls did not cross state lines and therefore do not qualify under 18 U.S.C. § 1952. [98 (Def. Andrews' Mot. to Dismiss Counts Seven & Eight of the Superseding Indictment Based on an Inability to Establish an Interstate Communication ("Andrews Interstate Communication Br.") at ¶¶ 2, 8]. The Government disagrees. See [139 (Gov't's Consolidated Resp. to Defs.' Pretrial Mots. ("Gov't Br.") at 66].

Second, Andrews moves in the alternative to dismiss on the basis that both counts fail to include an essential element of the offense because they do not identify a "subsequent overt act." [99 (Def. Andrews' Mot. to Dismiss Counts Seven & Eight of the Superseding Indictment for Failing to Identify the Required Subsequent Overt Act ("Andrews Overt Act Br.")) at ¶ 7]. The Government opposes this ground for dismissal as well. [139 (Gov't Br.) at 78].

Ald. Burke moves to adopt Andrews's first [98] [16] but not his second [99] motion [121 (Ald. Edward M. Burke's Mot. to Adopt Pretrial Mots. Filed by Co-Defs. Andrews & Cui ("Burke Mot. to Adopt")) at ¶ 4]. The Court will address each motion in turn, under the legal standard described in Part II.B, above.

## A.    Intrastate Use of a Facility of Interstate Commerce [98]

The Travel Act criminalizes in relevant part, the use of "the mail or any facility in interstate or foreign commerce with intent to * * * otherwise promote, manage, establish, carry on, or facilitate * * * any unlawful activity." See 18 U.S.C. § 1952(a)(3). Together, Andrews [98] and Ald. Burke [121] assert that the calls they placed never crossed state lines, so they cannot be charged with using a facility in interstate commerce under § 1952(a). The Government opposes the proposition that the wholly intrastate use of a telephone does not trigger § 1952(a) liability. See [139 (Gov't's Consolidated Resp. to Defs.' Pretrial Mots. ("Gov't Br.")) at 66].

The Court disagrees with Andrews and Ald. Burke that the intrastate use of a telephone does not state a claim under the Travel Act. It is clear from the plain language of 18 U.S.C. § 1952(a) that the use of a facility of interstate commerce is enough to fulfill the jurisdictional

---

[16] Ald. Burke tacks on that, if the Court were to agree with Andrews's motion [98] that the wholly intrastate use of a facility of interstate commerce does not trigger liability under the Travel Act, then the Court should (1) dismiss Count One RICO Acts 2a, 3e, 3f, 4a, 4b, 5b to the extent they include wholly intrastate calls, and (2) dismiss Counts Fifteen and Sixteen because they involve emails and calls that did not cross state lines. [121 at ¶ 4 n.1].

element of the statute.  The phrase "in interstate * * * commerce" modifies the word "facility," not the word "uses."  To accept Andrews's view that the interstate facility must be used across state lines, the phrase "in interstate or foreign commerce" would have to modify the word "uses."  The plain language of the statute undermines Andrews's argument because Congress could have, but did not, place the phrase "in interstate commerce" next to the word "uses."

Although the Seventh Circuit has yet to address the issue, the circuit courts that have done so have held that intrastate phone calls do satisfy the Travel Act.  The Second and Ninth Circuits have specifically interpreted the plain language and broad sweep of the statute to cover telephone calls that do not cross state lines.  See *United States v. Halloran*, 821 F.3d 321 (2d Cir. 2016) ("[p]urely intrastate use of an interstate facility is sufficient to violate the Travel Act"); *United States v. Nader*, 542 F.3d 713, 716 (9th Cir. 2008) ("hold[ing] that intrastate telephone calls made with intent to further unlawful activity can violate the Travel Act because they involve use of a facility in interstate commerce").

Although other circuits have not squarely addressed telephone calls, three additional circuits have concluded that the intrastate use of other interstate facilities, such as ATMs and the mail, satisfy § 1952's jurisdictional hook.  The Eighth Circuit read the plain language and purpose of the Travel Act to encompass wholly intrastate ATM withdrawals because the ATM network is itself a facility in interstate commerce.  See *United States v. Baker*, 82 F.3d 273, 275–76 (8th Cir. 1996) ("[f]ederal jurisdiction was established by proof that [the defendant] carried out extortion by causing [another individual] to use an interstate network of ATMs which comprise, in the words of the statute, a 'facility in interstate or foreign commerce'").  By the same logic, both the Second and Fifth Circuits have held that even mail that does not cross state lines can form the jurisdictional basis for § 1952 liability.  *United States v. Riccardelli*, 794 F.2d 829, 834 (2d Cir. 2005)

50

("holding * * * that Congress intended the Travel Act's federal jurisdictional nexus to be satisfied by *any* use of the mails"); *United States v. Heacock*, 31 F.3d 249, 255 (5th Cir. 1994) ("hold[ing] that any use of the United States mails in this case is sufficient to invoke jurisdiction under 18 U.S.C. § 1952, notwithstanding the intrastate destination of the mailings" (footnotes omitted)). By contrast, at least one Circuit has held that the purely intrastate use of the mail does not trigger Travel Act liability. See *United States v. Barry*, 888 F.2d 1092, 1092–93, 1097 (6th Cir. 1989).

The Seventh Circuit has interpreted the murder-for-hire statute, which contains some language that is nearly identical to the Travel Act, in a way that casts doubt on Andrews's construction of § 1952 and that reinforces this Court's understanding that § 1952 encompasses calls that do not cross state lines. The murder-for-hire statute, 18 U.S.C. § 1958(a), attaches liability for "us[ing] * * * the mail or any facility in interstate or foreign commerce" in furtherance of a crime. The Seventh Circuit has held that 18 U.S.C. § 1958(a) reaches intrastate phone calls. *United States v. Richeson*, 338 F.3d 653, 660 (7th Cir. 2003). The court of appeals reasoned that "there is only one way to read the plain language of [that] statute, and that is to require that the facility, and not its use, be in interstate or foreign commerce." *Id.* Reading "interstate commerce" to modify facility, not "use" "makes sense from both a logical and legal standpoint." *Id.* For decades, courts have found the murder-for-hire statute indicative of congressional intent on the scope of the Travel Act. See, *e.g.*, *Riccardelli*, 794 F.2d at 833 ("[a] further indication of congressional intent that any use of the mails be sufficient to invoke federal jurisdiction under the Travel Act can be gleaned from the recently-enacted murder-for-hire statute"); *Nader*, 542 F.3d at 718–19 ("[t]hat the phrase modifies 'facility' in the related murder-for-hire statute weighs in favor of reading the Travel Act the same way").

Andrews's attempt to neutralize the force of *Richeson* fails. He insists that a prior version of the murder-for-hire statute used the phrase "facility *in* interstate commerce" and "facility *of* interstate commerce." 18 U.S.C. § 1958 (emphasis added). As Andrews acknowledges, at the time *Richeson* was decided, the language of the substantive offense "facility in interstate commerce" mirrored the current language of the Travel Act, which now refers to the use of "any facility in interstate commerce." 18 U.S.C. § 1952(a)(3). Andrews also asks the Court to draw an inference from the fact that Congress later amended the murder-for-hire statute but did not amend the Travel Act. See [98 (Andrews Interstate Communication Br.) at 5]. True, Congress amended § 1958 to exclusively use the term "facility *of* interstate commerce," and eliminated all reference to a "facility in commerce." It would be a stretch, however, to draw any conclusions about what 18 U.S.C. § 1952 means from the fact that Congress amended a different statute, 18 U.S.C. § 1958, at some point in time. In fact, Congress has treated the terms "in" and "of" interchangeably. See, *e.g.*, *Nader*, 542 F.3d at 719 (the court "attach[es] no special significance to the use of the preposition 'in' rather than 'of' in the Travel Act" and noting that three circuits concluded that "Congress intended the two phrases to be interchangeable").

None of Andrews's arguments to the contrary are persuasive. The overwhelming weight of authority holds or at least suggests that § 1952 reaches intrastate telephone calls, and Congress appears to have promulgated the Travel Act under its authority to regulate the instrumentalities of commerce. Once Congress has grounded its jurisdiction in the *nature of the* instrumentality, the proof of *interstate movement* is not necessary to justify federal jurisdiction. Thus, this is not a question of Congressional prerogative, but rather congressional intent. See, *e.g.*, *Nader*, 542 F.3d at 717 (noting that construing whether § 1952(a)(3) applies to a call that does not cross state lines "is a question of congressional intent, not congressional power" because "telephones are

instrumentalities of interstate commerce" within Congress' power to regulate under *United States v. Lopez*, 514 U.S. 49, 558–59 (1995)).

Andrews's "[f]ederalism arguments are misplaced," because the Court is persuaded by the logic that "once the federal jurisdictional nexus of the use of the mails" (or, here, the phone) "is present, 'the statute reflects a clear and deliberate intent on the part of Congress to alter the federal-state balance in order to reinforce state law enforcement.'" See *Riccardelli*, 794 F.2d at 833 (quoting *Perrin v. United States*, 444 U.S. 37, 50 (1979)). In fact, the plain language of the statute restrains the federal government from interfering with state criminal prosecutions in other ways. The requirement that there be some connection between the crime and the use of the interstate facility of commerce ensures that this Court's construction of the statute would not allow the federal government to upend the state-federal balance. For example, in *United States v. Isaacs*, 493 F.2d 1124 (7th Cir. 1974), *abrogated on other grounds by McNally v. United States*, 438 U.S. 250, 359 (1987), the Seventh Circuit reversed Travel Act convictions because of the tenuous connection between the use of an interstate facility (a check) and the unlawful conduct, not because of the intrastate nature of the checks. See *Isaacs*, 493 F.2d at 1146 ("conclud[ing] that the use of interstate facilities here was so minimal, incidental, and fortuitous, and so peripheral to the activities of [the defendants] and the other participants in this bribery scheme" that the Travel Act charge should not have reached the jury).

Andrews's reliance on *Isaacs* for a slightly different proposition makes some headway but ultimately misses the mark as well. Some language in the opinion lends support for Andrews's theory. For example, the *Isaacs* court expressed concern with an interpretation of § 1952 that "suggest[ed] that the check need not actually travel interstate," and added in a footnote, "[t]hat some interstate travel is actually required by the statute is indicated by § 1952's use of the term

'facility in interstate or foreign commerce' rather than 'facility of interstate or foreign commerce.'" See *id.* at 1149, & n.1. However, the issue now before this Court—whether a wholly intrastate call or email triggers § 1952—was not before the Seventh Circuit in *Isaacs*. And the statute's plain language, the Supreme Court's expansive view of congressional power under *Lopez*, the Seventh Circuit's treatment of a nearly identical statute in *Richeson*, and the weight of circuit court of appeals authority all point in the opposite direction. The Court thus denies Andrews's motion [98] to dismiss Counts Seven and Eight.

### B.      Subsequent Overt Act [99]

In the alternative, Andrews argues that neither Counts Seven nor Eight identify the subsequent overt act as the third essential element of a Travel Act violation. See [99 (Andrews Overt Act Br.) at ¶ 7]. Specifically, he insists there is "no way for the defense to determine with certainty what subsequent overt act—an essential element of proving the violation—is charged in Counts Seven and Eight." [*Id.* at ¶ 10]. He acknowledges that there are acts by Andrews subsequent to his phone calls, but those are "intermingled" with allegations of acts by Ald. Burke and others, which leaves Andrews to "guess which of these acts represent the particular act (or acts) upon which the grand jury based its charge," [*id.* at ¶ 11], and "[t]his moving target also creates the possibility of a constructive amendment of the indictment in violation of the Fifth Amendment," [*id.* at ¶ 12].

The Court takes issue with the underlying premise of Andrews's motion. As the Government points out in opposition, there is no requirement that a Travel Act charge specifically identify the "thereafter" (or subsequent) acts taken by the defendant. [139 (Gov't Br.) at 78]. Even *Andrews* acknowledges that the Seventh Circuit has rejected the argument he raises, holding that

"there is no requirement that the indictment specifically identify the 'thereafter' acts." *United States v. Muskovsky*, 863 F.2d 1319, 1327 (7th Cir. 1988).

Given this controlling authority, this Court must reject the argument. But even if the issue were not already decided in this circuit, Andrews has provided no strong argument for adding a "subsequent overt act" to the Travel Act's essential elements. And doing so would place the Seventh Circuit in tension with the decisions of its sister circuits. See *United States v. Childress*, 58 F.3d 693, 720 (D.C. Cir. 1995) (an indictment that "failed to specify what overt acts [the defendants] performed" was not plain error because "the indictment charges the third element of the offense, albeit in conclusory language. As the Government notes, at least four circuits have upheld Travel Act convictions based on virtually identical indictments"); *United States v. Stanley*, 765 F.2d 1224, 1239-40 (5th Cir. 1985); *United States v. Tavelman*, 650 F.2d 1133, 1138 (9th Cir. 1981). The Indictment otherwise tracks the necessary elements of the statute and is sufficient. The Court therefore denies Andrews's second motion to dismiss Counts Seven and Eight [99] as well.

## V. Motion to Dismiss Counts Twelve, Thirteen, Fourteen, Fifteen [88, 89]

Cui moves [88, 89] to dismiss Counts Twelve, Thirteen, Fourteen, and Fifteen of the Superseding Indictment ("Indictment") [30]. Ald. Burke moves to adopt. [121 at ¶ 2]. For the reasons stated below, Cui's motion [88, 89] is denied.

### A. Factual and Procedure Background

Counts Twelve through Fifteen of the Indictment charge Cui with violations of the federal program bribery law, 18 U.S.C. § 666(a)(2), and the Travel Act, 18 U.S.C. § 1952(a)(3), in connection with favors Ald. Burke allegedly performed relating to a property owned by Cui's

Company, Company C. The allegations involve two government matters, TIF financing and a pole-sign permit.

Regarding the TIF financing, Count Twelve alleges that on or about February 12, 2016, an ordinance submitted to the City Council sought approval of a redevelopment agreement between Cui's Company, Company C, and the City of Chicago. The ordinance involved $2,000,000 in TIF funding to redevelop the 4901 Property. [30 (Indictment) at Count 12, ¶ 2a]. That ordinance was referred to the Committee on Finance, over which Ald. Burke presided at the time, and which exercised legislative power to recommend to the full City Council a TIF award. See [*Id.* at Count 12, ¶ 1; Count 1(c)] (incorporating paragraphs 1(c) by reference and describing Committee on Finance's role, respectively). On March 11, 2016, with Ald. Burke presiding, the Committee on Finance recommended passing the ordinance. [*Id.* at Count 12, ¶ 2b]. Then, on March 16, 2016, the City Council passed the ordinance on Ald. Burke's motion and with Ald. Burke's vote in favor. [*Id.* at ¶ 2c]. Thereafter, on June 28, 2016, the City of Chicago and Company C signed a redevelopment agreement for the 4901 Property. [*Id.* at ¶ 2d]. Although Company C could "access" the $2,000,000 TIF funds as a result, the Indictment alleges that the "funds were payable only after the conditions provided in the redevelopment agreement were met, and no TIF funds had been disbursed on or before September 5, 2017." [*Id.*]

As noted, the TIF financing deal was only one of two matters that implicated Ald. Burke. As described above, see Part I.A(3) above, the Indictment also alleges that on August 23, 2017, Cui contacted Ald. Burke for assistance after the Chicago Department of Planning and Development denied his application for a pole sign permit at the 4901 Property. [30 (Indictment) at Count 1, ¶¶ 51–54; Count 12, ¶ 1] (describing events and incorporating paragraphs 51–68 by reference, respectively). The next day, Cui informed a lawyer who had represented Cui in property

tax appeals for the 4901 Property that Ald. Burke had handed him the Klafter & Burke business card. [*Id.* at Count 1, ¶ 56; Count 12, ¶ 1]. Cui asked his then-lawyer if he could switch to Ald. Burke's law firm because "[h]e handled [*sic*] his tax appeal business card to me, and I [Cui] need his favor for [his] tif money. In addition, I need his help for my zoning etc[.] for my project. He is a powerful broker in City Hall, and I need him now." [*Id.*] Minutes later, Cui emailed Burke indicating he "may need your [Ald. Burke's] representation for tax appeal." [*Id.* at Count 1, ¶ 57; Count 12, ¶ 1]. When Individual C-1, an associate of Cui's, advised Ald. Burke that Cui wanted his assistance on tax appeals, Individual C-1 remarked, "I guess he has some need for you now," to which Burke replied, "[w]ell, I'll get together with him and see if we can do something to help him." [*Id.* at Count 1, ¶ 58; Count 12, ¶ 1].

By August 30, 2017, Cui and an attorney associated with Klafter & Burke initiated a client retainer agreement with the firm. [30 (Indictment) at Count 1, ¶¶ 60–61; Count 12, ¶ 1]. That same day and the day following, Ald. Burke and his staff contacted another city official, Commissioner C, for assistance with the pole sign permit. [*Id.* at Count 1, ¶¶ 62–63; Count 12, ¶ 1]. In the weeks following, Cui signed a formal contingent fee arrangement with Ald. Burke's law firm, and Ald. Burke contacted other administrators regarding the permit. [*Id.* at Count 1, ¶¶ 64, 66; Count 12, ¶ 1].

The events described above form the context for the charges against Cui and Ald. Burke. Count Twelve of the Indictment alleges that Cui violated the federal program bribery prohibition, 18 U.S.C. § 666(a)(2). Counts Thirteen, Fourteen, and Fifteen of the Indictment allege that Cui, or Ald. Burke and Cui, violated the Travel Act, 18 U.S.C. §1952(a)(3).

### B.    Legal Standard

Cui moves to dismiss Counts Twelve, Thirteen, Fourteen and Fifteen of the Indictment, challenging the legal sufficiency of all counts under Federal Rule of Criminal Procedure 12(b)(3)(B)(v).  He maintains that the facts allegedly do not constitute a violation of the statutes charged.  As noted above, under Rule 12(b), dismissal may be proper if "characterization of the undisputed facts did not constitute a violation of any statute."  *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988).  To put it differently, dismissal would be proper "not because the government could not prove its case, but because there was no case to prove."  See *id.*

### C.    Analysis

Although Cui takes a slightly different tact to challenge each of the counts raised in his motion, his papers boil down to one fundamental point: Cui insists that the fees he paid to Ald. Burke's law firm were legitimate compensation for legal services, not a bribe to influence Ald. Burke in his official capacity.  Cui first addresses the federal program bribery, 18 U.S.C. § 666, charge (Count Twelve) and then the Travel Act charges, 18 U.S.C § 1952(a) (Counts Thirteen, Fourteen, and Fifteen), and the Court will follow suit.

### 1.    Count Twelve - "Usual Course of Business" Under 18 U.S.C. § 666(c)

Cui argues that the allegations of Count Twelve[17] do not amount to a violation of 18 U.S.C. § 666.  Specifically, Cui asserts that the allegations cannot violate 18 U.S.C. § 666(a) because the

---

[17] Among other allegations, Count Twelve charges that Cui:

> Between in or around August 2017 and continuing until in or around 2018 in the Northern District of Illinois, Eastern Division * * * corruptly offered and agreed to give things of value, namely fees arising from the retention of Klafter & Burke, intending to influence and reward [Ald. Burke], an agent of the City of Chicago, in connection with a business, transaction, and series of transactions of the City of Chicago involving a thing of value of $5,000 or more, namely a permit and tax increment financing concerning the 4901 Property; In violation of Title 18, United States Code, Section 666(a)(2).

[30 (Indictment) at Count 12, ¶ 3].

contingency fees he agreed to pay Ald. Burke's law firm qualify for § 666(c)'s safe harbor. Subsection (c) states that § 666 "does not apply to bona fide salary, wages, fees, or other compensation paid * * * in the usual course of business." According to Cui, "[h]ad Klafter & Burke (and by extension Mr. Burke) recovered any money * * * it would only have been as contingency fees paid to a law firm," so the charge does not allege that the retention of Klafter & Burke was outside of the ordinary course of business. [89 (Def. Charles Cui's Memo. of Law in Support of Mot. to Dismiss Counts 12, 13, 14, 15 of the Superseding Indictment ("Cui MTD Counts 12–15 Br.")) at 12–13]. As a backstop, he asks this Court to dismiss Count Twelve to the extent it relates to the City of Chicago's decision to award Cui's property TIF money because the TIF deal predated Cui's contact with Ald. Burke. [*Id.* at 15]. The Government opposes both theories. [139 (Gov't Br.) at 78].

The Government has the better of both arguments at this stage of the case. The Court rejects Cui's primary argument, that 18 U.S.C. § 666(a) is not applicable to his dealings with Ald. Burke, because assessing whether any fees Cui agreed to pay were made "in the usual course of business" under § 666(c) is a jury question, not one for this Court on a motion to dismiss. *United States v. McClain*, 2022 WL 488944, at *2 (N.D. Ill. Feb. 17, 2022) ("A company cannot use its payroll line on its accounting ledger to circumvent all Government oversight of public corruption. While Defendants are entitled to use § 666(c) as an affirmative defense at trial, they are not entitled to dismissal at this stage based solely on their version of the facts" (internal citation omitted)).

*United States v. Lupton*, 620 F.3d 790 (7th Cir. 2010), lends further support for the proposition that evaluating whether Cui's arrangement with Klafter & Burke was made "in the usual course of business" would be premature at the motion to dismiss stage. In *Lupton*, the defendant sought to vacate his 18 U.S.C. § 666 conviction on the grounds that his attempt to split

a commission, as allegedly permitted by state law, constituted a payment in the usual course of business under subsection c. *Id.* at 802. In holding that there was sufficient evidence to support the factfinder's conclusion, the Seventh Circuit cited a sister circuit for the proposition that "[w]hether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide." *Id.* (quoting *United States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007)). See *United States v. Whiteagle*, 759 F.3d 734, 755 (7th Cir. 2014) (affirming a conviction for a corrupt solicitation of a job for a legislator's cousin under 18 U.S.C. § 666(b)). Although the *Lupton* court did not squarely address the issue of whether a district court could dispose a charge on subsection (c) grounds as a matter of law, the Court sees no reason to depart from this common-sense view, shared by the First and Fifth Circuits, and recently followed by Judge Leinenweber in *McClain*, that the application of this affirmative defense here is a proper jury question. See *United States v. Cornier-Ortiz*, 361 F.3d 29, 35–37 (1st Cir. 2004) (upholding § 666 verdict and rejecting defendant's argument that the evidence warranted finding subsection c applicable); *Williams*, 507 F.3d at 909 (reasoning application of subsection c is a proper jury question); *United States v. Dwyer*, 238 Fed. App'x 631, 647–48 (1st Cir. 2007) (same). Dismissing Count Twelve on the affirmative defense would short circuit the fact finder's role.

The Court also agrees with the Government that, even if determining the applicability of subsection (c) were within the province of the Court, the allegations in the Indictment are more than sufficient to find that Cui's arrangement with Ald. Burke's firm was not "in the usual course of business." See 18 U.S.C. § 666(c). As alleged in the Indictment, Cui explicitly stated he intended to retain Ald. Burke to influence him in an official capacity. According to the Indictment, Cui wrote an email to his previous property tax attorney specifying that he was about to select Ald. Burke's law firm and would "transfer the case back" once he obtained the official support he

needed.  See [30 (Indictment) at Count 1, ¶ 56; Count 12, ¶ 1] ("Can I have Edward Burke handle 4901 W. Irving Park property tax appeal for me, at least for this year? I have TIF deal going with the City, and he is the Chairman of Finance Committee. He handled [*sic*] his tax appeal business card to me, and I need his favor for my tif money. In addition, I need his help for my zoning etc[.] for my project. He is a powerful broker in City Hall, and I need him now. I'll transfer the case back to you after this year").

The timing and circumstances further reinforce the Government's contention that Cui's decision to retain Ald. Burke's law firm was not in the usual course of business.  Cui reached out to Ald. Burke for assistance with the pole sign permit, and, in Cui's own alleged words, Ald. Burke "handled [*sic*] his business card to [him]."  [30 (Indictment) at Count 1, ¶ 56; Count 12, ¶ 1]. Within days Cui signed a retention agreement with Ald. Burke's firm, and Ald. Burke began machinations regarding the pole sign once Cui had expressed his willingness to retain the firm. [*Id.* at Count 1, ¶ 54–66; Count 12, ¶ 1].

Cui insists in reply that his real dispute with Count Twelve is not a factual one, but rather "concerns the interpretation of Section 666(c)" such that if the facts are proven, they would not "constitute a crime." [153 (Def. Charles Cui's Reply in Support of Mot. to Dismiss Counts 12, 13, 14, 15 of the Superseding Indictment ("Cui MTD Counts 12–15 Reply Br.") at 10].  In his view, whether compensation is in the usual course of business depends on "whether the job itself was legitimate or a sham."  [*Id.*].  He characterizes the Government's definition of usual course of business as dependent "on the motivation or intent of the person acquiring or offering the job." [*Id.*]  Put differently, Cui argues that because Klafter & Burke performed legal services for him, his retention was in the usual course of business.

True, the Indictment alleges that Cui also *actually received* property tax services from Ald. Burke's law firm. The Court agrees with the Government that Cui's decision to select Ald. Burke's firm (over other firms, including the firm he already had retained on real estate matters) because of the official acts Ald. Burke could provide is what matters for present purposes. Cui can both receive services and unlawfully procure the assistance of Ald. Burke's firm. See also *Cornier-Ortiz*, 361 F.3d at 37 (similarly rejecting argument that bribe paid for salary warranted the subsection c exception because "[t]he prohibition against intentional misapplication covers the situation presented here: payments made for what was an underlying legitimate purpose but intentionally misapplied to undermine a conflict of interest prohibition. To hold that such payments were bona fide under § 666(c) would be inconsistent with § 666(a)(1)(A)").[18] Effectively, Cui's position is that he can cleanse the tainted procurement process if he receives *some* non-sham services. That view of § 666(c) is untenable. Congress would not craft an exception that swallows the rule.

It is no answer to say that the Government's interpretation has not been "embraced" by courts. Cui cites five cases in which the salary was not in the usual course of business because it was paid for work not actually performed. See [153 (Cui MTD Counts 12–15 Reply Br.) at 15–16]. Those cases do not cover the universe of bribery convictions. See, *e.g.*, *United States v. McClain*, 2022 WL 488944, at *2. Cui's argument that the Government's view renders the requirement that a bribe be "corruptly" given under subsection surplusage is not persuasive, either.

---

[18] The Court is aware that in *United States v. Mills*, 140 F.3d 630, 633–34 (6th Cir. 1998), the sixth circuit took a different view. See *id.* ("Congress also saw fit to exclude from the reach of the federal statute those individuals and those transactions that involved only the payment of bona fide salaries, wages, fees, and other compensation. In this case, the government failed to allege that the salaries received by individuals who paid bribes to obtain employment positions within the Shelby County government were unnecessary or unjustified"). However, the appellate court seemed to reach its conclusion, at least in part, on the grounds that the government could not show that the transaction met the monetary threshold of $5,000, unlike the transactions here. See *id.*

See [153 at 11]. The intent under subsection (a) goes to the intent of offering a thing of value, and the intent under subsection (c) supplements and elaborates on the meaning of corruptly under subsection (a).

Cui's backup argument, that the Court should dismiss the Count Twelve allegations to the extent they mention TIF funding, is not persuasive either. [89 (Cui MTD Counts 12–15 Br.) at 15]. Specifically, Cui contends that he procured the TIF funding nearly a year before he first contacted Ald. Burke or his firm. Again, Cui's argument is belied by his own words, quoted in the Indictment, in which Cui stated his belief that he "need[ed] his [Ald. Burke] favor for my tif money" and that "[h]e is a powerful broker in City Hall, and I need him now. I'll transfer the case back to you after this year." [30 (Indictment) at Count 1, ¶ 56; Count 12 at ¶ 1]. As the Government points out, "the TIF money had not yet been disbursed as of the date Cui offered and agreed to hire Burke's law firm." [139 (Gov't Br.) at 87]. Cui was under a Redevelopment Agreement with the City at the time he hired Klafter & Burke. The City's ability to renege on the agreement, while constrained, was still allegedly subject to Ald. Burke's influence, as Cui himself acknowledges. See [89 (Cui MTD Counts 12–15 Br.) at 16–17].

In the end, both of Cui's arguments with respect to Count Twelve go to the strength of the Government's case, a question well beyond the purview of this Court at this point in the case's life cycle. See, *e.g.*, *United States v. Moore*, 563 F.3d 585, 586 (7th Cir. 2009) (a motion to dismiss is not a summary-judgment motion and should not be used to "test[ ] the strength or weakness of the government's case, or the sufficiency of the government's evidence"). The Government has sufficiently alleged that Cui's arrangement with Ald. Burke's firm was done with intent to influence (or to reward) Ald. Burke in connection with the sign permit and TIF funds for Cui's property.

### 2. Counts Thirteen Through Fifteen: Sufficiency of Travel Act Charges

Cui also maintains that Counts Thirteen, Fourteen, and Fifteen fail to state an offense. Counts Thirteen, Fourteen, and Fifteen charge Cui (and Ald. Burke) with violations of the Travel Act, 18 U.S.C. § 1952(a)(3). According to the Indictment, Cui used a facility of interstate commerce in furtherance of violating four Illinois laws, 720 ILCS 5/33-1 (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), 720 ILCS 5/29A-1 (Commercial Bribery), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving).[19]

The Indictment therefore advances four potential state law violations as the predicate for the Travel Act charges, and Cui's motion unsuccessfully attempts to eliminate all four. First, he challenges the sufficiency of the state bribery, 720 ILCS 5/33-1, and official misconduct, 720 ILCS 5/33-3(a)(4) charges, and then he turns his attention to the commercial bribery charges (720 ILCS 5/33-1 and 720 ILCS 33-3(a)(4)). The Court will address each argument in turn.

#### a. Illinois Bribery and Official Misconduct Predicates

First, Cui insists that Counts Thirteen, Fourteen, and Fifteen do not allege unlawful conduct under the Illinois bribery statute, 720 ILCS 5/33-1, and official misconduct statute, 720 ILCS 5/33-3(a)(4). As to these statutes, he maintains that he "did not promise or tender to Mr. Burke anything that Mr. Burke was not authorized by law to accept." [89 (Cui MTD Counts 12–15 Br.) at 18].

---

[19] The indictment alleges, for example, that Cui,

> caused the use of a facility in interstate commerce, namely, an email account and associated communication network operated by the service provider Yahoo!, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, namely, a violation of 720 ILCS 5/33-1 (Bribery), 720 ILCS 5/33-3(a)(4) (Official Misconduct), 720 ILCS 5/29A-1 (Commercial Bribery), and 720 ILCS 5/29A-2 (Commercial Bribe Receiving), and thereafter, [Cui] did perform and attempt to perform an act to carry on and facilitate the promotion and carrying on of said unlawful activity.

[30 (Indictment) at Count 13].

There is no question that the Indictment alleges that Cui facilitated and promoted Ald. Burke's actions which were not authorized by law under 720 ILCS 5/33-1(a), (d), and 720 ILCS 5/33-3(a)(4).[20] Under Illinois law, a public official is not authorized to accept legal fees intended as a bribe. See, *e.g.*, *People v. Freedman*, 508 N.E.2d 326, 328–29 (Ill. App. Ct. 1987) (attorneys charged with soliciting money from clients with understanding that defendants would tender money to a judge to influence the judge's rulings fell within the clause "not authorized by law"). See Ill. Pattern Jury Instr. – Crim., § 21.11, committee's note (whether a payment is authorized by law is a legal question in most circumstances).

The conduct proscribed by the state bribery law is exactly the type of conduct the Indictment alleges Cui promoted and facilitated or aided and abetted. According to the Indictment, Cui sought assistance from Burke and retained Ald. Burke's firm to curry favor in obtaining TIF financing and the pole sign permit. On the very next day after he had contacted Ald. Burke about the sign permit, Cui sent emails to Individuals C-1 and C-2 stating that he would hire Burke's law firm for the property tax appeal to gain Burke's favor on the sign permit and TIF funding matters. [30 (Indictment) at Count 1, ¶¶ 55–56]. That same day, Cui sent an email to Burke seeking to hire his private law firm for the tax appeal. [*Id.* at ¶ 57].

It does not alter the equation that Cui could have received *bona fide* services— representation on his property tax appeal from Klafter & Burke—as a result. See *Freedman*, 508 N.E.2d at 329 (rejecting argument that conduct was not within statutory reach "because as

---

[20] Note that the Government and Cui part ways in how they define whether conduct is "unauthorized by law." Cui maintains that the Court must evaluate whether his conduct was authorized by law by reference to a specific statutory or regulatory prohibition. [89 (Cui MTD Counts 12–15 Br.) at 19]. The Government disagrees. [139 (Gov't Br.) at 94]. The Court assumes without deciding that Cui's conduct is unauthorized by law with reference to the Chicago Municipal Ordinance (or some other specific law) because the allegations easily could flunk the Chicago Municipal Ordinances, as discussed in the text, above. It appears that even though Cui's conduct need not violate the statute, he must have intent to violate the statute, and thus in turn the conduct must be "unlawful" as defined by the Chicago Municipal Code.

private attorneys they were not unauthorized by law to accept or solicit money from a client");

*United States v. Bryant*, 556 F. Supp. 2d 378 (D.N.J. 2008) (rejecting similar argument under

analogous state statute, "regardless of what legitimate work he may have done, [the defendant]

allegedly accepted * * * the salary in exchange for taking official action").

Cui offers three main points for dismissal. To begin, he argues that the Chicago Municipal

Code, § 2-156-030, entitled "Improper Influence," did not prohibit Cui's conduct because this

provision "does not prohibit officials from receiving income or compensation." [89 (Cui MTD

Counts 12–15 Br.) at 20–21]. Next, he contends that Ald. Burke did not violate the ordinance

prohibiting gift giving, Chicago Municipal Code § 2-156-142. [*Id.* at 21]. Finally, he directs the

Court's attention to another provision, Chicago Municipal Code § 2-156-142(f), which he argues

authorized his conduct because under that section Ald. Burke may accept compensation for

services unrelated to his official duties. [*Id.* at 21–22].

Multiple ethics ordinances of the City of Chicago reinforce the Court's understanding that

the Indictment properly charges Cui with engaging in or abetting Ald. Burke in conduct

"unauthorized by law." Cui's arguments are unpersuasive because the Municipal Code, which

fleshes out what it means to be "authorized by law," provides in no uncertain terms that subsection

(a) of Chicago Municipal Code § 2-156-030, in effect in 2017, prohibited Burke from using his

official position to assist Cui, with whom he had a financial relationship through Klafter & Burke.

Per § 2-156-030(a), Ald. Burke could not:

> use his position to influence any city governmental decision or action which he
> knows or has reason to know that he has any financial interest distinguishable from
> its effect on the public generally, or from which he has derived any income or
> compensation during the preceding twelve months or from which he reasonably
> expects to derive any income or compensation in the following twelve months.

According to Cui, this is the "wrong portion of the Ethics Ordinance" because the ordinance

prohibits officials like Ald. Burke from "using their positions to influence governmental decisions"

but not "from receiving income or compensation." [89 (Cui MTD Counts 12–15 Br.) at 21]. Cui has simply run back the argument that he made, and this Court rejected, that Ald. Burke received a *bona fide* salary from Cui. The ordinance plainly prohibits Ald. Burke from "attempt[ing] to use his position to influence any city governmental decision in which he knows * * * he has any financial interest distinguishable from its effect on the public generally," and "from which he reasonably expects to derive any income" within twelve months. See § 2-156-030(a). That is precisely what the Indictment alleges here, and the jury will need to sort out whether Cui or the Government have the better of the argument based on the evidence.

Cui's attempts to redirect the Court to the prohibition on gifts to public officials does not rescue his contention that his conduct was not "unauthorized by law." Even assuming for the sake of argument that Cui did not violate the gift provision of the municipal code, see Chicago Municipal Code § 2-156-142, his compliance with one law does not absolve him from potential liability for violating another one or from abetting Ald. Burke's violation.

That leaves Cui's contention that Chicago Municipal Code § 2-156-142(f) authorizes Ald. Burke to run a private business, which according to Cui means that Ald. Burke "was expressly not precluded from accepting compensation for Klafter & Burke's services." [89 (Cui MTD Counts 12–15) at 22]. The plain language undermines his argument because the ordinance limits officials from receiving private compensation so long as the services are "wholly unrelated" to official duties. Here, the allegations of the Indictment are that Cui contacted Ald. Burke about services related to his office. In the Government's words, "as alleged in the superseding indictment, and as demonstrated by the cited emails, Cui admitted that he was hiring Burke as an attorney in order to cause Burke to take action favorable toward Cui in regards to the sign permit he sought for the 4901 property." [139 (Gov't Br.) at 97]. And in turn, Ald. Burke allegedly solicited Cui's private

business for his law firm.  Again, the jury must decide whether Cui's payment for Ald. Burke's influence over the pole sign permit was "wholly unrelated"[21] to his official duties, and thus authorized by the City of Chicago.

### b.      Illinois Commercial Bribery Predicates

Cui's arguments about the remaining two state law predicates for the Travel Act counts fare no better.  Under 720 Ill. Comp. Stat. Ann. 5/29A-1, "[a] person commits commercial bribery when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs."[22]   And under 720 ILCS 5/29A-2, an employee who "without consent of his employer or principal, * * * solicits, accepts or agrees to accept any benefit" can also be held criminally liable for commercial bribery.[23]

Cui argues that the commercial bribery statutes, 720 ILCS 5/29A-1 and 720 ILCS 5/29A-2, do not apply to the allegations against and involving Ald. Burke because both statutes concern "commercial bribery," not bribery of public officials.   [89 (Cui MTD Counts 12–15) at 23].

---

[21] Cui adds in reply that the phrase "wholly unrelated" modifies "services" and not "compensation."  [153 (Cui's Reply Br. MTD Counts 12–15) at 22].  This argument assumes that the "services" for which Cui sought to compensate Ald. Burke were Klafter & Burke's services.  The crux of the allegations are that the services Cui sought out were Ald. Burke's official acts, and that Cui compensated Ald. Burke for those official acts by selecting Klafter & Burke over his own prior tax appeal lawyer (in addition to agreeing to any earned contingency fees).

[22] The elements of a 720 ILCS 5/33-1 offense require that the defendant (1) conferred, offered, or agreed to confer a benefit upon an employee, (2) did so without consent of the employer or principal, (3) did so with intent to influence the employee's, agent's or fiduciary's conduct.  See Ill. Pattern Crim. Instrs., § 21.08.

[23] The elements of a 720 ILCS 5/29A-2 crime are as follows: the defendant (1) was an employee, agent or fiduciary of his employer or principal; (2) solicited, accepted or agreed to accept a benefit from another person; (3) did so upon an understanding or agreement that such benefit would influence his conduct in relation to his employer's or principal's affairs; and (4) did so without the consent of his employer or principal.  See Ill. Pattern Instrs., § 21.10.

Failing that, Cui insists that the City consented to Burke's receipt of compensation for outside employment. [*Id.* at 26].

It appears to be an issue of first impression whether Illinois' commercial bribery laws apply to public officials. The Court concludes that Illinois' commercial bribery statutes apply to this case. The plain language of the statutes suggests that 720 ILCS 5/29A-1 and 5/29A-2 apply to "[a]ny employee" and "an employee." "[A]ny" means all, or universally applicable, and neither "any" nor "an" limit the statute to certain types of employees. Cui's construction of the statute would require the Court to read the statute to narrow its scope. "Courts must not depart from a statute's plain language by reading into it exceptions, limitations, or conditions the legislature did not express." *Newland v. Budget Rent-A-Car Sys., Inc.*, 744 N.E.2d 902, 904 (Ill. App. Ct. 2001). The General Assembly knows how to differentiate or exclude public officials from the commercial bribery statute, yet there is no language limiting the reach of the statute. Compare, *e.g.*, 720 ILCS 5/17-10.6(b)(2) (criminalizing bribery by "[a]n employee * * * of a financial institution"); 720 ILCS 5/33-3(b) (criminalizing conduct with respect to certain officials, such as law enforcement personnel). There is no such language here.

Ald. Burke insists that the statute is preempted by other, more specific statutes that apply to public officials. "It is a rule of statutory construction that the expression of one thing is the exclusion of others, and it is also axiomatic that the specific shall prevail over the general," *People v. Caryl*, 369 N.E.2d 926, 927 (Ill App. Ct. 1977), and "courts only resort to this device when the two provisions conflict." *Newland*, 744 N.E.2d at 906. It would be different, perhaps, if the Government were trying to apply a higher penalty and felony sentence to a private official bribing another public official. Compare *id.* (rejecting the argument that state law was preempted because the two provisions could "be construed harmoniously and no conflict exists"), with *People v.*

*Stupka*, 589 N.E.2d 1068, 1073 (Ill App. Ct. 1992) (specific statute preempted general because general statute would have attached criminal penalties to quantity below specific statute's higher threshold).

But the commercial bribery and public official bribery and misconduct statutes at issue in this case do not conflict. The commercial bribe receiving statute even imposes the same or a lower term of imprisonment as the public official-centric statutes. Specifically, Illinois punishes commercial bribery involving a bribe of under $500,000 with a fine, whereas Illinois public official bribery is a felony. Compare 720 ILCS 5/29A-3 (categorizing a commercial bribe involving over $500,000 as a Class 3 felony), with 720 ILCS 5/33-1 (categorizing state law bribery as a Class 2 felony), and 720 ILCS 5/33-3(c) (a public officer convicted of violating the provision forfeits his employment and commits a Class 3 felony). Cui's logic therefore is not sound. If the Court were to accept his approach to reading the statute, for example, the General Assembly would not be subject to the Illinois state bribery law because there is a more specific statute criminalizing bribery by Illinois state legislators.

Finding that the commercial bribery statutes apply to public officials also is logical because of the structure of the Illinois code. The public official bribery and official misconduct statutes coexist alongside a host of other provisions, for example, state laws designed to criminalize bribery in athletic contests, see 720 ILCS 5/29-1 *et seq.*, and those tailored to the provision of medical assistance, see 305 ILCS 5/8A-3. A common sense reading of the statutory framework is that the Illinois General Assembly intended to expand and supplement the reach of the public official corruption laws to cover as much territory as possible and to avoid a situation where, for example,

an official who wears several hats could escape punishment because of the blurry lines between public and private officials.[24]

There are cases in other jurisdictions pointing both ways on this score, but the rationale employed in these cases is largely inapposite. For example, some state supreme courts have concluded that commercial bribery does not apply to public officials. See *People v. Seligman*, 313 N.Y.S.2d 593, 598 (N.Y. App. Div. 1970), *aff'd as modified*, 270 N.E.2d 721 (1971) (concluding that the section of the code "relate[d] only to 'commercial fraud' committed by employees of a Private business" did not apply to the defendants because they "did not betray the interests of a private business in soliciting bribes"); *Commonwealth v. Benoit*, 196 N.E.2d 228, 230 (Mass. 1964) (the statute in question "relates to acts of agents, employees or servants of persons or corporations engaged in private business and not to acts of public officers"). Others have found that commercial bribery provisions do apply to public officials. See *Commonwealth v. Bellis*, 484 Pa. 486, 490 (Pa. 1979) (rejecting argument that the statute pertains only to commercial bribery because no language in the statute limited its applicability to the private sector); *People v. Nankervis*, 46 N.W.2d 592, 595 (Mich. 1951) (rejecting defendant's argument that the statute "applies only to employees of private employers, while he was a public servant"). These cases, which concern the interpretation of other state statutes with different language and coexist alongside different statutory schemes, shed no meaningful light on the Illinois commercial bribery statutes.

Failing to prevail on his assertion that the commercial bribe statute does not apply here, Cui insists that the City of Chicago consented to his receipt of compensation for outside

---

[24] In fact, the allegations against Ald. Burke present one such scenario. Under Cui's theory, Ald. Burke might successfully argue that only the commercial bribe statute, not the public bribery statute, applied to him because he accepted bribes through his capacity as a private lawyer, not as an official.

employment through the ethics ordinance (discussed above). [89 (Cui MTD Counts 12–15 Br.) at 26]. In reply, he characterizes the Government's position as requiring the City to consent to a public official's private employment on a transaction-by-transaction basis, rather than providing blanket authorization, which would be practically impossible. [*Id.* at 25]. This argument is simply a recapitulation of his argument that the ethics ordinances authorize public officials to conduct outside employment unrelated to their duties. The Court rejects the argument for the reasons stated above.

In sum, the Court therefore denies Cui's motion [88, 89] to dismiss Counts Twelve, Thirteen, Fourteen, and Fifteen.

## VI. Motion to Dismiss and Strike State Bribery, Commercial Bribery, Official Misconduct Charges [106, 107]

Next, Ald. Burke seeks to dismiss [106, 107] Counts One, Three, Four, Seven, Eight, Nine, Fifteen, and Sixteen of the Superseding Indictment ("Indictment") [30], which comprise the RICO and Travel Act charges. This motion brings the Court back to some of the same counts challenged in Ald. Burke's motion to dismiss the Amtrak-based charges [108]. However, Ald. Burke takes a different tact to chip away at the allegations, this time by challenging the constitutionality of the three Illinois state laws that underlie the RICO and Travel Act charges. In his view, none of the state laws pass constitutional muster because they are overbroad and void-for-vagueness in violation of the First and Fifth Amendments to the United States Constitution, respectively. See [106 (Ald. Burke's Mot. to Dismiss & Strike the State Bribery, Commercial Bribery, & Official Misconduct Charges ("Burke State Bribery Mot.")); 107 (Ald. Edward M. Burke's Memo. of Law in Support of his Mot. to Dismiss & Strike the State Bribery, Commercial Bribery, & Official Misconduct Charges ("Burke State Bribery Br."))]. Andrews moves to adopt the motion [122

(Def. Andrews' Mot. to Adopt Pretrial Mots. Filed by Codefendant Burke ("Andrews Mot. to Adopt")]. For the reasons stated below, the Court denies Ald. Burke's motion [106, 107] in full.

### A.     Factual and Procedural Background

As noted, the instant motion [106, 107] challenges the allegations that Ald. Burke and his co-defendant, Peter Andrews, violated the RICO statute, 18 U.S.C. § 1962(c), and the Travel Act, 18 U.S.C. § 1952(a)(3). An exhaustive recitation of those nine charges is not necessary. The challenged counts invoke three Illinois state laws as predicate offenses: (1) bribery, see 720 ILCS 5/33-1(e), (2) commercial bribery, 720 ILCS 5/29A-2, and (3) official misconduct, see 720 ILCS 5/33-3(a)(4). State law bribery, commercial bribery, and official misconduct form the basis for the Indictment's stand-alone Travel Act charges, and form predicates to the RICO racketeering activity. See, *e.g.*, [30 (Indictment) at Count 1, ¶ 84 (Racketeering Act 1(a)-(d)); Count 3 (Travel Act)].

Ald. Burke asks this Court to invalidate all three state statutes and to dismiss the RICO (Count One) and Travel Act charges (Counts Three, Four, Seven, Eight, Nine, Fifteen, Sixteen) under Federal Rule of Criminal Procedure 12(b)(3)(B)(v) for failure to state an offense, to strike the charges pursuant to Federal Rule of Criminal Procedure 7(d), or to impose a limiting construction.[25] The Government opposes in full. See [139 (Gov't Br.) at 105].

### B.     Legal Standard

Federal Rule of Criminal Procedure 12(b)(3)(B)(v) provides an avenue for dismissal of an indictment charging an unconstitutional statute. Federal Rule of Criminal Procedure 7(d) further provides a basis upon which to strike an indictment charging an unconstitutional statute. In the

---

[25] Ald. Burke requests that this Court impose a limiting construction on the laws to conform to 720 ILCS 5/33-8(a), or "in a manner comparable to the federal bribery as set forth in *McDonnell*." See [107 (Burke State Bribery Br.) at 46–48].

analysis that follows, the Court will draw on the legal standards articulated above, see Part II(B) and Part III(B) above, for challenges under these rules.

## C.    Analysis

According to Ald. Burke, the three state statutes underlying the RICO and Travel Act charges are unconstitutional under the First Amendment's Free Speech and the Fifth Amendment's Due Process clauses, respectively, on their face and in certain instances as applied to Ald. Burke. See [107 (Burke State Bribery Br.) at 11].

### 1.    Overbreadth

Ald. Burke asserts that the three state-law predicates for the RICO and Travel Act charges in the Indictment are constitutionally overbroad and vague. Under "First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). The Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* This approach "strike[s] a balance between competing social costs:" to avoid chilling "people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas" while also preserving perfectly constitutional laws that are "directed at conduct so antisocial that it has been made criminal." *Id.*

To determine whether a statute is overbroad, courts perform a two-step analysis. "The first step in overbreadth analysis is to construe the challenged statute * * *" to determine "what the statute covers." *Williams*, 553 U.S. at 293. In step one, a court "must adopt any limiting construction proffered by a state court." *Bell v. Keating*, 697 F.3d 445, 456 (7th Cir. 2012). The second step requires a court to determine whether the statute, as so construed, "criminalizes a substantial amount of protected expressive activity." *Williams*, 553 U.S. at 297. "To put the matter

74

another way, particularly where conduct and not merely speech is involved, * * * the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

*Bauer v. Shepard*, 620 F.3d 704 (7th Cir. 2010), and *Johnson v. United States* ("*Johnson II*"), 875 F.3d 360 (7th Cir. 2017), are instructive. In *Bauer*, the Seventh Circuit rejected an overbreadth challenge to several provisions of Indiana's code of judicial ethics, including one which prohibited judges only from making "commitments * * * inconsistent with the impartial performance of judicial office." *Id.* at 707. Granted, judges could not commit to certain behavior in office or make other speech covered by the commitments clause. *Id.* at 714–15. "But[,] it [was] unnecessary to decide whether *some* protected speech might come within the scope" of the challenged statute. *Id.* at 714–15. The prohibition only ruled out "commitments that are inconsistent with impartial adjudication," which left judges and candidates for office free to share "not only their general stance ('tough on crime' or 'tough on drug companies') but also their legal conclusions" on and off the bench. *Id.* at 715–16. "[W]hen the Supreme Court speaks of overbreadth, it does not mean a statute or rule that catches the occasional protected tidbit. All rules are overbroad in that sense." *Id.* at 715. Accordingly, the statute did not violate the First Amendment. Similarly, in *Johnson II*, the Seventh Circuit reasoned that a law prohibiting destruction of property did not criminalize a substantial amount of speech because under the ordinary and plain meaning of the statute, the phrase "any real or personal property" did not prohibit advocacy that would hurt intangible property, such as profits or goodwill. 875 F.3d at 365–66. Accordingly, the Court upheld the statute over the defendant's overbreadth challenge. *Id.*

A statute should not be "discarded in toto because some persons' arguably protected conduct may or may not be caught or chilled by the statute." *Broadrick*, 413 U.S. at 602, 615–618 (upholding a statute that limited state's civil servant political activities while allowing private expression of "virtually any expression not within the context of active partisan political campaigning"). The overbreadth doctrine is "strong medicine" that courts should use "sparingly and only as a last resort," particularly "when a limiting construction has been or could be placed on the challenged statute." *Id.* at 613.

### a.  Illinois State Bribery, 720 ILCS 5/33-1(e)

With these general overbreadth principles in mind, the Court now turns to the Illinois state bribery statute, 720 ILCS 5/33-1(e). In relevant part, 720 ILCS 5/33-1(e) provides that:

> A person commits bribery when: he or she solicits, receives, retains, or agrees to accept any property or personal advantage pursuant to an understanding that he or she shall improperly influence or attempt to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness.

*Id.* The Court begins, as it must, by construing the statute. According to the Illinois Supreme Court, "[t]he essence of the crime of bribery is the giving to, and receiving or acceptance by, a public officer of something of value to influence him in the performance of his official duty, whether it be termed general or specific." *People v. Clemons*, 187 N.E.2d 260, 261 (Ill. 1962) (construing earlier iteration of the statute). To take just one example, the Illinois Supreme Court has upheld bribery convictions against a defendant for giving money to two police officers in return for their role in securing the defendant's release from custody. See *People v. Wallace*, 312 N.E.2d 263, 264 (Ill. 1974). In *People v. Brandstetter*, 430 N.E.2d 731 (Ill. App. Ct. 1982), the Illinois Appellate Court upheld a state bribery conviction of a defendant who offered a state legislator a campaign contribution in exchange for the legislator's vote on specific bill. *Id.* at 733. The version of the statute in force at the time, which prohibited the receipt of "property or personal advantage"

76

not "authorized by law," *id.* at 734, was not unconstitutionally vague, *id.* at 734–36. The court found that the Illinois statutory scheme, which fleshed out those terms, provided sufficient guidance to protect First Amendment interests and did not chill campaign giving because "other public officials are 'authorized by law' to receive campaign contributions from those who might seek to influence the candidate's performance as long as no promise for or performance of a specific official act is given in exchange." *Id.* at 736.

The consistent guidance from the Illinois Supreme Court and Illinois Appellate Court lends support to the Government's view that the discernible core of the statute "target[s] corruption by criminalizing efforts to provide things of value as a means of obtaining improper and unlawful influence over individuals in positions of trust." [139 (Gov't Br.) at 107]. As a preliminary matter, as in *Brandstetter*, the charges here, which allege that the "property or personal advantage" the defendant agreed to was money (in the form of legal fees), leave this Court no reason to "conjecture what 'personal advantage' might mean in the context of other charges." See *Brandstetter*, 430 N.E.2d at 735.

Nor does this Court accept Ald. Burke's assertion that this bribery statute criminalizes a substantial amount of protected conduct. Ald. Burke hones in on two statutory phrases—"personal advantage" and "any act related"—to argue the state bribery law could chill at least two types of First Amendment speech. He claims that constituents will be afraid to make campaign contributions and then contact their politicians, and that politicians might eschew run-of-the-mill functions, like attending a luncheon event or giving a speech.

Ald. Burke's heavy reliance on the statutory terms does little to show the statute criminalizes a substantial amount of speech. The statute's text and Illinois judicial decisions make clear the statute does not criminalize receipt of campaign contributions or nominal gifts. The

Illinois Appellate Court long ago held that an earlier iteration of the state bribery statute did not criminalize lawful campaign contributions. See *Brandstetter*, 430 N.E.2d at 736. Any suggestion that the term "personal advantage" and "any act related" encompasses token gifts such as food at luncheons or travel expenses falls short as well for several reasons. First, the Illinois legislature included a scienter requirement in the statute. Per § 33-1(e), the property or personal advantage must be designed to "improperly influence" the conduct of the public officer. Improperly is synonymous with wrongful influence, and an intention of wrongdoing accompanies the tender of property and provides fair notice. The plain language of the statute imposes a scienter requirement such that the statute only proscribes the receipt of gifts intended to "improperly influence" specific conduct.[26] *Cf. United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996) (construing similar term "corrupt" in statute to protect defendants from chilling protected speech because the statute "by targeting only such persuasion as is 'corrupt[]', [the statute] does not proscribe lawful or constitutionally protected speech"); *United States v. Shotts*, 145 F.3d 1289, 1301 (11th Cir. 1998) (holding that this type of scienter requirement protects a statute against impermissible infringement of protected speech). Second, the plain language prohibits the receipt of "property or personal advantage." 720 ILCS 5/33-1(e). To be sure, "advantage," encompasses something short of property. Nevertheless, the term "property" plays a limiting function; the phrase "personal advantage" is "narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated.'" See *Johnson II*, 875 F.3d at 366 (quoting *Commodity Futures Trading Comm'n v. Worth Bullion Grp.*,

---

[26] Illinois courts have applied the intent element to rein in the statute in practice. Under earlier iterations of the statute, the Illinois Supreme Court has overturned bribery convictions for lack of intent. See, *e.g.*, *People v. Gokey*, 312 N.E.2d 637, 640 (Ill. 1974) (overturning conviction of arrestee charged with bribing officers for lack of intent given that the so-called bribe was "made in the presence of police officers" "[t]he amount of the claimed 'bribe' increased * * * more than 100 times, in the course of a minute" and "considering the circumstances, it was hardly language seriously proposing criminal conduct.").

*Inc.*, 717 F.3d 545, 550 (7th Cir. 2013)). Same too, the *quid* is cabined to something "related to the employment or function of any public officer." Just as *Johnson II*, when these terms are viewed "not in isolation, but instead in the context of the whole statute," their meaning is sufficiently clear. See *id.* at 366.

Even if the statute could hypothetically reach Ald. Burke's examples like luncheons and travel reimbursements, just like the occasionally protected "tidbit[s]" at issue in *Bauer* and *Broadrick*, Ald. Burke has not shown that the statute reaches "*substantial* amounts of protected speech." See *Bauer*, 620 F.3d at 715; *Broadrick*, 413 U.S. at 615. This Court does not "believe that [730 ILCS 5/33-1] must be discarded in toto because some persons' arguably protected conduct may or may not be caught or chilled by the statute." See *Broadrick*, 413 U.S. at 618. This Court could come up with a long list of examples of constituent requests "even more innocuous" than the luncheons and conferences Ald. Burke gives as examples, "[b]ut an ordinance is not unconstitutionally vague 'simply because one can conjure up a hypothetical dispute' over the meaning of a term." *Berrios v. Cook Cnty. Bd. of Comm'rs*, 2018 IL App (1st) 180654, ¶ 36 (ethics ordinance not unconstitutionally vague because the term "official action" "must be read as applying to action requiring the application of discretion, such that" the phrase did not extend to "minor ministerial functions" like picnic permits).

Above all else, bribery itself clearly is not protected speech and prohibiting it serves a critical purpose here in Illinois in particular. *United States v. Marchetti*, 466 F.2d 1309, 1314 (4th Cir. 1972) ("Threats and bribes are not protected simply because they are written and spoken; extortion is a crime although it is verbal"). There is no question that exposing corruption is a significant state interest, and that this interest is acute in Illinois given the litany of public-corruption convictions in this courthouse alone. See *First Nat'l Bank of Boston v. Bellotti*, 435

U.S. 765, 788–89 (1978) (describing preserving citizens' confidence in government as "interests of the highest importance").

### b.    Commercial Bribery, 720 ILCS 5/29A-2

Ald. Burke likewise claims that the Illinois Commercial Bribery statute, 720 ILCS 5/29A-2, violates the First Amendment.  Subsection 2 of 720 ILCS 5/29A states that:

> An employee, agent or fiduciary commits commercial bribe receiving when, without consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs.

Ald. Burke's First Amendment argument regarding the commercial bribery statute makes no more headway than his criticisms of the state bribery statute.  To begin, much of Burke's argument about the application of the commercial bribery statute has nothing to do with the First Amendment analysis discussed above; instead, it concerns a general dissatisfaction with the Government's use of the commercial bribery statute as a predicate for a violation of the Travel Act, 18 U.S.C. § 1952.  Recall that the north star of the analysis is whether 720 ILCS 5/29A-2 "criminalizes a substantial amount of protected expressive activity," see *Williams*, 553 U.S. at 297, not whether Ald. Burke was surprised that this law was applied to him.

In another twist on his prior arguments, Ald. Burke points to various words in the statute and contends that they are so limitless that politicians like him would avoid engaging with constituents.  Namely, he points to the phrase "conduct in relation to his employer's or principal's affairs" as broader than the narrow acts proscribed in *McDonnell v. United States*, 579 U.S. 550 (2016).  And he claims that the requirement that the employee act "without consent of his employer or principal" does not act as a limiting principle.

The Government has the better of the argument that the commercial bribery statutes are not unconstitutionally overbroad.  By its own terms, the statutes are limited to transactions by an

employee "without consent." In turn, a system of laws and rules govern city officials, and *that* system gives meaning to the phrase "without consent." For example, ethics rules dictate the conduct of City officials and employees. See, *e.g.*, Chicago Municipal Code, §§ 2-156-030, 2-156-142. Those rules, among other things, prohibit an elected official from making contact with any other city official or employee on a matter involving a person with whom the elected official reasonably expects to derive income or compensation in the following twelve months. *Id.* § 2-156-030(a). "When a statute is accompanied by [a] system that can flesh out details, the due process clause permits those details to be left to that system." See *Bauer*, 620 F.3d at 716. Although a certain statute may be "full of vague terms" that create ambiguities on the margins, the "Justices have been chary of holding laws unconstitutional 'on their face' precisely because they have recognized that vagueness will be reduced through a process of interpretation." *Id.*; *Trs. of Ind. Univ. v. Curry*, 918 F.3d 537, 541 (7th Cir. 2019) (similar). So even *if* the City, as Ald. Burke argues, could not "fire" Ald. Burke for acting without consent, the statutory system knocks the wind out of the sails of his argument that the statute is so broad that it will chill his speech. To be sure, the statute does not perfectly align with the guidance provided by the Supreme Court in *McDonnell v. United States*, 579 U.S. 550 (2016). But *McDonnell* did not purport to invalidate every state law that failed to divine what, if any, limits the Court would impose on the term "official acts." In fact, the Supreme Court in *McDonnell* and *Skilling*, 561 U.S. 358 (2010), specifically rejected constitutional challenges because of the "limiting constructions" available.

Accordingly, the system of laws and regulations that limit whether an official's conduct is "without the consent" of his employer together with Illinois courts' adjudication of this statute act as limiting principles that curb Ald. Burke's vagueness concerns. Instructing the jury in a manner

consistent with those laws and regulations also will be important. But, the commercial bribe receiving statute does not run afoul of the First Amendment.

### c.      Illinois Official Misconduct, 720 ILCS 5/33-3(a)(4)

That leaves Ald. Burke's contention that Illinois' official misconduct statute, 720 ILCS 5/33-3(a)(4), violates the First Amendment. Section 5/33-3(a)(4) provides in relevant part,

> (a) A public officer or employee or special government agent commits misconduct when, in his official capacity or capacity as a special government agent, he or she commits any of the following acts * * *

> > (4) Solicits or knowingly accepts for the performance of any act a fee or reward which he knows is not authorized by law.

The official misconduct statute only prohibits soliciting a fee or reward that is "not authorized by law," 720 ILCS 5/33-3(a)(4), a limitation that plainly excludes legitimate campaign contributions. Illinois courts have held that legitimate campaign contributions are outside the scope of the statute, whereas campaign contributions exchanged for specific official acts are within the statute's scope. In *People v. Kleffman*, 412 N.E. 2d 1057 (Ill. App. Ct. 1980), the Illinois Appellate Court upheld a conviction based on an earlier iteration of the Illinois Official Misconduct statute, 720 ILCS 33-3(c) (1961). Reversing the trial court's invalidation of the statute on overbreadth grounds, the court reasoned that the statute "does not purport to regulate speech, press, or any other constitutionally protected right," and that the phrase "in excess of lawful authority" imposed a limiting principle that "renders the statute inapplicable to constitutionally protected conduct." *Kleffman*, 412 N.E.2d at 1060. In addressing the term "personal advantage," the court provided a gloss on the meaning of "personal advantage," as:

> designed to reach those situations where a public officer or employee has in some fashion exploited his official position to the detriment of the public good such that personal * * * means an advantage to a particular person as opposed to the public the officer or employee serves. Again, as a general rule, public officers or employees should be able to determine whether they are acting in the public interest or the interest of a particular person.

*Id.* at 1061.

In the end, Ald. Burke cannot point this Court to even one appellate decision in the decades since the enactment of these state bribery laws that invalidated the statutes on overbreadth grounds. Given the prevalence of these cases, the Court cannot imagine that such a pressing constitutional concern would simply escape the judiciary's notice. Ald. Burke does not carry his burden to show that any of these statutes, as construed by the state courts themselves, have applied to a substantial amount of speech. None of the statutes violate the First Amendment.

### 2.    Vagueness

That brings the Court to Ald. Burke's void-for-vagueness arguments. The Fifth Amendment's guarantee that "[n]o person shall * * * be deprived of life, liberty, or property, without due process of law" forbids vague criminal laws. U.S. Const. amend. V; *Johnson v. United States* (*Johnson I*), 135 S. Ct. 2551, 2556 (2015). "A vagueness claim alleges that, as written, the law either fails to provide definite notice to individuals regarding what behavior is criminalized or invites arbitrary and discriminatory enforcement—or both." *Bell*, 697 F.3d at 455.

To determine whether a statute runs afoul of the Fifth Amendment, courts traditionally ask whether the law meets two criteria: does the statute "define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." *Bell*, 697 F.3d at 461 (quoting *Skilling*, 561 U.S. at 402–03).

For the first criterion, we ask "whether the ordinance makes clear that conduct which *does* give rise to a [violation] such that an ordinary individual can understand when his [conduct] is criminalized. As we do so, we consider not only the words of the ordinance, but also the context for which the statute is written." *Bell*, 697 F.3d at 461. A statute "fails th[e] second criterion if it

impermissibly delegates to law enforcement the authority to arrest and prosecute on 'an ad hoc and subjective basis.'" *Id.* at 462 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). "[A] statute is not vague simply because it requires law enforcement to exercise some degree of judgment." *Id.* As the Supreme Court instructs:

> [w]hat renders a statute vague, however, is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is. Thus, [the Supreme Court] ha[s] struck down statutes that tied criminal culpability to whether the defendant's conduct was "annoying" or "indecent"—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.

*Williams*, 553 U.S. at 305–06. See, *e.g.*, *Bell*, 697 F.3d at 462 (invalidating statutory text that prohibited conduct causing "annoyance" and "serious inconvenience" as unconstitutionally vague because such "inscrutable standard[s]" are "no standard at all").

The Government contends that the Court should ask whether the statutes Ald. Burke calls into constitutional question are vague when applied to the allegations against Ald. Burke, not on their face. As a general principle, "[v]agueness challenges to statutes that do not involve First Amendment interests are examined in light of the facts of the case at hand." *United States v. Coscia*, 866 F.3d 782, 794 (7th Cir. 2017) (quoting *United States v. Morris*, 821 F.3d 877, 879 (7th Cir. 2016)).

Surely, the statutes at issue here implicate free speech. But even when First Amendment interests are involved, the Supreme Court still has considered whether a statute was vague as applied to the particular facts at issue, for "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18–23 (2010) (quoting *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982)). "[W]hen a statute 'interferes with the right of free speech or of association, a more stringent vagueness test should apply.' 'But perfect

84

clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Id.* at 19 (internal quotation marks and citation omitted) (first quoting *Hoffman Ests.*, 455 U.S. at 499; and then quoting *Williams*, 553 U.S. at 304). Accordingly, "even to the extent a heightened vagueness standard applies, a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice. And he certainly cannot do so based on the speech of others." *Id.* at 20. To ascertain whether speech is clearly proscribed, a court asks, "whether the conduct at issue falls so squarely in the core of what is prohibited by the law that there is no substantial concern about arbitrary enforcement because no reasonable enforcing officer could doubt the law's application in the circumstances." *Coscia*, 866 F.3d at 793–95 (quoting *Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006)).

*United States v. Johnson* (*Johnson II*), 875 F.3d 360 (7th Cir. 2017), again is illustrative. The Seventh Circuit rejected a defendant's void-for-vagueness challenge to a federal statute that proscribed damage to the property of an "animal enterprise." The defendants' argument that the broad definition of "animal enterprise" invited arbitrary enforcement was a nonstarter. *Id.* at 370. The defendants could not "prove *their* prosecutions arose from arbitrary enforcement;" it was "beyond question" that the defendant's record of "releasing 2000 minks, destroying their breeding cards, spraying a caustic substance on farm equipment and spray painting 'Liberation is Love' on the barn of [a] mink farm 'f[ell] squarely in the core of what is prohibited by'" the statute's proscription of property damage to an animal enterprise such that "no reasonable enforcing officer could doubt" the statute's "application in the circumstances." *Id.* See, *e.g.*, *Coscia*, 866 F.3d at 793–95 (federal anti-spoofing statute that proscribed "offering with the intent to cancel the bid * * * before execution" not unconstitutionally vague where defendant commissioned a

program specifically designed to be cancelled); *Humanitarian L. Project*, 561 U.S. at 18–23 (although challenged statute was not "clear in every application," it was not unconstitutionally vague because "the dispositive point [was] that the statutory terms are clear in their application to plaintiffs' proposed conduct, which means that plaintiffs' vagueness challenge must fail").

### a. Illinois State Bribery, 720 ILCS 5/33-1(e)

In this case, the Illinois bribery statute, 720 ILCS 5/33-1(e), is not unconstitutionally vague. The statute provided Ald. Burke with fair notice of the conduct it prohibited, and the allegations in Ald. Burke's case fit neatly into the statute's core. But even if this Court were to consider the statute on its face, it is not unconstitutionally vague.

The allegations here—that Ald. Burke pedaled his influence on specific, pending matters in return for private firm legal fees[27]—are a far cry from the type of "prosaic interactions" Burke

---

[27] The Indictment alleges that Ald. Burke personally assisted (and pressured other officials to assist) constituents on certain, pending official matters or offered in exchange for legal fees for his private law firm. The Indictment alleges he pursued these exchanges with several different constituents and, on at least one occasion, interfered with a constituent's pending matter because they declined to hire his firm.

For example, the Indictment charges Ald. Burke with seeking out Company A as a tax client and agreeing to assist the Old Post Office's redevelopment on the understanding that Company A would hire his law firm. [30 (Indictment) at Count 1, ¶ 10]. In fact, the Indictment alleges facts from which one could infer Ald. Burke intended to withhold assistance on Company A's Amtrak negotiations, water access from the Chicago Water Department, and TIF funding unless and until Company A hired his law firm. [*Id.* at ¶¶ 11, 12, 16, 25] (noting Amtrak officials could be "worked with," but he "had not been hired yet by Company A, and that Company A had additional properties in the Chicago area"; "that [he] would not take any action benefitting Individual A-1 and Company A in connection with the Post Office project unless Individual A-1 retained [his] firm, Klafter & Burke, and told [Ald. Solis] that 'the cash register has not rung yet'"; and with respect the Water Department he "had not heard about 'getting hired to do the tax work,' so [he] was not 'motivated' to provide any assistance concerning the Post Office project"; and after noting he was not "fond of the way they've conducted themselves up until this point" remarking with respect to a TIF funding application "good luck getting it on the agenda").

Similarly, the Indictment further asserts that Ald. Burke solicited Company B as a tax client in return for approving their permits, but also directed staff to interfere with Company B's renovations after learning that Individuals B-1 and B-2 had not hired Klafter & Burke. [30 (Indictment) at Count 1, ¶¶ 40–44] (alleging, among other things, that "[b]ecause Company B failed to provide tax work to [his] law firm, [Burke] and [Andrews] agreed that [Andrews] would take action to interfere with the operation of the restaurant"). Ald. Burke allegedly let the renovations proceed only once Company B signed the Klafter & Burke retention agreement. [*Id.* at ¶¶ 45–49]. (Footnote continues on next page).

complains about in his brief. See, *e.g.*, *People v. Johnson* (*Johnson III*), 780 N.E.2d 803, 806–07 (Ill. App. Ct. 2002) (reversing trial court's finding that bribery statute was unconstitutionally vague as applied to deputy circuit clerk's receipt of cash in exchange for providing bond sheets on certain arrestees). Accepting lunch at a public appearance is nothing like the allegations that Ald. Burke hamstrung Company B's construction permit until Individuals B-1 and B-2 agreed to hire Klafter & Burke. As in *Humanitarian Law Project*, *Johnson II*, and *Coscia*, it is "beyond question that [Burke's] conduct * * * 'falls squarely in the core of what is prohibited by' the statute," see *Johnson II*, 875 F.3d at 370–71, which "preclud[es] any claim that he was subject to arbitrary enforcement," see *Coscia*, 866 F.3d at 794. Even applying the heightened vagueness standard, as this Court must, "the dispositive point here is that the statutory terms are clear in their application to [Ald. Burke's actual] conduct, which means that [his] vagueness challenge must fail." See *Humanitarian L. Project*, 561 U.S. at 21.

Even if this Court were to evaluate the constitutionality of the state bribery law on its face, Ald. Burke's challenge would not alter the outcome. As discussed above, Part VI.C(1)(a), the statute is sufficiently definite to put Ald. Burke on fair notice and therefore satisfies the first criterion of a void-for-vagueness challenge. The statute targets bribery and speaks of improper or unlawful efforts to influence the actions of a public official by means of soliciting or offering property, benefit, fee, reward, and other, identical subsections of the law have been interpreted to exclude campaign contributions. Recall, too, that the Illinois state bribery statute imposes a *mens rea* requirement, which "further reduces any potential for vagueness." See *Humanitarian L.*

---

As yet another example, when Cui contacted Ald. Burke to upend a permit denial, Ald. Burke allegedly handed him a Klafter & Burke business card. [30 (Indictment) at Count 1, ¶ 56]. Once Cui signaled he would retain Klafter & Burke, Ald. Burke contacted Commissioner C about Cui's permit application. [*Id.* at ¶¶ 57–61, 62–63].

*Project*, 561 U.S. at 21; *United States v. Cook*, 970 F.3d 866, 873–74 (7th Cir. 2020) (rejecting void for vagueness challenge where the prohibition was not a strict liability offense requiring no *mens rea*); *United States v. Johnson* (*Johnson IV*), 911 F.3d 849, 853 (7th Cir. 2018) (similar).

The statute also satisfies the second criterion because it does not risk arbitrary enforcement. As already discussed, above Part III.A(1) in rejecting Ald. Burke's First Amendment challenge, the extensive state framework and statutory purpose define the taking and receiving of "property" and "personal advantage" with specificity. See *Williams*, 553 U.S. at 305–07; *Brandstetter*, 430 N.E.2d at 736 ("the Illinois statutory scheme defines with specificity 'property or personal advantage' which a legislator is 'authorized by law' to accept"). See also *Kleffman*, 412 N.E.2d at 1061 (construing a similar term to be sufficiently definite; "as a general rule, public officers or employees should be able to determine whether they are acting in the public interest or the interest of a particular person" considering the legislative purpose). As the Government points out, there is no support for any suggestion that the statute has been arbitrarily enforced in the thirty-six years since it was last amended. That record suggests the statute does not contain "'sweeping standard[s] [that] place[ ] unfettered discretion in the hands of police, judges, and juries to carry out arbitrary and erratic arrests and convictions.'" See *Bell*, 697 F.3d at 462 (alterations in original) (quoting *Wright v. New Jersey*, 469 U.S. 1146, 1151, (1985)).

Ald. Burke points to several terms in the statute that he claims raise vagueness concerns. According to Burke, "the phrase 'any act related to the employment or function of any public officer' is too 'shapeless' a provision to comport with due process." [107 (Burke State Bribery Br.) at 26] (first quoting 720 ILCS 5/33-1(e); and then quoting *McDonnell*, 579 U.S. at 576). He also contends that the phrase "personal advantage" which is "something short of property" is not definite enough that ordinary people can know what it prohibits. [107 at 26]. Neither argument is

persuasive. The phrase "any act" is clearly modified by the phrase "employment or function of any public officer," which appears synonymous with official duty. Courts have construed official duty narrowly and in a way that aligns with *McDonnell*'s official act definition. See *People v. Senez*, 400 N.E.2d 928, 930 (1980) (rejecting defendant's argument that payment was not bribe because police were not performing an official duty). The question of whether Ald. Burke committed an act in connection to his office, "improperly," and for his personal gain, "is a question of fact" for a jury determination. See *Williams*, 553 U.S. at 306 ("Whether someone held a belief or had an intent is a true-or-false determination, not a subjective judgment such as whether conduct is 'annoying' or 'indecent.'"). Unlike the words "annoying" or "inconvenience" in the cases upon which *Burke* relies, "personal advantage" and "any act related to employment" are not so "inscrutable" that they leave law enforcement to fill in the blanks itself. See *Bell*, 697 F.3d at 445; 720 ILCS 5/33-1(e).[28]

### b. Commercial Bribery, 720 ILCS 5/29A-2

Like the state bribery charges, as applied to Ald. Burke, the allegations that he solicited multiple constituents to pressure them to hire his private law firm in exchange for his influence renders the commercial bribe statute "clear in [its] application to [Ald. Burke's] proposed conduct" and thus his vagueness challenge is futile. See *Humanitarian L. Project*, 561 U.S. at 23. Even if the Court were to entertain his attacks on a facial basis, Ald. Burke's void-for-vagueness challenge to the commercial bribe statute still fails. To be sure, the statute reaches conduct "as it relates to the affairs of his employer." 720 ILCS 5/29A-2. Whether a matter "relates to the affairs of his

---

[28] Finally, a statute is not vague just because it isn't delimited the same as another. Thus, although *McDonnell* emphasized the importance of free speech and due process, it also emphasized the pertinence of federalism. See *McDonnell v. United States*, 579 U.S. 550, 576 (2016) ("A State defines itself as a sovereign through 'the structure of its government, and the character of those who exercise government authority.' That includes the prerogative to regulate the permissible scope of interactions between state officials and their constituents") (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).

employer" is a factual issue to be determined by a jury, not a constitutional weakness in the text of the statute. Compare *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (statute requiring provision of "credible or reliable identification" provided police an inordinate amount of discretion), with *United States v. Oaks*, 302 F. Supp. 3d 716, 730 (D. Md. 2018) (the defendant's conduct fell within core of *McDonnell*'s proscriptions despite that the challenged statute "reaches conduct 'bear[ing] some *relation* to his official duties'"). But more to the point, "[r]esolving edge questions is a principal role of the courts" and our standard cannot be one in which,

> every time a court needs to decide a tough question about just how far a statute reaches, it should declare the law unconstitutional. That is fundamentally inconsistent with the Supreme Court's approach, under which a core of meaning is enough to reject a vagueness challenge, leaving to future adjudication the inevitable questions at the statutory margin.

*Curry*, 918 F.3d at 541.

### c. Illinois Official Misconduct, 720 ILCS 5/33-3(a)(4)

Ald. Burke's final challenge, to the official misconduct statute, fares no better because his conduct is clearly at its core. The charges do not apply the state statute to "prosaic" interactions— this Indictment charges Ald. Burke with offering his support and hefty influence on various matters before him as an alderman in return for the payment of legal fees to his private law firm. Even on a facial basis, his claim falters. He contends that the statute criminalizes nearly any act by a public official, which is simply incorrect; as noted above, the statute specifically criminalizes the solicitation of a fee or reward that the official is not authorized by law to receive. As the Illinois Appellate Court has explained in relation to an earlier, but similar version of the statute, the phrase "in excess of the lawful authority derives its meaning from a set of rules not contained in the statute" and as such, the phrase is not "so poorly defined that, as a general thing, public officials are unable to determine the propriety of their actions." *Kleffman*, 412 N.E.2d at 1060–61; see also *United States v. Ferriero*, 866 F.3d 107, 125 (3d Cir. 2017) (upholding a state bribery statute over

vagueness challenge in part because the statute contained the phrase "any benefit not authorized by law," for which a state statutory scheme provided further elaboration).

### D. Conclusion

Although he directs this Court to *McDonnell* as a watershed case for bribery law, Ald. Burke *does not identify a single case*, state or federal, where a state bribery statute has been found unconstitutional based under *McDonnell*'s holding or reasoning—either on First Amendment or vagueness grounds. To be sure, the Court is cognizant that *McDonnell* and *Skilling* provide important guidance for ensuring that government officials are only convicted for receiving certain benefits in exchange for exploiting their powers on specific matters. But this is the wrong juncture in the case to resolve these concerns. *McDonnell* does not ask courts to throw out the baby with the bath water, and ambiguities can be fleshed out by the deft touch of jury instructions rather than the heavy hand of invalidating statutes. See *McDonnell*, 579 U.S. at 580 (declining to invalidate the statute on vagueness grounds); *Skilling*, 561 U.S. at 404 (construing rather than invalidating § 1346 to apply to "bribes or kickbacks supplied by a third party who had not been deceived. Confined to these paramount applications, § 1346 presents no vagueness problem"). In fact, the best Ald. Burke can muster is citations to cases (in other circuits, concerning other state laws) in which courts have upheld state bribery laws. See, *e.g.*, *Ferriero*, 866 F.3d at 124–25 (New Jersey bribery law neither impermissibly broad nor void-for-vagueness). Although those cases concern different laws, the rationale of those decisions further undercut Burke's argument that *McDonnell* casts a shadow of constitutional doubt on every Illinois bribery law.

The Court therefore denies Ald. Burke's motion [106, 107] to dismiss the nine counts premised on the Illinois state bribery laws in full.

## VII.    Motions to Suppress Title III Interceptions [95, 97, 100, 102, 103]

Next up are Ald. Burke's suppression motions [95, 97 (redacted), 100 (sealed), 102 (redacted), 103 (sealed)].  To provide context, recall that the Government applied for and received approval from Chief Judge Castillo to intercept Ald. Burke's personal cellphone in May 2017, following months of investigation into Ald. Burke's conduct and supported by evidence yielded from conversations recorded by fellow Alderman Daniel Solis.[29]  In June 2017, the Government successfully applied to renew and expand the order to include Ald. Burke's conversations regarding a second real estate developer.[30]  The Government's wiretapping ultimately lasted until

---

[29] Relevant to the instant motions, the supporting documents are as follows and will be referred to herein by the following abbreviations (bolded and in quotes, below):

- [100-1 (Sealed Ex. A, Application for an Order Authorizing (I) the Interception of Wire Communications; (II) Use of a Pen Register & Trap & Trace Device; (III) Disclosure of Subscriber Information for Numbers in Contact with Target Phones 10, 11, 12, 13, 14 & 15 (**"Sealed May Office Phones Title III Application"**));

- 100-2 (Sealed Ex. B, Amended Application for an Order Authorizing (I) the Interception of Wire Communications; (II) Use of a Pen Register & Trap & Trace Device; and (III) Disclosure of Subscriber Information for Numbers in Contact with Target Phones 10, 11, 12, 13, 14, & 15 (**"Sealed Amended May Office Phones Title III Application"**));

- 100-3 (Sealed Ex. C, Application for an Order Authorizing (I) the Interception of Wire Communications; (II) Use of a Pen Register & Trap & Trace Device; & (III) Disclosure of Subscriber Information for Numbers in Contact with Target Phone 9 (**"Sealed May Cell Phone Title III Application"**));

- 103-1 (Sealed Ex. A, Order Authorizing (I) the Interception of Wire Communications; (II) Use of a Pen Register & Trap & Trace Device; & (III) Disclosure of Subscriber Information for Numbers in Contact with Target Phones 10, 11, 12, 13, 14 & 15 (**"Sealed May Authorization Order for Title III – Office Phones"**));

- 103-2 (Sealed Ex. B, Order Authorizing (I) the Interception of Wire Communications; (II) Use of a Pen Register & Trap & Trace Device; & (III) Disclosure of Subscriber Information for Numbers in Contact with Target Phone 9 (**"Sealed May Authorization Order for Title III—Cell Phone"**))].

[30] Relevant to the instant motions, the supporting documents include:

- [103-3 (Sealed Ex. C, Application for an Order Authorizing (I) the Continued Interception of Wire Communications; (II) Use of a Pen Register & Trap & Trace Device; & (III) Disclosure of Subscriber Information for Numbers in Contact with Target Phone 9 (**"Sealed June Title III Application"**))].

February 11, 2018.  See [100 (Sealed Ald. Edward M. Burke's Memo. of Law in Support of His Mot. to Suppress the Fruits & Derivatives of the Electronic Surveillance Conducted Pursuant to Title III of the Omnibus Crime Control & Safe Streets Act of 1968 ("Title III") ("Sealed May Title III Suppression Br.")) at 2].

Ald. Burke has filed two motions to suppress the fruits and derivatives of those cell phone interceptions at trial.  First, Ald. Burke has moved [95, 97, 100, 156] to suppress evidence from the May 2017 wiretaps forward as the improper fruits and derivatives of the electronic surveillance conducted pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968.  See [100 (Sealed May Title III Suppression Br.); 156 (Sealed Ald. Edward M. Burke's Reply in Support of His Mot. to Suppress the Fruits & Derivatives of the Electronic Surveillance Conducted Pursuant to Title III of the Omnibus Crime Control & Safe Streets Act of 1968 ("Title III") ("Sealed May Title III Suppression Reply"))].  Second, and in the event the Court denies his first motion, Ald. Burke moves to suppress [102, 103, 158] evidence from the June 2017 wiretaps forward as the improper fruits and derivatives of the electronic surveillance, also conducted pursuant to Title III.  See [103 (Sealed Ald. Edward M. Burke's Mot. to Suppress the Fruits & Derivatives of the Title III Electronic Surveillance Conducted Pursuant to the June 13, 2017 Cell Phone Wiretap ("Sealed June Title III Suppression Mot.")); 158 (Sealed Ald. Edward M. Burke's Reply in Support of His Mot. to Suppress the Fruits & Derivatives of the Title III Electronic Surveillance Conducted Pursuant to the June 13, 2017 Cell Phone Wiretap ("Sealed June Title III Suppression Reply"))].  Co-Defendant Andrews has moved to adopt both motions.  See [122 (Def. Andrews' Mot. to Adopt Pretrial Mots. Filed by Co-Defendant Burke ("Andrews Mot. to Adopt"))].  In both motions, Ald. Burke primarily argues that the affidavits in support of the wiretaps lacked probable cause to conclude that the search would uncover evidence that Ald. Burke

was extorting certain real estate developers, committing honest services fraud, or violating the Travel Act. The Court disagrees with Ald. Burke's view that the interceptions violated Title III or any other federal statute or Constitutional provision, and it therefore denies both motions [95, 97, 100, 102, 103].

### A.    Factual and Procedural Background

In May 2017, the Government applied for authorization to intercept the wire communications of Ald. Burke, primarily over his cellular telephone. Relevant here, although initially the Government sought to tap Ald. Burke's office telephones, it ultimately filed an amended motion limiting the request to Ald. Burke's cellular phone.[31] In support of its application, the Government submitted the affidavit of Steve Noldin, a special agent of the Federal Bureau of Investigation.[32]

---

[31] By way of context, the Government first filed and received permission to conduct interceptions of Ald. Burke's aldermanic office phone, and over six extension lines associated with the office on May 1, 2017, and May 5, 2017, respectively. See [100-1 (Sealed May Office Phones Title III Application); 100-2 (Sealed Amended May Office Phones Title III Application); 103-1 (Sealed May Authorization Order for Title III – Office Phones)]. On May 12, 2017, the Government filed a third application. [100-3 (Sealed May Cell Phone Title III Application)]. The May 12, 2017, application sought to intercept Ald. Burke's cellular telephone rather than his office phones because technical difficulties that arose in tapping the office phones rendered them "[in]sufficient to gather the evidence necessary concerning the offenses under investigation." See [139 (Gov't Resp.) at 119] (quoting [100-3 at ¶ 71]).

Although the Government filed several applications and affidavits, the Court will refer to the affidavit submitted in support of the interception of Ald. Burke's cellular phone, exclusively. The Government indicates that the affidavits for the office telephones and cellular were "substantially the same," [139 (Gov't Resp.) at 120], a point that Ald. Burke does not contest. See [100 (Sealed May Title III Suppression Br.) at 2 n. 1] ("[T]he May 5th and 12th Title III Affidavits * * * are nearly identical in all matters pertinent to Ald. Burke's Motion" to the May 1, 2017, Affidavit).

[32] Agent Noldin's affidavit is attached to the wiretap application. For ease of reference, the Court will refer to the contents of the affidavit by providing the **page** (as assigned on the docket) and *paragraph number* for each pincite to the facts. For example, see [100-3 (Sealed May Cell Phone Title III Application), at **20**, ¶ *1*].

Noldin's affidavit describes a series of events from 2016 through 2017 involving Daniel Solis, Edward M. Burke, and the redevelopment of the Old Post Office building.[33] At all relevant times, Daniel Solis, Alderman for the 25th Ward of the City of Chicago, was Chairman of the City Council's Committee on Zoning, Landmarks and Building Standards. [100-3 (Sealed May Cell Phone Title III Application) at 25, ¶ 10]. As Chairman, Ald. Solis held authority to support or block zoning requests and other approvals that developers required to develop property within Chicago. [*Id.*] Following a federal investigation of Ald. Solis regarding "a series of transactions that involved his abuse of his position as a public official[,]" [*id.* at 26, ¶ 10; at 32, ¶ 18], the Government confronted him and obtained his cooperation for an ongoing investigation, [*id.* at 27–28, ¶¶ 11, 13; at 32, ¶ 19]. The affiant further explained that pursuant to his role as cooperator and at the direction of the FBI, Ald. Solis made consensual recordings of conversations with Alderman Edward M. Burke between August 2016 and March 2017. [*Id.* at 28, ¶ 13; at 32, ¶ 27]. The Chief Judge himself authorized the consensual recording of calls involving Solis between August 2016 and March 2017. [*Id.* at 27, ¶ 27].

The players central to the conversations recorded between Ald. Solis and Ald. Burke included Harry Skydell and his firm, 601W, which was undertaking a $500 million renovation and redevelopment of the Old Chicago Post Office, located in Ald. Solis's ward. [100-3 (Sealed May Cell Phone Title III Application) at 28, ¶ 14; at 34, ¶ 25; at 37, ¶ 29 n.5.] According to the affiant, at the time, the Old Chicago Post Office had already required and would later likely require approvals from and assistance from the City of Chicago, including from the committee chaired by Ald. Solis, owing to the size and scope of the redevelopment. [*Id.* at 34–35, ¶ 26].

---

[33] The affiant explicitly stated that he "ha[d] not included each and every fact known to me concerning this investigation. Specifically, [he] ha[d] set forth only those facts that [he] believe[d] [were] necessary to establish the required foundation for an order authorizing the interception of wire communications." [100-3 (Sealed May Cell Phone Title III Application) at 22, ¶ 6].

More specifically, the affidavit described discussions between Ald. Solis and Ald. Burke about soliciting clients, including Skydell, for Ald. Burke's private law firm. In July 2016, Ald. Burke asked Ald. Solis to recommend a contractor to Skydell. [100-3 (Sealed May Cell Phone Title III Application) at 35–36, ¶ 28]. At the direction of the FBI, Ald. Solis participated in calls with Ald. Burke which he recorded. [*Id.* at 35, ¶ 27]. On a call with Ald. Burke on August 26, 2016, Ald. Solis relayed to Ald. Burke that "Mr. Skydell and his son * * * understood that it's important that they look at a process that's acceptable to me to recommend to his contractors," and Ald. Burke responded "[w]ell, while you're at it, recommend the good firm of Klafter & Burke to do the tax work." [*Id.* at 37, ¶ 29]. Ald. Solis agreed, and Ald. Burke offered "a marketing arrangement for [Solis]." [*Id.*]

The affidavit stated further that on September 26, 2016, Ald. Solis recorded an in-person meeting at Burke's City Hall office. [100-3 (Sealed May Cell Phone Title III Application) at 38, ¶ 30]. During the meeting, Ald. Solis advised Ald. Burke that he had met with Skydell, during which he had "brought him [Skydell] up you [*sic*], in terms of law work that you [do]," and that the developers would "be happy to entertain it." [*Id.*] (some alterations in original). Although Ald. Solis informed Ald. Burke "bottom line, they're gonna work through me [Ald. Solis]," Ald. Burke requested "face time with them." [*Id.*] Ald. Solis agreed to arrange a meeting between Skydell and Ald. Burke and raised his "interest[] in the marketing piece that you told me that you could help me out," adding that he didn't "think [he had] ever asked [him] for anything. But if you [Ald. Burke] could that would be great," to which Ald. Burke responded: "I'm of the belief that if you get help from somebody to get some work that they're entitled to share in it, and it's just up to us to figure out a way that it can be done so that there's no pitfalls, legally." [*Id.*]

96

Ald. Burke himself made a direct pitch to Skydell the month following. In October 2016, the affiant explained that "[a]t the FBI's direction" Ald. Solis arranged a face-to-face meeting, which took place in Ald. Solis's city hall office with Skydell, Skydell's son, Ald. Solis, and Ald. Burke. [100-3 (Sealed May Cell Phone Title III Application) at 41, ¶ 32; at 42, ¶ 34]. During the meeting, Ald. Burke stated "we'd love to present our firm to you. We do almost exclusively ad valorem taxation. Property tax work." [*Id.* at 42, ¶ 34]. When asked which law firm Skydell was using at that time, Skydell remarked that he was "happy to, ah, I'm happy to open the door * * * once our terms are over with them [the other law firm]." [*Id.*] He later added, "[i]t's a pleasure to deal with people who are so dedicated to the city * * * *. [W]e should continue many more years in good health, and we should be able to try to do some business together," to which Ald. Burke agreed, "[t]hank you. I would love to be, it would be an honor to do business with you." [*Id.*]

The conversation with Skydell revealed several snags in the Old Post Office redevelopment for which Ald. Burke offered his assistance. As noted in earlier portions of this opinion, the Old Post Office development had encountered issues with Amtrak. During the October 2016 meeting, Skydell noted that "[he] th[ought] the hardest thing would be * * * we have to work with landmarks; we have to work with Amtrak." [100-3 (Sealed May Cell Phone Title III Application) at 43, ¶ 35]. Ald. Solis stated "I'm gonna work with them" and Ald. Burke added, "[a]lright. As far as Amtrak i[s] concerned, put it in the back of your mind. The, one of the members of the board of Amtrak is a guy by the name of Jeff Moreland. * * * * [H]e is a presidential appointee to the Amtrak board[.] * * * * [W]e made his daughter a judge here, in Cook County" and "we're family, personal friends. And I know if you ever run into a problem there, Jeff can be helpful." [*Id.* at 43, ¶ 35]. Skydell said "we were hoping we can resolve [the problems]. But if we can't, we may reach out to you," and Ald. Burke responded "[w]ell, just put it in the back of your mind, you know

another—You'll find out that Chicago's a very small town," and "[e]verybody's that's anybody knows one another and generally speaking, everybody gets along." [*Id.* at 44, ¶ 35].

Following the Skydell meeting, Ald. Solis and Ald. Burke met privately. [100-3 (Sealed May Cell Phone Title III Application) at 44, ¶ 36]. Ald. Solis raised his interest in a "marketing" arrangement with Ald. Burke, to which Ald. Burke agreed so long as Ald. Solis could "tee" up "any potential client, not just these guys [the Old Post Office developers]."[34] [*Id.* at 45, ¶ 36]. With respect to Amtrak, Ald. Solis also stated to Ald. Burke that he thought the Old Post Office redevelopment needed "Amtrak to be more cooperative. They [Amtrak] want to charge them $5,000 every time they go down" to which Ald. Burke stated "Well, as I said, I've got this personal relationship" with Amtrak board member, Jeff Moreland. [*Id.*] Ald. Solis noted, "Yeah, I think that" the personal relationship with Moreland "connected with them." [*Id.*]

During follow-on conversations between Ald. Solis and Ald. Burke, the two discussed other opportunities to assist the Old Post Office's redevelopment and soliciting Skydell for Ald. Burke's law firm. During a meeting between Ald. Solis and Ald. Burke in November 2016, Ald.

---

[34] Ald. Burke suggested several additional developers for whom "[i]f [Solis] c[ould] tee them up, [Solis] c[ould] be our consultant." [100-3 (Sealed May Cell Phone Title III Application) at ¶ 35].

The affiant also explained that when Ald. Solis raised the potential for a marketing fee on several occasions, the two discussed the legality of such an arrangement. In this meeting and in future meetings, Ald. Solis asked for reassurance that the marketing arrangement "would be okay," Ald. Burke affirmed "[n]ot that I know of," "you're not gonna get in any trouble, and I'm certainly not gonna get in any trouble at this stage of the game." [100-3 (Sealed May Cell Phone Title III Application) at ¶ 36].

Again in November 2016, the two discussed how to structure Ald. Solis's fee in return for recruiting Skydell and other developers as legal clients for Ald. Burke's firm. Ald. Burke remarked "Good. I am a believer that if you're making money, that you should share the wealth. So you and I'll never have * * * we'll just figure out a way that's gonna be above board, legal, etc. Because you and I are not gonna * * * get in trouble over this * * * at this stage in the game." [100-3 (Sealed May Cell Phone Title III Application) at ¶ 38.] The affiant described his belief that the notion that this arrangement was "above board" was "pretextual because, among other things, [Ald. Burke] [was] formulating a plan to circumvent the Rules of Professional Responsibility, which prohibit paying Solis a portion of [Ald. Burke's] legal fee, and is soliciting clients from Solis that Solis is able to pressure because they have business before Solis in his capacity as an Alderman." [*Id.* at ¶ 38] (some alterations in original).

98

Solis updated Ald. Burke that he "did contact Mr. Skydell, and he's receptive, but not committed [to hire Klafter & Burke], but I have a strong feeling that I can convince him" to which Ald. Burke responded "Oh, good." [100-3 (Sealed May Cell Phone Title III Application) at 47, ¶ 38] (alteration in original). Ald. Solis continued "I'm gonna remind him again, 'cause he needs a lot of help, a lot of approvals, that I think carefully I can get him to go with you," to which Ald. Burke responded "Good." [*Id.* at 47–48, ¶ 38]. Later that same conversation, Ald. Solis said "I'm gonna follow up with Skydell, and * * * I like the idea of a consulting percentage. And I'll work to get more for you," to which Burke agreed: "Good. I am a believer that if you're making money, that you should share the wealth." [*Id.* at 49, ¶ 38].

Again, on December 12, 2016, Ald. Solis and Ald. Burke discussed an arrangement with Skydell. Ald. Solis placed a call to a phone used by Ald. Burke, during which Ald. Solis informed Burke, "I just wanted to let you know that I spoke to Harry Skydell * * * I think I've got * * * I've got good news. At first he sounded * * * like he was gonna use the other firm[,] but he's really concerned about that Amtrak matter because it's costing him $5,000 every time he tries to use it" and continued, "he's also gonna need permits and stuff[,] but I was wondering if maybe you could follow up with the contact that you have at Amtrak." [100-3 (Sealed May Cell Phone Title III Application) at 51, ¶ 42] (some alterations in original). Ald. Burke agreed: "Yeah, sure." [*Id.*] Ald. Solis responded, "[c]ause that would really, I think, make, ah, make the deal for him," to which Ald. Burke said, "[o]h, I think I could. In fact I talked to him last week on a different matter." [*Id.* at 51–52, ¶ 42]. In a follow-on call that same morning, Ald. Solis said to Ald. Burke that he was following up to make sure he relayed that "he [Skydell] seems to understand it and as long as we help him, and, with the necessary permits, which I think I'll follow up in [*sic*], and then if you can follow up with the Amtrak, then I think he understands he'll use your firm." [*Id.* at 53, ¶ 43]

(alteration in original). Ald. Burke responded, "Okay. Great." [*Id.*] When Ald. Burke asked who the "competition" was, Ald. Solis added that he "mentioned it to both of us * * *. Ah, but I think he's pretty frustrated right now and he said he'll just accept my guidance on just about everything." [*Id.*]

Ald. Burke then gathered information on the Old Post Office's redevelopment obstacles with Amtrak and ways he might influence Amtrak. Specifically, in a call Ald. Solis made to Ald. Burke on December 13, 2016, Ald. Burke asked Ald. Solis if he could speak to Skydell directly about the Old Post Office issues and that "it might also be necessary for me [Ald. Burke] to go in with them and negotiate with the Amtrak bureaucrats that are pushing this thing." [100-3 (Sealed May Cell Phone Title III Application) at 54, ¶ 44]. Then, on December 22, 2016, during an in-person meeting between Ald. Burke and Ald. Solis at Ald. Burke's city council office, Ald. Burke explained that he had spoken with Ray Lang, "who heads up government relations in the region for Amtrak." [*Id.* at 56, ¶ 46]. Ald. Burke had learned from Lang that Greg Prather—an employee of Skydell's contractor, Jones Lang LaSalle (now known as JLL)—disputed the terms of an agreement with Amtrak regarding access to air vent space running below the Old Post office redevelopment. [*Id.*] Ald. Burke advised Ald. Solis that Lang was open to making concessions for Prather on the Old Post Office project, specifically that he "Lang at [Chicago Union Station Company] would be willing to adjust some things" including specifically that Lang "would probably be willing to give them a five-hour window of space at night" to access the air space "so they could do the work and there could be economies of scale. So[,] in other words, instead of having multiple flagmen," to fulfill federal regulations, "they could probably get away with one [flagmen] if the work was done at night." [*Id.* at 56–57, ¶ 46]. However, Ald. Burke indicated that, "so umm, this guy can be worked with. This guy, Ray * * * But up until now, he has no reason

to do anything other than just be a bureaucrat and say this is what it is etc., etc. 'Cause he's not going to do any favors" for JLL. [*Id.* at 57, ¶ 46]. The two later discussed that they would plan a follow-up conversation and tour of Chicago's Union Station with Ray Lang. [*Id.* at 58, ¶ 47].

During that same December in-person conversation, Ald. Burke and Ald. Solis discussed whether Ald. Burke would be willing to influence Amtrak employee Ray Lang on Skydell's behalf. When Ald. Solis asked Ald. Burke "where did you leave it at with your last conversation" regarding Lang, Ald. Burke remarked, "I said, 'I'm not hired to represent them so I'm just trying to get to get background here.' * * * If indeed I get hired, then it's a different story. * * * Right now it's pro bono publica." [100-3 (Sealed May Cell Phone Title III Application) at 57–58, ¶ 46] (alterations in original). Ald. Solis said, "[a]nd they're not a not for profit, so[,]" to which Ald. Burke responded "[e]xactly * * * and they've got more properties here that they're using, well you know as well as I do, Jews are Jews and they'll deal with Jews to the exclusion of everybody else unless * * * unless there's a reason for them to use a Christian." [*Id.* at 58, ¶ 46].

Further conversations reinforced the notion that Ald. Burke was only willing to step in if he received a benefit from Skydell, which included either lobbying on Skydell's behalf or Skydell hiring Ald. Burke's law firm for tax assessment services. Approximately one month later, in January 2017, during another in-person conversation in Ald. Burke's city council office, Ald. Solis asked for an update. [100-3 (Sealed May Cell Phone Title III Application) at 59, ¶ 48]. Ald. Burke advised he hadn't heard any word and Ald. Solis asked, "[b]ut I thought we were going to do this tour and have a discussion with Ray Lang, or Moreland or somebody." [*Id.*] Ald. Burke responded that Jeff Moreland was the board member of Amtrak but that "but, you know, if we're not signed up, I'm not going to do any lifting for this guy [Skydell]." [*Id.*] (alteration in original). Ald. Solis asked "signed up for what, 'cause I think I told Mr. Skydell that it would be for the taxes." [*Id.*]

Ald. Burke affirmed: "Yeah, we haven't heard a word." [*Id*.] When Ald. Solis asked for clarification, "[s]o, you're not looking for anything else, the lobbying or anything," Ald. Burke stated, "[u]mm I could represent them, in negotiations with Amtrak." [*Id*.] Later, Ald. Solis pried again, "that's the basic thing I wanted to know. We're still focused for the law, not for the lobbying?" to which Ald. Burke responded, "[n]o, I can do that [lobbying], I mean that's law" and Ald. Solis said, "[t]ax, I mean tax," to which Ald. Burke said, "[y]eah." [*Id*. at 59–60, ¶ 48].

Ald. Solis and Ald. Burke also discussed other ways they might assist Skydell with the Old Post Office renovation, specifically with city permits. During that same in-person January 2017 discussion, Ald. Solis informed Ald. Burke, they "[601W] have a lot of other stuff they're gonna need in the future, I don't think the historical landmark issue has been resolved yet either." [100-3 (Sealed May Cell Phone Title III Application) at 60, ¶ 49] (alteration in original). Ald. Burke responded, "[s]o far we have no, the cash register has not rung yet." [*Id.*] When Ald. Solis asked Ald. Burke to specify what he meant, stating he was confused because "the last time you talked to me, 'I haven't got a contract,' and I thought maybe you were talking about something other than the tax work. I thought maybe you were talking about the lobbying too[,]" Ald. Burke expressed interest in both lobbying but also receipt of tax assessment business. [*Id.*] Ald. Burke responded, "[w]ell, they could hire our firm if they want somebody to lobby Amtrak. That's not a conflict for me." [*Id.*] However, when Ald. Solis asked Ald. Burke if "you would still prefer the tax work," Ald. Burke stated "[s]omebody's got to do it. I thought that's what our conversation was." Ald. Solis advised, "[t]hat's what the conversation was," and Ald. Burke added "[i]nitially." [*Id.*] During a follow-on conversation on February 10, 2017, Ald. Solis updated Ald. Burke that he had spoken with Skydell and that Skydell was "definitely interested in giving you those, that law

work," to which Ald. Burke responded, "[o]h good," and Ald. Solis specified, "[t]hat tax law." [*Id.* at 60–61, ¶ 50].

Ald. Solis and Ald. Burke did indeed meet with Ray Lang of Amtrak in February 2017, which revealed an opportunity for *Ald. Burke and Ald. Solis* to assist *Amtrak*.  Specifically, during a February 2017 tour of Union Station, (among other things) Lang informed the aldermen of plans to redevelop Union Station, which might involve a project that required city approval.  [100-3 (Sealed May Cell Phone Title III Application ) at 61, ¶ 50].  In a follow-up conversation that same month between Ald. Solis and Ald. Burke, Ald. Solis asked, "I was thinking about the tour and then I was thinking about how much self-interest there was with both the Amtrak and with Union Station and with the Post Office. And so I was wondering how far along you are in with your discussions with Ray about what they need from the city."  [*Id.* at 62, ¶ 51].  Although Ald. Burke stated he had not made progress, Ald. Solis asked, "do you think we can suggest to Ray that we'll get him what he needs on the project if he gets us what we need in regards to Skydell[,]" and Ald. Burke responded that "[a]h, in fact I've got a call to him right now."  [*Id.*]  Ald. Burke then asked Ald. Solis to "get [him] a list of the things that they think right now they could benefit from."  [*Id.*]  Ald. Solis agreed but reiterated, "[i]f we can get what Ray is going to need and we can help each other, then I think we'll be able to lock in the tax work."  [*Id*. at 62–63, ¶ 51].  Ald. Burke responded, "[g]ood. Well just get me a list of things that they need from Ray and I'll talk to him." [*Id*. at 63, ¶ 51].

Yet another opportunity to assist the Old Post Office redevelopment surfaced in connection with the Water Department.  Skydell's contractor, JLL, informed Ald. Solis by e-mail that the contractor needed an additional water access line but that city policy "does not permit new taps" onto the City's main line.  [100-3 (Sealed May Cell Phone Title III Application) at 63, ¶ 52].  JLL

thus "would request policy relief from the City to connect an additional" line to the main line. [*Id.*] Ald. Solis relayed the request to Ald. Burke, specifically informing Ald. Burke that JLL "told [Solis] he has an issue with the water department[,] and they need to get the water commissioner to sign off on something." [*Id.* at 64, ¶ 53]. Ald. Solis offered to forward the email from JLL detailing the issue and told Ald. Burke, "if[,] after you look at it, I think if we can take care of the water commissioner, we should be able to get the tax work and maybe my consulting from you." [*Id.*] Ald. Burke agreed, "[g]ood. Let me take a look at it," and he specified the email account Ald. Solis should use. [*Id.*] Ald. Solis did in fact direct his staff to forward the email to Ald. Burke's AOL account as agreed to by Ald. Burke. [*Id.* at 64–65, ¶ 54].

Ald. Burke followed up on the contractor's request for policy relief from the City, identifying ways he and Ald. Solis could facilitate resolution of the issue. In March 2017, the two discussed that it was technically complex and Ald. Solis's suggestion to bring the Water Commissioner in, but Ald. Burke explained "my suggestion would be to bring Tom Powers in, who used to be the commissioner, and is in that business now of engineering these kinds of projects and nobody knows the regs [regulations] and the ordinances or the people that'll have to make the decisions, better than him." [100-3 (Sealed May Cell Phone Title III Application) at 65, ¶ 55] (alteration in original). When Ald. Solis agreed, Ald. Burke resolved to "put this in his hands and he'll be able to sort through it" and agreed to set up a meeting with former Water Commissioner Powers. [*Id.*][35] The affiant stated his belief that two phone calls placed from Ald. Burke's phone were then made to Powers's office. [*Id.* at 66, ¶ 56]. In a follow-up conversation, the affiant stated

---

[35] Wrapping up the conversation, Ald. Solis said "I just wanted to make sure you understood that I think this is real important and I think this will seal the deal [unintelligible] * * * and then we'll meet with the commissioner" to which Ald. Burke stated, "[a]lright. We're on it." [100-3 (Sealed May Cell Phone Title III Application) at 65–66, ¶ 55].

that Ald. Solis learned from then-current Water Commissioner, Barrett Murphy, that Ald. Burke had called Powers and that Powers had called Murphy asking to arrange a meeting with Murphy, Powers, and Ald. Burke. [*Id.* at 66–67, ¶ 57]. In March 2017, Ald. Burke later advised Ald. Solis that progress was made on the water issue. In a March 2017 phone call, Ald. Burke stated "I've got the ball teed up for the folks from the post office to meet with * * * Murphy." [*Id.* at 68, ¶ 60]. He continued that Powers "went to talk with * * * Barrett [Murphy]" and that Powers had "explained it to him [Murphy]" and although Ald. Burke "d[idn't] think they [could] get a hundred percent on what they want, but [he] t[hought] they c[ould] * * * get * * * a situation * * * where they'll be comfortable." [*Id.*] (some alterations in original).

Later conversations between Ald. Solis and current Water Commissioner Barrett Murphy suggest that Powers had contacted Murphy about the water issues. When Ald. Solis later called the current Water Commissioner, Murphy, for an update, Murphy confirmed that he had spoken to Tom Powers about the issues, [100-3 (Sealed May Cell Phone Title III Application) at 69, ¶ 61], and was meeting with the Old Post Office redevelopers regarding potential solutions, [*id.* at 70, ¶ 61]. Ald. Solis asked Murphy about Powers's conversations, and Murphy explained that Powers had "called to give [him] the heads up that said the post office was having some issues and wanted to come in to meet with [him]" but that Powers did not know specifics about the Old Post Office developer's needs. [*Id.* at 71–72, ¶ 61]. Murphy also confirmed that what "Tom told me is that Ed [BURKE] called him and said: 'Hey these guys are, these guys are having some issue with their service, you know, 'What can you do?'" and that "he [Powers] told Ed [BURKE], just have them call, have them call Barrett's office" to have them arrange a meeting with Murphy. [*Id.* at 72, ¶ 61] (alterations in original). Ald. Solis learned later from JLL directly that they had met with Murphy, that "the water commissioner was very receptive and open to ideas[,] and I think it's all going to

work out." [*Id.* at 73, ¶ 62]. Ald. Solis relayed to Ald. Burke that Prather was pleased with the result of the meeting with the water commissioner. [*Id.* at 74, ¶ 63].

Based on the facts of the affidavit recounted, above, Chief Judge Castillo authorized the Government to monitor Ald. Burke's cell phone in May 2017. See [103-2 (Sealed May Authorization Order for Title III—Cell Phone)]. Chief Judge Castillo reasoned that the Government's May 2017 application, including Ald. Burke's conduct in connection with the Old Post Office, supported a finding of probable cause to believe that Ald. Burke and others have, are, and will continue to commit wire fraud, see 18 U.S.C. § 1343, attempted wire fraud, see 18 U.S.C. § 1349, attempted extortion, see 18 U.S.C. § 1951, and use of interstate facilities to promote and carry on unlawful activity, see 18 U.S.C. § 1952. [103-2 at 2–3, ¶ (a)].

During the initial interception period from May through early June 2017, the Government detected not only Ald. Burke's attempts to facilitate the Old Post Office redevelopment in exchange for tax business, but also inklings of a similar arrangement between Ald. Burke and a second developer. For the sake of clarity, the Court will reserve further elaboration on those allegations until Part VII.C(2)(a), below, but notes that, relevant here, on June 13, 2017, the Government applied (1) to continue intercepting Ald. Burke's cellphone, and (2) to expand its wiretap investigation to include the second developer. See [103-3 (Sealed June Title III Application)]. Chief Judge Castillo again authorized the wiretap.

Ald. Burke moves [95, 97, 100, 156] to suppress the evidence obtained from the May 2017 wiretaps forward as the improper fruits and derivatives of the electronic surveillance conducted pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("the May Wiretap Suppression Motion"). In both motions, Ald. Burke primarily argues suppression is appropriate under the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of

1968 ("Title III"), see 18 U.S.C. § 2518(10)(a), because—according to Ald. Burke—the warrant issued by Chief Judge Castillo was not supported by probable cause. In addition, in the event the Court denies his first motion, Ald. Burke has moved to suppress [102, 103, 158] evidence from the June 2017 wiretaps forward as the improper fruits and derivatives of the electronic surveillance ("the June Wiretap Suppression Motion"). The Court will address those motions, in turn.

### B.    Legal Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. With certain exceptions, the Fourth Amendment generally requires that the issuance of a warrant supported by probable cause precede any search. *Stanley v. Henson*, 337 F.3d 961, 963 (7th Cir. 2003). Generally, evidence that is seized during an unlawful search cannot be used against the victim of that search. See *United States v. Swift*, 220 F.3d 502, 507 (7th Cir. 2000). Title III codifies the Fourth Amendment's protections and invokes an identical standard. See *United States v. Mares-Martinez*, 240 F. Supp. 2d 803, 814 (N.D. Ill. 2002); *United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir. 1988) ("[T]he statutory probable cause standards set out in Title III are co-extensive with the constitutional requirements embodied in the fourth amendment").

To obtain wiretap authorization under Title III and the Fourth Amendment, the Government must demonstrate (among other things) "that there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular [statutorily-enumerated offense]," and that "there is probable cause for belief that particular communications concerning that offense will be obtained through such interception." 18 U.S.C. § 2518(3)(a)–(b). The search "need only allege specific facts establishing a reasonable probability that the items

sought are likely to be at the location designated." *United States v. Malin*, 908 F.2d 163, 166 (7th Cir. 1990) (quoting *United States v. Rambis*, 686 F.2d 620, 623 (7th Cir. 1982)).

To assess whether there was probable cause to support the search, the issuing court asks whether "based on the totality of the circumstances, the affidavit sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Searcy*, 664 F.3d 1119, 1122 (7th Cir. 2011) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The totality of the circumstances assessment is not an exact science. "In dealing with probable cause, * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Malin*, 908 F.2d at 165–66 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). "[T]he [complaint] need not also negate every argument that can be asserted against that probability." *Id.* (some alterations in original) (quoting *Rambis*, 686 F.2d at 623); *Mares-Martinez*, 240 F. Supp. at 808 ("[T]he possibility of an innocent explanation for the activity described in the application does not negate probable cause, so long as there is a reasonable probability of criminal activity"). Issuing judges may "draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." *Malin*, 908 F.2d at 166.

In this instance, Chief Judge Castillo authorized the wiretap, so the legal standard Ald. Burke suggests this Court use to review the authorization of the wiretap is slightly off base. "A district court does not engage in de novo review of an issuing judge's conclusion that, based on the totality of the circumstances, there was a 'fair probability that contraband or evidence of a crime w[ould] be found in a particular place.'" *United States v. Kelly*, 772 F.3d 1072, 1080 (7th Cir. 2014) (quoting *Illinois v. Gates*, 462 U.S. at 238); See, *e.g.*, *United States v. Zamudio*,

909 F.3d 172, 176 (7th Cir. 2018) ("[O]ur inquiry is whether [the agent's] affidavit gave the magistrate judge sufficient information suggesting a 'fair probability' that evidence of a crime would be found at [the place to be searched]"); *United States v. Carroll*, 750 F.3d 700, 704–05 (7th Cir. 2014) (same). To be sure, "the application must contain sufficient underlying facts so that the magistrate can make an independent determination as to the existence of probable cause. However, once the magistrate or, in this case, the issuing judge has made the determination, it is entitled to deference from a reviewing court." *United States v. Dorfman*, 542 F. Supp. 345, 361 (N.D. Ill. 1982), *aff'd sub nom. United States v. Williams*, 737 F.2d 594, 601–02 & n.4 (7th Cir. 1984). "Courts should defer to the issuing judge's initial probable cause finding if there is substantial evidence in the record that supports his decision." *Carroll*, 750 F.3d at 704; *United States v. Griffin*, 827 F.2d 1108, 1111 (7th Cir. 1987) ("the magistrate's decision will be upheld 'so long as the magistrate had a substantial basis for * * * conclud[ing] that a search would uncover evidence of wrongdoing.'" (internal quotation marks omitted) (quoting *Illinois v. Gates*, 462 U.S. at 236)).

## C.     Analysis

The Court will turn to the May Wiretap Suppression Motion [95, 97, 100, 156] in Section One, before reaching the June Wiretap Suppression Motion [102, 103, 158] in Section Two.

### 1.     May 2017 Wiretap

The Court begins with Ald. Burke's motion [95] and memorandum of law [100] regarding the May 2017 wiretaps. Ald. Burke moves [95] to suppress evidence gleaned in connection with the warrant authorizing the Government's interception of Ald. Burke's cellular phone and the telephone lines in the City of Chicago Committee on Finance. [*Id.* at 1]. In support of his motion, he argues that the wiretap of those lines violated the Fourth Amendment's Search and Seizure

clause, Title III, *see* 18 U.S.C. §§ 2515, 2518(10)(a), and Fed. R. Crim. P. 12(b)(3)(C), as well as the principles articulated in *Franks v. Delaware*, 438 U.S. 154 (1978). The Government opposes. [139 (Gov't Br.) at 118].

Based on the evidence presented in the Cell Affidavit and the reasonable inferences drawn from it, the Court concludes that Chief Judge Castillo had a substantial basis for finding probable cause to believe that the wire interceptions of Ald. Burke's phones would uncover evidence of a crime. In addition, the Court rejects Ald. Burke's request for a *Franks* hearing.

### a.    Probable Cause

To set the context, it is important to recall that the Government's affiant asserted that an interception of Ald. Burke's wire communications would uncover evidence of three categories of offenses: (1) honest services wire fraud, *see* 18 U.S.C. §§ 1343, 1346, 1349; (2) attempted Hobbs Act extortion under color of official right, *see* 18 U.S.C. § 1951(a)-(b)(2); and (3) violations of the Travel Act, *see* 18 U.S.C. § 1952. In his motion to suppress, Ald. Burke contends that Chief Judge Castillo did not have a substantial basis to support probable cause that a search would unearth evidence that Ald. Burke was engaging in any of these violations of law. In other words, the Alderman argues that the Chief Judge overreached in several directions. As discussed in further detail, below, Ald. Burke more specifically complains that none of the acts discussed in the affidavit constitute an "official act" under the meaning ascribed to that phrase in *McDonnell* nor demonstrate his intent to enter a corrupt *quid pro quo* agreement to undertake official acts. *See* [100 (Sealed May Title III Suppression Br.) at 38, 47].

The affidavit furnished a substantial basis for each of Chief Judge Castillo's probable cause findings. As explained below, Chief Judge Castillo had "substantial evidence in the record that supports his decision" that probable cause existed and that a search would uncover evidence of

Ald. Burke's honest-services fraud. See *Carroll*, 750 F.3d at 704. The affidavit included evidence which established a fair probability that the wiretap would uncover evidence that Ald. Burke was engaging in official acts concerning three pending and specific matters in exchange for work for his private law practice. The three matters included the Old Post Office developer's (1) request for water access from the Water Department, (2) historic landmark application, and (3) attempts to access Amtrak property. There also was a substantial basis for concluding that the wiretaps would unearth evidence of Ald. Burke's attempted violation of the Hobbs Act under color of official right. Further still, there was probable cause to believe that the wiretaps would uncover evidence that Ald. Burke's conduct would violate the Travel Act. Any one of these three violations would be sufficient to justify Chief Judge Castillo's handling of the Government's application.

### i. Honest Services Wire Fraud

First and foremost, there was a "substantial basis" to support Chief Judge Castillo's authorization to search for evidence of honest services wire fraud. The federal honest-services statute prohibits, among other things, "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Section 1346 "appli[es] to state and local corruption *and* to private-sector fraud" alike. *United States v. Nayak*, 769 F.3d 978, 982 (7th Cir. 2014) (quoting *Skilling v. United States*, 561 U.S. 358, 413 n.45 (2010)). Honest services fraud in the form of a bribery scheme requires proof that the "public official knew that the thing of value was offered with the intent to exchange the thing of value for the performance of the official act." See 7th Cir. Crim. Pattern Jury Instrs. at 555 (2020 ed). Regarding the *quo*, "any private gain whatsoever" does not suffice. *Nayak*, 769 F.3d at 981. Rather, "[t]he Supreme Court made clear that an honest services fraud prosecution requires proof of a kickback or bribe." *United States v. Johnson*, 874 F.3d 990, 999 (7th Cir. 2017) (citing *Skilling*, 561 U.S. at 408).

111

Rather than reciting the *McDonnell* case again, the Court draws on the principles laid out at the outset of this opinion. For now, it should suffice to reiterate that the Supreme Court has circumscribed the meaning of an "official act" under federal bribery law, see § 201(a)(3), in connection with the honest-services statute. In *McDonnell v. United States*, 579 U.S. 550 (2016), the Court "adopt[ed] a more bounded interpretation of 'official act.' Under that interpretation, setting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an 'official act.'" *Id.* at 567. As the High Court put it:

> An "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official. Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of "official act."

*Id.* at 574. In vacating the former governor's conviction, the Court reasoned that because the government presented evidence to the jury outside this scope and "the jury was not correctly instructed on the meaning of "official act," it may have convicted Governor McDonnell for conduct that is not unlawful." *Id.* at 579.

Although the Seventh Circuit has yet to address the issue, other circuits have held that to allege, and ultimately prove, honest services fraud, the government need not have evidence that the individual who has offered a bribe and the public official reached a meeting of the minds. "Because bribery does not require the official to agree to or actually complete a corrupt exchange, neither does honest-services fraud by bribery," or "[i]n other words, though the offeror of a bribe is guilty of honest-services fraud, his attempted target may be entirely innocent." *United States v.*

*Ring*, 706 F.3d 460, 467 (D.C. Cir. 2013); see also *United States v. Silver*, 948 F.3d 538, 548–50 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 656 (2021) ("Nothing [the defendant] points to suggests that the payor and recipient must share a common purpose").

In this case, there was a substantial basis upon which Chief Judge Castillo found probable cause that the search would uncover proof of Ald. Burke's intent to commit and substantial steps towards defrauding the citizens of Chicago of his honest services. See 18 U.S.C. §§ 1343, 1346, 1349. As the Government points out, see [139 (Gov't Br.) at 136], the affidavit articulates a detailed factual basis showing a fair probability that Ald. Burke's phone calls might contain evidence that he intended to enter an agreement with Old Post Office developer, Henry Skydell, to exchange his official government acts for Skydell awarding Ald. Burke's firm legal business. More specifically, the affidavit includes facts which support the proposition that Ald. Burke intended to solicit legal fees from Skydell and took steps towards arranging the *quid pro quo*, and that Ald. Burke intended to exchange his official acts for the legal fees.

First, the affidavit contained an overwhelming number of facts to support the notion that Ald. Burke was attempting to solicit Skydell indirectly and directly in exchange for official acts. In September 2016, Ald. Solis and Ald. Burke discussed the Old Post Office development, which was in Ald. Solis's ward. Ald. Solis remarked to Ald. Burke that the Old Post Office developer, Skydell, and his colleagues "understood that it's important that they look at a process that's acceptable to" Ald. Solis, and in response Ald. Burke asked Ald. Solis to "recommend the good firm of Klafter & Ald. Burke to do the tax work." [100-3 (Sealed May Cell Phone Title III Application) at 37, ¶ 29]. Ald. Burke then made the pitch to Skydell personally. Ald. Burke requested that Ald. Solis arrange an in-person meeting with Skydell. During that meeting, which took place in Ald. Solis's City Hall office, Ald. Burke personally recommended his law firm. [*Id.*

113

at 42, ¶ 34] (declaring that Ald. Burke stated to Skydell, "we'd love to present our firm to you. We do almost exclusively ad valorem taxation. Property tax work"). As if Ald. Burke's personal pitch left any question that he wanted to score Skydell's legal business, in a private debriefing with Ald. Solis following the meeting, Ald. Burke discussed paying Ald. Solis a fee so long as Ald. Solis could "tee * * * up" Skydell or other developers for legal business. [*Id.* at 44–45, ¶ 36].

The affidavit also showcased evidence from which Chief Judge Castillo could have discerned a fair probability that tapping Ald. Burke's lines would uncover an intent to exchange Skydell's legal business for Ald. Burke's official acts. Time and again, the affidavit describes Ald. Solis articulating a possible tit-for-tat between the aldermen and Skydell, and facts from which it is possible to infer Ald. Burke ratified that plan. For example, in a November 2016 meeting, Ald. Solis updated Ald. Burke that "Skydell * * * [is] receptive, but not committed [to hire Klafter & Burke], but I [Ald. Solis] ha[d] a strong feeling that I [Ald. Solis] could convince him [Skydell]" including by "remind[ing] him again, 'cause he needs a lot of help, a lot of approvals, that I [Ald. Solis] th[ought] carefully [he] c[ould] get [Skydell] to go with [Ald Burke's firm]." [100-3 (Sealed May Cell Phone Title III Application) at 47–48, ¶ 38] (some alterations in original). Ald. Burke at least arguably ratified Ald. Solis's approach to secure Skydell's legal business, responding, "[g]ood." [*Id.*] Even more explicitly, in December 2016, Ald. Solis updated Ald. Burke about his progress in recruiting Skydell to retain Klafter & Burke. Ald. Solis relayed that he had "spoke[n] to Harry Skydell," that "at first he sounded like he was gonna use the other firm[,] but he's really concerned about that Amtrak matter because it's costing him $5,000 every time he tries to use it," and that "he's also gonna need permits and stuff." [*Id.* at 51, ¶ 42]. Ald. Solis then asked Ald. Burke to follow up with his contact at Amtrak, and Ald. Burke agreed: "Yeah, sure." [*Id.*] Nor did Ald. Burke balk when, in response, Ald. Solis noted that Burke's reaching out to his contacts

at Amtrak "would really, I [Ald. Solis] think make, ah, make the deal for him [Skydell]." [*Id.* at 51, ¶ 42]. To the contrary, Ald. Burke stated, "Oh, I think I could. In fact[,] I talked to him last week on a different matter." [*Id.* at 52, ¶ 41]. In sum, there was a basis upon which to infer that Ald. Burke ratified Ald. Solis' suggestion, on multiple occasions[36] that they exchange assistance on a "specific and focused" matter that was "pending," see *McDonnell*, 579 U.S. at 574, to "make the deal" for Skydell's legal fees. [100-3 at 51, ¶42].

Furthermore, the affidavit stated that Ald. Burke made his official assistance *contingent* on receipt of Skydell's legal business. When Ald. Solis asked Ald. Burke for an update on the negotiations between Amtrak and JLL, Skydell's contractor, Ald. Burke remarked "'I'm not hired to represent them so I'm just trying to get the background here.' * * * If indeed I get hired, then it's a different story." [100-3 (Sealed May Cell Phone Title III Application) at 58, ¶ 46] (alteration in original). He doubled down a month later, explaining to Ald. Solis that he had personal contacts who could likely assist with negotiations, "but, you know, if we're not signed up, I'm not going to do any lifting for this guy [Skydell]." [*Id.* at 59, ¶ 48] (alteration in original). During that same in-person January 2017 discussion, Ald. Solis informed Ald. Burke that Skydell might need assistance on another, specific matter, the approval of historic landmark status. Ald. Solis observed, "[t]hey [601W] have a lot of other stuff they're gonna need in the future, I don't think the historical landmark issue has been resolved yet either," to which Ald. Burke responded, "[s]o

---

[36] Subsequent conversations revealed that Ald. Burke ratified the plan on multiple occasions. In a follow-on call that same morning, Ald. Solis said to Ald. Burke that he was following up to make sure he relayed that "he [Skydell] seems to understand it and as long as we help him, and, with the necessary permits, which I think I'll follow up in [*sic*], and then if you can follow up with the Amtrak, then I think he understands he'll use your firm," and Ald. Burke responded, "Okay. Great." [100-3 (Sealed May Cell Phone Title III Application) at 53, ¶ 43] (alteration in original). When Ald. Burke asked who the "competition" was, Ald. Solis added that Skydell had mentioned the name, "but I think he's pretty frustrated right now and he said he'll just accept my guidance on just about everything." [*Id.*]

far we have no, the cash register has not rung yet." See [*Id.* at 60, ¶ 49] (some alterations in original).

In short, Ald. Solis specifically suggested that Ald. Burke could secure legal fees from Skydell in exchange for "emphasizing what Burke and Solis could do for Skydell in his official capacity." [139 (Gov't Br.) at 130]. Ald. Burke not only "approved the tactic and offered a portion of the legal fees to Solis," [*id.*], but also specifically refused to take the official acts *unless* "the cash register rung," see [100-3 (Sealed May Cell Phone Title III Application) at 60, ¶ 49].

Ald. Burke's counterargument is that none of the issues with Amtrak and the Water Department amount to a violation or even an attempt to commit honest services wire fraud. See [100 (Sealed May Title III Suppression Br.) at 30–46].[37] Specifically, in the Alderman's view, the conduct described in the affidavits did not constitute an "official action" as defined by the Supreme Court in *McDonnell v. United States*, 579 U.S. 550 (2016), nor was it a *quid pro quo* agreement. [100 at 19, 28]. Relying on *McDonnell* and its discussion of what constitutes an "official act" for purposes of honest services fraud prosecutions, Ald. Burke contends that Chief Judge Castillo wrongly decided there was a "fair probability" that the tap would uncover evidence that Ald. Burke intended to exchange official acts for legal clients for his private practice. See [100 at 18–19].

Ald. Burke's *McDonnell* arguments are premature, at best. At this early stage in the case, the Government does not yet need to *prove* honest services wire fraud beyond a reasonable doubt to secure a search warrant. See *United States v. Angle*, 234 F.3d 326, 335 (7th Cir. 2000) ("Probable cause * * * does not require evidence sufficient to support a conviction * * *"

---

[37] Ald. Burke also takes issue with the Superseding Indictment's ("Indictment") [30] discussion of the potential marketing agreement discussed between Ald. Burke and Ald. Solis. [100 (Sealed May Title III Suppression Br.) at 52–54]. In its response [139], the Government focused on Ald. Burke's promises with respect to the Old Post office rather than the Burke-Solis arrangement, so the Court will limit its discussion to those arguments.

(alteration in original) (quoting *United States v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000))). At trial and again on a motion for vacatur in the event of an adverse verdict, Ald. Burke will have an opportunity to convince a properly-instructed jury (or this Court), with all the evidence amassed, that the Government has not carried its burden of proving that Ald. Burke attempted or did commit an "official act" beyond a reasonable doubt. The Court will properly instruct the jury on what constitutes an official act, with the benefit of counsel's input, on how to follow *McDonnell*'s guidance. To put it plainly, Ald. Burke should tell it to a jury. All that matters for present purposes is that there was a substantial basis supporting Chief Judge Castillo's probable cause finding, and there was.

Ald. Burke's reliance on a series of out-of-circuit, post-*McDonnell* cases in which the Second and Third Circuits overturned wire fraud convictions reinforce that he is raising these concerns too early. First, unlike the cases cited, the affiant did refer to discrete matters upon which Ald. Burke could act or attempt to commit official acts. Second, and tellingly, the procedural posture in the cases cited by Ald. Burke necessarily entailed a higher standard of proof—reversals or vacaturs of jury convictions in which the jury instructions failed to comport with the narrowed definition of an official act. See *United States v. Boyland*, 862 F.3d 279, 281, 289–91 (2d Cir. 2017); *United States v. Silver* ("*Silver I*"), 864 F.3d 102, 106, 115–19 (2d Cir. 2017); *United States v. Silver* ("*Silver II*"), 948 F.3d 538, 552–75 (2d Cir. 2020); *United States v. Fattah*, 914 F.3d 112, 152–59 (3d Cir. 2019). At this juncture, however, the facts set out in the affidavit presented to Chief Judge Castillo provide a substantial basis to find probable cause that subsequent wiretaps might reveal evidence of what specific steps Ald. Burke specifically took or would take to influence the Water Department, city permits and landmark status, and negotiations with Amtrak. That is enough to infer Ald. Burke intended to defraud Chicago citizens of his honest services.

117

Even if the Court indulged the most generous reading of Ald. Burke's gloss on the recorded phone calls, his own words gave the Government investigators and the Chief Judge ample reason to think that further probing would unearth evidence of three kinds of activities that might qualify as "official acts" under the *McDonnell* framework. Namely, Ald. Burke discussed (1) influencing a determination before the City of Chicago's Water Department, (2) influencing approval of city permits, *e.g.*, the Old Post Office building's landmark status, and (3) negotiating favorable contract terms with Amtrak on Skydell's behalf by offering Amtrak Ald. Burke's assistance with official acts.

As for the Water Department, the affidavit provided a substantial basis to support probable cause that Ald. Burke intended to take and actually took steps towards an official act, a Water Department approval for the Old Post Office development. Recall that the Old Post Office development needed the Water Department's approval to access a water line. [100-3 (Sealed May Cell Phone Title III Application) at 63, ¶ 52]. JLL, Skydell's contractor, informed Ald. Solis that city policy "does not permit new taps" onto the City's main line, and thus "would request policy relief from the City to connect an additional" line. [*Id.*] In March 2017, Ald. Solis relayed that request to Ald. Burke, explaining that Prather "has an issue with the water department and they need to get the water commissioner to sign off on something." [*Id.* at 64, ¶ 53]. Ald. Burke suggested they "bring Tom Powers in, who used to be the [water] commissioner, and is in the business now of engineering these kinds of projects and nobody knows the regs [regulations] and the ordinances or the people that'll have to make the decisions, better than him." [*Id.* at 65, ¶ 55] (some alterations in original). Thus, contrary to Ald. Burke's arguments, the permit issue was exactly "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *McDonnell*, 579 U.S. at 570. Accordingly, the affidavit clearly set forth facts from

which to infer the discussions centered on a "matter" that "involve[s] a formal exercise of governmental power that is similar in nature to a * * * determination before an agency."  See *McDonnell*, 579 U.S. at 574.

Ald. Burke's contention that any communications with the former Water Commissioner could not satisfy the *McDonnell* test reads the test too narrowly.  Ald. Burke complains that "connecting the developer with an independent third-party like Mr. Powers falls squarely into the broad category of constitutionally protected activity *McDonnell* made clear does not implicate the narrow concept of official action."  [100 (Sealed May Title III Suppression Br.) at 47].  First, the north star in evaluating an authorization for a search warrant is whether there was a "substantial basis" to believe that evidence of wrongdoing would be recovered from the search, not whether the facts were proved beyond a reasonable doubt.  As described above, Ald. Burke suggested he contact the former Water Commissioner, placed phone calls to the Water Commissioner, and the current Commissioner Murphy confirmed that Powers had reached out.  Ald. Burke explained that he should recruit Powers's assistance because Powers knew best "the people that'll have to make the decisions."  [100-3 (Sealed May Cell Phone Title III Application) at 65, ¶ 55].  As the Government put it, there was a reasonable probability that further investigation would shed light on whether Ald. Burke was attempting to pressure the Water Commissioner to override the Water Department's policy against permitting new taps because one could infer that "Burke, through Powers, had asked Murphy what he could do to resolve the Post Office's water problems."  [139 (Gov't Br.) at 110] (citing [100-3 at¶ 61]).[38]  See *McDonnell*, 579 U.S. at 574 ("That decision or

---

[38] To be sure, "standing alone," phone calls to Powers might not constitute a "decision or action within the meaning of § 201(a)(3), even if the * * * meeting * * * is related to a pending question or matter."  *McDonnell*, 579 U.S. at 571–72.  But Ald. Burke's calls did not stand alone.  Rather, the facts support probable cause that Ald. Burke understood the agreement, articulated on multiple occasions, that "if [they] can take care of the water commissioner, [they] should be able to get the tax work."  [100-3 (Sealed May Cell Phone Title III Application) at 64, ¶ 53].  The facts above suggest that Ald. Burke intentionally took

action may include using his official position to exert pressure on another official to perform an

'official act'").[39]

<hr/>

steps to contact a fellow city official to apply pressure to the Water Department on a specific, pending matter.

For example, on another occasion, Ald. Solis reiterated to Ald. Burke that Ald. Burke and Ald. Solis would "seal the deal," meaning receive tax business from Skydell, if they could resolve the water access issue in Skydell's favor. [100-3 Sealed May Cell Phone Title III Application) at 66, ¶ 55]. Ald. Burke responded, "Alright. We're on it." [*Id.*] The affidavit further reflects that Ald. Burke did then appear to take steps. Current Water Commissioner, Murphy, advised Ald. Solis that Ald. Burke had reached out to the former Water Commissioner, Tom Powers, and asked for a meeting between Ald. Burke and the former and current Water Commissioners to discuss the Post Office issue. [*Id.* at 67, ¶ 57]. After the Chicago Tribune ran an article about possible ethical violations, Ald. Burke discussed refraining from attending the planned meeting with the former Water Commissioner. [*Id.* at 68, ¶60]. Nevertheless, the current Water Commissioner, Barrett Murphy, later confirmed that former Water Commissioner Powers had in fact contacted him. [*Id.* at 69, ¶ 61].

The affidavit therefore clearly laid out facts to support that Ald. Burke did not just make a call or introduction but rather intended to "receive[] a thing of value knowing that it was given with the expectation that [he] would perform an 'official act,' in return." See *McDonnell*, 579 U.S. at 572.

[39] As a backstop, Ald. Burke attempts to portray his conduct as innocent, but these argument fare no better because they are proper for a jury trial (and, if need be, a motion for acquittal), not a suppression motion. First, Burke characterizes his decision to connect with the former Water Commissioner, Thomas Powers, as simply a desire to bring in someone with the requisite level of technical expertise, rather than a decision to influence a decision on Skydell's behalf in exchange for law firm business. Ald. Burke points to statements that "Ald. Burke simply put the developer in touch with individuals who possessed the appropriate level of technical expertise," see [100 (Sealed May Title III Suppression Br.) at 46], rather than committing an official act. If that were the totality of the Alderman's words and deeds in the affidavit, he might have a good argument. But, as noted below, there was much more—including a clear and repeated tie between the water permits and tax business for Klafter & Burke.

Moreover, Burke's point disregards the question currently before this Court. The Court's responsibility is to assess whether there is a substantial basis to support Chief Judge Castillo's conclusion that the "the affidavit sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." See *Searcy*, 664 F.3d at 1122.

The answer to that question is undoubtedly yes. The affidavit stated that on multiple occasions, Ald. Burke ratified Ald. Solis's suggestion that Ald. Burke's efforts to "take care" of the Water Department issues would "seal the deal" on the tax business, which raises the inference that Ald. Burke's calls to Thomas Powers were designed to influence a fellow government official, *i.e.*, to obtain the current Water Commissioner's approval on Skydell's behalf. Ald. Solis also explicitly told Ald. Burke he would remind Skydell he needed help with project approvals and permits as a means of securing tax work for Ald. Burke's firm. The affiant did not need to "negate every argument * * * against that probability" to seal the deal on Chief Judge Castillo's probable cause finding. See *Malin*, 908 F.3d at 165. Ald. Burke's insistence in his reply brief that "there were no 'compromises' made; and there was no pressure applied (or contemplated) by Ald. Burke on *any* person to undertake any particular action with respect to the Post Office's water

The affidavit also stated that Ald. Burke preliminarily agreed to help Skydell obtain other official acts, namely City approvals, in exchange for hiring Ald. Burke's law firm as well. For example, on November 7, 2016, Ald. Solis told Ald. Burke that he believed he could get Skydell to hire Ald. Burke's law firm by reminding Skydell that Skydell needed Ald. Solis's help with getting additional approvals for the Post Office project: "I'm gonna remind him [Skydell] again, 'cause he needs a lot of help, a lot of approvals, that I think carefully I can get him to go with you." [100-3 (Sealed May Cell Phone Title III Application) at 47–48, ¶ 38]. Ald. Burke responded "Good." [*Id.*] Ald. Burke then suggested ways to conceal any payment to Ald. Solis by routing it through another lawyer. [*Id*.] On another occasion, Ald. Solis told Ald. Burke that Skydell's company had a "lot of other stuff they're gonna need in the future, I don't think that the historical landmark issue has been resolved yet either," to which Ald. Burke responded, "the cash register has not rung yet"—again indicating his willingness to move on an official act—arranging landmark approvals or permits—only if and when he received a kickback. [*Id.* at 60, ¶ 49].

City "approvals," and specifically an application for "landmark" status, could constitute "official acts" within the meaning of *McDonnell.* It certainly is not a stretch to say that a promise to approve or "exert pressure on *another* official to perform 'an official act,'" namely to approve the Old Post Office as a historic landmark, a request which must be put in a "hearing before a committee" of the Chicago City Council, would constitute a "formal exercise of governmental power" within the definition announced by the Supreme Court. *McDonnell*, 579 U.S. at 574. Even if Ald. Burke had not taken a concrete step towards "resolution" of any specific city permit or landmark status approval at the time the matter was presented to the Chief Judge, the affidavit

issues," [156 (Sealed May Title III Suppression Reply) at 14], does not undermine this "common sense" view, see *Angle*, 234 F.3d at 335.

provides facts from which there was a fair probability that a search would reveal evidence concerning these matters.

Having concluded that the affidavit provided more than enough to support probable cause based on the Water Commission and City permit approvals, the Court does not even need to wade deeply into Ald. Burke's arguments regarding Amtrak. However, the Amtrak arrangement provided a third type of "official act" from which it was possible to infer probable cause of honest services wire fraud. The affidavit stated that Ald. Burke indicated his intent to help Skydell negotiate with Amtrak in exchange for hiring Ald. Burke's law firm and solicited Skydell's legal business by emphasizing what he could do for Skydell. Recall that later, on December 12, 2016, Ald. Solis informed Ald. Burke that Skydell was experiencing problems with Amtrak and would "need permits and stuff." [100-3 (Sealed May Cell Phone Title III Application) at 51, ¶ 42]. Ald. Solis told Ald. Burke that it would "make the deal for him," if Ald. Burke intervened with Amtrak on Skydell's behalf, to which Ald. Burke responded, "I think I could." [*Id*. at 52, ¶ 42]. That same day, Ald. Solis advised Ald. Burke that Skydell "seems to understand it and as long as we help him, and, with the necessary permits, which I think I'll follow up in [*sic*], and then if you can follow up with the Amtrak, then I think he understands he'll use your firm." [*Id.*] Ald. Burke again said "[o]kay, great." [*Id.* at 53, ¶ 42]. Ald. Burke met with Skydell personally in Ald. Solis's City Council office, during which he pitched his private law firm to Skydell and indicated his willingness to negotiate with Amtrak. He also later specifically declined to take steps on the Amtrak issue when Skydell had not yet given him tax work.

Ald. Burke also took a substantial step towards an official act on Skydell's behalf. Specifically, Ald. Burke proposed negotiating directly with Amtrak to resolve the problems and contacted an Amtrak executive to understand the issues at play and discuss the potential contract

terms that would need to change. [100-3 (Sealed May Cell Phone Title III Application) at 53–56, ¶¶ 44–46]. To be sure, Ald. Burke *also* offered to arrange meetings and make introductions for Skydell. But in contrast to the facts of *McDonnell*, the affidavit states that Ald. Burke went further, taking steps to assess and sway the agency's determination about the terms of the deal with Skydell and its contractors, including when, how, and at what cost they could access Amtrak's property.

None of Ald. Burke's arguments dissuade the Court. Ald. Burke laser focuses first on the October 2016 meeting and then the Raymond Lang meeting to minimize what Ald. Burke agreed to do or actually did do for Skydell. According to Ald. Burke, he simply offered a personal introduction, see [100 (Sealed May Title III Suppression Br.) at 31], and gathered background from an Amtrak executive, see [*id.* at 35]. Ald. Burke suggests that treating this behavior as probable cause that Ald. Burke would engage in "official conduct" would run afoul of *McDonell*, see [100 at 31–33, 35]. Furthermore, he insists that because Skydell only vaguely gestured to "problems" with Amtrak, the issues were not sufficiently concrete to amount to any "official act" Ald. Burke might take, or a *quid pro quo*, see [*id.* at 31–33].

The main thrust of Ald. Burke's arguments regarding Amtrak—that Ald. Burke merely offered to make a personal introduction and otherwise didn't agree to anything sufficiently concrete—is again premature on a suppression motion. But even if the Court were to jump ahead, the aldermen's rendition of the relevant facts before Chief Judge Castillo is seriously incomplete. Ald. Burke's attempt to sanitize the meetings effectively invites the Court to ignore the remainder of the affidavit. The Court declines that invitation. See *Leisure*, 844 F.2d at 1354 ("Appellants engage in a 'divide and conquer' attack on the affidavit, and urge this court to undertake a piecemeal dismemberment of the various paragraphs of the affidavit without attention to its force as a whole. We decline this invitation to review the affidavit in an overly stringent and

123

hypertechnical fashion"). Taking into account the whole of the affidavit, Chief Judge Castillo could have inferred that Ald. Burke did not simply offer to make an introduction to his personal friend or gather background information. Rather, in December 2016, Ald. Burke met and gathered information from Amtrak executives, which revealed a concrete matter upon which Amtrak had to act (or not act). Ald. Burke spoke to Raymond Lang and learned that the Old Post Office construction required access to certain airspace. That airspace was owned (at least in part) and governed by an agreement with Amtrak. The Old Post Office's contractor, JLL, disputed the agreement's terms, and Ald. Burke identified more agreeable contract terms to facilitate the contractor's access and save the developers money. Ald. Burke learned that Lang "would be willing to adjust some things" including "would probably be willing to give them a five-hour window of space at night so they could do the work and there could be economies of scale." [100-3 (Sealed May Cell Phone Title III Application) at 56–57, ¶ 46]. Ald. Burke also stated he could influence Amtrak's position on the matter when he suggested that he could secure the favorable terms from Amtrak. Specifically, he indicated that such executives could be "worked with" but that "up until now, he has no reason to do anything," and Ald. Burke further explained that "[i]f indeed [he] got hired, then it's a different story." [*Id.* at 57–58, ¶ 46]. Later, Ald. Solis and Ald. Burke even discussed official acts *they* could personally take to secure the agreeable terms for Skydell. Namely, they could offer to help Amtrak obtain city approval for a planned development of Chicago Union Station in exchange for Amtrak's concessions on the contract. [*Id.* at 62–63, ¶ 51]. As such, there are more than sufficient "specific" facts that a search would reveal evidence of an intent and steps towards entering a *quid pro quo* fraud—an offer to influence Amtrak by way of official acts for Amtrak, in exchange for Skydell's business.

That Ald. Burke focuses on *McDonnell* is hardly surprising, for it held that "setting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an 'official act'" and reasoned that because the jury did not receive this legal instruction, it may have convicted the former governor on the sole basis that the governor took these steps. 579 U.S. at 567, 577–80. But *McDonnell* does not help the Alderman now, and it may never, depending on how the jury evaluates the facts. Unlike in *McDonnell*, which involved a *conviction* for honest services fraud premised on personal introductions, it is reasonable to infer from the facts in the affidavit that Ald. Burke contemplated influencing another official to affect a specific, concrete, pending matter—Amtrak's approval of certain contract terms that would result in private economic gain for Skydell's development.[40]

---

[40] Ald. Burke also raises four arguments designed to downplay his conduct with respect to Amtrak. As a general matter, all of Ald. Burke's arguments disregard the probable cause standard, which does not require the Government to eliminate every alternative explanation for Burke's conduct. See *Malin*, 908 F.2d at 165–66 ("[T]he [complaint] need not also negate every argument that can be asserted against that probability.") That standard aside, all of Ald. Burke's arguments fail. First, with respect to Ald. Burke's and Ald. Solis's conversations regarding Ray Lang and the status of Ald. Burke's "conversations with about what Union Station needs from the City" on February 27, 2017, Ald. Burke paraphrases the affidavit to argue that Ald. Burke "did not respond to Solis's misleading proposal" to obtain permits for Amtrak in exchange for Amtrak's assistance to Skydell. [100 (Sealed May Title III Suppression Br.) at 37]. That assertion is, at best (from the Alderman's perspective), debatable. The conversation unfolded as follows: Ald. Solis stated, "[I]f we can get what Ray is going to need and we can help each other, then I think we'll be able to lock in the tax work," to which Ald. Burke directly responded "Good. Well just get me a list of the things that they [the developer] need[s] from Ray and I'll talk to him." [*Id.* at 63, ¶ 51].

Second, Ald. Burke argues that his request for a specific list of Skydell's asks means he did not even know what Amtrak needed "as late as February 2017" and therefore could not have been engaged in a *quid pro quo*, see [100 (Sealed May Title III Suppression Br.) at 46]. The record belies that statement, at least in part, because Ald. Burke identified the issues with the airspace in December 2016, months before the February 2017 conversation. See [100-3 (Sealed May Cell Phone Title III Application) at 55–56, ¶ 46].

Third, Ald. Burke argues that his conduct with respect to Amtrak does not amount to honest services fraud because the Government conflates and "distorts" Ald. Burke's offer to engage in lawful lobbying work regarding Amtrak. Namely, Ald. Burke insists that when Ald. Burke did in fact meet with Lang, "[a]s Ald. Burke explained, if Mr. Skydell were to hire him, that he would take action—*in his capacity as Mr. Skydell's lawyer, not as an Alderman*." [100 (Sealed May Title III Suppression Br.) at 43]. To be sure, it appears Ald. Burke might have been willing to accept a lobbying arrangement with Amtrak. [100-3 (Sealed May Cell Phone Title III Application) at 59–60, ¶¶ 48–49]. However, Ald. Burke also agreed to do the Amtrak work in exchange for tax work. Specifically, during a conversation regarding the Amtrak negotiations, on January 25, 2017, when Ald. Solis asked for an update on "discussion with Ray Lang,"

Zooming back out to the issue before this Court at this time, the Court concludes that the affidavit presented facts from which Chief Judge Castillo could easily infer a wiretap would uncover evidence of Ald. Burke's intent to and substantial step toward three types of official acts—influencing Water Department approval of an access point, influencing approval of City permits and historic landmark status, and negotiating favorable contract terms with Amtrak—in exchange for a kickback, the retention of his private law firm. Chief Judge Castillo therefore properly approved the wiretaps.

## ii. Hobbs Act Extortion

The Court also agrees with the Government that the affidavit included a sufficient showing of probable cause that Ald. Burke was attempting or would attempt to extort the Post Office executives in violation of the Hobbs Act. "The Hobbs Act makes it a criminal offense to obstruct, delay, or affect interstate commerce by actual or attempted extortion. 18 U.S.C. § 1951(a). 'Extortion' under this Act is defined in part as 'the obtaining of property from another, with his consent, * * * under color of official right.' 18 U.S.C. § 1951(b)(2)." *United States v. Carter*, 530 F.3d 565, 572 (7th Cir. 2008). To satisfy that the alleged extortion occurred under color of official right, the prosecution must "show that a public official has obtained a payment to which

---

among other things, Ald. Burke said "you know, if we're not signed up, I'm not gonna do any lifting for this guy [Skydell]." [*Id.* at 59, ¶ 48]. When Ald. Solis asked for further clarification, "[s]igned up for what, 'cause I think I told Mr. Skydell that it would be for the taxes," Ald. Burke affirmed he was talking about taxes, "[y]eah, we haven't heard a word.'" [*Id.* at 59, ¶ 48]. And again that same conversation, Ald. Solis stated, "[b]ut you said, you would still prefer the tax work, right?" to which Ald. Burke's response provide facts to support that he initially intended to agree to the kickback in exchange for his work on Amtrak, "[s]omebody's got to do it. I thought that's what our conversation was" at least "initially." [*Id.* at 60, ¶ 49].

Ald. Burke's fourth argument, that there was no meeting of the minds on the Amtrak-law firm deal, fares no better. To be sure, the City Hall meeting was just a pitch meeting, and the affidavit contains no details of Skydell's agreement to hire Ald. Burke's law firm. But Ald. Burke agreed to his side—he would only do the Amtrak work if he received the law firm services. See, *e.g.*, *Ring*, 706 F.3d at 467; *Silver*, 948 F.3d at 548–50.

he was not entitled, knowing that the payment was made in return for official acts." *Id.* at 574 (quoting *United States v. Marshall*, 75 F.3d 1097, 1112 (7th Cir. 1996)).

The extortioner does not need to *accomplish* the official act. See *United States v. Nedza*, 880 F.2d 896, 902 (7th Cir. 1989) ("[T]he issue is not whether the extortionist is ultimately effective"). Instead, the Hobbs Act "is violated when 'one attempts to induce a victim engaged in interstate commerce to part with property.'" *Carter*, 530 F.3d at 574 (citing *Nedza*, 880 F.2d at 902). Nor must the official have the *ability* to accomplish the act. The Seventh Circuit has specifically "held that '*[d]e jure* ability to perform the promised act need not be present; sufficient is 'a reasonable belief that the state system so operated that the power in fact of the defendant's office included the effective authority' to fulfill the promise." *Id.* (quoting *United States v. Rindone*, 631 F.2d 491 (7th Cir. 1980)). Rather, we ask "whether [the bribe payor] would have reasonably believed, *at the time of the extortionate act*, that [the defendant] could deliver the power of his office for the victim's benefit." *Id.* (quoting *Nedza*, 880 F.2d at 902–03). Much like honest-services wire fraud, other Circuits also hold that the bribe payor and official do not need to reach an agreement. *Silver II*, 948 F.3d at 550 ("Thus, extortion under color of right does not require a meeting-of-the-minds agreement").

In this case, the affidavit clearly established probable cause to believe that the Defendant did—or was about to attempt to—extort Skydell under color of official right. The affidavit states that Ald. Burke agreed with Ald. Solis to generate business for Klafter & Burke from Skydell. As described above, on multiple occasions Ald. Burke agreed with Ald. Solis's plans to solicit Skydell to hire his law firm, and later met Skydell to do so himself. See, *e.g.*, [100-3 (Sealed May Cell Phone Title III Application) at 43, ¶ 35]. Ald. Burke was told that Skydell indicated he had a law firm selected already. [*Id.* at 42, ¶ 34]. Ald. Burke also indicated that he was not likely to score

127

business with Skydell because, in his own words, Ald. Solis "kn[e]w as well as I do, Jews are Jews and they'll deal with Jews to the exclusion of everybody else unless * * * unless there's a reason for them to use a Christian." [*Id.* at 58, ¶ 46] (some alterations in original). Accordingly, there are facts to infer that Ald. Burke intended to "obtain[] a payment to which he was not entitled."

What's more, there is a reasonable inference that Ald. Burke intended to solicit Skydell's payment in exchange for official acts because Ald. Burke ratified Ald. Solis's plan to do so and stated he would withhold official acts until he received payment. As to the former, as the Court described above, Ald. Solis suggested, and Ald. Burke approved of, offers to help with public permits in exchange for Skydell's business on multiple occasions. See *supra*, Part VII.C(1)(a)(i). As to the latter, Ald. Burke made his official acts contingent on his law firm's receipt of Skydell's business. For example, after gathering preliminary information on Skydell's issues with Amtrak, Ald. Burke pumped the brakes until he obtained a positive signal from Skydell. He explained that he would not reach out to Amtrak employees specifically because "[i]f we're not signed up, I'm not gonna do any lifting for this guy," meaning Skydell. [100-3 (Sealed May Cell Phone Title III Application) at 59, ¶ 48]. When Ald. Solis told Ald. Burke later in the conversation that Skydell's company had a "lot of other stuff they're gonna need in the future, I don't think that the historical landmark issue has been resolved yet either," Ald. Burke responded, "the cash register has not rung yet"—again tying assistance on City business to private gain. [*Id.* at 60, ¶ 49]. Thus, there is no question the affidavit presented a substantial basis to support probable cause that Ald. Burke intended to solicit "payment * * * made in return for official acts.'" See *McDonnell*, 579 U.S. at 563.

It is no answer to say that Ald. Burke did not have the *ability* to take official action because he had no oversight over Amtrak or its employees/board members. See [100 (Sealed May Title

III Suppression Br.) at 30].  Specifically, Ald. Burke argues that the Amtrak negotiations did not

constitute extortion because both Amtrak and the Post Office are non-City parties and Ald. Burke

has no authority over Amtrak permits.  The Seventh Circuit has clearly held that the actual ability

to perform the promised act is not necessary.  *Carter*, 530 F.3d at 574 ("[I]t is immaterial whether

the questioned transaction involves a promise by the official to undertake acts unrelated to his

duties[,] '[s]o long as the motivation for the payment focuses on the recipient's office'" (internal

quotation marks omitted) (quoting *Rindone*, 631 F.2d at 495)).  In other words, even if Amtrak's

property and contracts lay beyond the ambit of Ald. Burke's "official duties," it would be

"immaterial whether" he "promis[ed] * * * to undertake acts unrelated to his duties" as an

alderman.  See *id.*  Ald. Burke himself bragged about his close relationship to Amtrak officials.[41]

Not only was Ald. Burke "family, personal friends" with a presidential appointee to the Amtrak

board, but he had "made his [the appointee's] daughter a judge here in Cook County."  [100-3

(Sealed May Title III Suppression Br.) at 43, ¶ 35].  Beyond these ties, the affidavit revealed that

Ald. Burke and Ald. Solis discussed ways in which the two could offer Amtrak official acts over

which they had control (future city permits for Union Station) to induce Raymond Lang to agree

to Skydell's contractor's terms.  To put it differently, Ald. Burke had the capacity to offer an

official act for Skydell's ultimate benefit.  It would have been eminently reasonable for Skydell to

---

[41] During the October 2016 meeting, Skydell explained that "[he] th[ought] the hardest thing would be * * * we have to work with landmarks; we have to work with Amtrak," [100-3 (Sealed May Cell Phone Title III Application) at 43, ¶ 35], and Ald. Burke responded, "[a]s far as Amtrak i[s] concerned, put it in the back of your mind. The, one of the members of the board of Amtrak is a guy by the name of Jeff Moreland. * * * * [H]e is a presidential appointee to the Amtrak board * * * * we made his daughter a judge here, in Cook County" and "[w]e're family, personal friends. And I know if you ever run into a problem there, Jeff can be helpful." [*Id.*] Skydell said "we were hoping we can resolve [the problems]. But if we can't, we may reach out to you," and Ald. Burke responded, "[w]ell, just put it in the back of your mind, you know, another—You'll find out that Chicago's a very small town" and "[e]verybody's that anybody knows one another and generally speaking, everybody gets along." [*Id.* at 44, ¶ 35].

"believe[], *at the time of the extortionate act*, that [Ald. Burke] could deliver the power of his office for the victim's benefit." *Carter*, 530 F.3d at 574.

### iii. Travel Act

Even setting aside the issue of Ald. Burke's specific, "official acts" to satisfy *McDonnell*, the affidavits also provided probable cause that Ald. Burke had or was about to violate statutes that do not necessarily require an official act. The affidavit provided an adequate basis from which Chief Judge Castillo could conclude that Ald. Burke's wire communications would contain proof that Ald. Burke had or was about to use a facility of interstate commerce to promote and facilitate unlawful activity. See 18 U.S.C. § 1952. "The Travel Act, 18 U.S.C. § 1952, makes it unlawful to use any facility in interstate commerce to distribute the proceeds of an unlawful activity." *United States v. Isaacs*, 493 F.2d 1124, 1145 (7th Cir. 1974), *overruled on other grounds by McNally v. United States*, 438 U.S. 250, 359 (1987) (disclaiming the intangible rights theory).

The Government points to three types of unlawful activity, including Illinois bribery, see 720 ILCS 5/33–1(d). "Unlawful activity" includes "bribery in violation of the laws of the state in which committed." See *Isaacs*, 493 F.2d at 1145. The Illinois bribery statute punishes receipt of property where such property was "promised or tendered with intent to cause him or her to influence the performance of any act related to the employment or function of any public officer." 720 ILCS 5/33–1(d).

Finally, "[t]o establish a Travel Act violation it is not necessary for the government to prove that" the defendant violated the applicable state law, but rather "Section '1952 refers to state law only to identify the defendant's unlawful activity[;] the federal crime to be provided in § 1952 is use of the interstate facilities in furtherance of the unlawful activity, not the violation of the law; therefore § 1952 does not require that the state crime ever be completed.'" *United States v. Baker*,

130

227 F.3d 955, 961 (7th Cir. 2000) (quoting *United States v. Campione*, 942 F.2d 429, 434 (7th Cir. 1991)).

In this case, the affidavit stated facts in support of the proposition that Ald. Burke's phone calls might uncover further proof that he was using a facility of interstate commerce to facilitate unlawful activity. For example, Ald. Burke discussed emails he would send and requested that others share with him information needed to advance the terms of the *quid pro quo*. The affidavit need not have provided probable cause that the Government could also "prove that" Ald. Burke had received Skydell's property or affected the Water Commissioner or Amtrak's conduct because "§ 1952 does not require that" bribery had "ever be[en] completed." See *Baker*, 227 F.3d at 961. For the reasons already stated, Ald. Burke's solicitation of and plan to tender Skydell's legal business support probable cause for a Travel Act violation.

\*\*\*\*\*

In sum, there was a "substantial basis" for Chief Judge Castillo's finding of probable cause to believe that the Government would uncover evidence of wrongdoing by Ald. Burke through the wiretap. The affiant relayed facts that were more than sufficient in regard to the commission or attempt to commit honest services fraud, Hobbs Act extortion, and a Travel Act violation. The Court therefore rejects Ald. Burke's first argument to suppress the fruits and the derivatives of the May 2017 wiretaps and subsequent wiretaps and shifts to Ald. Burke's request for a *Franks* hearing.[42]

---

[42] The backup argument that the affidavits did not establish probable cause that any of the telephone lines "were being used in the commission of any criminal offenses, nor that particular communications concerning criminal offenses would be obtained through the interception of the telephone lines," [100 (Sealed May Title III Suppression Br.) at 28], is not tenable, as the affidavit features months of recorded calls on Ald. Burke's telephone.

### b. *Franks* Hearing

Ald. Burke also seeks to suppress the fruits of the May 2017 wiretap on the grounds that the Government omitted key information from agent Noldin's affidavit and that those omissions violated the Fourth Amendment principles articulated in *Franks v. Delaware*, 438 U.S. 154 (1978). He makes two arguments in support. First, he claims that the Government did not tell Chief Judge Castillo that it had directed Ald. Solis's "carefully choreographed ruses" "designed to mislead Ald. Burke." [100 (Sealed May Title III Suppression Br.) at 28]. Second, he maintains that the Government's affidavit violated *Franks* because it did not inform Chief Judge Castillo that the Government had deliberately targeted Ald. Burke. On these bases, Ald. Burke insists he is entitled to a *Franks* hearing to demonstrate that "the totality of the circumstances, including the withheld facts, failed to support a finding of probable cause." [100 at 57].

In *Franks v. Delaware*, the Supreme Court held that a criminal defendant is entitled to an evidentiary hearing to examine the sufficiency of a search warrant in certain circumstances. Namely, "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." 438 U.S. at 155–56. To assess whether a defendant is entitled to a *Franks* hearing, the Seventh Circuit uses a three-pronged test. The circumstances warrant a hearing only

> if [the defendant] can make a substantial preliminary showing that: (1) the warrant affidavit contained false statements, (2) these false statements were made intentionally or with reckless disregard for the truth, and (3) the false statements were material to the finding of probable cause.

*United States v. Hancock*, 844 F.3d 702, 708 (7th Cir. 2016) (quoting *United States v. Mullins*, 803 F.3d 858, 861–62 (7th Cir. 2015)). As the Seventh Circuit has stated on multiple occasions,

"[b]ecause these elements are hard to prove, *Franks* hearings are rarely required." *United States v. Slizewski*, 809 F.3d 382, 384 (7th Cir. 2016); *United States v. Maro*, 272 F.3d 817, 821 (7th Cir. 2001) (same).

In regard to the first prong, a false statement, the *Franks* rule "[a]pplies to omissions as well as affirmative misrepresentations. However, '[i]f sufficient allegations existed warranting the search irrespective of the affiant's alleged errors, a hearing is unnecessary[,] and the motion should be denied.'" *Hancock*, 844 F.3d at 708 (citations omitted) (quoting *Mullins*, 803 F.3d at 862). Courts "assess the sufficiency of the allegations supporting the warrant according to the 'totality of the circumstances.'" *Id.* (quoting *Mullins*, 803 F.3d at 861).

As for the second prong, "[a]n affiant acts with reckless disregard for the truth when he 'in fact entertain[s] serious doubts as to the truth of his allegations.'" *United States v. Williams*, 718 F.3d 644, 650 (7th Cir. 2013) (internal quotation marks omitted) (quoting *United States v. Lowe*, 516 F.3d 580, 584 (7th Cir. 2008)). "This is a subjective inquiry that focuses on the officer's state of mind. A showing of reckless disregard requires more than a showing of negligence and may be proved from circumstances showing obvious reasons for the affiant to doubt the truth of the allegations." *Id.* In addressing the second prong in the context of an omission, "because officers must always make deliberate decisions about what to include in and omit from a warrant application, a *Franks* violation based on an omission requires a showing that the material information was omitted deliberately or recklessly to *mislead* the issuing magistrate." *Williams*, 718 F.3d at 650 (emphasis in original). Although an omission "of known and substantial adverse information about the informant's credibility is sufficient to support a reasonable inference of recklessness," *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014), the Seventh Circuit has disclaimed any sort of blanket rule that, for example, "mandates a *Franks* hearing every time

133

'substantial adverse information about the informant's credibility' is omitted from a probable cause affidavit." *Hancock*, 844 F.3d at 709 (describing such a blanket rule as a "misreading of [its] holding in *Glover*").

As for the third prong, "an unimportant allegation, even if viewed as intentionally misleading, does not trigger the need for a *Franks* hearing." *United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000).

The Court begins with Ald. Burke's first qualm with the Title III application: that the Government did not tell Chief Judge Castillo that the Burke-Solis discussions were part of a broad, choreographed ruse. Specifically, Ald. Burke complains that the Government did not inform Chief Judge Castillo that the "[g]overnment directed Ald. Solis to mislead and lie to Ald. Burke about Mr. Skydell's willingness to hire Klafter & Burke." [100 (Sealed May Title III Suppression Br.) at 57].[43] According to Ald. Burke, Skydell informed Ald. Solis that he was unwilling to hire Ald. Burke's law firm. Thus, Ald. Burke insists that the Government should have told the judge that (1) the Government directed Ald. Solis to lie to Ald. Burke about Skydell's intent;[44] and (2) Skydell did not intend to hire Ald. Burke. See [*id.* at 60]. Ald. Burke does not take issue with the ruse itself. In fact, he concedes that the Government's "use of ruses is entirely permissible." [*Id.* at 57]. However, the Government's "omissions show that the entire scheme was a false construct that was created and pushed by the *Government* and its severely compromised cooperator, Ald.

---

[43] Ald. Burke points us to several examples: the Government directed Ald. Solis to lie to Ald. Burke in Dec. 2016 that "it would really make the deal for Skydell[,]" if Ald. Burke could follow up on Amtrak, and on multiple occasions, the Government scripted and directed Ald. Solis to tell Ald. Burke that Skydell was "on the verge of hiring" Ald. Burke's law firm when the Government knew "Skydell had no intention of doing so." [100 (Sealed May Title III Suppression Br.) at 60].

[44] For example, Skydell told Ald. Solis that his "hands are tied for the foreseeable future" when he raised the possibility of hiring Ald. Burke's firm. [100 (Sealed May Title III Suppression Br.) at 61]. Interviews following the wiretaps revealed that Skydell believed that "98 percent" of the pressure was from Ald. Solis. [*Id.*]

Solis." [100 at 61]. It follows, says Ald. Burke, that the Government's omission to the Court "undermined the * * * finding of probable cause" because "the Chief Judge would have concluded that Mr. Skydell was a willing participant in a bribery scheme. This was false, and the [g]overnment knew it." [*Id.*]

Defendant's contention that the Government withheld the ruse from Chief Judge Castillo is not persuasive because it fails prong two of a *Franks* violation. There is nothing to suggest that the affiant intended to mislead Chief Judge Castillo about the ruse. See *Hancock*, 844 F.3d at 708; *Williams*, 718 F.3d at 650 ("[A] *Franks* violation based on an omission requires a showing that the material information was omitted deliberately or recklessly to *mislead* the issuing magistrate"). Nor is there a shred of indication that the Government "entertain[ed] serious doubts when" it represented Skydell's plans to hire (or not hire) Ald. Burke to show that the omission was made with "reckless disregard for the truth." See *id.* at 650.

Ald. Burke's argument also fails as a matter of common sense. The Government applied for the Chief Judge's sign off to electronically surveil one of Chicago's most prominent and powerful government officials. Ald. Burke would have this Court believe that the Government thought it could get away with pulling the wool over Chief Judge Castillo's eyes. At the time that the applications were presented for his review, Chief Judge Castillo had been a district judge for twenty-three years and Chief Judge for nearly four years. He thus had extensive experience reviewing search warrant and Title III applications by that stage of his career. And given the high profile of the case and the gravity of the allegations, there is no question that Chief Judge Castillo would have asked whatever questions about the circumstances of Ald. Solis's recordings he felt the need to explore before signing off on the Government's request.

Properly viewed through this practical lens, Ald. Burke's argument is a makeweight: the affidavit informed the issuing judge that Ald. Solis was the subject of an ongoing investigation, that Ald. Solis was cooperating with law enforcement, and that Ald. Solis was working at the behest of the FBI. [100-3 (Sealed May Cell Phone Title III Application) at 27, ¶ 11; at 28, ¶ 13; at 35, ¶ 27]. As the Government points out, with the information it did provide, Chief Judge Castillo surely knew that Ald. Solis was acting at the direction of the FBI, and if there was any question or doubts in his mind, he would have had every opportunity to require the Government to fill in the blanks. Accordingly, Ald. Burke has not provided any evidence to support the notion that the Government intended to mislead Chief Judge Castillo or that he misunderstood the circumstances.

Ald. Burke's motion boils down to a complaint that the Government did not furnish *more, specific* details about the ruse (Ald. Solis's role in the scheme or Skydell's position on the alleged bribe) and that this was done intentionally to mislead the judge.[45] As in *United States v. Swanson*, the defendant here claims that the affiant "misled the issuing judge because he failed to include *all* of the information from" the Government's ruse. See 210 F.3d at 790–91. The trouble is, just like in *Swanson*, "there is no evidence to suggest that [the affiant] *intentionally* withheld additional information to trick the judge," particularly given the high-stakes nature of this Title III application. See *id.* At most, "the failure to include more information, which would have given a

---

[45] Ald. Burke later makes a similar argument with respect to the information supplied about another informant. Specifically, Ald. Burke argues that the affiant indicated the wiretaps were necessary because another informant had tried, but failed, to maintain consistent contact with Ald. Burke regarding other alleged bribes. This argument suffers the same infirmity and shifts the burden of the *Franks* second prong from Defendant to the Government. In any event, the Government willingly told Chief Judge Castillo that it had worked with another cooperator, which again showed that the judge knew that the Government was attempting to covertly gather evidence about Ald. Burke. [100-3 (Sealed May Cell Phone Title III Application) at ¶ 87]. The Government need not have furnished every specific detail to negate any suggestion that it intended to mislead the Chief Judge.

more complete picture of" the ruse "and thus shed more light on whether or not" the arrangements between the aldermen and the Old Post Office developers were sincere was "little more than negligence. And negligence is no basis for convening a *Franks* hearing." *Swanson*, 210 F.3d at 790 (upholding denial of *Franks* hearing for government's omission of details regarding defendant's conduct). In this context, and mindful that an affiant "must always make deliberate decisions about what to include in and omit from a warrant application," Ald. Burke has not made out even a preliminary showing that the omission of the details was designed to "*mislead* the issuing magistrate." See *Williams*, 718 F.3d at 650.

Nor was the omission of these details material to satisfy the third prong of the *Franks* test. As discussed above, even if the affiant had painstakingly described every detail of the ruse to Chief Judge Castillo, he would have concluded at a minimum that there was probable cause that Ald. Burke was engaging in Hobbs Act extortion and Travel Act violations because neither law requires Skydell's agreement to the bribe. Regarding the Hobbs Act, there was probable cause to believe that Ald. Burke was about to engage in attempted extortion regardless of whether Ald. Burke and Skydell had reached a meeting of the minds. See *Silver*, 948 F.3d at 50 ("Thus, extortion under color of right does not require a meeting-of-the-minds agreement"); *Ring*, 706 F.3d at 467. Compare *Mares-Martinez*, 240 F. Supp. 2d at 818 (the fact that participant in the investigation was a confidential informant warranted a *Franks* hearing because, if correct, "the representations in the * * * wiretap applications that there were no confidential informants were untrue, and the claims that normal investigative procedures have been tried and have failed or are unlikely to succeed if tried—an essential prerequisite under Title III—were untrue, or at least omitted a significant fact" (citation omitted)).

137

Even if the Seventh Circuit were to hold, contrary to the Second and D.C. Circuits, that a Hobbs Act extortion does in fact require an agreement meeting-of-the-minds, the ruse would not be material to the finding of probable cause for a Travel Act violation. So long as the affiant stated probable cause that Ald. Burke had used email (*i.e.*, a facility of interstate commerce), and had intent to solicit or take a bribe under state law, the search warrant need not demonstrate Skydell's willingness to engage because the Travel Act does not require every element of the underlying state law. *Baker*, 227 F.3d at 961.

In short, irrespective of the Government's omission that Skydell had expressed reluctance to enter the agreement, "'sufficient allegations existed warranting the search irrespective of the affiant's alleged errors.'" See *Hancock*, 844 F.3d at 708. For those reasons, Defendant's argument that the Government supposedly misled the Chief Judge Castillo into believing that "Mr. Skydell was a willing participant in a bribery scheme," [100 (Sealed May Title III Suppression Br.) at 61], is an "unimportant allegation." *Swanson*, 210 F.3d at 790 ("[A]n unimportant allegation, even if viewed as intentionally misleading, does not trigger the need for a *Franks* hearing").

That brings the Court to Ald. Burke's second issue with the Title III application: that the Government deliberately targeted him, yet it withheld that information from Chief Judge Castillo. Ald. Burke raises two specific points. First, he claims that the Government omitted exculpatory information that it had gathered from Ald. Solis. For example, Ald. Solis told the Government that Ald. Burke had not exchanged anything of value in a twenty-five-year period. Second, he complains that the Government otherwise will not reveal the origins of its investigation. But even if Ald. Solis said positive things about Ald. Burke, the totality of the circumstances still shows that the affiant presented ample facts to support probable cause, including Ald. Burke's repeated suggestion that he pedal his law firm to Skydell in exchange for assistance with the Water

Commissioner, City permitting, and Amtrak. See *United States v. Murphy*, 768 F.2d 1529 (7th Cir. 1985) ("The Government offered [the defendant] opportunities to sell the powers of his office and disgrace himself. He accepted with alacrity"). Notably, Defendant does not cite a single authority—nor can this Court find one—for the proposition that the Government must explain "why it is worthwhile to investigate a particular public official." [139 (Gov't Br.) at 154]; see generally 18 U.S.C. § 2518.

In sum, Ald. Burke has not satisfied his preliminary burden to demonstrate his entitlement to a *Franks* hearing. He has not upended the probable cause finding on either ground advanced in his memorandum [100]. Ald. Burke's motion to suppress [95] the fruits and derivatives of the May 2017 wiretaps is therefore denied.

### 2. June 2017 Wiretap

Having denied in full the first of Ald. Burke's motions to suppress the fruits and derivatives of the Government's wiretaps, the Court now turns to Ald. Burke's motion [103] to suppress the fruits and derivatives of the June 2017 wiretaps.

### a. Background

As noted, under authorization from Chief Judge Castillo, the Government engaged in at least two periods of interception of Ald. Burke's wire communications. Regarding the first period, "the initial interception," the Government applied and received authorization to intercept Ald. Burke's office phones from May 1 through May 12, 2017. The Government then filed an application to intercept Ald. Burke's cellular phone, for which it received authorization from May 12, 2017, for a period of thirty days.

On June 13, 2017, the Government filed an application to continue its wiretaps and to focus on Ald. Burke's involvement with another real estate development group, Dhanani Group, and its

developers Shoukat and Zohaib ("Zo") Dhanani.  See [103-3 (Sealed June Title III Application) at 21, ¶¶ 2–3].

According to the June 2017 application, the initial interceptions revealed Ald. Burke's solicitation of other prospective clients in exchange for city permits.  In support of the application, the Government provided the affidavit of Agent Steven Noldin, who not only summarized the developments with respect to the Old Post Office development, [103-3 (Sealed June Title III Application) at 26–30, ¶¶ 11–15; at 32, ¶¶ 21–26], but also centered on Ald. Burke's relationship to the owners of a Burger King franchise located in Ald. Burke's ward, Shoukat and Zo, of the Dhanani Group.  [103-3 at 30, ¶ 16].  The initial interceptions of the office and cell phones indicated that Shoukat and Zo sought to discuss with Ald. Burke a remodeling permit for the Burger King located in Ald. Burke's ward that Shoukat described as "stuck in [Ald. Burke's] office or something."  [*Id.* at 30, ¶ 16; at 42–43, ¶ 27].

The affiant stated that Ald. Burke had not only followed up with the Dhananis regarding their permit needs but also voiced interest in soliciting their legal business.  During a call recorded on June 1, 2017, Ald. Burke received a call from Zo during which they arranged a meeting to discuss a permit for remodeling the Burger King.  [103-3 (Sealed June Title III Application) at 44, ¶ 29].  Approximately one week later, before the Ald. Burke-Dhanani meeting, Ald. Burke directed his staff to determine "who's filed with the assessor board" for "a Burger King in the forty hundred block of Pulaski. Ah, just north of 41st street."  [*Id.* at 44–45, ¶ 30].  The agent took this call to mean that Ald. Burke "[was] seeking the identity of the law firm that represented Dhanani Group in connection with the tax assessment of the Burger King franchise within his ward."  [*Id.* at 31, ¶ 16].  In a subsequent call with Rodney Ellis, the current County Commissioner of Harris County, Texas, and former Texas state senator, Ald. Burke mentioned his upcoming meeting with Shoukat

140

Dhanani. [*Id.* at 45, ¶ 31]. Ald. Burke drew a connection between the permit and potential legal business: Specifically, during the call with Ellis, in reference to Dhanani, Ald. Burke relayed to Ellis that he would "also like to get some of his law business and get him involved." [*Id.* at 46, ¶ 31].

Chief Judge Castillo authorized the Government's request. Now, Ald. Burke seeks to suppress the fruits and derivatives of the interceptions made pursuant to Chief Judge Castillo's order.

### b.   Analysis

Ald. Burke advances three reasons to suppress the evidence uncovered through the June 2017 wiretap. First, Ald. Burke argues that the Government failed to properly minimize interceptions during the initial interception period. Second, he asserts that the affidavit did not establish probable cause. Third and finally, he contends that the affidavit did not demonstrate the necessity for the wire interceptions. The Government again opposes in full. [139 (Gov't Br.) at 156].

### i.   Probable Cause

Ald. Burke's argument that the wiretap application did not supply probable cause is a nonstarter because the affidavit offered clear evidence that Ald. Burke was contemplating soliciting the Dhananis's legal business in exchange for approving their remodeling permit. According to Ald. Burke, the affidavit provided only unsupported, "bare assertions that Ald. Burke would perform an official act in exchange for private legal business." [103 (Sealed June Title III Suppression Mot.) at ¶ 1]. In reality, though, the affidavit stated that the Dhananis had called Ald. Burke regarding a remodeling permit in Ald. Burke's ward, and that Ald. Burke planned to meet with the Dhananis to discuss "iron[ing] out what the issues might be." [103-3 (Sealed June Title

III Application) at 44, ¶¶ 28–29]. In advance of the meeting with the Dhananis about the permit, Ald. Burke directed his staff to find out who was representing the Burger King property in its tax dealings. [*Id.* at 44–45, ¶ 30]. He also remarked to Ellis that, "I'd also like to get some of his law business" and "he's somebody [Ellis] and [Ald. Burke] should, * * * * try and, ah, ah, get to know." [*Id.* at 46, ¶ 31]. In other words, there was circumstantial evidence that Ald. Burke took steps toward soliciting and contemplated accepting a bribe, retention of his law firm by the Dhananis, in exchange for his official act, approving the permit.

Ald. Burke disagrees for three reasons. He contends that the affidavit did not feature any conversation that "even *suggests* that Ald. Burke was willing or planning 'to tie his official assistance'" or "would trade or tie" "privately representing Mr. Dhanani" for a city permit. [103 (Sealed June Title III Suppression Mot.) at ¶ 18]. Relatedly, Ald. Burke "never expressed any agreement or willingness to take any action on the Dhanani's behalf." [*Id.*] Failing that, he argues that the affidavit shows that Ald. Burke had a different motive for his meetings with the Dhananis. [*Id.* at ¶ 20].

The first two arguments ignore the probable cause standard. The inquiry is whether there is a "substantial basis," for concluding a search would "uncover evidence of wrongdoing," see *Griffin*, 827 F.2d at 1111, "under the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." See *Malin*, 908 F.2d at 165–66. Here, the affidavit did not rely on Ald. Burke's "conversations" alone to support the probable cause finding. After receiving the request for an official act but before taking steps to "iron out" approval with the Dhananis, Ald. Burke affirmatively researched whom the Dhananis had retained to represent them on tax matters and specifically told Ellis, who planned to remind the Dhananis how "important" Ald. Burke was, that he wanted the Dhananis's tax business. In other words, Ald.

142

Burke's actions spoke louder than his words: His conduct and timing suggested he would extort or attempt to extort the Dhananis. His attempts to provide an alternative excuse for the Dhanani meeting (*e.g.*, to iron out the illegal overnight parking issue), fare no better because the Government was not required to eliminate every innocent explanation to establish probable cause. See *Malin*, 908 F.2d at 165–66.

The direct and circumstantial evidence in the affidavit, under the "totality of the circumstances," see *Searcy*, 664 F.3d at 1122, shows "the magistrate had a substantial basis for * * * conclud[ing] that a search would uncover evidence of wrongdoing" regarding the Burger King and Dhananis. This provided an ample basis to justify Chief Judge Castillo's order authorizing the wiretap. Accordingly, the Court will not suppress the fruits and derivatives of the search on this basis. See *Griffin*, 827 F.2d at 1111 (quoting *Illinois v. Gates*, 462 U.S. at 236).

## ii. Necessity

Ald. Burke next argues that the Government did not satisfy the statutory requirements to conduct the June 2017 wiretaps. Section 2518 requires the government's application for electronic or wire surveillance to include a statement as to "whether or not other investigative procedures [1] have been tried and failed or [2] why they reasonably appear to be unlikely to succeed if tried or [3] to be too dangerous." *United States v. Maggard*, 865 F.3d 960, 966 (7th Cir. 2017) (quoting 18 U.S.C. § 2518(1)(c)). Under this so-called "necessity requirement," the government must "demonstrate that it has considered other methods of investigation and * * * explain why those methods have proven inadequate for one or more of the three listed reasons." *Id.* (quoting *United States v. Mandell*, 833 F.3d 816, 821 (7th Cir. 2016)). Despite its name, the "necessity requirement 'was not intended to ensure that wiretaps are used only as a last resort in an investigation.'" *Id.* (quoting *Mandell*, 833 F.3d at 821). Instead, the requirement is designed to "ensure that wiretaps

are not used routinely as the first step in an investigation." *United States v. Durham*, 766 F.3d 672, 679 (7th Cir. 2014). Accordingly, the government's burden "is not great," and is reviewed "in a practical and common-sense fashion." *Maggard*, 865 F.3d at 967 (quoting *United States v. McLee*, 436 F.3d 751, 763 (7th Cir. 2006)). The government need not "show absolute necessity." *Durham*, 766 F.3d at 679.

In this case, the Government's affidavit submitted to Chief Judge Castillo demonstrated that it was not trying to use the Title III wiretap as its first step in the investigation of the Old Post Office or the Dhananis. The affidavit explained that traditional investigative techniques had yielded some information but that tapping Ald. Burke's phones had become necessary to determine the "means and methods" Ald. Burke had utilized to take official action and to "gather evidence demonstrating [Ald. Burke's] intent to take official action." [103-3 (Sealed June Title III Application) at 62, ¶ 63]. Proving state of mind is notoriously difficult, and the affiant pointed out that tapping Ald. Burke's phones to reveal his conversations with third parties could "provide evidence concerning [Ald. Burke's] corrupt intent and c[ould] be used to rebut" any defense that Ald. Burke never intended to take official action. [*Id.* at 53, ¶ 47]. See *Mandell*, 833 F.3d at 821–22 (upholding denial of suppression motion because applicant urged that the wiretap was needed to identify and "(i) ascertain each defendant's role in the plot; and (ii) obtain evidence to prove each defendant guilty beyond a reasonable doubt" (citations omitted)); *United States v. Campos*, 541 F.3d 735, 748–49 (7th Cir. 2008) (similar); *United States v. Fudge*, 325 F.3d 910, 919 (7th Cir. 2003) (upholding necessity finding where "[t]he wiretap was instrumental in filling the gaps and securing critical evidence against the conspirators; we decline to impose implacable burdens that would frustrate this result").

The affidavit also explained the Government's multi-month, multi-pronged effort to gather evidence on Ald. Burke. The affidavit included an exhaustive disclosure of "the many other investigative techniques that the [G]overnment had employed or had ruled out in the investigation of" Ald. Burke's alleged corruption. See *Maggard*, 865 F.3d at 968 (affirming district court finding that government had satisfied the necessity requirement). The Government explained which tactics they had used to investigate Ald. Burke's public corruption case thus far and supplied a detailed explanation of "why those limitations had impeded its investigation." *Id.* at 969. These investigatory methods included (1) physical surveillance, (2) pen registers and telephone records, (3) undercover agents, (3) cooperating sources, (4) search warrants and consent searches, (5) grand jury subpoenas, (6) witness interviews, and (7) trash pulls.

The Government noted that it had employed some of the above tactics, like cooperating witnesses and pen registers, but those methods had reached the end of their utility. For example, the Government had enlisted cooperating witnesses who *were* useful but unlikely to yield the type of evidence the Government needed. The Government had relied for months on cooperator Ald. Solis, but Ald. Solis could not gather information about key third parties with whom Ald. Burke had direct contact to find out what those parties knew or their role. [103-3 (Sealed June Title III Application) at 53–54, ¶¶ 47–48]. Though, in theory, Ald. Solis could bypass Ald. Burke, doing so could cause Ald. Burke to "become wary and suspicious" and "jeopardize the investigation." [*Id.* at 54, ¶ 47]. The Government's other cooperators had tried but were so far unable to arrange meetings with Burke and were otherwise were not "in a position to develop admissible evidence concerning [Ald.] Burke" and the Dhananis nor the Post Office. [*Id.* at 56, ¶ 52]. Similarly, law enforcement had used pen registers and telephone, but those methods could not gather details of substance to reveal evidence of value, like the identities of the parties or substance of conversation.

145

[*Id.* at 51, ¶ 40]. See *Maggard*, 865 F.3d at 968 (acknowledging limited usefulness of pen register devices for gathering evidence of value for certain crimes); *Durham*, 766 F.3d at 680 (necessity satisfied in part where "pen registers had revealed all they could"). Nor did the devices always identify the caller because Ald. Burke received calls by way of a transfer from his City Hall office. [*Id.* at 51, ¶ 41].

The Government had also considered and ruled out other methods that were unlikely to generate useful information. The Government had effectively ruled out a grand jury subpoena because Ald. Burke was unlikely to cooperate and others directly involved might do the same. [103-3 (Sealed June Title III Application) at 58–59, ¶ 58]. Other methods that were less likely to tip off Ald. Burke didn't promise much of a return. The affiant explained that physical surveillance was unlikely to generate any substantive information because public corruption entails oral agreements that would not be evident "on its face." [103-3 at 50, ¶¶ 37–38]. The fact Ald. Burke was meeting with someone would leave "agents * * * to guess at the purpose and substance of his meeting." [*Id.*] It was unlikely an agent could view such agreements through surveillance, as those conversations would occur "inside buildings and other locations" beyond a surveilling agent's earshot or view. [*Id.* at 49, ¶ 37]. Ald. Burke is also a high-profile public official, meaning that surveillance was likely impractical in at least some locations or inartful in others—he worked out of his City Hall office, which would not be possible for law enforcement to access or surveil given the numerous security cameras in the building. [*Id.* at 50, ¶ 39].

The affiant also made clear that other traditional methods, such as undercover agents and trash pulls, posed practical barriers. The affiant had ruled out the use of a government agent to pose as a real estate developer because of the difficulty of developing a satisfactory "cover story" of a person with the financial wherewithal to engage in large-scale developments who would

146

appear legitimate to Ald. Burke. [103-3 (Sealed June Title III Application) at 52–53 ¶¶ 42–45]. Even then, it would be challenging to drum up a "plausible" scenario to introduce them into the fray. *Id.* Although the Government had considered introducing other undercover agents, even then, they were not expected to produce "relevant evidence concerning the steps [Ald. Burke] has or will take" and thus wouldn't "be able to develop the necessary evidence with respect to this investigation," in particular Ald. Burke's "actions with respect to the Dhananis and their request for assistance from [Ald. Burke]" as well as the Old Post Office. [*Id.* at 32–33, ¶ 45]. Similarly, trash pulls were unlikely to recover anything of substance given the practical difficulty of locating which trash belonged to Ald. Burke at City Hall. [*Id.* at 61, ¶ 62].

In the end, the affiant explained that many of the options mentioned, and those that remained, were not worth the bang for their buck. Grand jury subpoenas, interviews, and even cooperators risked gathering too little information at the peril of "alert[ing] [Ald. Burke] to the existence of this investigation, thereby causing him to become even more cautious in his activities, alter his activities or otherwise compromise this investigation." [103-3 (Sealed June Title III Application) at 54, ¶ 47; at 58–59, ¶ 58; at 59, ¶ 59]. That was particularly problematic because Ald. Burke appeared poised to exhibit increasing caution at that time. [*Id.* at 55, ¶ 51]. Take search warrants as one example. Although the agent believed Ald. Burke kept notes at his office regarding the Old Post Office Development, "given the caution he has recently displayed * * * it is unlikely that he ha[d] retained any written notes that are particularly incriminating on their face," and yet any search of his ward and aldermanic offices "would thwart the ongoing investigation by alerting him of its existence, thus causing him to discontinue any activities in furtherance" of the offenses. [*Id.* at 57–58, ¶ 55]. No other location had been identified, but search warrants would alert Burke about the ongoing investigation. [*Id.* at 58, ¶ 56]. Similarly, interviewing Burke was

simply "too risky" while the ongoing criminal investigation was underway because it might "caus[e] [Ald. Burke] to change his activities and discontinue his illegal conduct." [*Id.* at 60, ¶ 60].

In sum, "[f]ar from asking for a wiretap after little conventional investigation, the Government first used a variety of other techniques to gather information. And the wiretap application provided a reasonable explanation as to why other standard investigative techniques would not be appropriate." *Durham*, 766 F.3d at 679–80 (affirming district court's conclusion that law enforcement had satisfied the necessity requirement). The Government "easily established' the requisite factual predicate to support the district court's finding that a wiretap was statutorily necessary." See *Maggard*, 865 F.3d at 969.

None of Ald. Burke's arguments convince the Court that the Government failed to show a legitimate need to tap his phones to gather evidence on the Old Post Office or the Dhananis. Ald. Burke concedes that the Government detailed a lengthy attempt to gather evidence on his role in the Old Post Office redevelopment but insists that it did not carry its burden with respect to the Dhananis. Specifically, he argues that the Government improperly "bootstrap[ed]" its necessity finding by relying on what it did to investigate the Old Post Office allegations. [103 (Sealed June Title III Suppression Mot.) at ¶ 25].

Ald. Burke's effort to characterize the wiretap as a "first step" in the Dhanani investigation fails because it cannot be squared with the record. The affiant specifically discussed how the Government ruled out the use of undercover agents and cooperators because it did not anticipate those methods could yield useful information about the Dhananis. See [103-3 (Sealed June Title III Application) at 52, ¶ 45 (undercover agents); at 56, ¶ 52 (cooperating sources)]. Specifically, the investigators considered an undercover agent connected to an investigation involving Ellis but determined that the informant was too attenuated—from a different district, involving a different

148

scenario—to introduce to Ald. Burke. [*Id.* at 52, ¶ 44]. The affiant also explained that the Government had considered the use of an undercover agent and would continue to do so, but that it did not anticipate the informant would yield any information about the Dhananis, with whom Ald. Burke had direct contact. [*Id.*]

Furthermore, given the nature of the crimes the Government was investigating, the same obstacles to using other, traditional methods to obtain evidence of Ald. Burke's mental state and oral agreements behind closed doors applied. This type of crime limited the utility of physical surveillance, pen registers, and trash pulls, and the high-profile and ongoing nature of the alleged criminal conduct meant the risk that search warrants, interviews, and grand jury subpoenas would thwart the investigation. To be sure, the affiant could have spelled out how each method involved the same obstacles for gathering evidence about the Dhananis. However, the affidavit still clearly conveyed to the judge that the obstacles applied to both sets of developers solicited by Ald. Burke, as a matter of common sense. The contours of the crime were so similar—the main player, the pursuit of kickbacks, and the methods—that giving such an obvious explanation to an experienced Chief Judge simply was not warranted to satisfy the necessity showing.

Ald. Burke also directs the Court to *United States v. Gonzalez*, 412 F.3d 1102 (9th Cir. 2005), *amended on denial of reh'g*, 437 F.3d 854 (9th Cir. 2006), but this out-of-circuit case is readily distinguishable. In *Gonzalez*, the government performed an undercover investigation into person smuggling and obtained authority to wiretap two Arizona bus stations in search of evidence. 412 F.3d at 1106–07. After having conducted an initial Title III interception of the bus terminals, the government applied to wiretap a second location, an office in Los Angeles connected to the allegations. *Id.* at 1107–08. The Ninth Circuit affirmed the district court's conclusion that the government had not fulfilled the necessity requirement, reasoning that the government did not

conduct an independent investigation and "its limited use of traditional methods does not establish that normal tools were sufficiently exhausted before the government requested a wiretap." *Id.* at 1112.

Here, by contrast, the Government did conduct an independent investigation and the type of crime at issue eliminated many traditional investigatory methods from the jump. First, the Government considered and ruled out the use of undercover agents and confidential informants to arrange meetings with Ald. Burke himself, concluding that the obstacles to gathering evidence about Ald. Burke's interactions with one developer through traditional methods applied with equal force to Ald. Burke's dealings with the Dhananis. So, unlike in *Gonzales*, the Government has "establish[ed] that normal tools were sufficiently exhausted." *Gonzalez*, 412 F.3d at 1112. Second, the methods of producing evidence of public corruption are tightly circumscribed. Unlike human trafficking, public corruption is not readily apparent. In *Gonzales*, the government's first investigation at the bus terminals showed that traditional methods, like physical surveillance and recorded conversation, did in fact offer a glimpse into "an understanding of what occurred." See *id.* at 1107. Yet, the government offered no excuse for why it had asked for a wiretap of the second location without attempting those previously successful methods. See *id*. In contrast here, the futility of the traditional methods was obvious. In other words, the type of evidence—oral agreements behind closed doors, Ald. Burke's state of mind—provide good reason for the Government to rule out many of the potential avenues to yield evidence.

### iii.    Minimization

Finally, Ald. Burke challenges the Government's approach to minimizing "calls and voicemails *unrelated* to the Post Office." [103 (Sealed June Title III Suppression Mot.) at ¶ 5]. Specifically, Burke points to a handful of conversations recorded during the initial interception

period regarding the Dhananis, who sought a permit for a Burger King in Ald. Burke's ward.[46] [*Id.* at ¶ 7–14]. The Government used the conversations to support an application to extend the wiretap in June 2017. [103-3 (Sealed June Title III Application)]. According to Burke, the Government should have immediately minimized conversations about and with the Dhananis because the Burger King permits were entirely unrelated to the Old Post Office redevelopment.

Title 18 U.S.C. § 2518(5) requires that wiretaps "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." Section 2518, however, "does not forbid the interception of all non-relevant conversations." *Scott v. United States*, 436 U.S. 128, 139–40 (1978). Rather, the statute "instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Id.* at 140.

To ascertain whether the agents minimized the interception of calls, a court looks to the "facts and circumstances of each case." *Scott*, 436 U.S. at 140. Elaborating on this standard, the Seventh Circuit instructs that "[a] court assessing the sufficiency of the government's efforts * * * must ultimately decide whether the steps that agents have taken to minimize the interception of communications unrelated to the investigation were objectively reasonable given the circumstances confronting the agents." *United States v. Mansoori*, 304 F.3d 635, 647 (7th Cir.), *as amended on denial of reh'g* (Oct. 16, 2002). As the *Mansoori* court put it,

> Although the adequacy of the government's minimization efforts necessarily depends on the facts of each case, relevant considerations include the kind and scope of criminal enterprise that the government was investigating, the thoroughness of the government's efforts to ensure that nonpertinent calls will be minimized, the extent to which the government could have foreseen that certain types of conversations would be innocuous and thus subject to minimization, use

---

[46] Note that among other conversations, Ald. Burke points to a conversation between one of Ald. Burke's staff members and Defendant Peter Andrews. [103 (Sealed June Title III Suppression Mot.) at ¶ 8]. Ald. Burke does not have standing to seek to suppress this conversation or the fruits of the failure to minimize.

of code, and the extent to which the authorizing judge oversaw the interception efforts.

*Id.*

In this case, the Government's monitoring—of a complex crime, at such an early phase, with good faith efforts and judicial oversight—was objectively reasonable. The agents took an appropriate amount of latitude by monitoring calls with third parties—including Ellis, Burke's staffers, and the Dhananis—to investigate complex public corruption allegations that involved multiple official acts, individuals, organizations, and public figures. For example, the initial evidence gathered by agents revealed that Ald. Burke had sought out several ways to help the Old Post Office. His efforts to resolve the water and Amtrak issues, alone, dragged in Amtrak, Chicago Union Station, the Water Commission, Skydell's company, and Skydell's contractor, as well as employees and officials current and former. Weave into this complicated web the fact that Ald. Burke was "capable of directing and acting through others, including his staff, as well as third parties to carry out the subject offenses." [139 (Gov't Br.) at 143]. "In a case such as this, involving a wide-ranging conspiracy with a large number of participants, even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls," including those between Ald. Burke and the Dhananis and Rodney Ellis. See *Scott*, 436 U.S. at 142. The agents were not required, as Ald. Burke implies, "to immediately minimize these conversations," see [103 (Sealed June Title III Suppression Mot.) at ¶ 6], because other businesses (Burger King) or people (the Dhananis) were on the line. The agents could not "be expected to know in advance what direction the conversation w[ould] take" and needed to monitor calls from within and without Ald. Burke's ranks to determine who Ald. Burke called upon to assist him. See *Mansoori*, 304 F.3d at 647–48 (quoting *United States v. Quintana*, 508 F.2d 867, 874 (7th Cir. 2002)) (upholding denial of motion to suppress wiretap evidence because periodic spot-checking and two-minute instructions for complex ring involving multiple persons not unreasonable).

The agents also acted with appropriate discretion given that they were less than a month into the Title III wiretaps. The conversations about the Dhananis and the Burger King permits occurred within thirty days of Chief Judge Castillo having authorized the Title III wiretaps, when the agents were still becoming familiar with the contours of Ald. Burke's conduct and the players involved. Ald. Burke's argument that the agents were so "familiar with the investigation * * * by that stage" that they had a "specific, concrete frame of reference for determining whether or not the conversations were pertinent or non-pertinent to the Post Office-related investigation" therefore gains little traction. [158 (Sealed June Title III Suppression Reply) at 6]. To be sure, the Government had been gathering preliminary blueprints by recording Ald. Solis's conversations. However, the agents were new to monitoring *Ald. Burke*'s telephones, which means that they did not have enough of a sample to assess *how* he curried favors. *Mansoori*, 304 F.3d at 648 ("[I]f a pattern of innocent conversations emerges, agents should cease monitoring such conversations; but such patterns will not always be identifiable" (citing *Quintana*, 508 F.2d at 874)). In fact, some of the nonpertinent conversations, including those with the Dhananis, "were one-time conversations" that "did not give the agents an opportunity to develop a category of innocent calls which should not have been intercepted, their interception cannot be viewed as a violation of the minimization requirement." *Scott*, 436 U.S. at 142 (upholding court of appeals reversal of suppression of fruits of Title III wiretap).

The Government's good faith effort to minimize the wiretaps reinforces this Court's view that the minimization was objectively reasonable. The monitoring agents received oral and written instructions that narrowed the monitoring scope. Those instructions directed agents to determine whether the call was criminal "usually not in excess of two minutes, to determine whether the conversation concerns criminal activities" and to discontinue listening if they determine "during

the initial few minutes that a conversation * * * is not criminal conversation." [139 (Gov't Br.) at 161] (citing Ex. A–B (May 12, 2017, Minimization Instructions)). Those instructions permitted only periodic spot checking to assess if the conversation had returned to criminal topics. *Id.* With these parameters, the monitoring was "not inherently suspect." See *Mansoori*, 304 F.3d at 648. The Government submitted periodic progress reports to the supervising judge, which is "a circumstance that suggests it conducted the surveillance in good faith." See *id.*

The Government did not fail to minimize conversations and this Court cannot rely on hindsight to second guess the agents, who "cannot be expected to make snap judgments as to whether the subject of the conversation is within the scope of the intercept order." See *Mansoori*, 304 F.3d at 647.

****

In sum, having rejected Ald. Burke's arguments with respect to the May and June 2017 wiretaps, the Court denies Ald. Burke's motions [95, 97, 100, 102, 103] to suppress the fruits and derivatives of the wiretaps in full.

## VIII.   Motions for Bills of Particulars [101, 109]

Both Andrews and Ald. Burke request bills of particulars pursuant to Federal Rule of Criminal Procedure 7(f) [101, 109]. For the reasons stated below, the Court denies both motions [101, 109].

### A.     Factual and Procedural Background

Both Ald. Burke and Andrews's motions for bills of particulars flow from the Superseding Indictment's ("Indictment") allegations that Ald. Burke "abused his position as an Alderman by threatening to take official action, in his capacity as Chairman of the Committee on Finance, to derail a proposed admission fee increase sought by Museum 1, due to the failure of Museum 1 to

154

respond to his inquiry about an internship at Museum 1 for Individual E-1, who was the child of a personal acquaintance of [Burke]." [30 (Indictment) at Count 1, ¶ 69]; see also [*id.* at ¶¶ 70–77]. These allegations relate to several charges. This conduct was part of the pattern of racketeering charged in Count One, Racketeering Act 5—extortion with "use of actual and threated fear of economic harm, and under color of official right," in violation of the Hobbs Act, see 18 U.S.C. § 1951(a). [*Id.* at Count 1, ¶ 84 (RICO Act 5 (a))]. The Indictment further alleges that this violation of the Hobbs Act forms the predicate of a Travel Act violation. [*Id.* at Count 1, ¶ 84 (RICO Act 5(b))]. Finally, the Government also separately charges Ald. Burke with a standalone attempted Hobbs Act extortion, 18 U.S.C. § 1951(a), (Count Eighteen) and Travel Act (Count Nineteen) charge based on the same conduct alleged in Count One. [*Id.* at 58–59].

Andrews [101] asks this Court to order the Government to "formally identify the 'thing of value'" that forms the basis for the underlying offenses of the Travel Act violations alleged in Counts Seven and Eight. [101 (Def. Andrews' Mot. for a Bill of Particulars Regarding Counts 7 & 8 ("Andrews' Bill of Particulars Mot.")) at ¶ 4]. Ald. Burke moves to adopt [121 at ¶ 5]. Ald. Burke also moves [109] for an order requiring the Government to provide the following with respect to the Museum Counts:

1. Specifically identify any and all property that Ald. Burke allegedly received or attempted to obtain, in violation of the Hobbs Act.

2. To the extent any property identified in response to item 1 is an employment position or compensation for performance of the duties of an employment position, specifically identify which employment position Ald. Burke allegedly attempted to extort: (1) the internship applied for in July 2017; (2) the full-time position for which the opportunity to interview was offered in September 2017; (3) or a different position.

3. Specifically identify any and all "official acts" that Burke allegedly committed, withheld, threatened, or agreed to take under "color of official right," in violation of the Hobbs Act.

4. If any of the "official acts" identified in response to item 3 involved providing advice to or pressuring another public official, specifically identify the other

155

public official and the pressure or advice Ald. Burke applied, gave, or threatened.

[109 (Ald. Edward M. Burke's Mot. for Bill of Particulars ("Burke Bill of Particulars Mot.")) at 13].

### B.    Legal Standard

Federal Rule of Criminal Procedure 7(f) allows for the filing of a bill of particulars, *i.e.*, "a more specific expression of the activities defendant is accused of having engaged in which are illegal." *United States v. Canino*, 949 F.2d 928, 949 (7th Cir. 1991). "The test for whether a bill of particulars is necessary is 'whether the indictment sets forth the elements of the offense charged and sufficiently apprises the defendant of the charges to enable him to prepare for trial.'" *United States v. Kendall*, 665 F.2d 126, 134 (7th Cir. 1981) (quoting *United States v. Roya*, 574 F.2d 386, 391 (7th Cir. 1978)). This approach recognizes that "[t]he defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved." *Id.* at 135.

"An indictment which includes each of the elements of the offense charged, the time and place of the accused's conduct which constituted a violation, and a citation to the statute or statutes violated is sufficient to pass this test." *United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003). Moreover, "a bill of particulars is unnecessary if the information the defendant seeks is readily available through alternate means such as discovery." *United States v. Vaughn*, 722 F.3d 918, 927 (7th Cir. 2013). See, *e.g.*, *United States v. Hernandez*, 330 F.3d 964, 975–76 (7th Cir. 2003) (affirming denial of bill of particulars for indictment that charged the use of minors in selling drugs because the information sought—the minors' names—were readily available through discovery); *United States v. Glecier*, 923 F.2d 496, 501–02 (7th Cir. 1991) (upholding denial of bill of particulars to identify the specific bribes underlying RICO conspiracy where, among other

reasons, defendant "had the information that the government made available through discovery, which included voluminous public records and potential *Brady* material" and "all tape recordings of the defendants").

### C.    Analysis

#### 1.    Travel Act Counts Seven and Eight [101]

The Court turns first to Andrews's motion [101] requesting a bill of particulars for Counts Seven and Eight of the Indictment, which Ald. Burke moves to adopt [121 at ¶ 5]. As noted elsewhere, Counts Seven and Eight charge Andrews with violating 18 U.S.C. § 1952(a)(3), the Travel Act, and "relate only to the Restaurant Remodeling activity alleged in Count One." [101 (Andrews' Bill of Particulars Mot.) at 2 n.1].

Andrews argues that neither count identifies the "thing of value" alleged to have been sought or obtained. See [101 (Andrews' Bill of Particulars Mot.) at ¶ 4]. He insists that the Government should be required to formally identify the "thing of value" for which the grand jury found probable cause. Although Andrews acknowledges that he is not entitled to an order from this Court requiring the Government to reveal "precisely how the [G]overnment intends to prove its case," he claims that he is only asking for a specific piece of information to ensure that the Government does not alter the charge returned by the grand jury and to prevent double jeopardy because "[t]here are references to offenses based on Illinois statutes in Counts Seven and Eight making the possibility of other charges readily apparent." [*Id.* at ¶¶ 6–8]. He suggests that it is unclear whether the thing of value is "fees arising from the retention of [Ald. Burke's] law firm, Klafter & Burke" or "private benefits for [Burke's] personal associates." [*Id.* at ¶ 8]. Finally, he insists the amount of discovery and complexity of the charges further underscores the need for specificity. As just one example, he insists that "there are allegations of soliciting campaign

contributions for another politician and requests to hire local workers to complete the construction project." See [*id*. at ¶ 9] (citing *United States v. Edward M. Burke*, 19 CR 322-01, dkt No. 1, pp. 30, 20 (N.D. Ill.)).

The elements of a Travel Act offense under 18 U.S.C. § 1952(a)(3) are (1) travel in, or use of a facility of, interstate or foreign commerce; (2) with intent to commit a specified unlawful act; and (3) thereafter performed or attempted to perform that act. See *Dvorkin*, 799 F.3d at 876. Counts Seven and Eight parrot the language of the statute and include all essential elements, the use of a facility of interstate commerce (a cellular telephone), scienter (with intent), to carry on an unlawful act (Hobbs Act extortion, bribery in violation of Illinois law, and official misconduct in violation of Illinois law). See [30 (Indictment) at 44]. Counts Seven and Eight also specify the time and date of each phone call.

The trouble with Andrews's argument is that the Government does not need to *prove* that Andrews committed the predicate unlawful act to sustain a Travel Act conviction. See *Baker*, 227 F.3d at 961; *Karigiannis*, 430 F.2d at 150. So, the Government does not need to prove that Andrews agreed to exchange a thing of value. Nevertheless, the Government has agreed to specify the thing of value: "the superseding indictment makes clear that the 'thing of value' sought by Andrews, and the basis of the unlawful act in Count 7 and 8, is fees arising from the retention of Burke's law firm, Klafter & Burke." [139 (Gov't Br.) at 191]. As a practical matter, thus, Andrews's motion appears to be moot.

*United States v. Beavers*, 2016 WL 6775966 (N.D. Ind. Nov. 16, 2016), upon which Andrews relies, is inapposite. Unlike the indictment in *Beavers*, the Indictment here specified the "time, place, manner, or substance of the Defendant's threat or false statement" and without a bill

of particulars, Andrews is not "left to guess which of the several [things of value] would serve as the basis for the [Travel Act] charge." See *id.* at **2–3.

## 2. Museum Charges (Counts One, Eighteen, and Nineteen) [109]

Burke argues that he lacks adequate notice of several charges to enable him to prepare a defense. The Court disagrees. Count One of the Indictment tracks the language of 18 U.S.C. § 1962(c), including each element of the offense, the enterprise (the City of Chicago), intent (unlawfully and knowingly), the pattern of racketeering conduct (one of which includes Racketeering Act 5, extortion by threat of blocking the Museum 1 admission fee increase, and the other racketeering acts discussed in other sections of this opinion), the time and place of the conduct (2016 through 2018), and the period specifically with respect to the museum counts (September 2017). The Indictment thus clearly specifies "the time period during which the alleged conspiracy operated, the locations * * *, the principal actors, and with some detail, the specific types of predicate crimes to be committed." See *Glecier*, 923 F.2d at 500. Counts Eighteen and Nineteen likewise name and track the elements of 18 U.S.C. §§ 1951(a) and 1952(a) and (3), respectively. See [30 (Indictment) at 58–59]. Each count provides Burke with sufficient detail to prepare a defense.

Ald. Burke nevertheless moves under Rule 7(f) to specify which "property" Ald. Burke allegedly sought to extort from Museum 1. [109 (Burke Bill of Particulars Mot.) at 1]. He also moves to specify which "official act" Ald. Burke allegedly threatened for Counts One (Racketeering Act 5), Eighteen, and Nineteen. [*Id.*]

### a. Property

Ald. Burke's first request, for a bill of particulars because "the 'property' at issue is unclear," is doomed from the start. The Indictment clearly identifies the property as wages and

159

compensation for Individual E-1, the daughter of Burke's personal acquaintance. For Count One, the Indictment states that Burke attempted to extort "money and other employment compensation to be provided by Museum 1 to Individual E-1." [30 (Indictment), ¶ 84 (RICO Act 5(a)]. For Count Eighteen, "defendant attempted to obtain property, namely money and other employment compensation to be provided by Museum 1 to Individual E-1." [*Id.* at Count 18, p.58]. Finally, the Travel Act violation in Count Nineteen cross-references the attempted Hobbs Act violation. To be sure, it does not specify Count Eighteen, but given the Government's response to this motion, there is no question that the "property" is the same.

The Court sees no reason to depart from the common-sense view, held by multiple circuits, that wages satisfy the definition of "property" incorporated into the Hobbs Act. See *United States v. Brissette*, 919 F.3d 670, 682–86 (1st Cir. 2019) (forced payment of wages to a third-party can satisfy the Hobbs Act's "obtaining of property" element); *United States v. Kirsch*, 903 F.3d 213, 227 (2d Cir. 2018) ("[w]ages and benefits are 'capable of passing from one person to another,'— in this case, from the employer to the employee—and are therefore 'transferable'" (citation omitted)). A full-time job amounts to "property" under the Hobbs Act, even if the benefit does not flow to the alleged extortionist. See *United States v. Green*, 350 U.S. 415, 418, 420 (1956) ("extortion as defined in the statute in no way depends upon having a direct benefit conferred on the person who obtains the property"); *United States v. Lewis*, 797 F.2d 358, 364 (7th Cir. 1986) ("[t]o secure a conviction under the Hobbs Act, the prosecution does not have to show that the defendant acted to receive, either directly or indirectly, the proceeds of his extortion or any benefit therefrom").

In addition, voluminous discovery is readily available to assist Ald. Burke in preparing a defense. The Government has furnished Ald. Burke with recorded phone calls, interviews, and

grand jury testimony of Museum 1's CEO, Individual E-1, and Burke's assistant. For example, though Ald. Burke insists that he made no demands and Museum 1 acted of its own accord, discovery (presumably available to Ald. Burke, as it was included in the Government's brief) reveals that in recorded phone calls to a Museum 1 employee dated September 8, 2017, Ald. Burke made crystal clear, "I'm sure I know what you want to do, because if the Chairman of the Committee on Finance calls the President of the Park Board, your proposal is going nowhere." [139 (Gov't Br.) at 186] (citing TP 9, Session 5515). When Museum 1's CEO returned his call minutes later, Burke said he was "embarrassed that he had not heard back about the internship for Individual E-1," [*Id.* at 187] (citing TP 9, Session 5516), and later explained to E-1's mother following an email from Museum 1 employee's email about a full-time job opportunity that "he's now telling me there's a position there, umm, coordinator or something or other * * * Full time." [*Id.*] (citing TP 9, Session 5594). Evidence also indicates that Ald. Burke directed his assistant to email a Museum 1 employee stating "[t]he Alderman was inquiring how [Individual E-1] can apply and what the position is titled exactly to make sure she applies for the correct position," followed closely by his receipt of an email from a Museum 1 employee attaching the job description and a message that she would reach out to E-1 directly about the position. [*Id.*]

In sum, the discovery, including the phone calls, interviews, and grand jury testimony of Museum 1's CEO, Individual E-1, and Burke's assistant, "read in conjunction with the [I]ndictment, provides a roadmap of the [G]overnment's evidence." [139 (Gov't Br.) at 186]. Ald. Burke is "undoubtedly aware that the [G]overnment might seek to prove" that Ald. Burke attempted to extort wages and compensation, for a specific position, from Museum 1, for E-1 in September 2017, which "[is] more than sufficient to enable [Ald. Burke] to prepare for trial." See *Glecier*, 923 F.2d at 501–02; *Hernandez*, 330 F.3d at 974–76.

161

Despite the specific and copious discovery, Ald. Burke submits that the "allegations indicate that Ald. Burke simply wanted an email response or form of recognition—not a job offer for E-1" and that the theory of "what Ald. Burke supposedly sought from the Museum is conspicuously inconsistent." See [109 (Burke Bill of Particulars Mot.) at 8]. Again, the answer is "tell that to the jury."[47] The Government's theory, spelled out in the Indictment, is that when an employee of Museum 1 contacted Ald. Burke to discuss a pending admission fee increase scheduled for review by the Chicago Park District Board on September 13, 2017, Ald. Burke "threatened to contact the President of the Park District Board and object to Museum 1's requested admission fee increase because Museum 1 had failed to respond to [Ald. Burke's] prior effort to obtain an internship for Individual E-1 at Museum 1." [30 (Indictment) at ¶ 71]. Perhaps Ald. Burke was simply looking for an "acknowledgment" of his efforts or to assuage his "bruised ego." [109 (Burke Bill of Particulars Mot.) at 7]. But the Government sees it differently, intimating that Ald. Burke was focused on the employment or wages itself. A museum executive offered E-1 to apply for a full-time job at Museum 1, [30 at ¶ 72], and Ald. Burke clearly indicated interest in

---

[47] The Court gave the parties the opportunity to stipulate that for practical purposes, the Government's response [139] satisfies Ald. Burke's demands [109] that it "identify any and all property that Ald. Burke allegedly received or attempted" "specifically identify which employment position." [109 (Burke Bill of Particulars Mot.) at 12, ¶¶ 1–2]. Ald. Burke appears to concede this point in his reply. [162 (Ald. Edward M. Burke's Reply in Support of his Mot. for Bill of Particulars ("Burke Bill of Particulars Reply") at 1] ("[a]s to the[se] questions, the [g]overnment provides an answer to which it will be bound at trial that is contradicted by the facts"). Nevertheless, Ald. Burke maintained that a Bill of Particulars was still necessary for two reasons, neither of which is persuasive. First, in his view, the Government did not specify the official act. [182 (Feb. 8, 2022 Hr'g Tr.) at 24:12–14]. But (as the Court will explain in the next subsection) the Government identified the official act: Ald. Burke threatened actions designed to prevent the park district board's approval of the admission being increased, including but not limited to his threat to call the Park District Board. [*Id.* at 62:3–9].

Second, Ald. Burke also stressed that the specifics prevent double jeopardy. See [182 (Feb. 8, 2022 Hr'g Tr.) at 24:18–25:2]. Yet, no party has cited, nor could this Court find, a case within the Seventh Circuit indicating a defendant is entitled to a bill of particulars, rather than a pleading, to prevent double jeopardy. The cases suggest that the Government has done enough to help Ald. Burke prepare for trial. See *Vaughn*, 722 F.3d at 926–28.

*that* property: Ald. Burke relayed to E-1's mother the full-time job opportunity and directed his assistant to "ask[] for additional details" on the "position and what the title * * * was," [*Id.* at ¶ 74]. This Court cannot take sides on which inference should be drawn.

In reply [162], Ald. Burke insists that he is entitled to an explanation as an "answer in a bill of particulars" (to which the Government would be constrained at trial), to advise him why Ald. Burke would have "attempt[ed] to extort * * * salary from a job when Ind. E-1 was already gainfully employed by *Ald. Burke*." [162 (Ald. Edward M. Burke's Reply in Support of his Mot. for Bill of Particulars ("Burke Bill of Particulars Reply")) at 2]. Ald. Burke's demand ignores the Seventh Circuit's admonition that "the defendant's constitutional rights * * * do not require the [G]overnment to reveal the details of how it plans to prove its case." See *Glecier*, 923 F.2d at 502. His insistence that he never "expressly or implicitly requested the full-time position" is irrelevant to the question before this Court: whether the Indictment passes constitutional muster. [162 at 2 n.1]. The Court has already explained why the record provides more than ample discovery from which he can prepare a defense.[48]

### b.     Official Act

Ald. Burke next argues that the Indictment does not indicate what "official act" he took or threatened under the "color of official right" for the attempted Hobbs Act offenses underlying the Museum counts. [109 (Burke's Bill of Particulars Mot.) at 10]. He maintains that he lacked formal authority over the Museum or Park District and thus it is "unclear" what act he "could have taken or agreed to take as part of the alleged extortion." [*Id.* at 11].

---

[48] Ald. Burke also makes several other arguments that go to the weight of the evidence, for example arguing that a conversation between Ald. Burke and the CEO of Museum 1 "makes clear that Ald. Burke never requested any employment" because he told the Museum 1 CEO "that ship has already left the dock." See [109 (Burke Bill of Particulars Mot.) at 5]. The fact finder is entitled to draw whatever inferences it wants from this or other evidence, but Ald. Burke's argument is not within the ambit of a bill of particulars.

To begin, the Government makes clear that Ald. Burke threatened to object to Museum 1's admission fee increase. The Indictment alleges that "[Burke] abused his position as an Alderman by threatening to take official action, in his capacity as Chairman of the Committee on Finance, to derail a proposed admission fee increase." See [30 (Indictment) at ¶ 69]. The Indictment takes two routes, alleging he either attempted extortion through fear of economic harm or under color of official right.

It is no answer to say that the Indictment is unclear because the Government has not spelled out how it intends to prove its theory of conduct under color of official right. Ald. Burke suggests that the Government might have "mistakenly believed that Ald. Burke possessed de jure authority over the Museum" and thus could personally derail the increase or could have "contact[ed] the President" to object. [109 (Burke's Bill of Particulars Mot. at 11]. In Ald. Burke's view, the former is untrue, and the latter falls short of the official act requirement in *McDonnell v. United States*, 579 U.S. 550 (2016). As the Court has already noted, these questions are beside the point at the moment—the Government need not inform Ald. Burke how it intends to prove the allegations against him. Even if he were entitled to specifics, which he is not, the former argument runs headlong into the fact that attempted Hobbs Act extortion does not require the defendant to have actual authority to take the official act, so long as the victim reasonably believes the official could have that authority. See, *e.g.*, *United States v. Carter*, 530 F.3d 565, 574 (7th Cir. 2008) ("[T]his Court has held that '*[d]e jure* ability to perform the promised act need not be present; sufficient 'is a reasonable belief that the state system so operated that the power in fact of the defendant's office included the effective authority' to fulfill the promise") (some alterations in original) (quoting *Rindone*, 631 F.2d at 491)). And the latter ignores *McDonnell*'s clear command that an attempt to influence another official act on a pending matter, here the fee increase, could

constitute an official act, if proven. See *McDonnell*, 579 U.S. at 572 (A public official may also make a decision or take an action on a "question, matter, cause, suit, proceeding or controversy" by using his official position to exert pressure on another official to perform an "official act").

Ald. Burke's official act argument fails for the same reason as his property argument. Discovery fleshes out the details of the Government's case and therefore equips him with information he needs to mount a defense. The evidence turned over to Ald. Burke includes recordings of calls in which he himself linked his "help" with the matter during conversations with Individual E-1's mother, informing her that Museum 1's "staff screwed up, and now they're calling me asking to help 'em on another matter and I read 'em the riot act because of the way they treated [Individual E-1's], uh, application. So anyway[,] he's now telling me there's a position there." [139 (Gov't Br.) at 188–89] (citing TP 9, Session 5594). Evidence like this and others documenting Ald. Burke's comments to a museum employee named Individual E-2 that "if the Chairman of the Committee on Finance calls the President of the Park Board, your proposal is going to go nowhere" provides ample information about the specifics the Government will introduce at trial. [*Id.* at 190]. Equipped with an Indictment stating the essential elements of the charge and ample discovery, Ald. Burke has all that he is legally entitled to mount a defense.

Ald. Burke also moves for leave to file any additional pretrial motions that may become necessary depending on the outcome of the motion, see [109 at 7, 10 n.4]. That motion is granted.

## IX.     Motions for Severance [86, 87, 96, 111, 112, 114]

Defendants all move to sever their trials [86, 87, 96, 111, 112, 114]. The Court denies those motions without prejudice on Federal Rules of Criminal Procedure 8(b) grounds, to the extent they seek to mitigate prejudice under Federal Rule of Criminal Procedure 14(a), and to the extent they believe joinder violates their rights under the Fifth and Sixth Amendments to the

165

Constitution. Nevertheless, given the discretion afforded to district courts under Rule 14(a), the Court grants Defendants leave to renew their requests for severance under Rule 14(a) or on constitutional grounds at a later stage of the case.

### A. Factual and Procedural Background

As noted previously, the Superseding Indictment ("Indictment") [30] names Ald. Burke, Cui, and Andrews and joins nineteen counts. The Court will therefore briefly review the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c), charge before elaborating on the remaining eighteen counts of the Indictment.

### 1. Indictment [30]

The Government charges only Ald. Burke with violating the RICO Act, 18 U.S.C. § 1962(c). [30 (Indictment) at Count 1, 38]. Recall that the Indictment defines the City of Chicago as the enterprise and enumerates specific acts as comprising the pattern of racketeering. The racketeering acts identified concern (1) Ald. Burke's involvement with the Old Post Office redevelopment (the "Post Office Project"); (2) interference by Ald. Burke and his staffer, Andrews, with a fast-food restaurant located in Ald. Burke's ward (the "Fast-Food Restaurant Remodeling"), (3) Cui's and Ald. Burke's involvement with the 4901 Property (the "Pole-Sign Permit"), and (4) the Museum 1 fee increase (the "Museum 1 Admission Fee Increase"). [*Id.* at 29–38]. For present purposes, the following summary will suffice:

- Post Office Project. The first set of allegations are that Ald. Burke solicited the owners of the Old Post Office to retain his law firm, Klafter & Burke. The Government charges Ald. Burke with having attempted or agreed to assist the owners in obtaining TIF financing, class L approval, accommodations from Amtrak, and permits from the Water Department in exchange for the retention of his law firm. [30 (Indictment) at Count 1, ¶¶ 6–32]. The incident with the Old Post Office constitutes Racketeering Acts One and Two of Count One. See [*Id.* at Count 1, ¶ 84 (RICO Acts 1–2)].

- Fast-Food Restaurant Remodeling. The second set of allegations are that Ald. Burke corruptly solicited the owners of a fast-food restaurant located in his ward to retain Klafter

& Burke. Together, he and Andrews offered in return his support for and threatened to hold up a building permit and related driveway permit. [30 at Count 1, ¶¶ 33–49]. The incident with the restaurant remodel constitutes Racketeering Act Three of Count One. See [*id.* at Count 1, ¶ 84 (RICO Act 3)].

- Pole-Sign Permit. The third set of allegations are that Ald. Burke corruptly solicited Cui to retain Klafter & Burke in exchange for Ald. Burke's assistance to obtain a pole sign permit for Company C. [30 at Count 1, ¶¶ 50–68]. The incident with Cui constitutes Racketeering Act Four. [*Id.* at Count 1, ¶ 84 (RICO Act 4)].

- Museum 1 Admission Fee Increase. The fourth set of allegations are that Ald. Burke threatened to derail a proposed admission increase sought by Museum 1, due to Museum 1's failure to respond to an inquiry about an internship for a child of Ald. Burke's personal acquaintance. [30 at Count 1, ¶¶ 69–77]. The incident with Museum 1 constitutes Racketeering Act Five of Count One. [*Id.* at Count 1, ¶ 84 (RICO Act 5)].

Several other aspects of the RICO charge are worth emphasizing at the outset. To begin, three of the incidents involve Ald. Burke's targeting of various players to retain his private law firm, and all incidents involve Ald. Burke's alleged agreement to leverage his power to influence a governmental matter (or withhold that something) from the real estate developers or Museum 1. Moreover, Ald. Burke is the only participant common to each racketeering act; however, the predicate racketeering activity implicates the conduct of both Ald. Burke's co-defendants, Cui and Andrews. The Indictment alleges that Ald. Burke conspired with Andrews "to obstruct, delay, and affect commerce by extortion," the extortion of fees to be paid by Company B. [30 (Indictment) at Count 1, ¶ 84 (RICO Act 3(b))]. Similarly, the Indictment alleges that Cui sought assistance from Ald. Burke with the pole sign permit and planned to have "Burke handle 4901 W. Irving Park property tax appeal, at least for this year" while he "ha[d] TIF deal going with the City" and the "zoning etc[.] for my [Cui's] project." [*Id.* at Count 1, ¶ 56].

As noted above, the Indictment joins three co-defendants and eighteen other substantive counts. All additional charges relate to incidents underpinning the RICO charge. Namely, the Indictment joins Defendants Andrews and Cui with Ald. Burke, and eighteen substantive charges against a combination of Ald. Burke, Cui, and Andrews. The charges range from federal program

bribery, 18 U.S.C. §§ 666(a)(1)(B) and 2, to violations of or attempts to violate the Hobbs Act extortion statute, see 18 U.S.C. § 1951(a), and to violations of the Travel Act, 18 U.S.C. § 1952(a)(3), and making false statements to the FBI, 18 U.S.C. § 1001(a)(2). For a full list of the charges see Part I.B(2), above, which provides a table with the charges, substance, and named defendants.

### 2.    Motions to Sever

Cui, Andrews, and Ald. Burke seek an order for separate trials. Although they seek the same goal, each filed an independent motion asserting one or more bases for severance. Cui moves for an order severing the charges against him from co-defendants Ald. Burke and Andrews and granting separate trials under Federal Rules of Criminal Procedure 8(b) and 14(a). See [86 (Def. Charles Cui's Mot. for Severance ("Cui Severance Mot.")); 87 (Def. Charles Cui's Memo. of Law in Support of Mot. for Severance ("Cui Severance Br."))]. Ald. Burke moves to adopt that motion. [121 (Burke Mot. to Adopt) at ¶ 1]. Andrews moves for severance, claiming severance of Counts Five, Six, Seven, Eight, Ten is proper under Rule 8(b), and for a separate trial under Rule 14(a). [96 (Def. Andrews' Mot. for Severance ("Andrews Severance Mot.")) at 9, 17]. Ald. Burke moves to adopt. [121 at ¶ 3].

Finally, Ald. Burke also moves to sever both co-defendants, Cui and Andrews. He advances several bases for severance from Cui. First, he asserts that severance under Federal Rule of Criminal Procedure 14 would prevent prejudice. [111 (Ald. Edward M. Burke's Mot. for Severance from Co-Defendant Cui for Prejudicial Joinder ("Burke Severance Mot. – Cui, Prejudice")) at ¶ 15]. As a backup, he requests severance of Counts Thirteen and Seventeen. [*Id.* at ¶ 21]. In the alternative, Ald. Burke moves for severance from Cui [112] under the principles articulated in *Bruton v. United States*, 391 U.S. 123 (1968). [112 (Ald. Edward M. Burke's Mot.

to Sever Co-Defendant Cui on *Bruton* Grounds ("Burke Severance Mot. – Cui, Bruton")) at ¶ 4]. Ald. Burke moves for severance from Andrews as well on *Bruton* grounds. [114 (Ald. Edward M. Burke's Mot. to Sever Co-Def. Andrews on *Bruton* Grounds ("Burke Severance Mot. – Andrews, Bruton")) at ¶ 4].

The Government opposes these motions in full. See [139 (Gov't Br.) at 194].

### B.     Legal Standard

All three co-defendants seek separate trials and severance of counts under Federal Rules of Criminal Procedure 8(b) and 14(a), and Ald. Burke also asserts a right to severance on *Bruton* grounds. Rule 8(b) governs the joinder of two or more defendants in the same indictment. Under Rule 8(b), "[t]he indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." The Seventh Circuit "ha[s] interpreted the language 'same series of acts or transactions' to mean 'acts or transactions that are pursuant to a common plan or common scheme.'" *United States v. Lanas*, 324 F.3d 894, 899 (7th Cir. 2003) (quoting *United States v. Todosijevic*, 161 F.3d 479, 484 (7th Cir. 2003)). "[W]hich is to say (in the usual case) that the acts or transactions are parts of a single conspiracy." *United States v. Briscoe*, 896 F.2d 1476, 1515 (7th Cir. 1990). However,

> it is neither necessary nor sufficient under Rule 8(b) that the defendants be charged with the identical crimes. The focus is on the underlying acts that constitute criminal offenses. The defendants must be charged with crimes that well up out of the same series of such acts, but they need not be the same crimes. And obviously the fact that they are the same crimes doesn't mean they can be charged in the same indictment if they bear no relation to each other.

*United States v. Marzano*, 160 F.3d 399, 401 (7th Cir. 1998). "[T]he test is what the indictment charges, not what the evidence shows." *Id.*

Rule 8(b) is aimed at enhancing "judicial efficiency" and "recognizes that joint trials are beneficial not only for efficiency but because they limit inconvenience to witnesses, avoid delays in bringing defendants to trial, and allow the 'total story' to be presented to a single jury." *United States v. Stillo*, 57 F.3d 553, 557 (7th Cir. 1995).

Under Rule 14(a), "[if] the joinder of offenses or defendants in an indictment * * * appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Severance is proper "if the economy of the joint trial is outweighed by the prejudicial effect of such a trial on one or more (sometimes all) of the defendants." *Marzano*, 160 F.3d at 402. A defendant cannot "merely [] show that separate trials might have provided the defendant a better shot at acquittal." *United States v. White*, 737 F.3d 1121, 1133 (7th Cir. 2013) (quoting *United States v. Berg*, 714 F.3d 490, 496 (7th Cir. 2013)). Rather, courts grant severance where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Carrillo*, 435 F.3d 767, 778 (7th Cir. 2006) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). The defendant bears that "heavy burden" of establishing a joint trial prevented a reliable judgment. *White*, 737 F.3d at 1133 (quoting *Berg*, 714 F.3d at 496).

Furthermore, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together. Joint trials 'play a vital role in the criminal justice system.' They promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *Zafiro*, 506 U.S. at 539 (internal citation omitted) (quoting *Richardson v. Marsh*, 481 U.S. 200, 209–10 (1987)). "There is, moreover, a strong policy in favor of joint trial 'where the charges against all the defendants may be proved by the same evidence and results from the

same series of acts.'"  *United States v. Burton*, 724 F.2d 1283, 1286–87 (7th Cir. 1984) (quoting *United States v. McPartlin*, 595 F.2d 1321, 1333 (7th Cir. 1979)).

### C.    Analysis

#### 1.    Misjoinder: Propriety of Joinder under Rule 8(b)

In their respective motions, Cui and Andrews (and Ald. Burke, through his motion to adopt) contend that they are entitled to separate trials because the allegations against Ald. Burke, Cui, and Andrews are not part of a common scheme.  Rather, Cui insists that the allegations about the 4901 Property form one of "several separate and distinct schemes related to the Post Office project, the fast food restaurant, Company C, and the museum."  [87 (Cui Severance Br.) at 11].  Andrews argues much of the same, explaining that the allegations about his and Ald. Burke's conduct concerning the Fast-Food Restaurant Remodeling are not part of a common plan or scheme with the other episodes in the Indictment.  See [96 (Andrews Severance Mot.) at 12–13].  In Cui's words, Ald. Burke is the "only commonality between these schemes," which is not enough for Rule 8(b) joinder, and there is no allegation that the episodes were "undertaken pursuant to some sort of overarching conspiracy or master plan" and could not, because each involves different actors, at different times, and "engaging in distinct behaviors that were separate and apart from each other, with each alleged scheme pursuing its own unique ends," success of one having "no bearing on the others."  [87 at 11].

The Court accepts Defendants' premise that in a typical case prior to Congress' enactment of RICO, joinder would have been improper under Rule 8(b) based on the facts currently known to the Court.  If, in fact, the single link for all the episodes alleged in Counts Two through Eighteen were that they involved similar crimes—the formation of agreements with businesses to exchange Ald. Burke's benevolence as a powerful broker in City Hall in exchange for business for his private

law firm—that would be insufficient for joinder. The Court takes no issue with defendants' view that a similar crime is not enough, without more, to justify joinder. See *Marzano*, 160 F.3d at 401 ("[O]bviously the fact that they are the same crimes doesn't mean they can be charged in the same indictment if they bear no relation to each other"). "The government cannot bootstrap multiple defendants with similar but unconnected offenses into a single indictment by combining Rules 8(a) and 8(b) and the existence of overlapping defendants." *Stillo*, 57 F.3d at 557.

But this is not a case in which the single link is a similar crime or a common participant. As the Government points out, "Count 1 alleges Burke conducted the affairs of an enterprise affecting interstate commerce through a pattern of racketeering activity," and therefore "joinder is proper because each defendant is charged with conduct alleged as a racketeering predicate." [139 (Gov't Br.) at 196]. Informing this Court's understanding of the propriety of Rule 8(b) joinder, the Seventh Circuit has held that "there is a presumption that participants in a conspiracy or other criminal schemes should be tried together, 'not only to economize on judicial and prosecutorial resources but also to give the jury a fuller picture of the scheme.'" *United States v. Phillips*, 239 F.3d 829, 838 (7th Cir. 2001) (footnote omitted) (quoting *Taglia*, 922 F.2d at 416–17) (upholding joinder where codefendants' membership in same gang linked their separate crimes including drug and weapon offenses and violent crimes in aid of racketeering); *United States v. Valentino*, 436 F. App'x 700, 705–06 (7th Cir. 2011) (joinder of multiple defendants to bribery scheme proper).

Although the Court could not find many Seventh Circuit cases that elaborate on Rule 8(b) in the RICO context, our circuit has offered some helpful guidance on the issue. In *United States v. Stillo*, 57 F.3d 553 (7th Cir. 1995), the government indicted a state court judge on racketeering charges for fixing cases in exchange for cash. *Id.* at 555–56. The bribes followed a routine pattern

172

over six years in at least five or six separate cases: the state court judge met with a defense lawyer before trial, then found the lawyer's client not guilty, and subsequently met with the lawyer again after trial to accept a cash reward. *Id.* at 555. Three years and several public corruption scandals later, the judge took some added precautions, adding his nephew to the mix to arrange the bribe (in what turned out to be a fictitious case filed by the FBI) on the judge's behalf. *Id.* at 556. Although the indictment did not charge the nephew with racketeering, the government named the nephew as a co-defendant on a separate, substantive offense for conspiring to commit extortion. *Id.* In affirming the denial of the nephew's motion for severance, the Seventh Circuit reasoned that joinder of the RICO and conspiracy counts was proper under Rule 8(b) as the RICO count was not "unrelated to the extortion count." *Id.* at 556–57. The bribery scheme in the conspiracy count "was also the fourth predicate act of racketeering in Count I," which was a "necessary element of the RICO claim," and "severance of the two counts would have required trying the [bribe involving the nephew] episode twice." *Id.* Furthermore, joinder of the defendants was proper because the judge and nephew were both "alleged to have 'agreed to work together to obtain money from [the defense lawyer]" and to have met with [the defense lawyer] on separate occasions to reach this end." *Id.* at 557. "It is well settled that a conspiracy charge is a proper basis for joinder" and clearly "both defendants '[had] participated in the same series of acts or transactions.'" *Id.* Although cited by the Government for a different proposition, the Seventh Circuit more recently blessed the joinder of a mail fraud scheme that was also a racketeering act predicate for a federal RICO charge in *United States v. Warner*, 498 F.3d 666, 699 (7th Cir. 2007). As the court of appeals explained, the Rule 8(b) joinder was proper because "all of the conduct in [the joined counts] * * * relate[d] to the charges in either the RICO conspiracy, mail fraud scheme or both."

In this case, like the overlapping racketeering and substantive counts in *Stillo* and *Warner*, the Indictment ties together the racketeering acts with the separate, substantive offenses charged individually against Cui, Andrews, and Ald. Burke. Under the cases cited above, joinder of the claims against Cui with the RICO count against Ald. Burke is proper. The pole sign permit bribery allegations of Counts Twelve, Thirteen, Fourteen, Fifteen, and Sixteen are not "unrelated" because the incident "was also the [fourth] predicate act of racketeering in Count [One]" and "severance of the * * * counts would have required trying the [pole sign] episode twice." See *Stillo*, 57 F.3d at 556–57. The charges of lying to the FBI, Count Seventeen, could be construed as a cover up and thus part of the same scheme as well. See *White*, 737 F.3d at 1132–33 (joinder proper, including fraud that "also served as the scheme's cover-up" in part because "a conspiracy and its cover-up are parts of a common plan" (citing *Warner*, 498 F.3d at 699)). Joinder of Cui with both Ald. Burke and Andrews is proper as well because the other bribes in which Cui "was not involved were earlier attempts by [Ald. Burke and Andrews] to collect bribes from [other developers] and thus part of the same 'series of acts or transactions' as the later [pole sign bribery] scheme." See *id.* (describing joinder of defendants in same scheme as proper).

Joinder of the remaining, substantive counts against Andrews and Ald. Burke also comports with Rule 8(b) because the RICO Count against Ald. Burke works as the backbone of the entire case: the incidents alleged against Andrews and Ald. Burke in the substantive offenses mirror the remaining racketeering acts. The Indictment's charges against Andrews (Counts Five, Six, Seven, and Eight), include extortion, aiding and abetting federal program bribery, and using a facility of interstate commerce to further an unlawful act, and each concern the Fast-Food Restaurant Remodeling episode. That same conduct is charged as Racketeering Act Three of Count One. The Court has already addressed why the remaining charge against Andrews, the false

174

statement charge in Count Ten, could constitute part of the common plan as the cover up. Likewise, the RICO charge ties together Ald. Burke's other predicate RICO acts of Count One and correspond to the substantive counts involving the Museum 1 Admission Fee Increase incident and the Old Post Office. Each of these charges constituted one of the predicate racketeering crimes and were allegedly undertaken with the common goal of conducting the affairs of the City of Chicago by means of a pattern of racketeering.

In short, Andrews, Cui, and Ald. Burke are each charged with separate crimes that also constitute the predicate racketeering acts charged in Count One. Even though Andrews and Cui did not participate in every predicate act, and each bribe implicated different actors and involved slight wrinkles, their schemes were part of the same series of acts or transactions as those alleged in Count One. Requiring the Government to try these episodes on multiple occasions not only would undermine Rule 8(b)'s express preference for "economiz[ing] on judicial and prosecutorial resources" by requiring the Government to retry each episode three separate times, but also deprive "the jury a fuller picture of the scheme." See *Phillips*, 239 F.3d at 838.

The Seventh Circuit's willingness in *Stillo* and *Warner* to treat the RICO charge as the sufficient link and the "presumption that participants in a conspiracy or other criminal schemes should be tried together * * * to give the jury a fuller picture of the scheme" suggest that the concerns motivating the *Stillo* court still remain valid today. *Cf. White*, 737 F.3d at 1132–33 (indictment alleging "a single scheme to defraud homeowners" allowed joinder of defendants and "[t]he fact that [co-defendant 1] and [co-defendant 2] were not involved in" every aspect of the scheme, such as a fraudulent bankruptcy filing, did "not matter if the filings were connected to the success of the overall scheme"); *Valentino*, 436 F. App'x at 705–06 (joinder of multiple defendants

to bribery scheme proper, "Rule 8(b) does not require that all defendants be charged in the same count, nor that each defendant participate in precisely the same act or transaction").

The Court also takes comfort in the fact that the Second, Third, Fifth, and D.C. Circuits all have applied *Stillo*'s approach to joining substantive offenses charged for activity that forms the pattern of racketeering activity. At least these four other circuits have found joinder appropriate where the indictment charged RICO violations plus separate offenses committed as part of the pattern of racketeering activity, even if the defendant objecting to joinder is not named in the RICO count. See *United States v. Carson*, 455 F.3d 336, 373 (D.C. Cir. 2006) (upholding joinder where "[t]he indictment alleged that all of these counts were overt acts in furtherance of the narcotics conspiracy and predicate acts in furtherance of the RICO conspiracy. This provided the necessary link to satisfy Rule 8(b)"); *United States v. Irizarry*, 341 F.3d 273 (3d Cir. 2003) (joinder proper because defendant "was charged with a RICO substantive violation and a RICO conspiracy violation, and all of the criminal acts charged against him in the superseding indictment were charged either as predicates for the racketeering charge, or as acts undertaken in furtherance of a commonly charged RICO enterprise"); *United States v. Krout*, 66 F.3d 1420, 1429 (5th Cir. 1995) ("If an indictment charges RICO violations, offenses committed as part of the pattern of racketeering activity are properly joined even if the defendant objecting is not named in the RICO count"); *United States v. Weisman*, 624 F.2d 1118, 1129 (2d Cir. 1980) (Rule 8(b)'s same act "requirement is met by the RICO count of the indictment").

There is an intuitive appeal to the logic, laid out by the Fifth Circuit in *United States v. Welch*, 656 F.2d 1039, 1049–53 (5th Cir. 1981), that the RICO charge in Count One against Ald. Burke "provide[s] the connexity necessary to satisfy Rule 8(b)." As the *Welch* court explained, "through RICO, Congress intended to authorize the single prosecution of a multi-faceted,

176

diversified conspiracy by replacing the inadequate 'wheel' and 'chain' rationales with a new statutory concept: the enterprise." *Id.* at 1051 (quoting *United States v. Elliott*, 571 F.2d 880, 902 (5th Cir. 1978)). "Indeed, a construction of Rule 8(b) that required a closer relationship between transactions than that necessary to establish a 'pattern of racketeering activity' under RICO might possibly prohibit joinder in circumstances where Congress clearly envisioned a single trial." *Id.* (quoting *Weisman*, 624 F.2d at 1129). Defendants have not pointed this Court to a single case, inside or outside the Seventh Circuit, that casts doubt on Congress's express preference and the Seventh Circuit's presumption to join defendants and claims that form a conspiracy through Rule 8(b) joinder.

### 2. Prejudicial Joinder—*Bruton* Rule 14(a)

Ald. Burke also makes somewhat conclusory arguments that Cui's and Andrews's statements to the FBI constitute "confessions" and would deprive Ald. Burke of his right to confrontation under the Sixth Amendment to the Constitution. See [112 (Burke Severance Mot. – Cui, Bruton); 114 (Burke Severance Mot. – Andrews, Bruton)]; *Bruton v. United States*, 391 U.S. 123 (1968). This argument is not persuasive. The Sixth Amendment to the United States Constitution declares, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted by witnesses against him." U.S. CONST. amend. VI. In *Bruton v. United States*, the Supreme Court held that the admission of the confession of a nontestifying co-defendant at a joint trial deprives a person of his/her Sixth Amendment rights even if the jury is instructed to consider the confession only against the co-defendant. 391 U.S. 123, 126 (1968). In *Richardson v. Marsh*, 481 U.S. 200 (1987), however, the Court narrowed *Bruton*'s scope. The case involved a joint trial during which Marsh's co-defendant's police-station confession was admitted into evidence, but the confession was redacted to omit all references to Marsh and any indication that anyone other

than the co-defendant (and his associate) participated in the crime. *Id.* at 204–05. The court instructed the jury not to consider the co-defendant's confession against Marsh. *Id.* Nevertheless, in a later-filed habeas petition, a federal court of appeals found a *Bruton* violation, reasoning in part that the prosecutor's closing statement linked the confession back to Marsh. *Id.* at 205. The Supreme Court reversed, holding "that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson*, 481 U.S. at 211. Unlike in *Bruton*, "the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial." *Id.* at 208. The Court reasoned that an incriminating statement that requires an inferential link is less potent (and easier to alleviate with a jury instruction): "[W]hile it may not always be simple for the members of a jury to obey the instruction that they disregard an incriminating inference, there does not exist the overwhelming probability of their inability to do so that is the foundation of *Bruton*'s exception to the general rule." *Id.*

Statements admitted at trial that are not inculpatory do not appear to raise a *Bruton* issue, either. For example, in *United States v. Warner*, 2004 WL 1794476, at *24 (N.D. Ill. Aug. 11, 2004), a former Illinois governor and an Illinois businessman were indicted together and convicted in a joint trial arising from the governor's steering of contracts to the businessman. *Id.* During an FBI interview, the former governor admitted to appointing the businessman but denied any financial motivation. The district court denied the businessman's request to sever on *Bruton* grounds. *Id.* The governor's statements to the FBI, including that he had appointed the businessman on a colleague's recommendation, had "never discussed" the contracts with the businessman, and "had no personal knowledge that [the businessman] profited from the" contracts

178

did not incriminate him. *Id.* The Seventh Circuit affirmed, reasoning that "the statements admitted at trial were not inculpatory and did not amount to a confession from [the former governor]." *United States v. Warner*, 498 F.3d 666, 701 (7th Cir. 2007).

Ald. Burke does not identify which statements in the FBI transcripts he considers to be "confessions" by Cui and Andrews. See [112 (Burke Severance Mot. – Cui, Bruton); 114 (Burke Severance Mot. – Andrews, Bruton)]. Instead, he gestures broadly to the transcripts without identifying or even attempting to explain in opening or reply how those statements could amount to inculpatory statements. See [112; 114; 164 (Ald. Edward M. Burke's Consolidated Reply in Support of His Mot. for Severance from Co-Defs. Cui for Prejudicial Joinder; & His Mots. to Sever Co-Defs. Cui & Andrews on *Bruton* Grounds ("Burke Consolidated Severance Reply")) at 5]. Even if he had, the Court agrees with the Government that nothing in Cui's nor Andrews's interviews, in a vacuum, amounts an inculpatory statement that facially incriminates Ald. Burke. See *Warner*, 498 F.3d at 700–01. For the same reason that Ald. Burke gives no reason to think Cui's and Andrews's statements are facially inculpatory, *United States v. Hoover*, 246 F.3d 1054, 1059 (7th Cir. 2001), cited by Defendant, is readily distinguishable. Finally, the Court will have ample opportunity to mitigate any potential *Bruton* issues at trial by excluding any references to Ald. Burke made in the FBI interviews. Such precautions can easily reduce the risk that the mere use of "place-holders" will leave the interview facially incriminating. As Ald. Burke's counsel noted at a hearing on this matter, these issues might be more appropriate for resolution after the parties have presented their views on *Santiago* proffers. See [182 (Feb. 8, 2022 Hr'g Tr.) at 23:4–15].

### 3. Prejudicial Joinder—Other Arguments Under 14(a)

Defendants argue in the alternative that separate trials are necessary to prevent unfair prejudice under Federal Rule of Criminal Procedure 14(a). On the one hand, "economy is considerable because of the interrelatedness of the offenses," as joinder would streamline many overlapping issues—the predicate acts that form the RICO counts form the basis for the eighteen other counts. See *Marzano*, 160 F.3d at 402. The factual overlap means that a joint trial would alleviate an otherwise sizeable burden on witnesses, who would only need to testify once, rather than three times in a trial of each of the three defendants, regarding the same events. This "considerable duplication of evidence" if Ald. Burke were tried separately from Cui and Andrews "is a cost to society and a major consideration in the joinder of criminal defendants." *Id.* The Court would also save significant time presiding over a single trial, which is eminently logical even in normal times given the sheer number of issues and facts that overlap across the nineteen charges, and much more so during an ongoing pandemic that continues to strain the capacity of courts to provide speedy trials for all defendants who want them.

On the other hand, a joint trial may impose disadvantages for Defendants Cui and Andrews. It is true that Ald. Burke is a household name, and the episodes involving Cui and Andrews, for instance, are only pieces of the entire puzzle of Ald. Burke's alleged racketeering activity. However, both Cui and Andrews would still be entangled with the allegations against Ald. Burke, even if they were tried separately. See *Warner*, 498 F.3d at 700–01 (rejecting businessman's argument that his joinder with high-profile official worked unfair prejudice, "[h]ad he been tried separately, he would not have enjoyed the status of 'an unknown businessman,' as he suggests; he would have still faced charges as a coconspirator that centered around the activities of the former Governor"). As for prejudicial spillover, certainly much evidence is specific only to Ald. Burke.

180

But there appears to be at least a colorable argument that the evidence with respect to Cui and Andrews is not all necessarily inadmissible or irrelevant, and it is too soon to make an educated decision about whether hypothetical evidence not before this Court might be relevant as statements of a party opponent and relevant as to opportunity, knowledge, etc. in forming the bribery agreements. See *White*, 737 F.3d at 1133 (rejecting contention that joinder caused prejudicial spillover effect where much of the evidence would have been admissible against the defendant-appellant). The facts and players are sufficiently separate and discrete that a properly instructed set of jurors would likely be able to capably sort through the evidence pertaining to the Pole Sign Permit and Restaurant Remodel episodes. See *id.* ("The Supreme Court has held that limiting instructions 'often will suffice to cure any risk of prejudice [caused by joinder]'" (quoting *Zafiro*, 506 U.S. at 539)).

That leaves Cui's argument that he is only a "'bit player,' whose charges constitute only a tiny piece of the Indictment's otherwise sweeping allegations of widespread public corruption." See [139 (Gov't Br.) at 208] (citing [87 (Cui Severance Br.) at 12]). Even if Cui's conduct forms only one of the predicate racketeering acts in Ald. Burke's alleged overall enterprise of conducting the affairs of the City of Chicago through bribery, there is no question that Cui is *the* central player in the allegations regarding the pole sign permit. That is what distinguishes Cui from the office manager in *United States v. Tarango*, 396 F.3d 666 (5th Cir. 2005). Nor is there a foreseeable risk that Cui would be scapegoated for a central player's absence at trial. See *id.*

At least with the evidence before this Court at this time, the balance of equities favors a joint trial of Cui with Ald. Burke and Andrews. Thus, the Court will not presently exercise its discretion to sever Defendants Cui or Andrews under Rule 14(a). First, the significant benefits of a single trial far outweigh the risk of prejudice to Cui and Andrews of being tried as co-defendants

181

with Ald. Burke. Second, jury instructions can help mitigate prejudice that could flow from unrelated evidence and potential overlap. Third, the Court is persuaded that in balancing the equities, even if the Defendants must sit through extensive evidence and weeks of trial as a result, the arguments that a joint trial will involve "extensive, time-consuming" evidence that "d[oes] not directly relate to the" charges against each of them is not "sufficient to establish" in this case that the evidence will "prevent[] the jury from coming to a reliable determination" of either Andrews's or Cui's guilt. See *White*, 737 F.3d at 1133 (rejecting defendant's argument that unrelated, time-consuming evidence precluded reliable finding of guilt).

Ald. Burke raises different concerns. He worries that because of the "gross disparity" in evidence, if Cui and he were tried together, a jury might conclude that Ald. Burke had the necessary corrupt mindset to convict him by misattributing Cui's statements to Ald. Burke. [111 (Burke Mot. to Sever Cui – Prejudice) at ¶ 13]. Specifically, he directs the Court to statements Cui made in emails and interviews with the FBI from which a jury could inadvertently conclude that Ald. Burke also had the mindset necessary to warrant conviction. [*Id.* at ¶¶ 15–16]. Recall that Cui emailed Burke on Aug. 23, 2017, stating he had a legal matter for the firm and asking for assistance in obtaining a permit for the previously denied pole sign, then almost immediately emailed a real estate lawyer asking if Ald. Burke could handle his property tax appeal for a year and noting he needed Ald. Burke's favor for TIF and zoning. That same day, Cui emailed Ald. Burke about representation in his property tax appeals. Ald. Burke's argument that this email would be inadmissible in a separate trial of Ald. Burke is insufficient to warrant a separate trial. There is at least a colorable argument that Cui's statements could be admissible as to Ald. Burke as non-hearsay through the co-conspirator exception. See Fed. R. Evidence 801(d)(2)(E).

Finally, it is true that the allegations against Cui and Ald. Burke involve similar facts that might risk confusion among the jury (for example, both the Old Post Office developers and Cui sought TIF financing from Ald. Burke's committee).  See [111 at ¶ 17].  But, as noted above, at the end of the day, the episodes are straightforward and discrete enough that it should be "fairly easy for the jury to compartmentalize the evidence."  See *White*, 737 F.3d at 1133.

****

The Court therefore denies Defendants' motions for severance [86, 87, 96, 111, 112, 114]. However, to the extent Defendants seek severance under Rule 14, the motions are denied without prejudice.  If Defendants so choose, they may seek relief under Rule 14 closer to trial with the benefit of further factual and legal developments.

## X.     Motion to Strike Surplusage [110]

Ald. Burke also moves [110] under Federal Rule of Criminal Procedure 7(d) to strike as surplusage two sets of allegations.  First, he asks the Court to strike a reference in Count One, Paragraph Eleven as highly prejudicial.  [110 (Ald. Edward M. Burke's Mot. to Strike Prejudicial Surplusage from the Indictment ("Burke's Mot. to Strike Surplusage")) at 2].  Second, he requests that the Court eliminate the reference to Chicago's ethics ordinance in Count One, Paragraphs 1(u) and 78–80.  [*Id.* at 3].  Notwithstanding that Andrews has not been charged in Count One, he moves to adopt, asserting that the allegations may confuse and mislead the jury in regard to the charges against him.  [122 (Def. Andrews' Mot. to Adopt Pretrial Mots. Filed by Codefendant Burke)].  The Government disagrees with both requests, arguing that Rule 7(d) sets a high bar which these allegations do not clear.  [139 (Gov't Br.) at 214].

Neither of Ald. Burke's arguments are persuasive.  Below, the Court will consider each request, drawing on the same standard for a motion to strike under Rule 7(d), cited in Part III.B

183

above. See, *e.g.*, *United States v. Peters*, 435 F.3d 746, 753 (7th Cir. 2006) ("Surplusage should not be stricken unless 'it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial'").

### A.    Reference to Jewish Lawyers

Recall that Count One of the Superseding Indictment ("Indictment") [30] describes Ald. Burke's and Solis's alleged efforts to solicit Company A as a client of Klafter & Burke. According to the Indictment, on December 22, 2016, Ald. Burke updated Ald. Solis on the information he had gathered from an Amtrak employee. During that conversation, Ald. Burke remarked that he:

> had not been hired yet by Company A, and that Company A had additional properties in the Chicago area. [Burke] also communicated his belief that Individual A-1 and Company A would hire [Burke's] private law firm, Klafter & Burke, to perform tax work only if there was something [Burke] could do to assist Individual A-1 and Company A, by explaining that [Burke] believed that they would otherwise only work with Jewish lawyers to the exclusion of everybody else.

[30 (Indictment) at ¶ 11].

The Court denies Ald. Burke's first request because the allegations are directly relevant to Ald. Burke's mindset, *i.e.*, whether he had intent to take official action in exchange for Company A hiring his law firm. The Indictment alleges that Ald. Burke made the comment in the context of discussing what official actions he and Ald. Solis could take to sweeten the deal for Company A. The Government has stated that it anticipates that Ald. Solis will testify that he understood Ald. Burke to mean that Individual A-1 (who is Jewish) would only hire Ald. Burke (who is Christian) if Burke benefitted Individual A-1 with an official act. That Ald. Burke believed Company A was prone to hire a Jewish tax attorney unless he offered more, *i.e.*, assistance with Amtrak, goes to the heart of whether he intended to engage in a *quid pro quo*. For that reason, Ald. Burke's argument that the Court should strike Paragraph Eleven's reference to Jewish lawyers

as "plainly not relevant" with "no bearing on whether he committed the charged crimes" is not convincing.  [110 (Burke's Mot. to Strike Surplusage) at 2–3].

To be sure, the Court acknowledges Ald. Burke's argument that the comment in question is prejudicial.  It goes to, in his words, "the sensitive subject matter of religious identity" with "undercurrents of stereotyping and tribalism" and could therefore inflame the jury.  [110 (Burke's Mot. to Strike Surplusage) at 2–3].  But the statement is highly probative of Ald. Burke's intent to enter a *quid pro quo* (which Ald. Burke views as an essential element of the predicate racketeering activity and surely will request in a future jury instruction), which outweighs Ald. Burke's risk of embarrassment.   Ald. Burke's risk of embarrassment certainly does not meet the "exacting" standard for Rule 7(d) relief at this juncture.  The Court, however, grants Ald. Burke leave to raise this issue at a later date in the event that discovery unearths more evidence that he thinks affects the calculus on Rule 7(d) or in a motion in limine closer to trial.

### B.    Chicago Ethics Ordinance

The Court next turns to Ald. Burke's second request that the Court strike Count One, Paragraph 1(u), which recites subsections (a) and (b) of § 2-156-030 of the City of Chicago Ethics Ordinance.  See [110 (Burke's Mot. to Strike Surplusage) at 3; 30 (Indictment) at Count 1, ¶ 1(u)]. The Court denies this request as well.  The ethics ordinance provisions are relevant to the state-law predicate acts for the RICO racketeering activity.  Specifically, the Indictment charges that Ald. Burke violated the Illinois bribery and official misconduct statutes.  In relevant part, those statutes prohibit a public official from knowingly accepting a fee or reward "not authorized by law," 720 ILCS 5/33-3(a)(4), and from accepting property or personal advantage that the official "is not authorized by law to accept," 720 ILCS 5/33-1(d).  The Court agrees with the Government that the ethics ordinance bears directly on whether Ald. Burke's attempts or success in soliciting

legal fees were, in fact, "authorized by law." *Cf. United States v. Sorich*, 427 F. Supp. 2d 820, 834 (N.D. Ill. 2006), *aff'd*, 523 F.3d 702 (7th Cir. 2008) (approving reference to Chicago Governmental Ethics Ordinance as one source of defendant's fiduciary duties in honest services fraud indictment). Stated differently, the provisions cited "supplied one source of legal authority that barred Burke from accepting legal fees in exchange for taking action as an Alderman." [139 (Gov't Br.) at 217].

Granted, Ald. Burke is not charged with violating the Chicago ethics ordinance § 2-156-030. Nevertheless, based on what the Court presently understands about this case, the relevance of the provision far outweighs the risk of juror confusion. In fact, Ald. Burke's own pretrial motions undercut his position that the ordinance "has no relevance to the Government's charge" for two reasons. [110 (Burke's Mot. to Strike Surplusage) at 3]. First, Ald. Burke elsewhere in these consolidated pretrial motions relies on the ordinance to claim the allegations fail to state a claim. See [89 (Cui MTD Counts 12–15 Br.) at 18–22; 121 (Burke Mot. to Adopt) at ¶ 2] (seeking to strike Illinois state bribery and official misconduct predicates because he "did not promise or tender to Mr. Burke anything that Mr. Burke was not authorized by law to accept" under the very same Chicago Municipal Code now at issue here). Second, he complains that the Illinois state bribery and official misconduct statutes violate the United States Constitution because they are impermissibly vague. See [107 (Burke State Bribery Br.) at 46] (arguing that the official misconduct statute is void-for-vagueness in part because an illegal bribe or gratuity will automatically not be "authorized by law"). Yet now he seeks to strike the very system of state regulation that provides him the clarity he seeks. He cannot have it both ways.

### XI.    Motion for Disclosure of Evidence [117]

Finally, the Court turns to Defendant Andrews's motion to compel production from the Government [117] with respect to Count Ten.  The allegations of Count Ten flow from an interview conducted by the FBI on November 29, 2018.  Following a multi-year investigation, the FBI approached Andrews to conduct an interview.  [139 (Gov't Br.) at 219].  The FBI agents asked Andrews about his involvement in a scheme to extort Company B.  [*Id.* at 219].  The Government alleges that Andrews provided false responses during the interview and charged him with making false statements in violation of 18 U.S.C. § 1001(a)(2).  See [30 (Indictment) at Count 10].

Andrews moves to compel production of communications among agents and between agents and prosecutors.  [117 (Def. Andrews's Mot. for Disclosure of Favorable Evidence Related to "Materiality" ("Andrews Disclosure Mot.")) at ¶ 20].  He seeks evidence and information that relate to the requirement that the Government prove his statements were "material," which is a necessary element of an 18 U.S.C. § 1001(a)(2) violation.  [*Id.* at ¶¶ 1–2].  He therefore asks this Court to compel the Government to search for and disclose "internal communications between agents, between agents and supervisors or analysts, between agents and prosecutors, prosecutors and supervisors, and any other government officials" [*id.* at ¶ 3], related to:

> (1) the decision to interview Andrews; (2) the purpose of the interview; (3) Information hoped to be gained by the interview; (4) the decision to record the interview; (5) the type of questions to be asked; (6) the manner of questioning; (7) the state of the [G]overnment's investigation at the time of the interview; (8) the decision regarding which photographs to display to Andrews; (9) whether the agents intended to be truthful or deceptive in their statements to Andrews; (1) whether the interview was intended and designed to produce information or whether it was intended and designed in the hopes of producing a statement usable in an 18 U.S.C. § 1001 prosecution.

See [117 at ¶ 2] (referencing list of questions from [117-1 (Andrews Disclosure Mot.), Ex. A (May 2020 Letter) at 1]).  The Government opposes Andrews's motion in full.  [139 (Gov't Br.) at 219].

The thrust of Andrews's motion is that the FBI set out on a "fishing expedition" when it interviewed him in November 2018.  [117 (Andrews Disclosure Mot.) at ¶ 8].  According to Andrews, the interview was "not designed to obtain evidence that would be material to the [G]overnment's investigation, but rather was a means of obtaining a statement from Andrews that the [G]overnment could charge under § 1001." [*Id.* at ¶ 14].  In support of this theory, he contends that the FBI's questioning about the identity of Andrews's victims (asking Andrews to identify photos of Individuals B-1 and B-2) and whether Andrews and Ald. Burke had ever met with the victims had "no utility to the [G]overnment's investigation" and "no apparent investigatory benefit." [*Id.* at ¶¶ 14–15].  Furthermore, he insists that the decision to record the interview is indicative that the FBI was "fishing" for Andrews to make a false statement.  [*Id.* at ¶¶ 16, 20].  Finally, he points to the fact that the Government used different tactics when agents met with Individuals B-1 and B-2 than those methods used during his interview.  [*Id.* at ¶¶ 17–18].  He would also like discovery regarding the FBI's and prosecutors' motives in interviewing him.  [*Id.* at ¶ 20].

Several principles govern a defendant's entitlement to discovery in criminal cases.  Rule 16(a) of the Federal Rules of Criminal Procedure requires the government to produce upon request documents and data "material to preparing the defense."  See *id.* at 16(a)(1)(E)(i).  Documents are material if they would enable the defendant to "substantially alter the quantum of proof in his favor."  *United States v. Orzechowski*, 547 F.2d 978, 984 (7th Cir. 1976).  Several limitations curb Rule 16(a).  Those limitations include Federal Rule of Criminal Procedure 16(a)(2)'s exclusion of "the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case."

To be sure, the government has discovery obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), the Jencks Act, and 18 U.S.C. § 3500. The government's *Brady* obligations, largely co-extensive with its Rule 16 obligations, are limited to material documents and information. *Brady* "does not grant criminal defendants unfettered access to government files" just because the defense believes they may contain helpful materials. *United States v. Jumah*, 599 F.3d 799, 809 (7th Cir. 2010) (quoting *Phillips*, 854 F.2d at 278). See also *United States v. Baker*, 453 F.3d 419, 422–23 (7th Cir. 2006) ("[E]vidence is material under *Brady* only if there exists a 'reasonable probability' that its disclosure to the defense would have changed the result of the trial") (quoting *United States v. Gillaum*, 372 F.3d 848, 858 (7th Cir. 2004)).

The Government and Andrews both float the possibility of subjecting the materials to an *in camera* inspection (although Andrews suggests his own lawyers would be in a better position than this Court to perform that function). "[T]o obtain an *in camera* inspection from the district court, the defendant must 'at least make some plausible showing' that documents in the government's possession contain information 'both material and favorable to his defense.'" *Jumah*, 599 F.3d at 809–810 (quoting *United States v. Ritchie*, 480 U.S. 39, 58 n.15 (1987)). See also *United States v. Roberts*, 534 F.3d 560, 572 (7th Cir. 2008) ("[M]ere speculation that a government file may contain *Brady* material is not sufficient to require a remand for *in camera* inspection, much less reversal for a new trial" (quoting *United States v. Mitchell*, 178 F.3d 904, 907 (7th Cir. 2008)). And "the decision whether to review purported *Brady* materials in camera is entrusted to the district court's sound discretion," and has "no general independent duty to review government files for potential *Brady* material." *United States v. Bland*, 517 F.3d 930, 935 (7th Cir. 2008). This standard "balances the defendant's important need for access to potentially

relevant material with the Government's valid interest in protecting confidential files and the integrity of pending investigations." *Jumah*, 599 F.3d at 810.

The Court declines Andrews's requests for two reasons. First, the information Andrews seeks is protected by the attorney work-product doctrine. The requests enumerated above seek information at the heart of the work-product doctrine, including mental impressions, personal beliefs about investigative tactics, and deliberative discussions.

Second, even if the discovery Andrews seeks were not privileged, Andrews does not seek material information. As the Seventh Circuit explained in *United States v. Lupton*,

> To be "material" for purposes of 18 U.S.C. § 1001, a statement "must have a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed." We do not require the statement to actually influence the agency to which it was directed, or even that the agency rely on the statement in any way. * * * * Instead, we have recognized, like many of our sister circuits, that a frequent aim of false statements made to federal investigators is to cast suspicion away from the declarant, "which in the ordinary course would have an intrinsic capability * * * to influence an FBI investigation."

620 F.3d 790, 806–07 (7th Cir. 2010) (internal citations omitted) (quoting *United States v. Turner*, 551 F.3d 657, 663–64 (7th Cir. 2008)).

The Government has assured the Court that it has reviewed all potentially responsive material and found that "none are even arguably exculpatory." [139 (Gov't Br.) at 224]. This is a difficult assessment to make so early in the case, but Andrews carries the burden of providing a reason to think the documents he seeks could exculpate him on any element of the § 1001 charge. He has not met that burden. The most Andrews has advanced is the fact that the FBI agents recorded the interview and asked different questions of the perpetrator than his victims. Andrews's conjecture and "mere speculation that a government file may contain *Brady* material is not sufficient." *Roberts*, 534 F.3d at 572.

As the Government points out, Andrews's statements that he did not know the victims was capable of affecting the FBI's investigation into Andrews's and Burke's alleged extortion scheme, and that is all that is required. For example, the jury could, but need not, find that Andrews intended to direct the FBI's attention away from him. See *Lupton*, 620 F.3d at 806–07 ("When statements are aimed at misdirecting agents and their investigation, even if they miss spectacularly or stand absolutely no chance of succeeding, they satisfy the materiality requirement of 18 U.S.C. § 1001"). Nor does it alter the equation that the FBI knew Andrews's statements were not the truth based on prior investigation, as the Seventh Circuit "do[es] not require the statement to actually influence the agency to which it was directed, or even that the agency rely on the statement in any way" so long as it is *capable* of affecting the course of the investigation. See *id.* at 806.

Andrews's reliance on the Government's decision to move to dismiss the criminal information in *United States v. Michael T. Flynn*, Crim No. 17-232, dkt No. 198, at 1–2 (D.D.C.), is a stretch to say the least. See [117-2 (Ex. B, Gov't's Mot. to Dismiss the Criminal Information Against the Def. Michael T. Flynn)]. The *Flynn* discussion is inapposite. Among other distinctions from those extraordinary circumstances, the *sole* charge against Flynn was the false statement count. [139 (Gov't Br.) at 225]. Here, unlike in *Flynn*, Andrews has given this Court zero reason to believe the Government had "no basis 'to predicate further investigative efforts' into whether [Andrews]" had committed a crime, which was the subject of the Government's investigation, well prior to approaching Andrews. [117-2 at 2]. Rather, the Government had intercepted communications, surveillance, and documentary evidence which provided a "predicate" for further investigation, and a truthful interview could have provided the details of the extortion. Accordingly, Andrews has given the Court no reason to suspect that the Government

191

undertook a fishing expedition when it approached Andrews. Nor has Andrews satisfied his prima facie obligation to show that the documents here could be exculpatory.

In sum, Federal Rule of Criminal Procedure 16(a)(2) protects attorney work-product that is not exculpatory, and Andrews has not given this Court any reason to believe that the information he has requested is exculpatory and material to the § 1001 charge.[49]

## XII.  Conclusion

The Court recognizes, as all Defendants point out, that the Supreme Court's unanimous decision in *McDonnell v. United States*, 579 U.S. 550 (2016), circumscribes bribery law. In fact, *McDonnell* is part of a larger trend in which the Supreme Court and circuit courts of appeals have grappled with striking a balance between society's interest in preventing the corruption of public institutions on the one hand and the sanctity of free speech and the drawing of clear, understandable lines on the other, so that public officials have fair notice of the type of conduct that crosses the line. Of course, *McDonnell* was issued in June 2016. It was a much-anticipated decision that undoubtedly caught the eye of prosecutors, defense lawyers, and federal judges on the day it was

---

[49] At oral argument, Andrews raised whether a model order issued by the Seventh Circuit expanded the definition of *Brady* pursuant to the enactment of the Due Process Protections Act of 2020 (the "DPPA"), which amends Rule 5(f) of the Federal Rule of Criminal Procedure. See Fed. R. Crim. P. 5(f). According to Andrews, Rule 5(f) lowered the standard disclosure standard, such that "favorable evidence under *Brady* need have only some weight, and includes both exculpatory and impeaching." [182 (Feb. 2002 Hr'g Tr.) at 31:24–25]. The Government disagrees that the DPPA has changed the law substantively, and the parties seem to agree that there is not yet any case applying the amendment. [*Id.* at 63:18–22; 84:1–3]. At the last status hearing, the parties submitted, and the Court entered, an order [195] acknowledging the Government's obligations under the DPPA, which went into effect more than a year after the commencement of this case. At present, the Court concludes that Andrews has not carried his burden of showing that the undisclosed evidence has "some weight" towards proving materiality. However, the parties and the Court will need to remain vigilant going forward with respect to any guidance from the Supreme Court, the Seventh Circuit, or Congress on the obligations imposed by the DPPA, and if (a) Andrews is right that the standard has in fact changed substantively (not just procedurally), and (b) the Government has not met its full disclosure obligations under any new case law that may emerge, then (c) it will be incumbent on the Government to ensure that its disclosures do conform to the current state of the law.

issued.[50]  And, as best the Court can tell from the evidence revealed thus far in the case, *McDonnell* preceded all of the recorded conversations involving any of the Defendants in this case.  In other words, the Government was well aware of *McDonnell* as the investigation unfolded and certainly at the time that the charging decisions were made.

McDonnell and its progeny clearly will remain a focus of the case going forward.  With that said, given the allegations now known to the Court and applying the legal standards under the rules and controlling case law, including *McDonnell*, Defendants have not advanced any convincing argument for tossing any counts of the Superseding Indictment ("Indictment") or suppressing evidence gathered lawfully with permission from the Chief Judge based on an adequate showing of probable cause.  Indeed, with the notable exception of the constitutional challenges addressed above, Defendants' arguments principally challenge the weight of the evidence, not whether the Indictment states an offense.  Many of the arguments also highlight the need for painstaking clarity in regard to jury instructions in this case, both to account for the number and the nature of the charges and the multiple defendants. See *Federal Corruption Statutes—Bribery—Definition of "Official Act"*—McDonnell v. United States, 130 Harv. L. Rev.

---

[50] See, *e.g.*, Adam Liptak, *Supreme Court Vacates Ex-Virginia Governor's Graft Conviction*, NY Times, https://www.nytimes.com/2016/06/28/us/politics/supreme-court-bob-mcdonnell-virginia.html (June 27, 2016); *McDonnell v. United States*, SCOTUSblog, https://www.scotusblog.com/case-files/cases/mcdonnell-v-united-states/ (last visited June 2, 2022) (collecting SCOTUSblog coverage); Randall D. Eliason, *McDonnell v. United States: A Cramped Vision of Public Corruption*, On the Docket: Oct. Term 2015, G.W. L. Rev. (July 2, 2016), https://www.gwlr.org/mcdonnell-v-united-states-a-cramped-vision-of-public-corruption/; *Statutory Interpretation*: McDonnell v. United States, 130 Harv. L. Rev. 467 (Nov. 10, 2016) https://www.nytimes.com/2016/06/28/us/politics/supreme-court-bob-mcdonnell-virginia.html; Gregory M. Gilchrist, *Corruption Law After* McDonnell: *Not Dead Yet*, 165 U. Pa. L. Rev. Online 11, 15 (2016), Matt Ford, *Has the Supreme Court Legalized Public Corruption?*, The Atlantic (Oct. 19, 2017) https://www.theatlantic.com/politics/archive/2017/10/menendez-mcdonnell-supreme-court/543354/, (describing *McDonnell*'s "impact quickly reverberat[ing] through other public-corruption cases, including two high-profile prosecutions in New York"); Nick Corasaniti, *Overturned Convictions Loom Over Mendez's Corruption Trial*, NYTimes (Sept. 27, 2017) https://www.nytimes.com/2017/09/27/nyregion/overturned-convictions-loom-over-menendezs-corruption-trial.html.

467 (2016) ("*McDonnell* may best be understood as revising jury instructions rather than rewriting what constitutes corruption itself"). At later stages of the case, the Court will rule on motions in limine, develop (with the input of counsel) proper jury instructions, and ensure that this case is resolved properly under the Federal Rules of Criminal Procedure, the Federal Rules of Evidence, the statutes implicated, and the controlling case law. If appropriate, the Court will revisit any questions about the propriety of placing certain evidence and certain allegations before the jury. The Court will also consider anew whether any stronger arguments for severance have emerged. At present, however, all of the charges and all of the evidence remain in the case and on course to be decided at a single jury trial.

For the reasons stated above, the Court denies Defendants Ald. Burke's, Andrews's, and Cui's motions [86, 88, 95, 96, 98, 99, 101, 103, 104, 106, 108, 109, 110, 111, 112, 114, 117], with the limited exception that the Court has granted Defendant Ald. Burke's and Andrews's respective motions to adopt [121, 122] for the purposes of this opinion. The motions to sever are denied without prejudice and with leave to refile at a later stage of the case.