UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DISTRICT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 19 CR 322 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| EDWARD M. BURKE, | ) | |
| PETER J. ANDREWS, and | ) | |
| CHARLES CUI | ) | |

**GOVERNMENT'S SANTIAGO PROFFER AND MOTION TO ADMIT
EVIDENCE PURSUANT TO FEDERAL RULE OF EVIDENCE 801(D)(2)(E)**

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:     /s/ *Sarah Streicker*
AMARJEET BHACHU
DIANE MacARTHUR
SARAH STREICKER
TIMOTHY CHAPMAN
SUSHMA RAJU
Assistant United States Attorneys
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 353-5300

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

I.  Introduction .............................................................................................. 1

    A.  Factual Background ............................................................................ 2

    B.  The Superseding Indictment ............................................................. 5

II. Applicable Law ......................................................................................... 5

    A.  Existence of and Membership in the Conspiracy .............................. 6

    B.  In Furtherance of the Conspiracy ................................................... 10

    C.  Alternative Bases for Admissibility of Statements ........................ 12

        1.  A Defendant's Own Statements ............................................... 12

        2.  Non-Hearsay Statements ......................................................... 13

        3.  Statements Against Penal Interest .......................................... 14

        4.  Statements of an Agent/Employee ........................................... 15

        5.  Coconspirator Statements after *Crawford* ............................. 16

III. Evidence Demonstrating The Existence Of The Conspiracy And Burke's And Andrews' Participation In The Conspiracy ..................................................... 17

    A.  Anticipated Testimony ..................................................................... 18

        1.  Individual B-1 ........................................................................... 18

        2.  Individual B-2 ........................................................................... 24

        3.  Individual B-3 ........................................................................... 30

        4.  Architect B-1 ............................................................................ 35

        5.  DOB Employee 2 ....................................................................... 46

        6.  CDOT Employee 1 ..................................................................... 47

        7.  City of Chicago Witnesses ........................................................ 48

    B.  Wiretap Communications .................................................................. 50

C.     Documentary Evidence ............................................................ 64

    1.     Documents Obtained by Search Warrant................................. 64

    2.     Emails and Other Documents.................................................. 67

IV.    Coconspirator Statements ........................................................... 71

V.    Conclusion ................................................................................... 74

# TABLE OF AUTHORITIES

## Cases

*Beeson v. United States*, 90 F.2d 720 (7th Cir. 1937) .................................................. 12

*Bourjaily v. United States*, 483 U.S. 171 (1987) ...................................................... 6, 7

*Crawford v. Washington*, 541 U.S. 36 (2004) ......................................................... 6, 16

*Davis v. Washington*, 547 U.S. 813 (2006) ................................................................ 6

*Garlington v. O(Leary*, 879 F.2d 277 (7th Cir. 1989) ................................................ 12

*Salinas v. United States*, 522 U.S. 52 (1997) ............................................................. 9

*United States v. Alviar*, 573 F.3d 526 (7th Cir. 2009) ...................................... 1, 6, 11

*United States v. Ashman*, 979 F.2d 469 (7th Cir. 1992) ............................................ 12

*United States v. Ayala*, 601 F.3d 256 (4th Cir. 2010) ............................................... 10

*United States v. Bolivar*, 532 F.3d 599 (7th Cir. 2008) ............................................ 10

*United States v. Bustamante*, 493 F.3d 879 (7th Cir. 2007) ..................................... 11

*United States v. Coe*, 718 F.2d 830 (7th Cir. 1983) ................................................... 8

*United States v. Cox*, 923 F.2d 519 (7th Cir. 1991) ................................................. 11

*United States v. Cozzo*, 2004 WL 1151630 (N.D. Ill. 2004) ....................................... 10

*United States v. Cruz-Rea*, 626 F.3d 929 (7th Cir. 2010) ................................. 6, 10, 11

*United States v. Curry*, 977 F.2d 1042 (7th Cir. 1992) .............................................. 15

*United States v. Curtis*, 324 F.3d 501 (7th Cir. 2003) ................................................ 9

*United States v. Curtis*, 37 F.3d 301 (7th Cir. 1994) ................................................. 12

*United States v. Feldman*, 825 F.2d 124 (7th Cir. 1987) ............................................ 9

*United States v. Gajo*, 290 F.3d 922 (7th Cir. 2002) ........................................... 11, 14

*United States v. Gaytan*, 649 F.3d 573 (7th Cir. 2011) ............................................ 13

*United States v. Gil*, 604 F.2d 546 (7th Cir. 1979) .................................................... 8

*United States v. Godinez*, 110 F.3d 448 (7th Cir. 1997) ............................................. 13

*United States v. Guyton*, 36 F.3d 655 (7th Cir. 1994) ................................................. 8

*United States v. Hamilton*, 19 F.3d 350 (7th Cir. 1994)............................................ 15

*United States v. Handlin*, 366 F.3d 584 (7th Cir. 2004) ............................................. 9

*United States v. Hargrove*, 508 F.3d 445 (7th Cir. 2007) ....................................... 6, 16

*United States v. Harris*, 585 F.3d 394 (7th Cir. 2009) ........................................... 1, 7

*United States v. Haynes*, 582 F.3d 686 (7th Cir. 2009) ............................................. 11

*United States v. Herrera-Medina*, 853 F.2d 564 (7th Cir. 1988)........................... 8, 14

*United States v. Hoover*, 246 F.3d 1054 (7th Cir. 2001) ............................................. 6

*United States v. Irorere*, 228 F.3d 816 (7th Cir. 2000) ............................................. 8

*United States v. Johnson*, 200 F.3d 529 (7th Cir. 2000)..................................... 10, 11

*United States v. Johnson*, 592 F.3d 749 (7th Cir. 2010)............................................. 8

*United States v. Johnson*, No. 08 CR 466, 2011 WL 809194 (N.D. Ill. Mar. 2, 2011)71

*United States v. Jones*, 275 F.3d 648 (7th Cir. 2001) ................................................. 9

*United States v. Kaden*, 819 F.2d 813 (7th Cir. 1987)............................................... 11

*United States v. Lewis*, 641 F.3d 773 (7th Cir. 2011) ............................................... 14

*United States v. Lindemann*, 85 F.3d 1232 (7th Cir. 1996) ...................................... 12

*United States v. Longstreet*, 567 F.3d 911 (7th Cir. 2009) .......................................... 9

*United States v. Loscalzo*, 18 F.3d 374 (7th Cir. 1994) .............................................. 7

*United States v. Mahkimetas*, 991 F.2d 379 (7th Cir. 1993) ..................................... 10

*United States v. Maholias*, 985 F.2d 869 (7th Cir. 1993) .......................................... 12

*United States v. Maloney*, 71 F.3d 645 (7th Cir. 1995) ............................................. 11

*United States v. Martinez de Ortiz*, 907 F.2d 629 (7th Cir. 1990) .............................. 7

*United States v. McClellan*, 165 F.3d 535 (7th Cir. 1999) ........................................ 71

*United States v. Molinaro*, 877 F.2d 1341 (7th Cir. 1989) .......................................... 11

*United States v. Molt*, 772 F.2d 366 (7th Cir. 1985) .................................................... 11

*United States v. Montana*, 199 F.3d 947 (7th Cir. 1999) ....................................... 14, 16

*United States v. Monus*, 128 F.3d 376 (6th Cir. 1997) ............................................... 11

*United States v. Nagib*, 56 F.3d 798 (7th Cir. 1995) ................................................... 15

*United States v. Nicksion*, 628 F.3d 368 (7th Cir. 2010) ....................................... 6, 16

*United States v. Noble*, 754 F.2d 1324 (7th Cir. 1985) .................................................. 9

*United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977) ............................................ 6

*United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008) ................................................. 12

*United States v. Rea*, 621 F.3d 595 (7th Cir. 2010) ..................................................... 11

*United States v. Rivera*, 136 F. App'x 925 (7th Cir. 2005) ......................................... 12

*United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978) ........................................ 1, 6

*United States v. Smalls*, 605 F.3d 765 (10th Cir. 2010) ............................................. 15

*United States v. Sophie*, 900 F.2d 1064 (7th Cir. 1990) ................................... 9, 11, 12

*United States v. Stephenson*, 53 F.3d 836 (7th Cir. 1995) .......................................... 12

*United States v. Thompson*, 944 F.2d 1331 (7th Cir. 1991) .......................................... 6

*United States v. Tuchow*, 768 F.2d 855 (7th Cir. 1985) ................................... 8, 13, 14

*United States v. Van Daal Wyk*, 840 F.2d 494 (7th Cir. 1988) ........................ 8, 11, 14

*United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014) ............................... 15, 17

*United States v. Watson*, 525 F.3d 583 (7th Cir. 2008) .............................................. 15

*United States v. Westmoreland*, 240 F.3d 618 (7th Cir. 2001) ................................... 15

Statutes

18 U.S.C. § 1001(a)(2) ................................................................................................. 65

18 U.S.C. § 1951(a) ........................................................................................................ 5

Rules

Fed. R. Evid. 104(a) ................................................................................................ 1

Fed. R. Evid. 801(a) .............................................................................................. 13

Fed. R. Evid. 801(d)(2)(A) .................................................................................... 13

Fed. R. Evid. 801(d)(2)(E) .................................................................................... 73

Fed. R. Evid. 804(b)(3) ......................................................................................... 14

The United States of America, by its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, submits the following proffer of evidence as to the admission at trial of certain coconspirator statements against defendants Edward Burke and Peter Andrews and moves for the admission of such statements pursuant to Federal Rules of Evidence 104(a) and 801(d)(2)(E), and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

## I.    Introduction

In this submission, the government describes the law governing coconspirator statements, outlines some of its evidence establishing the conspiracy between Burke and Andrews to obtain fees arising out of legal business for Burke's private law firm induced by the wrongful use of actual and threatened economic fear and by color of official right, and sets forth some of the coconspirator statements for which a pretrial ruling by the Court is requested, in accordance with *Santiago*, 582 F.2d at 1130-31, and established practice in this Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris,* 585 F.3d 394, 398, 400 (7th Cir. 2009).

This submission does not detail all of the government's evidence that would establish the existence of the conspiracy or all of the coconspirator statements made in furtherance of the conspiracy. Rather, this submission highlights for the Court certain of the government's evidence sufficient to establish the existence of the conspiracy and the participation of the coconspirators. As a result, this submission does not list all of the government's evidence and witnesses. Finally, by presenting statements attributed to particular witnesses, the government is not committing to call each of the witnesses for each of the statements attributed.

A.     **Factual Background**

Defendant Edward Burke was Alderman of the 14th Ward for more than 50 years (1969 – 2023), a member of Chicago's City Council, and Chairman of the City Council's Committee on Finance. R. 30 ¶ 1g. Burke was also a lawyer and proprietor of his own law firm, Klafter & Burke, which specialized in contesting tax assessments made on real property. *Id.* ¶ 1h. Defendant Peter Andrews worked for Burke in Burke's ward office. *Id.* ¶ 1n. Defendant Charles Cui was a managing member of Company C, which owned property in Chicago. *Id.* ¶¶ 1o, 1p. Cui retained Klafter & Burke after the City denied a permit application for one of Company C's properties. *Id.* ¶¶ 51, 52, 57, 58, 64.

Between no later than 2016 and continuing through 2018, Burke used his positions as Alderman and Chairman of the Committee on Finance to solicit, attempt to solicit, and receive bribes from parties having business with the City of Chicago or subject to Burke's and fellow Alderman Daniel Solis's authority[1] as Aldermen. R. 30 ¶¶ 3, 4. Burke received and solicited these bribes in the form of fees arising from the retention of Klafter & Burke, as well as through private benefits for Burke's associates. *Id.* ¶ 4. Count One of the superseding indictment charges Burke with racketeering, and alleges that he engaged in five racketeering acts, a subsidiary conspiracy, and substantive offenses that center around the following four episodes:

(1)     Burke's repeated efforts to shakedown the developer of the Old Post Office in Chicago for legal work for his law firm;

---

[1]     Solis was identified as Alderman A in the superseding indictment.

(2)     Burke's and Andrew's efforts to shakedown the owners of fast-food restaurants, including a fast-food restaurant in Burke's ward, again for work for Burke's law firm;

(3)     Burke's acceptance of legal work from Cui, which was corruptly directed to Burke's law firm in return for his official assistance in obtaining a permit for Cui's business; and

(4)     Burke's attempt to extort a local museum in order to obtain a job for the child of a personal acquaintance.

The government seeks to admit co-conspirator statements as to the fast-food restaurant shakedown. The factual background regarding this corrupt activity is summarized below.[2]

### Fast-food Restaurant Shakedown

Burke used his position as Alderman to corruptly solicit and extort legal business from Company B in return for Burke's support for a building permit and related driveway permit for a fast-food restaurant located on South Pulaski Road in Burke's ward (the "restaurant"). R. 30 ¶ 33.

As set forth below, in May 2017, Individual B-1, an executive of Company B, sought Burke's official assistance with obtaining a building permit for the restaurant. *Id.* ¶ 34. Burke suggested meeting with Individual B-2, an employee of Company B, to discuss the permit and another restaurant-related matter. *Id.* On June 8, 2017, Burke directed a member of his Aldermanic staff to contact his law firm, Klafter & Burke, to find out who had represented Company B on tax assessment work. *Id.* ¶ 35.

---

[2]     For a summary of the facts underlying all five racketeering acts and the other offenses charged in the superseding indictment, please see the Government's Consolidated Response to Defendants' Pretrial Motions, R. 139 (under seal) and 140 (redacted version publicly filed), and the Court's Memorandum Opinion & Order denying defendants' pretrial motions, R. 196.

Two days later, Burke told a public official familiar with Individual B-1 that Burke wanted to get legal business from Individual B-1; the public official promised to impress upon Individual B-1 Burke's importance. *Id.* ¶ 36.

On June 14, 2017, Burke and Andrews met Individuals B-1 and B-2 at the restaurant. R. 30 ¶ 37. Burke then took Individuals B-1 and B-2 out to lunch for the purpose of soliciting tax work from them. *Id.* On June 27, 2017, while on the telephone with Individual B-2, Burke attempted to obtain legal business by tying his official assistance on the permit request to providing his law firm with tax business. *Id.* ¶ 38.

Company B received building permits in June 2017 and September 2017. R. 30 ¶ 39. But, by October 2017, Company B had not yet provided Klafter & Burke with any tax business. *Id.* ¶¶ 39, 40. On October 24, 2017, Burke and Andrews agreed that Andrews would take action to interfere with the operations of the restaurant on the pretext that the restaurant did not have a driveway permit, due to the failure of Company B to provide Burke's firm with tax work. *Id.* ¶ 40. The same day, Andrews told an employee of Company B to shut down the restaurant's remodeling work. *Id.* ¶ 41. The remodeling work came to a stop, which Andrews reported to Burke on October 25, 2017. *Id.* ¶¶ 41-42. Burke and Andrews agreed that Andrews would play "hard ball" with Company B. *Id.*

On November 14, 2017, Company B applied for a driveway permit for three pre-existing driveways adjacent to the fast-food restaurant. R. 30 ¶ 44. Burke caused members of his staff, including Andrews, to obstruct approval of the application. *Id.* On December 12, 2017, Individuals B-1 and B-2 met with Burke in an effort to get

Burke to agree to the continuation of the remodeling project, and at that very same meeting, Burke asked why he had not received the tax business. *Id.* ¶ 45. Individual B-1 related that Individual B-1 had asked a representative of Company B to get the process started to hire Burke's law firm. *Id.* Burke said he would try to get the remodeling project restarted again. *Id.*

On December 13, 2017, at Burke's direction, Burke's assistant sent an email to a representative of Company B for the purpose of arranging tax work for Klafter & Burke. R. 30 ¶ 46. The same day, Andrews advised Company B that the issues with the driveway permit had been cleared up. *Id.* ¶ 47. On December 19, 2017, at Burke's direction, Burke's assistant sent another email to a Company B representative stating that Burke should receive the tax business for all of Company B's Illinois locations. *Id.* ¶ 48. The same day, CDOT approved Company B's driveway permit application, and the permit was issued several weeks later. *Id.* ¶ 49.

### B.    The Superseding Indictment

Racketeering Act Three and Counts Five through Ten of the superseding indictment involve charges related to the fast-food restaurant shakedown. In particular, in Counts Five and Six, Burke and Andrews are charged with attempted extortion and extortion conspiracy, respectively, in violation of 18 U.S.C. § 1951(a).

## II.    Applicable Law

Federal Rule of Evidence 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against an opposing party" and "was made by the party's coconspirator during and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government

5

establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[3]

### A. Existence of and Membership in the Conspiracy

In accord with *Santiago*, this Court must determine whether statements by the defendants' coconspirator will be admissible at trial under Rule 801(d)(2)(E). In making this determination, this Court must decide "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy . . . ." *Id*. at 1143 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If this Court determines the statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

Under *Santiago*, the government must make a preliminary offer of evidence to show: (1) a conspiracy existed; (2) the defendants and declarant were members of the conspiracy; and (3) the statements sought to be admitted were made during and in furtherance of the conspiracy. *Santiago*, 582 F.2d at 1134-35; *see also, e.g., United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009). According to *Bourjaily v. United*

---

[3] No Sixth Amendment confrontation issues arise by the use of a non-testifying coconspirator's statements, offered for their truth against a defendant because they are not testimonial. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006) and *Crawford v. Washington*, 541 U.S. 36 (2004)); *see also United States v. Hargrove*, 508 F.3d 445, 448-49 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial).

*States*, 483 U.S. 171, 176-81 (1987), the court can consider the statements in question (the statements to be admitted) to determine whether the three *Santiago* criteria have been met.

Seventh Circuit cases construing *Bourjaily* have held that properly admitted hearsay, including statements admitted under the coconspirator exception to the hearsay rule, may be used to prove what another person did or said that may demonstrate their membership in the conspiracy. *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of that defendant's acts or statements may be provided by the statements of co-conspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (*en banc*).

While this Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and the defendants' participation in it, *Bourjaily*, 483 U.S. at 178, 180; *United States v. Harris*, 585 F.3d 394, 398-99 (7th Cir. 2009), the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and a defendant's participation. *Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and a defendant's membership in it may be

either direct or circumstantial. *See United States v. Johnson,* 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).[4]

There is no requirement, under Rule 801(d)(2)(E), that the government establish all elements of a conspiracy, such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil*, 604 F.2d 546, 548-50 (7th Cir. 1979). The government need only establish the existence of a joint venture for an illegal purpose (or for a legal purpose using illegal means) and participation in the joint venture by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549-550; *see also Coe*, 718 F.2d at 835.

While there is thus a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiry. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the

---

[4]     The coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted. Accordingly, statements by coconspirators may be admitted against a defendant, without establishing the *Santiago* factual predicates set forth above, when such statements are offered to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that defendant out of cocaine not hearsay because showed membership in conspiracy); *United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988) (addressing "war stories" about the drug trade); *United States v. Van Daal Wyk*, 840 F.2d 494, 497-98 (7th Cir. 1988) (statements had non-hearsay value to establish knowledge of and membership in conspiracy); *United States v. Tuchow*, 768 F.2d 855, 867-69 (7th Cir. 1985) (pre-conspiracy statements admissible to set scope of anticipated conspiracy).

substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet,* 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met, or has agreed with every coconspirator. *Longstreet,* 567 F.3d at 919; *Jones*, 275 F.3d at 652.

A defendant (or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) ("it is irrelevant when the defendant joined the conspiracy so long as he joined it at some point"). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). A coconspirator who has become inactive or less active in the conspiracy nevertheless is liable for his coconspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

The government is not required to prove the identity of the declarant; nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar*, 532 F.3d 599, 604-05 (7th Cir. 2008). Rather, the government need only prove (from the statement, the context and/or other evidence) that the declarant was in fact a coconspirator. *Id.*

### B.      In Furtherance of the Conspiracy

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See Cruz-Rea,* 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Id.* at 937-38. The "coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator exception. *Id.* at 937 (quotations and citations omitted). That statements were made to a government cooperating witness or undercover agent does not bar admission of statements otherwise "in furtherance" of the conspiracy. *United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993); *see also United States v. Ayala,* 601 F.3d 256, 268 (4th Cir. 2010).

"Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, 2004 WL 1151630, at *2-3 (N.D. Ill. 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in

10

furtherance" requirement. *United States v. Alviar*, 573 F.3d 526, 545 (7th Cir. 2009) (quotations and citations omitted). *See also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

- to conduct or help to conduct the business of the conspiracy, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also Johnson*, 200 F.3d at 533;[5]

- to recruit potential coconspirators, *Cruz-Rea*, 626 F.3d at 937-38; *United States v. Haynes*, 582 F.3d 686, 705 (7th Cir. 2009), *abrogated on other grounds by United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012);

- to identify other members of the conspiracy and their roles, *Alviar*, 573 F.3d at 545;

- to plan or to review a coconspirator's exploits, *United States v. Molt*, 772 F.2d 366, 368-69 (7th Cir. 1985);

- as an assurance that a coconspirator can be trusted to perform his role, *United States v. Sophie*, 900 F.2d 1064, 1073-74 (7th Cir. 1990); *see also United States v. Bustamante*, 493 F.3d 879, 890-91 (7th Cir. 2007);

- to inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545;

- to control damage to an ongoing conspiracy, *Johnson,* 200 F.3d at 533; *United States v. Molinaro,* 877 F.2d 1341*,* 1343-44 (7th Cir. 1989)*; United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

- to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995);

---

[5]     Statements that prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. *See United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997).

- to reassure or calm the listener regarding the progress or stability of the conspiracy, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

- to report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008);

- to "describe[e] the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992); and

- statements to outsiders "to serve as a salesmanship technique to enhance his position in the eyes of [the outsider] and give confidence about the ability of the organization," *United States v. Stephenson*, 53 F.3d 836, 845 (7th Cir. 1995); *United States v. Curtis*, 37 F.3d 301, 308 (7th Cir. 1994).

Finally, it has long been the rule that any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *Beeson v. United States*, 90 F.2d 720 (7th Cir. 1937); *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera,* 136 F. App'x 925, 926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility.").

### C. Alternative Bases for Admissibility of Statements

Various statements made during the course of a conspiracy are independently admissible and do not require a Rule 801(d)(2)(E) analysis.

### 1. A Defendant's Own Statements

A defendant's own statements, for example, are admissible against him or her pursuant to Rule 801(d)(2)(A), without reference to the coconspirator statement rule. *See United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993). *See also*

Fed. R. Evid. 801(d)(2)(A) (providing that a "statement" is not hearsay if "[t]he statement is offered against a party and . . . was made by the party in an individual or representative capacity"). In addition, a defendant's own admissions are relevant to establish the factual predicates for the admission of coconspirator statements against him or her. *See United States v. Godinez*, 110 F.3d 448, 455 (7th Cir. 1997).

Moreover, statements during a conversation with a defendant that are offered by the government to provide context for a defendant's statements are, as a general matter, admissible as non-hearsay. For example, in *United States v. Gaytan*, 649 F.3d 573 (7th Cir. 2011), the Seventh Circuit addressed the district court's introduction of a confidential informant's recorded statements to the defendant. The Court held that the challenged statements were non-hearsay because they were offered not for their truth but to put the defendant's "own words in context and to help the jury make sense out of his reaction to what [the informant] said and did." *Id.* at 580 (defendant's responses "would have been unintelligible without the context provided by [the informant's] statements").

### 2. Non-Hearsay Statements

The coconspirator statement rule is not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification. An example would be an order or a suggestion. *See United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985). This is because a "statement" is defined as "an oral [or] written assertion" or "nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a). Thus, a statement that is incapable of verification—such as a suggestion, question, offer, demand, or order—

13

does not constitute hearsay because it "do[es] not make any truth claims." *United States v. Montana*, 199 F.3d 947, 950 (7th Cir. 1999); *Tuchow*, 768 F.2d at 868. As set forth below, there are numerous instances in this case in which Burke or Andrews gave an instruction or order to Burke's staff, or to City of Chicago employees. These instructions, requests, demands, and orders are admissible as non-hearsay.

Finally, the coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c).[6] Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Santiago* factual predicates set forth above, when such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *Gajo*, 290 F.3d at 929-30; *see also United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69.

### 3. Statements Against Penal Interest

Under Rule 804(b)(3), a hearsay statement is admissible if (1) the declarant is unavailable; (2) the statement was against the declarant's penal interest at the time it was made; and (3) corroborating circumstances exist indicating that the statement is trustworthy. *See United States v. Lewis*, 641 F.3d 773, 783 (7th Cir. 2011). When determining whether a statement is against penal interest, each portion of a proffered

---

[6]   Federal Rule of Evidence 801(c) defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."

out-of-court statement is examined to determine whether it subjected the declarant to criminal liability. *United States v. Westmoreland*, 240 F.3d 618, 626 (7th Cir. 2001). A statement may satisfy this requirement if it would be probative at trial against the declarant. *United States v. Nagib*, 56 F.3d 798, 804 (7th Cir. 1995). Applying this standard, the Seventh Circuit has held that a declarant's inculpatory statements made to friends and acquaintances about crimes committed by the declarant and his associates are admissible. *See, e.g. United States v. Hamilton*, 19 F.3d 350, 357 (7th Cir. 1994) (holding that a jailhouse conversation between two codefendants which incriminated a third codefendant but was also inculpatory of the first two co-defendants was admissible against the third codefendant); *United States v. Curry*, 977 F.2d 1042, 1056 (7th Cir. 1992) (affirming the district court's decision to admit a co-defendant's inculpatory statement which also incriminated the defendant because it was not made in an attempt to curry favor with law enforcement, but was made to an acquaintance).

Such statements against penal interest are admissible against non-declarant defendants. *See United States v. Volpendesto*, 746 F.3d 273, 288 (7th Cir. 2014); *United States v. Watson*, 525 F.3d 583, 587-88 (7th Cir. 2008); *Hamilton*, 19 F.3d at 356. *See also United States v. Smalls*, 605 F.3d 765, 773-81 (10th Cir. 2010).

### 4. Statements of an Agent/Employee

Rule 801(d)(2)(D) provides that "[a] statement is not hearsay if . . . the statement is offered against a party and is . . . (D) a statement by the party's agent or employee on a matter within the scope of that relationship and while it existed." Here, as described more fully below, the government intends to introduce the

statements of defendant Peter Andrews, who worked on behalf of Burke in Burke's Ward office. In addition, as set forth below, the government intends to admit statements of another employee in Burke's Ward office, Ward Employee 2, that were made on behalf of Andrews and Burke regarding permits for the restaurant. Burke also at times directed a member of his Aldermanic staff who worked at his City Hall office (referred to herein as "City Employee 1") to take action on his behalf in connection with the restaurant and efforts to obtain business from the owners of the restaurant. Any statements Andrews, Ward Employee 2, or City Employee 1 made relating to a matter within the scope of their work for Burke are admissible under Rule 801(d)(2)(D). Furthermore, as noted above, any request or instruction that Burke and Andrews gave to Ward Employee 2 or City Employee 1 would be admissible as non-hearsay. *See Montana,* 199 F.3d at 950.

### 5.    **Coconspirator Statements after *Crawford***

Only "testimonial" statements implicate the Confrontation Clause, *Crawford v. Washington,* 541 U.S. 36 (2004), and a statement made in furtherance of a conspiracy is not a testimonial statement. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (rejecting confrontation clause claim as to introduction of coconspirator statements because such statements are not testimonial); *United States v. Hargrove*, 508 F.3d 445, 448 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial). Further, even if a hearsay statement does not qualify for admission under Rule 801(d)(2)(E), or any other hearsay exception, that fact alone would not create a Confrontation Clause issue because only testimonial statements implicate the right to confront a witness. *Crawford,* 541 U.S. at 68 ("Where

16

nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as . . . would an approach that exempted such statements from Confrontation Clause scrutiny altogether."); *see also Volpendesto*, 746 F.3d at 289 ("[a] statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes.").

## III. Evidence Demonstrating The Existence Of The Conspiracy And Burke's And Andrews' Participation In The Conspiracy

At trial, the government's evidence will establish the existence of a conspiracy between defendants Burke and Andrews to extort and attempt to extort legal business for Klafter & Burke from Company B in return for Burke's support for permits permitting the remodeling of a fast-food restaurant located in Burke's ward. The evidence that establishes the existence of this conspiracy meets the preponderance of the evidence standard applicable at this stage of the proceedings. Below, the government has summarized some but not all of the evidence that it will present at trial regarding this conspiracy. The existence of the conspiracy, and the participation of Burke and Andrews in this conspiracy, will be established by, among other things: (i) the testimony of numerous witnesses; (ii) court-authorized wire interceptions over Burke's cellular phone and landline phones at Burke's City Hall office; and (iii) documentary evidence, including emails and correspondence seized pursuant to search warrants and obtained by subpoena.

### A. Anticipated Testimony

The government anticipates that the witnesses called at trial will include the testimony of the individuals referenced below, among others. Their testimony will demonstrate the existence of the conspiracy, the methods used to engage in the illegal activity, identify Burke and Andrews' roles within the conspiracy, and explain the conspirators' motive and opportunity to engage in the illegal conduct.

### 1. Individual B-1

The government expects to call as a witness at trial Individual B-1, who was an executive of Company B. Individual B-1 will explain that, during the relevant time period, Company B owned approximately 150 fast-food restaurants in the Chicagoland area, including one located on South Pulaski Avenue in Chicago, which was in Burke's ward. The restaurant was located within a shopping center, which was not owned by Company B. In 2017, Company B undertook an effort to remodel the restaurant and Individual B-2 oversaw that project.

The government expects that Individual B-1 will testify that the remodel of the restaurant required permits from the City of Chicago, which Company B applied for through its architect ("Architect B-1"), who is also expected to testify at trial.

Individual B-1 is expected to testify that, in May 2017, Individual B-2 told Individual B-1 to talk to Burke regarding the restaurant. Thereafter, Individual B-1 called Burke and left him a voicemail. Individual B-1 will testify that he obtained Burke's phone number from a public official in Texas (referred to herein as "Individual C") who told Individual B-1 that Burke was the second most powerful

18

politician in Chicago behind only the Mayor of Chicago, and that Individual B-1 should get to know Burke if Individual B-1 planned to do business in Chicago.[7]

The government anticipates playing a recording of the call between Burke and Individual B-1 on May 25, 2017, which was intercepted through a court-authorized wiretap over Burke's cellular phone, as described in further detail below.[8] During the call, Individual B-1 told Burke that Company B had applied for a remodeling permit for the restaurant. Burke said that there were community activists contacting him with complaints about big rig trucks parking overnight in the parking lot of the restaurant. Burke suggested that Individual B-2 meet with Burke in person to iron out these issues. The government anticipates that Individual B-1 will testify that Individual B-1 and Individual B-2 agreed to meet with Burke in Chicago because they hoped Burke would help Company B obtain the necessary permits for the remodeling project and also because Individual C had recommended to Individual B-1 that Burke was someone he should know.

Individual B-1 will testify that, on June 14, 2017, Individual B-1 met with Burke and Andrews (who Individual B-1 knew to be "Pete," Burke's assistant) at the restaurant. Individual B-1 will explain that Individual B-2, Individual B-3, and another representative of Company B also attended the meeting.[9] During this

---

[7]    As set forth below, Burke talked to Individual C about Individual B-1 during an intercepted call.

[8]    The Court denied defendants' motions to suppress the wiretap interceptions. *See* R. 196 at 92-154.

[9]    Unbeknownst to the attendees of this June 14, 2017 meeting, law enforcement was surveilling this meeting and the government intends to admit photographs of this meeting.

meeting at the restaurant, they toured the property and Burke stated that the City had received complaints about trucks parking in the adjacent parking lot. The government expects that Individual B-1 will testify that he and his team from Company B responded that they would look into who owned the parking lot, and that if Company B owned it, they would address the issue by putting up no parking signs. Individual B-1 will further testify that Burke mentioned that Company B needed a driveway permit for the restaurant remodel, but that Individual B-1 felt this was a non-issue because the restaurant was part of a shopping center and did not own or control the driveway. The government expects that Individual B-1 will testify that he felt like Burke was making up the driveway permit issue to create a problem over which representatives of Company B would have to meet with him.

Individual B-1 will testify that, following the tour of the restaurant, Burke took Individuals B-1 and B-2, as well as another representative of Company B, to lunch at Burke's country club in Chicago and Burke paid for the lunch. Individual B-1 will explain that, during lunch, Burke told Individuals B-1 and B-2 about his law firm and that it handled property tax reductions. Individual B-1 will testify that he had not asked for information about property tax appeals or about Burke's firm and in fact had no knowledge of the firm prior to the lunch. Individual B-1 told Burke that Company B had a law firm that handled its property tax reduction business around the entire country, including Chicago. Individual B-1 told Burke that Individual B-1 was not involved in property tax issues directly, and would talk to the person in Texas who was, and would have that person reach out to Burke.

20

The government anticipates that Individual B-1 will testify that Individual B-1 "read between the lines," and understood that Burke was soliciting legal business from Individual B-1 in exchange for Burke's help with the permits for the restaurant. Individual B-1 understood that Burke's desire to pitch his law firm was the reason behind Burke wanting to meet with Individuals B-1 and B-2.

Individual B-1 is expected to testify that, after the meeting with Burke, Individual B-1 did not take immediate action to hire Burke's law firm because it was not a priority. Individual B-1 believed that the permit issues had been resolved because the City of Chicago Department of Buildings ("DOB") issued a building permit to the restaurant on June 20, 2017. Following this, a subsequent building permit was issued on or about September 22, 2017, to account for the fact that a new general contractor had been hired for the project.

In late October 2017, however, Individual B-1 learned from Individual B-2 that Burke had shut down the remodeling work at the restaurant. Individual B-1 will testify that it was his understanding that someone from Burke's office had come and shut down the remodel because of a permitting issue, and that Individual B-1 was not involved with these permitting issues.

Individual B-1 is expected to testify that, in December 2017, with the remodel still shut down, Individual B-1 and B-2 flew to Chicago and met with Burke at the Union League Club. Individual B-1 will testify that Individual B-1 came to Chicago in an effort to get Burke to agree to allow the remodel to continue. Individual B-1 will testify that Individual B-1 understood that Burke had shut down the remodel

21

because Company B had not yet hired Burke's law firm, and that in order to resolve the issues with the remodeling, Company B would need to hire Burke's law firm.

Individual B-1 will testify that, during the meeting with Burke at the Union League Club, Burke asked Individuals B-1 and B-2 why he (Burke) had not received tax business from their company. Individual B-1 told Burke that Individual B-1 had talked to Company B's property tax person and instructed that person to start the process to hire Burke's law firm, and Individual B-1 was not sure why it had not yet happened. Individual B-1 gave Burke the contact information for the individual at Company B who handled property taxes (referred to herein as "Individual B-4"). Individual B-1 is expected to testify that, in response, Burke stated that he would try to the resolve the permit issue for the restaurant and get the remodel started again. During the same meeting, Burke encouraged Individuals B-1 and B-2 to get involved with other politicians in Chicago, and asked them to attend a fundraiser for another local politician in Chicago in January 2018. Individual B-1 will testify that Individual B-1 felt it necessary to attend, or at least give a donation because, otherwise, Burke would not support Individual B-1's efforts to do business in Chicago, including at the restaurant.

The government anticipates that Individual B-1 will testify that Individual B-1 agreed to give Burke tax business for Burke's law firm in order to avoid any further delays in the remodeling project, as it was clear to Individual B-1 that Burke was going to interfere with the remodeling project until Burke received the tax business. Individual B-1 will testify that, at the time Individual B-1 promised Burke the tax

business, Individual B-1's understanding was that Company B had all of the necessary permits for the remodeling project, and that Burke used the driveway permits as a pretext to cause Company B to give Burke property tax business.

After Individual B-1 gave assurances to Burke at the December 2017 meeting that he would receive the tax business, Individual B-4 began corresponding with Burke's office, and the remodeling project was allowed to continue. The government expects that Individual B-1 will testify that these circumstances further demonstrated to him that the reason Burke had halted construction at the restaurant was because Company B had not hired Burke's law firm.

Individual B-1 will testify that the shut-down of the remodeling project at the restaurant had a negative economic impact on Company B because it decreased sales at the restaurant. While the remodeling project was shut down, only the drive-through of the restaurant was open. The shut-down delayed the opening of the dining area of the restaurant for several months.

Individual B-1 will testify that, ultimately, after several months of communications with Burke's law firm through spring 2018 (described further below), Individual B-4 did not give Burke's law firm any tax business from Company B. Individual B-1's understanding was that Individual B-4 did not want to give Burke's law firm the property tax work, and that Individual B-4 strung out the process for several months before ultimately declining to give any business to Burke's law firm.

### 2.    Individual B-2

Individual B-2's testimony will corroborate Individual B-1's testimony in material respects, including Individual B-1's testimony that Burke sought to tie the award of business to his private law firm to the resolution of outstanding permit difficulties the restaurant was facing.

Specifically, Individual B-2 will testify that, as a part of his work for Company B, he was tasked with overseeing the remodeling project at the restaurant. Individual B-2 will explain that, in early 2017, the architect for the remodeling project ("Architect B-1") applied for the permits on behalf of Company B. Individual B-2 will testify that the permits seemed to be taking a long time and Individual B-2 came to learn that the permits were being held up at the office of the Alderman of the ward in which restaurant was located – Alderman Burke. The government anticipates admitting at trial a March 30, 2017, email that Individual B-2 received from an employee of Company B located in the Chicago area stating that this Company B employee had met with Burke and that Burke would not sign off on the remodeling project until Burke met with Individual B-2 or Individual B-1.[10]

---

[10]    The March 30, 2017 email stated, in part: "[H]ad a long and interesting meeting with Alderman Ed Burke today. In order for us to continue the process for special use and permits at [the restaurant], we need him to sign off that he is in favor of the project. This is standard." Later in the same email, the Company B employee wrote, "Next to the Mayor, Burke is arguably the most powerful politician in Chicago. He has been in office for 48 years. He wants a donation to some local charitable org and he wants to know what we will do to rectify the issue in the back lot. Without his signature, we cannot get a permit. . . . One more catch, once we satisfy his desires, he wants to meet with you and/or [Individual B-1]. He won't sign off until he does."

Individual B-2 is expected to testify that, on or about May 22, 2017, he received an email from Architect B-1's co-worker stating that, in order to get the permit for the remodel, they needed to have a signed Aldermanic Acknowledgement Letter, which would signify that Burke (as Alderman of the Ward in which the restaurant was located) had no objection to the remodeling project. Individual B-2 will testify that, at this point, Company B still had not gotten the permit for the project. The government expects that Individual B-2 will testify that he had never dealt with an Alderman before and did not know how to handle the conversation, so Individual B-2 asked Individual B-1 to handle the matter with Burke. Soon after this, Individual B-2 learned that Individual B-1 had talked to Burke. A few days later, on June 1, 2017, Individual B-2 called Burke and spoke to Burke. The government will introduce this call at trial, which was intercepted over Burke's cell phone. During it, Burke suggested that they meet, and Individual B-2 made arrangements to meet Burke on June 14, 2017, at the restaurant, along with Individual B-1.

Like Individual B-1, the government anticipates that Individual B-2 will testify about meeting Burke at the restaurant on June 14, 2017, which was also attended by Andrews, Individuals B-1, B-2, and B-3, and another Company B representative. The government expects that Individual B-2 will identify Andrews as "Pete," whom Individual B-2 knew to be Burke's assistant. Individual B-2 is expected to testify that two matters were discussed during the tour of the property: (1) Burke talked about the fact that the City had received complaints about semi-trucks parking in the adjacent parking lot and that Company B needed to address

this; and (2) Burke said there was an issue with the driveway permit and that Company B would need to resolve it. Individual B-2 will explain that this was the first he had heard about driveway permits and that driveway permits had never been raised previously in connection with other restaurants owned by and remodeled by Company B in the Chicago area.

The government anticipates that Individual B-2 will testify that, after the tour, Burke took Individuals B-1 and B-2, along with another representative of Company B, to lunch at Burke's country club in Chicago. During lunch, Burke talked about his law firm, which specialized in property taxes. Like Individual B-1, the government expects that Individual B-2 will testify that, prior to this, he was unaware that Burke had a law firm, that the pitch from Burke about his law firm was unsolicited, and that he had not asked Burke for help finding a property tax attorney.

Individual B-2 will testify that, during lunch, there was some discussion of the permit issues, and that in reference to the permit issues, Burke stated words to the effect of, "we'll get this taken care of." Individual B-2 showed Burke the Aldermanic Acknowledgment Letter, but Burke did not sign it at that time. Individual B-2's understanding was that, after the meeting, someone from Company B's Texas office was supposed to contact Burke or Burke's law firm regarding the property tax work, but Individual B-2 did not know if this occurred as he was not involved with tax work for Company B's properties.

Individual B-2 is expected to testify that, approximately one week after the meeting with Burke, Individual B-2 learned that the City of Chicago DOB had issued

a permit for the remodeling of the restaurant. Individual B-2 understood that the issuance of this DOB permit meant that the restaurant had all of the necessary authorization it needed to commence the remodeling project.

On June 27, 2017, Individual B-2 talked to Burke over the phone, and the government intends to admit the recording of this call at trial, as detailed below. During the call, Individual B-2 told Burke that Company B had looked at the survey of the area surrounding the restaurant and saw that the parking lot where the trucks were parking was, in fact, part of the restaurant's lot. Burke responded that he (Burke) made us half a million bucks. Individual B-2 told Burke that Company B's district manager would post the no parking signs in the lot and would enforce the no overnight parking rule. Burke said to Individual B-2, "we were going to talk about the real estate tax representation and you were going to have somebody get in touch with me so we can expedite your permits." The government anticipates that Individual B-2 will testify that Individual B-2 felt it was inappropriate for Burke to ask about tax representation again, because Burke was linking the tax representation with Burke's assistance on the permits needed for the  restaurant. Individual B-2 told Burke that someone from Company B's office would reach out to him about the property tax work.

Following this, Individual B-2 recalled that either Burke or Andrews reached out to remind Individual B-2 that a driveway permit was needed for the restaurant. Individual B-2 will testify that he was confused because DOB had already issued the building permit, so Individual B-2 assumed that all outstanding issues with the

driveway permit were resolved, otherwise, the building permit would not have been issued. Individual B-2 did not understand why Burke was so focused on the driveway permit issue.

The remodeling project at the restaurant began on or about October 18, 2017. Individual B-2 will testify that it took some time between getting the original building permit and starting construction because Company B changed contractors for the project. Once construction began, Individual B-2 expected that it would take about 5 weeks to complete and cost around $300,000. Individual B-2 will testify that the construction work did not involve the construction of any new driveways.

On October 24, 2017, Individual B-2 received an email from Individual B-3, which is partially reproduced below. Individual B-3's email, dated October 24, 2017, at approximately 11:16 a.m., stated that Individual B-3 received a call from Andrews, and Andrews said that Burke's office had never signed off the plans and special use permit for the restaurant, and that Andrews had asked that Company B shut down the remodeling job[11] until Company B representatives met with Burke's office:

> Hello all
> I received a call today from Alderman Burke's office regarding [the restaurant] under remodel. Pete (Alderman's assistant) said their office never signed off on the plans and the special use permit. He asked we shut the job down until we meet with them with the GC [general contractor] to review all proper permit documentation and the plans. [Company B employee] is scheduling this

---

[11] What Individuals B-2 and B-3 did not know was that the very same day this email was sent (October 24, 2017), Burke and Andrews had discussed shutting down the remodeling project during a wiretapped phone call set forth in detail below.

> meeting ASAP. I asked [the general contractor] to shut the
> job down for now until we see what else these guys are
> looking for to get the project moving again. I know these
> guys are very powerful and they can make life very difficult
> for all of our Chicago stores and I do not want to take this
> risk at this time until we meet and discuss everything.

The government expects that Individual B-2 will testify that he was confused and frustrated when he got this email because Company B had the required building permit for the restaurant.

Individual B-2 will testify that construction was shut down at the restaurant, and that the general contractor scheduled a meeting with Andrews. Individual B-2 understood that Architect B-1, on behalf of Company B, was trying to deal with the driveway permit issued raised by Burke's office.

Individual B-2 was in Chicago in mid-November 2017, and during that trip, met with the DOB Commissioner (referred to herein as "Commissioner C"), along with Architect B-1. Individual B-2 is expected to testify that Commissioner C stated that there was no stop work order for the restaurant, so the construction could continue, though it would risk upsetting Burke. Individual B-2 understood this to mean that Burke would retaliate against Company B if Company B re-started construction at the restaurant without Burke's approval. Individual B-2 will testify that, as a result, Company B's plan going forward was to talk to Burke's office to try to resolve the driveway permit matter before starting construction.

Individual B-2 will explain that, in late November 2017, he learned that the restaurant had received citations or tickets related to the driveway, and Architect B-1 told him that Burke's office had put a hold on the driveway permit.

Individual B-2 is expected to testify that he arranged to meet with Burke in December 2017, along with Individual B-1. Thereafter, on December 12, 2017, Individuals B-1 and B-2 met with Burke in Chicago at the Union League Club. Individual B-2 will corroborate Individual B-1's testimony and explain that during the meeting, they talked briefly about the driveway permit and the remodel of the restaurant, but that most of the conversation was about the real estate tax work for Company B's restaurants in the Chicago area. Burke said that no one from Company B had reached out to him yet about giving the real estate tax business to his law firm. In response, Individuals B-1 and B-2 said that they would get someone to reach out to him (Individual B-4) as soon as possible about the real estate tax work.

The government anticipates that Individual B-2 will testify that, in January 2018, he learned that the driveway permits for the restaurant were issued.

Individual B-2 will further testify that, in total, the remodeling of the restaurant was halted from approximately late October 2017 through late January 2018. During the remodeling shut down period, only the drive-through was open, which negatively affected sales and cash flow for the restaurant, resulting in a depletion of business assets.

### 3. Individual B-3

Individual B-3 was a senior manager at Company B based in Illinois during the relevant time frame.

As set forth above, on or about June 14, 2017, Individual B-3, along with Individuals B-1 and B-2, met with Burke and Andrews (who Individual B-3 knew as "Pete," Burke's assistant) at the restaurant. The government anticipates that

Individual B-3 will testify that, prior to this meeting, Andrews had called Individual B-3 and another Company B representative regarding Andrews' concerns with trucks parking overnight in the parking lot of the restaurant. During this call, Andrews had introduced himself to Individual B-3 as "Pete" and as being Burke's assistant. Individual B-3 recalled that Andrews stated that community members complained about it and that the overnight truck parking could lead to potential crime. To address these concerns, Company B arranged for signs banning overnight parking to be put in the parking lot.

As noted above, the remodeling of the restaurant began on or about October 18, 2017. By that time, Individual B-3 assumed Company B had all the necessary permits from the City of Chicago because construction on a remodel did not start until all necessary permits were in hand. The government anticipates that Individual B-3 will testify that, on October 24, 2017, Individual B-3 received a telephone call from Andrews, who stated that "the office," which Individual B-3 understood to mean Alderman Burke's office, never approved the plans for the remodeling of the restaurant, and therefore, the construction work needed to stop at that location. Andrews further told Individual B-3 that Burke's office had not approved the special use permits, which Individual B-3 understood to be the drive-through permit needed from the City of Chicago. Andrews asked that Company B shut down the job until representatives of Company B met with Andrews to review all proper permit documents and plans. Individual B-3 told Andrews that she believed Company B had all the necessary permits for the remodeling project at the restaurant, though

Andrews did not agree. Andrews told Individual B-3 that his office had not reviewed the plans for the remodeling, and said the job should be shut down.

The government anticipates that Individual B-3 will testify that Andrews' tone was firm and matter of fact, and that Individual B-3 understood Andrews's statements about shutting the job down as an instruction. Andrews told Individual B-3 that the construction work at the restaurant needed to stop until his office signed off on the plans.

As a result of this call from Andrews, Individual B-3 called the general contractor on the remodeling project and told him to stop construction. At that point, the remodeling work stopped; the drive-through of the restaurant remained open, as it had been during the remodeling work. After the call with Andrews, Individual B-3 sent the email referenced above (discussing Andrews demand that the restaurant shut down) to Individual B-2 and others. The government anticipates that Individual B-3 will testify that she wrote in the email, "these guys are very powerful and they can make life very difficult for all of our Chicago stores," because another manager at Company B had told her that Burke was very powerful in the City of Chicago. Individual B-3 was worried, among other things, that Burke's office could cause problems with Company B's restaurants across the city, including by such means as sending health inspectors to cause problems at the restaurants.

Individual B-3 will testify that, some time prior to Andrews calling her on October 24, 2017, Andrews had asked Individual B-3 if Company B ran other fast-food restaurants in Chicago. Individual B-3 confirmed that Company B did, and

Andrews asked if those other locations had special-use permits, which Individual B-3 understood to be permits for the drive-through, and Individual B-3 confirmed that the restaurants had the required permits.

Individual B-3 is expected to testify that, initially, she believed the shut-down order from Andrews was the result of an administrative oversight by the general contractor. But as time went on and the project remained shut down for a long period of time, which in Individual B-3's experience was very unusual, Individual B-3 believed something else must be going on, but Individual B-3 did not know what.

Individual B-3 will testify that, on or about October 26, 2017 (two days after Andrews had called to shut down construction), Individual B-3 met with Andrews along with the general contractor on the restaurant project and another representative of Company B. The purpose of the meeting was to try to resolve the issues with Alderman Burke's office as soon as possible so that Company B could re-start the remodeling project. Individual B-3 will testify that the meeting occurred at 2650 West 51st Street in Chicago, the location of Burke's 14th Ward office. Individual B-3 will testify about her recollection of the meeting, including that, during the meeting Andrews asked who owned the restaurant, and Individual B-3 responded that it was Company B. Individual B-3 will testify that Andrews told the general contractor that Burke's office never signed off on the plans granting approval of the remodeling project. The general contractor had brought to the meeting all of the permits for the remodeling project and he showed them to Andrews, asking Andrews what was missing. According to Individual B-3, Andrews did not identify anything

that was missing, but said that his office had not seen the plans for the project, including the driveway permit. Individual B-3 understood Andrews' reference to the driveway permit to be a reference to the special use permit for the drive-through.[12]

Individual B-3 will testify that, during the meeting, Andrews asked the general contractor where his company was based, and the general contractor responded New Jersey. Andrews wanted to know where the workers at the restaurant job site were from, and told the general contractor that there were local workers available to fill jobs on the remodel. Individual B-3 recalled that Andrews was really "drilling" the general contractor on this point. The general contractor responded that he would welcome more help on the project and was willing to hire anyone capable of completing the work.

The government expects that Individual B-3 will testify that Individual B-3 felt intimidated by Andrews because the subcontractor work at the restaurant was not being performed by "locals." The government anticipates that Individual B-3 will testify that, based on her experience with the remodeling of more than 10 other fast-food restaurants in the City of Chicago prior to the restaurant in Burke's ward, she had never seen an Alderman's office intervene during a remodel because the Alderman's office needed to see or approve the plans for the project. Individual B-3 had the impression that Alderman Burke's office wanted something that went beyond the issues related to the remodeling of the restaurant, though Individual B-3 did not know what that was. After the meeting, Individual B-3 contacted Individual B-2 and

---

[12]    As set forth below, Architect B-1 will testify that the restaurant had already obtained a special use permit for the drive-through.

advised that Individual B-2 would need to speak with Burke's office in order to resolve the matters related to the work stoppage.

Individual B-3 learned that, while the work was still shut down, the restaurant received a citation for a violation from the City of Chicago. Individual B-3 was not aware of any of the other remodeling projects by Company B in the Chicago area ever having received a citation/fine for a violation.

On or about January 25, 2018, Individual B-2 notified Individual B-3 that the remodeling project at the restaurant could resume. Individual B-3 will testify that Individual B-3 was not privy to how or why the issues were resolved with Burke's office. The remodeling project resumed in mid-February 2018, and was completed in April 2018. Individual B-3 will further testify about the negative economic impact the months-long shut down of the restaurant (with the exception of the drive-through) had on Company B. Individual B-3 will further testify that, the main supplier of goods for the restaurant was Supplier B-1, a nationwide company that has various distribution centers throughout the country, one of which was in Wisconsin. Supplier B-1 delivered supplies from the Wisconsin distribution center to Company B's restaurants in the Chicagoland area, including the restaurant.

### 4. Architect B-1

Architect B-1 is expected to testify about the campaign of harassment unleashed by Burke and Andrews on various pretexts, owing to the failure of Company B to award legal business to Burke. As described herein, this harassment included demands that Company B halt all remodeling of the restaurant for trivial

and improper reasons, including the absence of a driveway permit for areas adjoining the restaurant.

Specifically, Architect B-1 has been architect in the Chicagoland area for many years. Company B hired Architect B-1's architecture firm to handle the remodeling of the restaurant and others owned by Company B in the Chicago area. Architect B-1 will testify that, by the time the remodeling project at the restaurant was set to begin in 2017, Architect B-1 had already completed the remodeling of numerous other fast-food locations in the Chicagoland area owned by Company B.

The government anticipates that Architect B-1 will testify that his architecture firm was responsible for applying for the necessary building permits for the remodeling project at the restaurant. He will explain that his firm had been applying for and obtaining building permits in the Chicago area for more than 25 years. Architect B-1 will testify that his firm began submitting the building permit application materials for the restaurant to DOB in or around April 2017. The permit process was a "self-certification" process, meaning an expedited process for obtaining permits that can be completed by qualifying architects such as Architect B-1. The government expects that Architect B-1 will testify that, typically, a self-certification permit could be obtained from DOB in one to three weeks.

The government expects that Architect B-1 will testify that a project manager at his architecture firm sent an email to Alderman Burke on or about March 1, 2017, attaching an Aldermanic Acknowledgement Letter on behalf of the restaurant and seeking his signature on the letter. Architect B-1 will explain that they were seeking

36

Burke's signature on the Aldermanic Acknowledgement Letter to include in the application to the DOB for the restaurant building permit. He will further explain that a signed Aldermanic Acknowledgement Letter is not required in order to obtain a self-certification building permit, but that it can help to speed along the process of obtaining a permit. By signing the letter, the alderman of the relevant ward certifies that s/he is aware of the building permit application and has no objection to the issuance of the building permit. Architect B-1 and a project manager at Architect B-1's firm advised Individual B-2 on multiple occasions in or about May and June 2017 that they needed a signed Aldermanic Acknowledgement Letter from Burke for purposes of obtaining a building permit. Architect B-1 is expected to testify that they never received a signed Aldermanic Acknowledgment Letter from Burke for the restaurant.

Nevertheless, the DOB issued the building permit for the remodel of the restaurant on June 20, 2017. Architect B-1 will testify that, it was his understanding that the DOB building permit signifies that construction can begin on a project; there are no other permits needed and the DOB building permit is all-encompassing for all trades (electrical, plumbing, etc.). The government anticipates that Architect B-1 will testify that, based on his experience, part of the process for obtaining a building permit is ensuring that all driveway permits are up to date; thus, the issuance of the

issuance of the building permit signifies that there are no outstanding driveway permit issues.[13]

Architect B-1 will testify that, on or about July 12, 2017, Architect B-1 received an email from Individual B-2, which the government intends to admit at trial. In the email, Individual B-2 asked Architect B-1 to call Andrews (referred to as "Pete Andners" in the email) about the driveway permits because "[t]he alderman called again" regarding those permits, and Individual B-2 did not know what there was to do on the driveway permits since the restaurant already was issued a building permit. The government anticipates that Architect B-1 will explain that the restaurant was located in a shopping center that had common driveways that were used by all of the shops in the shopping center. Therefore, based on his experience, Architect B-1 believed that the driveways were the responsibility of the shopping center.[14] Architect B-1 will testify that all of the driveways to the shopping center were pre-existing driveways; the remodeling project for the restaurant did not involve any construction on driveways or any new driveways. The government anticipates that

---

[13]     As set forth below, the government anticipates that DOB Employee 1 will testify at trial. The government anticipates that DOB Employee 1 will testify that DOB would generally not shut down a project for months simply due to the absence of a permit for a pre-existing driveway. DOB Employee 1 advised that, while the Department of Buildings might use a driveway permit issue to bring attention to another problem with a project, it was not the practice of the department to use driveway permits as a means to "jam up" a project.

[14]     Information obtained from the City of Chicago's Department of Transportation ("CDOT") reflects that, in 2012, an entity applied for and was granted a permit for nine new driveways associated with the development of a strip mall shopping center where the restaurant was located. Records indicate that the 2012 permit was reissued in 2015. The reissuing of the permit did not require any form Aldermanic approval because, according to CDOT, Aldermanic approval is not required for a permit for a pre-existing driveway. According to CDOT, driveway permits are to be renewed annually and the City of Chicago collects a fee with each such permit.

Architect B-1 will testify that he had never heard of there being driveway permit issues for shared driveways with a shopping center.

Architect B-1 will explain that CDOT handles and issues driveway permits, but that DOB also works with CDOT on those matters. In response to the email described above, Architect B-1 will testify that he asked the project manager at his firm to contact a person who works at DOB and who acted as a liaison regarding driveway permits with DOB (referred to herein as "DOB Employee 2").

The government anticipates that Architect B-1 will testify that, after the project manager talked to DOB, they learned that there was a driveway on West 40th Street for the shopping center in which the restaurant was located that was not registered in the city's database, and therefore needed to be registered. Architect B-1 will testify that, in his experience, sometimes it does happen that driveways are not registered. Architect B-1 will testify that he looked at the site survey and saw that the driveway on West 40th Street was a common access road for the shopping center. Accordingly, it was the responsibility of the shopping center owner (which was not Company B) to obtain the driveway permit. Architect B-1 instructed his project manager to inform an individual at Company B to contact the owner of the shopping center about this driveway.

Architect B-1 will testify that the remodeling project at the restaurant began in October 2017. Approximately one week after it began, Architect B-1 learned that Burke's office had shut down the remodeling project. Architect B-1's understanding was that Burke's assistant, Andrews, had shut down the project on the pretext that

the restaurant needed a drive-through window permit. Architect B-1 will testify that a drive-through window permit is different from a driveway permit, and that a drive-through window requires a special use permit. Architect B-1 will testify that Company B had all of the required permits for the drive-through window at the restaurant, and that if it did not, it would not have gotten the building permit from DOB. Architect B-1 will testify that, by DOB issuing the building permit for the restaurant, it meant that the Zoning Department had done all of its reviews on the property, had found no issues, and had approved the permit. Architect B-1 will further testify that, in obtaining the building permit for the restaurant, his architecture firm had followed the same process used for the other remodeling projects of Company B's fast-food restaurants, and there had never been any permitting problems with these other projects. Accordingly, Architect B-1 was not aware of any authority Burke had to shut down the remodeling project.

On October 26, 2017, Architect B-1 sent an email to multiple individuals within the DOB, seeking their assistance. The government anticipates admitting this email at trial, which stated in part:

> HELLO Please assist. . . . . See below as my client just informed me that Alderman Burke has shut this job down. This is quite disturbing considering that all of our restaurant projects follow the same process thru DOB for permit submittal and Zoning approval. The process determines if a subject property has or does not have a Special Use in place for the Drive Thru part of the restaurant. . . . This does not seem right that Burke can shut this project down considering we have our permit. Please advise as soon as you can. Thank you [sic]

40

Architect B-1 will testify that he received a response from DOB Employee 1 who informed Architect B-1 that there was no stop work order for the restaurant in the DOB database, and directed Architect B-1 to contact the owner and Alderman.

The government anticipates that Architect B-1 will testify that, soon after he learned that there was no stop work order with DOB, Architect B-1 called Alderman Burke's office and talked to Andrews. Architect B-1 will testify that Andrews at first failed to provide a specific answers. Over the course of multiple conversations with Andrews, Andrews initially talked about permits for the drive-through window and then raised the issue of driveway permits. Andrews did not provide Architect B-1 with ways to resolve the problem. Architect B-1 will testify that he got the impression that Andrews was searching for issues that he could use to hold up the project.

Architect B-1 will explain that, during conversations with Andrews in early November 2017, Andrews raised the topic of the driveways into the shopping center where the restaurant was located. Architect B-1 reviewed the plans for the site and determined that the driveway on Pulaski was not on the restaurant's property, and Architect B-1 informed Andrews of this fact. Architect B-1 also looked at the driveway on West 40th Street, and Architect B-1 determined that this driveway was on the restaurant's property. Architect B-1 is expected to testify that, on November 2, 2017, he emailed Andrews about the driveway on West 40th Street. In this email, Architect B-1 informed Andrews that the DOB driveways department did not have a driveway on West 40th Street in their system, which was why the restaurant was issued a building permit by DOB despite there not being a driveway permit for the

West 40th Street driveway. Architect B-1 will testify that Architect B-1 understood at that point that Company B would need to apply for a driveway permit for the West 40th Street driveway.

The government anticipates that Architect B-1 will testify that he advised Individual B-2 that construction could continue at the restaurant since there was no stop work order from DOB, however, if they were to continue with construction, it could cause problems with Burke. Architect B-1 had a conversation with Andrews in which Architect B-1 told Andrews that Company B was going to apply for the driveway permit for the 40th Street driveway and asked Andrews to allow construction to continue while the application is pending, which Andrews refused. Andrews told Architect B-1 that Company B needed to wait until the permit application was processed and the Alderman's office got notice of it, and then Andrews said we would see where we were at. Architect B-1 will further testify that Andrews then again said that the driveway on Pulaski also needed a permit, and Architect B-1 again explained that this driveway was not on Company B's property. Architect B-1 felt that this was another delay tactic by Andrews, although Architect B-1 did not know why Andrews would be trying to delay the project.

Architect B-1 will testify that, on or about November 14, 2017, he submitted the driveway permit application for the driveway on West 40th Street to DOB. The application also included two other driveways at the shopping center where the restaurant was located. The government will introduce a copy of the application as an exhibit at trial. The application included a form listing the address of the

42

driveways, which Architect B-1 filled out in person at DOB with DOB Employee 2. Architect B-1's understanding was that, once DOB looked at the application, it would provide the application to CDOT.[15]

Like Individual B-2, Architect B-1 will testify that, on or about November 20, 2017, Architect B-1 and Individual B-2 met with Commissioner C (the DOB Commissioner), who the government also intends to present as a witness at trial. According to Architect B-1, Commissioner C reiterated that DOB did not have a stop work order on the restaurant. Architect B-1 will testify that Commissioner C seemed surprised to hear about Burke's office shutting down the construction, and Commissioner C recommended that Company B take it up with Burke one more time before Commissioner C got involved.

Architect B-1 will testify that, in November 2017, Architect B-1 sent an email to Individual B-2 and others explaining that Architect B-1 had applied for the driveway permit, but that the driveways department was questioning the site survey which showed easements on the incoming driveway access to the shopping center. Architect B-1 will testify that easements allow for common access to a shopping center. Architect B-1 reviewed the site survey and believed that the easements were not on the restaurant's property. Architect B-1 will testify that this easement issue

---

[15] Information obtained from CDOT confirmed Architect B-1's understanding: permit applications for a pre-existing driveway must first obtain approval from the Department of Zoning, which is part of DOB, before going to CDOT for approval. Records obtained from the City of Chicago reflect that the Zoning Department approved Company A's driveway permit application on November 14, 2017, the same day it was submitted.

was another delay and he did not understand why the driveway department was raising the easement issue.

The campaign of harassment continued into late November 2017. Architect B-1 is expected to testify that Architect B-1 learned that the restaurant had received a citation from CDOT related to the driveway and that there was a mandatory hearing for the citation. Architect B-1 will testify that this was the first time he had seen a citation issued as a result of a driveway permit issue. As described below, the government intends to admit a copy of the citation from CDOT, which is dated October 27, 2017, at trial. The citation reflects that it was issued to Company B for not having a driveway permit for one of several driveways adjacent to the restaurant.

On or about November 30, 2017, Architect B-1 sent an email to Individual B-2 updating Individual B-2 regarding the status of the driveway permit application. Architect B-1 informed Individual B-2 of a conversation that Architect B-1 had with DOB Employee 2, in which DOB Employee 2 told him that Burke's office had called the driveway department questioning Company B's driveway permit application. The government anticipates that Architect B-1 will testify that this seemed strange to him because it was Burke's office that had required Company B to get the driveway permit, but then he was learning that after the permit application was submitted, Burke's office was holding up the application.

Architect B-1 will testify about emails he exchanged with an employee of CDOT (referred to herein as "CDOT Employee 4")[16] regarding Company B's pending

---

[16]     The government intends to call CDOT Employee 4 as a witness at trial.

driveway permit application. In one email, dated December 11, 2017, CDOT Employee 4 informed Architect B-1 that Burke's office asked for the driveway permit for the West 40th Street driveway to be put on hold because of an easement:

> Good morning. As a follow up, the Alderman's office spoke with [CDOT Employee 3] and asked for this permit to be put on hold pending questions about the easement?
>
> I believe they are requesting that the easement needs to be updated? That you cannot use the old easement that was directed to an entity that no longer has interest in this property? I am handing the file to my Supervisor [DOT Employee 1] and you can follow up with [CDOT Employee 1] on the processing of this permit pending conversations with the Alderman for this ward. Thank you.

Architect B-1 will testify that he did not understand why Burke's office would be holding up the driveway permit.

Architect B-1 was aware that Individual B-2 was meeting with Burke on December 12, 2017; Architect B-1 wanted to attend but was not invited. Architect B-1 will further testify that, on December 13, 2017, Architect B-1 received a call from Andrews, who told Architect B-1 that everything was cleared up and Company B could again start construction on the restaurant. Architect B-1 will testify that Andrews did not give Architect B-1 a reason as to why the matter was now resolved. After this conversation, Company B's driveway permit application was approved. Ultimately, Company B paid for three existing driveway permits – two on West 40th Street and one on Pulaski. Although only one of these driveways was on the restaurant's property, Company B paid for all three in an effort to address each of the issues Burke identified so that the remodeling project to continue.

45

### 5. DOB Employee 2

The government anticipates that DOB Employee 2 will testify that, on or about November 17, 2017, she received an email from a member of Alderman Burke's Ward staff ("Ward Employee 2") that advised DOB Employee 2 that "Pete Andrews, Chief of Staff to Alderman Burke would like to speak with you at your earliest convenience."[17] The government anticipates admitting this email into evidence at trial. After receiving this email, DOB Employee 2 called Andrews. The government expects that DOB Employee 2 will testify that Andrews stated during the call that Burke had concerns about the construction being done at the restaurant. Andrews asked DOB Employee 2 if there were driveway permits on file for the property, and DOB Employee 2 looked into that and saw none. DOB Employee 2 will testify that Andrews asked DOB Employee 2 to send him the application Company B had submitted for the restaurant. On November 28, 2017, DOB Employee 2 sent an email to Andrews attaching the driveway permit application that Architect B-1 had submitted. DOB Employee 2's email to Andrews stated that the permit package was being evaluated, and that it had been "very nice working with you [Andrews] on the driveway matter."

---

[17] As set forth below, wiretap interceptions confirm that, on October 24, 2017 and October 25, 2017, Burke and Andrews agreed to play "hardball" with the owners restaurant – who had not yet responded to Burke's solicitation of Company B's tax business even after Burke "played nice" and took them to lunch – on the pretext that the restaurant did not have driveway permits necessary for the remodeling project. In addition to the wiretap interceptions, the testimony described above is further proof that, after talking to Burke, Andrews took steps to hold up the remodeling project by contacting DOB employees regarding driveway permits for the restaurant.

### 6.   CDOT Employee 1

CDOT Employee 1 was used by Burke and Andrews as a tool for applying pressure to the owners of the restaurant as part of their extortion bid. As noted above, the restaurant was issued a citation in connection with a purportedly missing driveway permit—something Architect B-1 will testify to.

CDOT Employee 1 will testify about his use as a pawn by Burke and Andrews in connection with the issuance of the citation. The government anticipates that CDOT Employee 1 will testify that he was an employee of CDOT for more than 20 years, and in 2017, worked as an inspector of public ways, which included driveways. As a CDOT inspector, CDOT Employee 1 had responsibility for a number of wards, including the 14th Ward.

On October 27, 2017, CDOT Employee 1 issued the citation to Company B for the restaurant's failure to have a driveway permit. The government anticipates that CDOT Employee 1 will testify that, prior to issuing the citation, CDOT Employee 1 was contacted by an employee of Burke's 14th Ward office (referred to herein as "Ward Employee 2"). The government expects that CDOT Employee 1 will testify that Ward Employee 2 told CDOT Employee 1 that there was construction going on at the restaurant and requested that CDOT Employee 1 go to the restaurant and look at the driveways. When CDOT Employee 1 arrived at the location of the restaurant, CDOT Employee 1 called the CDOT office responsible for driveway permits, and learned there was no permit for the driveway in the area of the restaurant. CDOT Employee 1 entered the restaurant and asked a worker there about a driveway permit, and that worker had no knowledge of a driveway permit. CDOT Employee 1 also asked for the

name of the owner of the restaurant, and learned it was Company B. CDOT Employee 1 then wrote the citation to Company B for failure to have a driveway permit. The government expects that CDOT Employee 1 will testify that CDOT Employee 1 would not have gone to the restaurant to inspect its driveways but for the call he received from Ward Employee 2 requesting this be done. CDOT Employee 1 will testify that CDOT Employee 1 did not observe any safety issues with regard to the driveways near the restaurant. CDOT Employee 1 will further testify that CDOT Employee 1 did not have any authority to shut down a business, and that CDOT Employee 1 had never seen a business shut down for the type of driveway citation he issued to Company B.

### 7. City of Chicago Witnesses

In addition to those detailed above, the government anticipates calling various other current and former City of Chicago employees who were involved with or otherwise had knowledge of the permits for the restaurant. These witnesses are expected to explain the permitting process for building permits and driveway permits, as well as their experience with the permits for the restaurant. Their testimony will further establish that Burke and Andrews caused remodeling work on the restaurant to come to a halt on the pretext that the restaurant did not possess all necessary permits for the remodeling, and thereafter held up Company B's efforts to obtain a driveway permit.

For example, the government anticipates that DOB Employee 1 will testify that, after receiving the October 26, 2017, email from Architect B-1 referenced above, he searched DOB's computer database and saw no stop worker order concerning the

48

restaurant.  The government anticipates that DOB Employee 1 will testify that he was not aware of a case in which an Alderman could stop remodeling construction authorized by DOB, although an Alderman's opinion was important and an Alderman could communicate his/her concerns regarding a construction project to DOB.  The government anticipates that DOB Employee 1 would further testify that DOB generally would not shut down a project for months simply due to the absence of a permit for a pre-existing driveway.

As another example, the government anticipates that City Attorney 1, an attorney with the City of Chicago's Law Department who handled building code enforcement during the relevant time period, will testify that City Attorney 1 was contacted in November 2017 by a CDOT employee (CDOT Employee 3) regarding an easement at the shopping center where the restaurant was located.  The government anticipates that City Attorney 1 will explain that, in the context of a driveway, an easement allows one entity to access a driveway that is not on that entity's property. City Attorney 1 will testify that, based on the inquiry from the CDOT employee, he determined that the shopping center owner, not the restaurant, owned the driveway off of Pulaski and that the restaurant had an easement to use the driveway.  City Attorney 1 will testify that he communicated this to the CDOT employee.  Following this, on December 5, 2017, City Attorney 1 received an email from the same CDOT employee asking, "The alderman's office would like to know, is the easement transferable from owner to owner."  City Attorney 1 will testify that he cannot recall whether he called the CDOT employee to answer this question, but that he may have,

and the answer would have been yes, an easement transfers from owner to owner. City Employee 1 will testify that he had no knowledge of which Alderman was involved in the restaurant driveway matter, and that in his experience working with Alderpersons, they typically encourage the issuance of a permit because they want building projects to occur in their ward.

The testimony from various city employees, including those set forth above, will provide important context for the jury in understanding how Burke and Andrews carried out their extortion scheme by trying to stall the remodeling of the restaurant through the pretext that certain permits or other approvals were required. The testimony of these current and former City employees will also serve to corroborate the testimony of other witnesses – such as Individuals B-2, B-3 and Architect B-1 – who were handling permitting matters for Company B and believed these issues to be a pretext for another agenda being pursued by Burke and Andrews.

## B.     Wiretap Communications

As noted above, Individual B-1 and Individual B-2 will provide direct evidence that Burke improperly tied the resolution of the restaurant's permitting issues to the award of business to his law firm. Other witnesses, such as Individual B-3 and Architect B-1, as well as city employees will provide testimony that will powerfully demonstrate that Burke and Andrews unleashed the City bureaucracy on the restaurant in efforts to trump up a reason to extort legal fees from Company B. The wiretap communications discussed herein provide devastating corroborating evidence of the criminal intent of both Burke and Andrews, provide powerful corroborating evidence of the existence of the conspiracy and the participation of

Burke and Andrews in the conspiracy, and contain coconspirator statements in furtherance of the conspiracy.[18]

Specifically, wiretap calls demonstrate that Andrews and Burke worked together to withhold Burke's Aldermanic approval for the remodeling permit for the restaurant so that Burke could attempt to extract legal business for his law firm by using the remodeling permit as a pretext for arranging a face-to-face meeting with the owners of the restaurant and pitch the services of his private law firm. They further demonstrate that, after Company B failed to hire Burke's law firm, Burke and Andrews took steps to shut down the remodeling project on the pretext of missing driveway permits, and then blocked Company B from receiving a driveway permit until Burke again met with Individuals B-1 and B-2 and obtained their assurance that his law firm would receive tax business from Company B. The interceptions further show that, after Individuals B-1 and B-2 assured Burke that he would receive Company B's tax business, Burke received communications from Individual B-4 arranging for Burke's firm to get the tax business, and Andrews abruptly abandoned his concerns about driveway permits, easements, and other trivial complaints, and allowed construction to continue at the restaurant.

For example, on or about May 23, 2017, at approximately 5:12 p.m., Individual B-1 left a voicemail for Burke, during which Individual B-1 stated, "If you could please give me a call when you get a minute, when you get a chance. [Phone number

---

[18]     The transcripts quoted herein are in draft form only and are subject to revision before trial.

redacted.]  Ah, we have an application that's been made for remodel and I think it's stuck in your office or something.  So, please give me a call, I'll give you the details."

On or about May 25, 2017, at approximately 3:39 p.m., Burke received an incoming call from Individual B-1 about the building permit for the restaurant. Specifically, Individual B-1 said, "Ah, one of the things I was calling about, Ed, is, ah, we have a remodeling permit that we have applied for and I think it's in your area and, uh –"  Burke said, "Is that the one that's at, ah, [address of the restaurant]?" Individual B-1 said, "Yes, yes, yes."  Burke said, "Okay."  Individual B-1 said, "So, ah, basically, excuse me just a second, want to meet you to discuss a concern with truck parking that's in our parking lot."  Burke said, "Yeah, that's been an ongoing problem there."  Individual B-1 said, "Oh, really?"  Burke said, "Yeah. They have these big rigs that are parking there and parking overnight and that sort of stuff, ah, so some of the community activists are giving me a little aggravation about it.  Tell me about, ah, who's ah, who's on the ground here in Chicago?  Who's your key person?"  Individual B-1 said, "Ah, key person . . . . You know it's, ah, [Individual B-2]."  Burke said, "Why don't you have [Individual B-2] give me a call on this number.  Maybe we can get together next week and see if we can iron out what the issues might be."  Individual B-1 said, "Awesome. Sounds good."

On or about June 1, 2017, at approximately 4:32 p.m., Burke received an incoming call from Individual B-2.  During the call, Burke and Individual B-2 discussed meeting about the building permit.  Specifically, Burke said, "Well, I was gonna suggest if you were here that you come out and see me and talk about this

52

issue." Individual B-2 said, "Well, I'll be in, I'll, I'll be in Chicago not next week, but the following week. So I would love to come by and meet you and talk about things." Burke said, "Good. And [Individual B-1] said that he hoped to be up here too and have, perhaps dinner and so that'd be nice. I look forward to that . . . . Uhm, now, ah, is there something urgent? He mentioned something about permitting." Individual B-2 responded, "Yes. So we were trying to remodel a [name of restaurant] at ah –" At that point, the call was minimized by law enforcement.

On or about June 8, 2017 at approximately 11:47 a.m.—six days before Burke's June 14, 2017, meeting with Individuals B-1 and B-2 that both Individual B-1 and Individual B-2 are expected to testify about—Burke placed an outgoing call to his City Hall office and spoke with City Employee 1. Burke asked City Employee 1 to find out what law firm handled real estate tax work for Company B. Specifically, Burke said, "And there's a [restaurant] in the [location redacted]. Ah, just north of [street redacted] Street on the west side of the street." City Employee 1 said, "Uh-huh. Yeah." Burke said, "I want somebody at the law office to check to see who's filed with the assessor of the board on that one." City Employee 1 said, "On that [restaurant]? Okay. And that's the one where you're meeting—" Burke said, "That's where I'm supposed to be meeting those people next week?" City Employee 1 said, "Yeah, exactly." This call establishes that, after Burke learned from Individuals B-1 and B-2 that they needed his official assistance with permits for the restaurant located in Burke's ward, and in preparation for meeting with Individuals B-1 and B-2, Burke wanted City Employee 1 to contact his private law firm (Klafter & Burke)

and ask someone there to research what law firm represented the restaurant in prior challenges to real estate taxes. This interception demonstrates Burke's motivation to obtain legal business from Company B at the same time that he was evaluating the remodeling project, and knew that Company B was seeking his assistance with permits so the project could go forward.

On or about June 11, 2017, at approximately 12:42 p.m., Burke received an incoming call from Individual C, who as discussed earlier was a public official in Texas. During the call, Burke informed Individual C that Burke wanted to get some business for his private law firm from Individual B-1. Specifically, Individual C said, "Happy Sunday. I'm about to have lunch with our friend, [Individual B-1], so I hope your meeting with him went well." Burke said, "Well, we haven't met yet. Ah, he's supposed to be, ah, coming here this coming week and we're gonna visit one of his sites and have lunch." Individual C said, "Oh, good, good. I'm about to have lunch with him now. . . . But I'll tell him you're looking forward to it." Burke said, "Yes, and give him the old, ah, ah . . . ." Individual C said, "I'll let him know how important you are." Burke said, "Well, you're good to do that but I'd also like to get some of his law business and get him involved, ah, here in, ah, in ah—" Individual C said, "Chicago." Burke said, "Yeah, and, you know, he's a [unintelligible] businessman here and you gotta, ah, be active." Individual C said, "Yeah. And he's pretty substantial. He's has a lot of, a lot of stuff out there, right?" Burke said, "I hear he's got 300 [restaurants] here." Individual C said, "Huh. Okay, okay, yeah." Burke said, "So he's somebody you and I should, ah—" Individual C said, "Well, keep me posted."

Burke said, "—try and, ah, ah, get to know." Individual C said, "Okay. Good. I'm glad you called me about it. And, uh, that's why I figured I'd work him. But I'll make sure he, he understands it." Burke said, "Good." Burke's statements to Individual C further reflect Burke's fixation on obtaining tax business from Individual B-1, and Burke's understanding that Individual C would inform Individual B-1 of Burke's official position in Chicago, where Individual B-1 was doing business.

Soon thereafter, on June 14, 2017, Burke and Andrews met with Individuals B-1 and B-2 and others at the restaurant. As set forth above, following the tour of the property, where Burke raised the issues of the trucks parking overnight and driveway permits, Burke took Individuals B-1 and B-2 to lunch, where Burke made an unsolicited pitch to them about hiring his law firm, and Individual B-1 stated that the person who handles property taxes at Company B would reach out to Burke. Following that, however, Individual B-1 did not follow-up with Company B's tax person and Burke was not contacted about Company B's legal work.

On or about June 27, 2017, at approximately 2:23 p.m., Burke received an incoming call at his office, which was transferred to his cellular phone, from Individual B-2. During the call, Burke and Individual B-2 discussed Burke's assistance with obtaining a permit for the restaurant, and Company B providing business to Burke's private law firm. Specifically, Burke said, "Hello my friend in [city redacted]. How are you?" Individual B-2 said, "Good, Mr. Burke. How are you?" Burke said, "Good, um, I haven't heard back. I'm just checking in with you." Individual B-2 said, "Well, Mr. Burke, since we last spoke, we did look at the survey

and the truck parking is part of our lot so we confirmed that part." Burke said, "Oh, that's good. So I made you half a million bucks." Individual B-2 laughed and said, "Yes sir, you did. Um, we have ordered signs to post in that area and those signs came in on Friday. I have the restaurant manager, the district manager putting up the signage today and once that signage is posted, they're going to send me pictures and I can send that over to you as well. They'll also be enforcing the no overnight parking now that we're going to 24 hours, and we will be making sure that if a truck is there overnight, that we will be asking them to leave, and if we have any issues then we will be calling the local police department to help us." Burke said, "Good. And um, we were going to talk about the real estate tax representation and you were going to have somebody get in touch with me so we can expedite your permits." Individual B-2 said, "I'm sorry Mr. Burke. What was that last part?" Burke said, "You were going to have somebody call me so we can help you make sure you get your permits for the remodeling." Individual B-2 said, "Yes, I believe, I thought my architect had reached out to you. Um, I guess, now that I'm talking to you, he has not. So I will follow up with him." Burke said, "Unless he's talked to my assistant , but I doubt that. I imagine he would have mentioned it to me." Individual B-2 said, "I will, I will follow up with the architect and have him reach out as soon as possible and I will have somebody from our [city redacted] office reach out to you regarding the property taxes. That's not something I manage on my end." Burke said, "Okay good. So I look forward to hearing from you and thanks for being responsive." Individual B-2 said, "No problem, Mr. Burke."

56

Approximately 6 weeks later, on or about August 2, 2017, at approximately 11:27 a.m., Burke placed an outgoing call to Andrews, during which they discussed the status of the restaurant remodeling project. By that point, Burke still had not been contacted by Company B about providing tax business to Burke's private law firm. Specifically, Burke asked, "Have we ever heard any more from those [restaurant] people on Pulaski?" Andrews responded, "No, not a word." Burke said, "Okay." Andrews said, "Not a word. It's why, they called me about three weeks ago talking about their remodeling, I said, 'Geez,' I said, 'Think the owners were supposed to get back with the Alderman after they had lunch,' and that's how I left it." Burke responded, "And the trucks are still parked there." Andrews replied, "Well the trucks, they put up, the trucks, they put up signs that say 'No Parking' from like 11 to 4 in the morning, their closed hours. The trucks, you know, because the trucks that are coming in there, those are the guys that are coming in there now, but there's not supposed to be any trucks parked overnight. And they've got the big, and they've got the big signs up on that, I went out there and I took pictures, I've got the pictures showing it says from 11 to 4 no parking." Burke responded, "Okay." Andrews asked, "So, ah, on that one, okay, but nothing else has, uh, happened?" Burke replied, "No." Andrews said, "Okay." Burke said, "Nope."

On or about October 24, 2017, at approximately 9:57 a.m., Burke made an outgoing call to Andrews, during which they discussed the restaurant. Specifically, Burke told Andrews, "I just drove by the [restaurant] on Pulaski . . . And there appears to be, ah, remodeling work going on there. Weren't we supposed to be

contacted, ah—" Andrews responded, "Yeah." Burke continued, "—before they did any work? What ah, what happened there?" Andrews responded, "Let me ah, I don't know. Let me get out there, cause ah, find out, they weren't supposed to do anything. No." Burke asked, "What was the issue? Why, why was I . . . able to hold it up?" Andrews replied, "Well the issue was you were, you had met, um—." Burke stated, "I know that. Why was I able to hold it up? What did they need from me?" Andrews responded, "Um, well they needed their driveway permits and everything signed off on." Burke stated, "Well, I don't remember signing off on any driveway permits." Andrews responded, "No. I never remember seeing anything come in. Let me get over there and see if there's an actual permit in the window. I'll get over there. Cause I mean ah, yeah. They knew that they were, I mean we, how many times, we had two different meetings with those people." Burke replied, "Yep." Andrews stated, "Hmm, hmm. Okay." Burke further stated, "And they appear to be ah, operating the drive-through. So maybe they're remodeling the inside for the people that are going to eat in, but it looks like cars are moving through there and picking up their, uh, orders." Andrews stated, "Okay." Burke stated, "But I don't know how that can happen if they don't have a driveway permit." Andrews responded, "No. If they don't have any – we'll get on 'em. And find out."

This call vividly demonstrates that Burke and Andrews planned to take steps to interfere with business operations of the restaurant under the pretext of the driveway permit issue as a means of extorting Company B so that Company B would provide Burke with tax work for his firm. As the testimony of Individuals B-1, B-2,

and B-3 will confirm, after Andrews talked to Burke, Andrews called Individual B-3 that same day and effectively instructed her to shut down construction at the restaurant, and demanded that she meet with Andrews under the pretext that permits were needed at the restaurant, despite the fact that the restaurant had a building permit for the remodeling project. Indeed, Individual B-3 sent the email to Individual B-2 and others at Company B informing them of Andrews' call on October 24, 2017, at approximately 11:16 a.m., less than 90 minutes after Burke and Andrews talked.

The next day, October 25, 2017, Andrews called Burke to inform Burke of the progress he had made with representatives of Company B in terms of shutting down construction and requiring that representatives of Company B meet with him. Specifically, on or about October 25, 2017, at approximately 6:59 p.m., Burke asked Andrews: "I forgot to ask you, I'm just gonna be driving past the [restaurant]. What, what was the result of your inquiry?" Andrews responded, "They're coming in tomorrow with all their, um . . . They shut down the construction. They're coming in tomorrow to try to show us all their permits and the big thing is, you know, I mean they can go and get their building permits, but where's their driveway permits?" Burke stated, "And, and they didn't have their, didn't they have their permits posted on the site as they're supposed to?" Andrews (speaking over Burke) stated, "Driveway permits . . . driveway permits. Yeah, but like I said yesterday, I couldn't see if they were posted or not because they had that big green construction fence out there that was out there. But my big thing is, if they haven't transferred over the driveway

59

permits, it's illegal." Burke replied, "Yeah." Andrews stated, "You know, but, hey, hey, not only, and I'm gonna put 'em out there and say, 'By the way, not only does the construction has [sic] to stop, the business has to stop.'" Burke stated, "All the other licenses that they have." Andrews (speaking over Burke) continued, "'You guys never transferred over.'" Burke stated, "Yep . . . All the other licenses they have." Andrews responded, "Yeah, now that group [Individual B-1's company  associated with Company B]—did they ever get back to you –" Burke responded, "Never." Andrews continued, "—After your, ah —" Burke replied, "Never." Andrews continued, "—meeting at Beverly [Country Club]?" Burke stated, "Never. I took 'em [Individuals B-1 and B-2] to lunch. I was playing nice with 'em—never got back." Andrews stated, "To tell you the truth, I'm at Beverly right now." Later in the conversation, Andrews stated, "You know, they're, you know, but that group [Individual B-1's company associated with Company B] never got back to you, right?" Burke responded, "Never." Andrews replied, "All right, I'll play as hard ball as I can." Burke stated, "Okay."

This conversation, particularly when considered in conjunction with the witness testimony and prior intercepted calls, proves that Burke and Andrews agreed to, and in fact did, take action to shut down construction at the restaurant ("I'll play as hard ball as I can") based on the pretext that the restaurant did not have a driveway permit, but in reality, based upon the fact that Individuals B-1 and B-2 had not yet provided tax work to Burke (Individuals B-1 and B-2 "never" got back to Burke even after Burke "played nice" and took them to lunch at Beverly). Indeed, the day after this call—October 26, 2017—Andrews met with Individual B-3 and other

representatives of Company B, and grilled them about the remodeling project and the fact that the general contract and his labor force were not local.  Further confirming Burke's and Andrews' motivations is the fact that, Burke and Andrews continued to hold up the project even after Company B applied for a driveway permit, and indeed held up the project until Burke was assured by Individuals B-1 and B-2 on December 12, 2017, that he would get the tax business from Company B (as set forth above, Andrews called Architect B-1 on December 13, 2017, to tell him that everything was cleared up as to the driveway permit).

Soon after Burke was assured he would receive tax business from Company B, Burke received correspondence from Company B's tax person, Individual B-4, as proven by email records set forth below, as well as wire interceptions.  For example, on or about December 19, 2017, at approximately 1:15 p.m., Burke spoke with his administrative assistant, City Hall Employee 1.  During the call, City Hall Employee 1 informed Burke of an email received from the Company B "tax guy" [Individual B-4].  Specifically, she stated, "Um I just wanted to see, I got an email from the [Company B] tax guy and he's asking if he's sending all Illinois locations or only Cook County [referring to the multiple restaurant locations owned by Company B in Illinois]."  Burke responded, "Umm, all Illinois locations. Well, I'm relatively certain they're just metropolitan."  City Hall Employee 1 replied, "Chicagoland area, yeah."  Burke stated, "Cook [County], Will [County]."  City Hall Employee 1 stated, "Lake [County]."  Burke stated, "Lake, umm, DuPage [County], etc."  As described below, the government obtained a copy of this email communication, and intends to admit it

61

at trial. Two days later, on or about December 21, 2017, Burke had another call with City Hall Employee 1 in which City Hall Employee 1 informed Burke that Individuals B-1 and B-2 were going to call Burke.[19]

On or about January 18, 2018, at approximately 4:52 p.m., Burke received an incoming call from Individual B-1. During the call, Individual B-1 explained that Individual B-2 was not going to be able to attend the fundraiser that Burke had invited him to that was being held for another local politician. Individual B-1 stated that bad weather kept him from flying to Chicago, but that Individual B-1 had made a donation to the candidate online. Burke said, "Good, well I wanted you to meet some of the people that are going to be there because, you know, there's some of the movers and shakers here that I think you should start to become acquainted with, but we'll do it another time. I understand." Individual B-1 then specified the amount Individual B-1 had donated: "I was wanting to donate like $10,000." Burke said, "That's great." Individual B-1 said, "But they said they couldn't do it. There was a limit, $5,600 per person, individual." Burke said, "Oh okay, alright, good." Individual B-1 said, "Maybe then we do it, maybe we do one in [Individual B-2's first name] name." Burke said, "Yeah . . . we'll figure it out." Individual B-1 said, "Yeah, okay we'll figure it out but definitely I will miss, but I really wanted to meet everybody and you also, but I'm going to be making a trip shortly so maybe we can plan it ahead of time." Burke said, "Good, just give me a little bit of warning. A few days in advance."

---

[19]     No corresponding call was intercepted over the wiretap of Burke's cellular telephone.

Approximately three days later, on or about January 21, 2018, at approximately 12:54 p.m., Burke called Andrews and discussed the official action taken by Burke to assist Company B with respect to the remodeling project at the restaurant. Specifically, Burke said, "Um, the guy from uh, Houston asked me what he needs to do to get going again on the [restaurant]. I thought we gave them um, clearance on that?" Andrews said, "I did. I called his um, architect [name of Architect B-1] immediately and he thanked me and he said, 'Appreciate everything you've done.' And I says, 'It's clear to take off.' He says, 'Thank you.' He says, 'I'll be right at it.' Right? So I, I mean that's a month ago." Burke said, "And it's sitting there with uh, nothing going on." Andrews said, "Well I mean I, immediately the same day I had talked to the guy [Architect B-1]. And I got it, uh, talking about uh, things starting uh, I saw they brought it in 'cause I'd gotten a call because they were going to start with the sub zero they pulled off on it a little bit. I saw they got their bulldozers at um, Archer and Kedzie for the [bank] to go up." Burke said, "Okay." Andrews said, "That's gonna start. So. We shall see. I'll give that [name of Architect B-1] another call tomorrow then."

On or about January 25, 2018, at approximately 6:57 p.m., Burke talked to City Employee 1 regarding the contact information for Individual B-2. Specifically, Burke asked, "Now tell me, um, I thought that we would have in our, um, like in my iPhone –"City Employee 1 stated, 'Uh uh." Burke continued, "—the name, the name of our guy in [Texas city], the [restaurant] guy. City Employee 1 stated, "The [last name of Individual B-2] guy?" Burke stated, "Yeah." City Employee 1 stated,

"[Individual B-2] and I don't know his number off the top of my head." Burke asked, "How do you spell it?" City Employee 1 responded, "[spelling out each letter of last name of Individual B-2]." Burke asked, "Why wouldn't it be in my iPhone?" City Employee 1 responded, "It could be that he's only in your calendar, that he was never added to your contacts that I didn't put it in there that way." Burke stated, "Alright, spell it for me again." City Employee 1 responded, "[spelling out each letter of last name of Individual B-2]." City Employee 1 further stated, "Pete [Andrews] just talked to him."

### C.    Documentary Evidence

The government anticipates admitting at trial documents, records, and emails gathered throughout the investigation (including those already referenced above), which will corroborate witness testimony and the wire interceptions in proving the existence of the conspiracy and Burke and Andrews' participation in the conspiracy.

### 1.    Documents Obtained by Search Warrant

The government intends to introduce testimony from law enforcement officers concerning searches executed at multiple locations, and to admit documents found during those searches. Specifically, on November 29, 2018, law enforcement executed search warrants at Burke's City Hall office, Burke's 14th Ward office, and on Burke's cellular phone. As relevant to the restaurant conspiracy, in Burke's City Hall office, law enforcement found Individual B-2's business card. Furthermore, law enforcement found a number of documents in the Ward office where Andrews worked

that confirmed Andrews' involvement in the conspiracy.[20]   For instance, law enforcement found a typed memorandum dated December 12, 2017, from "Pete Andrews" to "EMB" (Edward M. Burke), and the subject line is the name of the restaurant.  The memorandum reads:

> Met with [representative of Company B] regarding their remodeling approximately a year and a half ago.
>
> Met with the new ownership of [the restaurant], Company B at site this past summer.  (Had lunch with them at Beverly)
>
> They were reminded as new owners that they were required to update driveway permits, etc. prior to construction.
>
> They submitted their plans to COC [City of Chicago], Building Department without doing so.
>
> We stopped construction on the site and it is still on hold while the Department of Transportation reviews the driveway permits that were submitted mid-November.
>
> Footnote: They have hired a construction company from New Jersey to do the remodeling.  Architect is local from [suburb of Chicago], [name of Architect B-1].
>
> I recall that you mentioned to them since they are out of [Texas city] they should think about local legal representation for the zoning matters and so forth.

---

[20]   On the same date that the search warrants were executed – November 29, 2018 – FBI agents spoke with Andrews about Individuals B-1 and B-2. R. 30, Count 10 (charging Andrews with violating 18 U.S.C. § 1001(a)(2)).  During this recorded conversation, Andrews falsely denied ever hearing the names of Individuals B-1 and B-2. *Id.* The agents asked Andrews whether he thought Burke had ever met Individuals B-1 and B-2. *Id.* Andrews responded that he did not know. *Id.* When agents asked Andrews if he remembered dealing with Individuals B-1 and B-2, he falsely responded, "They may have come in to our office or something. . . . Maybe, I don't know. I don't recall." *Id.*  At trial, the government anticipates admitting law enforcement testimony about this interview, as well as the recording of the interview itself.  Andrews' statements to agents are directly contradicted by the evidence set forth above.  Andrews' false statements seeking to conceal his knowledge of Individuals B-1 and B-2 and to conceal his contact and Burke's contact with Individuals B-1 and B-2 is further evidence of Andrews' participation in the conspiracy.

Notably, Andrews' memorandum is dated the same day – December 12, 2017 – that Burke met with Individuals B-1 and B-2 at the Union League Club. As set forth above, at that time, the remodeling work at the restaurant was shut down by Burke and Andrews through the use of the driveway permit artifice, and Individuals B-1 and B-2 will testify that, during this lunch meeting, Burke asked why he had not yet been contacted about handling property tax work for Company B. Thus, this memorandum is powerful proof of the existence of the conspiracy between Burke and Andrews to extort Company B. The memorandum proves that Burke and Andrews ("we") shut down construction at the restaurant, that Andrews was well aware that Burke was seeking legal business from Company B ("I recall that you mentioned to them . . . they should think about local legal representation . . . .") at the same time that Andrews and Burke stopped construction restaurant ("We stopped construction on the site and it is still on hold . . . ."). The memorandum is also consistent with Burke and Andrews' statements during the October 24, 2017, and October 25, 2017 interceptions cited above, in which Burke asked Andrews why Burke was able to "hold up" the remodeling project (an excuse that Burke could not even marshal himself), and after Andrews said "they needed their driveway permits and everything signed off on," Burke confirmed he had not signed off and had not heard from Individuals B-1 and B-2 since he "played nice" and took them to lunch, and in response, Andrews promised to "play hardball" with them. These communications reflect that Andrews was well aware of Burke's ultimate goal of obtaining tax work

from Company B and that Andrews continued to track the issue on Burke's behalf to accomplish that result.

Also during the search of the Ward office, law enforcement found a folder labeled with the name of the restaurant and Company B and numerous documents demonstrating Andrews' involvement in the conspiracy, including but not limited to:

- A hard-copy print-out of the November 28, 2017, email from DOB Employee 2 to Andrews regarding the restaurant driveway permit that is referenced above. The email from DOB Employee 2 to Andrews begins, "It's been very nice working with you on this driveway matter." The email states that the driveway permit packet had been submitted by Architect B-1 and was being evaluated by CDOT, and the packet was attached DOB Employee 2's email. After providing information about the driveways and a possible easement agreement, the email concludes, "I hope this information assists you and Alderman Burke thus far."

- An executive profile of Individual B-1 which appears to have been printed from Company B's website.

- Individual B-3's business card.

- The building plans/blue-prints for the restaurant.

- A printed out hard-copy of the email sent on March 1, 2017, by Architect B-1's project manager to Burke's office attaching the Aldermanic Acknowledgement Letter for the restaurant and requesting Burke's signature on it.

## 2. Emails and Other Documents

As already detailed herein, the government obtained emails and other records from the City of Chicago, Company B, Architect B-1, and other sources related to the restaurant. These records not only will trace the history of the permits applied for and received by the restaurant and the driveway citation issued to Company B by CDOT, but also will demonstrate the efforts undertaken by Burke and Andrews to

withhold Burke's official support for the building permit and a related driveway permit for purposes of stalling the remodeling project until Company B committed to giving legal work to Burke's private law firm. For example:

- City of Chicago records and emails that will provide a timeline of events related to the permits applied for and issued to the restaurant, as set forth above. For instance, the government intends to admit at trial the building permits issued to the restaurant and related materials, the application for the driveway permits, and the CDOT citation issued to the restaurant for the purported failure to have a driveway permit.

- Emails from Company B employees regarding efforts to obtain permits for the restaurant, Burke's approval of such permits, and Burke and Andrews halting construction at the restaurant. Certain of these emails were discussed above, including the October 24, 2017, at approximately 11:16 a.m., email from Individual B-3 stating that Andrews asked Individual B-3 to shut down construction until Andrews could meet with the general contractor to review permit documentation at the plans for the restaurant.

- Emails exchanged between Burke's office and employees of DOB and CDOT, such as: (a) the November 17, 2017, email discussed above from Ward Employee 2 to DOB Employee 2 stating that Andrews, Burke's "Chief of Staff" wanted to speak with DOB Employee 2; and (b) the November 29 and November 30, 2017, emails from Ward Employee 2 to CDOT Employee 3 stating that Andrews, Burke's "Chief of Staff" wanted to speak with CDOT Employee 3.

- Emails exchanged between Architect B-1 and employees of DOB and CDOT, such as the email exchange between Architect B-1 and CDOT Employee 4, dated December 11 – December 13, 2017, regarding the driveway permit. In CDOT Employee 4's December 11, 2017, email, as detailed above, CDOT Employee 4 informed Architect B-1 that Burke's office asked for the driveway permit for the West 40th Street driveway to be put on hold because of an easement.

- Emails between Architect B-1 and Company B representatives about permits for the remodeling project, including the July 12,

2017, email described above in which Individual B-2 asked Architect B-1 to call Andrews because Burke had called again about the driveway permits.

- Emails exchanged between Architect B-1's architecture firm and Burke's office. For example, on November 1, 2017, Architect B-1 sent an email to a staff member at Burke's Ward office to the attention of Andrews explaining that the driveways at the restaurant were not on the restaurant's property. Architect B-1's email stated, "Pete see this for the survey as stated and as permitted thru the city, these drives are not on our property. We need to start back on the construction phase now." Attached to the email was the plat of survey for the restaurant. On November 2, 2017, Architect B-1 followed up with an email directed to Andrews that stated, "from our call today Pete I do see the drive of course on [street] . DOB driveways does not have this in their system and that is how I got the building permit."

Email evidence will further establish that, immediately after Burke was promised legal business from Company B on December 12, 2017, Burke and Andrews permitted Company B to receive the driveway permit for the restaurant, and at the same time, Burke (through City Employee 1) corresponded with Individual B-4 regarding Burke's firm obtaining the legal business for all of Company B's restaurants in Illinois. For example, on or about December 13, 2017, at approximately 10:03 a.m., City Employee 1 sent the following email to Individual B-4 using Burke's personal AOL email account:

> Alderman Burke recently met with [Individual B-1] and he instructed him to reach out regarding real estate tax appeal work in the metropolitan Chicago area. We just wanted to confirm this was the best method to reach you. Alderman Burke can be reached either via this email ([email address redacted@aol.com]), his office number which is 312-744-3380, or his cell phone which is [telephone number redacted].
>
> Thank you.

> [Name redacted]
> Assistant to Alderman Burke
> 312-744-3380[21]

On that very same day (December 13, 2017), as set forth above, Andrews contacted Architect B-1 and said that the driveway permit matter was resolved.

Emails obtained from Company B reflect that, on or about December 15, 2017, City Employee 1 sent another email to Individual B-4 stating, "I am just following up on the email below." The following Monday, December 18, 2017, Individual B-4 responded to the email and set out the terms Company B and its affiliates had with their "current tax consultant." On or about December 19, 2017, Individual B-4 sent the following email to Burke's personal email address:

> [City Employee 1],
>
> Can you please confirm that I am sending all IL locations or only Cook County locations. Also, any other info I need to send?

As set forth above, after receiving this email, City Employee 1 spoke to Burke, who confirmed that Company B would be sending his private law firm the property tax business for all of Company B's Illinois locations. Following this call, City Employee 1 responded to Individual B-4's email copied above and stated, "It would be all IL locations."

The government anticipates that Individual B-1 will testify that Individual B-4 did not want to give Burke the tax business, and after stringing out the process for

---

[21]     As set forth herein, Burke had City Employee 1 conducting private law firm business on his behalf, which further demonstrates the illicit nature of the conspiracy.

several months, did not end up giving any tax work to Klafter & Burke. As set forth above, the government anticipates that Individual B-3 will testify that the remodeling project at the restaurant was completed in April 2018.

## IV.    COCONSPIRATOR STATEMENTS

The statements between the coconspirators in furtherance of the conspiracy fall into numerous categories, all concerning subjects integral to the conspiracy and its success. These statements—which will establish the information flow between coconspirators and was intended to help each perform his role—will be introduced through the testimony of witnesses, including but not limited to those noted above, lawfully recorded telephone calls, including those referenced throughout this submission, and emails and documents (some of which are described herein). As outlined in the opening section of this proffer, a larger number of these statements will be admissible without regard to the coconspirator hearsay rule, because they are statements of the defendants, statements of an agent or employee, statements not offered to prove the truth of the matter asserted, verbal acts, or for other reasons.

Given the extent and number of such statements in this case, the government does not, and cannot, detail each and every coconspirator statement of each witness or document. Nor does *Santiago* or Seventh Circuit precedent require the government to set forth the specific, verbatim coconspirator statement. Instead, the Seventh Circuit has specifically stated that categories of statements, such as those set forth below, suffices. *See United States v. McClellan*, 165 F.3d 535, 554 (7th Cir. 1999) (rejecting the argument that the "government is bound to give notice in advance of trial of co-conspirator statements it intends to introduce at trial"); *United States v.*

*Johnson*, No. 08 CR 466, 2011 WL 809194, at *8 (N.D. Ill. Mar. 2, 2011) (rejecting defendant's argument that the government failed to "specifically identif[y] the statements it intends to introduce" and rejecting defendant's request "that the Government be required to specifically identify each statement by a co-conspirator it intends to introduce"). Nevertheless, the government has provided numerous specific examples. The coconspirator statements concern the subjects listed below, and include, but are not limited to, the coconspirator statements discussed above:

1. Statements regarding the members of the conspiracy, including the following:

    a. Identifying members of the conspiracy and their roles;

    b. Reviewing a coconspirator's exploits and criminal acts previously committed in order to, among other things, update a fellow coconspirator on actions taken in furtherance of the illegal objectives of the conspiracy;

    c. Statements that reveal the roles of participants in the conspiracy's illegal activities or specific criminal conduct;

    d. To report coconspirators' status and in turn receive assurances of assistance from coconspirators;

2. Statements to conduct or help conduct the conspiracy's activities, including the following:

    a. The purpose behind prior criminal acts carried out by the conspiracy;

    b. To plan criminal acts by the conspiracy;

    c. To instill and maintain the trust and cohesiveness of the conspiracy;

    d. To advise of the progress and accomplishments of the conspiracy;

    e. To inform or reassure the listener regarding the conspiracy's activities;

    f. Statements to outsiders to enhance the conspiracy's position in the eyes of outsiders and express confidence about the ability of the conspiracy; and

    g. To inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), and to reassure or calm the listener regarding the progress or stability of the conspiracy.

3. Statements concerning the means used to conceal the conspiracy's illegal activities; and

4. Statements to others outside the conspiracy to reassure those individuals, and to seek their cooperation.

As is evident from the categories' description, all such statements made by Burke and Andrews furthered the conspiracy. Thus, under the case law summarized above, all such statements are properly admitted at trial as coconspirator statements under Fed. R. Evid. 801(d)(2)(E).

## V. Conclusion

The above is an outline of the evidence that the government will introduce to establish that the charged conspiracy existed. Based upon this proffer, the government respectfully requests that this Court find that categories of coconspirator statements listed above, as well as coconspirator statements like them, are admissible pending the introduction of evidence to support this proffer.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:    _/s/ Sarah Streicker_
AMARJEET BHACHU
DIANE MacARTHUR
SARAH STREICKER
TIMOTHY CHAPMAN
SUSHMA RAJU
Assistant United States Attorneys
219 South Dearborn Street, Fifth Floor
Chicago, Illinois 60604
(312) 353-5300

74