IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | 19 CR 322 |
| EDWARD M. BURKE, PETER J. ANDREWS, and CHARLES CUI, | ) ) ) ) | Judge Virginia M. Kendall |
| *Defendants*. | ) | |

## ORDER

Before the Court are Defendant Edward Burke's motion L within his Second Consolidated Motions *in Limine* [247] and Defendant Charles Cui's Motion *in Limine* 1 [253]. Cui moves to exclude evidence that he submitted a photoshopped image of the pole sign on his LLC's (Company C) property to the Chicago Department of Buildings. (Dkt. 253 at 4–6). Separately, Burke moves to exclude the same evidence plus any of Cui's pre-August 31, 2017 communications as inadmissible against himself. (Dkt. 247 at 43–46). For the following reasons, both motions are denied.

## BACKGROUND

The Court assumes general familiarity with the facts of this case. (*See* Dkts. 196, 287, 301, 309). The May 30, 2019 Superseding Indictment (the "Indictment") charges Burke with fourteen counts of racketeering, federal-program bribery, extortion conspiracy, and the use of interstate commerce to further such violations. (Dkt. 30). The charges arise from four discrete episodes of alleged corruption: the (1) Post Office; (2) Restaurant; (3) Pole Sign; and (4) Museum episodes. (*Id.*; *see also* Dkt. 287 at 1). Specific to the Pole Sign episode—implicating Cui and relevant to the present motions—the Indictment charges Burke with various offenses relating to his alleged solicitation of a bribe from Cui. (Dkt. 30, Counts 1, 11, 15–16). For his part, Cui is charged with offering to bribe Burke and making false statements to the FBI. (*Id.*, Counts 12–15, 17).

Below is a timeline of events the Government intends to prove at trial, underlying its theory of the challenged evidence's relevance. (*See* Dkt. 286 at 59–60; 88–94; Dkt. 289).

- March 2016. The Chicago City Council, with Burke's support as Chairman of the Finance Committee, passed an ordinance providing for up to $2,000,000 in tax-increment financing (TIF) for Cui's LLC's (Company C's) redevelopment of its 4901 West Irving Park Road property, pursuant to a redevelopment agreement between Company C and the City. (Dkt. 286 at 89).

1

- April 2017. Company C's tenant, Company D, applied for a permit to use the pole sign on the same property. (*Id.* at 89–90).

- May 18, 2017. The Department of Buildings denied the permit. (*Id.* at 90).

- July 2017. Due to the permit denial, Cui and Company D renegotiated their lease—reducing Company D's rent by a total of $750,000. (*Id.* at 90). The loss of that rent may have impacted Company C's planned redevelopment subject to its agreement with the City—putting the $2,000,000 of TIF money in jeopardy. (*Id.*)

- August 23, 2017.

    o 9:33 a.m. Cui left Burke a voicemail about needing help with a legal matter. (Dkts. 289-1).

    o 9:58 a.m. Cui emailed Burke seeking advice about the pole sign. (Dkt. 289-2).

    o 2:53 p.m. Burke listened to most of Cui's voicemail. (Dkt. 289-3).

- August 24, 2017.

    o 11:59 a.m. Cui forwarded his email to Burke to a mutual acquaintance, Individual C-1, saying: "fyi. I threw your name there. Maybe he thinks there is a conflict of interest, because of his position. I'll ask him to represent me for the property tax appeal, which will be a big bite, comparing with this." (Dkt. 289-4; Dkt. 247 at 55).

    o 12:03 p.m. Cui emailed his property tax lawyer:

    Can I ask you for a favor? Can I have Edward Burke handle 4901 W. Irving Park property tax appeal for me, at least for this year? I have TIF deal going with City, and he is the Chairman of Finance Committee. He handled [sic] his tax appeal business card to me, and I need his favor for my tif money. In addition, I need his help for my zoning etc for my project. He is a powerful broker in City Hall, and I need him now. I'll transfer the case back to you after this year.

    (Dkt. 289-5 Dkt. 247 at 44).

    o 12:47 p.m. Cui emailed Burke, requesting representation in the tax appeal for 4901 West Irving Park Road. (Dkt. 289-6).

    o 1:45 p.m. Individual C-1 called Burke and mentioned that Cui's need for help with tax work. Burke acknowledged having received an email from Cui "the other day." (Dkt. 289-7).

    o 3:52 p.m. Burke's assistant told him about an email from Cui. (Dkt. 289-8).

- August 25, 2017. Burke responded to Cui's email, telling Cui that someone from Burke's law firm, Klafter & Burke, would reach out soon. (Dkt. 289-6).

- August 26, 2017. Cui replied: "Thank you Mr. Burke. Will you be able to represent me for the pole sign matter?" (Dkt. 289-6).

- August 28, 2017.

    - 4:55 p.m. Cui forwarded his emails with Burke to Individual C-1, asking Individual C-1 to talk to Burke about taking on the pole sign matter. (Dkt. 289-9).

    - 8:50 p.m. Burke listened to Cui's August 23, 2017 voicemail again. (Dkt. 289-10).

- August 29, 2017. Burke asked his assistant whether he had already contacted someone at Klafter & Burke about Cui's request. (Dkt. 289-11).

- August 30, 2017.

    - 9:42 a.m. Burke told his assistant to refer Cui to an attorney at Klafter & Burke, after learning that he had not yet done so. (Dkt. 289-12).

    - 10:42 a.m. The Klafter & Burke attorney emailed Cui, requesting information about the property. (Dkt. 289-13).

    - ~11:16 a.m. Burke left a voicemail for Commissioner C of the Department of Buildings, requesting a call back. (Dkt. 289-14).

    - 11:25 a.m. Cui responded to the Klafter & Burke attorney's email with the requested information. (Dkt. 289-13).

    - 4:27 p.m. Burke told his assistant to call Commissioner C. (Dkt. 289-15).

- August 31, 2017.

    - 8:47 a.m. Burke's assistant told him that she would call Commissioner C that day. (Dkt. 289-16).

    - 9:53 a.m. Burke's assistant emailed Cui, saying Commissioner C would reach out that day. (Dkt. 289-2).

    - 12:58 p.m. Cui thanked Burke's assistant. (*Id.*)

    - At some point, Cui and Commissioner C spoke about the pole sign. (Dkt. 286 at 91–92; Dkt. 289 at 5).

3

- September 1, 2017.

    - 3:51 p.m. Cui asked his zoning attorney to contact Commissioner C about the pole sign. (*Id.*; Dkt. 286 at 92).

    - 4:42 p.m. Cui sent a photoshopped image to his zoning attorney—purporting to show that the pole sign had been in continuous use—for forwarding to the Department of Buildings. (Dkt. 289 at 5; Dkt. 286 at 92).

- September 5, 2017.

    - 9:17 a.m. Cui emailed his zoning attorney saying Commissioner C was expecting to hear from them. (Dkt. 289 at 5).

    - 12:14 p.m. Cui emailed his zoning attorney again, telling him to tell Commissioner C that Burke was involved in the pole sign matter. (*Id.*)

    - 2:34 p.m. The Klafter & Burke attorney sent Cui a draft contingent-fee agreement for the tax appeal. (*Id.*)

    - 2:50 p.m. Cui returned the signed contingent-fee agreement. (*Id.*)

- September 6, 2017.

    - 1:58 p.m. Cui emailed Commissioner C to thank her for speaking with him on August 31, 2017. (*Id.* at 6; Dkt. 286 at 93).

    - 3:30 p.m. Cui's zoning attorney emailed Commissioner C saying Cui wanted to submit evidence of the pole sign's continuous use. (Dkt. 289 at 6; Dkt. 286 at 93).

    - 3:34 p.m. Commissioner C referred the matter to Department of Buildings employee specializing in ordinance issues relating to signs ("Department Sign Specialist"). (Dkt. 289 at 6; Dkt. 283 at 93).

- September 7, 2017.

    - 9:43 a.m. The Department Sign Specialist emailed Commissioner C and Cui's zoning attorney about the May 18, 2017 pole-sign permit denial. (Dkt. 289 at 6).

    - 9:59 a.m. Cui's zoning attorney sent the photoshopped image of the pole sign to Commissioner C and the Department Sign Specialist. (*Id.*)

    - 10:17 a.m. The Department Sign Specialist responded to Commissioner C and Cui's zoning attorney pointing out that the photograph was photoshopped. (*Id.*)

- o 1:58 p.m. Cui emailed his zoning attorney asking how to get the pole sign approved, to which the attorney replied that it could not be done. (*Id.*)

- September 8, 2017. Cui emailed commissioner C claiming that the photoshopped image came from an unnamed broker, who could vouch for its accuracy. (*Id.*; Dkt. 286 at 94).

- September 11, 2017. The Department Sign Specialist notified Commissioner C that Cui's zoning attorney said he had withdrawn from representing Cui on the pole sign matter. (Dkt. 289 at 7).

- September 13, 2017. Cui met with Alderman John Arena of the 45th Ward and later emailed him noting that he stood to lose $750,000 in lost rents and describing the importance of the pole sign to the redevelopment project. (*Id.*)

- September 14, 2017. Burke's assistant told him that she had learned from Commissioner C about Cui's submission of a photoshopped image of the pole sign. Burke then asked his assistant to contact a zoning administrator about helping with the pole sign matter—an effort that later proved unfruitful. (Dkt. 289 at 7; Dkt. 289-17).

- November 6, 2017. The denial of Company D's permit application became final. (Dkt. 286 at 94).

Now, Cui moves to exclude evidence of the photoshopped-image incident as irrelevant, improper other-act evidence, and unfairly prejudicial. (Dkt. 253 at 4–6). Burke argues that evidence of the same incident, and Cui's pre-August 31, 2017 emails, are irrelevant as to him. (Dkt. 247 at 43–46). The Court heard oral argument on these motions on October 16 and October 18, 2023. (Dkts. 288, 292; *see also* Dkts. 306, 308).

## DISCUSSION

From above timeline of events, Cui's submission of the photoshopped image of the pole sign is relevant to his motive and intent to bribe Burke. *See* Fed. R. Evid. 401, 402; *see also United States v. Hamzeh*, 986 F.3d 1048, 1052 (7th Cir. 2021) (observing that relevant evidence need only meet the "low threshold" of having "any tendency to make a fact of consequence more or less probable than it would be without the evidence") (cleaned up). Specifically, the evidence reflects Cui's willingness to take shortcuts—his desperation, even—to avoid losing $750,000 in rent and $2,000,000 more in TIF funds. The Indictment may not charge Cui for attempting to defraud the City in connection with the photoshopped-image incident. Yet, Cui's objection under Rule 404(b) is unconvincing. Even assuming the photoshopped-image incident is sufficiently separable from Cui's charged conduct to be deemed an "other act," rather than direct evidence, the Government offers the challenged evidence to show Cui's state of mind during the very window of time in which he sought Burke's help with the pole-sign permitting issue—not for a forbidden propensity inference. *See* Fed. R. Evid. 404(b)(2); *United States v. Ferrell*, 816 F.3d 433, 444 (7th Cir. 2015) (evidence relevant to "another purpose" through "some propensity-free chain of reasoning" is admissible, subject to Rule 403 balancing (quoting *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (en banc)); *see also United States v. Khan*, 771 F.3d 367, 377 (7th Cir. 2014) (explaining

that evidence of another bad act must be "similar and close enough in time to be relevant"). For that non-propensity purpose, the evidence has strong probative value.

Central to the corrupt-offer charge against Cui is his "intent to influence or reward" Burke in connection with business or transactions of the City of Chicago. *See* 18 U.S.C. § 666(a)(2); *United States v. Morgan*, 929 F.3d 411, 428 (7th Cir. 2019) (observing that "the degree to which the non-propensity issue actually is disputed in the case will affect the probative value of the other-act evidence" (quoting *Gomez*, 763 F.3d at 857)). Cui's seeming effort to reverse the pole-sign permit denial by submitting a photoshopped image to the Department of Buildings—after getting Commissioner C's attention through Burke—goes straight to Cui's motive and intent to achieve the same by bribing Burke. The evidence has further relevance in explaining why Cui's efforts to obtain the pole-sign permit fell through despite his retention of Klafter & Burke. Next to the high probative value of the evidence, the risks that it will result in unfair prejudice, confusion, or a minitrial appear minimal. *See* Fed. R. Evid. 403. Accordingly, Cui's motion to exclude the evidence is denied. (Dkt. 253 at 4–6).

Cui's conduct in the photoshopped-image incident is also admissible against Burke. The evidence is probative of Burke's knowledge and intent: after learning of Cui's submission of the doctored image to the Department of Buildings—demonstrating Cui's apparent motive to bribe Burke or, at least, Cui's willingness to obtain the permit through shady means—other evidence shows that Burke still tried to help Cui resolve his permitting problem by contacting a zoning administrator. The dangers of unfair prejudice or confusion do not outweigh the probative value of the incident in showing Burke's knowledge and intent. *See* Fed. R. Evid. 403.

Cui's pre-August 31, 2017 communications are admissible against Burke too. These emails are strong circumstantial evidence of Burke's knowledge that Cui's retention of Klafter & Burke was connected to Burke's help, in his official capacity, with the permitting problem. Soon after receiving Cui's August 23 messages about his zoning and tax issues, by August 30, Burke began attempting to contact Commissioner C.

Notably, two of Cui's emails in question—to Individual C-2 and Cui's property tax attorney on August 24, 2017—are also subject to Burke's motion F, (Dkt. 247 at 15–28), which a forthcoming order will address in full. Since those emails are wrapped up in Burke's motion L, the Court resolves Burke's hearsay challenge now. (*See id.* at 25–26). If Cui opts not to testify—making him unavailable as a witness—his emails would easily meet the other two requirements for the statements-against-interest exception. *See* Fed. R. Evid. 804(b)(3); *United States v. Volpendesto*, 746 F.3d 273, 288 (7th Cir. 2014) ("For Rule 804(b)(3) to apply, the proponent of an inculpatory hearsay statement must show: (1) that the declarant is unavailable to testify at trial; (2) that the statement was against the declarant's penal interest when made; and (3) that corroborating circumstances clearly suggest that the statement is trustworthy." (citation omitted)). The emails are inculpatory, and Cui's repetition of a similar sentiment to different recipients within four minutes suggests the statements are trustworthy indications of his true intent. *See Volpendesto*, 746 F.3d at 288.

Even if Cui does not testify, his Cui's emails to his property tax attorney and Individual C-2 are admissible as statements of his "then-existing state of mind"—namely, as powerful evidence

6

of Cui's intent to trade private legal fees for an aldermanic favor—and to show later action in conformity with that intent. *See* Fed. R. Evid. 803(3) (excepting from the rule against hearsay "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan)"); *Mut. Life Ins. Co. of N.Y. v. Hillmon*, 145 U.S. 285, 295–96 (1892); *United States v. Hartmann*, 958 F.2d 774, 784 ("[S]tatements of a declarant's future intent are admissible to show that the declarant acted in conformity with his intention." (citing *Hillmon*, 145 U.S. at 295)); *see also United States v. Hughes*, 970 F.2d 227, 233–34 (7th Cir. 1992) ("Statements indicating state of mind are generally admissible only when state of mind is in issue or when it tends to prove the doing of the act intended." (quoting *United States v. Peak*, 856 F.2d 825, 833 (7th Cir. 1988)). Cui's intent to bribe Cui is central to the case. His emails reflecting his intent to retain Klafter & Burke in order to gain Burke's help in his official capacity—to different recipients, minutes apart—are admissible to show that Cui, in fact, carried the same mindset into his subsequent retention of Klafter & Burke. *See Hartmann*, 958 F.2d at 784 ("Werner's declared intent to carry out the 'juice loan scam' was admissible to show intent to execute the plan as well as to prove that he, in fact, carried out that plan."). Considering the timing and the content of the emails, Cui's statements of intent appear contemporaneous with his mental state and made with "no time to reflect, that is, no time to fabricate or misrepresent his thoughts." *See United States v. Pacilio*, --- F.4th ----, 2023 WL 6970157, at *11 (7th Cir. Oct. 23, 2023) (quoting *United States v. Neely*, 980 F.2d 1074, 1083 (7th Cir. 1992)).

Since the emails are reliable statements of Cui's then-existing state of mind, the only hurdle to their admission against Burke is Rule 403. *See United States v. Green*, 680 F.2d 520, 523 (7th Cir. 1982); *see also Johnson v. Chrans*, 844 F.2d 482, 486 n.4 (7th Cir. 1988) (noting that "reliable evidence relating to a declarant's state of mind can sometimes be used as circumstantial proof of another person's conduct" (citing *Kemnitz v. United States*, 369 F.2d 389, 391 (7th Cir. 1966))); *see also Volpendesto*, 746 F.3d at 288 (explaining that statements against interest—since that exception "is rooted in a theory about such statements' reliability"—are admissible "for any purpose, including as substantive evidence of a co-defendant's guilt"). The danger that Cui's pre-August 31, 2017 emails will unfairly prejudice Burke (absent an instruction limiting their use as against Cui) does not substantially outweigh the probative value. Burke will be free to argue the weight of these emails to the jury.

## CONCLUSION

For these reasons, Burke's motion L within his Second Consolidated Motions *in Limine* [247] and Cui's Motion *in Limine* 1 [253] are both denied.

_____
Virginia M. Kendall
United States District Judge

Date: November 1, 2023