IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>*Plaintiff*, )<br>)<br>v. )<br>)<br>EDWARD M. BURKE, PETER J. )<br>ANDREWS, and CHARLES CUI, )<br>)<br>*Defendants.* ) | No. 19 CR 322<br><br>Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

The Government moves to exclude testimony by Dr. Jeffrey Neuschatz, Defendant Peter Andrews's proposed expert witness on memory and detecting deception (Dkt. 241). For the following reasons, the motion is granted.

## BACKGROUND

The Court assumes familiarity with the facts and posture of this case. (*See* Dkts. 196, 287, 301). For brief context, Count 10 of the May 30, 2019 Superseding Indictment (the "Indictment") charges Defendant Peter Andrews with making false statements to law enforcement about an alleged extortion scheme targeting Individuals B-1 and B-2, executives of a company that owned a fast-food restaurant in former alderman Defendant Edward Burke's ward. (Dkt. 30, Count 10). During a November 29, 2018 interview with FBI agents, Andrews allegedly made the following false statements:

    i.    Andrews denied ever hearing the name of Individual B-1;

    ii.   Andrews denied ever hearing the name of individual B-2;

    iii.  When asked whether he thought Burke had ever met Individual B-1 and Individual B-2, Andrews said, "I don't know. I don't know."; and

1

>    iv. When asked whether he remembered dealing with Individual B-1 and Individual B-2, Andrews replied, "They may have come in to our office or something. . . . Maybe, I don't know. I don't recall."

(*Id.* at 48).

Andrews offers Dr. Neuschatz's testimony to explain the workings of memory and detecting deception. (Dkt. 274). The Government has moved to exclude Dr. Neuschatz's testimony, arguing it is common sense, confusing, and invades the province of the jury. (Dkt. 24). On November 2, 2023, the Court held a hearing on the *Daubert* motion. (Dkts. 321, 330).

## LEGAL STANDARD

Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), "govern the admissibility of expert testimony." *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 871 (7th Cir. 2021) (citation omitted). Trial judges act as gatekeepers to screen expert testimony for relevance and reliability. *Daubert*, 509 U.S. at 589; *see also C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if:

>    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>    (b) the testimony is based on sufficient facts or data;
>    (c) the testimony is the product of reliable principles and methods; and
>    (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Thus, "the key to the gate is not the ultimate correctness of the expert's conclusions but rather the soundness and care with which the expert arrived at her opinion." *Burton v. E.I. du Pont de Nemours & Co., Inc.*, 994 F.3d 791, 826 (7th Cir. 2021) (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)) (cleaned up).

The Court applies *Daubert* flexibly, consistent with its gatekeeping function. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). Employing a three-part analysis, the Court evaluates: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Anderson v. Raymond Corp.*, 61 F.4th 505, 508 (7th Cir. 2023) (quoting *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017)). The relevance inquiry asks "whether the testimony will assist the trier of fact to understand the evidence or determine a fact in issue." *Gopalratnam*, 877 F.3d at 779 (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)) (cleaned up). The expert's proponent bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *See id.* at 782; *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment. If the Court determines that an expert's testimony is admissible, "any questions or problems concerning the expert's opinion and testimony may be thoroughly explored during the cross-examination of the expert witness." *United States v. Perez*, 612 F.3d 879, 886 (7th Cir. 2010).

## DISCUSSION

### A.    Dr. Neuschatz's Qualifications

Dr. Neuschatz is a psychology professor at the University of Alabama in Huntsville. (Dkt. 241-1 at 2). He holds a Bachelor of Arts in psychology from Roger Williams University, a Master of Arts in experimental psychology from the State University of New York at Cortland, and a Ph.D. in cognitive psychology from Binghamton University. (*Id.*) In his research, Dr. Neuschatz focuses on memory and eyewitness identification. (*Id.* at 19; Dkt. 330 at 16:16–17:3). He has published around 50 peer-reviewed articles (including around 35 on human memory), three books, and several more book chapters and articles, and presented at over 100 conferences. (Dkt. 241-1 at 3–18; Dkt. 241-2 at 2; Dkt. 330 at 17:4–19:5). Dr. Neuschatz has given expert testimony in over

3

100 cases—almost always as a memory expert. (Dkt. 241-2 at 2; Dkt. 330 at 23:14–22). The Government does not contest Dr. Neuschatz's qualifications. (*See generally* Dkt. 241). Considering his extensive experience, Dr. Neuschatz is qualified to testify as an expert on memory.

**B.     Reliability of Dr. Neuschatz's Methodology**

Reliability "is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013). Factors that may bear on an expert's reliability include "whether the methods have been tested or subject to peer review and whether they are generally accepted in the field." *United States v. Truitt*, 938 F.3d 885, 890 (7th Cir. 2019) (citing *Daubert*, 509 U.S. at 593–94). The test for reliability is "flexible," and the factors enunciated in *Daubert* "neither necessarily nor exclusively appl[y] to all experts or in every case." *Kumho Tire*, 526 U.S. at 141. Moreover, expert testimony is not unreliable, "simply because it is founded on [a witness's] experience rather than on data." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010).

In preparing his report, Dr. Neuschatz reviewed photographs and surveillance pictures, transcripts of witness statements, audio recordings of Andrews's FBI interview, and reports of law enforcement. (Dkt. 241-2 at 2). Dr. Neuschatz's proposed expert testimony would explain (1) how human memory functions, relying on the accepted theory of reconstructive memory; and (2) how accurately people can detect deception. (Dkt. 241-2; Dkt. 330 at 24:1–3, 26:21–28:8). Starting with the workings of memory, Dr. Neuschatz's report observes that "[m]emory does not work like a camera or video-recorder," (Dkt. 241- at 2), which is "one of the biggest myths of memory." (Dkt. 330 at 26:7–20). Rather, the human memory is more like a computer, operating in three phases: (1) "encoding"; (2) "storage"; and (3) "retrieval." (Dkt. 330 at 24:5–23).

Instead of recording "a verbatim and complete copy" of an event, "we store the gist of the event, and when we want to retrieve the experience, we fill in gaps in accord with what we know about how the world works." (Dkt. 241-2 at 2). The reconstructive process may or may not be accurate: people can hold memories of non-existent events or retrieve memories differently each time. (*Id.* at 2–3). According to Dr. Neuschatz, personally or emotionally significant events are more likely to be stored accurately. (Dkt. 241-2 at 3; Dkt. 330 at 25:4–26:1). Yet, some of these generally accepted conclusions about memory are not so intuitive, Dr. Neuschatz's report points out, citing survey studies suggesting that laypersons' beliefs about memory are out of step with scientific opinion. (Dkt. 241-2 at 3). Specifically, laypeople are more likely than experts to believe that memory works like a video recorder, that events "do[] not change in memory," and that "people are more likely to notice unexpected events." (*Id.*)

In addition to flaws in encoding or storage, "retrieval, or accessing the information in memory, is the cause of many memory errors." (*Id.*) That is, people are sometimes unable to access stored memories. (*Id.*) As examples of this occurrence, Dr. Neuschatz points to the common experience of being unable to remember a known person's name or the "tip of the tongue phenomenon." (*Id.* at 3–4). Studies have shown that retrieval cues, context, and rehearsal can help people remember things. (*Id.* at 4–5; Dkt. 330 at 32:9–34:2). Thus, "[c]ompared to the traditional question and answer style of police interviewing," the "Mental Context Reinstatement" stage of the "Cognitive Interview" technique—in which "witnesses are asked to reinstate the environmental context at the time of encoding, including sights, sounds and smells, as well as their psychological state at the time of the incident"—"has repeatedly shown to produce a larger amount of accurate recall with a negligible increase in inaccurate information being recalled." (Dkt. 241-2 at 4–5).

5

Conversely, the passage of time "leads to forgetting, which in turn leads to inaccurate or distorted memories." (*Id.* at 5). When people "learn new information during the retention interval"—meaning, "the amount of time that elapses between the person's initial experience of an event and the person's attempt to remember information about the event"—the new information can distort the original memory. (*Id.*; Dkt. 330 at 34:3–35:4). Studies have indicated that "longer retention intervals lead to poorer face memory and worse identification performance." (Dkt. 241-2 at 5–6). In addition, the impact of new, or "post-event," information—especially of the misleading variety—is "one of the most widely studied topics in memory." (*Id.* at 7; Dkt. 330 at 29:5–21). The phrasing of questions, studies have revealed, can prompt people "to believe they remember an event even though they do not have an actual or accurate recollection." (Dkt. 241-2 at 7–8; Dkt 330 at 29:22–31:7). "Memories are more susceptible to impairment when the post-event information is given by a credible source," like "an authority figure, parent, or trusted friend." (Dkt. 241-2 at 8; Dkt. 330 at 31:8–11).

Applying some of these principles, Dr. Neuschatz's report opines that Andrews may not have remembered Individuals B-1 and B-2 during his FBI interview until receiving retrieval cues from the agents. (Dkt. 241-2 at 5). People "forget or misremember things all the time especially if the events have no personal significance," so Dr. Neuschatz would be unsurprised if Andrews did "not remember people he encountered briefly a long time ago." (*Id.*) Since Andrews's FBI interview occurred 17 months after his interaction with Individuals B-1 and B-2, he had "ample time" to forget or suffer from memory distortion. (*Id.* at 6–7). Plus, Andrews may have been "more susceptible to suggestion." (*Id.* at 6–7). The FBI agents, by mentioning the names of Individuals B-1 and B-2 and their relationship to Burke, could have altered Andrews's memory—making it "unclear" whether Andrews then remembered "events actually witnessed or the implanted external

6

factors suggested to him." (*Id.* at 7–8). Still, Dr. Neuschatz would "take no specific position on the accuracy of [Andrews's] memories." (*Id.* at 1).

Then, in Dr. Neuschatz's report on detecting deception,[1] he explains that "[i]t is very difficult to detect when people are lying, including whether they are lying about their recollection of events." (*Id.* at 8). Dr. Neuschatz relies on studies suggesting that college students detect lies "at chance levels," and police officers may fare no better. (*Id.* at 8–9). Another study found that police officers detected deception slightly better than chance. (*Id.* at 9). But police officers' commonly held beliefs that lies correlate with eye contact or fidgeting have "little to no empirical support." (*Id.*) Dr. Neuschatz's report does not explain how detecting deception applies to this case. Yet, he concludes: "In my review of witness' statements and witness testimony, there are replete examples which can be expanded upon in expected trial court testimony, which bear on the reliability of those statements and testimony years later." (*Id.* at 9).[2]

Dr. Neuschatz's proposed testimony does not suffer from a reliability problem. He grounds his theories in scientific studies, showing that they have general acceptance in the field. Although Dr. Neuschatz does not engage deeply with the facts of the case, the Court does not fault him for keeping some distance from the ultimate issue of whether Andrews lied during his FBI interview. To the extent Dr. Neuschatz puts his theories into action, the application is mostly straightforward—reflecting the "soundness and care" expected of experts. *See United States v. Protho*, 41 F.4th 812, 822 (7th Cir. 2022) (quoting *Schultz*, 721 F.3d at 431); *see also, e.g.*, *Blackmon v. City of Chicago*, 2022 WL 3908593, at *4–5 (N.D. Ill. Aug. 30, 2022). By steering

---

[1] At the hearing, Andrews's counsel decided not to examine Dr. Neuschatz on detecting deception. (Dkt. 330 at 9:11–10:8).
[2] To the extent Dr. Neuschatz intends to apply any concepts to this case in ways he has not yet explained, the Court cannot assess the reliability of that testimony. *See* Fed. R. Crim. P. 16(b)(1)(C)(iii) (requiring expert disclosures to include "a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case in chief" and "the bases and reasons for them").

clear of strong, unsupported conclusions about Andrews, Dr. Neuschatz has remained "within reliable scientific bounds." *See Protho*, 41 F.4th at 822; *cf. Textron*, 807 F.3d at 837 (explaining that exclusion of expert testimony is proper when "there is simply too great an analytical gap between the data and opinion proffered" (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997))).

What gives the Court pause is Dr. Neuschatz's unclear application of retrieval cues and post-event information to the facts of this case. On one hand, Dr. Neuschatz suggests that "[m]ore retrieval cues" from the interviewing FBI agents "might have helped" jog Andrews's memory. (Dkt. 241-2 at 5). On the other hand, Dr. Neuschatz opines that the FBI agents could have distorted Andrews's memory by mentioning Individuals B-1 and B-2. (*Id.* at 8). Since Dr. Neuschatz takes no clear position on whether the agents gave Andrews helpful or misleading cues, (*see* Dkt. 330 at 49:14–50:13), his report invites potentially inconsistent inferences about Andrews's memory during the interview. Nonetheless, Dr. Neuschatz would avoid definitive opinions about Andrews's memory. (*See* Dkt. 330 at 55:5–57:16, 59:16–60:20, 71:8–72:8, 74:15–75:5, 78:1–11). More than reliability, therefore, the unclear application of concepts in Dr. Neuschatz's report speaks to the proposed testimony's helpfulness.

C.  **Relevance of Dr. Neuschatz's Opinions**

Relevance is the primary weakness in Dr. Neuschatz's proposed testimony. No doubt, expert testimony on memory can be helpful to jurors—particularly in cases involving eyewitness identifications. *See United States v. Carter*, 410 F.3d 942, 950 (7th Cir. 2005) ("[E]xpert testimony regarding eyewitness identification, memory, and perception is not per se unhelpful." (quoting *United States v. Welch*, 368 F.3d 970, 974 (7th Cir. 2004), *vacated on other grounds*, 543 U.S. 1112 (2005))); *cf. United States v. Bartlett*, 567 F.3d 901, 906 (7th Cir. 2009) ("Expert evidence

8

can help jurors evaluate whether their beliefs about the reliability of eyewitness testimony are correct."); *see also Blackmon*, 2022 WL 3908593, at *5 (collecting cases). But his testimony would not be helpful here.

Andrews hopes for Dr. Neuschatz to bolster his faulty-memory theory, which goes like this: Andrews had met Individuals B-1 and B-2 only briefly, and so, during his FBI interview 17 months later, he could not remember Individuals B-1 and B-2 until the agents prompted a vague memory to resurface. (*See* Dkt. 274 at 5, 7). Yet, the applicable principles from Dr. Neuschatz's proposed testimony—memory is fallible, it can fade over time, and it can be refreshed—are within the realm of common experience and knowledge. *See Carter*, 410 F.3d at 950 ("In general, . . . jurors understand that memory can be less than perfect."); *Welch*, 368 F.3d at 974 ("[I]t does not require an expert witness to point out that memory decreases over time."); *United States v. Labansat*, 94 F.3d 527, 530 (9th Cir. 1996) ("It is common knowledge that memory fades with time."); *United States v. Redwood*, 216 F. Supp. 3d 890, 897 (N.D. Ill. 2016) ("[E]very juror will already know that a witness's ability to perceive something could be affected by whether and for how long the witness could see or hear it, and whether the witness was focused or distracted."); *United States v. Shiraishi*, 2019 WL 1386365, at *5 n.7 (D. Haw. Mar. 27, 2019) (finding expert testimony on "how memories can fade over two years and how details can become somewhat inaccurate" unhelpful because it "falls within the common knowledge of the average layman"); *United States v. Heine*, 2017 WL 5260784, at *3 (D. Or. Nov. 13, 2017) (excluding expert testimony that "memories are fallible and may deteriorate over time" as "within the ken of the ordinary juror"). On these topics, Dr. Neuschatz's testimony would merely attach scientific labels to ideas that are familiar to the average juror. *See, e.g.*, *United States v. Libby*, 461 F. Supp. 2d 3, 12 (D.D.C. 2006) ("Although the average juror may not understand the scientific basis and labels

attached to causes for memory errors, jurors inevitably encounter the frailties of memory as a commonplace matter of course."). Understanding Andrews's side of the story does not require expert help.

Of course, Dr. Neuschatz's theories are not all common sense; his report suggests the opposite, observing studied tension between lay and expert opinion on certain aspects of human memory. *See Webster v. Daniels*, 784 F.3d 1123, 1143 (7th Cir. 2015) ("We have often pointed out the dangers of relying on 'common sense' when social science reveals that common assumptions are wrong."); *United States v. Williams*, 522 F.3d 809, 811–12 (7th Cir. 2008) ("If there is one thing known about eyewitness identification, it is that 'common sense' misleads more often than it helps."). But the less intuitive concepts in Dr. Neuschatz's proposed testimony have little to do with Andrews's faulty-memory defense. In deciding whether Andrews truthfully could or could not recall Individuals B-1 and B-2 during the FBI interview, the jury may picture Andrews's memory as a video recorder attempting to rewind the tape or a computer searching for a file. The theoretical distinction does not seem to matter.

Nor would it help the jury to hear expert testimony suggesting that post-event information or misleading retrieval cues could have changed the details of Andrews's memories relating to Individuals B-1 and B-2. Without clarifying whether or how post-event information or retrieval cues might have affected Andrews's memory, this line of testimony would only invite confusion. In short, this case does not present the sort of "unique circumstances" that may justify expert testimony on memory. *See Redwood*, 216 F. Supp. 3d at 899 (citing *Carter*, 410 F.3d at 950, *Newsome v. McCabe*, 319 F.3d 301, 306 (7th Cir. 2003), and *Libby*, 461 F. Supp. 2d at 18).

Weighing the helpfulness of Dr. Neuschatz's testimony "against the costs of collateral inquiries," the costs are far heavier. *See Bartlett*, 567 F.3d at 906 (cautioning that expert testimony

10

on memory can "sidetrack a trial"); *Carter*, 410 F.3d at 950 (collecting cases); Fed. R. Evid. 403. Dr. Neuschatz's testimony would needlessly prolong the trial while emphasizing and overcomplicating intuitive concepts. *See Redwood*, 216 F. Supp. 3d at 898. Although Dr. Neuschatz would not offer strong conclusions about Andrews's memory, the dangers remain that jurors would struggle to apply Dr. Neuschatz's concepts or misconstrue his expert testimony as a signal to leave their common sense and collective wisdom at the door. *See Libby*, 461 F. Supp. 2d at 18 (finding that expert testimony on "the general principles of memory and cognition 'may cause jurors to surrender their own common sense in weighing the testimony,' and instead cause them to rely too heavily upon [the expert's] testimony" (quoting *Bastow v. Gen. Motors Corp.*, 844 F.2d 506, 510–11 (8th Cir. 1988))) (cleaned up); *Redwood*, 216 F. Supp. 3d at 898 (same); *see also United States v. Christian*, 573 F.3d 702, 710 (7th Cir. 2012) ("[A] witness should not be allowed to put an 'expert gloss' on a conclusion that the jurors should draw themselves." (quoting *United States v. York*, 572 F.3d 415, 423 (7th Cir. 2009))). In that sense, Dr. Neuschatz's testimony would encroach on the jury's province. Thus, Dr. Neuschatz's proposed testimony on memory is inadmissible under Rules 702 and 403.

Dr. Neuschatz's testimony on detecting deception also appears irrelevant. After suggesting that detecting lies is "very difficult"—even for law enforcement officers—Dr. Neuschatz's report does not explain whose ability to detect deception may be at issue in this case. (*See* Dkt. 241-2 at 8–9). According to Andrews, the relevance of this topic hinges on the Government's introduction of testimony by the interviewing FBI agents about Andrews's apparent emotional state or body language during the interview. (Dkt. 274 at 10–11; Dkt. 330 at 9:11–10:8). The Court previously granted Andrews's motion *in limine* to exclude one agent's recorded statement during the interview that Andrews "seem[ed] emotional." (Dkt. 316 at 1–2). Yet, the Court declined to impose

11

an outright bar on testimony by the interviewing agents about Andrews's emotional state or body language. (*Id.* at 2). Because the jury is capable of judging the credibility of the witnesses using their common sense and applying all facts and circumstances to the event, Dr. Neuschatz's testimony on detecting deception is excluded.

## CONCLUSION

For the reasons above, the Government's motion to exclude Dr. Neuschatz's testimony [241] is granted.

_____
Virginia M. Kendall
United States District Judge

Date: November 20, 2023