IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *Plaintiff* | ) | |
| | ) | Case No. 19 CR 322 |
| v. | ) | |
| | ) | Honorable Virginia M. Kendall, |
| CHARLES CUI | ) | *Presiding Judge* |
| *Defendant* | ) | |

## DEFENDANT CUI'S SENTENCING MEMORANDUM

The defendant, Charles Cui, by counsel, respectfully submits the following sentencing memorandum.

## I. Introduction

A consideration of the §3553(a) factors weigh heavily against the severe guideline range and recommendation of a lengthy period of incarceration requested by the government. Charles Cui immigrated to the United States from China nearly thirty years ago with the intent to better his life. Through hard work and dedication, Charles became a devoted family man, loving husband, successful lawyer and businessman, and valued member of the community. The circumstances of this case, weighed against a lifetime as a productive citizen, contributions to his community and family, lack of criminal history, and the limited time frame of criminality warrant a below-guideline, non-custodial sentence, namely a term of probation or home confinement.

## II. The §3553(a) factors support a below guideline sentence.

"When a defendant appears for sentencing, the sentencing court considers the defendant on that day, not on the date of his offense or the date of his conviction." *Concepcion v. United States*, 597 U.S. 481, 486 (2022), citing *Pepper v. United States*, 562 U.S. 476, 492 (2011). While a judge must consider all the §3553(a) factors, she is "not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances." *U.S. v. Jones* 460 F.3d 191, 195 (2nd Cir. 2006).

### A. The Nature and Circumstances of the Offense

Mr. Cui challenged the government's case at trial. While disappointed in the result, he is respectful of the justice process and thankful for the jurors' hard work. He was convicted of bribery and making a false statement in one of the government's four-arc episodes presented at trial. The defense and Mr. Cui acknowledge that these are serious offenses that erode public confidence in governmental processes. However, without deprecating the seriousness of the convictions, certain aspects of the offenses warrant consideration.

#### i. Bribery Convictions

Mr. Cui's real estate project at the Six Corners in Portage Park was designed to bring vitality to the neighborhood and having a major retailer like Binny's undoubtedly brought value to the community. The community wanted Binny's at that location. As Judy Frydland testified, "the concern was really with Binny's, to get Binny's into there. And for the economic development and getting storefronts

occupied and moving forward, it would be good to have Binny's there. It would be good for them to have the sign. Irrespective of everything else going around in, you know, the situation, it was a good thing." Tr. 3523. Binny's remains at that location to this day, and the neighborhood is revitalized. The defense does not suggest that good intentions excuse a bribe, but the circumstances here are less harmful and deserving of a lesser punishment than instances where the bribe runs contrary to the public interest.

Mr. Cui was a real estate developer, but somewhat inexperienced regarding a project of this size. He did not begin the project with any preexisting intent to bribe Edward Burke ("Burke"). *See, United States v. Nachamie*, 121 F. Supp.2d 285, 297 (S.D.N.Y. 2000) (Scheindlin, J.) (affirming that a district court may consider "a defendant's initial lack of intent" in medicare fraud scheme). When Mr. Cui sought TIF funding in 2016, he made no effort to hire Burke's firm, and the government stipulated that there was no allegation of wrongdoing in relation to the passage of the TIF deal.

No money was ever paid as the bribe was only the possibility of legal fees that never came to fruition. Klafter and Burke performed legal services for Mr. Cui but never received any fees because the firm was unsuccessful in obtaining tax relief. While the success of the bribe is not required for a conviction, it is mitigating that no money was ever tendered to Mr. Burke. In addition, the purported motivation for the bribe — to avoid a 15-year rent reduction —  never materialized. Binny's never

3

attempted to enforce the windfall of a 15-year rent reduction, opting instead to settle the matter for $60,000. *See*, Tr. 2101.

There was also nothing particularly complex about Mr. Cui's conduct. Mr. Cui took no surreptitious actions behind the back of government officials. There were no secret meetings or coded language, and no meetings or phone calls with Mr. Burke whatsoever. The emails make clear his intention to obtain the pole sign for his tenant. When Cui's email openly advised his lawyer of his plan to retain Mr. Burke's law firm because he needed Mr. Burke's "favor," his attorney offered no rebuke or caution. While this did not rise to the level of an advice of counsel defense, it may be considered in viewing the context of the offense.

No pressure was exerted to obtain the pole sign. The "official act" consisted of Burke's phone calls to city employees Judy Frydland and Patricia Scudiero. Both women testified that Burke exerted no pressure or made any request to reverse the denial of the pole sign. Tr. 3542, 3744, 3780.

### ii. §1001

Like the bribery charges, making a false statement to an agent is a serious matter, however, the Court may consider facts that mitigate the offense. First, without a special verdict form, it is unclear which of the three charged statement were found to be false. Even assuming the jury found all three statements to be the basis of the conviction, these statements should be viewed in the context of the entire interview. The first false statement is that Mr. Cui made no business offers to Burke during the pole signage matter. Although Mr. Cui did not connect the firm's hire to

4

the pole sign, he readily disclosed his retention of Burke's firm. Tr. 145-T at 14. The other two statements – that he hired Klafter and Burke because it was a good firm and the response to the catch-all question that he provided information to the best of his knowledge – are peripheral compared to the information he did disclose. Any of the three charged false statements, when viewed in the context of the entire interview, are minimally significant. *See, United States v. Silveira*, 297 F. Supp. 2d 349, 358-60 (D. Mass. 2003), (granting a downward departure where the defendant's materially false statements were of lesser significance than his materially truthful statements and deemed "peripheral").

The statements are only a small part of the interview in which Mr. Cui made truthful disclosures about his contact with Burke, including the following: (1) he and his lawyer met with Burke regarding his TIF funding; (2) he contacted Burke about the pole sign but it did not help as the pole sign was removed; (3) he never met with Burke in person regarding the pole sign or tax work; (4) he never directly spoke with Burke; (5) he hired Klafter and Burke for property tax work; (6) he made a phone call to Burke's assistant; and (7) he spoke to Ray Chin about reaching out to Burke. GX 145-T. Cui was forthright about his interactions with Burke and did not seek to hide his connection to Burke. In fact, he was the first person to mention Burke's name during the interview. According to the agent, Mr. Cui displayed no obstructive behavior during the interview, and advised the agent he could speak with Mr. Cui's attorney. Tr. 3904, 3914, 3920, 3921-22. Mr. Cui had no prior notice of the interview and was asked to recall events that happened over a year earlier. Tr. 3869, 3884,

5

3888, 3899. Agents also never showed him any emails or documents to refresh his recollection.

### B. Mr. Cui's Personal History and Characteristics

<u>Upbringing and Education</u>

Mr. Cui has led an exemplary life of hard work and devotion to family. He was born in 1971 in Haiyang (central China). His father worked for the local county government, primarily in the health administration office and his mother was a stay-at-home mom. His parents valued education, and they saved whatever they could to send Charles and his siblings to college. Charles obtained his bachelor's degree in communications and law in Shanghai at an international studies university in 1993. After working briefly at a national newspaper in Beijing, he came to the United States, in 1995, to study communications at Southern Illinois University. He transferred to the University of Illinois, Champaign, and received his master's degree in communications and business administration. After graduation, Mr. Cui worked for an immigration law firm in Skokie, Illinois. He then attended law school graduating from Chicago-Kent College of Law with an LLM certificate and a law degree. PSR ¶ 101. He became a naturalized U.S. citizen in 2004. PSR ¶82.

<u>Professional success and integrity</u>

Mr. Cui developed a successful immigration law practice handling thousands of cases over the course of his career. He represented numerous clients who sought to bring their families to the United States, including helping asylees have a chance to start new lives in America. Prashanth Mahakali remembers Charles helping him

6

"every step of my journey from being a professional with a work visa to a citizen and successful business owner." Letter of Prashanth Mahakali. *See*, character letters attached as Exhibit A. George Bellas, his business attorney attests,

> He is one of the most experienced and able immigration lawyers I have ever encountered in my 50+ years of practice. I have observed Charles' treatment of his clients with the upmost regard for their best interests. He places the best interests of his clients above any other consideration and further considers their financial wherewithal. Charles has proven to be a[n] honorable person whose promise to his clients is his bond.

Letter from George Bellas; *see also,* Letter of McKenna Guertin ("his dedication to his clients is unparalleled…treating each client with genuine care and respect"). Amalfi Diaz has worked at the immigration law practice for 19 years and confirms Mr. Cui has a "strong commitment to his clients" and "approaches his work with a level of dedication and professionalism that is truly commendable." Letter of Amalfi Diaz. Mr. Diaz has seen Mr. Cui invest "significant time and effort into ensuring that his clients' needs are met." *Id.*

Mr. Cui has been a dedicated and hard-working attorney for many years, helping people in difficult circumstances and prioritizing client's needs. His commitment to helping others demonstrates that a lengthy sentence is not necessary in this case.

<u>Family Ties & Support</u>

Charles's main focus in life is his family. He married his wife, Carley, in 2008. They have two children together: a 15 year-old daughter and a 14 year-old son. He also has an 18 year-old stepson, Mathias. (Carley's son from a previous marriage). As detailed more fully in Carley's letter, their son Mathias ▮▮▮▮▮▮▮▮▮▮,

7

██████ and "parenting a child with these special needs, has been one of our greatest challenges." Letter of Carley Cui. Charles is Mathias' primary father-figure as Mathias's biological father is not active in his life and "not capable of providing financial support or guidance." *Id*. Charles has been "integral in helping Mathias" with his challenges. *Id*. Mathias recently finished high school and is now attending a local community college, with Charles and Carley covering his tuition and living expenses. Mathias credits Charles' guidance and support for giving him hope for a bright future, emphasizing Charles' role as a hardworking and disciplined role model who teaches the difference between right and wrong.

Mr. Cui's other two children are in high school where they are straight A students. Charles and Carley support their son's aspirations to become a professional golfer, investing significant time and resources to help their child's dream come true. They are equally supportive of their daughter and her academic and extracurricular pursuits. Mr. Cui is a present, dedicated, and devoted, father, fostering a special relationship with each of his children.

The character letters depict the sincere acts of a man who is utterly committed to his family. Letter of Ethan Meister (Charles is "a dedicated father and family man"). His in-laws "have marveled at his dedication to God, his wife (our daughter), and his children. Charles is a man that, when he comes home from work, hangs up his 'work' hat and puts on his 'honey' and 'daddy' hat. He is always first to offer a hand for any task that needs doing." Letter of Nancy and Patrick Sullivan.

8

Mr. Cui's wife, Carley, describes Mr. Cui as a "super-loving, dedicated father" and a "great human being" who is "always trying to do the best at anything he does." *See* PSR ¶80. Aline Grange, Carley's grandmother, has also witnessed Charles's kindness and generosity firsthand. Despite her advanced age and the loss of her husband, Aline has received consistent support from Charles, who ensures that her needs are met and surprises her with birthday dinners. Aline describes Charles as one of the nicest people that she has ever met, highlighting his dedication to his family and his role as a hardworking and loving husband and father. Letter from Aline Grange.

Charles also enjoys close relationships with his extended family. His niece, in China, attests to his selflessness and dedication. Arriving in the United States in 2012 as a college student, she faced numerous challenges but found unwavering support from Charles. He provided her with guidance, emotional support, and even legal assistance, helping her secure permanent residency. His actions profoundly impacted her life. Letter of Di Chen. Despite the physical distance between them, he maintains regular communication with his siblings in China, and they remain supportive of him during his current legal challenges.

Mr. Cui has lived his life trying to be a good husband, father, and member of the community. As the letters attest, he relies on his family and his faith, and tries to help others whenever possible. Letter of Carley Cui. Dr. Eman Alsahlani writes, Charles "is always willing to listen, offer advice, and provide support when needed. His warmth, empathy, and kindness have created a sense of belonging and unity

9

among our neighbors, and he is highly regarded by those who know him." Letter of Dr. Eman Alsahlani; *see also*, Letter from McKenna Guertin ("his mentorship has been instrumental in my professional development, and I am eternally grateful for his belief in my potential when others did not"). Now, his family and community stand ready to support him.

### C. The Need to Provide Adequate Specific and General Deterrence, Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

Based on his lifetime of otherwise lawful behavior, re-offending is not a serious risk here. Nevertheless, any concerns related to specific deterrence can be achieved by a below guideline, non-custodial sentence. First, Mr. Cui is 53 years old. Recidivism rates decline relatively consistently as age increases. *See,* U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders,* p. 3, 22-23 (Dec. 2017). Recidivism rates are strongly correlated to age and the guidelines' ranges do not account for this fact, despite the importance of age in calculating recidivism. *United States v. Carter*, 538 F.3d 784, 791-92 (7th Cir. 2008).

Mr. Cui also has no criminal history and qualifies as a zero-point offender. Studies by the United States Sentencing Commission demonstrate that individuals in lower criminal history categories are less likely to recidivate. *See*, U.S. Sent'g Comm'n, The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders, pp. 7-8, (March 2017) (finding that the higher the criminal history category of an individual, the higher the recidivism rate).

10

General deterrence can also be satisfied by a non-custodial sentence. A federal felony conviction, and all the collateral consequences that accompany that label, provides a strong deterrent to the general public. Here, upon being indicted, Mr. Cui lost the TIF funding for the Six Corners project. As a result, the property went into foreclosure, and he is being sued for his personal guarantee on the loan. His law license is suspended, and he will eventually be disbarred. Even a probationary or home confinement sentence will send a strong message to the public who sees Mr. Cui lose his development, his investment, his law license, and become a convicted felon. Courts "should consider general deterrence but must also hand down an individualized sentence." *United States v. Molton*, 743 F.3d 479, 486 (7th Cir. 2014), *quoting Gall v. United States*, 552 U.S. 38, 50 (2007).

### D. Unwarranted Sentencing Disparities

Courts may consider an unwarranted sentencing disparity between co-defendants under §3553(a). *United States v. Moore,* 50 F.4th 597, 604 (7th Cir. 2022). Here, Co-defendant Burke had a guideline range of 78 to 97 months. Tr. 134. The Court determined Mr. Burke merited a sentence of two years' imprisonment, a $2 million fine, $65,000 in restitution, and $13,000 special assessment. Dk. #512. Even though Mr. Cui was convicted of a §1001 offense in addition to the bribery counts, he is significantly less culpable that Burke. Mr. Cui was not a public official, was not charged with racketeering, has a lower benefit amount under §2C1.1, lower guideline range, and no restitution. He was only involved in one of the four criminal episodes presented by the government at trial. While both Burke and Mr. Cui were convicted of bribery related to the pole sign, Burke also was convicted of racketeering (Post

11

Office, Field Museum, Burger King, and pole sign), extortion (Field Museum), and bribery (Post Office). While every defendant is viewed individually, and Burke's age and good deeds played a role in his sentence, he was convicted of more offenses, and more serious offenses, than Mr. Cui.

### E. The Need to Take Into Account the Types of Sentences Available

There is no mandatory minimum sentence, and Mr. Cui is statutorily eligible for probation or an alternative sentence with a period of home confinement. Such a sentence satisfies the dictates of §3553(a). In addition to providing a strong deterrent effect, a felony conviction alone is a significant punishment, reflects the seriousness of the offense, and promotes respect for the law. *See, United States v. Engler*, 806 F.2d 425, 440 (3rd Cir. 1986) ("[I]t has been traditionally recognized that collateral consequences of felony convictions are both inevitable and serious"); *Parker v. Ellis*, 362 U.S. 574, 593-94 (1960) (Warren, C.J. dissenting) ("[C]onviction of a felony imposes a status upon a person which … seriously affects his reputation and economic opportunities"); *United States v. Warner*, 792 F.3d 847, 860 (7th Cir. 2015) *citing Gall*, 552 U.S. at 48. Mr. Cui is now a convicted felon, a permanent consequence that will undoubtedly affect his life and employment.

Probation is "a substantial restriction of freedom" rather than "an act of leniency." *Gall,* 552 U.S. at 43 (affirming below guideline sentence of probation). Probationers "do not enjoy the absolute liberty to which every citizen is entitled." *United States v. Knights*, 534 U.S. 112, 119 (2001). As a sentencing option, it is imposed when it is sufficient but not greater than necessary to satisfy the goals of

12

§3553(a). *See, United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008) (defendant convicted of conspiracy to defraud Medicare of over five million dollars received sentence of three months incarceration and 24 months' probation despite guideline range of 63 to 78 months); *United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008) (defendant convicted of copyright fraud involving over one million dollars properly sentenced to probation, community service, and substantial restitution despite guideline range of 41 to 51 months); *United States v. Boumenot*, No. 09-CR-194, 2010 WL 145848 (E.D.Wis. 2010) (Adelman, J.) (sentence of probation where mortgage fraud involved over $200,000 in actual losses). The U.S. Sentencing Commission reported, for the Fourth Quarter of 2023, that 23% of defendants convicted of bribery/corruption received sentences of probation or an alternative to probation[1]. Here, a term of probation or home confinement subject to any conditions the Court deems appropriate would provide just punishment and satisfy the goals of §3553.

In addition, a false-statement offense does not equate to a prison sentence. For example, in *United States v. Desmond*, 2008 WL 686779 (N.D. Ill. 2008) the defendant was sentenced to probation despite an advisory Guidelines range of 63 to 78 months based on a loss amount of $14.7 million for perjury and wire fraud where the offense level determined substantially overstated the seriousness of the offense. *Id. see, also United States v. Davis,* 16-CR-524-1, Dkt.18 (N.D. Ill.) (imposing a sentence of one year probation for a false statement to FBI regarding "Public Official A"). Accordingly, even in light of the §1001 conviction, a sentence less severe than that

---

[1] USSC_Quarter_Report_4th_FY23.pdf

which Mr. Burke received would not deprecate the seriousness of the offense and would avoid an unwarranted sentencing disparity.

The collateral consequences of the felony conviction for Mr. Cui – including imminent disbarment – also increase the overall severity of the punishment. *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."); *see also, United States v. Ballentine*, 2019 WL 1112273, at *3 (N.D. Ill. Mar. 11, 2019) (noting that the district court considered, among other factors, "the likely collateral consequence of disbarment," in imposing a sentence of one day imprisonment, three years' supervised release, a special assessment of $600, and $140,940 in restitution, which was far less than the nearly $3 million requested by the government, after a jury convicted the defendant of mail fraud, wire fraud, financial institution fraud, and making false statements to a financial institution); *see also United States v. Nesbeth*, No. 15-CR-18 (E.D.N.Y. May 25, 2016) (sentencing a drug defendant to probation despite a guideline range of 33-41 months in part based on the "nearly 50,000 federal and state statutes regulations that impose penalties, disabilities, or disadvantages on a convicted felon").

There is also no doubt that the charges themselves have imposed significant punishment. As argued *supra*, the City cancelled the TIF funding after the indictment, and the lender foreclosed on the property. Mr. Cui has lost his entire investment in the Six Corners project and the lender is suing him for $13 million, including the balance of the loan and an enormous amount of penalties and interest.

14

His law license is suspended, and disbarment will follow. His conduct cost him his profession, reputation, and a felony conviction. *United States v. Dominguez,* 296 F.3d 192, 199-200 (3rd Cir. 2002) (finding significant punishment was not necessary for a defendant who lost her employment, reputation, and shamed her family for no gain).

### III. Conclusion

Mr. Cui recognizes his actions are what brought him here today and nothing herein is intended to diminish the seriousness of the offenses. However, several compelling factors support a below-guideline, non-custodial sentence. Mr. Cui was charged and convicted in only one of the government's four-episode arc. His offenses occurred over a short period, late in his life, resulting in an extremely low risk of recidivism. There is no restitution, but Mr. Cui will nevertheless suffer significant financial penalties based on the pending lawsuit. He also lost his real estate project, his investment, his law license, and his law practice. His lifetime of hard work to make something of himself and make his family proud is now tarnished with a felony conviction. He has an extremely loving, and supportive family and community who have attested to his lifetime of service and support. Mr. Cui understands the seriousness of his conduct. However, the charged offenses stand in stark contrast to his otherwise exemplary life and character. Considering the unique history of Mr. Cui, including his life circumstances, lack of criminal history, significant employment background, and supportive family, he respectfully requests the Court to consider a below-guideline, non-custodial sentence. Such a sentence is sufficient but not greater than necessary to satisfy the requirements of §3553(a).

15

                                          Respectfully submitted,

                                          /s/ *Susan M. Pavlow*
                                          Attorney for defendant


SUSAN M. PAVLOW
Attorney for Defendant
53 West Jackson Boulevard, Suite 1550
Chicago, Illinois 60604
312-322-0094
smpavlow@mac.com


ADAM SHEPPARD
Attorney for Defendant
180 North LaSalle Street, Suite 2510
Chicago, Illinois 60601
312-443-1233
adam@sheppardlaw.com